```
1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
2

3      United States of America,      ) Criminal Action
                                      ) No. 19-cr-255
4                      Plaintiff,     )
                                      ) JURY TRIAL
5      vs.                            ) DAY 2
                                      )
6      Frederick Gooding,            ) Washington, DC
                                      ) September 7, 2022
7                      Defendant.     ) Time:  1:30 p.m.
       _____
8
                         TRANSCRIPT OF JURY TRIAL
9                            HELD BEFORE
                    THE HONORABLE JUDGE TANYA S. CHUTKAN
10                     UNITED STATES DISTRICT JUDGE

11     _____

                         A P P E A R A N C E S
12
       For Plaintiff:      JILLIAN D. WILLIS, ESQ.
13                         JIL SIMON, ESQ.
                           U.S. Department of Justice
14                         1400 New York Avenue NW
                           Washington, DC 20005
15                         (202) 353-0822

16     For Defendant:      MICHAEL J. KHOURI, ESQ.
                           Khouri Law Firm, APC
17                         2222 Martin, Suite 215
                           Irvine, CA 92612
18                         (949) 336-2433
                           FREDERICK D. COOKE, JR., ESQ.
19                         Rubin, Winston, Diercks, Harris & Cooke, LLP
                           1250 Connecticut Avenue NW, Suite 700
20                         Washington, DC 20036
                           (202) 861-0870
21     _____

22     Court Reporter:           Janice E. Dickman, RMR, CRR, CRC
                                 Official Court Reporter
23                               United States Courthouse, Room 6523
                                 333 Constitution Avenue, NW
24                               Washington, DC  20001
                                 202-354-3267
25
```

1       *  *  *  *  *  *  *  * AFTERNOON SESSION *  *  *  *  *  *  *  *

2                    (The jury is not present.)

3             THE COURT:  All right.  Things are going just a

4       little too smoothly.  So, I've been informed by Mr. Bradley

5       that juror seated in seat No. 13 -- is it 13, Mr. Bradley?

6             THE COURTROOM DEPUTY:  That's correct, Your Honor.

7             THE COURT:  The one who had the Vegas trip planned

8       now realizes, having been sworn in as a juror, that she is not

9       scheduled to come back on Monday morning as planned.  She was

10      leaving for the trip on the Friday, coming back -- she'll be --

11            THE COURTROOM DEPUTY:  17th.

12            THE COURT:  Saturday.  She's coming back on the

13      Tuesday.  So she said, "Well, can I be an alternate?"  But

14      Mr. Bradley said he was not going to discuss that with her.  So

15      I have three -- at this point, given that I don't know -- we

16      may even be done sooner.  I'm not inclined to excuse her at

17      this point.

18            There are two options that I think we have.  One is to

19      designate her now as an alternate and just go forward, but not

20      tell her, or wait -- my preference is just to wait until the

21      evidence has been submitted, because it may be that if the

22      evidence is in and, you know -- I don't know, we could always

23      have them start deliberating on Tuesday instead of Monday, or

24      they start deliberating and are finished.  It's still early

25      days.

1          What I'm going to tell her:  We understand her plans,

2     we'll see what we can do.  But we'll get started on the trial

3     and she should continue to serve as a juror.  Maybe when we get

4     closer, maybe into next week, we can decide whether we want to

5     convert her to an alternate or not.

6          Ms. Willis, what's your position?

7               MS. WILLIS:  No objection from the government.

8               THE COURT:  Mr. Khouri?

9               MR. KHOURI:  That's acceptable, Your Honor.

10              THE COURT:  Okay.  All right.

11              MR. KHOURI:  I'm telling Mrs. Khouri that I'll be

12    home for dinner on Wednesday night.

13              THE COURT:  You can make promises to a judge, but you

14    can't break that promise.  Let's bring the jury in.

15              MR. KHOURI:  I have one thing also, Your Honor.  Just

16    very briefly.  At the conclusion of jury selection, I think

17    before the jury was selected, you asked me if I had any

18    objections to the jury and I said no.  I took that question to

19    mean in the manner of the jury selection process.  In pretrial

20    proceedings I objected to the jury or a witness or my

21    client wearing --

22              THE COURT:  With a mask, right.

23              MR. KHOURI:  I want to preserve that.

24              THE COURT:  Yes, that objection is preserved.  For

25    the record, I was asking if you had any objection to the

1    composition of the jurors, the jurors selected, and so on.

2    That's what I meant.

3              MR. KHOURI:  Thank you.

4         (Whereupon Juror 13 enters the courtroom.)

5              THE COURT:  Okay.  Now I remember, during voir dire

6    you said you had plans to go to Las Vegas for the weekend, the

7    weekend of the 17th, is that correct?

8              JUROR 13:  Yes.

9              THE COURT:  MR. Bradley tells me you now realize,

10   instead of coming back the Monday, you're scheduled to come

11   back Tuesday?

12             JUROR 13:  Yes.  We get on the plane on the 19th.

13   Because I didn't book anything, my sisters did.  And so when I

14   asked, she said when we get on the road, and so I just assumed

15   that was for the 19th.  But I realized that, when she sent it

16   over, it says we're leaving on the 19th, but then we're coming

17   into D.C. at 6 o'clock in the morning on a Tuesday.  And I

18   didn't realize that.

19             THE COURT:  Well, ma'am, I'll tell you this:  We're

20   still early in the trial and it may well be that we are done

21   with everything and you're done by that time.  It may be that

22   you -- we can delay a day when you come back -- there are a lot

23   of options we have.  So what I'm going to tell you is that you

24   should continue to participate as a juror.  I know you talked

25   about being an alternate or something.  We don't say who the

1    alternates are.  But we have several options that we will

2    consider as the case goes on.  But for right now, thank you for

3    letting us know.  We'll bear that in mind.  And you should just

4    continue to pay attention to the evidence in the case.

5              JUROR 13:  Okay.  I don't mind.

6              THE COURT:  Thank you very much.

7              JUROR 13:  You're welcome.

8              THE COURT:  Okay.  Bye.

9         (Whereupon Juror 13 leaves the courtroom.)

10             THE COURT:  All right.  You can bring the jury in.

11        While we're waiting, you can address the jury from that

12   lectern there, facing the jury.  Obviously, you can take your

13   mask off while you're doing that.

14        Questioning of a witness -- for opening statement -- now,

15   actually, if you -- if you don't get any closer to the jury

16   than -- because I think I know what Mr. Khouri's preference is

17   going to be -- than the edge of counsel table, I don't think we

18   even need to -- I'm going to trust you to not get any closer to

19   the jury.  You can stand and speak to the jury with the

20   microphone, you don't have to be at that lectern there.  Or we

21   can take -- how easy is it to take out?

22             THE COURTROOM DEPUTY:  I can push it.

23             MS. SIMON:  Your Honor, I don't mind the lectern.  I

24   understood Mr. Khouri was delaying opening.

25             THE COURT:  Okay.  So we don't need to do it right

```
 1    now.  If you want to -- you want them -- you're okay with the

 2    plexiglass?

 3                MS. SIMON:  Does it come -- does it come off?

 4                THE COURT:  It comes off.  It came off up there

 5    pretty quick.  Can you check?  Sometimes that does distort, the

 6    plexi does distort.

 7                THE LAW CLERK:  It's bolted on.

 8                THE COURT:  Oh, well, should have thought of that

 9    before, but -- all right.

10          We'll be breaking at 4:25.  I have a 4:30 judges'

11    meeting.

12          Mr. Khouri are you going to want the plexi off the podium

13    right there when you open to the jury?

14                MR. KHOURI:  Oh, that would be such an imposition.

15    I'll do whatever the government --

16                THE COURT:  It's actually not.  I don't think it's

17    that hard to take down.  I'll check.

18                MR. KHOURI:  I would like to maybe just stand.

19                THE COURT:  That's easier.  We'll push it out of the

20    way.  My limit is the edge of counsel table.  As long as you

21    stay that far away from the jury, you're good.

22                MR. KHOURI:  Understood.

23                THE COURTROOM DEPUTY:  Your Honor, jury panel.

24          (Whereupon the jury panel enters the courtroom.)

25                THE COURT:  All right.  Good afternoon.  You may be
```

1    seated.

2         Good afternoon, ladies and gentlemen.  We had a couple

3    things to discuss, but now we are ready to get started with the

4    actual trial.  And the government is going to make an opening

5    statement.  Ms. Simon.

6         MS. SIMON:  Thank you, Your Honor.  Good afternoon,

7    everyone.

8         THE JURORS:  Good afternoon.

9         MS. SIMON:  This is a case about lies for money, all

10   the lies the defendant told in order to steal millions of

11   dollars from Medicare, a government program providing insurance

12   to elderly folks and people with disabilities.

13        The defendant, Dr. Frederick Gooding, was a medical

14   doctor and he had a doctor's office located right here in

15   Washington, D.C.  From 2015 to 2018 Medicare paid the defendant

16   millions of dollars for spinal injections and knee injections.

17   You will see that the claims the defendant submitted to

18   Medicare for these injections were false.

19        The defendant billed Medicare for spinal injections he

20   never provided.  The defendant billed Medicare for knee

21   injections he never provided, and the defendant billed Medicare

22   for procedures that required equipment the defendant didn't

23   even have.  Lies for money.

24        You're going to hear that senior citizens came to the

25   defendant's doctor's office in pain.  And you're going to hear

1    from some of those patients who never received spinal

2    injections, who never received knee injections, even though the

3    defendant billed Medicare as though they had.  And the evidence

4    will also show that the defendant billed Medicare, claiming to

5    have performed x-ray-guided spinal injections in order to

6    destroy or block spinal nerves.  But this was a lie.

7         This procedure explicitly requires special extra

8    equipment, equipment the defendant didn't have.  And the

9    equipment required for this is a CT machine or a fluoroscopy

10   machine.  Maybe you've seen a CT machine before.  It's a very

11   large x-ray machine.  It kind of looks like an MRI.  Well, a

12   fluoroscopy machine is pretty similar.  And a fluoroscopy

13   machine provides the doctor with a realtime video x-ray of his

14   patient's spine.  A doctor uses this video throughout the

15   entire procedure so that he can accurately place the needle and

16   ensure that he is injecting into the right spot.

17        You're going to hear that spinal nerves are small and

18   close together.  So this guidance is necessary to make sure

19   that the chemical is injected into the right nerve.  And that's

20   important because, remember, for this injection the type of

21   chemical that's being injected, is to destroy or block spinal

22   nerves.  So precision matters.

23        Now, you're going to hear that without CT or fluoroscopy

24   guiding the spinal injection, Medicare does not consider this

25   procedure to be reasonable and medically necessary and Medicare

1    won't pay for it.  Now, CT or fluoroscopy-guided spinal

2    injections are what the defendant billed Medicare, claiming

3    that this was the procedure he had performed.  But the

4    defendant knew that this wasn't true.  He knew it because he

5    didn't have a fluoroscopy or CT machine.

6         The evidence is going to show that when the defendant

7    billed for this type of spinal injection, guided by CT or

8    fluoroscopy, that he often also billed for an ultrasound.

9    You're going to hear from some of the defendant's former

10   patients that the defendant sometimes used a smaller ultrasound

11   machine to view their back.  But these same patients will tell

12   you that when the defendant used ultrasound, it was always

13   before the injection.  Before.  Not during.  So at the time the

14   defendant was injecting nerve-destroying or blocking chemicals

15   into the spines of his elderly patients, he wasn't using any

16   guidance; not CT or fluoroscopy, as clearly required by the

17   procedure he billed, not even ultrasound.

18        He took the needle and he went in blind.  And the

19   defendant didn't only do this a few times.  The evidence will

20   show that from 2015 to 2018, out of all of the providers in

21   D.C., Maryland, Northern Virginia, and Delaware, the defendant

22   billed for CT or fluoroscopy-guided spinal injections the most.

23   He was the top biller.  And he wasn't just the top biller for

24   these spinal injections, the defendant also billed for certain

25   knee injections, more than any other provider in the same

1    region for the same time period, the injections he didn't

2    provide or didn't provide as billed.  Lies for money.

3         Now, you're going to learn that Medicare is what's called

4    a trust-based system.  And that means that Medicare isn't

5    checking each and every claim a provider submits on the front

6    end.  It can't.  There are too many claims.  But it also means

7    that when the defendant signed up to be a Medicare provider, he

8    agreed to follow Medicare rules.  He agreed that he would not

9    submit false claims, so that when Medicare received the

10   defendant's claims for payment, it trusted that those claims

11   actually represented the procedures the defendant had

12   performed; that they weren't lies.

13        The evidence will show that the defendant signed the

14   Medicare enrollment forms, and these are the precise promises

15   he made when he did so.  But the defendant didn't just make

16   promises, he also made millions of dollars from falsely billing

17   these procedures.  For all this, the defendant is charged with

18   committing health care fraud.  The judge will instruct you on

19   the law.  But to prove the defendant guilty of this crime,

20   we're going to show you that he knew that submitting these

21   claims was wrong, and he purposely did it anyway.  And here's

22   how we're going to prove it to you:  We're going to call

23   witnesses and we're going to show you documents.

24        As I mentioned, you're going to hear from some of the

25   defendant's former patients, patients who never received spinal

1    injections, patients who never received knee injections, and

2    patients who never received CT or fluoroscopy-guided spinal

3    injections, even though the defendant billed Medicare as if

4    they had.  And you'll hear directly from some of the

5    defendant's former employees that this wasn't a mistake.

6         A medical assistant who used to work for the defendant

7    will tell you how the defendant personally filled out charge

8    sheets after seeing patients and selected which billing codes

9    were to be used.  She will tell you how the defendant was very

10   focused on billing and making sure the money was coming in, and

11   she will tell you how the defendant didn't even order enough

12   medicine to cover all of the knee injections he was billing.

13        You're also going to hear from a former employee who

14   worked for the defendant submitting insurance claims, including

15   to Medicare.  She will tell you that she personally gave the

16   defendant information from Medicare, explaining that

17   fluoroscopy was required for the type of spinal injection he

18   was billing.

19        She'll also tell you that when Medicare denied claims,

20   the defendant would just change the billing codes and have her

21   resubmit them.  You're also going to see documents, and they

22   tell exactly the same story.  You're going to see the charge

23   sheets filled out by the defendant.  You're going to see

24   handwritten notes from the defendant to his employees

25   referencing billing targets and with instructions to just

1    change codes and resubmit when Medicare had initially denied

2    claims.

3         You're also going to see a letter that Medicare wrote to

4    the defendant in 2017.  This was after Medicare conducted a

5    review of some of the defendant's claims, including claims for

6    fluoroscopy or CT-guided spinal injections.  Medicare denied

7    all of the claims that it reviewed, in part because CT or

8    fluoroscopy had not been used by the defendant.  And in the

9    letter, Medicare sets out the requirement for this type of

10   spinal injection to be billed, and it clearly states that CT or

11   fluoroscopy guidance was required.

12        You will see that even after receiving this letter from

13   Medicare, the defendant continued to falsely bill for CT or

14   fluoroscopy-guided spinal injections.  You're also going to see

15   patient files and Medicare billing data.  The billing data

16   shows each fraudulent claim the defendant submitted to Medicare

17   and the dollar amount that Medicare paid the defendant.

18        The billing data isn't super exciting, but it's important

19   because it enables us to follow all of the lies to get to the

20   money, and that is what this case is about, ladies and

21   gentlemen, the millions of dollars the defendant stole from

22   Medicare in just about three and a half years.

23        During this trial we ask that you do three things:

24   First, carefully scrutinize all of the evidence.  Second,

25   follow the judge's instructions.  And, third, use your common

1    sense.  That's the same common sense that you use every day

2    when making important decisions.  And when you do those three

3    things, you will return the only verdict consistent with the

4    evidence, the judge's instructions, and common sense, which is

5    guilty on all counts.  Thank you.

6           THE COURT:  Thank you, Ms. Simon.

7         Government is going to call its first witness.

8           MS. WILLIS:  Yes, Your Honor.  The government calls

9    Maya Parrott.

10          THE COURT:  All right.  And, ladies and gentlemen,

11   from time to time you may see people working with either side,

12   coming in and out of the courtroom.  Maybe there may be a time

13   when a lawyer has to absent themselves to deal with something

14   having to do with the trial.  It doesn't mean they're not

15   working hard, they're not paying attention, just means there's

16   a lot of moving parts involved, and you shouldn't read anything

17   into that.

18        Good afternoon, ma'am.  Come on up.  And, ma'am, when you

19   sit down I'll tell you the logistics.

20                        MAYA PARROTT,

21   was called as a witness and, having been first duly sworn, was

22   examined and testified as follows:

23          THE COURT:  All right.  I'm going to ask you, you can

24   take your mask off while you're speaking and pull the

25   microphone nice and close to you, so that not only the jury,

```
 1   but the court reporter can hear.  Thank you.
 2              THE WITNESS:  Okay.
 3              THE COURT:  Okay.  You may proceed, Ms. Simon.
 4                     DIRECT EXAMINATION
 5   BY MS. WILLIS:
 6   Q.  Good afternoon.  Can you say and spell your name for the
 7   record?
 8   A.  Maya, M-A-Y-A.  Parrott, P-A-R-R-O-T-T.
 9   Q.  Where are you from?
10   A.  Montgomery County.
11   Q.  What is it that you do for a living?
12   A.  I am a program analyst.
13   Q.  Prior to being a program analyst, did you previously work
14   in the medical field?
15   A.  Yes.
16   Q.  And did you receive any training in the medical field prior
17   to working in that field?
18   A.  Yes.
19   Q.  Can you tell us a little bit about that?
20   A.  I attended Fortis College for medical assistant.
21   Q.  And where is Fortis College?
22   A.  In New Carrollton, Maryland.
23   Q.  After you received your training at Fortis College, did you
24   get a job in the medical field?
25   A.  Yes.
```

1    Q.  And what was your first job?

2    A.  Dr. Gooding's office.

3    Q.  Do you see Dr. Gooding in the courtroom today?

4    A.  Yes.

5    Q.  Can you say where he is sitting and maybe describe an

6    article of clothing that he is wearing?

7    A.  He's over there in the middle, with the white mask on, with

8    glasses.

9            MS. WILLIS:  Let the record reflect that the witness

10   has identified the defendant.

11           THE COURT:  The record will so reflect.

12   BY MS. WILLIS:

13   Q.  Now, when you worked for Dr. Gooding, did you work in an

14   office?  Or what kind of setting was it?

15   A.  It was an office.

16   Q.  Where was that office located?

17   A.  At Providence Hospital.

18   Q.  Is that here in Washington, D.C.?

19   A.  Yes.

20   Q.  Now, was the office affiliated with Providence Hospital, or

21   just in the same building?

22   A.  It was just in the same building.

23   Q.  And at some point did the office move suites in that

24   building?  Or did it always stay in the same place?

25   A.  It moved suites.

1   Q.  Do you recall when you started working with Dr. Gooding in

2   that office?

3   A.  2012.

4   Q.  And how long did you work for Dr. Gooding?

5   A.  Four or five years.

6   Q.  Would that be from 2012 to two thousand and, about,

7   seventeen?

8   A.  Yes.

9   Q.  And you mentioned that the office moved suites at some

10  point.  Was that in approximately 2015?

11  A.  Yes.

12  Q.  Now, focusing on the timeframe in that second office suite

13  until the time you left the practice, how many medical

14  providers were in that office?

15  A.  Just one.

16  Q.  And who was that one?

17  A.  Dr. Gooding.

18  Q.  Were there any other doctors, nurses, or nurse

19  practitioners in that office?

20  A.  No.

21  Q.  And who else worked in the office?

22  A.  Myself, there was a few other colleagues that came and gone

23  during that time.  But it was usually myself, Dr. Gooding, and

24  one other person, the biller.

25  Q.  Okay.  And when you say, "a few other colleagues," do you

1    mean a few other medical assistants?

2    A.  Yes.

3    Q.  So, you, Dr. Gooding, and a biller?  Or whoever the medical

4    assistants were, Dr. Gooding, and a biller, is that correct?

5    A.  Yes.

6    Q.  What was your role as a medical assistant?  Like, what did

7    you do?

8    A.  Um -- so, I checked in the patients.  I took the patients

9    back to the room, the exam room.  I ordered the medications for

10   the office.  I prepped the patients for procedures.  I checked

11   them out.  I would do prescription refill requests.

12   Q.  Okay.  So are you familiar with all the different parts of

13   the office, given that you did all those tasks?

14   A.  Yes.

15   Q.  And how many days a week were you in the office?

16   A.  Five.

17   Q.  Okay.  I'm going to ask Ms. Slater if you could show the

18   witness what's been marked for identification as Government's

19   Exhibit 24, which has also previously been provided to the

20   defense.

21           And, Ms. Slater, if you could just thumb through

22   those pages for the witness.

23           (Exhibit displayed.)

24           Do you recognize what we are looking at in

25   Government's Exhibit 24?

 1    A.  Yes.

 2    Q.  Are these fair and accurate depictions of Dr. Gooding's

 3    office located in Providence Hospital that you mentioned?

 4    A.  Yes.

 5    Q.  And would these be from that second office suites, from

 6    after 2015?

 7    A.  Yes.

 8            MS. WILLIS:  At this time the government would move

 9    to admit Exhibit 24.

10            THE COURT:  Any objection?

11            MR. KHOURI:  No objection.

12            THE COURT:  They will be admitted and published to

13    the jury.

14            MS. WILLIS:  Ms. Slater, can you go to the first

15    page?

16            THE COURT:  Are the pictures up on the jury monitors?

17            THE COURTROOM DEPUTY:  Can you see them?

18            THE JURORS:  Rotate.

19            THE COURT:  If you hear that something is being

20    published and it doesn't pop up, just raise your hand.  They're

21    turning -- oh, I think --

22            THE COURTROOM DEPUTY:  The back panel is not coming

23    up.

24            THE COURT:  Everybody have a picture up on the

25    monitor?

1           There we go.  Everybody's got it.  We're not as fancy as

2      the annex.  The annex is the new wing of the courthouse.

3      They're really fancy.  But we're trying, we're doing our best.

4           THE COURTROOM DEPUTY:  Now we're good.

5           THE COURT:  Okay.  Go ahead, Ms. Willis.

6      BY MS. WILLIS:

7      Q.  Okay.  So are we looking at the front door to Dr. Gooding's

8      suite?

9      A.  Yes.

10     Q.  Ms. Slater, could you go to the second picture?

11          And is that just the suite number?

12     A.  Yes.

13     Q.  And then, Ms. Slater, could you scroll through the next

14     three photos?

15          Is this when you would walk into the office?  What

16     are we looking at?

17     A.  This is the waiting area.

18     Q.  And then, Ms. Slater, could you go to the next few?  And

19     I'll ask you to stop.  Go up one more.

20          Do you see the area that's labeled in this photo as

21     Room C?  What are we looking at there?

22     A.  So, that was just a small office to the side where the

23     biller would sit throughout the day, and then, like, during

24     down time the medical assistant would sit in the other desk.

25     Q.  When you say, "the biller," who were -- was there one

1    biller that was there during your time in the office, or were

2    there multiple?

3    A.   There were multiple.

4    Q.   Who were some of these people?

5    A.   So, the first one was Michelle Peebles, and then he had a

6    consultant there for a little while, her name was Deborah

7    Wyatt, and then after that it was Erica Wright.

8    Q.   Okay.  Ms. Slater, can you go to the next photo?

9             What are we looking at here?

10   A.   That's still the same small office to the side.

11   Q.   Okay.  And can you go to the next?  And I'll stop you.

12            What -- do you see the room that's labeled Room G?

13   What is that?

14   A.   So, that was the small kitchenette area within the office.

15   Q.   And do you see kind of a tray on the left side?

16   A.   Yes.

17   Q.   Do you know what that was?

18   A.   That was the cart for the EMG machine.

19   Q.   And do you know what an EMG machine does?

20            MR. KHOURI:  Objection.  Lack of foundation.

21            THE COURT:  Overruled.  If you know.

22   A.   It just -- I guess, it showed like if --

23            MR. KHOURI:  Same objection.

24            MS. WILLIS:  I can lay a foundation.

25            THE COURT:  Yes.

1    BY MS. WILLIS:

2    Q.  When you were at the office, did you see anyone use the EMG

3    machine?

4    A.  Yes.

5    Q.  What was it used for, from your observations?

6                MR. KHOURI:  Objection.  Lack of foundation.

7                THE COURT:  Overruled.

8    A.  So when the new patient came into the office, he would use

9    that as the initial machine, to test to see if they had any

10   nerves that were blocked.

11   BY MS. WILLIS:

12   Q.  Okay.  Ms. Slater, can you scroll through the next?  And

13   can you stop.

14                Is this -- can you scroll?

15                Is this just another perspective of that machine?

16   A.  Yes.

17   Q.  Can you go to the next photo, please?

18                And stop at Room H.

19                What are we looking at here in Room H?

20   A.  One of the exam rooms.

21   Q.  And to the left of the chair in Room H, do you see another

22   machine?

23   A.  Yes.

24   Q.  And what kind of machine is that?

25   A.  Ultrasound.

1    Q.  And how do you know that?

2              MR. KHOURI:  Objection.  Lack of foundation.

3              THE COURT:  Overruled.

4    A.  That's just another machine that he used in the office.

5    That's what I was told.

6    BY MS. WILLIS:

7    Q.  Did you see Dr. Gooding ever use that machine in the

8    office?

9    A.  Yes.

10   Q.  If you could scroll to the next photos, Ms. Slater?

11             And then I will stop on -- stop, Ms. Slater.

12             The picture at the top, I think this would be

13   Government's Exhibit 24-23.  Is that just another view of the

14   ultrasound machine?

15   A.  Yes.

16   Q.  Ms. Slater, if you could keep scrolling.

17             What are we looking at in Room I?

18   A.  That's another exam room.

19   Q.  Okay.  Ms. Slater, if you could keep going.  And stop.

20             At 24-29, Room J, what are we looking at in this

21   picture?

22   A.  Dr. Gooding's office.

23   Q.  Okay.  Keep -- if you could keep scrolling.

24             And are all of these just different perspectives of

25   Dr. Gooding's office?

1    A.  Yes.

2    Q.  And then I will just -- we can just scroll to the end.

3          Are we looking at some medicines that were in the

4    office?

5    A.  Yes.

6    Q.  Okay.  So we looked at a number of pictures from this

7    practice.  Was there a room that we missed in the practice that

8    had a big machine in it?

9    A.  No.

10   Q.  Are you familiar with what a fluoroscopy machine is?

11   A.  Not really.

12   Q.  Okay.  And do you know what a CT machine is?

13   A.  A what machine?

14   Q.  A CT machine.

15   A.  I've heard of it, yes.

16   Q.  Did you ever see one of those in this office?

17          MR. KHOURI:  Objection.

18          THE COURT:  The objection is sustained, unless you

19   can establish that she knows what that looks like.

20   BY MS. WILLIS:

21   Q.  Were there any other machines, other than the EMG machine

22   and the ultrasound machine?

23   A.  No.

24   Q.  Now, you said that you worked five days a week, is that

25   correct?

1    A.  He saw patients three days a week, but the other two days

2    were just office days.

3    Q.  And how would you describe the patients that came to

4    Dr. Gooding's practice?

5    A.  Majority of them were elderly.

6    Q.  Do you know how patients learned about Dr. Gooding's

7    practice?

8    A.  Most of them were referred to him by their primary care

9    physicians or other doctors.

10   Q.  Do you know if they were referred by mostly the same person

11   or different people?

12   A.  Majority of them referred to by, like, at least two of the

13   same doctors.

14   Q.  Okay.  And were there -- are you familiar with some of the

15   common types of insurance that these patients had?

16   A.  Yes.

17   Q.  What type of insurance did most patients have?

18   A.  Medicare and Blue Cross/Blue Shield.

19   Q.  Now, when patients arrived, what was the first thing that

20   they did when they got to the office?

21   A.  They would sign in on the sign-in sheet that was placed on

22   the front desk.

23   Q.  Now, Ms. Slater, could you show the witness what's been

24   marked as Exhibit 17B?

25             Ms. Parrott, can you see the screen?

```
 1    A.  Yes.

 2    Q.  And do you recognize 17B?

 3    A.  Yes.

 4    Q.  What is 17B?

 5    A.  That is just the list of the appointments of the patients

 6    for that day.

 7    Q.  And, Ms. Slater, can you show the first page of the

 8    exhibit?

 9         Is this another type of sign-in sheet?

10    A.  That was the sign-in sheet.

11         MS. WILLIS:  The government would move to admit 17B.

12         THE COURT:  Any objection?

13         MR. KHOURI:  None, Your Honor.  Thank you.

14         THE COURT:  It will be admitted and may be published.

15    BY MS. WILLIS:

16    Q.  Ms. Slater, could you show page 22?

17         So let's look at the, I guess, first line on this day

18    of March 31st, 2016.  Do you see that?

19    A.  Yes.

20    Q.  Who was the first patient to sign in?

21    A.  Ms. Karen Mackey.

22    Q.  And what else does this sign-in sheet tell us?

23    A.  Pretty much what -- it depends, if they were in a series of

24    injections, we would notate that under the notes.  So she was

25    in for her first knee injection -- yeah, her first knee
```

1    injection.

2    Q.  And does it also indicate the approximate length of the

3    appointment?

4    A.  Yes.

5    Q.  What is the length here?

6    A.  Fifteen minutes.

7    Q.  So after a patient would -- and you can --

8            THE COURT:  Is there an objection, Mr. Khouri?

9            MR. KHOURI:  Your Honor, I'm sorry.  I apologize to

10   interrupt.  Would it be all right if I moved around to the

11   other side of the plexiglass, so I could get a good view of the

12   exhibit?

13           THE COURT:  That's fine, yes.  But remember that if

14   you have to speak or make an objection, you need to make it

15   into the microphone, so you may want to move the microphone.

16   Mr. Bradley will help you.

17       All set?

18           MR. KHOURI:  I'm one of those elderly people.

19           THE COURT:  I hear, you.  I hear you, Mr. Khouri.

20       Go ahead, Ms. Willis.

21   BY MS. WILLIS:

22   Q.  So we mentioned the approximate length of 15 minutes.

23           And you can take that down now, Ms. Slater.  Thank

24   you.

25           Now, after a patient signed in, did there come a time

1    when they would go into the exam room?

2    A.  Yes.

3    Q.  And what would happen at that point of the appointment?

4    A.  I would just ask them initial questions, how they feel,

5    depending on if they were a new patient or just a returning

6    patient, it just depends.  Then if they were a returning

7    patient and if I knew they were coming in already for a series

8    of injections on their knee or whatever, I would prep them.  I

9    would get them in position and prep them.

10   Q.  And during these appointments, was there a time that just

11   Dr. Gooding was in the room?

12   A.  Yes.

13   Q.  So let's talk a little bit more about the order.  So if a

14   patient were to come in, would they see you first?

15   A.  Yes.

16   Q.  And then would you leave the room when Dr. Gooding went in,

17   or would you both be in there?

18   A.  So, I would leave the room because I would have the

19   patient's chart.  And I would just ask them initial questions

20   of how they feel, then I would leave the room and give the

21   chart to Dr. Gooding and then he will go in on his own to speak

22   with the patient.

23   Q.  And then after Dr. Gooding spoke with the patient, would

24   you ever go back in the room?

25   A.  Yes.

1   Q.  So were you in the room when patients' actual procedures

2   were performed, like injections?

3   A.  Yes.

4   Q.  After you spoke to the patients in the beginning and then

5   went back in later, were there ever any patients who seemed

6   surprised to learn that they would be getting shots?

7   A.  Sometimes, yes.

8   Q.  Now let's talk about what was happening when you were in

9   the room when there were shots given.

10              What did Dr. Gooding use?

11              MR. KHOURI:  Objection.  Lack of foundation.

12              THE COURT:  You can lay -- sustained.  Lay the

13   foundation for --

14   BY MS. WILLIS:

15   Q.  Did you see Dr. Gooding giving injections to patients?

16   A.  Yes.

17   Q.  So could you see the entire procedure and what he was

18   using?

19   A.  Yes.

20              THE COURT:  You can ask the question.

21   BY MS. WILLIS:

22   Q.  What did he use to give injections?

23   A.  A needle.  And I would place, already, a pulse oximeter on

24   the patient's finger.

25              THE COURT:  Did you say a pulse oximeter?

```
 1              THE WITNESS:  Yes.
 2              THE COURT:  Now we all know what those things are,
 3     ladies and gentlemen.  Those are the little things that measure
 4     your blood -- I shouldn't be saying this.  I guess it's COVID,
 5     we use them a lot.  But I'm not testifying.  So you can ask the
 6     witness.
 7     BY MS. WILLIS:
 8     Q.  Do you know what a pulse oximeter does?
 9     A.  Yes.
10     Q.  What does that do?
11     A.  Just tests the patient's pulse and oxygen.
12              THE COURT:  Sorry about that; COVID.
13     BY MS. WILLIS:
14     Q.  Was there a syringe on the needle?
15     A.  Yes.
16     Q.  Now, who prepared the medicines that would go in the
17     syringe?
18     A.  Dr. Gooding.
19     Q.  Where did he keep the medicine?
20     A.  In his drawer in his office.
21     Q.  Did he prepare the medicines in front of you or alone in
22     his office?
23     A.  Alone in his office.
24     Q.  So, after Dr. Gooding would talk to the patient, would he
25     then leave and go get the medicine?
```

344

 1    A.  Yes.

 2    Q.  Did he prepare the medicine with the door open or closed?

 3    A.  Closed.

 4    Q.  Now, when you were in the room for the procedures, was the

 5    ultrasound machine in the room used at the time the procedures

 6    were done?

 7    A.  No.

 8    Q.  Could you tell if an ultrasound machine was used before a

 9    procedure was done?

10    A.  Yes.

11    Q.  And how could you tell that?

12    A.  If there was gel on one of the handles, because I would

13    typically have to wipe it off and disinfect it.

14    Q.  Would that be before these procedures?

15    A.  Yes.

16    Q.  And would that be in the time that Dr. Gooding was in the

17    room alone with the patient?

18    A.  Yes.

19    Q.  And then you would go in for -- or, would you then go in

20    for the actual procedure?

21    A.  Yes.

22    Q.  And where no ultrasounds used?

23    A.  No.

24    Q.  No, no ultrasound was used, or no, you wouldn't --

25    A.  No ultrasound was used during the procedure.

1    Q.  How often did Dr. Gooding bill for ultrasound?

2    A.  I'm not a biller, so I'm not sure.

3    Q.  Did you fill out the -- did you get the charge sheets after

4    the -- after a patient came out of the room?

5    A.  Yes.

6    Q.  And do you ever recall any times where the charge sheet

7    showed that ultrasound was billed, but that it wasn't

8    performed?

9    A.  A few times.

10   Q.  Okay.  Would you say a few times or more times?

11            MR. KHOURI:  Objection.  Leading.  Asked and

12   answered.

13            THE COURT:  Sustained.

14   BY MS. WILLIS:

15   Q.  Ms. Parrott, did you testify before the grand jury on July

16   18th --

17            THE COURT:  Phone.

18        (Bench discussion.)

19            THE COURT:  Are you seeking to impeach the witness or

20   refresh her recollection?

21            MS. WILLIS:  I'm going to impeach her.

22            THE COURT:  Okay.  I'm very particular about the

23   procedure you use, which is you must confront the witness with

24   the prior inconsistent statement.  So, did you testify

25   so-and-so, and when you testified, did you say X?

```
 1              MS. WILLIS:  Okay.  I am going to first verify that
 2      she remembers testifying and lay that foundation first.
 3              THE COURT:  Yes.  Yes.  Be careful, because there's
 4      refreshing and there's impeaching, and I'm very particular
 5      about the difference.  If you ask a witness if they recollect
 6      and they have no recollection, then you cannot impeach them.
 7      You must refresh her recollection.
 8          So if you believe you've gotten an answer from this
 9      witness that is inconsistent with her prior testimony, you can
10      go right ahead into confronting her with her earlier testimony.
11      But if you go and ask a witness if they remember and they say,
12      "I don't remember," then you're confined to refreshing
13      recollection.  And I am, again, particular about which one
14      you're doing.
15              MS. WILLIS:  Understand.
16              THE COURT:  Okay.  Thank you.
17          (Open court:)
18      BY MS. WILLIS:
19      Q.  Ms. Parrott, you testified just now --
20              MS. WILLIS:  And I'm moving on, Your Honor, just to
21      be clear.
22      BY MS. WILLIS:
23      Q.  -- that Dr. Gooding did not use machinery during the
24      injections.  What did he use?
25      A.  The needle.
```

1   Q.  Did he use anything other than his eyes and fingers, or

2   anything like that?

3   A.  Yes, his finger and his eyes.

4   Q.  And was that all?

5   A.  Yes.

6   Q.  And did you ever question Dr. Gooding about this?

7   A.  No.

8   Q.  And why not?

9   A.  This was my first health-care-field job, so I didn't know

10  what was right or wrong.  I never have received an injection

11  before.

12  Q.  After patient visits -- and I believe we talked about this

13  a little bit -- did Dr. Gooding create any paperwork for the

14  patient files?

15  A.  Yes.

16  Q.  What kind of paperwork?

17  A.  Procedure reports.

18  Q.  And what was your role in processing this paperwork?

19  A.  So, after the patient would come out, I would give them

20  their appointment, I would give them -- if they had

21  prescriptions, and then after they left, throughout the day I

22  would type up the procedure reports.

23  Q.  Did these procedure reports go into the patient file?

24  A.  Yes.

25  Q.  Did you work with patient files on a daily basis?

```
 1    A.  Yes.

 2    Q.  And that is typing progress reports and putting things in

 3    the patient files, is that correct?

 4    A.  Yes.

 5    Q.  Would you recognize a patient file if you saw it?

 6    A.  Yes.

 7    Q.  Ms. Slater, could you show the witness Exhibit 11?  And if

 8    you could just quickly page through that.

 9              Ms. Parrott, do you recognize what we're looking at

10    in Exhibit 11?

11    A.  Yes.

12    Q.  What is this?

13    A.  A patient's file.

14    Q.  Do you know what patient?

15    A.  Yes.

16    Q.  Which patient?

17              THE COURT:  Can we -- can you just refer to the

18    patient by the last name?  Just for patient privacy purposes.

19              MS. WILLIS:  Yes, Your Honor.  Just for the

20    Court's -- these patients also will be testifying.

21              THE COURT:  Oh.  Still, let's just go by the -- let's

22    go by the last name.

23    BY MS. WILLIS:

24    Q.  Can you identify this patient file by the last name?

25    A.  Yes.  Ms. Mackey.
```

```
 1              MS. WILLIS:  At this time the government would move
 2     to admit Exhibit 11.
 3              THE COURT:  Any objection?
 4              MR. KHOURI:  None, Your Honor.
 5              THE COURT:  It will be admitted.
 6     BY MS. WILLIS:
 7     Q.  Ms. Slater, could you pull up Exhibit 17A for the witness?
 8     And could you scroll through this quickly, the pages?
 9              Ms. Parrott, what are we looking at in 17A?
10     A.  Charge sheet.
11     Q.  And are these the charge sheets that you described earlier?
12     A.  Yes.
13              MS. WILLIS:  At this time the government would move
14     to admit 17A.
15              THE COURT:  Any objection?
16              MR. KHOURI:  No objection.
17              THE COURT:  It will be admitted and may be published.
18     BY MS. WILLIS:
19     Q.  Ms. Slater, could you publish 17A, and then go to page 2?
20              So, looking at page 2, for this charge sheet dated
21     March 31st, 2016 --
22              THE JURORS:  (Raise hands.)
23              THE COURT:  Okay.  We have -- jury doesn't have it.
24         Do you have it up in front of you, Miss Parrott?
25              THE WITNESS:  Yes.
```

```
 1                THE COURT:  I have it.  So it's just the jurors.
 2      It's not on that monitor either.
 3                THE COURTROOM DEPUTY:  I seem to have the problem all
 4      the time.
 5                THE COURT:  I wish I could say this doesn't happen,
 6      but it does.  A lot.
 7                THE COURTROOM DEPUTY:  I keep hitting buttons.  There
 8      it is.
 9                THE COURT:  Have it now?  Okay.  Great.
10                JUROR 14:  I don't.
11                THE COURT:  You don't have it on?
12                THE COURTROOM DEPUTY:  I don't know why -- let me try
13      something else.
14                THE COURT:  Maybe the monitor is turned off -- you're
15      getting past my technical expertise here.  I just turn it on
16      and off again.
17                THE COURTROOM DEPUTY:  Turn it on and off.  The big
18      screen is on.
19                JUROR 14:  Okay.  User error.
20                THE COURT:  Okay.  Great.  That's it.  I can't do any
21      more technical stuff.  On and off is my limit.
22           Go on, please.
23      BY MS. WILLIS:
24      Q.  Okay.  You can't make it just one page?
25                Okay.  I understand.  Sorry.  I was trying to get it
```

1    to be just one page on here.

2              Looking at the bottom part of page 2, with the

3    procedure codes, whose handwriting is that?

4    A.  That's Dr. Gooding's.  Under the diagnosis?

5    Q.  Yes, under the diagnosis.

6    A.  That's Dr. Gooding's.

7    Q.  Based on working with these charge sheets, whose Xs are

8    those?

9    A.  Dr. Gooding's.

10   Q.  Ms. Slater, could you go to 6, please?

11             And I guess at the bottom -- I don't know if your

12   screen is kind of split in the middle?

13   A.  Yes.

14   Q.  But at the bottom of the page -- the top of the page is on

15   the bottom and the bottom of the page is on the top.

16             So looking at the bottom of the page to talk about

17   the top of the page, do you see a charge sheet dated October

18   13th, 2016?

19   A.  Yes.

20   Q.  And is that for care for a patient with the initials K.M.?

21   A.  Yes.

22   Q.  Whose handwriting is that under "Patient name"?

23   A.  Mine.

24   Q.  So would you fill out the top part of the charge sheets?

25   A.  Yes.

1    Q.  Would you then -- would you ever fill out the bottom part?

2    A.  No.

3    Q.  Whose handwriting is it on page 6?  The bottom part being

4    at the top of this screen.

5    A.  Dr. Gooding's.

6    Q.  Ms. Slater, could you show the witness Exhibit 12A?

7            If you could just scroll through for her.

8            Do you recognize what we're looking at in exhibit

9    12A?

10   A.  Yes.

11   Q.  What is it?

12   A.  Just the follow-up reports in the patient's chart.

13   Q.  Would these be in the patient's chart for a patient by the

14   name of G.B.?

15   A.  Yes.

16   Q.  By the initials G.B.?

17   A.  Yes.

18   Q.  Ms. Slater, can you show 12B?  And can you scroll through

19   12B.

20           Are these patient records for the same individual?

21   A.  Yes.

22           MS. WILLIS:  At this time the government would move

23   to admit Exhibits 12A and 12B.

24           THE COURT:  Any objection, Mr. Khouri?

25           MR. KHOURI:  None, Your Honor.

```
 1                    THE COURT:  It will be admitted and may be published.

 2       BY MS. WILLIS:

 3       Q.  And, Ms. Slater, could you go to Exhibit 18A?

 4                    Could you scroll 18A for the witness.

 5                    Are these charge sheets for patient G.B.?

 6       A.  Yes.

 7                    MS. WILLIS:  The government would move to admit

 8       Exhibit 18A.

 9                    THE COURT:  Any objection?

10                    MR. KHOURI:  None, Your Honor.

11                    THE COURT:  It will be admitted.

12       BY MS. WILLIS:

13       Q.  Ms. Slater, could you go to page 25?

14                    Now.  At the top of page 25, which is at the bottom

15       of the screen --

16                    THE COURT:  Did we admit 12A and B?  Did I?

17                    MS. WILLIS:  Yes.

18                    THE COURT:  Okay.  Trying to keep track here.  All

19       right, go on.

20                    MS. WILLIS:  Or at least that was the government's

21       intention, to admit 12A and B.

22                    THE COURT:  I think I did.  But if I didn't, no

23       objection, Mr. Khouri, to 12A and B?

24                    MR. KHOURI:  No.  No, Your Honor.

25                    THE COURT:  They will be admitted.
```

```
 1                    MS. WILLIS:  I think we're looking at 18A.

 2                    THE COURT:  18A is in evidence.

 3                    MS. WILLIS:  And so publish 18 -- or, oh, it is

 4        published.

 5                    THE COURT:  Yes.

 6                    MS. WILLIS:  If we could go to page 25, Ms. Slater.

 7        BY MS. WILLIS:

 8        Q.  Now, Ms. Parrott, looking at the top of page 25 -- if your

 9        screen is like mine, it's on the bottom.

10        A.  Yes.

11        Q.  Whose handwriting is that?

12        A.  Mine.

13        Q.  There's just the name?

14        A.  Yes, and the insurance.

15        Q.  And what kind of insurance is MDCR?

16        A.  Medicare.

17        Q.  And at the bottom of the page, where the services are

18        checked and the handwriting, whose handwriting is that?

19        A.  Dr. Gooding's.

20        Q.  Just for the witness, Ms. Slater.  Could you pull up

21        Exhibit 13?

22                    Could you scroll through Exhibit 13.

23                    Is Exhibit 13 the patient file for an individual with

24        the initials A.M.?

25        A.  Yes.
```

 1          MS. WILLIS:  At this time the government would move

 2     to admit Exhibit 13.

 3          MR. KHOURI:  No objection.

 4          THE COURT:  It will be admitted.

 5     I guess you said these individuals are going to be

 6     witnesses.  Are they going to be asked about the medical

 7     records, as well?

 8          MS. WILLIS:  Some questions, yes.

 9          THE COURT:  I guess you can use their names then.

10          MS. WILLIS:  We're happy to do it either way, Your

11     Honor.

12          THE COURT:  I think, in an abundance of caution, it's

13     probably best to use initials, at least at this stage.

14          MS. WILLIS:  Okay.

15     BY MS. WILLIS:

16     Q.  Ms. Slater, could you show the witness Exhibit 19A, please?

17          THE COURT:  13 is in.  Yes?  Did we publish 13?

18          THE COURTROOM DEPUTY:  Yes.

19          MS. WILLIS:  We admitted it.  We didn't need to

20     publish.  I believe we admitted it.

21          THE COURTROOM DEPUTY:  You're on 19A, right?

22          MS. WILLIS:  We're on 19A.

23     Ms. Slater, can you scroll through 19A for the witness?

24     BY MS. WILLIS:

25     Q.  Ms. Parrott, are these charge sheets for the individual

 1    A.M., whose chart we just looked at?

 2    A.  Yes.

 3              MS. WILLIS:  The government would move to admit 19A.

 4              THE COURT:  Mr. Khouri?

 5              MR. KHOURI:  No objection, Your Honor.

 6              THE COURT:  They'll be admitted.

 7    BY MS. WILLIS:

 8    Q.  Ms. Slater, could you publish page 10 of 19A?

 9              At the top of page 19A, for the date of October 11,

10    2016, whose handwriting is that for the patient name?

11    A.  Mine.

12    Q.  And for the insurance, did you indicate that it was

13    Medicare and Blue Cross/Blue Shield?

14    A.  Yes.

15    Q.  For the actual charges in the charge sheet, meaning the Xs

16    next to the numbers and the diagnosis writing, whose

17    handwriting is that?

18    A.  Dr. Gooding's.

19    Q.  Ms. Slater, can you show the witness Exhibit 14A?

20              Can you scroll through it.

21              Ms. Parrott, do you recognize Exhibit 14A as

22    documents in the patient file for patient Y.A.?

23    A.  Yes.

24    Q.  Ms. Slater, can you show the witness Exhibit 14B?  Is this

25    another part of the patient file for patient Y.A.?

 1    A.  Yes.

 2              MS. WILLIS:  At this time the government would move

 3    to admit exhibits 14A and 14B.

 4              THE COURT:  Any objection?

 5              MR. KHOURI:  No, Your Honor.

 6              THE COURT:  They'll be admitted.

 7    BY MS. WILLIS:

 8    Q.  Ms. Slater, can you show the witness Exhibit 20A?

 9              And can you go to page 30.

10              At the top of page 30, for the charge sheet -- my

11    apologies.

12              Do you recognize 20A?

13    A.  Yes.

14    Q.  Is 20A the charge sheets for patient Y.A.?

15    A.  Yes.

16              MS. WILLIS:  The government would move to admit 20A.

17              MR. KHOURI:  No objection.

18              THE COURT:  It will be admitted.

19    BY MS. WILLIS:

20    Q.  If we could publish 20A at page 30.

21              At the top of the chart -- I will wait a moment.

22    Sorry.  I see that the --

23              THE COURT:  Still don't have it.

24              THE COURTROOM DEPUTY:  It's slow sometimes.

25         Okay.  Everybody see -- can everyone see it?

```
 1              THE JURORS:  No.  Flashed on and disappeared.

 2              MS. WILLIS:  I can use the Elmo, if that's better.

 3              THE COURT:  Now mine is gone.

 4              THE COURTROOM DEPUTY:  I'm switching on and off.

 5              THE COURT:  Tried and true method.

 6              THE COURTROOM DEPUTY:  Something going on here.  It's

 7    not connecting, Judge, for some reason.

 8              THE COURT:  Little flickers of hope.  Okay.  Let's

 9    see.  Wait.

10              THE COURTROOM DEPUTY:  I'm watching the big screen.

11    The big screen let's you know they're watching.

12              THE COURT:  I don't have it yet.  But does the jury

13    have it?

14              THE JURORS:  (Shake heads.)

15              MS. WILLIS:  It looks like it's coming on.

16              THE COURTROOM DEPUTY:  Now she can do what she needs

17    to do.

18              MS. WILLIS:  Ms. Slater, can you publish Exhibit 20A,

19    page 30?

20              THE COURT:  Everybody okay?  Do you have it,

21    Ms. Parrott?

22              THE WITNESS:  Yes.

23              THE COURT:  Okay.

24    BY MS. WILLIS:

25    Q.  Ms. Parrott, do you recognize the writing at the top of the
```

1     charge sheet for June 14th, 2017?

2     A.  Yes.

3     Q.  And whose handwriting is that?

4     A.  Mine.

5     Q.  And under the insurance, did you note that it was Medicare

6     and Blue Cross/Blue Shield?

7     A.  Yes.

8     Q.  Now, on the rest of the charge sheet, whose handwriting is

9     it?

10    A.  Dr. Gooding's.

11    Q.  Ms. Slater can you show Exhibit 15 to the witness?

12            Ms. Parrott, are we looking at a patient file for a

13    patient with the initials J.G.?

14    A.  Yes.

15            MS. WILLIS:  At this time the government would move

16    to admit Exhibit 15.

17            MR. KHOURI:  No objection.

18            THE COURT:  It will be admitted.

19            MR. KHOURI:  Defense has no objection, Your Honor, to

20    any of the medical records and the charge sheets.

21            THE COURT:  Okay.  Then I'll assume there's no

22    objection, unless you state one.  When she moves, I'll just let

23    them in.  Okay.  Lay the foundation.

24            THE COURTROOM DEPUTY:  Are we showing 15?

25            THE COURT:  We're done.  It's in, No. 15 --

```
 1                    MS. WILLIS:  We're not going to look at 15.

 2                    THE COURT:  Okay.

 3   BY MS. WILLIS:

 4   Q.  Ms. Slater, can you show the witness Exhibit 21A?

 5                    Do you recognize this as J.G.'s chart sheets?

 6   A.  Yes.

 7                    MS. WILLIS:  The government would move to admit 21A.

 8                    THE COURT:  It will be admitted.

 9                    MS. WILLIS:  With the Court's permission, Ms. Slater,

10   can you publish 21A, page 8?

11   BY MS. WILLIS:

12   Q.  For this charge sheet dated 2-16-16, whose handwriting is

13   it in the bottom of the sheet, selecting the codes?

14   A.  Dr. Gooding's.

15   Q.  Ms. Slater, can you go to page 26?

16                    And the same question regarding page 26, for this

17   charge sheet dated February 27, 2018.  Do you recognize the

18   handwriting in the bottom of the sheet?

19   A.  Yes.

20   Q.  And whose handwriting is that?

21   A.  Dr. Gooding's.

22   Q.  And then, finally, one more patient file.

23                    Ms. Slater, can you show the witness Exhibit 16?

24                    Do you recognize this as the patient file for a

25   patient with the initials S.B.?
```

```
 1      A.  Yes.

 2              MS. WILLIS:  The government would move to admit

 3      Exhibit 16.

 4              THE COURT:  It will be admitted.

 5      BY MS. WILLIS:

 6      Q.  And then, Ms. Slater, can you show the witness Exhibit 22A?

 7              Do you recognize Exhibit 22A as charge sheets for

 8      patients -- for a patient with the initials S.B.?

 9      A.  Yes.

10              MS. WILLIS:  Government would move to admit 22A.

11              THE COURT:  It will be admitted.

12              MS. WILLIS:  Ms. Slater, can you publish 22A, page

13      15, please?

14      BY MS. WILLIS:

15      Q.  Now, for this charge sheet --

16              THE COURT:  Do you all have it?

17              THE JURORS:  (Shake heads.)

18              THE COURT:  No?

19          Do you have it?

20              THE WITNESS:  Yes.

21              THE COURT:  Mr. Cramer, we're happy to see you.

22              MR. CRAMER:  Hopefully you're still happy.

23              THE COURT:  I'm always happy to see Mr. Cramer.

24          Mr. Cramer is the hardest working man in our courthouse,

25      ladies and gentlemen.
```

```
1              THE COURTROOM DEPUTY:  Yes, he is.  Absolutely.

2         (Pause.)

3              THE COURTROOM DEPUTY:  Can you all see it?

4         THE JURORS:  Yes.

5              THE COURT:  Thank you, Mr. Cramer.

6         MR. CRAMER:  You're welcome.

7              THE COURT:  All right.  You may proceed, Ms. Willis.

8    BY MS. WILLIS:

9    Q.  So, we're looking at Exhibit 22A, page 15, a charge sheet

10   dated 2-24-16.  Do you recognize the handwriting at the bottom

11   of this page for the charges and the diagnosis?

12   A.  Yes.

13   Q.  And whose handwriting is that?

14   A.  Dr. Gooding.

15   Q.  And, Ms. Slater, could you publish page 21?

16              For this same patient, S.B., for -- I believe that's

17   July 13th, 2016.  Do you recognize the handwriting at the

18   bottom of the page?

19   A.  Yes.

20   Q.  Whose handwriting is that?

21   A.  Dr. Gooding's.

22   Q.  And at the top of the page, where it says, "Patient name,"

23   is that your handwriting?

24   A.  Yes.

25   Q.  And does MDCR here mean the individual has Medicare?
```

1    A.  Yes.

2    Q.  Now, who created these charge sheets?

3    A.  Dr. Gooding and the biller.

4    Q.  Okay.  Did you have any part in creating the charge sheet?

5    A.  Oh, no.

6    Q.  Did you ever change anything on the charge sheet?

7    A.  No.

8    Q.  Did you do anything other than write the name and the

9    insurance?

10   A.  Nothing else, and the date.  That's it.

11   Q.  And when you got these charge sheets, what would you do

12   with them?  Or did you ever do anything with these charge

13   sheets?

14   A.  After.

15   Q.  After?

16   A.  Again, he would give me the chart and I would make their

17   next appointment, as it states at the bottom, whatever he put

18   at the bottom, then I would give the charge sheets to the

19   biller or they would just go in a stack and at the end of the

20   day she would get all of the charge sheets.

21   Q.  Okay.  So let's talk a little bit more about some of the

22   other duties and tasks that you had in the office.  In addition

23   to typing up progress notes and being present during the

24   injections, did you also order any supplies for the clinic?

25   A.  Yes.

1    Q.  And did that include medicine?

2    A.  Yes.

3    Q.  What kind of medicines did you order?

4    A.  The medications for the injections.

5    Q.  Did you ever order Gel-One?

6    A.  Oh, yes.

7    Q.  And are you familiar with how it was -- how it came

8    packaged to the office?

9    A.  Yes.

10   Q.  How was it packaged?

11   A.  One per box.

12   Q.  And just for clarity for the jury, one what per box?

13   A.  Like, one syringe in a box.

14   Q.  Was there anything notable to you about the amount of

15   medicine, specifically Gel-One, that you were ordering?

16   A.  Um, I would -- I would only order about, like, maybe four

17   to six at a time.

18   Q.  And did that align with the amount of Gel-One that you saw

19   billed in the practice, based on the charge sheet?

20   A.  No.

21   Q.  Was it more or less?  Can you tell the jury about what, if

22   anything -- the quantity that you ordered versus the quantity

23   used, that you noticed?

24              MR. KHOURI:  Objection.  Calls for narrative.  Lack

25   of foundation for this witness.

```
 1              THE COURT:  Overruled.
 2   A.  So, we perform -- well, one syringe of Gel-One is supposed
 3   to be used for one particular patient.  One patient at a time.
 4   I was not ordering Gel-One that often, for as many knees and
 5   joints that we were doing, as far as the procedures.
 6   BY MS. WILLIS:
 7   Q.  Now, how would you describe Dr. Gooding's attitude towards
 8   money at the practice?
 9   A.  It was necessary that he saw payments coming in or he was
10   not having a good day.
11   Q.  How closely did Dr. Gooding track what was being billed in
12   the office?
13   A.  Very closely.
14   Q.  Who was in charge of opening the mail?
15   A.  Dr. Gooding.
16   Q.  And did that include things like explanations of benefits?
17   A.  Yes, everything.
18   Q.  And just so we can let the jury know, do you know what the
19   explanation of benefits is that I asked you about?
20   A.  Yes.
21   Q.  What is that?
22   A.  Just pretty much tells you what the insurance paid of that
23   patient.
24   Q.  And does insurance include Medicare and other insurers?
25   A.  Yes.
```

1   Q.  Does the office ever receive complaints from patients about

2   services charged on their EOBs?

3               MR. KHOURI:  Objection.  Hearsay.  Irrelevant.

4               THE COURT:  Overruled.  It's not being offered for

5   the truth, but only if you received them.  Did you receive

6   them?

7               THE WITNESS:  Yes.

8               THE COURT:  Overruled.

9   BY MS. WILLIS:

10  Q.  And did you ever hear Dr. Gooding instruct you or any other

11  employees to just do what he said?

12  A.  Yes.

13              MS. WILLIS:  May I have the Court's indulgence?

14              THE COURT:  Yes.

15          (Pause.)

16              MS. WILLIS:  No further questions for this witness.

17  Thank you.

18              THE COURT:  All right.  We have been going

19  approximately an hour.  We will be going today until 4:25

20  because I have a 4:30 meeting.

21          Ms. Dickman, you're okay?  Jury, does anybody need a

22  short break?  We do.  Okay.  Let's take a very quick break.

23  Ten minutes.  Let's come back at five minutes after three.

24  Thank you.

25              (Recess.)

```
 1                (Whereupon the jurors enter the courtroom.)

 2                THE COURT:  All right.  Mr. Khouri.

 3                MR. KHOURI:  Thank you, Your Honor.

 4                       CROSS-EXAMINATION

 5    BY MR. KHOURI:

 6    Q.  Good afternoon.

 7    A.  Hi.

 8    Q.  My name is Mike Khouri, I'm one of Dr. Gooding's lawyers.

 9    A.  Okay.

10    Q.  Also one of the elderly people you and counsel have been

11    talking about.

12                It's a pleasure to meet you.

13    A.  Nice meeting you.

14    Q.  I would like to start out by asking you a few questions

15    about your background.  You said you were a medical assistant,

16    correct?

17    A.  Yes.

18    Q.  You're not a nurse, correct?

19    A.  Right.

20    Q.  Not a RN or a LVN, correct?

21    A.  Right.

22    Q.  Do you know what a LVN is?

23    A.  LVN?

24    Q.  Licensed vocational nurse.  It might be known as a licensed

25    professional nurse in the industry?
```

 1    A.  Oh, yes.

 2    Q.  You're not that either?

 3    A.  No.

 4    Q.  Your training was at a school, and one of the things that

 5    the school did was teach people how to be medical assistants,

 6    correct?

 7    A.  Yes.

 8    Q.  And that type of training involved a lot of recordkeeping

 9    at a medical office, correct?

10    A.  Yes.

11    Q.  It involved a lot of how to deal with patients one-on-one,

12    correct?

13    A.  Yes.

14    Q.  Things like scheduling; true?

15    A.  Yeah.

16    Q.  And the actual hands-on work with the patient was pretty

17    limited, is that accurate?

18    A.  Yes.

19    Q.  You're trained for, and may be able to, depending on what

20    state, kind of do things like take blood pressure, correct?

21    A.  Yes.

22    Q.  How to gauge heart rate?

23    A.  Yes.

24    Q.  Respiration --

25    A.  Yes.

1    Q.  -- just by use of the pulse oximeter?

2    A.  Yes.

3    Q.  That little thing that looks like a clamp that goes at the

4    end of your finger?

5    A.  Yes.

6    Q.  And that's the limit of what you did with respect to

7    patients when you worked for Dr. Gooding, correct?

8    A.  Yes.

9    Q.  Okay.  You're not familiar with billing codes, are you?

10   A.  No.

11   Q.  Do you remember when counsel -- I'm sorry.  I didn't mean

12   to interrupt you.

13            Remember when counsel was showing you the charge

14   sheets --

15   A.  Yes.

16   Q.  -- with respect to each patient?

17            You know what a charge sheet is, right?

18   A.  Yes.

19   Q.  Because you know you got to fill in the name of the

20   patient, correct?  Is that true?

21   A.  Yes.

22   Q.  All right.  The date the patient was there, right?

23   A.  Yes.

24   Q.  And some identifying information about the patient, like

25   insurance?

1   A.   Yes.

2   Q.   Okay.  But when it comes to filling out the actual code

3   that is to be billed to the insurance company, you're not

4   familiar with what those codes mean?

5   A.   No.

6   Q.   And when it comes to checking off the diagnosis that the

7   doctor arrived at to justify the codes, you're not familiar

8   with the diagnosis, are you?

9   A.   No.

10  Q.   Do you have any idea what a 59 modifier is, or even what

11  I'm talking about?

12  A.   No.

13  Q.   All right.  And you don't know whether the code that Dr.

14  Gooding was using actually required fluoroscopy, do you?

15  A.   No.

16  Q.   All right.  And you don't know whether it would be

17  acceptable to use some other type of device instead of a

18  fluoroscopy; true?

19  A.   True.

20  Q.   Like an ultrasound, right?

21  A.   Right.

22  Q.   And an ultrasound, you -- have you ever seen a baby in a

23  woman's womb in ultrasound?  Do you remember seeing that?  My

24  grandson, for the first time, that's what an ultrasound is,

25  right?

1    A.  Yes.

2    Q.  It shows a picture, correct?

3    A.  Yes.

4    Q.  A pretty definite one, right?

5    A.  (No response.)

6    Q.  Well, you don't know?

7              MS. WILLIS:  Objection.

8              THE COURT:  Okay.  We're going to do one question and

9    one answer.  It's difficult sometimes because Mr. Khouri may

10   not be finished and you may want to answer.  For the court

11   reporter's sake, make sure he's finished asking his question

12   before you give your answer.  And same for you, Mr. Khouri.

13             MR. KHOURI:  And that's my fault, Your Honor.

14             THE COURT:  Not a problem.

15   BY MR. KHOURI:

16   Q.  So, you can't really tell whether the picture that was

17   being taken by Dr. Gooding when you used the ultrasound is

18   something that's well defined or not well defined, right?

19   A.  What do you mean by "well defined"?

20   Q.  You just can't tell what the picture means when you look at

21   the ultrasound, right?

22   A.  Right.

23   Q.  Okay.  But doesn't it kind of make sense to you that a

24   well-trained, experienced physician would be able to see things

25   in that picture that you can't?  Nor can I, right?

1    A.  Right.

2    Q.  And that's what you thought at the time that you assisted

3    Dr. Gooding in his procedures; true?

4    A.  He never used a ultrasound during the procedure.

5    Q.  So I heard you say that there were a few times when you

6    believe that ultrasound was billed --

7    A.  Right.

8    Q.  -- that wasn't done, correct?

9    A.  Correct.

10   Q.  Okay.  A few times.

11           Now, let me go back to that original question about

12   looking at the picture in the ultrasound.  You wouldn't know

13   whether it's significant or not.  But doesn't it make sense to

14   you -- this is my question -- that a well-trained doctor, an

15   experienced doctor who does these procedures every day would

16   see something in that picture that you may not?  Or that I may

17   not?

18   A.  Right.

19   Q.  Makes comon sense, doesn't it?

20   A.  Yes.

21   Q.  Okay.  So, it sounds like these -- what was bothering you

22   at the time was that there were a few instances where a bill

23   went out for ultrasound when you think the ultrasound wasn't

24   performed, right?

25   A.  Well, when he --

```
 1    Q.  There were a few times -- third or fourth time you've said

 2    it -- that bills went out for ultrasound that you think weren't

 3    performed, right?

 4    A.  There were because no gel was on any of the machinery and

 5    you need to use the gel to be able to see.

 6    Q.  Okay.  That was my next question.

 7    A.  Okay.

 8    Q.  You're reading my mind.  See how good you are at this?

 9              You brought the patients back to the exam room,

10    you --

11              THE COURT:  Wait.  You have to -- because the court

12    reporter has to write down what you say, you can't nod.  You

13    have to say yes or no --

14              THE WITNESS:  Yes.

15              THE COURT:  -- or a word.

16    BY MR. KHOURI:

17    Q.  You brought the patients back to the exam room, correct?

18    A.  Yes.

19    Q.  This was after the patients were required -- I want to be

20    real specific about this -- they were required to sign a

21    sign-in sheet, correct?

22    A.  Yes.

23    Q.  And the reason they were required to sign a sign-in sheet

24    is to ensure that no bill went out for somebody that wasn't

25    there, right?
```

1    A.   Yes.

2    Q.   Right.   It was an effort to make sure that the billing was

3    accurate.   Do you agree with that?

4              MS. WILLIS:   Objection.

5              THE COURT:   If you know.

6    A.   I mean --

7    BY MR. KHOURI:

8    Q.   I'll rephrase.   You must have learned in school about how

9    to ensure, to a certain extent, that billing is accurate,

10   right?

11   A.   No.

12   Q.   You didn't?   Okay.   Well, fair enough.

13             When you were at the office, did you have an

14   impression as to why patients were required to sign in?

15   A.   So we would know that they were there.

16   Q.   Well, that's one reason, obviously.

17             But isn't another reason for a sign-in sheet, is to

18   utilize in billing so that a patient that wasn't there is

19   billed?

20   A.   I'm not a biller.

21   Q.   You don't know, right?

22   A.   Correct.

23   Q.   Okay.   So you don't know what steps might have been taken

24   to ensure accuracy or inaccuracy of billing, correct?

25   A.   Correct.

```
 1    Q.  Okay.  All you know is there were a few occasions when you
 2    walked into that exam room after the procedure was over and the
 3    gel wasn't on the wand part of the ultrasound?
 4    A.  It wasn't after the procedure.
 5    Q.  When you walked into the room for the procedure to be done,
 6    was Dr. Gooding there?
 7    A.  That's not how it went.
 8    Q.  Okay.  Well, let's find out how it really went.
 9    A.  I took the patient back.
10    Q.  Okay.
11    A.  I would ask them initial questions of what's the issue,
12    what they're there for.  I would jot all that down and then I
13    would leave the room and give the chart to Dr. Gooding.
14    Q.  All right.  Stop right there.  You would leave the room,
15    give the chart to Dr. Gooding.  Dr. Gooding would go inside the
16    room, right?
17    A.  Yes.
18    Q.  The door would close --
19    A.  Yes.
20    Q.  -- to ensure patient privacy?
21    A.  Yes.
22    Q.  And during the time that Dr. Gooding was in the room alone
23    with the patient, you didn't know what was going on, correct?
24    A.  No.  Right.  Correct.
25    Q.  Right?  Okay.
```

```
 1              Now, I know you don't know much about ultrasound and
 2     fluoroscopy, but ultrasound is an imaging device that
 3     essentially takes a picture --
 4              MS. WILLIS:  Objection.
 5              THE COURT:  Yeah, I don't think you can testify,
 6     Mr. Khouri.
 7              MR. KHOURI:  I'm sorry.  I got carried away.
 8              THE COURT:  That may short-circuit things, but --
 9              MR. KHOURI:  I'll rephrase.
10     BY MR. KHOURI:
11     Q.  Is ultrasound -- as far as you know, does it take a
12     picture?
13     A.  Yes.
14     Q.  Okay.  And it's a picture -- if you know, is it of a
15     certain point in time?
16              (Counsel moves microphone.)
17              THE COURT:  No, you got to keep it close.
18     BY MR. KHOURI:
19     Q.  Is it a certain point in time?
20     A.  What is what a certain point in time?
21     Q.  I'm sorry, bad question.
22              Do you know how long it would take to take that
23     picture?
24     A.  Just depends.
25     Q.  Depends.  Okay.  Seconds?  You don't know?
```

1    A.  Possibly, yes.

2    Q.  You don't know?

3    A.  I was in the room a few times when he would use the

4    ultrasound machine.

5    Q.  Oh, you were?

6    A.  Yes.

7    Q.  Okay.  So let's talk about what you saw when he would use

8    the ultrasound machine.  Gel would be put at the end of the

9    wand, correct?

10   A.  Yes.

11   Q.  And then the wand would be placed on the area of the body

12   where you're presuming Dr. Gooding would inject; true?

13   A.  Correct.

14   Q.  And then a picture would come up on the screen, right?

15   A.  Correct.

16   Q.  Then the picture would go away after Dr. Gooding would look

17   at it, right?

18   A.  Correct.

19   Q.  And then he would do the injection; true?

20   A.  Not at that moment.

21   Q.  I agree.  Not at that moment, right?

22   A.  Right.

23   Q.  But sometime within minutes, correct?

24   A.  No, not minutes.  It just -- he would then leave out and he

25   would make the syringe with the medication, and so there would

1    be a wait time, there would be a moment.  I wouldn't say two

2    minutes or anything like that.

3    Q.  Fine.  So he would take the ultrasound, look at the

4    picture, and then go prepare the medication, correct?

5    A.  And then during that time --

6    Q.  Hold on.

7    A.  Okay.

8    Q.  And then he would go prepare the medication, right?

9    A.  Correct.

10   Q.  We're going to circle back to that.

11              But, you go outside of the office, Dr. Gooding would

12   be inside the office, alone for a sufficient time to take the

13   ultrasound picture, isn't that true?

14   A.  Sometimes, yes.

15   Q.  Okay.  But you're assuming he didn't because when you

16   walked into the room, you didn't see the gel at the end of the

17   ultrasound; true?

18   A.  Not just that, but also --

19   Q.  Well, we're going to get there.  You didn't see the gel on

20   the ultrasound, right?

21   A.  Yes.

22   Q.  Okay.  And it was your -- one of your responsibilities was

23   to clean up the gel?

24   A.  Yes.

25   Q.  So when you walked back in, did you look in the trash cans

1    to see if Dr. Gooding had removed the gel himself?

2    A.  No, I didn't look inside the trash --

3    Q.  You don't really know, do you?  You really don't know what

4    happened inside that room; true?

5    A.  No, not true.

6    Q.  Okay.  So you went back inside the room.  Did you look at

7    the ultrasound machine to see if the pictures were saved?

8    A.  Yes.  So, again, sometimes the patient demographics would

9    still be up on the screen and the images would not be there.

10   That's not something that he did.  I would do that.  So, if the

11   patient's demographics were still on the screen, that lets me

12   know that he did not use the ultrasound.

13   Q.  Got it.  And did you check to see if he had taken those

14   demographics down, done the ultrasound picture, and then they

15   came back up?  Did you check the machine?

16   A.  I would check the machine.

17   Q.  Oh, you would?  Did you tell the FBI that in your

18   interviews?

19   A.  They didn't -- if they asked me a specific question

20   regarding that, I would.

21   Q.  But you can't recall telling that to the FBI in your

22   interviews?

23   A.  Which part?

24            MR. KHOURI:  Well, may I have a moment, Your Honor?

25            THE COURT:  Yes.

```
 1              (Pause.)
 2              MR. KHOURI:  Thank you.
 3    BY MR. KHOURI:
 4    Q.  Well, you do you remember being interviewed by the FBI in
 5    October of 2018?
 6    A.  Yes.
 7    Q.  And do you remember saying anything to the FBI about you
 8    checking the ultrasound machine?
 9    A.  If they asked me a question regarding it, I would answer
10    it, to whatever they asked me.
11    Q.  So you can't remember.
12              By the way, were you trained on how to operate the
13    ultrasound machine?
14    A.  Yes.  Well --
15    Q.  You were?  You were trained on how to put the gel on the
16    wand part of the ultrasound machine, correct?
17    A.  No, I did not do that part.
18    Q.  You didn't do that part.  You are trained on how to remove
19    the gel from the wand part of the ultrasound machine?
20    A.  That wasn't -- training wasn't necessary for that.
21    Q.  Okay.  And when were you trained on how to operate the
22    machine?
23    A.  When I first started, I learned how to enter in the
24    patient's name, because that was my responsibility, to put in
25    the patient's name into the ultrasound.  I would then -- the
```

1    name will already be up on the ultrasound when he walked into

2    the exam room.

3    Q.   Okay.  And these are on a few occasions.  And is it your

4    testimony under oath right now that you would check the

5    ultrasound machine to see if there was a picture that had been

6    taken of the patient while you were out of the room?

7    A.   I'm -- when you're saying I checked, I didn't check

8    anything.  You would just know.  He would have to go to a

9    different screen to take that picture.  So if I'm going back

10   into the exam room and the demographics are still showing up on

11   the screen, then it's obvious that he did not take the picture,

12   and there's no gel on the wand.

13   Q.   But the picture comes down, right?

14   A.   No.  The picture would still be up because I would be the

15   one that would have to turn the ultrasound off, and then we

16   always wheel the ultrasound out of the room because the rooms

17   were too small --

18   Q.   How do you know that Dr. --

19             THE COURT:  You have to let the witness finish the

20   answer.

21             MR. KHOURI:  I'm sorry.

22   A.   Because the exam rooms were very small rooms, so there

23   was -- I would have to roll -- I would have to turn it off.  I

24   would wipe off the wand and then alcohol swab it and then I

25   would wheel the ultrasound out of the room during the procedure

1    because the rooms were so small.

2    BY MR. KHOURI:

3    Q.  So you -- you don't know whether Dr. Gooding took the

4    picture down on a different screen, do you, because you weren't

5    there; true?

6              MS. WILLIS:  Objection.

7              MR. KHOURI:  Is that no or --

8              THE COURT:  No, no.  There's an objection.  Go to the

9    phone, Mr. Khouri.

10         (Bench discussion:)

11             THE COURT:  Mr. Khouri, your question is confusing

12   because you're saying, "You don't know."  Are you talking about

13   when she left the room?

14         And what's your objection, Ms. Willis?

15             MS. WILLIS:  Our objection is twofold.  One is that

16   the question is confusing.  But a lot of this is asked and

17   answered and he's going back over it.

18             THE COURT:  We are.  I'm going to let you ask one

19   more time, but clearly, and then we're going to move on because

20   I think you've gone over this.

21         All right.  Thanks.

22         (Open court:)

23             MR. KHOURI:  May I proceed, Your Honor?

24             THE COURT:  Yes.

25             MR. KHOURI:  Thank you.

1    BY MR. KHOURI:

2    Q.  So, it sounds to me like you're assuming that Dr. Gooding

3    did not perform the function of taking the picture and then

4    bringing it down and cleaning up the mess on the gel while you

5    were outside of the room; fair?

6    A.  He would never.

7    Q.  Okay.  All right.

8    A.  That just wasn't him.

9    Q.  Okay.  On a few occasions -- do you remember what year this

10   was?

11   A.  No.  I'm sorry.

12   Q.  Do you remember if a few occasions were in the same year?

13   A.  It would be multiple times.  There wasn't a --

14   Q.  Now it's multiple times.  Okay.

15           So you must have thought that there was something

16   wrong going on at that office, right?

17   A.  Wrong as far as what?

18   Q.  Well, as far as billing for ultrasound?

19   A.  After some time, yes.

20   Q.  Okay.  And you were there for a long time, weren't you?

21   A.  Five years.  Five years.

22   Q.  And you would never stay at a place of employment if you

23   thought that something was wrong, would you?

24   A.  Again, after some time.  I didn't realize until after time.

25   This is my first health-care-field job.  I've never worked in a

1    doctor's office before.

2    Q.  After that period of time, whatever it was, would you --

3    did you go to law enforcement?

4    A.  No.

5    Q.  Did you call Medicare or Medicaid or private insurance and

6    report it to anybody?

7    A.  No.

8    Q.  Did you make any notes of what was going on because you

9    felt like it was wrong?

10   A.  No.

11   Q.  So you stayed there and continued to be employed?

12   A.  Correct.

13   Q.  Okay.  We're going to -- and as a matter of fact, you

14   recommended one of your cousins to Dr. Gooding to work there as

15   the biller, right?

16   A.  No, not as a biller.

17   Q.  Okay.

18          MR. KHOURI:  May I have a moment, Your Honor?

19          THE COURT:  Yes.

20          MR. KHOURI:  Thank you.

21   BY MR. KHOURI:

22   Q.  Who's Amber Jackson?

23   A.  That's my cousin.

24   Q.  And didn't you recommend Amber Jackson to Dr. Gooding to

25   work at the office?

 1    A.  Yes.

 2    Q.  And Dr. Gooding hired Amber Jackson?

 3    A.  Correct.

 4    Q.  And do you remember being interviewed by the FBI on October

 5    23rd, 2018?

 6    A.  Sure.

 7    Q.  I'm sorry, ma'am?

 8    A.  Yes, I remember being interviewed.

 9    Q.  Okay.  And did you tell the FBI that your cousin Amber

10    Jackson was hired by Dr. Gooding to do the billing?

11    A.  She was not hired for the billing.

12    Q.  Okay.  What was she hired for?

13    A.  Just as a -- just a medical assistant.  She had no

14    training.

15    Q.  Okay.  Another medical assistant?

16    A.  Yes.

17    Q.  And you wouldn't refer your cousin, especially, to go work

18    at a place where you thought fraud was going on.

19    A.  She came prior to us even moving down to that new office.

20    She came, like, within the first or second year of me working

21    there.

22    Q.  Would you refer a relative to go work at a place that --

23    that you believed fraud was happening?

24    A.  Again, she was not there during the time -- she was only

25    there for a short amount of time.  She wasn't in the new office

1    that we were -- we moved into.  She was young, just came out of

2    high school.

3              MR. KHOURI:  Your Honor, I move to strike as

4    nonresponsive.

5              THE COURT:  I'm going to strike the answer as

6    nonresponsive.  And it was previously given, in any event.

7         The question that Mr. Khouri asked you was:  Would you

8    refer a relative to go to work at a place that you believe

9    fraud was happening?

10             THE WITNESS:  No, I wouldn't have.

11   BY MR. KHOURI:

12   Q.  All right.  There came a period of time when you left,

13   right?  The office.

14   A.  In 2017.

15   Q.  And in 2017, at the end of 2017, didn't you refer your

16   other cousin to Dr. Gooding's office, to work there?

17   A.  No.

18   Q.  Do you have a cousin by the name of -- I can't read my own

19   handwriting.

20             MR. KHOURI:  May I have a moment, Your Honor.

21             THE COURT:  Yes.

22             MR. KHOURI:  Thank you.

23        (Pause.)

24             MR. KHOURI:  May I proceed, Your Honor?

25             THE COURT:  Yes.

```
1    BY MR. KHOURI:

2    Q.  Do you have a cousin by the name of Martella -- and is it

3    pronounced Parrott?

4    A.  Martella --

5    Q.  Yes.

6    A.  -- Parrott.

7    Q.  Martella or Martella, last name spelled P-A-R-R-O-T-T?

8    A.  Yes.

9    Q.  Okay.  And didn't you refer her to Dr. Gooding in February

10   of 2018 to work there?

11   A.  I might have, yes, because she didn't have a job.

12   Q.  Isn't it true that on February 25th, 2018 you sent an email

13   to Dr. Gooding asking him to interview Martella for a position

14   at the office?

15   A.  I don't recall.

16   Q.  Would it refresh your recollection if I showed you a copy

17   of the email on Dr. Gooding's phone?

18   A.  I mean, I could have referred her, yes.  I could have sent

19   him an email, yes, but that was about it.

20   Q.  And was your email at the time maya.perrott@GMC@hotmail.com

21   (sic)?

22   A.  Yes.

23   Q.  Anybody else use that email in February of 2018?

24   A.  No.

25   Q.  It was your exclusive email, wasn't it?
```

1   A.  Yes.

2   Q.  Can you think of any reason why anyone would send an e-mail

3   from that email address other than you, ma'am?

4   A.  No.

5   Q.  And that was in February of 2018, months after you left Dr.

6   Gooding's employment; true?

7   A.  Yes.

8   Q.  So, can I show you the email?  And you can tell me whether

9   it was one that you actually sent to Dr. Gooding about your

10  cousin.

11  A.  Sure.

12          MR. KHOURI:  May I approach the witness, Your Honor?

13          THE COURT:  Yes.

14          MR. KHOURI:  I'll show it to the government.

15          THE COURT:  This is the first -- the first I've had a

16  refresh recollection used on a phone.  But as long as he's not

17  seeking to admit it.

18      Do you have any objection?

19          MS. WILLIS:  No objection.

20          THE COURT:  Go ahead Mr. Khouri.

21          MR. KHOURI:  May I approach, Your Honor?

22          THE COURT:  Yes, you may.

23          MR. KHOURI:  Thank you.

24  BY MR. KHOURI:

25  Q.  So I'm going to show you a copy of what purports to be --

```
 1              THE COURT:  Mr. Khouri, if you're refreshing her
 2      recollection, there's a way to do it.
 3              Take a look at what Mr. Khouri is showing you,
 4      Ms. Parrott, and when you're finished, look up, and then you
 5      can ask the question, Mr. Khouri.
 6      BY MR. KHOURI:
 7      Q.  Are you finished?
 8      A.  Yes.
 9              THE COURT:  Okay.
10              MR. KHOURI:  May I return to the lectern?
11              THE COURT:  Yes.
12              MR. KHOURI:  Thank you.
13      BY MR. KHOURI:
14      Q.  So, it's true -- oh, after looking at the phone, does that
15      refresh your recollection as to whether you sent an email to
16      Dr. Gooding in February of 2018, referring your cousin Martella
17      for employment at Dr. Gooding's office?
18      A.  Yes.
19      Q.  And that's true, you did send such an email, didn't you?
20      A.  Yes.
21      Q.  Okay.
22              MR. KHOURI:  May I read the email, Your Honor?
23              THE COURT:  No, Mr. Khouri, you may not.
24              MR. KHOURI:  Just thought I would ask.
25              THE COURT:  It has not been shown, it has not been
```

1    produced in discovery.

2    BY MR. KHOURI:

3    Q.  So, my question to you is:  If you wouldn't refer somebody,

4    especially your family member, to a business that was

5    committing fraud, why did you refer your cousin to work at Dr.

6    Gooding's office?

7    A.  Because she was eager to get -- she needed a job.

8    Q.  And you thought that Dr. Gooding's office would be a good

9    place for her to work?

10   A.  And they were looking for a medical assistant.  So, I

11   referred her, that was it.

12   Q.  You even attached her resumé to that email to Dr. Gooding,

13   right?

14   A.  Yes.

15   Q.  All right.  Let's move on.

16           MR. KHOURI:  Your Honor, may I give this back to

17   counsel table?

18           THE COURT:  Yes, please.

19           MR. KHOURI:  Thank you.

20           THE COURT:  Make sure it's on silent or turned off.

21           MR. KHOURI:  May I proceed?

22           THE COURT:  Yes.

23           MR. KHOURI:  Thank you.

24   BY MR. KHOURI:

25   Q.  Now, it's true that most of Dr. Gooding's business came

1    from referrals from other physicians in the community, right?

2    A.  Yes.

3    Q.  You understood Dr. Gooding to be something called a

4    physiatrist, right?

5    A.  Yes.

6    Q.  Basically, someone who's in physiatry, you understood to be

7    one who treats chronic pain, right?

8    A.  Yes.

9    Q.  And the doctors that referred patients to Dr. Gooding were

10   those that were not specialized in that area, true?

11   A.  Correct.

12   Q.  And they kept referring patients to Dr. Gooding, right?

13   A.  Yes.

14   Q.  And that probably made you think, hey, this is a pretty

15   cool practice because he has a constant flow of people coming

16   in from legitimate doctors in the community, right?

17   A.  I mean, there was his colleagues, those were his friends.

18   Q.  Sure, sure.  And as far as you know, they were licensed

19   physicians, correct?

20   A.  Correct.

21   Q.  Okay.  And the patients that came in kept coming back,

22   right?

23   A.  Correct.

24   Q.  Weren't most of the patients people that were way on in

25   their years?

 1    A.   Correct.

 2    Q.   Okay.   Who were in pain, right?

 3    A.   Correct.

 4    Q.   A lot of them would have to use assistance in walking,

 5    correct?

 6    A.   Correct.

 7    Q.   Pain in the back and in the hip and in the knee, basically,

 8    right?

 9    A.   Yes.

10    Q.   And they kept coming back, right?

11    A.   Correct.

12    Q.   And didn't you assume they kept coming back because Dr.

13    Gooding was making them feel better?

14    A.   Some.   Some.

15    Q.   Or at least they perceived some benefit going to Dr.

16    Gooding, right?

17    A.   Correct.

18    Q.   Right.   Okay.   So, I have a few questions to ask you about

19    the Gel-One samples.

20         Obviously, you're not a pharmacist, right?

21    A.   (Nods head.)

22    Q.   Is that right?

23    A.   Correct.

24    Q.   You're not a pharmacy tech; true?

25    A.   Correct.

1   Q.  You didn't have any training in pharmacology or pharmacy at

2   the school that you went to?

3   A.  Correct.

4   Q.  Right?  Okay.

5        And did you have any understanding what the Gel-One

6   was for?

7   A.  Yes.

8   Q.  The Gel-One was gel for arthritic joints, to provide

9   cushion?

10        MS. WILLIS:  Objection.

11        THE COURT:  Phone.

12      (Bench discussion:)

13        THE COURT:  Ms. Willis?

14        MS. WILLIS:  It's our same objection about testifying

15   and saying what things mean.

16        THE COURT:  Well, you asked the witness about Gel-One

17   and she testified about that, you know, he put it in the

18   syringes and he prepared it.  So he can testify as a general

19   manner what Gel-One was to clarify, to lay the foundation for

20   his question.

21        MS. WILLIS:  Okay.

22      (Open court:)

23        THE COURT:  Objection is overruled.

24      Probably quicker to go this way, but further steps.

25        MR. KHOURI:  Would you rather I --

1          THE COURT:  You can come this way, it will be

2     shorter.  But it's up to you.

3          MR. KHOURI:  The way I was trained.

4          THE COURT:  That's fine, I don't mind.

5     BY MR. KHOURI:

6     Q.  Oh, yeah.  The Gel-One was a gel-like substance to provide

7     cushion for arthritic joints, right?

8     A.  Correct.

9     Q.  And it was injected into the joints with a syringe, right?

10    A.  Correct.

11    Q.  Now, isn't it true that there were other types of gel

12    substances at the office that Dr. Gooding could use for the

13    same purpose?

14    A.  Yes.

15    Q.  All right.  There's something called ORTHOVISC?

16    A.  Correct.

17    Q.  That was in the office, right?

18    A.  Yes.

19    Q.  There's something called SYNVISC.  That was in the office,

20    right?

21    A.  Correct.

22    Q.  And there was some other ones as well; true?

23    A.  Sure.  Yes.

24    Q.  And Dr. Gooding would get samples from drug salesmen that

25    he could use as well, right?

```
 1    A.  Yes.
 2    Q.  Okay.  And didn't it make sense to you that Dr. Gooding
 3    would -- would prepare the medication, because you weren't
 4    trained on how to prepare the medication, right?
 5    A.  Correct.
 6    Q.  You don't know how much medication is appropriate or not
 7    appropriate, right?
 8    A.  Correct.
 9    Q.  Okay.  And nobody else in the office did either, right?
10    A.  Yes.
11    Q.  There were no -- there was no RNs at the office; true?
12    A.  Yes.  Yes.
13    Q.  No nurse practitioners, no physician assistants, people
14    like that, right?
15    A.  Correct.
16    Q.  So it sounds to me -- I'm not saying you're acting in bad
17    faith, but it sounds to me you're assuming that it's one dose
18    equals one package, right?
19    A.  Well, I'm not assuming.  The sales rep directed that that's
20    how it works.
21    Q.  That's something that you talked to a sales rep about?
22    A.  Yes.
23    Q.  You don't have any personal knowledge of that?
24    A.  No.
25              MR. KHOURI:  Okay.  Move to strike as hearsay.
```

```
 1                THE COURT:  Denied.
 2   BY MR. KHOURI:
 3   Q.  Okay.  And Dr. Gooding was the one that prepared the
 4   medications, correct?
 5   A.  Correct.
 6   Q.  Okay.  Okay.  And there was nobody else in the office that
 7   could prepare them; true?
 8   A.  Correct.
 9   Q.  Okay.  Now, I just want to clarify that ORTHOVISC and
10   SYNVISC, as far as you know, was used for the same purpose,
11   correct?
12   A.  Correct.
13   Q.  Okay.
14                MR. KHOURI:  May I have a moment, Your Honor?
15                THE COURT:  Yes.
16   BY MR. KHOURI:
17   Q.  You mentioned in your direct testimony that a consultant
18   was hired?
19   A.  Correct.
20   Q.  And that was a billing consultant, right?
21   A.  Yes.
22   Q.  Who hired the billing consultant?
23   A.  Dr. Gooding.
24   Q.  Did you have any involvement in the hiring of the billing
25   consultant?
```

1    A.  No.

2    Q.  Was it your impression that Dr. Gooding hired the billing

3    consultant to try to make sure that his billing was accurate?

4    A.  Yes.

5    Q.  Okay.  And were there discussions between -- that you

6    overheard between Dr. Gooding and other people, like Erica, or

7    maybe yourself, about what codes to use in certain instances?

8                MS. WILLIS:  Objection.

9                THE COURT:  It is hearsay.  Is it being asked for

10   purposes -- are you asking -- are you eliciting the information

11   for a purpose other than the truth of the matter asserted?

12               MR. KHOURI:  Right.  Well, it's an operative fact, I

13   think, to show good faith in trying to get the billing right.

14               THE COURT:  Phone.

15        (Bench discussion:)

16               THE COURT:  Before we even begin to discuss this

17   objection, Mr. Khouri, I would just like to note that the

18   last -- when you requested -- when you moved to strike the

19   witness's testimony, that testimony was elicited -- can you

20   hear me?

21               MS. WILLIS:  I can, yes.

22               THE COURT:  That testimony was elicited as -- first

23   of all, it's not -- I don't think it's offered for the truth of

24   the matter asserted.  You elicited it as to why -- how she knew

25   what a dose was used for, and she said because the sales rep

1   told her.  So that's not being -- it's not being asserted for

2   the truth of the matter of the statement, and certainly it was

3   in response to your question.  Hence, the motion to strike was

4   denied.

5        As to this question, which is:  And were there

6   discussions that you overheard between Dr. Gooding and other

7   people, like Erica, how is that not hearsay?

8        I can't hear you.

9        MR. KHOURI:  It's offered to show that Dr. Gooding

10  was acting in good faith because he was discussing that --

11  about -- he -- just like hiring a billing consultant, he's

12  discussing what the right codes should be.

13       THE COURT:  Well, she can -- she's testified that she

14  heard conversations.  But she can't testify to what he's saying

15  about conversations because you're offering them for the truth

16  of the matter asserted.  So I'm going to overrule the

17  objection.  I mean, she -- it's hearsay.  How -- tell me what

18  exception, what hearsay exception here applies.

19       MR. KHOURI:  State of mind.

20       THE COURT:  Her state of mind?

21       MR. KHOURI:  No, Dr. Gooding's state of mind.

22       THE COURT:  You're --

23       MR. KHOURI:  How else can I show good faith?

24       THE COURT:  First of all, you can always put it on

25  through your own client's testimony.  But you can't offer

1    hearsay to show -- you can offer hearsay to show what -- the

2    statement would have reflected her state of mind or something,

3    but you can't offer what she overheard Dr. Gooding say to

4    somebody else to show Dr. Gooding's state of mind.  You've

5    already put in that he hired a billing specialist because he

6    was concerned about billing and that he had conversations about

7    billing.

8              MR. KHOURI:  I submit.  Thank you, Your Honor.

9              THE COURT:  Okay.

10         (Open court:)

11             MR. KHOURI:  Okay.  Let's --

12             THE COURT:  And, ladies and gentlemen, you had the

13   right reaction.  During our bench conferences, if you need to

14   stand up, stretch, you know, while in the box, that's perfectly

15   fine.  You may do that.

16   BY MR. KHOURI:

17   Q.  So, there were conversations at the office about what the

18   proper codes should be, correct?

19   A.  Yes.

20   Q.  And were those conversations initiated by Dr. Gooding at

21   times?

22   A.  Erica, mostly.

23   Q.  Did Erica report to Dr. Gooding?

24   A.  Yes.

25   Q.  Okay.  The times that you saw Dr. Gooding inject patients,

```
 1    would he move the needle around different spots after placing
 2    the needle inside the patient's body?
 3                 MS. WILLIS:  Objection.
 4                 THE COURT:  Basis?  If you can do it in a word.
 5                 MS. WILLIS:  Relevance and beyond the scope.
 6                 THE COURT:  It is beyond the scope, Mr. Khouri.  So I
 7    am going to sustain the objection.
 8                 MR. KHOURI:  All right, Your Honor.
 9           Thank you very much, Ms. Parrott.  It was a pleasure to
10    meet you.
11          May I return, Your Honor?
12                 THE COURT:  Yes, Mr. Khouri?
13          Ms. Willis, do you have redirect?
14                 MS. WILLIS:  Briefly, Your Honor.
15                 THE COURT:  All right.
16                        REDIRECT EXAMINATION
17    BY MS. WILLIS:
18    Q.  Good afternoon, again.
19    A.  Hi.
20    Q.  On cross-examination you were asked some questions about
21    Gel-One versus other types of injections, medication.  Do you
22    recall that line of questioning?
23    A.  Yes.
24    Q.  Do you recall looking at Exhibit 17A, the charge sheets?
25    A.  Do I recall the charge sheets?
```

1    Q.  Looking at charge sheets on direct.

2    A.  Yes.

3    Q.  Ms. Slater, could you pull up Exhibit 17A?

4           THE COURT:  And this has been admitted.

5    BY MS. WILLIS:

6    Q.  I'm going to direct your attention to --

7           THE COURT:  Does the jury have it?

8           THE JURORS:  (Nod heads.)

9    BY MS. WILLIS:

10   Q.  To the -- I guess, third column, if we're going from left

11   to right, and the third, kind of, category down.  I circled it.

12   Do you see that?

13   A.  Yes.

14   Q.  Are there different types of medications that are indicated

15   specifically on the charge sheet?

16   A.  Yes.

17   Q.  Can you read the different categories of the medications?

18   A.  The Hyalgan and the Supartz, the Botox and the Gel-One.

19   Q.  So based on reading that, is Gel-One specifically listed

20   under the medications?

21   A.  Yes.

22   Q.  Defense counsel asked you about a billing consultant.  Do

23   you recall that line of questioning?

24   A.  Yes.

25   Q.  How long was the billing consultant there?

1    A.   About two months, if that.

2    Q.   And what, if anything, would you note about the working

3    relationship between the billing consultant and Dr. Gooding?

4    A.   It became hostile after a while.

5    Q.   And then, final category of questions, the ultrasound, do

6    you remember being asked questions on cross-examination about

7    the ultrasound?

8    A.   Yes.

9    Q.   And just to get the order straight of how the ultrasound

10   was used, when you first -- when a patient first came and they

11   first went in the room, was that you alone in the room with the

12   patient?

13   A.   Yes.

14   Q.   And was ultrasound ever used then?

15   A.   No, I didn't use it.

16   Q.   So after you left the room, did Dr. Gooding then go in the

17   room with the patient?

18   A.   Yes.

19   Q.   And during that time were there times that you saw -- well,

20   you saw evidence that an ultrasound was used?

21            MR. KHOURI:   Objection.   Vague.

22            THE COURT:   Sustained.   That's leading.

23   BY MS. WILLIS:

24   Q.   During the time that -- after you left the room, did Dr.

25   Gooding -- just to orient the witness, did Dr. Gooding go in

1   the room with the patient alone?

2   A.  Yes.

3   Q.  Would you enter the room again after that time that Dr.

4   Gooding was in there alone?

5   A.  Yes.

6   Q.  On this second time that we're talking about when you

7   entered in the room, did you ever notice anything that would

8   tell you whether or not the ultrasound machine was used?

9   A.  Yes.

10  Q.  What were the things that you would notice that would tell

11  you whether the ultrasound was used during that time that Dr.

12  Gooding was in the room alone?

13  A.  The images would still be on the screen and there would be

14  gel on the wand.

15  Q.  Now, were there times when there were not images on the

16  screens and no gel on the wand?

17  A.  Yes.

18          MR. KHOURI:  Objection.  Leading.  Move to strike.

19          THE COURT:  Overruled.

20  BY MS. WILLIS:

21  Q.  Now, when you would go back in the room, would Dr. Gooding

22  ever give procedures or injections when you returned to the

23  room?

24  A.  Yes.

25  Q.  Was the ultrasound, whether it was used before or not, ever

1    used during that time?

2    A.  No.

3    Q.  So at the time you saw a needle go into a person's body,

4    was the ultrasound machine used?

5    A.  No.

6              MS. WILLIS:  I don't have any other questions.

7              THE COURT:  Thank you, Ms. Parrott.  You are free to

8    leave.

9              THE WITNESS:  Thank you.

10             THE COURT:  Have a good afternoon.

11             THE WITNESS:  Thank you.

12             THE COURT:  You have 25 more -- no, we have half an

13   hour more, so let's press on, if we can.

14             MS. SIMON:  Thank you.

15        Your Honor, the government calls Erica Wright.

16             THE COURT:  All right.

17             THE COURTROOM DEPUTY:  Good afternoon, ma'am.  Would

18   you please raise your right hand?

19                        ERICA WRIGHT,

20   was called as a witness and, having been first duly sworn, was

21   examined and testified as follows:

22             THE COURT:  Good afternoon.

23             THE WITNESS:  Good afternoon, ma'am.

24             THE COURT:  I'm going to ask you, you can take your

25   mask off when you're speaking into the microphone.  And if you

1    could pull the microphone nice and close in to you so we can

2    all hear you.  Thank you.

3               THE WITNESS:  You're welcome.

4               THE COURT:  And you can take the mask off when you're

5    testifying, if you like.

6               THE WITNESS:  Yes, ma'am.

7               THE COURT:  Okay.

8                         DIRECT EXAMINATION

9    BY MS. SIMON:

10   Q.  Good afternoon, Ms. Wright.  Could you please state and

11   spell your name for the record?

12   A.  Erica Wright.  E-R-I-C-A, W-R-I-G-H-T.

13   Q.  Ms. Wright, where do you live?

14   A.  Lanham, Maryland.

15   Q.  And how long have you lived in Maryland?

16   A.  All my life.

17   Q.  What do you do for a living?

18   A.  I'm a practice manager -- medical practice manager.

19   Q.  Is that in a doctor's office?

20   A.  Yes.

21   Q.  As a medical practice manager, what do you do, generally?

22   A.  Oversee day-to-day operations, ensure that the clinic is

23   fully staffed, and guarantee great customer service to our

24   patients.

25   Q.  Do you know Dr. Frederick Gooding?

1    A.   I do.

2    Q.   How do you know him?

3    A.   He's my former employer.

4    Q.   About how long did you work for Dr. Gooding?

5    A.   I believe it was between -- either 2016 or '17 I started

6    with him.

7    Q.   And when did you finish?

8    A.   The end of 2019.

9    Q.   What did you do before you worked for Dr. Gooding?

10   A.   Previous, before that, I was disabled.  I was in -- I was

11   injured, so --

12   Q.   So you were out on disability?

13   A.   Yes.

14   Q.   Okay.  When you were working in Dr. Gooding's office, what

15   were your duties?  What was your job there?

16   A.   Oversee the day-to-day operations, payroll, entering

17   charges, and billing.

18   Q.   As part of the billing responsibility, would you submit

19   claims to insurance companies?

20   A.   Yes, I did.

21   Q.   And did that include to Medicare?

22   A.   Yes.

23   Q.   Could you explain generally for the jury how that worked?

24   What was the process?

25   A.   Well, pretty much patients would be scheduled to come in to

1    see Dr. Gooding.  We would get the charts together and do chart

2    prep, getting ready for the new flow sheet, and putting a

3    charge sheet on the top of the chart.

4    Q.  And you mentioned a charge sheet.  What is that?

5    A.  A charge sheet is -- it's a fee ticket, they're the same

6    thing.  Pretty much it has all the charges listed for any

7    procedures that we offer in the office.  And the doctor would

8    go through and mark what he did per patient.

9    Q.  And then after that happened, what was the next step for

10   you to submit the claims?

11   A.  I would receive the charge sheet, a packet of them, along

12   with the signing sheet, and then I would submit the charges to

13   Medicare, Blue Cross/Blue Shield, or whatever commercial

14   insurance was there, the patient had.

15   Q.  Who filled out the charge sheets with information about

16   what to bill?

17   A.  Dr. Gooding.

18   Q.  Did you ever fill out any of the information about what to

19   bill?

20   A.  No.

21   Q.  Did anyone else in the office select any of the items to be

22   billed from the charge sheets?

23   A.  No.

24   Q.  Did you -- did you ever get any trainings or go to any

25   seminars on billing while you worked for Dr. Gooding?

1    A.  I did not.

2    Q.  Did you ever ask to?

3    A.  I did.

4    Q.  And what happened?

5    A.  Dr. Gooding declined to send me.  He went to the seminars.

6    Q.  What was it like to work in Dr. Gooding's office?

7              MR. KHOURI:  Objection.  Calls for narrative and

8    vague.

9              THE COURT:  Overruled.  You may answer.

10             THE WITNESS:  Yes, ma'am.

11   A.  It was interesting.  We had some good times and we had some

12   challenges, as well.

13   BY MS. SIMON:

14   Q.  What were some of the challenges?

15   A.  Well, it wasn't -- this type of employer did not have,

16   like, a lot of leave or things that you could accrue.  When we

17   were out of the office, you know, it was like a big

18   inconvenience.  So, that was the difference with any other

19   employer that I worked with.

20   Q.  Did Dr. Gooding -- did Dr. Gooding look at all the mail

21   that came in?

22   A.  Yes.

23   Q.  Did anyone else ever look at any of the mail?

24   A.  We would only get the mail at the mailbox and put it in his

25   inbox and wait for any correspondence to be put in our inboxes

1        after he reviewed everything.

2        Q.  Do you know what EOBs are?

3        A.  Yes, explanation of benefits.

4        Q.  Did Dr. Gooding look at the EOBs?

5        A.  The ones that came in the mail.  The ones that came

6        electronically, we would print them out and put them in his

7        inbox.

8        Q.  In the ordinary course of working in Dr. Gooding's office,

9        did he ever leave notes for you?

10       A.  Yes.

11       Q.  Did that happen a lot?

12       A.  Yes.

13       Q.  What would you do with those notes?

14       A.  Respond back on the note and make a copy, so I would have a

15       copy of it.

16       Q.  Okay.  We're going to show the witness what's been

17       previously marked as Government Exhibit 25B.  This is pages 1,

18       3, 5, 6, 7, and 8.  We're just going to slowly scroll through

19       those please, Ms. Slater.  If we could just scroll through the

20       pages that I noted, that would be helpful.

21              Can you see those, Ms. Wright?

22       A.  Yes, I can.

23       Q.  Are these fair and accurate examples of the notes the

24       defendant would write to you?

25       A.  Yes.

 1              MS. SIMON:  At this time we would move to admit

 2     Government Exhibit 25B pages 1, 3, 5, 6, 7, and 8.

 3              THE COURT:  Any objection?

 4              MR. KHOURI:  May I have a moment?

 5              THE COURT:  Yes.

 6          (Pause.)

 7              MR. KHOURI:  No objection.

 8              THE COURT:  They'll be admitted.

 9              MS. SIMON:  You can take that down.  Thank you.

10     BY MS. SIMON:

11     Q.  Before -- a few moments ago you mentioned --

12              THE COURT:  Did you want to put them up, Ms. Simon?

13              MS. SIMON:  Not just yet.  Thank you, Your Honor.

14     I'll come back to that.  Thank you, Mr. Bradley.

15     BY MS. SIMON:

16     Q.  We spoke a moment ago about charge sheets.  And is it fair

17     to say that charge sheets listed the billing codes --

18     A.  Yes.

19     Q.  -- for the procedures?

20              Was every possible billing code in the world listed

21     on the charge sheet?

22     A.  No, only what pertained to his specialty.

23     Q.  And who decided, if you know, which billing codes were on

24     the charge sheets?

25     A.  Dr. Gooding.

1    Q.  And after Dr. Gooding saw a patient, I believe you said, he

2    filled out the charge sheet, is that correct?

3    A.  Yes.

4              MS. SIMON:  Could we -- Ms. Slater, could you please

5    pull up Exhibit 17A and go to page 2?

6          Your Honor, this was previously admitted into evidence.

7              THE COURT:  Yes.

8              MS. SIMON:  If we could publish that for the jury,

9    Mr. Bradley?

10             THE COURTROOM DEPUTY:  Yes.

11   BY MS. SIMON:

12   Q.  Can you see that, Ms. Wright?

13   A.  I can.

14   Q.  It seems like perhaps the jury can't see it yet.

15             All right.  I'll wait a moment.

16             (Pause.)

17             THE COURTROOM DEPUTY:  Mr. Cramer said to give it ten

18   seconds.  I'm going to give it ten seconds.

19             MS. SIMON:  All right.  The 10-second rule.  Got it.

20   BY MS. SIMON:

21   Q.  Ms. Wright, is what's on your screen --

22             THE COURT:  Is it up yet?  Still not up?

23             THE JURORS:  (Nod heads.)

24             THE COURTROOM DEPUTY:  Not those two?  That I don't

25   know.

1          Can you turn it off and turn it on?  I don't know what to

2     do.

3               THE COURT:  Is there a flicker?  Is it up on the big

4     screen over there?  Is it on any of the jurors' screens?

5               JUROR 14:  I turned it on, turned it off.

6               THE COURT:  Okay.  Mr. Bradley, maybe this evening we

7     can tell Mr. Cramer we have a balky screen.

8          Is it up now?

9               JUROR 14:  Yes.

10              THE COURT:  Okay.

11    BY MS. SIMON:

12    Q.  Taking a look at your screen, Ms. Wright, is there an

13    example of Dr. Gooding's charge sheets?

14    A.  Yes.

15    Q.  And do you recognize whose handwriting is in the body of

16    the document, with the Xs?

17    A.  Dr. Gooding's.

18    Q.  Now, you said that there was a time that you would then get

19    the charge sheet at the end -- from Dr. Gooding, is that right?

20    A.  At the end of the day or the next day I would get the

21    charge sheets with the sign-in sheet.

22    Q.  Okay.  And then what would you do with the charge sheet?

23    A.  Enter the charges as on the charge sheet.

24    Q.  Okay.  When you say "enter the charges," can you just help

25    us understand what that means?  Where would you enter them?

```
1   A.   Into the computer, right into -- we had a billing -- sorry.

2   I'm trying to recall.  We had a system where we could go into

3   the patient's chart and add new charges.  So that's what we

4   would do.  We would add the charges and then we would submit

5   electronically to the insurance company and wait to get

6   confirmation of receipt.

7   Q.   So if you take a look at the top of this charge sheet, you

8   see the "Patient name" line there?

9   A.   Yes.

10  Q.   And this relates to a patient with the initials K.M., is

11  that right?

12  A.   Yes.

13  Q.   And what is the insurance for this patient?

14  A.   Medicare.

15  Q.   So if you were to get this charge sheet, where would you

16  enter the billing codes for this charge sheet?

17  A.   In the system, in the computer system.

18  Q.   And when you say, "in the computer system," is that a

19  system that then submits the claim to Medicare, or something

20  else?

21  A.   Yes, we had a -- what is it called?  It's like a -- it's a

22  company that does -- like a clearinghouse that processes

23  claims.  And the claims that would go through successfully you

24  would get confirmation.  But it could deny certain charges for

25  any reason, a diagnosis code or whatever the reason may be.  So
```

1    if the claims did deny, then I had to go let him know and go in

2    and try to resubmit.

3    Q.   Okay.  We can take it down, please, Ms. Slater.

4            Could we please publish for the witness Exhibit 25B,

5    page 4?

6            Ms. Wright, do you see --

7            THE COURT:  Everyone have it?

8            THE JURORS:  (Shake heads.)

9            MS. SIMON:  It hasn't been entered into evidence yet.

10           THE COURT:  25B?

11           MS. SIMON:  I'm sorry.  This is page 4.

12           THE COURT:  I see.

13   BY MS. SIMON:

14   Q.   Do I see that on your screen, Ms. Wright?

15   A.   I do.

16   Q.   Do you recognize this document?

17   A.   I do.

18   Q.   Is this your handwriting on the document?

19   A.   It is.

20   Q.   Okay.  What is this document?

21   A.   This is just a printout I gave Dr. Gooding of the fees of

22   all the charges.

23           MS. SIMON:  At this time the government would move to

24   admit Exhibit 25B, page 4 into evidence.

25           THE COURT:  Any objection?

 1                    MR. KHOURI:  No, Your Honor.

 2                    THE COURT:  It will be admitted.

 3                    MS. SIMON:  Could we please publish that,

 4        Mr. Bradley?

 5                    THE COURT:  We'll see how this works out.  I'm more

 6        concerned about 13 and 14.  You guys got it all, 13, 14?

 7                    JUROR 13:  (Nods head.)

 8                    JUROR 14:  (Nods head.)

 9                    THE COURTROOM DEPUTY:  I assume they do.

10                    THE COURT:  Okay.

11        BY MS. SIMON:

12        Q.  Ms. Wright, looking at this charge sheet, could you -- I

13        believe on your screen you can touch the document.  Could you

14        circle or draw a line pointing to a billing code?  Any billing

15        code is fine.

16        A.  (Complies with request.)

17        Q.  And did you circle the billing codes 64647 and also 64642?

18        A.  Yes.

19        Q.  Okay.  What are the handwritten numbers that are on this

20        charge sheet?

21        A.  The fees, what we -- the charge, what we billed for.

22        Q.  What you billed for, for each of the procedures that are

23        listed here?

24        A.  That is correct.

25        Q.  Are those usually on a charge sheet?

416

1    A.  Well, it depends on the provider.  Some providers do add

2    that on theirs, it all depends on the provider.

3    Q.  Did they use on Dr. Gooding's charge sheets?

4    A.  No.

5    Q.  Okay.  Thank you.  Taking a look at the second column.  Do

6    you see the heading "Neurolytic"?

7    A.  I do.

8    Q.  And do you know who put the headings on this document?

9    A.  I believe Dr. Gooding did.  I'm not sure.  This was done

10   before my arrival to the practice.

11   Q.  Okay.  What are the billing codes that are listed under

12   this heading?

13   A.  64633, 64634, 64635, 64636.

14   Q.  And can we take a look, please, at the top of the third

15   column on this document?

16          Do you see the heading "Ultrasound"?

17   A.  Yes.

18   Q.  Did Dr. Gooding bill for ultrasound a lot?

19   A.  Yes.

20   Q.  What are the first two codes that are listed under

21   ultrasound?

22   A.  76881, 76882.

23   Q.  And does say what type of ultrasound these codes are for?

24   A.  Complete and limited -- complete extremity, limited

25   extremity.

1    Q.  We can take that down, Ms. Slater.

2              Ms. Wright, have you heard of fluoroscopy before?

3    A.  I have.

4    Q.  Did Dr. Gooding have a fluoroscopy machine in his office?

5    A.  He did not.

6    Q.  Did he ever consider getting one for the office?

7    A.  He did not.

8    Q.  Did you ever give Dr. Gooding information about

9    fluoroscopy-guided spinal injections?

10   A.  I did.

11   Q.  And what was that information?

12   A.  I printed off the latest literature from the Medicare

13   website on those codes that we just discussed, the 64633, -34,

14   64635 and -36.  I printed that information off and gave Dr.

15   Gooding the literature.

16   Q.  And did he say anything to you when he received that from

17   you?

18   A.  Well, it did say that one of the codes, I believe it was

19   the 6 --

20              MR. KHOURI:  Objection.  Hearsay.

21              THE COURT:  The question was -- the objection is

22   sustained.

23        I think the question was:  What, if anything, did Dr.

24   Gooding say to you?

25              THE WITNESS:  What did Dr. Gooding say?

1          THE COURT:  Yes, if he said anything at all.

2          THE WITNESS:  So, the -- we talked about the

3    fluoroscopy and he stated that he has the newest interventional

4    way of doing it with the ultrasound.

5    BY MS. SIMON:

6    Q.  And what did you understand that to mean?

7          MR. KHOURI:  Objection.

8          THE COURT:  Overruled.  What was your objection?

9          MR. KHOURI:  Relevance.

10          THE COURT:  Overruled.

11   A.  I wasn't really sure of that way, I hadn't heard of it.

12   But, he's the doctor, so I wouldn't second-guess a doctor.

13   BY MS. SIMON:

14   Q.  And just to be clear, when you said you weren't really

15   sure, you hadn't heard of it that way, what "it" are you

16   talking about?"

17   A.  Using an ultrasound to do some of the procedures.

18   Q.  Okay.  Did you ever receive a nerve block procedure?

19   A.  I did, several.

20   Q.  Ms. Slater, could we please pull up Exhibit 25B, page 7 --

21   excuse me.  That's page 2.  Apologies.

22          THE COURT:  Was this admitted?

23          MS. SIMON:  This has not yet been admitted, Your

24   Honor.

25          THE COURT:  It's hard to tell because I just have

1    25B.

2    BY MS. SIMON:

3    Q.  Ms. Wright, do you see that on your screen?

4    A.  Yes.

5    Q.  Do you recognize this document?

6    A.  Yes.  This is my procedure.

7             MS. SIMON:  At this time we move to admit Government

8    Exhibit 25B, page 2, into evidence.

9             MR. KHOURI:  I have an objection.

10            THE COURT:  You do?

11        (Bench discussion:)

12            THE COURT:  Go ahead, Mr. Khouri.

13            MR. KHOURI:  Her medical records and procedures that

14   she's received has nothing to do with this case.

15            THE COURT:  Well, I don't know.  Where are you going

16   with this, Ms. Simon?

17            MS. SIMON:  Your Honor, there's a note handwritten by

18   the defendant, a Post-it note on top of this exhibit.  I'm

19   certainly happy to lay the foundation with her with that before

20   I seek to admit it.

21            THE COURT:  Okay.  What's the relevance?

22            MS. SIMON:  The relevance is, you know, we believe

23   that the testimony will be that she provided Dr. Gooding with

24   this procedure report specifically so that he could see the

25   type of procedure report that her doctor did and should be done

1    for this procedure.

2                THE COURT:  I see.

3                MR. KHOURI:  That's malpractice.  It has nothing to

4    do with how reports are written, has nothing -- the case has

5    nothing to do with whether he was doing the right procedure or

6    the wrong procedure.

7                THE COURT:  I think -- you put his state of mind at

8    issue, and so it does go to the information that she provided

9    him about what she was getting.  So if you put his state of

10   mind at issue, I think it -- if the state of mind is going to

11   be -- and it's an element, then I think it's relevant.  So I'm

12   going to overrule the objection.

13        But please direct your -- I'm going to let Ms. Simon lead

14   a little bit so that we don't go into a whole lot of extraneous

15   stuff.

16        Thank you.

17        (Open court:)

18                THE COURT:  The objection is overruled.

19                MS. SIMON:  Permission to publish?

20                THE COURT:  Yes.

21        The objection is overruled.  Page 2 of 25B will be

22   admitted.

23   BY MS. SIMON:

24   Q.  Ms. Wright, do you see the Post-it note on the top of this

25   page?

```
 1    A.  I do.

 2    Q.  And who wrote the Post-it note?

 3    A.  Dr. Gooding.

 4    Q.  Why would Dr. Gooding have your personal procedure report

 5    from a different doctor?

 6    A.  I was showing him --

 7              MR. KHOURI:  Objection.  Speculation.

 8              THE COURT:  Well, rephrase.  Objection is sustained.

 9    BY MS. SIMON:

10    Q.  Did you provide your personal procedure report to Dr.

11    Gooding?

12    A.  I did.

13    Q.  Why did you do that?

14    A.  I wanted to show how detailed the actual office note was,

15    to give him an idea of a way we could improve with medical

16    records.

17    Q.  And why did you want to do that?

18    A.  To be compliant and make sure that patients were able to

19    follow through on their procedures.

20    Q.  We can take that down, please, Ms. Slater.

21              Were you ever aware of monthly billing targets that

22    Dr. Gooding had?

23    A.  No.

24    Q.  Ms. Slater, could you please pull up Exhibit 25B, page 3?

25              This has already been admitted into evidence.  And I
```

 1     would ask to please publish to the jury, Mr. Bradley.

 2                Ms. Wright, do you see this note?

 3     A.  I do.

 4     Q.  And is this in Dr. Gooding's handwriting?

 5     A.  Yes.

 6     Q.  Is it addressed to you?

 7     A.  It is.

 8     Q.  Is your handwriting also on the note, at the bottom?

 9     A.  Yes, where the asterisk is.

10     Q.  Do you see at the top where it says "MCR lagging"?

11     A.  Yes.

12     Q.  What is MCR?

13     A.  Medicare.

14     Q.  And do you see the next line?

15     A.  Yes.

16     Q.  And what is that -- what does that say?

17     A.  We are under 30K, below my target for this month.  Maybe it

18     will kick in next month, hope so.

19     Q.  Thank you.

20     A.  You're welcome.

21     Q.  Were Medicare claims that you submitted for Dr. Gooding

22     ever denied?

23     A.  Yes.

24     Q.  You mentioned that before, I think.  What was the process

25     when that would happen?

1          MR. KHOURI:  Excuse me, Your Honor.  Could we take

2     the highlight --

3          THE COURT:  You want to take the highlighting down?

4     Yes, we can take --

5          MS. SIMON:  We can take the whole exit down, Ms.

6     Slater.

7          Thank you so much.

8     BY MS. SIMON:

9     Q.  Do you remember the question, Ms. Wright?

10    A.  I don't.

11    Q.  I'll ask it again.  Okay.  What was the process when

12    Medicare claims were denied?

13    A.  I would print the EOB out, pull the chart, and we would put

14    the charge sheet that we billed for where it was denied and

15    give it back to the doctor, so the doctor would make any

16    changes.

17    Q.  He would make changes, and then what would happen?

18    A.  I would resubmit the claim.

19    Q.  Ms. Slater, could we please pull up what's been previously

20    admitted, Exhibit 25B, page 7.

21          Can we publish this?  Thank you, Mr. Bradley.

22          Do you see the note on your screen, Ms. Wright?

23    A.  I do.

24    Q.  Is this Dr. Gooding's handwriting?

25    A.  And mine.

1   Q.  And yours?

2   A.  Yes.

3   Q.  Where is your handwriting on the note?

4   A.  At the very top where it says "done" and at the very bottom

5   where it says "sent email to Dr. G."

6   Q.  Do you see where it says, at the top, "Records, records,

7   records.  Still no pay, or very little"?

8   A.  Yes.

9   Q.  Pay from whom?

10          MR. KHOURI:  Objection.  Speculation.

11          THE COURT:  If you know.  If you know what he was

12   referring to.

13          THE WITNESS:  I'm not sure what.

14          THE COURT:  Okay.

15   BY MS. SIMON:

16   Q.  Ms. Wright, would you read the next line?

17   A.  Yes.  "This has gone on too long.  Call CMS."  So that's

18   Medicare.

19   Q.  CMS is Medicare?

20   A.  Yes.

21   Q.  Did you call CMS?

22   A.  I'm about 90 percent sure I did.

23   Q.  Did you ever call CMS about spinal injections with

24   fluoroscopy guidance?

25   A.  I'm sure I spoke about codes.  I don't know if I spoke

1    about the actual literature of the code.

2    Q.  Did you call CMS about the code 64633, 64634, 64635, and/or

3    64636?

4    A.  Yes.  I called about every code on that charge sheet,

5    mostly.

6             THE COURT:  Ms. Simon, you have a couple minutes to

7    figure out a good place to stop, because I have a 4:30 meeting

8    and I need to excuse the jury.  But we have a few minutes, so

9    whenever you think is a good place to break within the next

10   five minutes.

11            MS. SIMON:  Okay.  Understood, Your Honor.

12          One moment, please.

13   BY MS. SIMON:

14   Q.  When you called CMS about those codes, the 64633

15   through -36 codes, why did you call them?

16   A.  If I had a question about the code or if the code was

17   denied or if I wanted to know about payable diagnosis, getting

18   guidance from Medicare, I would always reach out to any

19   insurance company so I can get the best information possible.

20   Q.  Do you recall the 646 codes being denied?

21   A.  I do recall them -- they were paying at first, and then

22   they denied for odd reasons, so I called to find out.

23            MS. SIMON:  Okay.  I think if it works for Your

24   Honor, that this would be a good place to stop.

25            THE COURT:  Yes, I think it makes sense to break.

1              Ms. Wright, you'll have to come back tomorrow to complete

2      your testimony.

3              THE WITNESS:  Oh, I can't.  I can't.  I've already

4      took off work twice.

5              THE COURT:  Okay.  I'm going to excuse the jury for a

6      minute -- for the day, and then we'll talk about your

7      situation.

8              Ladies and gentlemen of the jury, it's time for us -- I

9      have a 4:30 meeting.  We will start promptly at 9:30 a.m.  We

10     don't have any morning matters.  So if you want breakfast, come

11     at 9.  And tomorrow we'll end at 4 because of a prior conflict

12     of one of the parties.  So we'll plan on breaking at 4 o'clock

13     tomorrow, for planning purposes.

14             Have a good evening.  Please don't discuss the case or

15     the testimony or anything else about this case.

16             Make sure you have everything.

17             THE JURORS:  Thank you.

18             THE COURT:  Okay.  Have a good evening.

19        (Whereupon the jurors leave the courtroom.)

20             THE COURT:  Okay.  Ms. Wright, I'm afraid you are in

21     the middle of your direct examination as a government witness

22     and you have to be back tomorrow.  So tell me what your

23     situation is.

24             THE WITNESS:  Well, I got the subpoena late and I had

25     to give 24-hour notice, and I had to be out right after a

1    holiday.  And I've been off the 6th and the 7th.  So if I

2    didn't need to be off the 6th -- I was pretty much told if I

3    didn't come, I would go to -- get locked up.

4              THE COURT:  Well, we don't want to get there.  But

5    you are under subpoena and you have to come.  But I don't want

6    you to get in trouble at work and I don't want you to lose your

7    job or anything.  Do you work for a doctor's office?

8              THE WITNESS:  I do.

9              THE COURT:  Would it assist you if I gave a letter or

10   you had the prosecutor call and explain what was going on?  And

11   it's not your choice, you're under court order, because a

12   subpoena is a court order.

13             THE WITNESS:  Right.

14             THE COURT:  And you cannot be fired for that.  I

15   mean, that's -- you know, I understand people are unhappy, but

16   this isn't your choosing.  This is a court order.  Would it --

17   would it be helpful or would it make things worse?  Do you want

18   a copy of the subpoena?

19             THE WITNESS:  They have it.

20             THE COURT:  They have it.  So the prosecutors can

21   call and explain what's going on, or I can call and explain

22   what's going on.  What would you prefer?

23             THE WITNESS:  I don't know if that's a good idea, to

24   have a judge.

25             THE COURT:  All right.  I know exactly.  I don't want

1    to make things worse.  Okay.  Why don't you have the prosecutor

2    call them and explain that this is not -- you have no choice,

3    this is not your doing, it's certainly not your desire, but you

4    have to complete your testimony.  And I don't think you will go

5    past -- we start at 9:30, I think you'll be done by 11

6    tomorrow.

7         Mr. Khouri is that a fair -- how much more do you have,

8    Ms. Simon?

9              MS. SIMON:  Maybe 15 minutes.

10             THE COURT:  Okay.  Yeah, you'll be out of here by 11.

11             THE WITNESS:  I guess I don't have a choice.

12             THE COURT:  You don't have a choice.  I'm so sorry.

13   But we will try to mitigate any blowback in your direction.  So

14   just talk with the prosecutors about who they need to talk to

15   and whatever assurances they need to make.

16        And I also have to emphasize with you that you cannot

17   discuss with them or anyone the topic of your testimony, the

18   subject matter of your testimony because you're still on the

19   stand, technically.  So you can talk to them about who they

20   need to talk to, what number they need to call and so on, but

21   you can't talk to them about your testimony while you're still

22   on the stand.

23             THE WITNESS:  I don't want to.

24             THE COURT:  Okay.  Good.  Perfect.  See you tomorrow

25   at 9:30 in the morning.

1        THE WITNESS:  Okay.

2        THE COURT:  If you could wait outside -- I'll be with

3   the lawyers for a few minutes -- and then talk with Ms. Simon

4   or Ms. Willis.

5        THE WITNESS:  Yes, ma'am.

6        THE COURT:  Thank you very much.

7      If you need to get me involved --

8      (Whereupon the witness leaves the courtroom.)

9        MS. WILLIS:  May I approach?

10        THE COURT:  Yes.

11        MS. WILLIS:  I think one of the issues with this

12   witness may also be that she's subpoenaed by both the defense

13   and the government.  And so we told her that we could not

14   excuse her from showing up because it was their subpoena.  We

15   could tell her the day that we thought that we would testify,

16   like, in the case-in-chief, but that we can't excuse her from

17   the defense's subpoena.  So --

18        THE COURT:  Do you want -- are you planning on

19   calling her as a witness?  Do you want to call her out of turn?

20        MR. KHOURI:  No, Your Honor.  I don't -- I think I

21   want to cross her.

22        THE COURT:  Right.

23        MR. KHOURI:  But I think we don't need to call her as

24   a witness.

25        THE COURT:  So once she's finished cross-examination

 1   and re-direct, she'll be released from your subpoena, is that

 2   correct?

 3           MR. KHOURI:  Yes, Your Honor.

 4           THE COURT:  All right.  Great.

 5       One other thing, Mr. Khouri.  With the email on the

 6   phone, don't do that to me.  That was a bit of an ambush.  That

 7   was an email that was not turned over, that the defense had not

 8   had a chance to see.  It was used to refresh, it was not used

 9   as substantive evidence.  And to ask me in front of the jury if

10   you could show it to them was not proper procedure.  And,

11   frankly, I don't want to make you look bad by admonishing you

12   for that, so I tried not to.  But please don't do that again.

13           MR. KHOURI:  Yes, Your Honor.

14           THE COURT:  I realize it was something you were doing

15   on the fly, but it wasn't admissible anyway because it was just

16   being used to refresh her recollection.

17           MR. KHOURI:  We just found out about --

18           THE COURT:  You have to speak into the microphone.

19           MR. KHOURI:  We just found out about this email --

20   and there's a similar one from Ms. Wright -- just yesterday.

21   And I considered it to be impeachment and, really, not subject

22   to being shown --

23           THE COURT:  Which is why I'm a stickler.  You used it

24   to refresh her recollection.  And if it refreshes recollection,

25   it doesn't come in as substantive evidence.

 1          In any event, these are emails from your client.  I'm not

 2    sure why you're just getting them.  But be that as it may, you

 3    need to slow them to Ms. Simon and Ms. Willis tonight, if you

 4    intend to use them at all in cross-examination or in your case.

 5          And, everybody, if you are going to refresh, there is a

 6    way to do this, which I require, which is:  Do you remember?

 7    No, I don't remember.  Would it help you remember, refresh your

 8    recollection -- whatever you want to say -- if I showed you a

 9    bowl of spaghetti?  You show them the document.  When you're

10    finished -- they look at it silently, when they finish, they

11    look up.  You ask:  Is your recollection refreshed?  Do you

12    remember now?  That is not admissible.  It's being used to

13    refresh recollection, which is why it doesn't have to be

14    admitted evidence.

15          If you want to impeach, you confront with the impeaching

16    statement:  Sir, you're saying today that the moon was yellow,

17    but five months ago you said the moon was blue.  No.  Okay,

18    then I'm going to read:  Did you testify in the grand jury?

19    And that's how I want it done.  Otherwise, we get into this

20    mushiness of asking them if they remember, when what you're

21    trying to do is impeach.  So I'm a bit picky about that, but

22    that's how I require it.

23          MR. KHOURI:  Thank you.

24          THE COURT:  All right.  Thanks.  Everyone, I'll see

25    you at -- I'll be here at nine.  If there are matters that I

1    need to address, let's do them at 9:15 and plan to start with

2    Ms. Wright promptly at 9:30.  Thank you.

3              (Proceedings concluded at 4:32 p.m.)

4                           *   *   *

5

6

7

8              CERTIFICATE OF OFFICIAL COURT REPORTER

9

10        I, JANICE DICKMAN, do hereby certify that the above and

11   foregoing constitutes a true and accurate transcript of my

12   stenographic notes and is a full, true and complete transcript

13   of the proceedings to the best of my ability.

14                      Dated this 8th day of September, 2022

15

16

17              _____

18              Janice E. Dickman, CRR, CMR, CCR
                Official Court Reporter
19              Room 6523
                333 Constitution Avenue, N.W.
20              Washington, D.C.  20001

21

22

23

24

25

```
 1                                    INDEX

 2      WITNESSES:

 3          MAYA PARROTT
                    Direct Examination by Ms. Willis..................328
 4                  Cross-Examination by Mr. Khouri...................367
                    Redirect Examination by Ms. Willis...............400
 5
            ERICA WRIGHT
 6                  Direct Examination by Ms. Simon..................405

 7

 8      EXHIBITS RECEIVED:

 9      Exhibit 11...............................................349
        Exhibits 12A and 12B.....................................353
10      Exhibit 13...............................................355
        Exhibits 14A and 14B.....................................357
11
        Exhibit 15...............................................359
12      Exhibit 16...............................................361
        Exhibit 17A..............................................349
13      Exhibit 17B..............................................339

14      Exhibit 18A..............................................353
        Exhibit 19A..............................................356
15      Exhibit 20A..............................................357
        Exhibit 21A..............................................360
16
        Exhibit 22A..............................................361
17      Exhibit 24...............................................332
        Exhibits 25B, pages 1, 3, 5, 6, 7, 8.....................410
18      Exhibit 25B, page 2......................................420
        Exhibit 25B, page 4......................................415
19
                                  *   *   *
20

21

22

23

24

25
```

**'**

**'17** [1] - 406:5

# 1

**1** [3] - 409:17, 410:2, 433:17
**10** [1] - 356:8
**10-second** [1] - 411:19
**11** [6] - 348:7, 348:10, 349:2, 356:9, 428:5, 428:10
**11............................**
**..................349** [1] - 433:9
**1250** [1] - 315:19
**12A** [7] - 352:6, 352:9, 352:23, 353:16, 353:21, 353:23, 433:9
**12B** [3] - 352:18, 352:19, 352:23
**12B............................**
**..........353** [1] - 433:9
**13** [17] - 316:5, 318:4, 318:8, 318:12, 319:5, 319:7, 319:9, 354:21, 354:22, 354:23, 355:2, 355:17, 415:6, 415:7
**13............................**
**..................355** [1] - 433:10
**13th** [2] - 351:18, 362:17
**14** [7] - 350:10, 350:19, 412:5, 412:9, 415:6, 415:8
**1400** [1] - 315:14
**14A** [4] - 356:19, 356:21, 357:3, 433:10
**14B** [2] - 356:24, 357:3
**14B............................**
**..........357** [1] - 433:10
**14th** [1] - 359:1
**15** [9] - 340:22, 359:11, 359:16, 359:24, 359:25, 360:1, 361:13, 362:9, 428:9
**15............................**
**..................359** [1] - 433:11
**16** [2] - 360:23, 361:3
**16............................**
**..................361** [1] - 433:12
**17A** [7] - 349:7, 349:9, 349:14, 349:19, 400:24, 401:3, 411:5
**17A............................**

**..................349** [1] - 433:12
**17B** [4] - 338:24, 339:2, 339:4, 339:11
**17B............................**
**..................339** [1] - 433:13
**17th** [2] - 316:11, 318:7
**18** [1] - 354:3
**18A** [5] - 353:3, 353:4, 353:8, 354:1, 354:2
**18A............................**
**..................353** [1] - 433:14
**18th** [1] - 345:16
**19-cr-255** [1] - 315:3
**19A** [7] - 355:16, 355:21, 355:22, 355:23, 356:3, 356:8, 356:9
**19A............................**
**..................356** [1] - 433:14
**19th** [3] - 318:12, 318:15, 318:16
**1:30** [1] - 315:7

# 2

**2** [8] - 315:5, 349:19, 349:20, 351:2, 411:5, 418:21, 419:8, 420:21
**2-16-16** [1] - 360:12
**2-24-16** [1] - 362:10
**2............................**
**........420** [1] - 433:18
**20001** [2] - 315:24, 432:20
**20005** [1] - 315:14
**20036** [1] - 315:20
**2012** [2] - 330:3, 330:6
**2015** [4] - 321:15, 323:20, 330:10, 332:6
**2016** [6] - 339:18, 349:21, 351:18, 356:10, 362:17, 406:5
**2017** [5] - 326:4, 359:1, 386:14, 386:15
**2018** [10] - 321:15, 323:20, 360:17, 380:5, 385:5, 387:10, 387:12, 387:23, 388:5, 389:16
**2019** [1] - 406:8
**202** [2] - 315:15, 315:20
**202-354-3267** [1] - 315:24
**2022** [2] - 315:6, 432:14

**20A** [6] - 357:8, 357:12, 357:14, 357:16, 357:20, 358:18
**20A............................**
**..................357** [1] - 433:15
**21** [1] - 362:15
**215** [1] - 315:17
**21A** [3] - 360:4, 360:7, 360:10
**21A............................**
**..................360** [1] - 433:15
**22** [1] - 339:16
**2222** [1] - 315:17
**22A** [5] - 361:6, 361:7, 361:10, 361:12, 362:9
**22A............................**
**..................361** [1] - 433:16
**23rd** [1] - 385:5
**24** [3] - 331:19, 331:25, 332:9
**24-23** [1] - 336:13
**24-29** [1] - 336:20
**24-hour** [1] - 426:25
**24............................**
**..................332** [1] - 433:17
**25** [5] - 353:13, 353:14, 354:6, 354:8, 404:12
**25B** [14] - 409:17, 410:2, 414:4, 414:10, 414:24, 418:20, 419:1, 419:8, 420:21, 421:24, 423:20, 433:17, 433:18, 433:18
**25th** [1] - 387:12
**26** [2] - 360:15, 360:16
**27** [1] - 360:17

# 3

**3** [4] - 409:18, 410:2, 421:24, 433:17
**30** [4] - 357:9, 357:10, 357:20, 358:19
**30K** [1] - 422:17
**31st** [2] - 339:18, 349:21
**333** [2] - 315:23, 432:19
**336-2433** [1] - 315:18
**34** [1] - 417:13
**353-0822** [1] - 315:15
**36** [2] - 417:14, 425:15

# 4

**4** [5] - 414:5, 414:11, 414:24, 426:11, 426:12
**4............................**
**........415** [1] - 433:18
**4:25** [2] - 320:10, 366:19
**4:30** [4] - 320:10, 366:20, 425:7, 426:9
**4:32** [1] - 432:3

# 5

**5** [3] - 409:18, 410:2, 433:17
**59** [1] - 370:10

# 6

**6** [7] - 318:17, 351:10, 352:3, 409:18, 410:2, 417:19, 433:17
**646** [1] - 425:20
**64633** [4] - 416:13, 417:13, 425:2, 425:14
**64634** [2] - 416:13, 425:2
**64635** [3] - 416:13, 417:14, 425:2
**64636** [2] - 416:13, 425:3
**64642** [1] - 415:17
**64647** [1] - 415:17
**6523** [2] - 315:23, 432:19
**6th** [2] - 427:1, 427:2

# 7

**7** [6] - 315:6, 409:18, 410:2, 418:20, 423:20, 433:17
**700** [1] - 315:19
**76881** [1] - 416:22
**76882** [1] - 416:22
**7th** [1] - 427:1

# 8

**8** [3] - 360:10, 409:18, 410:2
**8............................**
**........410** [1] - 433:17
**861-0870** [1] - 315:20
**8th** [1] - 432:14

# 9

**9** [1] - 426:11

**90** [1] - 424:22
**92612** [1] - 315:17
**949** [1] - 315:18
**9:15** [1] - 432:1
**9:30** [4] - 426:9, 428:5, 428:25, 432:2

## A

**A.M** [2] - 354:24, 356:1
**a.m** [1] - 426:9
**ability** [1] - 432:13
**able** [4] - 368:19, 371:24, 373:5, 421:18
**absent** [1] - 327:13
**absolutely** [1] - 362:1
**abundance** [1] - 355:12
**acceptable** [2] - 317:9, 370:17
**accrue** [1] - 408:16
**accuracy** [1] - 374:24
**accurate** [7] - 332:2, 368:17, 374:3, 374:9, 397:3, 409:23, 432:11
**accurately** [1] - 322:15
**acting** [2] - 395:16, 398:10
**Action** [1] - 315:3
**actual** [8] - 321:4, 342:1, 344:20, 356:15, 368:16, 370:2, 421:14, 425:1
**add** [3] - 413:3, 413:4, 416:1
**addition** [1] - 363:22
**address** [3] - 319:11, 388:3, 432:1
**addressed** [1] - 422:6
**admissible** [2] - 430:15, 431:12
**admit** [21] - 332:9, 339:11, 349:2, 349:14, 352:23, 353:7, 353:16, 353:21, 355:2, 356:3, 357:3, 357:16, 359:16, 360:7, 361:2, 361:10, 388:17, 410:1, 414:24, 419:7, 419:20
**admitted** [27] - 332:12, 339:14, 349:5, 349:17, 353:1, 353:11, 353:25, 355:4, 355:19, 355:20, 356:6, 357:6, 357:18, 359:18, 360:8, 361:4, 361:11, 401:4, 410:8, 411:6, 415:2, 418:22, 418:23, 420:22, 421:25, 423:20, 431:14
**admonishing** [1] -

**430**:11
**affiliated** [1] - 329:20
**afraid** [1] - 426:20
**afternoon** [13] - 320:25, 321:2, 321:6, 321:8, 327:18, 328:6, 367:6, 400:18, 404:10, 404:17, 404:22, 404:23, 405:10
**AFTERNOON** [1] - 316:1
**ago** [3] - 410:11, 410:16, 431:17
**agree** [2] - 374:3, 377:21
**agreed** [2] - 324:8
**ahead** [5] - 333:5, 340:20, 346:10, 388:20, 419:12
**alcohol** [1] - 381:24
**align** [1] - 364:18
**alone** [9] - 343:21, 343:23, 344:17, 375:22, 378:12, 402:11, 403:1, 403:4, 403:12
**alternate** [4] - 316:13, 316:19, 317:5, 318:25
**alternates** [1] - 319:1
**Amber** [4] - 384:22, 384:24, 385:2, 385:9
**ambush** [1] - 430:6
**America** [1] - 315:3
**amount** [4] - 326:17, 364:14, 364:18, 385:25
**analyst** [2] - 328:12, 328:13
**annex** [2] - 333:2
**answer** [8] - 346:8, 371:9, 371:10, 371:12, 380:9, 381:20, 386:5, 408:9
**answered** [2] - 345:12, 382:17
**anyway** [2] - 324:21, 430:15
**APC** [1] - 315:16
**apologies** [2] - 357:11, 418:21
**apologize** [1] - 340:9
**applies** [1] - 398:18
**appointment** [4] - 340:3, 341:3, 347:20, 363:17
**appointments** [2] - 339:5, 341:10
**approach** [3] - 388:12, 388:21, 429:9
**appropriate** [2] - 395:6, 395:7

**approximate** [2] - 340:2, 340:22
**area** [5] - 333:17, 333:20, 334:14, 377:11, 391:10
**arrival** [1] - 416:10
**arrived** [2] - 338:19, 370:7
**arthritic** [2] - 393:8, 394:7
**article** [1] - 329:6
**asserted** [4] - 397:11, 397:24, 398:1, 398:16
**assist** [1] - 427:9
**assistance** [1] - 392:4
**assistant** [8] - 325:6, 328:20, 331:6, 333:24, 367:15, 385:13, 385:15, 390:10
**assistants** [4] - 331:1, 331:4, 368:5, 395:13
**assisted** [1] - 372:2
**assume** [3] - 359:21, 392:12, 415:9
**assumed** [1] - 318:14
**assuming** [4] - 378:15, 383:2, 395:17, 395:19
**assurances** [1] - 428:15
**asterisk** [1] - 422:9
**attached** [1] - 390:12
**attended** [1] - 328:20
**attention** [3] - 319:4, 327:15, 401:6
**attitude** [1] - 365:7
**Avenue** [4] - 315:14, 315:19, 315:23, 432:19
**aware** [1] - 421:21

## B

**baby** [1] - 370:22
**background** [1] - 367:15
**bad** [3] - 376:21, 395:16, 430:11
**balky** [1] - 412:7
**based** [4] - 324:4, 351:7, 364:19, 401:19
**basis** [2] - 347:25, 400:4
**bear** [1] - 319:3
**became** [1] - 402:4
**BEFORE** [1] - 315:9
**begin** [1] - 397:16
**beginning** [1] - 342:4
**below** [1] - 422:17
**bench** [6] - 345:18, 382:10, 393:12,

397:15, 399:13, 419:11
**benefit** [1] - 392:15
**benefits** [3] - 365:16, 365:19, 409:3
**best** [4] - 333:3, 355:13, 425:19, 432:13
**better** [2] - 358:2, 392:13
**between** [5] - 397:5, 397:6, 398:6, 402:3, 406:5
**beyond** [2] - 400:5, 400:6
**big** [6] - 337:8, 350:17, 358:10, 358:11, 408:17, 412:3
**bill** [7] - 326:13, 345:1, 372:22, 373:24, 407:16, 407:19, 416:18
**billed** [24] - 321:19, 321:20, 321:21, 322:3, 322:4, 323:2, 323:7, 323:8, 323:17, 323:22, 323:24, 324:2, 325:3, 326:10, 345:7, 364:19, 365:11, 370:3, 372:6, 374:19, 407:22, 415:21, 415:22, 423:14
**biller** [14] - 323:23, 330:24, 331:3, 331:4, 333:23, 333:25, 334:1, 345:2, 363:3, 363:19, 374:20, 384:15, 384:16
**billing** [44] - 324:16, 325:8, 325:10, 325:12, 325:18, 325:20, 325:25, 326:15, 326:18, 369:9, 374:2, 374:9, 374:18, 374:24, 383:18, 385:10, 385:11, 396:20, 396:22, 396:24, 397:2, 397:3, 397:13, 398:11, 399:5, 399:6, 399:7, 401:22, 401:25, 402:3, 406:17, 406:18, 407:25, 410:17, 410:20, 410:23, 413:1, 413:16, 415:14, 415:17, 416:11, 421:21
**bills** [1] - 373:2
**bit** [7] - 328:19, 341:13, 347:13, 363:21, 420:14, 430:6, 431:21
**blind** [1] - 323:18
**block** [3] - 322:6, 322:21, 418:18
**blocked** [1] - 335:10
**blocking** [1] - 323:14

**blood** [2] - 343:4, 368:20
**blowback** [1] - 428:13
**Blue** [4] - 338:18, 356:13, 359:6, 407:13
**blue** [1] - 431:17
**body** [4] - 377:11, 400:2, 404:3, 412:15
**bolted** [1] - 320:7
**book** [1] - 318:13
**bothering** [1] - 372:21
**Botox** [1] - 401:18
**bottom** [19] - 351:2, 351:11, 351:14, 351:15, 351:16, 352:1, 352:3, 353:14, 354:9, 354:17, 360:13, 360:18, 362:10, 362:18, 363:17, 363:18, 422:8, 424:4
**bowl** [1] - 431:9
**box** [4] - 364:11, 364:12, 364:13, 399:14
**Bradley** [11] - 316:4, 316:5, 316:14, 318:9, 340:16, 410:14, 411:9, 412:6, 415:4, 422:1, 423:21
**break** [5] - 317:14, 366:22, 425:9, 425:25
**breakfast** [1] - 426:10
**breaking** [2] - 320:10, 426:12
**briefly** [2] - 317:16, 400:14
**bring** [2] - 317:14, 319:10
**bringing** [1] - 383:4
**brought** [2] - 373:9, 373:17
**building** [3] - 329:21, 329:22, 329:24
**business** [2] - 390:4, 390:25
**buttons** [1] - 350:7
**BY** [76] - 328:5, 329:12, 333:6, 335:1, 335:11, 336:6, 337:20, 339:15, 340:21, 342:14, 342:21, 343:7, 343:13, 345:14, 346:18, 348:23, 349:6, 349:18, 350:23, 353:2, 353:12, 354:7, 355:15, 355:24, 356:7, 357:7, 357:19, 358:24, 360:3, 360:11, 361:5, 361:14, 362:8, 365:6, 366:9, 367:5, 373:16, 374:7, 376:10, 376:18, 380:3,

382:2, 383:1, 384:21, 386:11, 388:24, 389:6, 389:13, 390:2, 390:24, 394:5, 396:2, 396:16, 399:16, 400:17, 401:5, 401:9, 402:23, 403:20, 405:9, 408:13, 410:10, 410:15, 411:11, 411:20, 412:11, 414:13, 415:11, 418:5, 418:13, 419:2, 420:23, 421:9, 423:8, 424:15, 425:13
**bye** [1] - 319:8

# C

**CA** [1] - 315:17
**cannot** [3] - 346:6, 427:14, 428:16
**cans** [1] - 378:25
**care** [5] - 324:18, 338:8, 347:9, 351:20, 383:25
**careful** [1] - 346:3
**carefully** [1] - 326:24
**carried** [1] - 376:7
**Carrollton** [1] - 328:22
**cart** [1] - 334:18
**case** [10] - 319:2, 319:4, 321:9, 326:20, 419:14, 420:4, 426:14, 426:15, 429:16, 431:4
**case-in-chief** [1] - 429:16
**categories** [1] - 401:17
**category** [2] - 401:11, 402:5
**caution** [1] - 355:12
**CCR** [1] - 432:18
**certain** [7] - 323:24, 374:9, 376:15, 376:19, 376:20, 397:7, 413:24
**certainly** [3] - 398:2, 419:19, 428:3
**CERTIFICATE** [1] - 432:8
**certify** [1] - 432:10
**chair** [1] - 335:21
**challenges** [2] - 408:12, 408:14
**chance** [1] - 430:8
**change** [3] - 325:20, 326:1, 363:6
**changes** [2] - 423:16, 423:17
**charge** [64] - 325:7, 325:22, 345:3, 345:6, 349:10, 349:11,

349:20, 351:7, 351:17, 351:24, 353:5, 355:25, 356:15, 357:10, 357:14, 359:1, 359:8, 359:20, 360:12, 360:17, 361:7, 361:15, 362:9, 363:2, 363:4, 363:6, 363:11, 363:12, 363:18, 363:20, 364:19, 365:14, 369:13, 369:17, 400:24, 400:25, 401:1, 401:15, 407:3, 407:4, 407:5, 407:11, 407:15, 407:22, 410:16, 410:17, 410:21, 410:24, 411:2, 412:13, 412:19, 412:21, 412:22, 412:23, 413:7, 413:15, 413:16, 415:12, 415:20, 415:21, 415:25, 416:3, 423:14, 425:4
**charged** [2] - 324:17, 366:2
**charges** [11] - 356:15, 362:11, 406:17, 407:6, 407:12, 412:23, 412:24, 413:3, 413:4, 413:24, 414:22
**chart** [14] - 341:19, 341:21, 352:12, 352:13, 356:1, 357:21, 360:5, 363:16, 375:13, 375:15, 407:1, 407:3, 413:3, 423:13
**charts** [1] - 407:1
**check** [7] - 320:5, 320:17, 379:13, 379:15, 379:16, 381:4, 381:7
**checked** [4] - 331:8, 331:10, 354:18, 381:7
**checking** [3] - 324:5, 370:6, 380:8
**chemical** [2] - 322:19, 322:21
**chemicals** [1] - 323:14
**chief** [1] - 429:16
**choice** [4] - 427:11, 428:2, 428:11, 428:12
**choosing** [1] - 427:16
**chronic** [1] - 391:7
**CHUTKAN** [1] - 315:9
**circle** [3] - 378:10, 415:14, 415:17
**circled** [1] - 401:11
**circuit** [1] - 376:8
**citizens** [1] - 321:24
**claim** [4] - 324:5,

326:16, 413:19, 423:18
**claiming** [2] - 322:4, 323:2
**claims** [19] - 321:17, 324:6, 324:9, 324:10, 324:21, 325:14, 325:19, 326:2, 326:5, 326:7, 406:19, 407:10, 413:23, 414:1, 422:21, 423:12
**clamp** [1] - 369:3
**clarify** [1] - 393:19, 396:9
**clarity** [1] - 364:12
**clean** [1] - 378:23
**cleaning** [1] - 383:4
**clear** [2] - 346:21, 418:14
**clearinghouse** [1] - 413:22
**clearly** [3] - 323:16, 326:10, 382:19
**CLERK** [1] - 320:7
**client** [2] - 317:21, 431:1
**client's** [1] - 398:25
**clinic** [2] - 363:24, 405:22
**close** [5] - 322:18, 327:25, 375:18, 376:17, 405:1
**closed** [2] - 344:2, 344:3
**closely** [2] - 365:11, 365:13
**closer** [3] - 317:4, 319:15, 319:18
**clothing** [1] - 329:6
**CMR** [1] - 432:18
**CMS** [6] - 424:17, 424:19, 424:21, 424:23, 425:2, 425:14
**code** [11] - 370:2, 370:13, 410:20, 413:25, 415:14, 415:15, 425:1, 425:2, 425:4, 425:16
**codes** [24] - 325:8, 325:20, 326:1, 351:3, 360:13, 369:9, 370:4, 370:7, 397:7, 398:12, 399:18, 410:17, 410:23, 413:16, 415:17, 416:11, 416:20, 416:23, 417:13, 417:18, 424:25, 425:14, 425:15, 425:20
**colleagues** [3] - 330:22, 330:25, 391:17

**College** [3] - 328:20, 328:21, 328:23
**COLUMBIA** [1] - 315:1
**column** [3] - 401:10, 416:5, 416:15
**coming** [14] - 316:10, 316:12, 318:10, 318:16, 325:10, 327:12, 332:22, 341:7, 358:15, 365:9, 391:15, 391:21, 392:10, 392:12
**commercial** [1] - 407:13
**committing** [2] - 324:18, 390:5
**common** [4] - 326:25, 327:1, 327:4, 338:15
**community** [2] - 391:1, 391:16
**comon** [1] - 372:19
**companies** [1] - 406:19
**company** [4] - 370:3, 413:5, 413:22, 425:19
**complaints** [1] - 366:1
**complete** [5] - 416:24, 426:1, 428:4, 432:12
**compliant** [1] - 421:18
**Complies** [1] - 415:16
**composition** [1] - 318:1
**computer** [3] - 413:1, 413:17, 413:18
**concerned** [2] - 399:6, 415:6
**concluded** [1] - 432:3
**conclusion** [1] - 317:16
**conducted** [1] - 326:4
**conferences** [1] - 399:13
**confined** [1] - 346:12
**confirmation** [2] - 413:6, 413:24
**conflict** [1] - 426:11
**confront** [2] - 345:23, 431:15
**confronting** [1] - 346:10
**confusing** [2] - 382:11, 382:16
**Connecticut** [1] - 315:19
**connecting** [1] - 358:7
**consider** [3] - 319:2, 322:24, 417:6
**considered** [1] - 430:21
**consistent** [1] - 327:3
**constant** [1] - 391:15

**constitutes** [1] - 432:11
**Constitution** [2] - 315:23, 432:19
**consultant** [10] - 334:6, 396:17, 396:20, 396:22, 396:25, 397:3, 398:11, 401:22, 401:25, 402:3
**continue** [3] - 317:3, 318:24, 319:4
**continued** [2] - 326:13, 384:11
**conversations** [5] - 398:14, 398:15, 399:6, 399:17, 399:20
**convert** [1] - 317:5
**COOKE** [1] - 315:18
**Cooke** [1] - 315:19
**cool** [1] - 391:15
**copy** [5] - 387:16, 388:25, 409:14, 409:15, 427:18
**correct** [64] - 316:6, 318:7, 331:4, 337:25, 348:3, 367:16, 367:18, 367:20, 368:6, 368:9, 368:12, 368:20, 369:7, 369:20, 371:2, 372:8, 372:9, 373:17, 373:21, 374:22, 374:24, 374:25, 375:23, 375:24, 377:9, 377:13, 377:15, 377:18, 377:23, 378:4, 378:9, 380:16, 384:12, 385:3, 391:11, 391:19, 391:20, 391:23, 392:1, 392:3, 392:5, 392:6, 392:11, 392:17, 392:23, 392:25, 393:3, 394:8, 394:10, 394:16, 394:21, 395:5, 395:8, 395:15, 396:4, 396:5, 396:8, 396:11, 396:12, 396:19, 399:18, 411:2, 415:24, 430:2
**correspondence** [1] - 408:25
**Counsel** [1] - 376:16
**counsel** [7] - 319:17, 320:20, 367:10, 369:11, 369:13, 390:17, 401:22
**counts** [1] - 327:5
**County** [1] - 328:10
**couple** [2] - 321:2, 425:6
**course** [1] - 409:8
**court** [11] - 328:1,

346:17, 371:10, 373:11, 382:22, 393:22, 399:10, 420:17, 427:11, 427:12, 427:16
**Court** [3] - 315:22, 315:22, 432:18
**COURT** [235] - 315:1, 316:3, 316:7, 316:12, 317:8, 317:10, 317:13, 317:22, 317:24, 318:5, 318:9, 318:19, 319:6, 319:8, 319:10, 319:25, 320:4, 320:8, 320:16, 320:19, 320:25, 327:6, 327:10, 327:23, 328:3, 329:11, 332:10, 332:12, 332:16, 332:19, 332:24, 333:5, 334:21, 334:25, 335:7, 336:3, 337:18, 339:12, 339:14, 340:8, 340:13, 340:19, 342:12, 342:20, 342:25, 343:2, 343:12, 345:13, 345:17, 345:19, 345:22, 346:3, 346:16, 348:17, 348:21, 349:3, 349:5, 349:15, 349:17, 349:23, 350:1, 350:5, 350:9, 350:11, 350:14, 350:20, 352:24, 353:1, 353:9, 353:11, 353:16, 353:18, 353:22, 353:25, 354:2, 354:5, 355:4, 355:9, 355:12, 355:17, 356:4, 356:6, 357:4, 357:6, 357:18, 357:23, 358:3, 358:5, 358:8, 358:12, 358:20, 358:23, 359:18, 359:21, 359:25, 360:2, 360:8, 361:4, 361:11, 361:16, 361:18, 361:21, 361:23, 362:5, 362:7, 365:1, 366:4, 366:8, 366:14, 366:18, 367:2, 371:8, 371:14, 373:11, 373:15, 374:5, 376:5, 376:8, 376:17, 379:25, 381:19, 382:8, 382:11, 382:18, 382:24, 384:19, 386:5, 386:21, 386:25, 388:13, 388:15, 388:20, 388:22, 389:1, 389:9, 389:11, 389:23, 389:25, 390:18, 390:20, 390:22, 393:11, 393:13, 393:16, 393:23, 394:1,

394:4, 396:1, 396:15, 397:9, 397:14, 397:16, 397:22, 398:13, 398:20, 398:22, 398:24, 399:9, 399:12, 400:4, 400:6, 400:12, 400:15, 401:4, 401:7, 402:22, 403:19, 404:7, 404:10, 404:12, 404:16, 404:22, 404:24, 405:4, 405:7, 408:9, 410:3, 410:5, 410:8, 410:12, 411:7, 411:22, 412:3, 412:6, 412:10, 414:7, 414:10, 414:12, 414:25, 415:2, 415:5, 415:10, 417:21, 418:1, 418:8, 418:10, 418:22, 418:25, 419:10, 419:12, 419:15, 419:21, 420:2, 420:7, 420:18, 420:20, 421:8, 423:3, 424:11, 424:14, 425:6, 425:25, 426:5, 426:18, 426:20, 427:4, 427:9, 427:14, 427:20, 427:25, 428:10, 428:12, 428:24, 429:2, 429:6, 429:10, 429:18, 429:22, 429:25, 430:4, 430:14, 430:18, 430:23, 431:24, 432:8
**Court's** [3] - 348:20, 360:9, 366:13
**courthouse** [2] - 333:2, 361:24
**Courthouse** [1] - 315:23
**courtroom** [8] - 318:4, 319:9, 320:24, 327:12, 329:3, 367:1, 426:19, 429:8
**COURTROOM** [26] - 316:6, 316:11, 319:22, 320:23, 332:17, 332:22, 333:4, 350:3, 350:7, 350:12, 350:17, 355:18, 355:21, 357:24, 358:4, 358:6, 358:10, 358:16, 359:24, 362:1, 362:3, 404:17, 411:10, 411:17, 411:24, 415:9
**cousin** [9] - 384:23, 385:9, 385:17, 386:16, 386:18, 387:2, 388:10, 389:16, 390:5
**cousins** [1] - 384:14
**cover** [1] - 325:12

**COVID** [2] - 343:4, 343:12
**Cramer** [6] - 361:21, 361:23, 361:24, 362:5, 411:17, 412:7
**CRAMER** [2] - 361:22, 362:6
**CRC** [1] - 315:22
**create** [1] - 347:13
**created** [1] - 363:2
**creating** [1] - 363:4
**crime** [1] - 324:19
**Criminal** [1] - 315:3
**CROSS** [1] - 367:4
**cross** [5] - 400:20, 402:6, 429:21, 429:25, 431:4
**Cross** [1] - 433:4
**CROSS-EXAMINATION** [1] - 367:4
**cross-examination** [4] - 400:20, 402:6, 429:25, 431:4
**Cross-Examination** [1] - 433:4
**Cross/Blue** [4] - 338:18, 356:13, 359:6, 407:13
**CRR** [2] - 315:22, 432:18
**CT** [15] - 322:9, 322:10, 322:23, 323:1, 323:5, 323:7, 323:16, 323:22, 325:2, 326:6, 326:7, 326:10, 326:13, 337:12, 337:14
**CT-guided** [1] - 326:6
**cushion** [2] - 393:9, 394:7
**customer** [1] - 405:23

**D**

**D.C** [5] - 318:17, 321:15, 323:21, 329:18, 432:20
**daily** [1] - 347:25
**data** [3] - 326:15, 326:18
**date** [3] - 356:9, 363:10, 369:22
**Dated** [1] - 432:14
**dated** [5] - 349:20, 351:17, 360:12, 360:17, 362:10
**DAY** [1] - 315:5
**day-to-day** [2] - 405:22, 406:16
**days** [6] - 316:25,

331:15, 337:24, 338:1, 338:2
**DC** [4] - 315:6, 315:14, 315:20, 315:24
**deal** [2] - 327:13, 368:11
**Deborah** [1] - 334:6
**decide** [1] - 317:4
**decided** [1] - 410:23
**decisions** [1] - 327:2
**declined** [1] - 408:5
**defendant** [45] - 321:10, 321:13, 321:15, 321:17, 321:19, 321:20, 321:21, 321:22, 322:3, 322:4, 322:8, 323:2, 323:4, 323:6, 323:10, 323:12, 323:14, 323:19, 323:21, 323:24, 324:7, 324:11, 324:13, 324:15, 324:17, 324:19, 325:3, 325:6, 325:7, 325:9, 325:11, 325:14, 325:16, 325:20, 325:23, 325:24, 326:4, 326:8, 326:13, 326:16, 326:17, 326:21, 329:10, 409:24, 419:18
**Defendant** [2] - 315:7, 315:16
**defendant's** [6] - 321:25, 323:9, 324:10, 324:25, 325:5, 326:5
**defense** [5] - 331:20, 359:19, 401:22, 429:12, 430:7
**defense's** [1] - 429:17
**defined** [3] - 371:18, 371:19
**definite** [1] - 371:4
**Delaware** [1] - 323:21
**delay** [1] - 318:22
**delaying** [1] - 319:24
**deliberating** [2] - 316:23, 316:24
**demographics** [4] - 379:8, 379:11, 379:14, 381:10
**denied** [11] - 325:19, 326:1, 326:6, 396:1, 398:4, 422:22, 423:12, 423:14, 425:17, 425:20, 425:22
**deny** [2] - 413:24, 414:1
**Department** [1] - 315:13
**depictions** [1] - 332:2

**DEPUTY** [26] - 316:6, 316:11, 319:22, 320:23, 332:17, 332:22, 333:4, 350:3, 350:7, 350:12, 350:17, 355:18, 355:21, 357:24, 358:4, 358:6, 358:10, 358:16, 359:24, 362:1, 362:3, 404:17, 411:10, 411:17, 411:24, 415:9
**describe** [3] - 329:5, 338:3, 365:7
**described** [1] - 349:11
**designate** [1] - 316:19
**desire** [1] - 428:3
**desk** [2] - 333:24, 338:22
**destroy** [2] - 322:6, 322:21
**destroying** [1] - 323:14
**detailed** [1] - 421:14
**device** [2] - 370:17, 376:2
**diagnosis** [8] - 351:4, 351:5, 356:16, 362:11, 370:6, 370:8, 413:25, 425:17
**Dickman** [3] - 315:22, 366:21, 432:18
**DICKMAN** [1] - 432:10
**Diercks** [1] - 315:19
**difference** [2] - 346:5, 408:18
**different** [9] - 331:12, 336:24, 338:11, 381:9, 382:4, 400:1, 401:14, 401:17, 421:5
**difficult** [1] - 371:9
**dinner** [1] - 317:12
**dire** [1] - 318:5
**DIRECT** [2] - 328:4, 405:8
**direct** [6] - 396:17, 401:1, 401:6, 420:13, 426:21, 430:1
**Direct** [2] - 433:3, 433:6
**directed** [1] - 395:19
**direction** [1] - 428:13
**directly** [1] - 325:4
**disabilities** [1] - 321:12
**disability** [1] - 406:12
**disabled** [1] - 406:10
**disappeared** [1] - 358:1
**discovery** [1] - 390:1
**discuss** [5] - 316:14,

321:3, 397:16, 426:14, 428:17
**discussed** [1] - 417:13
**discussing** [2] - 398:10, 398:12
**discussion** [5] - 345:18, 382:10, 393:12, 397:15, 419:11
**discussions** [2] - 397:5, 398:6
**disinfect** [1] - 344:13
**displayed** [1] - 331:23
**distort** [2] - 320:5, 320:6
**DISTRICT** [3] - 315:1, 315:1, 315:10
**doctor** [13] - 321:14, 322:13, 322:14, 370:7, 372:14, 372:15, 407:7, 418:12, 419:25, 421:5, 423:15
**doctor's** [5] - 321:14, 321:25, 384:1, 405:19, 427:7
**doctors** [5] - 330:18, 338:9, 338:13, 391:9, 391:16
**document** [9] - 412:16, 414:16, 414:18, 414:20, 415:13, 416:8, 416:15, 419:5, 431:9
**documents** [3] - 324:23, 325:21, 356:22
**dollar** [1] - 326:17
**dollars** [4] - 321:11, 321:16, 324:16, 326:21
**done** [14] - 316:16, 318:20, 318:21, 344:6, 344:9, 359:25, 372:8, 375:5, 379:14, 416:9, 419:25, 424:4, 428:5, 431:19
**door** [3] - 333:7, 344:2, 375:18
**dose** [2] - 395:17, 397:25
**down** [18] - 320:17, 327:19, 333:24, 340:23, 373:12, 375:12, 379:14, 381:13, 382:4, 383:4, 385:19, 401:11, 410:9, 414:3, 417:1, 421:20, 423:3, 423:5
**Dr** [142] - 321:13, 329:2, 329:3, 329:13, 330:1, 330:4, 330:17, 330:23, 331:3, 331:4, 332:2, 333:7, 336:7,

440

336:22, 336:25, 338:4,
338:6, 341:11, 341:16,
341:21, 341:23,
342:10, 342:15,
343:18, 343:24,
344:16, 345:1, 346:23,
347:6, 347:13, 351:4,
351:6, 351:9, 352:5,
354:19, 356:18,
359:10, 360:14,
360:21, 362:14,
362:21, 363:3, 365:7,
365:11, 365:15,
366:10, 367:8, 369:7,
370:13, 371:17, 372:3,
375:6, 375:13, 375:15,
375:22, 377:12,
377:16, 378:11, 379:1,
381:18, 382:3, 383:2,
384:14, 384:24, 385:2,
385:10, 386:16, 387:9,
387:13, 387:17, 388:5,
388:9, 389:16, 389:17,
390:5, 390:8, 390:12,
390:25, 391:3, 391:9,
391:12, 392:12,
392:15, 394:12,
394:24, 395:2, 396:3,
396:23, 397:2, 397:6,
398:6, 398:9, 398:21,
399:3, 399:4, 399:20,
399:23, 399:25, 402:3,
402:16, 402:24,
402:25, 403:3, 403:11,
403:21, 405:25, 406:4,
406:9, 406:14, 407:1,
407:17, 407:25, 408:5,
408:6, 408:20, 409:4,
409:8, 410:25, 411:1,
412:13, 412:17,
412:19, 414:21, 416:3,
416:9, 416:18, 417:4,
417:8, 417:14, 417:23,
417:25, 419:23, 421:3,
421:4, 421:10, 421:22,
422:4, 422:21, 423:24,
424:5
  **draw** [1] - 415:14
  **drawer** [1] - 343:20
  **drug** [1] - 394:24
  **duly** [2] - 327:21,
404:20
  **during** [20] - 318:5,
323:13, 326:23,
330:23, 333:23, 334:1,
341:10, 344:25,
346:23, 363:23, 372:4,
375:22, 378:5, 381:25,
385:24, 399:13,
402:19, 402:24,

403:11, 404:1
  **duties** [2] - 363:22,
406:15

━━━━━━━━━━━━━
**E**
━━━━━━━━━━━━━

  **e-mail** [1] - 388:2
  **eager** [1] - 390:7
  **early** [2] - 316:24,
318:20
  **easier** [1] - 320:19
  **easy** [1] - 319:21
  **edge** [2] - 319:17,
320:20
  **effort** [1] - 374:2
  **either** [6] - 327:11,
350:2, 355:10, 368:2,
395:9, 406:5
  **elderly** [5] - 321:12,
323:15, 338:5, 340:18,
367:10
  **electronically** [2] -
409:6, 413:5
  **element** [1] - 420:11
  **elicited** [3] - 397:19,
397:22, 397:24
  **eliciting** [1] - 397:10
  **Elmo** [1] - 358:2
  **email** [16] - 387:12,
387:17, 387:19,
387:20, 387:23,
387:25, 388:3, 388:8,
389:15, 389:19,
389:22, 390:12, 424:5,
430:5, 430:7, 430:19
  **emails** [1] - 431:1
  **EMG** [4] - 334:18,
334:19, 335:2, 337:21
  **emphasize** [1] -
428:16
  **employed** [1] - 384:11
  **employee** [1] - 325:13
  **employees** [3] - 325:5,
325:24, 366:11
  **employer** [3] - 406:3,
408:15, 408:19
  **employment** [3] -
383:22, 388:6, 389:17
  **enables** [1] - 326:19
  **end** [11] - 324:6,
337:2, 363:19, 369:4,
377:8, 378:16, 386:15,
406:8, 412:19, 412:20,
426:11
  **enforcement** [1] -
384:3
  **enrollment** [1] -
324:14
  **ensure** [6] - 322:16,
373:24, 374:9, 374:24,

375:20, 405:22
  **enter** [7] - 367:1,
380:23, 403:3, 412:23,
412:24, 412:25, 413:16
  **entered** [2] - 403:7,
414:9
  **entering** [1] - 406:16
  **enters** [2] - 318:4,
320:24
  **entire** [2] - 322:15,
342:17
  **EOB** [1] - 423:13
  **EOBs** [3] - 366:2,
409:2, 409:4
  **equals** [1] - 395:18
  **equipment** [4] -
321:22, 322:8, 322:9
  **Erica** [7] - 334:7,
397:6, 398:7, 399:22,
399:23, 404:15, 405:12
  **ERICA** [3] - 404:19,
405:12, 433:5
  **error** [1] - 350:19
  **especially** [2] -
385:17, 390:4
  **ESQ** [4] - 315:12,
315:13, 315:16, 315:18
  **essentially** [1] - 376:3
  **establish** [1] - 337:19
  **evening** [3] - 412:6,
426:14, 426:18
  **event** [2] - 386:6,
431:1
  **evidence** [19] -
316:21, 316:22, 319:4,
322:3, 323:6, 323:19,
324:13, 326:24, 327:4,
354:2, 402:20, 411:6,
414:9, 414:24, 419:8,
421:25, 430:9, 430:25,
431:14
  **exactly** [2] - 325:22,
427:25
  **exam** [10] - 331:9,
335:20, 336:18, 341:1,
373:9, 373:17, 375:2,
381:2, 381:10, 381:22
  **Examination** [4] -
433:3, 433:4, 433:4,
433:6
  **examination** [5] -
400:20, 402:6, 426:21,
429:25, 431:4
  **EXAMINATION** [4] -
328:4, 367:4, 400:16,
405:8
  **examined** [2] - 327:22,
404:21
  **example** [1] - 412:13
  **examples** [1] - 409:23

  **exception** [2] - 398:18
  **exciting** [1] - 326:18
  **exclusive** [1] - 387:25
  **excuse** [7] - 316:16,
418:21, 423:1, 425:8,
426:5, 429:14, 429:16
  **Exhibit** [45] - 331:19,
331:25, 332:9, 336:13,
338:24, 348:7, 348:10,
349:2, 349:7, 352:6,
353:3, 353:8, 354:21,
354:22, 354:23, 355:2,
355:16, 356:19,
356:21, 356:24, 357:8,
358:18, 359:11,
359:16, 360:4, 360:23,
361:3, 361:6, 361:7,
362:9, 400:24, 401:3,
409:17, 410:2, 411:5,
414:4, 414:24, 418:20,
419:8, 421:24, 423:20,
433:9, 433:13, 433:15,
433:18
  **exhibit** [15] - 331:23,
339:8, 340:12, 352:8,
419:18, 433:10,
433:11, 433:12,
433:12, 433:14,
433:14, 433:15,
433:16, 433:17, 433:18
  **Exhibits** [1] - 352:23
  **exhibits** [4] - 357:3,
433:9, 433:10, 433:17
  **EXHIBITS** [1] - 433:8
  **exit** [1] - 423:5
  **experienced** [2] -
371:24, 372:15
  **expertise** [1] - 350:15
  **explain** [5] - 406:23,
427:10, 427:21, 428:2
  **explaining** [1] -
325:16
  **explanation** [2] -
365:19, 409:3
  **explanations** [1] -
365:16
  **explicitly** [1] - 322:7
  **extent** [1] - 374:9
  **extra** [1] - 322:7
  **extraneous** [1] -
420:14
  **extremity** [2] - 416:24,
416:25
  **eyes** [2] - 347:1, 347:3

━━━━━━━━━━━━━
**F**
━━━━━━━━━━━━━

  **facing** [1] - 319:12
  **fact** [2] - 384:13,
397:12

fair [6] - 332:2, 374:12, 383:5, 409:23, 410:16, 428:7
faith [4] - 395:17, 397:13, 398:10, 398:23
false [2] - 321:18, 324:9
falsely [2] - 324:16, 326:13
familiar [7] - 331:12, 337:10, 338:14, 364:7, 369:9, 370:4, 370:7
family [1] - 390:4
fancy [2] - 333:1, 333:3
far [7] - 320:21, 365:5, 376:11, 383:17, 383:18, 391:18, 396:10
fault [1] - 371:13
FBI [6] - 379:17, 379:21, 380:4, 380:7, 385:4, 385:9
February [6] - 360:17, 387:9, 387:12, 387:23, 388:5, 389:16
fee [1] - 407:5
fees [2] - 414:21, 415:21
felt [1] - 384:9
few [21] - 323:19, 330:22, 330:25, 331:1, 333:18, 345:9, 345:10, 367:14, 372:5, 372:10, 372:22, 373:1, 375:1, 377:3, 381:3, 383:9, 383:12, 392:18, 410:11, 425:8, 429:3
field [6] - 328:14, 328:16, 328:17, 328:24, 347:9, 383:25
fifteen [1] - 340:6
figure [1] - 425:7
file [10] - 347:23, 348:5, 348:13, 348:24, 354:23, 356:22, 356:25, 359:12, 360:22, 360:24
files [4] - 326:15, 347:14, 347:25, 348:3
fill [5] - 345:3, 351:24, 352:1, 369:19, 407:18
filled [4] - 325:7, 325:23, 407:15, 411:2
filling [1] - 370:2
final [1] - 402:5
finally [1] - 360:22
fine [5] - 340:13, 378:3, 394:4, 399:15, 415:15
finger [3] - 342:24,

347:3, 369:4
fingers [1] - 347:1
finish [3] - 381:19, 406:7, 431:10
finished [7] - 316:24, 371:10, 371:11, 389:4, 389:7, 429:25, 431:10
fired [1] - 427:14
Firm [1] - 315:16
first [30] - 326:24, 327:7, 327:21, 329:1, 332:14, 334:5, 338:19, 339:7, 339:17, 339:20, 339:25, 341:14, 346:1, 346:2, 347:9, 370:24, 380:23, 383:25, 385:20, 388:15, 397:22, 398:24, 402:10, 402:11, 404:20, 416:20, 425:21
five [8] - 330:5, 331:16, 337:24, 366:23, 383:21, 425:10, 431:17
flashed [1] - 358:1
flicker [1] - 412:3
flickers [1] - 358:8
flow [2] - 391:15, 407:2
fluoroscopy [24] - 322:9, 322:12, 322:23, 323:1, 323:5, 323:8, 323:16, 323:22, 325:2, 325:17, 326:6, 326:8, 326:11, 326:14, 337:10, 370:14, 370:18, 376:2, 417:2, 417:4, 417:9, 418:3, 424:24
fluoroscopy-guided [5] - 323:1, 323:22, 325:2, 326:14, 417:9
fly [1] - 430:15
focused [1] - 325:10
focusing [1] - 330:12
folks [1] - 321:12
follow [5] - 324:8, 326:19, 326:25, 352:12, 421:19
follow-up [1] - 352:12
follows [2] - 327:22, 404:21
FOR [1] - 315:1
foregoing [1] - 432:11
former [5] - 323:9, 324:25, 325:5, 325:13, 406:3
forms [1] - 324:14
Fortis [3] - 328:20, 328:21, 328:23

forward [1] - 316:19
foundation [11] - 334:20, 334:24, 335:6, 336:2, 342:11, 342:13, 346:2, 359:23, 364:25, 393:19, 419:19
four [2] - 330:5, 364:16
fourth [1] - 373:1
frankly [1] - 430:11
fraud [5] - 324:18, 385:18, 385:23, 386:9, 390:5
fraudulent [1] - 326:16
FREDERICK [1] - 315:18
Frederick [3] - 315:6, 321:13, 405:25
free [1] - 404:7
Friday [1] - 316:10
friends [1] - 391:17
front [6] - 324:5, 333:7, 338:22, 343:21, 349:24, 430:9
full [1] - 432:12
fully [1] - 405:23
function [1] - 383:3

### G

G.B [3] - 352:14, 352:16, 353:5
gauge [1] - 368:22
Gel [14] - 364:5, 364:15, 364:18, 365:2, 365:4, 392:19, 393:5, 393:8, 393:16, 393:19, 394:6, 400:21, 401:18, 401:19
gel [18] - 344:12, 373:4, 373:5, 375:3, 377:8, 378:16, 378:19, 378:23, 379:1, 380:15, 380:19, 381:12, 383:4, 393:8, 394:6, 394:11, 403:14, 403:16
gel-like [1] - 394:6
Gel-One [14] - 364:5, 364:15, 364:18, 365:2, 365:4, 392:19, 393:5, 393:8, 393:16, 393:19, 394:6, 400:21, 401:18, 401:19
general [1] - 393:18
generally [2] - 405:21, 406:23
gentlemen [7] - 321:2, 326:21, 327:10, 343:3, 361:25, 399:12, 426:8
given [4] - 316:15,

331:13, 342:9, 386:6
glasses [1] - 329:8
Gooding [105] - 315:6, 321:13, 329:3, 329:13, 330:1, 330:4, 330:17, 330:23, 331:3, 331:4, 336:7, 341:11, 341:16, 341:21, 341:23, 342:10, 342:15, 343:18, 343:24, 344:16, 345:1, 346:23, 347:6, 347:13, 362:14, 363:3, 365:11, 365:15, 366:10, 369:7, 370:14, 371:17, 372:3, 375:6, 375:13, 375:15, 375:22, 377:12, 377:16, 378:11, 379:1, 382:3, 383:2, 384:14, 384:24, 385:2, 385:10, 387:9, 387:13, 388:9, 389:16, 390:12, 391:3, 391:9, 391:12, 392:13, 392:16, 394:12, 394:24, 395:2, 396:3, 396:23, 397:2, 397:6, 398:6, 398:9, 399:3, 399:20, 399:23, 399:25, 402:3, 402:16, 402:25, 403:4, 403:12, 403:21, 405:25, 406:4, 406:9, 407:1, 407:17, 407:25, 408:5, 408:20, 409:4, 410:25, 411:1, 412:19, 414:21, 416:9, 416:18, 417:4, 417:8, 417:15, 417:24, 417:25, 419:23, 421:3, 421:4, 421:11, 421:22, 422:21
Gooding's [36] - 329:2, 332:2, 333:7, 336:22, 336:25, 338:4, 338:6, 351:4, 351:6, 351:9, 352:5, 354:19, 356:18, 359:10, 360:14, 360:21, 362:21, 365:7, 367:8, 386:16, 387:17, 388:6, 389:17, 390:6, 390:8, 390:25, 398:21, 399:4, 406:14, 408:6, 409:8, 412:13, 412:17, 416:3, 422:4, 423:24
Government [3] - 409:17, 410:2, 419:7
government [25] - 317:7, 320:15, 321:4, 321:11, 327:7, 327:8, 332:8, 339:11, 349:1,

349:13, 352:22, 353:7,
355:1, 356:3, 357:2,
357:16, 359:15, 360:7,
361:2, 361:10, 388:14,
404:15, 414:23,
426:21, 429:13
**Government's** [3] -
331:18, 331:25, 336:13
**government's** [1] -
353:20
**grand** [2] - 345:15,
431:18
**grandson** [1] - 370:24
**great** [4] - 350:9,
350:20, 405:23, 430:4
**guarantee** [1] - 405:23
**guess** [9] - 334:22,
339:17, 343:4, 351:11,
355:5, 355:9, 401:10,
418:12, 428:11
**guidance** [5] - 322:18,
323:16, 326:11,
424:24, 425:18
**guided** [8] - 322:5,
323:1, 323:7, 323:22,
325:2, 326:6, 326:14,
417:9
**guiding** [1] - 322:24
**guilty** [2] - 324:19,
327:5
**guys** [1] - 415:6

# H

**half** [2] - 326:22,
404:12
**hand** [2] - 332:20,
404:18
**handles** [1] - 344:12
**hands** [2] - 349:22,
368:16
**hands-on** [1] - 368:16
**handwriting** [25] -
351:3, 351:22, 352:3,
354:11, 354:18,
356:10, 356:17, 359:3,
359:8, 360:12, 360:18,
360:20, 362:10,
362:13, 362:17,
362:20, 362:23,
386:19, 412:15,
414:18, 422:4, 422:8,
423:24, 424:3
**handwritten** [3] -
325:24, 415:19, 419:17
**happy** [5] - 355:10,
361:21, 361:22,
361:23, 419:19
**hard** [3] - 320:17,
327:15, 418:25

**hardest** [1] - 361:24
**Harris** [1] - 315:19
**head** [3] - 392:21,
415:7, 415:8
**heading** [3] - 416:6,
416:12, 416:16
**headings** [1] - 416:8
**heads** [5] - 358:14,
361:17, 401:8, 411:23,
414:8
**health** [3] - 324:18,
347:9, 383:25
**health-care-field** [2] -
347:9, 383:25
**hear** [16] - 321:24,
321:25, 322:17,
322:23, 323:9, 324:24,
325:4, 325:13, 328:1,
332:19, 340:19,
366:10, 397:20, 398:8,
405:2
**heard** [6] - 337:15,
372:5, 398:14, 417:2,
418:11, 418:15
**hearsay** [9] - 366:3,
395:25, 397:9, 398:7,
398:17, 398:18, 399:1,
417:20
**heart** [1] - 368:22
**HELD** [1] - 315:9
**help** [3] - 340:16,
412:24, 431:7
**helpful** [2] - 409:20,
427:17
**hence** [1] - 398:3
**hereby** [1] - 432:10
**hi** [1] - 400:19
**Hi** [1] - 367:7
**high** [1] - 386:2
**highlight** [1] - 423:2
**highlighting** [1] -
423:3
**himself** [1] - 379:1
**hip** [1] - 392:7
**hired** [8] - 385:2,
385:10, 385:11,
385:12, 396:18,
396:22, 397:2, 399:5
**hiring** [2] - 396:24,
398:11
**hitting** [1] - 350:7
**hold** [1] - 378:6
**holiday** [1] - 427:1
**home** [1] - 317:12
**Honor** [48] - 316:6,
317:9, 317:15, 319:23,
320:23, 321:6, 327:8,
339:13, 340:9, 346:20,
348:19, 349:4, 352:25,
353:10, 353:24,

355:11, 356:5, 357:5,
359:19, 367:3, 371:13,
379:24, 382:23,
384:18, 386:3, 386:20,
386:24, 388:12,
388:21, 389:22,
390:16, 396:14, 399:8,
400:8, 400:11, 400:14,
404:15, 410:13, 411:6,
415:1, 418:24, 419:17,
423:1, 425:11, 425:24,
429:20, 430:3, 430:13
**HONORABLE** [1] -
315:9
**hope** [2] - 358:8,
422:18
**hopefully** [1] - 361:22
**Hospital** [3] - 329:17,
329:20, 332:3
**hostile** [1] - 402:4
**hour** [2] - 366:19,
404:13
**Hyalgan** [1] - 401:18

# I

**idea** [3] - 370:10,
421:15, 427:23
**identification** [1] -
331:18
**identified** [1] - 329:10
**identify** [1] - 348:24
**identifying** [1] -
369:24
**images** [3] - 379:9,
403:13, 403:15
**imaging** [1] - 376:2
**impeach** [5] - 345:19,
345:21, 346:6, 431:15,
431:21
**impeaching** [2] -
346:4, 431:15
**impeachment** [1] -
430:21
**important** [3] - 322:20,
326:18, 327:2
**imposition** [1] -
320:14
**impression** [2] -
374:14, 397:2
**improve** [1] - 421:15
**IN** [1] - 315:1
**inaccuracy** [1] -
374:24
**inbox** [2] - 408:25,
409:7
**inboxes** [1] - 408:25
**inclined** [1] - 316:16
**include** [4] - 364:1,
365:16, 365:24, 406:21

**including** [2] - 325:14,
326:5
**inconsistent** [2] -
345:24, 346:9
**inconvenience** [1] -
408:18
**INDEX** [1] - 433:1
**indicate** [2] - 340:2,
356:12
**indicated** [1] - 401:14
**individual** [4] -
352:20, 354:23,
355:25, 362:25
**individuals** [1] - 355:5
**indulgence** [1] -
366:13
**industry** [1] - 367:25
**information** [10] -
325:16, 369:24,
397:10, 407:15,
407:18, 417:8, 417:11,
417:14, 420:8, 425:19
**informed** [1] - 316:4
**initial** [4] - 335:9,
341:4, 341:19, 375:11
**initials** [8] - 351:20,
352:16, 354:24,
355:13, 359:13,
360:25, 361:8, 413:10
**initiated** [1] - 399:20
**inject** [2] - 377:12,
399:25
**injected** [3] - 322:19,
322:21, 394:9
**injecting** [2] - 322:16,
323:14
**injection** [10] - 322:20,
322:24, 323:7, 323:13,
325:17, 326:10,
339:25, 340:1, 347:10,
377:19
**injections** [31] -
321:16, 321:18,
321:19, 321:21, 322:2,
322:5, 323:2, 323:22,
323:24, 323:25, 324:1,
325:1, 325:3, 325:12,
326:6, 326:14, 339:24,
341:8, 342:2, 342:15,
342:22, 346:24,
363:24, 364:4, 400:21,
403:22, 417:9, 424:23
**injured** [1] - 406:11
**inside** [6] - 375:15,
378:12, 379:2, 379:4,
379:6, 400:2
**instances** [1] - 372:22,
397:7
**instead** [3] - 316:23,
318:10, 370:17

**instruct** [2] - 324:18, 366:10

**instructions** [3] - 325:25, 326:25, 327:4

**insurance** [19] - 321:11, 325:14, 338:15, 338:17, 354:14, 354:15, 356:12, 359:5, 363:9, 365:22, 365:24, 369:25, 370:3, 384:5, 406:19, 407:14, 413:5, 413:13, 425:19

**insurers** [1] - 365:24

**intend** [1] - 431:4

**intention** [1] - 353:21

**interesting** [1] - 408:11

**interrupt** [2] - 340:10, 369:12

**interventional** [1] - 418:3

**interview** [1] - 387:13

**interviewed** [3] - 380:4, 385:4, 385:8

**interviews** [2] - 379:18, 379:22

**involved** [4] - 327:16, 368:8, 368:11, 429:7

**involvement** [1] - 396:24

**irrelevant** [1] - 366:3

**Irvine** [1] - 315:17

**issue** [3] - 375:11, 420:8, 420:10

**issues** [1] - 429:11

**items** [1] - 407:21

## J

**J.G** [1] - 359:13

**J.G.'s** [1] - 360:5

**Jackson** [4] - 384:22, 384:24, 385:2, 385:10

**Janice** [2] - 315:22, 432:18

**JANICE** [1] - 432:10

**JIL** [1] - 315:13

**job** [8] - 328:24, 329:1, 347:9, 383:25, 387:11, 390:7, 406:15, 427:7

**joints** [4] - 365:5, 393:8, 394:7, 394:9

**jot** [1] - 375:12

**JR** [1] - 315:18

**judge** [3] - 317:13, 324:18, 427:24

**JUDGE** [2] - 315:9, 315:10

**Judge** [1] - 358:7

**judge's** [2] - 326:25, 327:4

**judges'** [1] - 320:10

**JULLIAN** [1] - 315:12

**July** [2] - 345:15, 362:17

**June** [1] - 359:1

**juror** [5] - 316:5, 316:8, 317:3, 318:24, 415:8

**Juror** [2] - 318:4, 319:9

**JUROR** [9] - 318:8, 318:12, 319:5, 319:7, 350:10, 350:19, 412:5, 412:9, 415:7

**JURORS** [11] - 321:8, 332:18, 349:22, 358:1, 358:14, 361:17, 362:4, 401:8, 411:23, 414:8, 426:17

**jurors** [5] - 318:1, 350:1, 367:1, 426:19

**jurors'** [1] - 412:4

**JURY** [2] - 315:4, 315:8

**jury** [37] - 316:2, 317:14, 317:16, 317:17, 317:18, 317:19, 317:20, 319:10, 319:11, 319:12, 319:15, 319:19, 320:13, 320:21, 320:23, 320:24, 327:25, 332:13, 332:16, 345:15, 349:23, 358:12, 364:12, 364:21, 365:18, 366:21, 401:7, 406:23, 411:8, 411:14, 422:1, 425:8, 426:5, 426:8, 430:9, 431:18

**Justice** [1] - 315:13

**justify** [1] - 370:7

## K

**K.M** [2] - 351:20, 413:10

**Karen** [1] - 339:21

**keep** [8] - 336:16, 336:19, 336:23, 343:19, 350:7, 353:18, 376:17

**kept** [4] - 391:12, 391:21, 392:10, 392:12

**KHOURI** [116] - 315:16, 317:9, 317:11, 317:15, 317:23, 318:3,

320:14, 320:18, 320:22, 332:11, 334:20, 334:23, 335:6, 336:2, 337:17, 339:13, 340:9, 340:18, 342:11, 345:11, 349:4, 349:16, 352:25, 353:10, 353:24, 355:3, 356:5, 357:5, 357:17, 359:17, 359:19, 364:24, 366:3, 367:3, 367:5, 371:13, 371:15, 373:16, 374:7, 376:7, 376:9, 376:10, 376:18, 379:24, 380:2, 380:3, 381:21, 382:2, 382:7, 382:23, 382:25, 383:1, 384:18, 384:20, 384:21, 386:3, 386:11, 386:20, 386:22, 386:24, 387:1, 388:12, 388:14, 388:21, 388:23, 388:24, 389:6, 389:10, 389:12, 389:13, 389:22, 389:24, 390:2, 390:16, 390:19, 390:21, 390:23, 390:24, 393:25, 394:3, 394:5, 395:25, 396:2, 396:14, 396:16, 397:12, 398:9, 398:19, 398:21, 398:23, 399:8, 399:11, 399:16, 400:8, 402:21, 403:18, 408:7, 410:4, 410:7, 415:1, 417:20, 418:7, 418:9, 419:9, 419:13, 420:3, 421:7, 423:1, 424:10, 429:20, 429:23, 430:3, 430:13, 430:17, 430:19, 431:23

**Khouri** [29] - 315:16, 317:8, 317:11, 319:24, 320:12, 340:8, 340:19, 352:24, 353:23, 356:4, 367:2, 367:8, 371:9, 371:12, 376:6, 382:9, 382:11, 386:7, 388:20, 389:1, 389:3, 389:5, 389:23, 397:17, 400:6, 400:12, 419:12, 428:7, 430:5

**Khouri's** [1] - 319:16

**Khouri..................
367** [1] - 433:4

**kick** [1] - 422:18

**kind** [11] - 322:11, 329:14, 334:15, 335:24, 347:16, 351:12, 354:15, 364:3, 368:20, 371:23, 401:11

**kitchenette** [1] - 334:14

**knee** [10] - 321:16, 321:20, 322:2, 323:25, 325:1, 325:12, 339:25, 341:8, 392:7

**knees** [1] - 365:4

**knowledge** [1] - 395:23

**known** [1] - 367:24

**knows** [1] - 337:19

## L

**labeled** [2] - 333:20, 334:12

**lack** [5] - 334:20, 335:6, 336:2, 342:11, 364:24

**ladies** [7] - 321:2, 326:20, 327:10, 343:3, 361:25, 399:12, 426:8

**lagging** [1] - 422:10

**Lanham** [1] - 405:14

**large** [1] - 322:11

**Las** [1] - 318:6

**last** [5] - 348:18, 348:22, 348:24, 387:7, 397:18

**late** [1] - 426:24

**latest** [1] - 417:12

**law** [2] - 324:19, 384:3

**Law** [1] - 315:16

**LAW** [1] - 320:7

**lawyer** [1] - 327:13

**lawyers** [2] - 367:8, 429:3

**lay** [1] - 334:24, 342:12, 346:2, 359:23, 393:19, 419:19

**lead** [1] - 420:13

**leading** [3] - 345:11, 402:22, 403:18

**learn** [1] - 324:3, 342:6

**learned** [3] - 338:6, 374:8, 380:23

**least** [4] - 338:12, 353:20, 355:13, 392:15

**leave** [11] - 341:16, 341:18, 341:20, 342:25, 375:13, 375:14, 377:24, 404:8, 408:16, 409:9, 426:19

**leaves** [2] - 319:9, 429:8

**leaving** [2] - 316:10, 318:16

**lectern** [4] - 319:12, 319:20, 319:23, 389:10

**left** [10] - 330:13,

334:15, 335:21,
347:21, 382:13,
386:12, 388:5, 401:10,
402:16, 402:24
**legitimate** [1] - 391:16
**length** [3] - 340:2,
340:5, 340:22
**less** [1] - 364:21
**letter** [4] - 326:3,
326:9, 326:12, 427:9
**letting** [1] - 319:3
**licensed** [3] - 367:24,
391:18
**lie** [1] - 322:6
**lies** [6] - 321:9,
321:10, 321:23, 324:2,
324:12, 326:19
**life** [1] - 405:16
**limit** [3] - 320:20,
350:21, 369:6
**limited** [3] - 368:17,
416:24
**line** [7] - 339:17,
400:22, 401:23, 413:8,
415:14, 422:14, 424:16
**list** [1] - 339:5
**listed** [7] - 401:19,
407:6, 410:17, 410:20,
415:23, 416:11, 416:20
**literature** [3] - 417:12,
417:15, 425:1
**live** [1] - 405:13
**lived** [1] - 405:15
**living** [2] - 328:11,
405:17
**LLP** [1] - 315:19
**located** [3] - 321:14,
329:16, 332:3
**locked** [1] - 427:3
**logistics** [1] - 327:19
**look** [20] - 339:17,
360:1, 371:20, 377:16,
378:3, 378:25, 379:2,
379:6, 389:3, 389:4,
408:20, 408:23, 409:4,
412:12, 413:7, 416:5,
416:14, 430:11,
431:10, 431:11
**looked** [2] - 337:6,
356:1
**looking** [25] - 331:24,
333:7, 333:16, 333:21,
334:9, 335:19, 336:17,
336:20, 337:3, 348:9,
349:9, 349:20, 351:2,
351:16, 352:8, 354:1,
354:8, 359:12, 362:9,
372:12, 389:14,
390:10, 400:24, 401:1,
415:12

**looks** [4] - 322:11,
337:19, 358:15, 369:3
**lose** [1] - 427:6
**LVN** [3] - 367:20,
367:22, 367:23

## M

**M-A-Y-A** [1] - 328:8
**ma'am** [10] - 318:19,
327:18, 385:7, 388:3,
404:17, 404:23, 405:6,
408:10, 429:5
**machine** [41] - 322:9,
322:10, 322:11,
322:12, 322:13, 323:5,
323:11, 334:18,
334:19, 335:3, 335:9,
335:15, 335:22,
335:24, 336:4, 336:7,
336:14, 337:8, 337:10,
337:12, 337:13,
337:14, 337:21,
337:22, 344:5, 344:8,
377:4, 377:8, 379:7,
379:15, 379:16, 380:8,
380:13, 380:16,
380:19, 380:22, 381:5,
403:8, 404:4, 417:4
**machinery** [2] -
346:23, 373:4
**machines** [1] - 337:21
**Mackey** [2] - 339:21,
348:25
**mail** [6] - 365:14,
388:2, 408:20, 408:23,
408:24, 409:5
**mailbox** [1] - 408:24
**majority** [2] - 338:5,
338:12
**malpractice** [1] -
420:3
**man** [1] - 361:24
**manager** [3] - 405:18,
405:21
**manner** [2] - 317:19,
393:19
**March** [2] - 339:18,
349:21
**mark** [1] - 407:8
**marked** [3] - 331:18,
338:24, 409:17
**Martella** [5] - 387:2,
387:4, 387:7, 387:13,
389:16
**martella** [1] - 387:7
**Martin** [1] - 315:17
**Maryland** [4] - 323:21,
328:22, 405:14, 405:15
**mask** [6] - 317:22,

319:13, 327:24, 329:7,
404:25, 405:4
**matter** [6] - 384:13,
397:11, 397:24, 398:2,
398:16, 428:18
**matters** [3] - 322:22,
426:10, 431:25
**Maya** [2] - 327:9,
328:8
**MAYA** [2] - 327:20,
433:3
**maya.perrott@GMC
@hotmail.com** [1] -
387:20
**MCR** [2] - 422:10,
422:12
**MDCR** [2] - 354:15,
362:25
**mean** [14] - 317:19,
327:14, 331:1, 362:25,
369:11, 370:4, 371:19,
374:6, 387:18, 391:17,
393:15, 398:17, 418:6,
427:15
**meaning** [1] - 356:15
**means** [5] - 324:4,
324:6, 327:15, 371:20,
412:25
**meant** [1] - 318:2
**measure** [1] - 343:3
**Medicaid** [1] - 384:5
**medical** [23] - 321:13,
325:6, 328:14, 328:16,
328:20, 328:24,
330:13, 331:1, 331:3,
331:6, 333:24, 355:6,
359:20, 367:15, 368:5,
368:9, 385:13, 385:15,
390:10, 405:18,
405:21, 419:13, 421:15
**medically** [1] - 322:25
**Medicare** [49] -
321:11, 321:15,
321:18, 321:19,
321:20, 321:21, 322:3,
322:4, 322:24, 322:25,
323:2, 324:3, 324:4,
324:7, 324:8, 324:9,
324:14, 325:3, 325:15,
325:16, 325:19, 326:1,
326:3, 326:4, 326:6,
326:9, 326:13, 326:15,
326:16, 326:17,
326:22, 338:18,
354:16, 356:13, 359:5,
362:25, 365:24, 384:5,
406:21, 407:13,
413:14, 413:19,
417:12, 422:13,
422:21, 423:12,

424:18, 424:19, 425:18
**medication** [7] -
377:25, 378:4, 378:8,
395:3, 395:4, 395:6,
400:21
**medications** [6] -
331:9, 364:4, 396:4,
401:14, 401:17, 401:20
**medicine** [6] - 325:12,
343:19, 343:25, 344:2,
364:1, 364:15
**medicines** [4] - 337:3,
343:16, 343:21, 364:3
**meet** [2] - 367:12,
400:10
**meeting** [5] - 320:11,
366:20, 367:13, 425:7,
426:9
**member** [1] - 390:4
**mentioned** [8] -
324:24, 330:9, 332:3,
340:22, 396:17, 407:4,
410:11, 422:24
**mess** [1] - 383:4
**method** [1] - 358:5
**MICHAEL** [1] - 315:16
**Michelle** [1] - 334:5
**microphone** [8] -
319:20, 327:25,
340:15, 376:16,
404:25, 405:1, 430:18
**middle** [3] - 329:7,
351:12, 426:21
**might** [3] - 367:24,
374:23, 387:11
**Mike** [1] - 367:8
**millions** [4] - 321:10,
321:16, 324:16, 326:21
**mind** [13] - 319:3,
319:5, 319:23, 373:8,
394:4, 398:19, 398:20,
398:21, 399:2, 399:4,
420:7, 420:10
**mine** [7] - 351:23,
354:9, 354:12, 356:11,
358:3, 359:4, 423:25
**minute** [1] - 426:6
**minutes** [12] - 340:6,
340:22, 366:23,
377:23, 377:24, 378:2,
425:6, 425:8, 425:10,
428:9, 429:3
**Miss** [1] - 349:24
**missed** [1] - 337:7
**mistake** [1] - 325:5
**mitigate** [1] - 428:13
**modifier** [1] - 370:10
**moment** [12] - 357:21,
377:20, 377:21, 378:1,
379:24, 384:18,

386:20, 396:14, 410:4,
410:16, 411:15, 425:12
**moments** [1] - 410:11
**Monday** [3] - 316:9,
316:23, 318:10
**money** [6] - 321:9,
321:23, 324:2, 325:10,
326:20, 365:8
**monitor** [3] - 332:25,
350:2, 350:14
**monitors** [1] - 332:16
**Montgomery** [1] -
328:10
**month** [2] - 422:17,
422:18
**monthly** [1] - 421:21
**months** [3] - 388:5,
402:1, 431:17
**moon** [2] - 431:16,
431:17
**morning** [4] - 316:9,
318:17, 426:10, 428:25
**most** [5] - 323:22,
338:8, 338:17, 390:25,
391:24
**mostly** [3] - 338:10,
399:22, 425:5
**motion** [1] - 398:3
**move** [25] - 329:23,
332:8, 339:11, 340:15,
349:1, 349:13, 352:22,
353:7, 355:1, 356:3,
357:2, 357:16, 359:15,
360:7, 361:2, 361:10,
382:19, 386:3, 390:15,
395:25, 400:1, 403:18,
410:1, 414:23, 419:7
**moved** [5] - 329:25,
330:9, 340:10, 386:1,
397:18
**moves** [2] - 359:22,
376:16
**moving** [3] - 327:16,
346:20, 385:19
**MR** [116] - 317:9,
317:11, 317:15,
317:23, 318:3, 320:14,
320:18, 320:22,
332:11, 334:20,
334:23, 335:6, 336:2,
337:17, 339:13, 340:9,
340:18, 345:11, 349:4,
349:16, 352:25,
353:10, 353:24, 355:3,
356:5, 357:5, 357:17,
359:17, 359:19,
361:22, 362:6, 364:24,
366:3, 367:3, 367:5,
371:13, 371:15,
373:16, 374:7, 376:7,

376:9, 376:10, 376:18,
379:24, 380:2, 380:3,
381:21, 382:2, 382:7,
382:23, 382:25, 383:1,
384:18, 384:20,
384:21, 386:3, 386:11,
386:20, 386:22,
386:24, 387:1, 388:12,
388:14, 388:21,
388:23, 388:24, 389:6,
389:10, 389:12,
389:13, 389:22,
389:24, 390:2, 390:16,
390:19, 390:21,
390:23, 390:24,
393:25, 394:3, 394:5,
395:25, 396:2, 396:14,
396:16, 397:12, 398:9,
398:19, 398:21,
398:23, 399:8, 399:11,
399:16, 400:8, 402:21,
403:18, 408:7, 410:4,
410:7, 415:1, 417:20,
418:7, 418:9, 419:9,
419:13, 420:3, 421:7,
423:1, 424:10, 429:20,
429:23, 430:3, 430:13,
430:17, 430:19, 431:23
**MRI** [1] - 322:11
**MS** [140] - 317:7,
319:23, 320:3, 321:6,
321:9, 327:8, 328:5,
329:9, 329:12, 332:8,
332:14, 333:6, 334:24,
335:1, 335:11, 336:6,
337:20, 339:11,
339:15, 340:21,
342:14, 342:21, 343:7,
343:13, 345:14,
345:21, 346:1, 346:15,
346:18, 346:20,
346:22, 348:19,
348:23, 349:1, 349:6,
349:13, 349:18,
350:23, 352:22, 353:2,
353:7, 353:12, 353:17,
353:20, 354:1, 354:3,
354:6, 354:7, 355:1,
355:8, 355:10, 355:14,
355:15, 355:19,
355:22, 355:24, 356:3,
356:7, 357:2, 357:7,
357:16, 357:19, 358:2,
358:15, 358:18,
358:24, 359:15, 360:1,
360:3, 360:7, 360:9,
360:11, 361:2, 361:5,
361:10, 361:12,
361:14, 362:8, 365:6,
366:9, 366:13, 366:16,
371:7, 374:4, 376:4,

382:6, 382:15, 388:19,
393:10, 393:14,
393:21, 397:8, 397:21,
400:3, 400:5, 400:14,
400:17, 401:5, 401:9,
402:23, 403:20, 404:6,
404:14, 405:9, 408:13,
410:1, 410:9, 410:10,
410:13, 410:15, 411:4,
411:8, 411:11, 411:19,
411:20, 412:11, 414:9,
414:11, 414:13,
414:23, 415:3, 415:11,
418:5, 418:13, 418:23,
419:2, 419:7, 419:17,
419:22, 420:19,
420:23, 421:9, 423:5,
423:8, 424:15, 425:11,
425:13, 428:9, 429:9,
429:11
**multiple** [4] - 334:2,
334:3, 383:13, 383:14
**mushiness** [1] -
431:20
**must** [4] - 345:23,
346:7, 374:8, 383:15

# N

**N.W** [1] - 432:19
**name** [21] - 328:6,
334:6, 348:18, 348:22,
348:24, 351:22,
352:14, 354:13,
356:10, 362:22, 363:8,
367:8, 369:19, 380:24,
380:25, 381:1, 386:18,
387:2, 387:7, 405:11,
413:8
**names** [1] - 355:9
**narrative** [2] - 364:24,
408:7
**necessary** [4] -
322:18, 322:25, 365:9,
380:20
**need** [17] - 319:18,
319:25, 340:14,
355:19, 366:21, 373:5,
399:13, 425:8, 427:2,
428:14, 428:15,
428:20, 429:7, 429:23,
431:3, 432:1
**needed** [1] - 390:7
**needle** [8] - 322:15,
323:18, 342:23,
343:14, 346:25, 400:1,
400:2, 404:3
**needs** [1] - 358:16
**nerve** [3] - 322:19,
323:14, 418:18

**nerve-destroying** [1] -
323:14
**nerves** [4] - 322:6,
322:17, 322:22, 335:10
**Neurolytic** [1] - 416:6
**never** [12] - 321:20,
321:21, 322:1, 322:2,
324:25, 325:1, 325:2,
347:10, 372:4, 383:6,
383:22, 383:25
**new** [7] - 333:2, 335:8,
341:5, 385:19, 385:25,
407:2, 413:3
**New** [2] - 315:14,
328:22
**newest** [1] - 418:3
**next** [17] - 317:4,
333:13, 333:18, 334:8,
334:11, 335:12,
335:17, 336:10,
356:16, 363:17, 373:6,
407:9, 412:20, 422:14,
422:18, 424:16, 425:9
**nice** [3] - 327:25,
367:13, 405:1
**night** [1] - 317:12
**nine** [1] - 431:25
**nobody** [2] - 395:9,
396:6
**none** [3] - 339:13,
349:4, 352:25
**None** [1] - 353:10
**nonresponsive** [2] -
386:4, 386:6
**Northern** [1] - 323:21
**notable** [1] - 364:14
**notate** [1] - 339:24
**note** [13] - 359:5,
397:17, 402:2, 409:14,
419:17, 419:18,
420:24, 421:2, 421:14,
422:2, 422:8, 423:22,
424:3
**noted** [1] - 409:20
**notes** [8] - 325:24,
339:24, 363:23, 384:8,
409:9, 409:13, 409:23,
432:12
**nothing** [5] - 363:10,
419:14, 420:3, 420:4,
420:5
**notice** [3] - 403:7,
403:10, 426:25
**noticed** [1] - 364:23
**number** [3] - 333:11,
337:6, 428:20
**numbers** [2] - 356:16,
415:19
**nurse** [5] - 330:18,
367:18, 367:24,

367:25, 395:13
**nurses** [1] - 330:18
**NW** [3] - 315:14,
315:19, 315:23

# O

**o'clock** [2] - 318:17,
426:12
**oath** [1] - 381:4
**objected** [1] - 317:20
**objection** [65] - 317:7,
317:24, 317:25,
332:10, 332:11,
334:20, 334:23, 335:6,
336:2, 337:17, 337:18,
339:12, 340:8, 340:14,
342:11, 345:11, 349:3,
349:15, 349:16,
352:24, 353:9, 353:23,
355:3, 356:5, 357:4,
357:17, 359:17,
359:19, 359:22,
364:24, 366:3, 371:7,
374:4, 376:4, 382:6,
382:8, 382:14, 382:15,
388:18, 388:19,
393:10, 393:14,
393:23, 397:8, 397:17,
398:17, 400:3, 400:7,
402:21, 403:18, 408:7,
410:3, 410:7, 414:25,
417:20, 417:21, 418:7,
418:8, 419:9, 420:12,
420:18, 420:21, 421:7,
421:8, 424:10
**objections** [1] -
317:18
**observations** [1] -
335:5
**obvious** [1] - 381:11
**obviously** [3] - 319:12,
374:16, 392:20
**occasions** [4] - 375:1,
381:3, 383:9, 383:12
**October** [4] - 351:17,
356:9, 380:5, 385:4
**odd** [1] - 425:22
**OF** [3] - 315:1, 315:8,
432:8
**offer** [4] - 398:25,
399:1, 399:3, 407:7
**offered** [3] - 366:4,
397:23, 398:9
**offering** [1] - 398:15
**office** [74] - 321:14,
321:25, 329:2, 329:14,
329:15, 329:16,
329:20, 329:23, 330:2,
330:9, 330:12, 330:14,

330:19, 330:21,
331:10, 331:13,
331:15, 332:3, 332:5,
333:15, 333:22, 334:1,
334:10, 334:14, 335:2,
335:8, 336:4, 336:8,
336:22, 336:25, 337:4,
337:16, 338:2, 338:20,
343:20, 343:22,
343:23, 363:22, 364:8,
365:12, 366:1, 368:9,
374:13, 378:11,
378:12, 383:16, 384:1,
384:25, 385:19,
385:25, 386:13,
386:16, 387:14,
389:17, 390:6, 390:8,
394:12, 394:17,
394:19, 395:9, 395:11,
396:6, 399:17, 405:19,
406:14, 407:7, 407:21,
408:6, 408:17, 409:8,
417:4, 417:6, 421:14,
427:7
**OFFICIAL** [1] - 432:8
**Official** [2] - 315:22,
432:18
**often** [3] - 323:8,
345:1, 365:4
**once** [1] - 429:25
**One** [15] - 316:18,
364:5, 364:15, 364:18,
365:2, 365:4, 392:19,
393:5, 393:8, 393:16,
393:19, 394:6, 400:21,
401:18, 401:19
**one** [49] - 316:7,
317:15, 330:15,
330:16, 330:24,
333:19, 333:25, 334:5,
335:20, 337:16,
340:18, 344:12,
346:13, 350:24, 351:1,
359:22, 360:22,
364:11, 364:12,
364:13, 365:2, 365:3,
367:8, 367:10, 368:4,
368:11, 371:4, 371:8,
371:9, 374:16, 378:22,
381:15, 382:15,
382:18, 384:14, 388:9,
391:7, 395:17, 395:18,
396:3, 417:6, 417:18,
425:12, 426:12,
429:11, 430:5, 430:20
**one-on-one** [1] -
368:11
**ones** [3] - 394:22,
409:5
**open** [7] - 320:13,

344:2, 346:17, 382:22,
393:22, 399:10, 420:17
**opening** [4] - 319:14,
319:24, 321:4, 365:14
**operate** [2] - 380:12,
380:21
**operations** [2] -
405:22, 406:16
**operative** [1] - 397:12
**options** [3] - 316:18,
318:23, 319:1
**order** [12] - 321:10,
322:5, 325:11, 341:13,
363:24, 364:3, 364:5,
364:16, 402:9, 427:11,
427:12, 427:16
**ordered** [2] - 331:9,
364:22
**ordering** [2] - 364:15,
365:4
**ordinary** [1] - 409:8
**orient** [1] - 402:25
**original** [1] - 372:11
**ORTHOVISC** [2] -
394:15, 396:9
**otherwise** [1] - 431:19
**outside** [3] - 378:11,
383:5, 429:2
**overheard** [3] - 397:6,
398:6, 399:3
**overrule** [2] - 398:16,
420:12
**overruled** [13] -
334:21, 335:7, 336:3,
365:1, 366:4, 366:8,
393:23, 403:19, 408:9,
418:8, 418:10, 420:18,
420:21
**oversee** [2] - 405:22,
406:16
**own** [3] - 341:21,
386:18, 398:25
**oximeter** [4] - 342:23,
342:25, 343:8, 369:1
**oxygen** [1] - 343:11

# P

**P-A-R-R-O-T-T** [1] -
328:8
**p.m** [2] - 315:7, 432:3
**package** [1] - 395:18
**packaged** [2] - 364:8,
364:10
**packet** [1] - 407:11
**page** [48] - 332:15,
339:7, 339:16, 348:8,
349:19, 349:20,
350:24, 351:1, 351:2,
351:14, 351:15,

351:16, 351:17, 352:3,
353:13, 353:14, 354:6,
354:8, 354:17, 356:8,
356:9, 357:9, 357:10,
357:20, 358:19,
360:10, 360:15,
360:16, 361:12, 362:9,
362:11, 362:15,
362:18, 362:22, 411:5,
414:5, 414:11, 414:24,
418:20, 418:21, 419:8,
420:21, 420:25,
421:24, 423:20,
433:18, 433:18
**pages** [6] - 331:22,
349:8, 409:17, 409:20,
410:2, 433:17
**paid** [3] - 321:15,
326:17, 365:22
**pain** [4] - 321:25,
391:7, 392:2, 392:7
**panel** [3] - 320:23,
320:24, 332:22
**paperwork** [3] -
347:13, 347:16, 347:18
**Parrott** [19] - 327:9,
328:8, 338:25, 345:15,
346:19, 348:9, 349:9,
349:24, 354:8, 355:25,
356:21, 358:21,
358:25, 359:12, 387:3,
387:6, 389:4, 400:9,
404:7
**PARROTT** [3] -
327:20, 387:7, 433:3
**part** [14] - 326:7,
351:2, 351:24, 352:1,
352:3, 356:25, 363:4,
375:3, 379:23, 380:16,
380:17, 380:18,
380:19, 406:18
**participate** [1] -
318:24
**particular** [4] - 345:22,
346:4, 346:13, 365:3
**parties** [1] - 426:12
**parts** [2] - 327:16,
331:12
**past** [2] - 350:15,
428:5
**patient** [67] - 326:15,
335:8, 339:20, 340:7,
340:25, 341:5, 341:6,
341:7, 341:14, 341:22,
341:23, 343:24,
344:17, 345:4, 347:12,
347:14, 347:19,
347:23, 347:25, 348:3,
348:5, 348:14, 348:16,
348:18, 348:24,

351:20, 352:13, 352:20, 353:5, 354:23, 356:10, 356:22, 356:25, 357:14, 359:12, 359:13, 360:22, 360:24, 360:25, 361:8, 362:16, 365:3, 365:23, 368:16, 369:16, 369:20, 369:22, 369:24, 374:18, 375:9, 375:20, 375:23, 379:8, 381:6, 402:10, 402:12, 402:17, 403:1, 407:8, 407:14, 411:1, 413:10, 413:13

**Patient** [3] - 351:22, 362:22, 413:8

**patient's** [12] - 322:14, 341:19, 342:24, 343:11, 348:13, 352:12, 352:13, 379:11, 380:24, 380:25, 400:2, 413:3

**patients** [39] - 322:1, 323:10, 323:11, 323:15, 324:25, 325:1, 325:2, 325:8, 331:8, 331:10, 338:1, 338:3, 338:6, 338:15, 338:17, 338:19, 339:5, 342:4, 342:5, 342:15, 348:20, 361:8, 366:1, 368:11, 369:7, 373:9, 373:17, 373:19, 374:14, 391:9, 391:12, 391:21, 391:24, 399:25, 405:24, 406:25, 421:18

**patients'** [1] - 342:1

**pause** [6] - 362:2, 366:15, 380:1, 386:23, 410:6, 411:16

**pay** [4] - 319:4, 323:1, 424:7, 424:9

**payable** [1] - 425:17

**paying** [2] - 327:15, 425:21

**payment** [1] - 324:10

**payments** [1] - 365:9

**payroll** [1] - 406:16

**Peebles** [1] - 334:5

**people** [13] - 321:12, 327:11, 334:4, 338:11, 340:18, 367:10, 368:5, 391:15, 391:24, 395:13, 397:6, 398:7, 427:15

**per** [3] - 364:11, 364:12, 407:8

**perceived** [1] - 392:15

**percent** [1] - 424:22

**perfect** [1] - 428:24

**perfectly** [1] - 399:14

**perform** [2] - 365:2, 383:3

**performed** [7] - 322:5, 323:3, 324:12, 342:2, 345:8, 372:24, 373:3

**perhaps** [1] - 411:14

**period** [3] - 324:1, 384:2, 386:12

**permission** [2] - 360:9, 420:19

**person** [2] - 330:24, 338:10

**person's** [1] - 404:3

**personal** [3] - 395:23, 421:4, 421:10

**personally** [2] - 325:7, 325:15

**perspective** [1] - 335:15

**perspectives** [1] - 336:24

**pertained** [1] - 410:22

**pharmacist** [1] - 392:20

**pharmacology** [1] - 393:1

**pharmacy** [2] - 392:24, 393:1

**phone** [8] - 345:17, 382:9, 387:17, 388:16, 389:14, 393:11, 397:14, 430:6

**photo** [3] - 333:20, 334:8, 335:17

**photos** [2] - 333:14, 336:10

**physiatrist** [1] - 391:4

**physiatry** [1] - 391:6

**physician** [2] - 371:24, 395:13

**physicians** [3] - 338:9, 391:1, 391:19

**picky** [1] - 431:21

**picture** [26] - 332:24, 333:10, 336:12, 336:21, 371:2, 371:16, 371:20, 371:25, 372:12, 372:16, 376:3, 376:12, 376:14, 376:23, 377:14, 377:16, 378:4, 378:13, 379:14, 381:5, 381:9, 381:11, 381:13, 381:14, 382:4, 383:3

**pictures** [3] - 332:16, 337:6, 379:7

**place** [11] - 322:15,

329:24, 342:23, 383:22, 385:18, 385:22, 386:8, 390:9, 425:7, 425:9, 425:24

**placed** [2] - 338:21, 377:11

**placing** [1] - 400:1

**Plaintiff** [2] - 315:4, 315:12

**plan** [2] - 426:12, 432:1

**plane** [1] - 318:12

**planned** [2] - 316:7, 316:9

**planning** [2] - 426:13, 429:18

**plans** [2] - 317:1, 318:6

**pleasure** [2] - 367:12, 400:9

**plexi** [2] - 320:6, 320:12

**plexiglass** [2] - 320:2, 340:11

**podium** [1] - 320:12

**point** [8] - 316:15, 316:17, 329:23, 330:10, 341:3, 376:15, 376:19, 376:20

**pointing** [1] - 415:14

**pop** [1] - 332:20

**position** [3] - 317:6, 341:9, 387:13

**possible** [2] - 410:20, 425:19

**possibly** [1] - 377:1

**Post** [3] - 419:18, 420:24, 421:2

**Post-it** [3] - 419:18, 420:24, 421:2

**practice** [12] - 330:13, 337:7, 338:4, 338:7, 364:19, 365:8, 391:15, 405:18, 405:21, 416:10

**practitioners** [2] - 330:19, 395:13

**precise** [1] - 324:14

**precision** [1] - 322:22

**prefer** [1] - 427:22

**preference** [2] - 316:20, 319:16

**prep** [3] - 341:8, 341:9, 407:2

**prepare** [7] - 343:21, 344:2, 378:4, 378:8, 395:3, 395:4, 396:7

**prepared** [3] - 343:16, 393:18, 396:3

**prepped** [1] - 331:10

**prescription** [1] -

331:11

**prescriptions** [1] - 347:21

**present** [2] - 316:2, 363:23

**preserve** [1] - 317:23

**preserved** [1] - 317:24

**press** [1] - 404:13

**pressure** [1] - 368:20

**presuming** [1] - 377:12

**pretrial** [1] - 317:19

**pretty** [10] - 320:5, 322:12, 339:23, 365:22, 368:16, 371:4, 391:14, 406:25, 407:6, 427:2

**previous** [1] - 406:10

**previously** [6] - 328:13, 331:19, 386:6, 409:17, 411:6, 423:19

**primary** [1] - 338:8

**print** [2] - 409:6, 423:13

**printed** [2] - 417:12, 417:14

**printout** [1] - 414:21

**privacy** [1] - 348:18, 375:20

**private** [1] - 384:5

**problem** [2] - 350:3, 371:14

**procedure** [29] - 322:7, 322:15, 322:25, 323:3, 323:17, 342:17, 344:9, 344:20, 344:25, 345:23, 347:17, 347:22, 347:23, 351:3, 372:4, 375:2, 375:4, 375:5, 381:25, 418:18, 419:6, 419:24, 419:25, 420:1, 420:5, 420:6, 421:4, 421:10, 430:10

**procedures** [18] - 321:22, 324:11, 324:17, 331:10, 342:1, 344:4, 344:5, 344:14, 365:5, 372:3, 372:15, 403:22, 407:7, 410:19, 415:22, 418:17, 419:13, 421:19

**proceed** [5] - 328:3, 362:7, 382:23, 386:24, 390:21

**Proceedings** [1] - 432:3

**proceedings** [2] - 317:20, 432:13

**process** [4] - 317:19, 406:24, 422:24, 423:11

**processes** [1] - 413:22
**processing** [1] - 347:18
**produced** [1] - 390:1
**professional** [1] - 367:25
**program** [3] - 321:11, 328:12, 328:13
**progress** [2] - 348:2, 363:23
**promise** [1] - 317:14
**promises** [3] - 317:13, 324:14, 324:16
**promptly** [2] - 426:9, 432:2
**pronounced** [1] - 387:3
**proper** [2] - 399:18, 430:10
**prosecutor** [2] - 427:10, 428:1
**prosecutors** [2] - 427:20, 428:14
**prove** [2] - 324:19, 324:22
**provide** [5] - 324:2, 393:8, 394:6, 421:10
**provided** [5] - 321:20, 321:21, 331:19, 419:23, 420:8
**Providence** [3] - 329:17, 329:20, 332:3
**provider** [5] - 323:25, 324:5, 324:7, 416:1, 416:2
**providers** [3] - 323:20, 330:14, 416:1
**provides** [1] - 322:13
**providing** [1] - 321:11
**publish** [16] - 349:19, 354:3, 355:17, 355:20, 356:8, 357:20, 358:18, 360:10, 361:12, 362:15, 411:8, 414:4, 415:3, 420:19, 422:1, 423:21
**published** [6] - 332:12, 332:20, 339:14, 349:17, 353:1, 354:4
**pull** [10] - 327:24, 349:7, 354:20, 401:3, 405:1, 411:5, 418:20, 421:24, 423:13, 423:19
**pulse** [5] - 342:23, 342:25, 343:8, 343:11, 369:1
**purports** [1] - 388:25
**purpose** [3] - 394:13, 396:10, 397:11

**purposely** [1] - 324:21
**purposes** [3] - 348:18, 397:10, 426:13
**push** [2] - 319:22, 320:19
**put** [15] - 363:17, 377:8, 380:15, 380:24, 393:17, 398:24, 399:5, 408:24, 408:25, 409:6, 410:12, 416:8, 420:7, 420:9, 423:13
**putting** [2] - 348:2, 407:2

## Q

**quantity** [2] - 364:22
**questioning** [3] - 319:14, 400:22, 401:23
**questions** [11] - 341:4, 341:19, 355:8, 366:16, 367:14, 375:11, 392:18, 400:20, 402:5, 402:6, 404:6
**quick** [2] - 320:5, 366:22
**quicker** [1] - 393:24
**quickly** [2] - 348:8, 349:8

## R

**raise** [3] - 332:20, 349:22, 404:18
**rate** [1] - 368:22
**rather** [1] - 393:25
**ray** [3] - 322:5, 322:11, 322:13
**re** [1] - 430:1
**re-direct** [1] - 430:1
**reach** [1] - 425:18
**reaction** [1] - 399:13
**read** [6] - 327:16, 386:18, 389:22, 401:17, 424:16, 431:18
**reading** [2] - 373:8, 401:19
**ready** [2] - 321:3, 407:2
**real** [1] - 373:20
**realize** [4] - 318:9, 318:18, 383:24, 430:14
**realized** [1] - 318:15
**realizes** [1] - 316:8
**really** [9] - 333:3, 337:11, 371:16, 375:8, 379:3, 418:11, 418:14, 430:21
**realtime** [1] - 322:13
**reason** [7] - 358:7,

373:23, 374:16, 374:17, 388:2, 413:25
**reasonable** [1] - 322:25
**reasons** [1] - 425:22
**receipt** [1] - 413:6
**receive** [5] - 328:16, 366:1, 366:5, 407:11, 418:18
**RECEIVED** [1] - 433:8
**received** [11] - 322:1, 322:2, 324:9, 324:25, 325:1, 325:2, 328:23, 347:10, 366:5, 417:16, 419:14
**receiving** [1] - 326:12
**recess** [1] - 366:25
**recognize** [17] - 331:24, 339:2, 348:5, 348:9, 352:8, 356:21, 357:12, 358:25, 360:5, 360:17, 360:24, 361:7, 362:10, 362:17, 412:15, 414:16, 419:5
**recollect** [1] - 346:5
**recollection** [14] - 345:20, 346:6, 346:7, 346:13, 387:16, 388:16, 389:2, 389:15, 430:16, 430:24, 431:8, 431:11, 431:13
**recommend** [1] - 384:24
**recommended** [1] - 384:14
**record** [5] - 317:25, 328:7, 329:9, 329:11, 405:11
**recordkeeping** [1] - 368:8
**Records** [1] - 424:6
**records** [7] - 352:20, 355:7, 359:20, 419:13, 421:16, 424:6, 424:7
**redirect** [1] - 400:13
**Redirect** [1] - 433:4
**REDIRECT** [1] - 400:16
**refer** [8] - 348:17, 385:17, 385:22, 386:8, 386:15, 387:9, 390:3, 390:5
**referencing** [1] - 325:25
**referrals** [1] - 391:1
**referred** [6] - 338:8, 338:10, 338:12, 387:18, 390:11, 391:9
**referring** [3] - 389:16, 391:12, 424:12

**refill** [1] - 331:11
**reflect** [2] - 329:9, 329:11
**reflected** [1] - 399:2
**refresh** [11] - 345:20, 346:7, 387:16, 388:16, 389:15, 430:8, 430:16, 430:24, 431:5, 431:7, 431:13
**refreshed** [1] - 431:11
**refreshes** [1] - 430:24
**refreshing** [3] - 346:4, 346:12, 389:1
**regarding** [3] - 360:16, 379:20, 380:9
**region** [1] - 324:1
**relates** [1] - 413:10
**relationship** [1] - 402:3
**relative** [2] - 385:22, 386:8
**released** [1] - 430:1
**relevance** [4] - 400:5, 418:9, 419:21, 419:22
**relevant** [1] - 420:11
**remember** [22] - 318:5, 322:20, 340:13, 346:11, 346:12, 369:11, 369:13, 370:23, 380:4, 380:7, 380:11, 383:9, 383:12, 385:4, 385:8, 402:6, 423:9, 431:6, 431:7, 431:12, 431:20
**remembers** [1] - 346:2
**remove** [1] - 380:18
**removed** [1] - 379:1
**rep** [3] - 395:19, 395:21, 397:25
**rephrase** [3] - 374:8, 376:9, 421:8
**report** [6] - 384:6, 399:23, 419:24, 419:25, 421:4, 421:10
**reporter** [2] - 328:1, 373:12
**Reporter** [3] - 315:22, 315:22, 432:18
**REPORTER** [1] - 432:8
**reporter's** [1] - 371:11
**reports** [6] - 347:17, 347:22, 347:23, 348:2, 352:12, 420:4
**represented** [1] - 324:11
**request** [1] - 415:16
**requested** [1] - 397:18
**requests** [1] - 331:11
**require** [2] - 431:6,

431:22
**required** [10] - 321:22, 322:9, 323:16, 325:17, 326:11, 370:14, 373:19, 373:20, 373:23, 374:14
**requirement** [1] - 326:9
**requires** [1] - 322:7
**respect** [2] - 369:6, 369:16
**respiration** [1] - 368:24
**respond** [1] - 409:14
**response** [2] - 371:5, 398:3
**responsibilities** [1] - 378:22
**responsibility** [2] - 380:24, 406:18
**rest** [1] - 359:8
**resubmit** [4] - 325:21, 326:1, 414:2, 423:18
**resumé** [1] - 390:12
**return** [3] - 327:3, 389:10, 400:11
**returned** [1] - 403:22
**returning** [2] - 341:5, 341:6
**review** [1] - 326:5
**reviewed** [2] - 326:7, 409:1
**RMR** [1] - 315:22
**RN** [1] - 367:20
**RNs** [1] - 395:11
**road** [1] - 318:14
**role** [2] - 331:6, 347:18
**roll** [1] - 381:23
**Room** [9] - 315:23, 333:21, 334:12, 335:18, 335:19, 335:21, 336:17, 336:20, 432:19
**room** [47] - 331:9, 334:12, 336:18, 337:7, 341:1, 341:11, 341:16, 341:18, 341:20, 341:24, 342:1, 342:9, 344:4, 344:5, 344:17, 345:4, 373:9, 373:17, 375:2, 375:5, 375:13, 375:14, 375:16, 375:22, 377:3, 378:16, 379:4, 379:6, 381:2, 381:6, 381:10, 381:16, 381:25, 382:13, 383:5, 402:11, 402:16, 402:17, 402:24, 403:1, 403:3, 403:7, 403:12, 403:21, 403:23

**rooms** [5] - 335:20, 381:16, 381:22, 382:1
**rotate** [1] - 332:18
**Rubin** [1] - 315:19
**rule** [1] - 411:19
**rules** [1] - 324:8

# S

**S.B** [3] - 360:25, 361:8, 362:16
**sake** [1] - 371:11
**sales** [3] - 395:19, 395:21, 397:25
**salesmen** [1] - 394:24
**samples** [2] - 392:19, 394:24
**Saturday** [1] - 316:12
**saved** [1] - 379:7
**saw** [10] - 338:1, 348:5, 364:18, 365:9, 377:7, 399:25, 402:19, 402:20, 404:3, 411:1
**scheduled** [3] - 316:9, 318:10, 406:25
**scheduling** [1] - 368:14
**school** [5] - 368:4, 368:5, 374:8, 386:2, 393:2
**scope** [2] - 400:5, 400:6
**screen** [23] - 338:25, 350:18, 351:12, 352:4, 353:15, 354:9, 358:10, 358:11, 377:14, 379:9, 379:11, 381:9, 381:11, 382:4, 403:13, 411:21, 412:4, 412:7, 412:12, 414:14, 415:13, 419:3, 423:22
**screens** [2] - 403:16, 412:4
**scroll** [14] - 333:13, 335:12, 335:14, 336:10, 337:2, 349:8, 352:7, 352:18, 353:4, 354:22, 355:23, 356:20, 409:18, 409:19
**scrolling** [2] - 336:16, 336:23
**scrutinize** [1] - 326:24
**seat** [1] - 316:5
**seated** [2] - 316:5, 321:1
**second** [8] - 326:24, 330:12, 332:5, 333:10, 385:20, 403:6, 416:5, 418:12
**second-guess** [1] -

418:12
**seconds** [3] - 376:25, 411:18
**see** [66] - 317:2, 321:17, 325:21, 325:22, 325:23, 326:3, 326:12, 326:14, 327:11, 329:3, 332:17, 333:20, 334:12, 334:15, 335:2, 335:9, 335:21, 336:7, 337:16, 338:25, 339:18, 341:14, 342:15, 342:17, 351:17, 357:22, 357:25, 358:9, 361:21, 361:23, 362:3, 371:24, 372:16, 373:5, 373:8, 378:16, 378:19, 379:1, 379:7, 379:13, 381:5, 401:12, 407:1, 409:21, 411:12, 411:14, 413:8, 414:6, 414:12, 414:14, 415:5, 416:6, 416:16, 419:3, 419:24, 420:2, 420:24, 422:2, 422:10, 422:14, 423:22, 424:6, 428:24, 430:8, 431:24
**seeing** [2] - 325:8, 370:23
**seek** [1] - 419:20
**seeking** [2] - 345:19, 388:17
**seem** [1] - 350:3
**select** [1] - 407:21
**selected** [3] - 317:17, 318:1, 325:8
**selecting** [1] - 360:13
**selection** [2] - 317:16, 317:19
**seminars** [1] - 407:25, 408:5
**send** [3] - 388:2, 389:19, 408:5
**senior** [1] - 321:24
**sense** [8] - 327:1, 327:4, 371:23, 372:13, 372:19, 395:2, 425:25
**sent** [6] - 318:15, 387:12, 387:18, 388:9, 389:15, 424:5
**September** [2] - 315:6, 432:14
**series** [2] - 339:23, 341:7
**serve** [1] - 317:3
**service** [1] - 405:23
**services** [2] - 354:17, 366:2
**SESSION** [1] - 316:1

**set** [1] - 340:17
**sets** [1] - 326:9
**setting** [1] - 329:14
**seventeen** [1] - 330:7
**several** [2] - 319:1, 418:19
**Shake** [3] - 358:14, 361:17, 414:8
**sheet** [46] - 338:21, 339:9, 339:10, 339:22, 345:6, 349:10, 349:20, 351:17, 356:15, 357:10, 359:1, 359:8, 360:12, 360:13, 360:17, 360:18, 361:15, 362:9, 363:4, 363:6, 364:19, 369:17, 373:21, 373:23, 374:17, 401:15, 407:2, 407:3, 407:4, 407:5, 407:11, 407:12, 410:21, 411:2, 412:19, 412:21, 412:22, 412:23, 413:7, 413:15, 413:16, 415:12, 415:20, 415:25, 423:14, 425:4
**sheets** [29] - 325:8, 325:23, 345:3, 349:11, 351:7, 351:24, 353:5, 355:25, 357:14, 359:20, 360:5, 361:7, 363:2, 363:11, 363:13, 363:18, 363:20, 369:14, 400:24, 400:25, 401:1, 407:15, 407:22, 410:16, 410:17, 410:24, 412:13, 412:21, 416:3
**Shield** [4] - 338:18, 356:13, 359:6, 407:13
**short** [3] - 366:22, 376:8, 385:25
**short-circuit** [1] - 376:8
**shorter** [1] - 394:2
**shots** [2] - 342:6, 342:9
**show** [34] - 322:4, 323:6, 323:20, 324:13, 324:20, 324:23, 331:17, 338:23, 339:7, 339:16, 348:7, 352:6, 352:18, 355:16, 356:19, 356:24, 357:8, 359:11, 360:4, 360:23, 361:6, 388:8, 388:14, 388:25, 397:13, 398:9, 398:23, 399:1, 399:4, 409:16, 421:14,

430:10, 431:9
**showed** [4] - 334:22, 345:7, 387:16, 431:8
**showing** [6] - 359:24, 369:13, 381:10, 389:3, 421:6, 429:14
**shown** [2] - 389:25, 430:22
**shows** [2] - 326:16, 371:2
**sic** [1] - 387:21
**side** [5] - 327:11, 333:22, 334:10, 334:15, 340:11
**sign** [13] - 338:21, 339:9, 339:10, 339:20, 339:22, 373:20, 373:21, 373:23, 374:14, 374:17, 412:21
**sign-in** [8] - 338:21, 339:9, 339:10, 339:22, 373:21, 373:23, 374:17, 412:21
**signed** [3] - 324:7, 324:13, 340:25
**significant** [1] - 372:13
**signing** [1] - 407:12
**silent** [1] - 390:20
**silently** [1] - 431:10
**similar** [2] - 322:12, 430:20
**Simon** [10] - 321:5, 327:6, 328:3, 410:12, 419:16, 420:13, 425:6, 428:8, 429:3, 431:3
**SIMON** [42] - 315:13, 319:23, 320:3, 321:6, 321:9, 404:14, 405:9, 408:13, 410:1, 410:9, 410:10, 410:13, 410:15, 411:4, 411:8, 411:11, 411:19, 411:20, 412:11, 414:9, 414:11, 414:13, 414:23, 415:3, 415:11, 418:5, 418:13, 418:23, 419:2, 419:7, 419:17, 419:22, 420:19, 420:23, 421:9, 423:5, 423:8, 424:15, 425:11, 425:13, 425:23, 428:9
**Simon.....................** **405** [1] - 433:6
**sisters** [1] - 318:13
**sit** [3] - 327:19, 333:23, 333:24
**sitting** [1] - 329:5
**situation** [2] - 426:7, 426:23

**six** [1] - 364:17
**Slater** [51] - 331:17, 331:21, 332:14, 333:10, 333:13, 333:18, 334:8, 335:12, 336:10, 336:11, 336:16, 336:19, 338:23, 339:7, 339:16, 340:23, 348:7, 349:7, 349:19, 351:10, 352:6, 352:18, 353:3, 353:13, 354:6, 354:20, 355:16, 355:23, 356:8, 356:19, 356:24, 357:8, 358:18, 359:11, 360:4, 360:9, 360:15, 360:23, 361:6, 361:12, 362:15, 401:3, 409:19, 411:4, 414:3, 417:1, 418:20, 421:20, 421:24, 423:6, 423:19
**slow** [2] - 357:24, 431:3
**slowly** [1] - 409:18
**small** [7] - 322:17, 333:22, 334:10, 334:14, 381:17, 381:22, 382:1
**smaller** [1] - 323:10
**smoothly** [1] - 316:4
**so-and-so** [1] - 345:25
**someone** [1] - 391:6
**sometime** [1] - 377:23
**sometimes** [7] - 320:5, 323:10, 342:7, 357:24, 371:9, 378:14, 379:8
**sooner** [1] - 316:16
**Sorry** [1] - 350:25
**sorry** [12] - 340:9, 343:12, 357:22, 369:11, 376:7, 376:21, 381:21, 383:11, 385:7, 413:1, 414:11, 428:12
**sounds** [4] - 372:21, 383:2, 395:16, 395:17
**spaghetti** [1] - 431:9
**speaking** [2] - 327:24, 404:25
**special** [1] - 322:7
**specialist** [1] - 399:5
**specialized** [1] - 391:10
**specialty** [1] - 410:22
**specific** [2] - 373:20, 379:19
**specifically** [4] - 364:15, 401:15, 401:19, 419:24
**speculation** [2] - 421:7, 424:10

**spell** [2] - 328:6, 405:11
**spelled** [1] - 387:7
**spinal** [20] - 321:16, 321:19, 322:1, 322:5, 322:6, 322:17, 322:21, 322:24, 323:1, 323:7, 323:22, 323:24, 324:25, 325:2, 325:17, 326:6, 326:10, 326:14, 417:9, 424:23
**spine** [1] - 322:14
**spines** [1] - 323:15
**split** [1] - 351:12
**spot** [1] - 322:16
**spots** [1] - 400:1
**stack** [1] - 363:19
**staffed** [1] - 405:23
**stage** [1] - 355:13
**stand** [5] - 319:19, 320:18, 399:14, 428:19, 428:22
**start** [6] - 316:23, 316:24, 367:14, 426:9, 428:5, 432:1
**started** [5] - 317:2, 321:3, 330:1, 380:23, 406:5
**state** [11] - 359:22, 368:20, 398:19, 398:20, 398:21, 399:2, 399:4, 405:10, 420:7, 420:9, 420:10
**statement** [6] - 319:14, 321:5, 345:24, 398:2, 399:2, 431:16
**states** [2] - 326:10, 363:17
**STATES** [2] - 315:1, 315:10
**States** [2] - 315:3, 315:23
**stay** [3] - 320:21, 329:24, 383:22
**stayed** [1] - 384:11
**steal** [1] - 321:10
**stenographic** [1] - 432:12
**step** [1] - 407:9
**steps** [2] - 374:23, 393:24
**stickler** [1] - 430:23
**still** [15] - 316:24, 318:20, 334:10, 348:21, 357:23, 361:22, 379:9, 379:11, 381:10, 381:14, 403:13, 411:22, 424:7, 428:18, 428:21
**stole** [1] - 326:21

**stop** [10] - 333:19, 334:11, 335:13, 335:18, 336:11, 336:19, 375:14, 425:7, 425:24
**story** [1] - 325:22
**straight** [1] - 402:9
**stretch** [1] - 399:14
**strike** [6] - 386:3, 386:5, 395:25, 397:18, 398:3, 403:18
**stuff** [2] - 350:21, 420:15
**subject** [2] - 428:18, 430:21
**submit** [6] - 324:9, 399:8, 406:18, 407:10, 407:12, 413:4
**submits** [2] - 324:5, 413:19
**submitted** [4] - 316:21, 321:17, 326:16, 422:21
**submitting** [2] - 324:20, 325:14
**subpoena** [7] - 426:24, 427:5, 427:12, 427:18, 429:14, 429:17, 430:1
**subpoenaed** [1] - 429:12
**substance** [1] - 394:6
**substances** [1] - 394:12
**substantive** [2] - 430:9, 430:25
**successfully** [1] - 413:23
**sufficient** [1] - 378:12
**Suite** [2] - 315:17, 315:19
**suite** [3] - 330:12, 333:8, 333:11
**suites** [4] - 329:23, 329:25, 330:9, 332:5
**Supartz** [1] - 401:18
**super** [1] - 326:18
**supplies** [1] - 363:24
**supposed** [1] - 365:2
**surprised** [1] - 342:6
**sustain** [1] - 400:7
**sustained** [6] - 337:18, 342:12, 345:13, 402:22, 417:22, 421:8
**swab** [1] - 381:24
**switching** [1] - 358:4
**sworn** [3] - 316:8, 327:21, 404:20
**SYNVISC** [2] - 394:19,

396:10
**syringe** [6] - 343:14, 343:17, 364:13, 365:2, 377:25, 394:9
**syringes** [1] - 393:18
**system** [6] - 324:4, 413:2, 413:17, 413:18, 413:19

## T

**table** [3] - 319:17, 320:20, 390:17
**TANYA** [1] - 315:9
**target** [1] - 422:17
**targets** [2] - 325:25, 421:21
**tasks** [2] - 331:13, 363:22
**teach** [1] - 368:5
**tech** [1] - 392:24
**technical** [2] - 350:15, 350:21
**technically** [1] - 428:19
**ten** [3] - 366:23, 411:17, 411:18
**test** [1] - 335:9
**testified** [6] - 327:22, 345:25, 346:19, 393:17, 398:13, 404:21
**testify** [7] - 345:15, 345:24, 376:5, 393:18, 398:14, 429:15, 431:18
**testifying** [5] - 343:5, 346:2, 348:20, 393:14, 405:5
**testimony** [15] - 346:9, 346:10, 381:4, 396:17, 397:19, 397:22, 398:25, 419:23, 426:2, 426:15, 428:4, 428:17, 428:18, 428:21
**tests** [1] - 343:11
**THE** [301] - 315:1, 315:1, 315:9, 316:3, 316:6, 316:7, 316:11, 316:12, 317:8, 317:10, 317:13, 317:22, 317:24, 318:5, 318:9, 318:19, 319:6, 319:8, 319:10, 319:22, 319:25, 320:4, 320:7, 320:8, 320:16, 320:19, 320:23, 320:25, 321:8, 327:6, 327:10, 327:23, 328:2, 328:3, 329:11, 332:10, 332:12, 332:16, 332:17, 332:18, 332:19,

332:22, 332:24, 333:4, 333:5, 334:21, 334:25, 335:7, 336:3, 337:18, 339:12, 339:14, 340:8, 340:13, 340:19, 342:12, 342:20, 342:25, 343:1, 343:2, 343:12, 345:13, 345:17, 345:19, 345:22, 346:3, 346:16, 348:17, 348:21, 349:3, 349:5, 349:15, 349:17, 349:22, 349:23, 349:25, 350:1, 350:3, 350:5, 350:7, 350:9, 350:11, 350:12, 350:14, 350:17, 350:20, 352:24, 353:1, 353:9, 353:11, 353:16, 353:18, 353:22, 353:25, 354:2, 354:5, 355:4, 355:9, 355:12, 355:17, 355:18, 355:21, 356:4, 356:6, 357:4, 357:6, 357:18, 357:23, 357:24, 358:1, 358:3, 358:4, 358:5, 358:6, 358:8, 358:10, 358:12, 358:14, 358:16, 358:20, 358:22, 358:23, 359:18, 359:21, 359:24, 359:25, 360:2, 360:8, 361:4, 361:11, 361:16, 361:17, 361:18, 361:20, 361:21, 361:23, 362:1, 362:3, 362:4, 362:5, 362:7, 365:1, 366:4, 366:7, 366:8, 366:14, 366:18, 367:2, 371:8, 371:14, 373:11, 373:14, 373:15, 374:5, 376:5, 376:8, 376:17, 379:25, 381:19, 382:8, 382:11, 382:18, 382:24, 384:19, 386:5, 386:10, 386:21, 386:25, 388:13, 388:15, 388:20, 388:22, 389:1, 389:9, 389:11, 389:23, 389:25, 390:18, 390:20, 390:22, 393:11, 393:13, 393:16, 393:23, 394:1, 394:4, 396:1, 396:15, 397:9, 397:14, 397:16, 397:22, 398:13, 398:20, 398:22, 398:24, 399:9, 399:12,

400:4, 400:6, 400:12, 400:15, 401:4, 401:7, 401:8, 402:22, 403:19, 404:7, 404:9, 404:10, 404:11, 404:12, 404:16, 404:17, 404:22, 404:23, 404:24, 405:3, 405:4, 405:6, 405:7, 408:9, 408:10, 410:3, 410:5, 410:8, 410:12, 411:7, 411:10, 411:17, 411:22, 411:23, 411:24, 412:3, 412:6, 412:10, 414:7, 414:8, 414:10, 414:12, 414:25, 415:2, 415:5, 415:9, 415:10, 417:21, 417:25, 418:1, 418:2, 418:8, 418:10, 418:22, 418:25, 419:10, 419:12, 419:15, 419:21, 420:2, 420:7, 420:18, 420:20, 421:8, 423:3, 424:11, 424:13, 424:14, 425:6, 425:25, 426:3, 426:5, 426:17, 426:18, 426:20, 426:24, 427:4, 427:8, 427:9, 427:13, 427:14, 427:19, 427:20, 427:23, 427:25, 428:10, 428:11, 428:12, 428:23, 428:24, 429:1, 429:2, 429:5, 429:6, 429:10, 429:18, 429:22, 429:25, 430:4, 430:14, 430:18, 430:23, 431:24
**theirs** [1] - 416:2
**themselves** [1] - 327:13
**third** [5] - 326:25, 373:1, 401:10, 401:11, 416:14
**thousand** [1] - 330:6
**three** [7] - 316:15, 326:22, 326:23, 327:2, 333:14, 338:1, 366:23
**throughout** [3] - 322:14, 333:23, 347:21
**thumb** [1] - 331:21
**ticket** [1] - 407:5
**timeframe** [1] - 330:12
**today** [3] - 329:3, 366:19, 431:16
**together** [2] - 322:18, 407:1
**tomorrow** [6] - 426:1, 426:11, 426:13,

426:22, 428:6, 428:24
**tonight** [1] - 431:3
**took** [6] - 317:18, 323:18, 331:8, 375:9, 382:3, 426:4
**top** [23] - 323:23, 336:12, 351:14, 351:15, 351:17, 351:24, 352:4, 353:14, 354:8, 356:9, 357:10, 357:21, 358:25, 362:22, 407:3, 413:7, 416:14, 419:18, 420:24, 422:10, 424:4, 424:6
**topic** [1] - 428:17
**touch** [1] - 415:13
**towards** [1] - 365:7
**track** [2] - 353:18, 365:11
**trained** [9] - 368:19, 371:24, 372:14, 380:12, 380:15, 380:18, 380:21, 394:3, 395:4
**training** [7] - 328:16, 328:23, 368:4, 368:8, 380:20, 385:14, 393:1
**trainings** [1] - 407:24
**TRANSCRIPT** [1] - 315:8
**transcript** [2] - 432:11, 432:12
**trash** [2] - 378:25, 379:2
**tray** [1] - 334:15
**treats** [1] - 391:7
**TRIAL** [2] - 315:4, 315:8
**trial** [5] - 317:2, 318:20, 321:4, 326:23, 327:14
**tried** [2] - 358:5, 430:12
**trip** [2] - 316:7, 316:10
**trouble** [1] - 427:6
**true** [27] - 323:4, 358:5, 368:14, 369:20, 370:18, 370:19, 372:3, 377:12, 377:19, 378:13, 378:17, 379:4, 379:5, 382:5, 387:12, 388:6, 389:14, 389:19, 390:25, 391:10, 392:24, 394:11, 394:22, 395:11, 396:7, 432:11, 432:12
**trust** [2] - 319:18, 324:4
**trust-based** [1] - 324:4

**trusted** [1] - 324:10
**truth** [5] - 366:5, 397:11, 397:23, 398:2, 398:15
**try** [4] - 350:12, 397:3, 414:2, 428:13
**trying** [6] - 333:3, 350:25, 353:18, 397:13, 413:2, 431:21
**Tuesday** [4] - 316:13, 316:23, 318:11, 318:17
**turn** [7] - 350:15, 350:17, 381:15, 381:23, 412:1, 429:19
**turned** [5] - 350:14, 390:20, 412:5, 430:7
**turning** [1] - 332:21
**twice** [1] - 426:4
**two** [8] - 316:18, 330:6, 338:1, 338:12, 378:1, 402:1, 411:24, 416:20
**twofold** [1] - 382:15
**type** [12] - 322:20, 323:7, 325:17, 326:9, 338:17, 339:9, 347:22, 368:8, 370:17, 408:15, 416:23, 419:25
**types** [4] - 338:15, 394:11, 400:21, 401:14
**typically** [1] - 344:13
**typing** [2] - 348:2, 363:23

## U

**U.S** [1] - 315:13
**Ultrasound** [1] - 416:16
**ultrasound** [63] - 323:8, 323:10, 323:12, 323:17, 335:25, 336:14, 337:22, 344:5, 344:8, 344:24, 344:25, 345:1, 345:7, 370:20, 370:22, 370:23, 370:24, 371:17, 371:21, 372:4, 372:6, 372:12, 372:23, 373:2, 375:3, 376:1, 376:2, 376:11, 377:4, 377:8, 378:3, 378:13, 378:17, 378:20, 379:7, 379:12, 379:14, 380:8, 380:13, 380:16, 380:19, 380:25, 381:1, 381:5, 381:15, 381:16, 381:25, 383:18, 402:5, 402:7, 402:9, 402:14, 402:20, 403:8, 403:11,

403:25, 404:4, 416:18, 416:21, 416:23, 418:4, 418:17
**ultrasounds** [1] - 344:22
**under** [12] - 339:24, 351:4, 351:5, 351:22, 359:5, 381:4, 401:20, 416:11, 416:20, 422:17, 427:5, 427:11
**understood** [5] - 319:24, 320:22, 391:3, 391:6, 425:11
**unhappy** [1] - 427:15
**UNITED** [2] - 315:1, 315:10
**United** [2] - 315:3, 315:23
**unless** [2] - 337:18, 359:22
**up** [38] - 320:4, 324:7, 327:18, 332:16, 332:20, 332:23, 332:24, 333:19, 347:22, 349:7, 349:24, 352:12, 354:20, 363:23, 377:14, 378:23, 379:9, 379:15, 381:1, 381:10, 381:14, 383:4, 389:4, 394:2, 399:14, 401:3, 410:12, 411:5, 411:22, 412:3, 412:8, 418:20, 421:24, 423:19, 427:3, 429:14, 431:11
**user** [1] - 350:19
**uses** [1] - 322:14
**utilize** [1] - 374:18

## V

**vague** [2] - 402:21, 408:8
**Vegas** [2] - 316:7, 318:6
**verdict** [1] - 327:3
**verify** [1] - 346:1
**versus** [2] - 364:22, 400:21
**video** [2] - 322:13, 322:14
**view** [3] - 323:11, 336:13, 340:11
**Virginia** [1] - 323:21
**visits** [1] - 347:12
**vocational** [1] - 367:24
**voir** [1] - 318:5
**vs** [1] - 315:5

## W

**W-R-I-G-H-T** [1] - 405:12
**wait** [10] - 316:20, 357:21, 358:9, 373:11, 378:1, 408:25, 411:15, 413:5, 429:2
**waiting** [2] - 319:11, 333:17
**walk** [1] - 333:15
**walked** [5] - 375:2, 375:5, 378:16, 378:25, 381:1
**walking** [1] - 392:4
**wand** [9] - 375:3, 377:9, 377:11, 380:16, 380:19, 381:12, 381:24, 403:14, 403:16
**Washington** [7] - 315:6, 315:14, 315:20, 315:24, 321:15, 329:18, 432:20
**watching** [2] - 358:10, 358:11
**wearing** [2] - 317:21, 329:6
**website** [1] - 417:13
**Wednesday** [1] - 317:12
**week** [4] - 317:4, 331:15, 337:24, 338:1
**weekend** [2] - 318:6, 318:7
**welcome** [4] - 319:7, 362:6, 405:3, 422:20
**well-trained** [2] - 371:24, 372:14
**wheel** [2] - 381:16, 381:25
**white** [1] - 329:7
**whole** [2] - 420:14, 423:5
**WILLIS** [101] - 315:12, 317:7, 327:8, 328:5, 329:9, 329:12, 332:8, 332:14, 333:6, 334:24, 335:1, 335:11, 336:6, 337:20, 339:11, 339:15, 340:21, 342:14, 342:21, 343:7, 343:13, 345:14, 345:21, 346:1, 346:15, 346:18, 346:20, 346:22, 348:19, 348:23, 349:1, 349:6, 349:13, 349:18, 350:23, 352:22, 353:2, 353:7, 353:12, 353:17, 353:20, 354:1, 354:3,

354:6, 354:7, 355:1, 355:8, 355:10, 355:14, 355:15, 355:19, 355:22, 355:24, 356:3, 356:7, 357:2, 357:7, 357:16, 357:19, 358:2, 358:15, 358:18, 358:24, 359:15, 360:1, 360:3, 360:7, 360:9, 360:11, 361:2, 361:5, 361:10, 361:12, 361:14, 362:8, 365:6, 366:9, 366:13, 366:16, 371:7, 374:4, 376:4, 382:6, 382:15, 388:19, 393:10, 393:14, 393:21, 397:8, 397:21, 400:3, 400:5, 400:14, 400:17, 401:5, 401:9, 402:23, 403:20, 404:6, 429:9, 429:11
**Willis** [9] - 317:6, 333:5, 340:20, 362:7, 382:14, 393:13, 400:13, 429:4, 431:3
**Willis..................328** [1] - 433:3
**Willis................400** [1] - 433:4
**wing** [1] - 333:2
**Winston** [1] - 315:19
**wipe** [2] - 344:13, 381:24
**wish** [1] - 350:5
**WITNESS** [27] - 328:2, 343:1, 349:25, 358:22, 361:20, 366:7, 373:14, 386:10, 404:9, 404:11, 404:23, 405:3, 405:6, 408:10, 417:25, 418:2, 424:13, 426:3, 426:24, 427:8, 427:13, 427:19, 427:23, 428:11, 428:23, 429:1, 429:5
**witness** [42] - 317:20, 319:14, 327:7, 327:21, 329:9, 331:18, 331:22, 338:23, 343:6, 345:19, 345:23, 346:5, 346:9, 346:11, 348:7, 349:7, 352:6, 353:4, 354:20, 355:16, 355:23, 356:19, 356:24, 357:8, 359:11, 360:4, 360:23, 361:6, 364:25, 366:16, 381:19, 388:12, 393:16, 402:25, 404:20, 409:16, 414:4, 426:21, 429:8, 429:12, 429:19, 429:24

**witness's** [1] - 397:19
**WITNESSES** [1] - 433:2
**witnesses** [2] - 324:23, 355:6
**woman's** [1] - 370:23
**womb** [1] - 370:23
**word** [2] - 373:15, 400:4
**works** [3] - 395:20, 415:5, 425:23
**world** [1] - 410:20
**worse** [2] - 427:17, 428:1
**WRIGHT** [2] - 404:19, 433:5
**Wright** [23] - 334:7, 404:15, 405:10, 405:12, 405:13, 409:21, 411:12, 411:21, 412:12, 414:6, 414:14, 415:12, 417:2, 419:3, 420:24, 422:2, 423:9, 423:22, 424:16, 426:1, 426:20, 430:20, 432:2
**write** [3] - 363:8, 373:12, 409:24
**writing** [2] - 356:16, 358:25
**written** [1] - 420:4
**wrote** [2] - 326:3, 421:2
**Wyatt** [1] - 334:7

## X

**x-ray** [2] - 322:11, 322:13
**x-ray-guided** [1] - 322:5
**Xs** [3] - 351:7, 356:15, 412:16

## Y

**Y.A** [3] - 356:22, 356:25, 357:14
**year** [3] - 383:9, 383:12, 385:20
**years** [5] - 326:22, 330:5, 383:21, 391:25
**yellow** [1] - 431:16
**yesterday** [1] - 430:20
**York** [1] - 315:14
**young** [1] - 386:1
**yourself** [1] - 397:7