UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,        .
                                 .
          Plaintiff,             .   CR No. 19-0255 (TSC)
                                 .
     v.                          .
                                 .   Washington, D.C.
FREDERICK GOODING,               .   Thursday, September 8, 2022
                                 .   9:51 a.m.
          Defendant.             .
. . . . . . . . . . . . . . . ..     Morning Session


DAY 3
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          JILLIAN D. WILLIS, ESQ.
                             JIL SIMON, ESQ.
                             U.S. Department of Justice
                             1400 New York Avenue NW
                             Washington, DC 20005
                             (202) 353-0822

For Defendant:               MICHAEL J. KHOURI, ESQ.
                             Khouri Law Firm, APC
                             2222 Martin
                             Suite 215
                             Irvine, CA 92612
                             (949) 336-2433

                             FREDERICK D. COOKE, JR., ESQ.
                             Rubin, Winston, Diercks,
                             Harris & Cooke, LLP
                             1250 Connecticut Avenue NW
                             Suite 700
                             Washington, DC 20036
                             (202) 861-0870

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186

C O N T E N T S

TESTIMONY

ERICA WRIGHT:          Direct Examination Cont'.............462
                       Cross-Examination....................471
                       Redirect Examination.................492
                       Recross-Examination..................496

ALLENE MCDUFFIE:       Direct Examination...................496
                       Cross-Examination....................500
                       Redirect Examination.................504

JUAN SCHAENING-PEREZ:  Direct Examination...................505

*   *   *

EXHIBITS RECEIVED

Government Exhibit No. 1 ..................................511
Government Exhibit No. 2A .................................516
Government Exhibit No. 2B .................................518
Government Exhibit Nos. 26-29 ............................525
Government Exhibit No. 33 ................................529
Government Exhibit No. 34 ................................533
Government Exhibit No. 32A ...............................539
Government Exhibit No. 31 ................................547

*   *   *

                      P R O C E E D I N G S

1          THE DEPUTY CLERK:  Your Honor, we have criminal

2   action 19-255, United States of America versus Frederick

3   Gooding.  We have Ms. Jil Simon and Ms. Jillian Willis

4   representing the government, and we have Mr. Frederick Cooke,

5   Jr., and Mr. Michael Khouri representing Mr. Gooding.

6   All parties are present.

7          THE COURT:  Good morning, counsel.  You saw what I was

8   dealing with.  Sorry I was late.  Now, I understand we have an

9   issue with regard to an email -- I provided a copy -- that

10  purports to be from Ms. Wright, an email exchange between

11  Ms. Wright and Dr. Gooding.  I assume, Mr. Khouri, you're

12  going to seek to use this as impeachment in cross-examination

13  as evidence of bias or something.  Is that right?

14         MR. KHOURI:  Yes.  I think I'll be using it to refresh

15  the witness's recollection.  Quite frankly, Your Honor, and --

16         THE COURT:  Wait.  Well, you need to refresh her

17  recollection or to -- how do you know she's not going to

18  remember it?

19         MR. KHOURI:  Well, that's the point I was about

20  ready to make.  I don't know what I'm going to ask until

21  I'm standing here at the lectern asking questions.  And I'm

22  not too good at predicting the future, but the government

23  seems to be concerned about how I'm going to use that text

24  message.

1          THE COURT:  Well, you're an experienced trial lawyer.

2     Let me ask you a couple of questions, though.  When was this

3     provided to the government?

4          MR. KHOURI:  Last night I gave it to the government

5     after the Court ordered -- asked me to do so.  But I sent

6     it from my phone so the date and time wasn't on it.  So

7     this morning I sent it from -- I had Dr. Gooding's son take --

8     I think it's called a screenshot? -- and email it to me.

9          THE COURT:  You're dating yourself, Mr. Khouri.

10         MR. KHOURI:  And then I emailed it over to the

11    government.  So the correct answer to that question is this

12    morning.

13         THE COURT:  Is this a text -- so it's a text, not an

14    email?

15         MR. KHOURI:  It's a text message.

16         THE COURT:  All right.  Ms. Willis, are -- oh,

17    Ms. Simon.  What's your objection?  I mean, if he's intending

18    to use it as cross-examination to impeach this witness in an

19    area of bias or to undermine her testimony that, you know,

20    she had -- for example, that she had concerns about what

21    Dr. Gooding was doing.  And he says, no, you didn't, look

22    at this text, you said, you know -- it shows that you had a

23    different state of mind back then.  Why isn't it usable even

24    if it hasn't been produced until now?

25         MS. SIMON:  Well, the context of the message doesn't

1    seem clear based on what we were provided with this morning.

2    The prior text in the chain is cut off.  It seems like the

3    text message is actually between three people.  It's not clear

4    that the message before was sent from Dr. Gooding or even what

5    that message is.  But additionally, the --

6        THE COURT:  Let me stop you on that point.  I agree

7    with that point.  Mr. Khouri, if you're going to use it,

8    you can't just take a little snippet of a text and show her.

9    She has to be able to see the whole text exchange.

10       MR. KHOURI:  I think that's a legitimate point, and

11   that's why this morning I asked Dr. Gooding's son, who's a

12   lawyer, to look at Dr. Gooding's phone going backwards, going

13   in the past, and I spoke with my client about it and my belief

14   is that was an unsolicited text message, the text message that

15   the Court has.

16       THE COURT:  Well, if it's unsolicited or not, if you're

17   going to use it to impeach a witness, the rule of completeness

18   requires that Ms. Simon be able to look at the text preceding

19   this to see in what context the statement was made.  You can't

20   just isolate a single statement and not allow the government

21   to see the context in which the statement was made and allow

22   the witness in redirect if necessary to explain the context in

23   which it was made.

24       MR. KHOURI:  I agree with the Court.

25       THE COURT:  Are you going to let them see it?

1           MR. KHOURI:  But aren't you talking about text

2     messages between Dr. Gooding and Erika Wright?

3           THE COURT:  I'm talking about -- in other words,

4     this is a group chat.  This is three people.  You showed me

5     two texts.  One is half of a text from Dr. Gooding, and the

6     other is an entire text from Ms. Wright, and it may be that

7     this one from Ms. Wright is the first one on the topic:

8     "Good afternoon, hi, Dr. Gooding and team."  But Ms. Simon

9     is entitled to see what prompted or spurred this text.

10          So she's entitled to see, first of all, at the very

11    minimum, the entire text that preceded it and probably a

12    couple others to see -- in other words: "I hope this message

13    finds you all doing well.  I miss you very much.  Dr. Gooding,

14    you will prevail over these shenanigans."

15          What is she referring to?  Ms. Simon has a right to see

16    what she's talking about.  You can't just impeach her with

17    this text without the government knowing the context in which

18    the statement was made.

19          MR. KHOURI:  I do not believe that any of the prior

20    text messages will be of assistance.

21          THE COURT:  That's your belief.  Since when does a

22    defense lawyer believe -- I mean, that may be your opinion,

23    but the government's entitled to see it.  They can't go on

24    your belief.

25          MR. KHOURI:  Your Honor, I believe in candor and

1    honesty and we have nothing to hide, and I'm sorry the Court

2    feels that way.

3          THE COURT:  No, no, no, no, no.  I have no reason to

4    doubt your word as an officer of the court.  What I'm saying

5    is your proffer that you don't believe that the other texts

6    have anything to do with Ms. Wright's text is not sufficient

7    for the government.  And it wouldn't be for me if I were the

8    defense lawyer and the government was making the same proffer.

9          They have a right, if I'm going to let you use this -- and

10    I'm inclined to let you use this, so consider where I'm going

11    here.  I'm inclined to let you use it, but fair is fair and

12    the government has the right to see the message in context.

13          MR. KHOURI:  And they can look.  Where's the phone?

14    Can you pull them up?

15          THE COURT:  You could have short-circuited this.

16          MS. SIMON:  I'll take a look.  Thank you.

17          THE COURT:  Okay.

18          MS. SIMON:  Just for the record -- and maybe it'll

19    be clearer once we look.  But it does not appear from what

20    we were provided that -- the prior message actually is from

21    someone with the initial L, it looks like, which is one of the

22    reasons why we weren't clear about the context or even who the

23    prior message was from on this group chat with three people.

24          THE COURT:  Well, you can look at the chat.  Once the

25    witness has been confronted with it, you can ask her about it.

1    If your witness still has a phone, I'd even allow you to look

2    at your witness's phone, at the text, to see, if you want.

3    But Mr. Khouri is offering to let you look.

4        Hold on, before you start handing over phones.

5        But do you have any, other than the context, any other

6    objection?

7        MS. SIMON:  No, Your Honor.  The other objection is

8    regarding -- it's just sort of the lack of clarity and what

9    she's referring to, what shenanigans she's referring to --

10        THE COURT:  So Mr. Khouri has offered you an

11    opportunity to look at his -- at Dr. Gooding's phone and

12    the text exchange.  Obviously, not every text exchange, but

13    immediately before and after, to gauge the context.  And

14    obviously you will be allowed to have the witness explain

15    further in redirect.  Other than that, I'm going to allow it.

16        MR. KHOURI:  So if the record will reflect that I'm

17    turning the phone over.  I'm going to take his credit cards

18    out before I hand it to the government.

19        THE COURT:  Now, wait a second.  Do you want to do

20    this now or at the break?

21        MS. SIMON:  The witness is coming up first.

22    I probably have 10, 15 minutes worth of --

23        THE COURT:  She needs to get the jury in, get her

24    direct finished, and then we can take a break and she can look

25    at it before you start your cross-examination.  How's that?

 1            MS. SIMON:  Thank you, Your Honor.

 2        (Jury in at 10:03 a.m.)

 3            THE COURT:  Good morning, ladies and gentlemen.  I'm

 4     sorry for the delay, and I have a feeling I'll be apologizing

 5     a lot, but I'm going to try not to too often.  I had a nine

 6     o'clock matter.  I scheduled it for nine, thinking we would

 7     be done before 9:30, but we started late.

 8      So the lawyers were all here; everybody was here on time;

 9     it's my fault.  So, if you blame anybody, blame me.  The

10     matter ran late, and then we had to deal with a very quick

11     legal matter in this case.

12      So, I apologize.  Thank you for your patience.  I hope you

13     were able to have some breakfast, and we're going to continue

14     with the testimony of Ms. Wright.  And just as a note, we will

15     be stopping at four o'clock today.

16            MS. SIMON:  The government calls Erica Wright.

17            THE COURT:  Good morning, Ms. Wright.

18     ERICA WRIGHT, WITNESS FOR THE GOVERNMENT, PREVIOUSLY SWORN

19                   DIRECT EXAMINATION CONTINUED

20     BY MS. SIMON:

21     Q.   Good morning, Ms. Wright.

22     A.   Good morning.

23     Q.   Ms. Wright, do you want to be here today?

24     A.   No.

25     Q.   Why are you here today?

1    A.    Because I have to be?

2    Q.    Okay.  Did you like Dr. Gooding when you worked for him?

3    A.    I did.

4    Q.    Was he good to you?

5    A.    He was very understanding because of what I was going

6    through with my pain as well.  So he was understanding about

7    that.

8    Q.    In 2017 when you were working there, do you remember

9    Medicare doing an audit of some of Dr. Gooding's claims?

10   A.    I do.

11   Q.    Did that audit include the codes we talked about

12   yesterday, 64635, and 64636?

13   A.    Yes.

14   Q.    What do you remember about that audit?

15   A.    We received the audit in the mail, and we pulled all

16   of the charts for the patients that were listed on the notice.

17   We pulled the date of service fee ticket, or charge sheet.

18   We also pulled out the procedure report, and we put all of

19   them aligned in Dr. Gooding's office on his credenza.

20   Q.    Then what happened with those documents?

21   A.    Dr. Gooding took those charts home for further review.

22   Q.    And then were the charts submitted to Medicare as part

23   of the audit?

24   A.    I believe we did resubmit some of the charges.

25   Q.    What were the results of that audit that Medicare

1    conducted in 2017?

2           MR. KHOURI:  Calls for hearsay.

3           THE COURT:  Sustained.

4    BY MS. SIMON:

5    Q.   Did Medicare send a letter with the results of that

6    audit?

7    A.   Yes.

8    Q.   Did Dr. Gooding receive that letter?

9    A.   Yes.

10   Q.   Did Dr. Gooding tell you what the results of the audit

11   were?

12          MR. KHOURI:  Objection.  Hearsay.

13          THE COURT:  Not being offered for the truth of the

14   matter asserted.  Overruled.  Not what he told you, just

15   whether he told you.  Did he tell you that he had gotten the

16   results?

17          THE WITNESS:  Yes.  He told me.

18   BY MS. SIMON:

19   Q.   Do you know what the results were?

20          MR. KHOURI:  Objection.  Hearsay.

21       (Bench conference.)

22          MS. SIMON:  The defendant's statements wouldn't be

23   hearsay, though, right?

24          THE COURT:  It's his statement telling her what a

25   letter said.  So --

1          MS. SIMON:  But his statement about what the result of

2     the audit was separate and apart from the letter wouldn't be

3     hearsay.

4          THE COURT:  Well, it is the defendant's statement.  Are

5     you offering it for the truth?

6          MS. SIMON:  I'm offering it for -- yes, the truth.

7          THE COURT:  Are you offering it as a statement of the

8     defendant?

9          MS. SIMON:  Yes.  What the defendant told the witness.

10         THE COURT:  Mr. Khouri, why doesn't it meet the hearsay

11    exception for the statement of a party opponent?

12         MR. KHOURI:  Because it's based upon double hearsay.

13    The original level of hearsay is the letter and the decision

14    by Medicare.  And if that isn't proven up to be -- proven up

15    independently to be correct, then the statement of the

16    defendant is meaningless.

17         THE COURT:  Why doesn't it go to his state of mind?

18    In other words -- again, that's why I'm asking about the truth

19    of the matter asserted.  Doesn't it go to his state of mind

20    and his awareness of the audit results?

21         MR. KHOURI:  I think counsel said they were admitting

22    it for the truth of the matter, which is the audit.

23         THE COURT:  I understand.  But I have to make a

24    determination as to whether it's admissible under any of

25    the hearsay exceptions, and I'm asking you, why isn't it

1    admissible to show his state of mind?

2           MR. KHOURI:  I don't think it shows his state of mind.

3    I think what the statement is is he's going to be repeating

4    what the audit concluded.  And if that's not independently

5    proven up, it's irrelevant.  His state of mind --

6           THE COURT:  Well, it does go to state of mind because

7    the government is saying he knowingly, and you're going to be

8    arguing that he didn't knowingly break the law, and if he's

9    aware of the audit results and is communicating them to this

10   witness, why doesn't that come in, not only as a statement

11   of a party opponent, but also go to his state of mind?

12          MR. KHOURI:  It has no relevance what the auditors

13   concluded.  This was an audit that was performed I believe

14   by a Medicare contractor.  And they're not the ones that set

15   forth the law.  There was no administrative determination made

16   by the Department of Health and Human Services.  There was no

17   order to that effect.

18          THE COURT:  Let me stop you for a minute, Mr. Khouri.

19     Are you planning on eliciting this audit letter in any

20   other context, Ms. Simon?  Are you going to seek its

21   admission?

22          MS. SIMON:  Yes, Your Honor.  It's on the exhibit list,

23   and we would be bringing it in through Alice Mierzwa, who is

24   the Medicare clinical nurse who conducted the audit and wrote

25   the letter.

1          THE COURT:  Then I think you should do it that way.

2     The jury has already heard that Dr. Gooding received the

3     letter, that he told her the results of the letter.  And I

4     think you can then complete that by bringing in the letter

5     through another witness, rather than through this witness.

6          MS. SIMON:  Okay.  Understood, Your Honor.

7          THE COURT:  All right.

8       (End of bench conference.)

9     BY MS. SIMON:

10    Q.   Could you please pull up -- and Mr. Bradley, we would

11    like to publish this for the jury if possible.

12         Can you see that, Ms. Wright?

13    A.   I can.  It's a little small.

14    Q.   A little small?  Is there a way to zoom in perhaps on

15    that Post-it note on the top left of the page?  How's that?

16    A.   That's better.  Thank you.

17    Q.   Do you see Dr. Gooding's handwriting on this Post-it

18    note?

19    A.   I do.

20    Q.   Do you also see your handwriting on the Post-it note?

21    A.   I do.

22    Q.   Which part is your handwriting?

23    A.   "Sent email."

24    Q.   Can you read the first two sentences on the note?

25    A.   "I notice you are getting J codes rejected.  Are we

1   recovering it with resubs?"

2   Q.   What does resubs mean?

3   A.   Resubmission.

4   Q.   And do you know -- were there issues with J codes being

5   rejected?

6   A.   Yes.

7          MS. SIMON:   Thank you, Ms. Slater.

8          THE COURT:   What's a J code?

9          THE WITNESS:   Well, there's a few.   One of them is

10   a Botox, one of them is a Synvisc-One, and one of them is a

11   Gel-One.   So they're different types of injections you can

12   administer.

13          THE COURT:   Thank you.

14          THE WITNESS:   You're very welcome.

15          MS. SIMON:   Thank you, Your Honor.

16   BY MS. SIMON:

17   Q.   We're going to pull up, please, Ms. Slater, Exhibit 25B,

18   page 4.   This has already been admitted into evidence.   We

19   looked at it yesterday as well.   And Your Honor beat me to

20   the punch here.

21       If we could look at the section that says "medication"

22   in the third column there, Ms. Wright, are these the J codes

23   you were just answering the judge's questions about?

24   A.   Yes.

25   Q.   Okay.   Thank you.

1    A.   You're welcome.

2         MS. SIMON:  Ms. Slater, could we now pull up

3    Exhibit 25B page 6, please?

4         THE COURT:  Has this been admitted?  Page 6?

5         MS. SIMON:  Page 6, yes.  This has been admitted as well.

6         THE COURT:  Okay.

7         MS. SIMON:  Ms. Slater, could we zoom in on the Post-it

8    note on the top right of the page?

9    BY MS. SIMON:

10   Q.   Ms. Wright, do you see that Post-it note?

11   A.   Yes.

12   Q.   Is this Dr. Gooding's handwriting?

13   A.   Yes.

14   Q.   And can you read what it says?

15   A.   "Try resub Gel-One denials with Supartz code (since

16   it is same but less concentrated.)"

17   Q.   Okay.  You spoke yesterday about resubmitting codes

18   after they had initially been denied.  Correct?

19   A.   Correct.

20   Q.   Is this an example of Dr. Gooding telling you how to

21   resubmit a code?

22   A.   Yes.

23   Q.   After the initial billing claim has been denied?

24   A.   Yes.

25   Q.   We can take that down.  Thank you, Ms. Slater.

1      Ms. Wright, were you ever in the exam room with patients
2  when procedures were being done?
3  A.   I did come in and prep patients maybe a few times when
4  I first started, but then I primarily was just in the billing
5  office.
6  Q.   Okay.  And we talked a lot about billing yesterday.
7  Just to be clear, did you make any of the decisions about
8  which codes were billed?
9  A.   No.
10  Q.   You billed -- is it true that you just billed what
11  Dr. Gooding told you to bill?
12  A.   Correct.
13      MS. SIMON:  Court's indulgence.
14    Thank you, Ms. Wright.  No further questions from the
15  government.
16      THE WITNESS:  You're welcome.
17      THE COURT:  Ladies and gentlemen, before Mr. Khouri
18  starts his cross, we just need -- the parties need a couple
19  minutes to look at some exhibits.  So I'm going to excuse you
20  for -- well, how much time do you need, Ms. Simon?
21      MS. SIMON:  No more than five minutes, Your Honor.
22      THE COURT:  Five minutes.  A real five minutes.  Don't
23  go far.  They just need to look at some exhibits for this
24  witness, and then we'll be back.
25      THE WITNESS:  Should I leave?

```
 1              THE COURT:  You could stay there if you like.

 2              THE WITNESS:  Okay.

 3              THE COURT:  That's fine.  We're trying to get you out

 4         the door as quickly as possible.

 5              THE WITNESS:  Thank you, ma'am.

 6           (Recess from 10:16 a.m. to 10:24 a.m.)

 7              THE COURT:  All right.  Cross-examination, Mr. Khouri?

 8              MR. KHOURI:  Thank you.

 9                           CROSS-EXAMINATION

10     BY MR. KHOURI:

11     Q.   Good morning.

12     A.   Good morning.

13     Q.   I understand you don't want to be here, so I'll try to be

14     as quick as possible.  My name is Mike Khouri.  I'm one of

15     Dr. Gooding's lawyers.  It's a pleasure to meet you.

16     A.   Nice to meet you as well.

17     Q.   Thanks.  Could you speak up, because I'm a little hard of

18     hearing.

19     A.   Is this better?

20     Q.   Oh, that's great.

21           Now, why don't we start out by -- I'm going to ask

22     the government, Your Honor, to pull up Exhibit 25B, page 7.

23     The government has been gracious enough to --

24              THE COURT:  Thank you, Ms. Slater.

25              MR. KHOURI:  -- streamline this.
```

1    BY MR. KHOURI:

2    Q.   Now, do you see that exhibit on the screen, Ms. Wright?

3    A.   I do.

4    Q.   Okay.  I'm going to direct you to the middle of the

5    exhibit where it says, "call" and it looks like a D, "CMS."

6    See that?

7    A.   I do.

8    Q.   Do you recall reading this note that was written by

9    Dr. Gooding?

10   A.   I do.

11   Q.   And is your understanding of the DCMS to stand for the

12   District of Columbia Medical Society?

13   A.   I didn't even notice the D until you just showed it to

14   me.

15   Q.   All right.  Looking at the exhibit now, does it look like

16   to you that what Dr. Gooding was trying to convey was that you

17   call the District of Columbia Medical Society?

18   A.   It's a possibility.  He did mention that society before.

19   Q.   He mentioned that to you?

20   A.   He did.

21   Q.   Okay.  Around the time that this exhibit was put on your

22   desk?

23        THE COURT:  Mr. Khouri, if you could get a little

24   closer to the microphone, because I can barely hear you and

25   the jury is further away.  All this Plexiglas.

1    BY MR. KHOURI:

2    Q.   Around the time that you found that exhibit in your work

3    space?

4    A.   I'm sorry.  Can you repeat that?

5    Q.   Did Dr. Gooding tell you that around the time that you

6    found this exhibit in your work space?

7    A.   So can you ask that again?

8    Q.   Well, I'm trying to determine when Dr. Gooding told you

9    to call the District of Columbia Medical Society.

10   A.   I'm not sure of the exact date.

11   Q.   And when you saw this exhibit, did you call the District

12   of Columbia Medical Society?

13   A.   I may have.  I don't recall.

14   Q.   Do you recall whether you called CMS?

15   A.   I definitely contacted Medicare.

16   Q.   Okay.  CMS stands for the Center for Medicare and

17   Medicaid Services.  Right?

18   A.   Correct.

19   Q.   And you called the medical society and you called --

20        MS. SIMON:  Objection, Your Honor.

21        THE COURT:  Sustained.  You're assuming facts not

22   in evidence.

23   BY MR. KHOURI:

24   Q.   Did you call the medical society?

25   A.   I did call before, but I'm not sure if I called around

1      the time I got this note.

2      Q.   All right.  So when you called the medical society,

3      that was an effort to ask questions and get answers about

4      the types of codes that you should use for Dr. Gooding's

5      injections.  Right?

6      A.   I was referred right back to Medicare.

7      Q.   That's fine.  But my question was, the reason you

8      called was to try to get the codes that were appropriate

9      to bill Dr. Gooding's injections.  Correct?

10     A.   Correct.

11     Q.   Okay.  And the reason why you called CMS is the same.

12     Right?

13     A.   Yes.

14     Q.   Dr. Gooding asked you to.  Right?

15     A.   Yes.

16     Q.   You trusted Dr. Gooding, didn't you?

17     A.   I did.

18     Q.   Okay.  Now, we're going to come back to this, but you

19     were the head of billing at Dr. Gooding's office for how long?

20     A.   Three years.

21     Q.   And during those three years, you must have submitted

22     thousands of bills to Medicare and private insurance.

23     A.   Correct.

24     Q.   And you're a pretty experienced biller, aren't you?

25     A.   I like to think so.

1    Q.   You worked for Dr. Gooding as head of billing for

2    three years.   True?

3    A.   Correct.

4    Q.   And prior to that time, were you involved in medical

5    billing?

6    A.   Yes.

7    Q.   And did you have any type of schooling or training or

8    education in medical billing?

9    A.   I had certification on knowing how to process claims.

10   Q.   So you're a certified medical biller and coder --

11   A.   No, I'm not.   Billing and coding is a different

12   terminology.

13   Q.   How many years were you involved in medical billing

14   prior to the time that you started working for Dr. Gooding?

15   A.   Maybe eight, eight to six.

16   Q.   So by the time you ended up working for Dr. Gooding,

17   you had been involved in medical billing for nine to 11 years.

18   Is that true?   Approximately?

19   A.   That sounds about right.

20   Q.   The bills are transmitted while you're sitting in front

21   of a computer.   True?

22   A.   Correct.

23   Q.   You're not using a paper billing form at all to submit

24   to the entities that pay the bill.

25   A.   It's all electronic.

1    Q.   Okay.  And you believed that the bills at that time,

2    you believed the bills should be accurate.  Right?

3    A.   Can you elaborate?

4    Q.   Well, you wouldn't submit a bill to Medicare or a private

5    insurance that you believed was not accurate, would you?

6    A.   I was told to submit the claims that were on the charge

7    sheet, and that's what I did.

8    Q.   I get that.  You were following directions.  But even

9    with that, you wouldn't submit a claim to Medicare or some

10   other private payer that you believed was not accurate.

11   A.   So if a claim denied and I gave it to the doctor and

12   he would recode it, even if it denied for the same diagnosis

13   and I was advised to resubmit --

14        MR. KHOURI:  Your Honor, move to strike as

15   nonresponsive.

16        THE COURT:  I'm going to ask that you just answer

17   Mr. Khouri's question.  If there's an explanation or you want

18   to talk more about it, Ms. Simon will have an opportunity to

19   ask you about that in redirect.

20        THE WITNESS:  Yes, ma'am.

21        THE COURT:  So I will strike the answer.  Ask the

22   question again, Mr. Khouri.

23   BY MR. KHOURI:

24   Q.   You wouldn't, as an experienced biller, submit a claim

25   to any payor that you believed or knew was for a service that

1    wasn't rendered or that was inaccurate.  Right?

2    A.   Correct.

3    Q.   Okay.  And you believed that the bills were appropriate

4    because you trusted Dr. Gooding.  Right?

5    A.   Correct.

6    Q.   And because of all the efforts that you made to try to

7    get answers from Medicare.  Correct?

8    A.   Correct.

9    Q.   Okay.  Now, there must have been multiple phone calls to

10   Medicare and other organizations trying to get an answer about

11   how to correctly code Dr. Gooding's injections.

12          THE COURT:  Is that a question, Mr. Khouri?

13          MR. KHOURI:  Yes, it is.

14   BY MR. KHOURI:

15   Q.   Were there multiple phone calls to various entities,

16   including Medicare, to try to determine what the proper codes

17   were for Dr. Gooding's injections?

18   A.   Yes.

19   Q.   And over the three years that you were head of billing,

20   could you estimate how many times you called just Medicare to

21   try to determine what the proper codes were?

22   A.   I can't give you a number.  It was a lot.

23   Q.   A lot.  Is a lot over 500?

24   A.   Again, I can't give you a number, but it was a lot.

25   Q.   Is a lot over a hundred?

1    A.    So my answer is still the same.

2    Q.    Okay.  Thank you very much.  I appreciate it.

3    A.    You're welcome.

4    Q.    And how long did these phone calls take?  How long were

5    you on the phone each time?

6    A.    It depends.

7    Q.    Did you get to talk to a live person all the time?

8    A.    Yes, I did, majority of the time.  I would say 90 percent

9    of the time.

10   Q.    Did you leave messages and sometimes you got a call back,

11   sometimes you didn't get a call back?

12   A.    That is a possibility.

13   Q.    And did you try to call other professional organizations

14   to try to determine what the proper codes were?

15   A.    Just the medical society and the insurance companies.

16   Q.    Okay.  When you say insurance company, are you referring

17   to like Blue Cross and Blue Shield?

18   A.    Medicare, Blue Cross Blue Shield, UnitedHealthcare, so

19   forth and so on.

20   Q.    Because those private insurance companies you believed

21   could give you some guidance on how to do the same thing with

22   Medicare.  Right?

23   A.    Well, Medicare sets the standard.  So once Medicare makes

24   a decision, most commercial insurance follows behind Medicare.

25   Q.    So you called both CMS and private insurance companies

1    and professional organizations to try to figure out what

2    the proper codes were.  Correct?

3    A.   Correct.

4    Q.   And this is all in an attempt to, number one, be

5    accurate, but number two, get the claims paid.  Right?

6    A.   Correct.

7    Q.   Okay.  And I think you indicated that you are a practice

8    manager now for a medical group?

9    A.   I am.

10   Q.   And it's not unusual in the business of medicine to

11   attempt to get your claims paid.  Right?

12   A.   Correct.

13   Q.   Okay.  That's one of the goals that people hire you for.

14   Correct?

15   A.   Correct.

16          MS. SIMON:  Objection.  Call for speculation.

17          THE COURT:  I'll allow it.  Overruled.

18   BY MR. KHOURI:

19   Q.   Because, like any business, if you're not getting paid

20   for the product you sell, you're going to go out of business.

21   Right?

22   A.   Correct.

23          THE COURT:  Everybody needs to keep their voice up.

24   Again, I'm having to strain, so I imagine that -- and I see

25   jurors nodding.  So I think they're probably having the same

1      situation.

2                    THE WITNESS:  Sorry.

3                    THE COURT:  That's fine.  Testifying is not a normal

4      thing.

5                    THE WITNESS:  Okay.

6      BY MR. KHOURI:

7      Q.   So when you saw these messages that Dr. Gooding would

8      leave you about collections, you didn't think that was

9      unusual, did you?

10     A.   No.  Just inquiring about payments.

11     Q.   Normal.  Right?

12     A.   And rejections.

13     Q.   And that's the next point I want to make.  There were

14     many claims -- well, let me rephrase.  It was not uncommon

15     for Medicare to reject claims.  Correct?

16     A.   Repeat that one more time, please.

17     Q.   It was not uncommon, not only in Dr. Gooding's office

18     but at other offices you've worked at, Medicare sometimes

19     rejects claims.

20     A.   That is true.

21     Q.   And when a claim is rejected, it was your job, in part,

22     to try to figure out why.

23     A.   It was our job.

24     Q.   Good point.  Not only was it your job, but it was

25     Dr. Gooding's job too.  Right?

1    A.   Correct.

2    Q.   And you both worked together, in good faith, to try to

3    figure out why Medicare was rejecting claims that you believed

4    were legitimate.

5              MS. SIMON:  Objection, Your Honor.

6              THE COURT:  Sustained.

7              MR. KHOURI:  On what basis, Your Honor?

8              THE COURT:  You're assuming facts not in evidence.

9              MR. KHOURI:  Okay.  Thank you, Your Honor.

10   BY MR. KHOURI:

11   Q.   Did you work with Dr. Gooding to determine why certain

12   claims were rejected?

13   A.   Well, on the explanation of benefits, it has the reason

14   at the bottom.

15   Q.   Then did you work with Dr. Gooding to determine how to

16   recode so that the claim could be paid?

17   A.   Yes, I did.

18   Q.   Okay.  Okay.  And you trusted Dr. Gooding.  Right?

19   A.   I did.

20   Q.   And you were acting in good faith when you submitted

21   the recoded claims.  Right?

22   A.   Of course.

23   Q.   And you believed Dr. Gooding was too.

24   A.   Yes.

25   Q.   Okay.  As a matter of fact, when the J codes were

1    submitted, those codes were what I'm going to refer to as

2    a downcoded code?

3             MS. SIMON:  Objection, Your Honor.

4             MR. KHOURI:  I'll rephrase.  I'm going to rephrase.

5             THE COURT:  Yes.

6    BY MR. KHOURI:

7    Q.   Those codes, if paid, would pay at a lower reimbursement

8    rate than the original code submitted.  Or do you remember?

9    A.   You're confusing me.  Can you repeat that?

10   Q.   Okay.  You remember the J codes?

11   A.   I do.

12   Q.   And y'all switched to J codes because the codes that

13   were being used before that were rejected.  Right?

14   A.   Correct.

15   Q.   Okay.  And the reimbursement, had reimbursement been paid

16   on the J codes, you would have received less money than the

17   money you would have received on the original codes that were

18   rejected.

19   A.   You would receive a reduction.

20   Q.   Okay.  Dr. Gooding didn't ask you to, in that instance,

21   to bill a code that would increase payment.  Right?

22   A.   Repeat that?

23   Q.   Dr. Gooding didn't ask you to submit a code that would

24   increase payment; he asked you to submit the J codes.  Right?

25   A.   Well, the J codes were different prices, so I don't

1  think your statement is accurate, what you're asking me.

2  Q.   But the reimbursement for the J codes was less?

3  A.   No, that's not true.  Some J codes paid more than the

4  others.

5  Q.   I thought you just said the reimbursement was less?

6  A.   It depended on what J code you were switching to.

7  Q.   Okay.  And the ones that were switched to would reimburse

8  at a rate that was less than the original ones.  Or don't you

9  know?

10  A.   It depended on what code he switched to.

11  Q.   Okay.  Now, Dr. Gooding impressed you as a very generous

12  person.  Right?

13  A.   Yes.

14  Q.   Dr. Gooding did things for his staff and his patients

15  that showed his generosity.  Right?

16  A.   Yes.

17  Q.   At his own financial detriment.  True?

18  A.   Yes.

19       MR. KHOURI:  May I have a moment, Your Honor?

20       THE COURT:  Yes.

21       MR. KHOURI:  May I proceed, please?

22       THE COURT:  Yes.

23       MR. KHOURI:  Thank you.

24  BY MR. KHOURI:

25  Q.   And Dr. Gooding actually helped a patient get care in

1     exchange for some part-time work.  Right?

2              MS. SIMON:  Objection.

3              THE COURT:  This is beyond the scope, Mr. Khouri.

4              MR. KHOURI:  Okay.

5              THE COURT:  The objection is sustained.

6              MR. KHOURI:  Thank you.

7     BY MR. KHOURI:

8     Q.  Can you think of any examples of Dr. Gooding's

9     generosity?

10             MS. SIMON:  Objection, Your Honor.

11             THE COURT:  Sustained.

12             MR. KHOURI:  I'll move on.

13    BY MR. KHOURI:

14    Q.  Now, it sounds like then that over this period of time

15    there was confusion about what the right codes were and a

16    effort to get to the right codes.  Is that true?

17    A.  Can you repeat that?

18    Q.  Okay.  We've talked about the efforts that were made to

19    get to the right codes.  Correct?

20    A.  Yes.

21    Q.  And those -- the efforts were because y'all wanted to

22    figure out how to do the billing correctly.  True?

23    A.  That is correct.

24    Q.  Okay.  Now, I've got some questions about the billing

25    process itself.  The bill was submitted to Medicare

1    electronically.  Correct?

2    A.    Correct.

3    Q.    And the bill has certain information on it.  Right?

4    A.    Yes.

5    Q.    It has the personal identifying information about the

6    patient.  Correct?

7    A.    It does.  It has their Medicare ID number.

8    Q.    Name, date of birth, Medicare ID number, stuff like that.

9    Correct?

10    A.    Correct.

11    Q.    And it has the name of the Medicare provider,

12    Dr. Gooding?

13    A.    Correct.

14    Q.    And it has his Medicare provider number on it.  Correct?

15    A.    Correct.

16    Q.    And then there are a series of codes on the -- I'm going

17    to call it a bill, but in the computer that tells Medicare

18    what was done.  True?

19    A.    Correct.  You have a date of service, you have a

20    procedure code, you have a billed amount.  That is all

21    submitted to the insurance company for processing.

22    Q.    I'm getting there.  You have a date of service.  True?

23    A.    Correct.

24    Q.    Now, you mentioned a procedure code.  Is that a numerical

25    code that tells Medicare what the doctor did to the patient?

1    A.   It's not always numerical.

2    Q.   Okay.  But in this situation, isn't it a numerical code

3    with maybe some numbers -- I mean some letters?

4    A.   Right.  Yes.

5    Q.   Okay.  So when you said it's not always numerical, is

6    that because I omitted the letters, or did you write something

7    down and submit it to Medicare?

8    A.    No.  No, I didn't write anything, but some of the J

9    codes, again, that we talked about previously, so those are

10   procedure codes as well.

11   Q.   So for the purposes of this case, the procedure code that

12   was used would be a injection code.  Correct?

13   A.   It would accompany also evaluation and management code as

14   well, the type of visit the patient had.

15   Q.   So the jury understands, an evaluation and management

16   code pays the doctor for the time that the doctor spends with

17   the patient in a visit evaluating the patient's condition and

18   diagnosing the patient and writing reports and things like

19   that.  Right?

20   A.   Correct.

21   Q.   Okay.  So, in addition to the procedure code, did these

22   bills have a diagnosis code?

23   A.   Yes.

24   Q.   And a diagnosis code again is a series of letters or

25   numbers that tells Medicare what's wrong with the patient.

1    Correct?

2    A.   Correct.

3    Q.   Or maybe what's right.  Like a well baby code.  And for

4    Medicare to pay, the diagnosis code has to match the procedure

5    code.  Correct?

6    A.   So what happens is usually there's a list of diagnoses

7    codes that are payable to the service, the E&M code.

8    Q.   Let me simplify it.  If Dr. Gooding -- and this is a

9    pure hypothetical -- puts down a procedure code for removing

10   a ingrown toenail, and the diagnosis code is strep throat,

11   there's going to be a problem.

12   A.   It's going to reject.

13   Q.   It's going to reject.  Exactly.  So based upon that

14   answer, it was your belief that Medicare, whether through

15   computers or people or whatever, evaluated what was on that

16   electronic transmission to determine whether to pay or whether

17   not to pay.

18   A.   Not -- we wouldn't know that right when we would submit

19   the claim always.  We would find that out once we got the

20   explanation of benefits once Medicare processed it.

21   Q.   Right.  Medicare would send you an explanation of

22   benefits that basically would say we're rejecting this claim

23   and this is the reason why.

24   A.   Correct.

25   Q.   Okay.  And circling back to this diagnosis code,

1   procedure code, the procedure code is what Medicare pays on.

2   Correct?

3   A.   Correct.

4   Q.   And Medicare pays on a schedule.  Right?

5   A.   What do you mean, schedule?

6   Q.   Well, isn't it common for providers to bill Medicare and

7   private insurance for more than what they know they're going

8   to get paid?

9          MS. SIMON:  Objection, Your Honor.  Beyond the scope.

10          THE COURT:  Sustained.  Agreed.

11          MR. KHOURI:  Okay.  I'll move on.

12   BY MR. KHOURI:

13   Q.   Now, I'd like to circle back to your trust in

14   Dr. Gooding.

15          MR. KHOURI:  May I go to counsel table and retrieve

16   something, Your Honor.

17          THE COURT:  Yes.  While you're there, Mr. Khouri, can

18   you pick up the phone.  And Ms. Simon, can you pick up the

19   phone.

20      (Bench conference.)

21          THE COURT:  You're certainly examined to cross-examine

22   on bias and so on but if you're going into Dr. Gooding and her

23   relationship with Dr. Gooding and her trust in Dr. Gooding,

24   that's also beyond the scope of the direct examination.  I let

25   you go into it earlier.

1     MR. KHOURI:  I'm just going to do the email and then

2  I'm done.

3     THE COURT:  Okay.

4     MR. KHOURI:  Okay.

5     MS. SIMON:  Well, hold on, Your Honor.  Sorry, excuse

6  me, I'm so sorry.  If Mr. Khouri is referring to the text

7  message, I'm not sure what -- perhaps it's not ripe yet, but

8  I'm not sure what he'd be refreshing the witness on.

9     THE COURT:  Yeah, exactly.  You have to lay the

10  foundation.  If you're using it to undercut some kind of bias,

11  it is not relevant.  The door has not been opened to that.

12  She has testified that he was generous, that she trusted him,

13  basically she said he was a great guy.  So this text you're

14  seeking to use at this point is not impeaching anything, so

15  you'd have to lay a foundation before you seek to use it.

16   I'm not hearing you.

17     MR. KHOURI:  I said I understand.

18     THE COURT:  Okay.  Thank you.

19   (End of bench conference.)

20  BY MR. KHOURI:

21  Q.   Ma'am, you were interviewed by the FBI in this case.

22  Remember?

23     MS. SIMON:  Objection, Your Honor.

24     THE COURT:  I'll allow it if he's seeking to lay a

25  foundation.

 1          THE WITNESS:  Yes.

 2     BY MR. KHOURI:

 3     Q.   And you've come to the court as a witness for the

 4     government.  Correct?

 5     A.   I came to court because I had no choice.

 6     Q.   Okay.  And to this day, don't you believe that

 7     Dr. Gooding should be -- defeat these charges?

 8          THE COURT:  Mr. Khouri.  I am going to strike that

 9     question.

10     BY MR. KHOURI:

11     Q.   Is it your belief right now as you testify that

12     Dr. Gooding should prevail --

13          MS. SIMON:  Objection, Your Honor.

14          THE COURT:  Mr. Khouri.  The phone.

15        (Bench conference.)

16          THE COURT:  This is absolutely improper.  You're not

17     seeking to refresh her recollection, you're not seeking to

18     impeach her because you haven't elicited any bias.  She said

19     she came here because she was required to.  And her belief as

20     to whether he should defeat these charges or whether he's

21     innocent is absolutely improper for you to elicit.

22          MR. KHOURI:  Well --

23          THE COURT:  And I'm going to strike it.  And frankly,

24     I don't like doing that in front of the jury, but it is

25     completely improper.

1          MR. KHOURI:  Well, I think that the text message is

2     relevant as to what her belief is.

3          THE COURT:  No, it's not.  Why is her belief at all

4     relevant?  Why is her belief as to whether he's innocent or

5     guilty -- she said she's here, she said she's here because she

6     has to be here.  You have not succeeded in eliciting from her

7     any bias or any ill feeling toward Dr. Gooding, and therefore

8     you are not allowed to elicit her personal feeling as to his

9     guilt or innocence.

10          MR. KHOURI:  Well, I think she doesn't have any bias

11     towards Dr. Gooding.

12          THE COURT:  Exactly.  Then why are you eliciting this?

13     How is this possibly relevant?

14          MR. KHOURI:  Because I want the text message to come

15     into evidence.

16          THE COURT:  I'm sure you do.  I'm sure you do, but

17     it's not relevant.  Her opinion and her hope as to whether

18     he prevails in this case is not relevant and it is improper,

19     it is invading the province of the jury, and you should know

20     better.  Do not ask that question.

21          MR. KHOURI:  All right, Your Honor.

22          (End of bench conference.)

23          THE COURT:  The jury should disregard the last two

24     questions and answers.

25

1    BY MR. KHOURI:

2    Q.   Now, Ms. Wright, did you ask Dr. Gooding for a letter

3    of recommendation so you can get another job?

4    A.   I may have.

5    Q.   Okay.  All right.

6        MR. KHOURI:  All right.  Thank you very much.

7      Thank you, Your Honor.

8        THE COURT:  Thank you, Mr. Khouri.

9      Do you have any redirect, Ms. Simon?

10       MS. SIMON:  Briefly, Your Honor.

11                        REDIRECT EXAMINATION

12   BY MS. SIMON:

13   Q.   We won't take up too much more of your time, Ms. Wright.

14   A.   I'm here.  I want to get it all over with.

15   Q.   I understand.  Just now on cross, defense counsel asked

16   or -- asked, you wouldn't submit a claim to any payer that you

17   believed, you knew was for a service that wasn't accurate or

18   given.  And I believe that you answered yes.  Is that correct?

19   A.   I'm not sure.

20   Q.   Well, would you -- you wouldn't submit a claim to any

21   payer that you believed was for a service that wasn't accurate

22   or given.  Is that true?

23   A.   I submitted claims as I was told what was on my charge

24   sheet.

25   Q.   And I believe you testified on direct that you were not

1    usually in the room when procedures were done by the doctor.

2    Is that right?

3    A.    That is correct.

4    Q.    And did you confirm when you got the charge sheets that

5    what Dr. Gooding had marked for the procedure codes matched

6    what he had written down in the patient notes from that visit?

7    A.    Well, I didn't do the office note, so I only went on my

8    charge sheet.

9    Q.    You only went by the X's that were marked on the charge

10   sheet.

11   A.    That is correct.

12   Q.    And you also testified regarding diagnosis codes and

13   procedure codes having to match.  Is that right?

14   A.    Yes.

15   Q.    Can you just make up a diagnosis code and get paid?

16   A.    M480 --

17   Q.    I'm sorry.  That was an unclear question.

18   A.    Sorry.

19   Q.    The diagnosis codes are set.  They're not a number that

20   you can just fabricate.

21   A.    No.  I would get that information from Medicare's website

22   of payable diagnosis codes.

23   Q.    Did Dr. Gooding ever solicit your advice as to which

24   codes should be billed for a patient?  Did he ever ask your

25   opinion?

1   A.   We consulted.

2   Q.   Did you have -- in that consultation, did you have a

3   choice as to what procedure code you billed Medicare for?

4   A.   So, again, I provided all the documentation per Medicare

5   guidelines, and the doctor would make a decision on what codes

6   we would use.  He would have a list of diagnosis codes so he's

7   able to code better.

8   Q.   And that information that you provided, is that

9   information that you got from Medicare?

10  A.   Yes.

11  Q.   Would you print out the codes for Medicare?

12  A.   Yes.

13  Q.   And give them to Dr. Gooding?

14  A.   Correct.

15  Q.   Did you also print out LCDs or local coverage

16  determinations?

17  A.   Yes.

18  Q.   Rings a bell?

19  A.   Yes.

20  Q.   You testified on direct that you gave Dr. Gooding

21  information specifically about spinal injections that required

22  fluoroscopy guidance.  Is that correct?

23  A.   Correct.

24  Q.   What did the defendant say in response to that

25  information?

```
1    A.   That Medicare hasn't caught up yet, this is the new --

2    what is the word? -- interventional way of providing those

3    injections, through ultrasound.

4    Q.   With ultrasound?

5    A.   Correct.

6    Q.   And after that conversation, did you bill the 646 codes

7    that we've been talking about to Medicare?

8    A.   Yes.

9    Q.   Court's indulgence.

10        Nothing further, Ms. Wright.  Thank you very much.

11        MR. KHOURI:  Your Honor, may I have --

12       (Bench conference.)

13        THE COURT:  -- allow recross.  So tell me what question

14   of Ms. Simon's would allow you to have recross.

15        MR. KHOURI:  When she mentioned the 646 codes, I just

16   want to add to it that they also bill for ultrasound on the

17   same charts.

18        THE COURT:  You could have asked that in

19   cross-examination.

20        MR. KHOURI:  Then I'd move to reopen.

21        THE COURT:  Why?  If you forgot or didn't get around

22   to asking a question in cross-examination, why are you moving

23   to reopen now?  I mean why should I?  Is it one question?

24        MR. KHOURI:  Just one question.

25        THE COURT:  I'll allow it.
```

1          MR. KHOURI:  Thank you.

2       (End of bench conference.)

3                    RECROSS-EXAMINATION

4    BY MR. KHOURI:

5    Q.   When you sent out the bills that bundled fluoroscopy

6    with the injection, did you also bill a code for ultrasound?

7    A.   Yes.

8    Q.   Thank you.

9          MR. KHOURI:  Nothing further, Your Honor.

10         THE COURT:  Ms. Wright, thank you very much.  We

11   appreciate you being here and being on time.  You're free

12   to go.

13         THE WITNESS:  Thank you.

14         THE COURT:  You're welcome.  Have a good day.

15         THE WITNESS:  You do likewise, Your Honor.

16      (Witness steps down.)

17         THE COURT:  All right.  Government?

18         MS. SIMON:  The government calls Allene McDuffie.

19    ALLENE MCDUFFIE, WITNESS FOR THE GOVERNMENT, SWORN

20                    DIRECT EXAMINATION

21   BY MS. SIMON:

22   Q.   Good morning, Ms. McDuffie.

23   A.   Hi.

24   Q.   Can you see me over here?

25   A.   Yes.

1    Q.   Would you feel more comfortable leaving your mask on,

2    ma'am?

3    A.   You want me to take it off?

4         THE COURT:  It's up to you, but it's easier for the

5    jury to hear and see you, and for all of us to see and hear

6    if you take it off.  Just while you're testifying.  But only

7    if you feel comfortable.

8    BY MS. SIMON:

9    Q.   Thank you, Ms. McDuffie.  Can you please state and

10   spell your name?

11   A.   Allene McDuffie, A-L-L-E-N-E, M-C-D-U-F-F-I-E.

12   Q.   And Ms. McDuffie, where do you live?

13   A.   Washington, D.C.

14   Q.   How long have you lived there, ma'am?

15   A.   It'll be a year next month.

16   Q.   Where did you live before Washington, D.C.?

17   A.   I'm a native Washingtonian.

18        THE COURT:  They exist.

19        MS. SIMON:  Good to know.

20   BY MS. SIMON:

21   Q.   And are you working now?  Are you retired?

22   A.   Retired.

23   Q.   What did you do before you retired?

24   A.   I was a library technician for 32 years at the Library of

25   Congress, and for 10 years I was a receptionist at a law firm.

1    Q.   And what type of health insurance do you have?

2    A.   I have Blue Cross Blue Shield and Medicare.

3    Q.   And how long have you had Medicare?

4    A.   Since I was eligible.  I think it's 62 or 65.  I can't

5    remember.

6    Q.   Do you know Dr. Frederick Gooding?

7    A.   Yes.

8    Q.   How do you know him?

9    A.   I was a patient of his.

10   Q.   When did you start seeing Dr. Gooding as your doctor?

11   A.   I think it was in 2014 or '15.

12   Q.   And do you remember why you started seeing Dr. Gooding,

13   why he was treating you?

14   A.   I got a recommendation from my primary care because I was

15   having pain in my shoulder and neck.

16   Q.   In your shoulder and neck?

17   A.   Yes.  And arm.

18   Q.   Did you like Dr. Gooding?

19   A.   Loved him.

20   Q.   Did you ever have pain in your lower back?

21   A.   No.

22   Q.   Did you ever have any kind of problem with your lower

23   back?

24   A.   No.

25   Q.   Did Dr. Gooding ever give you injections in your lower

1     back?

2     A.    No.

3     Q.    Could you describe a typical appointment when you would

4     go and see Dr. Gooding, from the time you arrived to the time

5     you left.  How would that go?

6     A.    I would go in, when I started, first started, I was

7     having -- I thought I had carpal tunnel, but it turns out

8     I had arthritis in my neck and shoulders.  So he would ask

9     me questions and then at some point I did get injections for

10    the pain.

11    Q.    And where did you get those injections?  Where on your

12    body?

13    A.    Left and right shoulders.

14    Q.    Do you know what an ultrasound is?

15    A.    Yes.

16    Q.    Did Dr. Gooding ever use an ultrasound on your body?

17    A.    Yes.

18    Q.    Did he ever use the ultrasound at the same time he

19    gave you an injection?

20          MR. KHOURI:  Objection.  Vague.

21          THE COURT:  Overruled.  You may answer the question,

22    ma'am.

23          THE WITNESS:  To my recollection, he might have, because

24    he was checking for the -- I had a torn rotator cuff, and he

25    would use the ultrasound to check that.  So maybe he did give

1    me an injection.  I'm not sure.

2    BY MS. SIMON:

3    Q.   Just to be clear, you said maybe he did give you an

4    injection, I'm not sure.  The question that I asked was

5    whether you recalled him using the ultrasound machine at

6    the same time he gave you an injection, or was it before

7    or after or something else?

8    A.   It was before.

9         MS. SIMON:  Court's indulgence.

10      Thank you, Ms. McDuffie.

11        THE COURT:  Cross-examination?

12        MR. KHOURI:  Yes, Your Honor.

13                    CROSS-EXAMINATION

14   BY MR. KHOURI:

15   Q.   Good morning.

16   A.   Good morning.

17   Q.   My name's Mike Khouri and I'm one of Dr. Gooding's

18   lawyers.

19        How many times did you go to see Dr. Gooding?

20   A.   Oh, I can't count the times, because it was over a

21   period of a couple of years.

22   Q.   So you went to see him over a period of a couple

23   years, once a month?

24   A.   If I was having an issue, probably.

25   Q.   And then you were referred to Dr. Gooding by your

1    primary care physician?

2    A.   Yes.

3    Q.   And did you keep going back to see Dr. Gooding because

4    you believed it was helping?

5    A.   Yes.

6    Q.   Okay.  And when you went into the exam room and

7    Dr. Gooding examined you, before he gave an injection,

8    the actual injection, he used the ultrasound.  Correct?

9    A.   To my recollection, he did.

10   Q.   There was a machine in the room with a computer screen

11   on it?

12   A.   Yes.

13   Q.   And attached to the machine was a device, kind of looks

14   like a wand or something like that?

15   A.   Yes.

16   Q.   And he would maneuver the wand over the area where you

17   said you were having pain?

18   A.   Yes.

19   Q.   Would he maneuver the wand over the spine?

20   A.   No.

21   Q.   Did the wand have a gel on it?

22   A.   Yes.

23   Q.   Did Dr. Gooding put the gel on?

24   A.   Yes.

25   Q.   Did he clean it up afterwards if you can recall?

1    A.    Did he clean it up?

2    Q.    Yeah.  Do you remember that?

3    A.    Probably, yes.

4    Q.    Now, you indicated on direct that Dr. Gooding injected

5    your shoulder?

6    A.    Shoulders.

7    Q.    Shoulder.  Okay.  Which one?

8    A.    Both right and left.

9    Q.    Both, okay.  And do you -- when you say shoulder --

10             THE COURT:  The witness said "shoulders."

11             MR. KHOURI:  Shoulders?

12             THE WITNESS:  With an "s".

13             MR. KHOURI:  Okay.

14   BY MR. KHOURI:

15   Q.    When you say shoulders, did you feel the needle prick

16   going in underneath the shoulder blade?

17   A.    Yes.

18   Q.    Okay.  And how far underneath the shoulder blade could

19   you tell?

20   A.    When you say how far, do you mean in inches or -- I mean,

21   it was like the muscle, I assume.

22   Q.    You can't see the needle going into your shoulder,

23   obviously.

24   A.    No.

25   Q.    And I'm wondering if you could estimate how many inches

```
 1        below the shoulder blade that --
 2                MS. SIMON:  Objection, Your Honor.
 3                THE COURT:  If you can answer.  I'll overrule the
 4        objection.  Do you know how deep the needle went?
 5                THE WITNESS:  Do you want me to estimate?  Maybe a
 6        couple of inches, two inches?
 7        BY MR. KHOURI:
 8        Q.   Below the shoulder?
 9        A.   Yes.
10        Q.   And when I say below, I don't mean under the skin; I just
11        mean how far down below the shoulder blade --
12                THE COURT:  Mr. Khouri, I don't see, unless this
13        witness has her head on a swivel, how she could have observed
14        that.
15           Could you observe that?
16                THE WITNESS:  No.
17        BY MR. KHOURI:
18        Q.   Okay.  So -- and I'm just going by what you sensed.
19        Once the needle was inside through the skin, did you feel
20        that it was being moved around in different places?
21                MS. SIMON:  Objection, Your Honor.
22                THE COURT:  Overruled.
23                THE WITNESS:  Yes.
24        BY MR. KHOURI:
25        Q.   And how many different directions could you feel that
```

1      Dr. Gooding was moving the needle?

2      A.   It was painful, so I didn't count.

3      Q.   Okay.  I'm sorry, ma'am.

4           And I know these are hard questions, but did you feel

5      the needle being pointed in the direction of the spine, or

6      could you tell?

7      A.   No.

8      Q.   You can't tell one way or the other, right?

9      A.   No.

10          MR. KHOURI:  Okay.  Thank you very much.

11          THE WITNESS:  You're welcome.

12          THE COURT:  Any redirect?

13          MS. SIMON:  Very briefly, Your Honor.

14          THE COURT:  All right.

15                     REDIRECT EXAMINATION

16     BY MS. SIMON:

17     Q.   Ms. McDuffie, when you say your shoulders, could you

18     just help us out and point to where you mean on your body?

19     A.   Here.

20          THE COURT:  Okay.  For the record, I have to do this

21     because there's no videotape.  The witness -- can you do

22     that again?  The witness has taken her left hand and placed

23     it over the top of her right shoulder.

24          THE WITNESS:  And here.

25          THE COURT:  And the witness has taken her right

1    hand and placed it over the top of her left shoulder.

2              MS. SIMON:  Thank you, Your Honor . And thank you,

3    Ms. McDuffie.

4              THE COURT:  Ms. McDuffie, you're free to leave.

5    Thank you.

6         (Witness steps down.)

7              THE COURT:  I do not have a lunch matter today, so

8    we'll plan to take our lunch break close to 1:00, depending

9    on if we're close to being done with the witness, but somewhere

10   in that range.  So we'll take a midmorning break in about

11   20 minutes or so; or if you need one before, just raise your

12   hand and we can do it.  All right.

13             MS. WILLIS:  At this time the government would call

14   Dr. Juan Schaening-Perez.

15             THE COURT:  All right.

16      JUAN SCHAENING-PEREZ, WITNESS FOR THE GOVERNMENT, SWORN

17                       DIRECT EXAMINATION

18   BY MS. WILLIS:

19   Q.   Good morning.

20   A.   Good morning.

21   Q.   Can you say and spell your name for the record?

22   A.   My name is Juan L. Schaening-Perez.  My last name

23   is spelled S-C-H-A-E-N-I-N-G, and Perez, P-E-R-E-Z.

24   Q.   And Dr. Perez, where are you joining us from today?

25   A.   I am coming as the contractor medical director from

1    Novitas Solutions.

2    Q.   What is Novitas Solutions?

3    A.   Novitas Solutions is the administrative contractor for

4    Medicare claims on the jurisdictions H and L.  They administer

5    the fee-for-service claims of the Part A and Part B Medicare.

6    Q.   Is Novitas the Medicare administrative contractor for the

7    region that includes Washington, D.C.?

8    A.   That is correct.  That would be jurisdiction L.

9    Q.   How long have you been a Medicare contractor director --

10   or the contractor medical director with Novitas?

11   A.   Five years with Novitas, and I have been 18 years a

12   contractor medical director.

13   Q.   Can you tell us, does Novitas, when you say contractor,

14   who do they contract with?

15   A.   The Center for Medicaid and Medicare Services.

16   Q.   Prior to your work with Medicare, can you tell us a

17   little bit about your background, including your education

18   and schooling?

19   A.   So I'm a doctor of medicine, I do the specialty of

20   internal medicine where I'm board certified.  I did infectious

21   disease clinics for the correctional population of Puerto

22   Rico, treating patients with HIV and hepatitis C.  Later,

23   I became the chief medical director of the Puerto Rico

24   Correctional Health Service Program, and after that I became

25   the carrier medical director for Medicare for Puerto Rico and

1     the Virgin Islands.

2          And later, I became the contractor medical director

3     for Puerto Rico, Virgin Islands, and Florida, and now I'm

4     the contractor medical director for Novitas Solutions and

5     executive contractor medical director for First Coast Service

6     Options.  That is the contractor for the jurisdiction of

7     Florida, Puerto Rico, and the Virgin Islands.

8     Q.   Earlier, when I said where are you joining us from

9     today, geographically, where are you joining us from today?

10    A.   So I'm -- I live in Jacksonville, Florida and I am

11    visiting here in Washington, D.C.

12    Q.   Okay.  And as a contractor medical director for Novitas

13    Solutions, what are some of your duties as they relate to

14    Novitas and as they relate to the administration of Medicare

15    claims?

16    A.   As a contractor medical director, I look at coverage

17    determinations for our regions.  I provide a guidance and

18    directions to the multiple areas that the medical

19    administrative contractor performs its services, medical

20    review, other areas, I provide guidance and direction.

21    Q.   Okay.  Can you tell the jury generally what is Medicare?

22    A.   So Medicare is a federal health program that was signed

23    into law in 1965 and it provides a health insurance benefits

24    for the elderly people 65 and over, people with disabilities

25    and people with end-stage renal disease.

 1    Q.   Is Medicare a government-funded program?

 2    A.   Yes.

 3    Q.   Does Medicare have different parts?

 4    A.   Yes.  It has a Part A, Part B, Part D, a Part C.

 5    Yes, it has multiple parts.

 6    Q.   Okay.  What is Part A?

 7    A.   Part A is the -- related to facilities.  It's the way

 8    we pay facility services.  That would be hospitals, ambulatory

 9    surgical centers, that type of facilities.

10    Q.   And what's Part C?

11    A.   Part C, that would be medic -- Medicare Advantage.

12    That's a private contractor that is contracted to provide

13    the services for certain beneficiaries that decide to go

14    through Medicare Part C, they will visit the Part A and Part B

15    and Part D benefits through this private contractors that

16    contracting with those beneficiaries.

17    Q.   Okay.  You mentioned Part D.  What's Part D?

18    A.   Part D is for medications.  Part B Medicare has limited

19    medication benefits.  So for oral medicines you need to have

20    the Part D Medicare.

21    Q.   Okay.  And today we're going to be focusing on Part B.

22    So can you tell us a little bit more about what Part B of

23    Medicare is?

24    A.   So Part B of Medicare is the services that are paid on

25    the physician fee scale, basically.  Are services that are

1    fee for service, that you perform a service and you bill the

2    Medicare program for the service that you perform for one of

3    our beneficiaries.

4    Q.   So does Medicare reimburse the cost of medical services?

5    A.   Yes.

6    Q.   And does Medicare operate throughout the country, or does

7    it just operate in one state?

8    A.   No, it's throughout the country.

9    Q.   Does Medicare process claims across state lines?

10   A.   Yes, it does.

11   Q.   And does Medicare pay claims across state lines?

12   A.   Yes, it does.

13   Q.   So you mentioned the word "beneficiary."  What is a

14   beneficiary?

15   A.   So a beneficiary is a person of 65 years old, or ESRD, or

16   that has disability that obtain the benefit of the participate

17   on the Medicare program.

18   Q.   So a Medicare beneficiary is someone who is covered by

19   Medicare.  Is that correct?

20   A.   That is correct.

21   Q.   Now, when a patient who is a Medicare beneficiary goes

22   to the doctor, can just any doctor bill for their services?

23   A.   No.  It must be a doctor that is enrolled on the Medicare

24   program.  To receive money from the beneficiaries or the

25   Medicare program, physicians must be enrolled in the program.

1    Q.   So a doctor has to be a doctor that Medicare says can

2    bill for those services.  Is that correct?

3    A.   Yes.

4    Q.   So when a patient that's a Medicare beneficiary goes

5    to a doctor that can bill for their services, how does that

6    doctor get paid?

7    A.   So he submits a claim to the Medicare administrative

8    contractor to receive payment for the services that he

9    provided to that beneficiary.

10   Q.   So does Novitas as a Medicare contractor, and the

11   contractor that administrates claims, maintain enrollment

12   documents in its regular course of business?

13   A.   Yes, it does.

14   Q.   Have you reviewed some enrollment documents from 2012

15   associated with a Dr. Frederick Gooding?

16   A.   Yes.

17   Q.   Now, when doctors who are enrolled in Medicare make

18   changes to their practice, changes to their location, any

19   types of changes, do they have to keep submitting forms to

20   Medicare?

21   A.   Yes.  They have to update their enrollment forms.

22   Q.   So do doctors have potentially multiple enrollment forms

23   or multiple forms submitted to Medicare if they've changed

24   locations or practices in any way?

25   A.   Correct.

1      Q.   Ms. Slater, could you show the witness Exhibit 1?

2           Dr. Schaening, what are we looking at here in Exhibit 1?

3      A.   So that's the Medicare enrollment application that we

4      call the CMS-855I.  That is the application that should be

5      used for enrolling physicians and non-physician practitioners.

6      Q.   Are these 855I forms updated over time, in terms of might

7      a physician sign multiple 855s if he changes locations,

8      practices, anything like that?

9      A.   Yes.

10     Q.   And do all of these 855 forms contain a certification or

11     promises that a doctor has to agree to when submitting them?

12     A.   Yes.  The doctors always sign an attestation with --

13     agreeing to certain conditions with the Medicare program.

14           MS. WILLIS:  At this time the government would move to

15     admit Exhibit 1.

16           THE COURT:  Any objection?

17           MR. KHOURI:  None.

18           THE COURT:  It will be admitted.

19                              (Government Exhibit No. 1

20                               received into evidence.)

21     BY MS. WILLIS:

22     Q.   Now, Dr. Schaening, do physicians have a particular

23     number that is associated with them in the Medicare system?

24     A.   Yes.

25     Q.   And is that an NPI?

1   A.   They have a national provider identifier number that

2   they must get a -- request from Medicare before they submit

3   the Medicare enrollment application, and when they submit

4   their Medicare enrollment application they receive a PTAN

5   number that is a provider-specific number that is assigned by

6   Medicare for payment purposes.

7   Q.   Okay.  And does a provider -- just going back to NPIs,

8   would a provider himself or herself have an NPI that may be

9   separate from the NPI from their practice?

10   A.   Yes.  He is going to have his personal NPI.  That is

11   the same NPI that he's going to have in the nation, yes.

12   Q.   Ms. Slater, could you turn to page, I believe it will

13   be page 3 of this form but page 5 of this exhibit.

14        Dr. Schaening, do you see at the bottom of the page an

15   NPI associated with this particular 855?

16   A.   Yes.

17   Q.   And is that 1255377180?

18   A.   That's correct.

19   Q.   Now -- I'm going to rephrase the question.  Now, that

20   NPI, could that be associated with either the physician or

21   the practice?

22   A.   You could take an NPI for a practice.

23   Q.   But could it also be for an individual?

24   A.   Yes.  It's usually for an individual.

25   Q.   Now, when we talked about these 855 forms containing

1    certifications, do they all have like a list of things that a

2    provider must agree to?

3    A.   Yes.

4    Q.   Ms. Slater, could you turn to page 25 of the application

5    or enrollment form, but page 27 of the exhibit.

6         Is this the certification statement that you're referring

7    to?

8    A.   Yes.

9    Q.   And Ms. Slater, could you enlarge the first three

10   paragraphs at the top, starting with "as an individual

11   practitioner."

12        Dr. Schaening, can you read what?

13   A.   It states as follows:  "As an individual practitioner,

14   you are the only person who can sign this application.  The

15   authority to sign the application on your behalf may not be

16   delegated to any other person.

17        "The certification statement contains certain standards

18   that must be met for initial and continuous enrollment in the

19   Medicare program.  Review these requirements carefully.

20        "By signing the certification statement, you agree to

21   adhere to all of the requirements listed therein and

22   acknowledge that you may be denied entry to or revoked from

23   the Medicare program if any requirements are not met."

24   Q.   Ms. Slater, could you enlarge -- we won't go through

25   every single one of the certifications, but we will go through

1    a few.  Can you enlarge No. 3?

2        What is the certification in No. 3, Dr. Schaening?

3    A.   So the certification is -- states as follows.  It says:

4    "I have read and understand the penalties for falsifying

5    information, as printed in this application.  I understand

6    that any deliberate omission, misrepresentation, or

7    falsification of any information contained in this application

8    or contained in any communication supplying information to

9    Medicare, or any deliberate alteration of any text on this

10   application form, may be punished by criminal, civil, or

11   administrative penalties including, but not limited to, the

12   denial or revocation of Medicare billing privileges, and/or

13   the imposition of fines, civil damages, and/or imprisonment."

14   Q.   Ms. Slater, could you enlarge No. 4.

15       THE COURT:  Do we need the doctor to read the whole

16   thing?  Are you asking the doctor to read that paragraph?

17       MS. WILLIS:  Yes, Your Honor.  I only have one more

18   after.

19       THE COURT:  Okay.  Go ahead.

20       THE WITNESS:  Should I?

21       MS. WILLIS:  If the Court will allow it.

22       THE COURT:  Yes.  Yes, you can.

23       THE WITNESS:  Okay.  This is section No. 4.

24   It states as follows:

25       "I agree to abide by Medicare laws, regulations and

1      program instructions that apply to me or to the organization

2      listed in Section 4A of this application.  The Medicare laws,

3      regulations and program instructions are available through

4      the fee-for-service contractor.  I understand that payment

5      of a claim by Medicare is conditioned upon the claim and the

6      underlying transaction complying with such laws, regulations,

7      and program instructions (including, but not limited to, the

8      Federal anti-kickback statute and the Stark law), and on the

9      supplier's compliance with all applicable conditions of

10     participation in Medicare."

11         MS. WILLIS:  And I just have one more shorter

12     paragraph.  Ms. Slater, can you enlarge paragraph 8.

13         THE WITNESS:  Paragraph 8 states:  "I will not

14     knowingly present or cause to be presented a false or

15     fraudulent claim for payment by Medicare, and will not

16     submit claims with deliberate ignorance or reckless

17     disregard of their truth or falsity."

18     BY MS. WILLIS:

19     Q.   Ms. Slater, can you go to the next page of this

20     exhibit, page 28 of the exhibit, which is page 26 of the 855.

21     Can you enlarge the top of Section 15?

22         Is there a name with a signature on this application?

23     A.   Yes.  There's a name and signature.  The name is

24     Frederick Gooding, and there's a signature and it's dated

25     8/14/2012.

1   Q.   Thank you.  Are there other enrollment forms that a

2   practitioner or provider gives to Medicare when they are

3   making changes or enrolling?

4   A.   Yes.

5   Q.   Does one of those forms allow for a provider to be paid?

6   A.   Yes.

7   Q.   Ms. Slater, can you show the witness Government's Exhibit

8   2A.  Can you page through it, and I'll ask you to back up,

9   Ms. Slater, to page 6.

10        Dr. Schaening, is one of those forms an electronic funds

11   transfer?

12   A.   That is correct.

13   Q.   And is 2A an example of such a form?

14   A.   Yes.

15        MS. WILLIS:  At this time the government would move

16   to admit Exhibit 2A.

17        THE COURT:  Any objection?

18        MR. KHOURI:  No objection.

19        THE COURT:  It will be admitted.

20                      (Government Exhibit No. 2A

21                        received into evidence.)

22   BY MS. WILLIS:

23   Q.   And in an electronic funds transfer, does a physician

24   or provider provide information that allows the physician

25   to be paid electronically?

1    A.   Yes.

2    Q.   And I would ask to publish page, I believe it's 8, the

3    last page of Exhibit 2A for the jury.

4         (Exhibit published.)

5    BY MS. WILLIS:

6    Q.   Does the provider provide a check so that the money

7    will go into their bank account?

8    A.   Yes.

9    Q.   Does a provider also provide a document to Medicare

10   called an EDI?

11   A.   Yes.

12   Q.   And what is an EDI?

13   A.   It's an authorization to use electronic data and transfer

14   it.  So they can submit claims.

15   Q.   So when you say the transfer of electronic data, do you

16   mean the electronic submission of claims for payment?

17   A.   Yes.

18   Q.   Ms. Slater, can you show the witness Exhibit 2B, and

19   can you page through it for the witness.

20        Is this an example of an EDI form?

21   A.   Yes.  This is an EDI enrollment form.

22   Q.   Is this a fair and accurate representation of an EDI

23   enrollment form?

24   A.   Yes.

25             MS. WILLIS:  At this time the government would move

1    to admit Exhibit 2B.

2              THE COURT:  Any objection?

3              MR. KHOURI:  None, Your Honor.

4              THE COURT:  It will be admitted.

5                        (Government Exhibit No. 2B

6                         received into evidence.)

7    BY MS. WILLIS:

8    Q.   Ms. Slater, can you publish page 2 of Exhibit 2B.

9         Can you zoom in on the Part D with the NPI number?

10   Is this NPI number, 1326230830, the NPI number that appears

11   to be associated with Frederick W. Gooding & Associates?

12   A.   Yes.

13   Q.   And is this an EDI form submitted in connection with

14   Frederick Gooding & Associates?

15   A.   Yes.

16   Q.   Ms. Slater, can you go to page 4?

17              THE COURT:  Let's take 10 minutes, and when we come

18   beck we'll go straight through to one o'clock.  Thank you.

19         (Recess from 11:39 a.m. to 11:58 a.m.)

20              THE COURT:  Okay.  Please come up, Doctor.

21         (Witness resumes the stand.)

22         Go ahead.  Ms. Willis.

23   BY MS. WILLIS:

24   Q.   Dr. Schaening, when we left off, I believe we were

25   talking about Government Exhibit 2B, which is the electronic

1    data interchange enrollment.  Do you recall that line of

2    questioning?

3    A.    Yes.

4    Q.    Okay.  And does this EDI enrollment form also include

5    some provisions that a provider must agree to?

6    A.    Yes.

7    Q.    And are some of these provisions shorter than the ones

8    we went over?

9    A.    Yes, they are.

10   Q.    Okay.  We're just going to go over four of them.

11         Ms. Slater, can you enlarge No. 1.

12         Can you read after "the provider agrees" in No. 1.

13   A.    It says:  "That it will be responsible for all Medicare

14   claims submitted to CMS or a designated CMS contractor by

15   itself, its employees, or its agents."

16   Q.    Ms. Slater, can you enlarge No. 7.

17   A.    "That I will submit claims that are accurate, complete,

18   and truthful."

19   Q.    Okay.  And does it potentially say that "it" will submit

20   claims?

21   A.    Yes.  "That it will submit claims," "that it will" --

22   we're talking about the agreement of the provider and the

23   provider is agreeing that it will submit claims that are

24   accurate, complete, and truthful.

25   Q.    And, Ms. Slater, can you enlarge No. 10.

1          Can you read No. 10?

2     A.    "That the CMS-assigned unique identifier number

3     (submitter identifier) or NPI constitutes the provider's

4     legal electronic signature and constitutes an assurance

5     by the provider that services were performed as billed."

6     Q.    And then finally No. 12.

7     A.    "That it will acknowledge that all claims will be paid

8     from Federal funds, that the submission of such claims is a

9     claim for payment under the Medicare program, and that anyone

10    who misrepresents or falsifies or causes to be misrepresented

11    or falsified any record or other information relating to that

12    claim that is required pursuant to this Agreement may, upon

13    conviction, be subject to a fine and/or imprisonment under

14    applicable Federal law."

15    Q.    And Ms. Slater, can you go to the next page, which is

16    page 5 of this exhibit.

17          Is there an attestation and a signature at the bottom

18    of Government's 2B, page 5?

19    A.    Yes.

20    Q.    And can you read the name associated with that signature?

21    A.    Frederick Gooding, MD.

22    Q.    Thank you, Ms. Slater.  And you can take that down.

23          Now, Dr. Schaening, at the time a claim is submitted,

24    does Medicare verify in advance that the claim is medically

25    necessary?

1    A.   No.

2    Q.   Why not?

3    A.   We pay, you know, millions of claims.  The contractor

4    pays 128 millions of claims in a year.  So it would be onerous

5    to review and verify the validity of such claims, of all

6    claims.

7    Q.   So does Medicare trust that the claims submitted are

8    accurate?

9    A.   Yes.

10    Q.   When a provider is submitting a claim, how do they

11    describe to Medicare or tell Medicare that the services --

12    what services they provided?

13    A.   So they identify the services through a procedure code,

14    CPT codes, and diagnosis codes to identify the procedure that

15    they performed on the beneficiary, plus the diagnosis for why

16    they're doing the service.

17    Q.   And is it important that providers use the correct CPT

18    code or codes to describe the claim?

19    A.   Yes.

20    Q.   Do the codes themselves, like the words in the code,

21    describe the services that they cover?

22    A.   Yes.

23    Q.   And does Medicare also provide any additional guidance

24    regarding the CPT codes?

25    A.   Yes.  The contractors have education on the their pages

1    regarding coding guidance, and also the CMS web page.  So,

2    yes, there's readily available information regarding coding.

3    Q.   And you talked a little bit, or I believe you said you

4    work with LCDs?

5    A.   Yes.  Local coverage determinations.

6    Q.   And what are those?

7    A.   Local coverage determination is when there's not a

8    national coverage determination made by the Centers for

9    Medicare & Medicaid Services, contractors need to find that

10   it's reasonable and necessary under 1862(a)(1) of the --

11        THE COURT:  You're going to have to slow down a little

12   bit because I can tell when there's steam coming from my court

13   reporter's --

14        THE WITNESS:  Okay.  Okay.  So, basically, a local

15   coverage determination is the statement of a contractor of

16   what's locally covered under jurisdiction.  We define what

17   is considered reasonable and necessary for a procedure to

18   be performed in one of our beneficiaries.

19   BY MS. WILLIS:

20   Q.   How does Medicare decide how much to reimburse for a

21   particular service?

22   A.   So for services under the physician fee schedule rules,

23   we use a calculation, equation based on relative value units

24   of the provider work, practice expense, and malpractice for

25   that provider for doing that procedure.

1          Each element of that equation is assigned some relative

2     value units of what the weight that each part will have,

3     and then it's multiplied by geographic adjustment factors

4     to equate the payment that we're doing in one state with

5     the other, if it has a different cost of living; and at the

6     end, we multiply for the geo conversion factor that will tell

7     you -- when you multiply that, that will tell you the amount

8     of money that that code is worth.

9     Q.   So is it fair to say based on what you just described,

10    does Medicare pay more for services that cost physicians more

11    to provide?

12    A.   Yes.

13    Q.   And does this include a consideration of any technology

14    that services may cost?

15    A.   Yes.  That will be part of the practice expense.

16    Q.   Now, are you familiar with certain spinal injection

17    CPT codes?

18    A.   Yes.

19    Q.   Let's talk about code 64633 to 64636.

20    A.   Okay.

21    Q.   Ms. Slater, can you show the witness Exhibits 26, 27,

22    28, and 29.

23          Do you recognize Exhibits 26 through 29 as the

24    descriptions associated with codes 64633 to 64636?

25    A.   Yes.

1    Q.    And are these the descriptions that were publicly

2    available for these codes?

3    A.    Yes.

4    Q.    And I'll say during time period from 2015 to 2018.

5    A.    Yes.

6         MS. WILLIS:  At this time the government would move

7    to admit Government Exhibits 26 through 29.

8         THE COURT:  Any objection, Mr. Khouri?

9      (Bench conference.)

10        THE COURT:  Yes, Mr. Khouri.

11        MR. KHOURI:  I would like the Court to make it clear

12   to the jury that it's being admitted for the limited purposes

13   of showing what's publicly available, and not that Dr. Gooding

14   ever read this or was ever said to him or ever provided to him.

15        THE COURT:  I believe the witness is being asked

16   questions about Medicare procedures generally, and certainly

17   you're free to elicit that in cross-examination.  You're

18   asking that Ms. Willis somehow elicit that in her direct?

19   Is that right?

20        MR. KHOURI:  Well, I don't know for what purpose it's

21   being admitted for.

22        THE COURT:  I assume to show -- well, Ms. Willis?

23        MS. WILLIS:  To show what information was publicly

24   available about the codes during the time period.

25        THE COURT:  There you go, Mr. Khouri.

1          MR. KHOURI:  Okay.  Thank you.

2      (End of bench conference.)

3          MS. WILLIS:  Your Honor, Exhibits 26 through 29, are

4  they admitted?

5          THE COURT:  Yes.  They'll be admitted.

6                          (Government Exhibit Nos. 26-29

7                           received into evidence.)

8  BY MS. WILLIS:

9  Q.   Ms. Slater, can you show the witness and publish

10  Exhibit 26.

11      And can you zoom in -- well, I'll first ask you,

12  Dr. Schaening, did the descriptions of these codes change

13  between 2015 to 2018 in any way that was material?

14  A.   No.

15  Q.   Okay.  Ms. Slater, can you just zoom in -- we'll just

16  go with 2016.

17      Can you read the long description of CPT code -- long

18  descriptor of 64633.

19  A.   Yes.  "Destruction by neurolytic agent, paravertebral

20  facet joint nerve(s), with imaging guidance (fluoroscopy or

21  CT); cervical or thoracic, single facet joint."

22  Q.   And could you do the same for Exhibit 27, which is 64634.

23  If you could just go on the 2016 descriptor.

24      Did any of these codes, 33 through 36, change in any

25  material fashion over these years?

1    A.   The only material changes between the codes is the

2    anatomical location of the code.   The descriptor of the

3    procedure, destruction by neurolytic agent, paravertebral

4    is the same for all the codes.

5        What changes is that, for example, 34 is, after thoracic

6    is "for each additional," so it's an add-on code to the

7    previous code.   The previous code was a single one, so this

8    is each additional, and the following codes will be other

9    anatomical regions, but the same descriptor.

10    Q.   Okay.  I will ask the question in a slightly different

11    way.  For each of these codes we're going to read, 33, 34, 35,

12    36, when we're going over them and we're choosing a year, is

13    the description in the year different between them?

14    A.   No.  They didn't change.

15    Q.   But there's -- there's slight differences in the codes

16    themselves.  Correct?

17    A.   Yeah.  They're for distinct anatomical regions.

18    Q.   And we'll go over that after we go through the descriptors.

19    So 64634 you said was an add-on code?  Is that correct?

20    A.   Yes.  It mostly deal with the -- after billing the 64633

21    because it's for each additional facet joint.  So the first

22    one reported with the 33 and then each additional you would

23    report with this other code.

24    Q.   Okay.  And for 64633 and 64634, are they referring to the

25    same part of the spine?

1    A.    Yes.  The paravertebral facet joint.

2    Q.    And where is that?

3    A.    That is -- between each vertebra there are articular

4    process on the superior vertebra and the inferior vertebra

5    that they create an articulation, the paravertebral facet

6    joint articulation.  So they're located on the dorsal spine

7    of each vertebra from the cervical to the lumbosacral and

8    sacroiliac.

9    Q.    Okay.  When you say cervical spine, you put your hand

10   up a little bit?

11   A.    Yeah.  Cervical spine, thoracic, lumbar, they all have

12   paravertebral facet joints.

13   Q.    So these codes go down the spine, is that what you're

14   saying?

15   A.    Yes.

16   Q.    Ms. Slater, can you show Government's Exhibit 28,

17   please.  Is that 64635?

18   A.    Yes.

19   Q.    And can you zoom in?  Under the long descriptor, is this

20   another destruction of a facet joint?

21   A.    Yes.  It's another destruction under imaging guidance

22   with fluoroscopy or CT but this time is lumbar or sacral,

23   single facet joint.

24   Q.    And when we talk about cervical, is it fair to say we

25   were talking about upper spine?

1    A.    Yes.

2    Q.    And when we talk about lumbar, are we talking about

3    lower spine?

4    A.    Correct.

5    Q.    So do these describe essentially the same procedure,

6    but one in the upper spine and one in the lower spine?

7    A.    Correct.

8    Q.    And is 64636 just an add-on code for the lower spine

9    after 64635?

10   A.    Correct.

11   Q.    Now, what is a facet joint?  I believe you started

12   telling us but can you describe a bit more.

13   A.    So a facet joint is an articulation in your spine that

14   allows you to bend, basically.  You have disc between each

15   vertebra, and the vertebra, each vertebra have a superior

16   articular process and an inferior articular process that they

17   touch against each other and they create an articulation that

18   give flexibility to the spine with the cushioning of the

19   intervertebral discs.  So it's an articulation that allows

20   human beings to bend.

21   Q.    Ms. Slater, can you show the witness Exhibit 33, and can

22   you page through it.

23         Does Exhibit 33, would that help you explain some of

24   where some of these features are occurring?

25   A.    Yes.  So basically --

1          THE COURT:  Hold on.

2          MS. WILLIS:  At this time we would move to admit 33,

3     but just for demonstrative purposes.

4          THE COURT:  Any objection to admission for

5     demonstrative purposes?

6          MR. KHOURI:  None at all.

7          THE COURT:  All right.  Exhibit 33 will be admitted

8     for demonstrative purposes, for the jury to follow along with

9     the witness's testimony.

10                              (Government Exhibit No. 33

11                               received into evidence.)

12    BY MS. WILLIS:

13    Q.   Okay.  Now, Dr. Schaening, I would note that you can

14    circle and do things on the screen in front of you.

15    A.   Okay.

16    Q.   So with Exhibit 33 in front of you, can you tell us

17    a little bit more about the facet joints that you were

18    describing?

19    A.   So, as you can see, there's a superior vertebra, and over

20    here you can see the, what it will be, really, this is the

21    inferior articular process of this vertebra.  You're missing

22    the superior vertebra.  And from here, about here will be the

23    inferior articular process that conjoins with the superior

24    articular process of this lower vertebra here.

25         So this area over here is this area, that is the surface

1    when one hits against the other and create the articulation,

2    and there's the -- so that is basically the area.

3    Q.   Okay.  And I'm sorry.  I know that you know a lot about

4    this stuff.  I'm going to actually have to ask you to explain

5    it in a different way that may be a little bit different

6    understanding.  Is this whole thing that we're looking at

7    part of the spine, this whole little --

8    A.   Oh, yes.  Those are vertebras.  You can see the disc

9    that I was talking about.  That's the white thing that you

10   see there.  That's the disc that is between each vertebra to

11   provide cushion, and the joints are the ones that allows you

12   to have that movement, bending movement.

13   Q.   And then you said something about inferior articulation?

14   A.   Yeah.

15   Q.   Can you kind of give us another word for that?

16   A.   So, basically they have a process, superior articular

17   process, that is this area, that you can see that a flat

18   surface that is -- and a inferior articular process that

19   have the same, coming from the vertebra that is above.

20        So, to create an articulation, you really need two

21   vertebras, the superior and the inferior, so they're usually

22   described by two numbers.  Let's say the L4-L5, that will be

23   lumbar 4, lumbar 5 articular, paravertebral articular area

24   will be the target because you need both vertebras to form

25   that articulation.

1          So you identify the vertebras, the pertinent vertebras

2     that has the pedicles or the surfaces that are going to strike

3     one against the other, by numbers and the letter of the type

4     of vertebra that they are.  Lumbar vertebra, you would use an

5     L.  There are five lumbar vertebra, so you would identify them

6     from 1 to 5.

7     Q.   Okay.  Ms. Slater, can you go to page 2 of the exhibit?

8          Now, on page 2 is this just another view of the spine?

9     A.   Yes.

10    Q.   And when we're talking about the procedures in 64633

11    to 64636, what is happening in the spinal area with those

12    procedures?

13    A.   So, basically, I think the previous one is a better one

14    to explain that.

15    Q.   Okay.  Can you go back to the first page, Ms. Slater?

16    A.   So here you can see a medial nerve that goes here.  You

17    can see here the articular process I was talking about.  That

18    circle over here, that is the paravertebral articulation that

19    I was talking about.  And you see that over here you have the

20    dorsal ramus, the spinal nerve coming out, and that -- this

21    nerve over here, the medial branch of the nerve, it goes over

22    the paravertebral facet joints, and that nerve is the target

23    for the destruction to relieve the pain.

24         So here you can see the nerve that you must be targeting

25    and destroying to relieve the pain if the originator of pain

1    was the facet joint.

2    Q.   Okay.  So are you saying for the procedures associated

3    with 64633 to 64636, that we are trying to destroy --

4    A.   That little nerve there, yes.

5    Q.   -- the little nerve --

6    A.   Medial branch nerve.

7    Q.   That you have circled.  Let the record reflect the

8    witness circled a nerve, a third of the way up the page.

9         THE COURT:  The record will so reflect.

10   BY MS. WILLIS:

11   Q.   And when you say destroy, what do you mean?

12   A.   Destruction.  Destruction.  It usually gets burned or

13   destroyed through chemical agents.  So the idea is you destroy

14   the nerve, then you don't have the pain sensation because you

15   don't have a functioning nerve that can perceive pain.

16   Q.   When you destroy a nerve, how long would one expect

17   that nerve to stay destroyed?  Like, how long would it take

18   for the nerve to regenerate?

19   A.   At least -- you know, that varies.  The fastest you could

20   see is about six months, but the destruction procedure could

21   be -- last a year up to six months.  They have the ability to

22   regenerate.  Sometimes they can regenerate in about six

23   months.

24   Q.   Now, are there certain requirements for using codes 64633

25   to 64366, these nerve degeneration codes?

1    A.    Yes.  Those are codes that are required to be done using

2    image guidance, specifically a CT scan or fluoroscopy.

3    Q.    What is fluoroscopy?  Are you familiar with what it is?

4    A.    So fluoroscopy is basically an x-ray machine that you can

5    pretty much see in real time while you're doing a procedure.

6    Q.    How big is a fluoroscopy machine?

7    A.    It's quite big.  It usually has sort of a C arrangement

8    and it's quite big, and it needs -- yes, it's a big machine.

9    Q.    Ms. Slater, can you show the witness Exhibit 34?

10         Do you recognize what's in Exhibit 34?

11   A.    Yes.  That looks like a fluoroscopic suite that you can

12   see the fluoroscopy machine in that room.

13         MS. WILLIS:  At this time the government would move to

14   admit Government Exhibit 34.

15         MR. KHOURI:  No objection.

16         THE COURT:  It will be admitted.

17                         (Government Exhibit No. 34

18                           received into evidence.)

19   BY MS. WILLIS:

20   Q.    Ms. Slater, can you publish Exhibit 34.

21         So, Dr. Schaening, is what we are looking at an example

22   of a fluoroscopy machine?

23   A.    Yes.

24   Q.    How does a fluoroscopy machine compare -- well, strike

25   that.  How big -- have you seen a CT machine before?

1      A.    Yes.

2      Q.    How big is a CT machine?

3      A.    It's big also.  I will say bigger.  Or around the same

4      size or bigger.

5      Q.    And do these fluoroscopy machines and CT machines require

6      a space in an office to house these machines?

7      A.    Yes.  Since they emit radiation, your space must be able

8      to handle that radiation safely, so it takes some compliance

9      with some building standards.

10     Q.    For CPT codes 64633 to 64636, do they allow for any other

11     imaging other than fluoroscopy or CT scan?

12     A.    No.

13     Q.    And why are fluoroscopic guidance or CT guidance

14     required?

15     A.    It's the standard of medicine.  It's considered the

16     standard of medicine to do these procedures image guided

17     to be able to hit the target safely and effectively.

18     Q.    And is the target -- we looked at that picture and it

19     was blown up.  Is that target a small target, a large target?

20     How would you describe the target that a provider would be

21     trying to hit with the injection?

22     A.    A small target.

23     Q.    Are you familiar with how the fluoroscopy machine is

24     used during the procedure?

25     A.    Yes.

1    Q.   Can you tell us?

2    A.   So basically you'll see this arm that looks like a C.

3    This part throws x-rays that are captured by this other part

4    below, and the physician is looking --

5         THE COURT:  I'm sorry.  Can the witness -- is this

6    one of the exhibits that they can mark on?

7         MS. WILLIS:  Yes.

8         THE WITNESS:  Okay.  I will make it marked.

9      So using this -- you see this C arm that looks like a C,

10   that C arm has over here a -- this is the part that irradiates

11   x-rays.  And they go through the patient and they're captured

12   on this part, and then they create an image that you can see

13   it on this screen over here.  So the physician does the

14   procedure looking at the screen.  This arm is movable so you

15   can move it looking for the best angle possible to see the

16   image that you're doing.

17   BY MS. WILLIS:

18   Q.   And just for the record, in this demonstrative, or

19   exhibit, there are people on here.  This is not the procedures

20   that we're talking about.  We're just talking about the

21   machine.  Is that correct?

22   A.   Yes.  We're just talking about a fluoroscopic machine.

23   Q.   And what is a physician looking for when they're looking

24   at the screen while giving the injection?

25   A.   So they look at the needle that they're inserting, that

1    they is getting to the anatomical landmarks that will verify

2    that you hit your target.

3    Q.   And are they inserting any kind of dye or anything to

4    show them what's like -- can you explain kind of in detail

5    what is happening?

6    A.   So it depends on the procedure.  We are talking about

7    these facet joint destructions.  So in these facet joint

8    destruction you just use the needle to make sure that you are

9    hitting that paravertebral facet joint and create a -- that

10   you reach your area that you are going to destroy through

11   radiofrequency or neurolytic agents.

12        So for this particular procedure, you basically use

13   the anatomical margins, the facets that are -- you can see it

14   clearly on a fluoroscopic machine, and to place the needle on

15   the correct anatomical area.

16   Q.   Under Medicare rules and regulations, are the procedures

17   performed in 64633 to 64636 considered safe and effective

18   without imaging guidance?

19   A.   No.

20   Q.   And would they be considered safe and effective with

21   guidance like an ultrasound machine?

22   A.   No.

23   Q.   And does the amount of reimbursement for procedures

24   requiring fluoroscopic guidance, would that amount of

25   reimbursement be more than it would be for a procedure

1    with technology like an ultrasound?

2    A.   Yes.  It usually is based on the practice expense of

3    the equipment.

4    Q.   Do you know how much an ultrasound machine costs versus

5    a fluoroscopy machine?

6    A.   It depends of the -- how fancy you want your machine,

7    if you want it to be a machine those can range -- that will

8    be sufficient to do this type of procedure.  Those could range

9    from 4,500 an echo machine, to $30,000 if you're getting to

10   the high end.

11   Q.   Are we talking about ultrasound or fluor --

12   A.   Ultrasound.  And fluoroscopy will be about $30,000 the

13   low end to 70, $80,000.  And it depends.  Both machines can

14   get much higher depending on the features that you add to

15   them.  That would be sort of the average.

16   Q.   Okay.  And are there other CPT codes that require imaging

17   guidance, like fluoroscopic or CT guidance?

18   A.   Yes.  There are multiple CPT codes that require that.

19   Q.   Let's talk about code 64483.  Are you familiar with that

20   code?

21   A.   Yes.  I am familiar with that code.

22   Q.   And Ms. Slater, can you show the witness Exhibit 30.

23        Dr. Schaening, does Exhibit 30 demonstrate or depict

24   descriptions of 644 -- may I have the Court's indulgence?

25             THE COURT:  Yes.

1          (Government conferring.)

2     BY MS. WILLIS:

3     Q.   Dr. Schaening, we're actually showing you Exhibit 32A.

4     Do you see some descriptions in 32A?

5     A.   Yes.  Here we have the code that you were asking; that is

6     the 64 over here.  That's the code you were asking, the lumbar

7     or sacral single level.

8     Q.   Okay.  And what am I showing you in 32A?  Does it appear

9     to be a copy of a book?

10    A.   Yes.  It's the current procedural terminology, CPT book

11    for the year 2015.  That book has the full descriptor of the

12    codes.  This code, basically the way you read it on this book

13    will be with the descriptor that you see on 64479 over here,

14    that it says -- the font is small.

15         But it's basically an epidural, a transforaminal epidural

16    injection, anesthetic agent and/or steroid, transforaminal

17    epidural, with imaging guidance, fluoroscopy or CT, and you

18    see the point and comma there, then the 83 will be that same

19    statement and it will say lumbar or sacral.

20         MS. WILLIS:  At this time the government would move

21    to admit Exhibit 32A.

22         THE COURT:  Any objection?

23         MR. KHOURI:  None, Your Honor.

24         THE COURT:  It will be admitted.

25

1                        (Government Exhibit No. 32A

2                        received into evidence.)

3     BY MS. WILLIS:

4     Q.   Ms. Slater, can you zoom in on actually the 64479 that

5     he first described?

6          So the 64479 that you were describing, is that the

7     description that you were reading for the jury?

8     A.   Yes.  That description is applicable to all the codes on

9     the family.  What changes is the statement behind the point

10    and comma, that they will be -- the 79 is for cervical or

11    thoracic, single level.  And then the 80 would be additional

12    level.  Then the 83 will be lumbar or sacral.  So what changes

13    is -- like I mentioned previously, it's the same descriptor.

14    What changes is the anatomical target.

15    Q.   So the part of the spine that we're looking at.

16    A.   Yes.

17    Q.   Ms. Slater, can you zoom in on 64483.

18         And so 64483 is lumbar or sacral.  Are you saying that's

19    the part of the code that changes?

20    A.   Yes.  A single level.  Yes.

21    Q.   Now, on this -- I'll back up.  For 64483, can you

22    describe like what the procedure is?

23    A.   So in that procedure what you're doing is a

24    transforaminal epidural injection of a steroid or anesthetic

25    agent.  The idea is to cure back pain.  So what they do is

1    they go to the neural foramen, that's a hole that is formed

2    between two adjacent vertebra, the superior and the inferior,

3    where the spinal nerve comes out, and then you enter through

4    that hole, and you're supposed to enter in the superior aspect

5    of the neural foramen to inject on the epidural space your

6    solution of steroids and anesthetics.

7    Q.   Ms. Slater, could you go back to Exhibit 33, and can you

8    go to page 4 of that exhibit?

9         Dr. Schaening, would this help in the explanation?

10   A.   Yes.  That will be the needle that you would be entering

11   the neural foramen.  That neural foramen, remember, it has

12   superior vertebra, so between the two vertebra, they create

13   that hole that the nerve goes by, and then you have to enter

14   through that hole to the superior aspect to be able to inject

15   your medication into the epidural space.

16   Q.   What is another way to describe epidural space?

17   A.   So you have the spinal cord, and that is the cord that is

18   within your spine, and that carries all the nerves -- your

19   nerves.  And in that spinal cord is covered by a membrane that

20   is called the dura.  And above that membrane there is a space

21   that is the epidural space through which the nerves comes out,

22   and that's the area where you want to get your needle within

23   and inject your steroid and anesthetic agent so it basically

24   numbs the nerve and alleviates the pain of the patient.

25   Q.   Okay.  So are all of the codes we've talked about so far,

1    that's 64633 to 64636, and 64483, do they all involve spinal

2    injection?

3    A.    What?

4    Q.    Spinal injections?

5    A.    Oh, yes.

6    Q.    And what is the difference between the 64483 code that we

7    talked about and those nerve destruction codes that we talked

8    about a little bit earlier at 64633 through 36?

9    A.    So this will be open to interpretation.  They have in

10   common that both should be performed CT or fluoroscopy-guided,

11   but the difference is that in this one you are not destroying

12   the nerve.  You are trying to alleviate the pain by numbing

13   that nerve through the use of a steroid that will diminish the

14   inflammation of the nerve.

15        The theory is that the pain is because that nerve is

16   inflamed, so you try to decrease the inflammation with a

17   steroid use, and give an anesthetic to alleviate the pain

18   while the steroid does its job.  So this is basically we're

19   not destroying the nerve, but we're trying to alleviate back

20   pain on both procedures, one destroys the nerve, this

21   alleviates pain.

22   Q.    So both are spinal injection.  One is destroying nerves,

23   and one is -- by inserting chemicals, and one is blocking the

24   pain with other chemicals.  Is that correct?

25   A.    Yes.

1    Q.   And is fluoroscopic guidance required for this 64483,

2    this nerve blocking type procedure as well?

3    A.   Yes.

4    Q.   Why?

5    A.   As I mentioned previously, it's considered a standard

6    of care to do this image guided with fluoroscopy and CT.

7    They're the gold standard because it's a small target that

8    you must hit, that transforaminal space, the neural foramen.

9    You should hit it, not just the foramen itself, but on the

10   superior aspect of that foramen.  So it's very precise

11   procedure.  So obviously imaging will help you hit your

12   target.

13   Q.   And is this imaging, does it have to occur at the same

14   time that the needle is in the body?

15   A.   Yes.

16   Q.   And why?

17   A.   Well, this -- for example, in this procedure, you need

18   to be certain that you are on the epidural space.  You don't

19   want to miss that space.  So in this procedure when you get

20   to the epidural space, usually you put a contrast medium, and

21   that contrast medium you will see that you are confirming that

22   you are on the epidural space and it is safe to inject them,

23   you take out the syringe and put in the therapeutic syringe

24   with the steroid and anesthetic, and you now are certain

25   because you saw that you were in place, that I can medicate

1    this patient in a safe and effective manner.

2    Q.   So without imaging guidance are these injections under

3    64483 considered by Medicare safe and effective?

4    A.   No.

5    Q.   Are they considered medically necessary without imaging

6    guidance?

7    A.   No.

8    Q.   Ms. Slater, can you go back to Exhibit 32A, please.

9    And can you zoom in on the 64483 code again, please.

10       Now, under 64483, do you see the parenthetical at the

11   bottom of the code?

12   A.   Yes.

13   Q.   And what does this parenthetical -- what does it say,

14   for the record?

15   A.   So this parenthetical is giving coding guidance, that if

16   you perform this procedure under ultrasound guidance, that you

17   should use this 0230T code.  That is a code that is for the

18   same procedure but guided by ultrasound.

19   Q.   Now, is this T code -- can you tell us a little bit more

20   about what these T codes mean?

21   A.   So these are Category III codes on the CPT book.

22   Category III codes are considered tracking codes of new

23   technology, emerging technology, that we need to gather

24   information to see if in the future this technology may be

25   safe and effective to be used on a patient.  So they're for

1    a payor to be able to track the use of these experimental

2    innovative procedures.

3    Q.   So does Medicare reimburse these T codes?

4    A.   No.  They are -- this T code, it will be considered

5    noncovered.

6    Q.   Why is it considered noncovered?

7    A.   Well, at the time of this CPT book, we have to make a

8    determination of noncovered procedures, and we listed that

9    code.  And the reason we listed that code is that the North

10   American Spinal Society deemed that the gold standard of

11   performing this type of services would be under fluoroscopic

12   or CT guidance, that ultrasound guidance, they could not be

13   confident to perform this procedure with ultrasound guidance.

14   Q.   And just to be clear, to use this T code, even this

15   nonreimbursable T code, would "under ultrasound guidance"

16   mean the ultrasound was used at the same time the needle was

17   in the body?

18   A.   Yes.  If you're going to do an ultrasound guidance, it

19   should be basically real time during inserting the needle

20   while you look with your ultrasound probe the screen of your

21   ultrasound machine to see where the needle is at.

22   Q.   And could these T codes -- were there T codes for these

23   64633 through 64636 codes?

24   A.   Excuse me?

25   Q.   Were there T codes for the 64633 to 64636 codes?

1    A.    No.   Those codes, if you do not use image guidance, or

2    if you use a different sort of guidance, and like ultrasound,

3    you should be billing an unlisted code.   64999 will be the

4    unlisted code of a neurolytic procedure.   So the destruction

5    codes, they do not have T codes for ultrasound guidance for

6    destruction.   You must bill unlisted because a CPT didn't

7    publish any tracking or reporting codes for that procedure

8    being done with an ultrasound machine.

9    Q.    Okay.   And would 64999, does that mean -- can you tell

10    us a little more about what that means?   Does Medicare cover

11    64999?

12    A.    So when we're talking about nonspecified codes, those are

13    codes that you only use when you're doing that procedure that

14    is not described by any code on your CPT book.   So if you're

15    doing something that there's not a code that identifies the

16    service that you perform, then we have these unlisted codes

17    that not all are specified codes, that tells you I did

18    something that is not qualified in this book in the

19    neurological area.   And then a contractor, since we do not

20    know what they're doing, we usually develop and see what the

21    provider is doing to be able to pay that claim.

22    Q.    Okay.   Ms. Slater, you can exit out of this exhibit.

23          Now, are there separate codes for ultrasound?

24    A.    Yes.

25    Q.    And if one were to use a 59 modifier for an ultrasound,

1    what is a 59 modifier?

2    A.    So a 59 modifier tells you that there's a separate

3    identifiable procedure, that is something that I did separate

4    of the other codes.  Modifiers are used on our payment system

5    to apply certain system edits that will deny certain codes

6    that are billed together, with a modifier when you are making

7    attestation that, A, this is a separately identifiable service

8    and therefore you should not deny my service, you should pay

9    it.

10   Q.    So if I billed a bundled service and then a code with a

11   59 modifier, what am I telling Medicare?

12   A.    That that service that I'm dealing with the 59 was not

13   related to the other service that will have really bundled

14   that ultrasound.

15   Q.    And let's talk a little bit about a different type of

16   code altogether, a J code.  Now, are you familiar with code

17   J3726?

18   A.    Yes.

19   Q.    And, Ms. Slater, can you show the witness Exhibit 31.

20         And Dr. Schaening, what does J3726 refer to?

21   A.    So basically, Jill, that is a HCPCS code that describes

22   a hyaluronan acid derivative for intra-articular injection

23   of the knee.

24   Q.    And is J7326 associated with a particular type of

25   medicine?

1    A.   Brand name Gel-One, yes.

2         MS. WILLIS:  And at this time the government would

3    move to admit Exhibit 31.

4         THE COURT:  Any objection?

5         MR. KHOURI:  None, Your Honor.

6         THE COURT:  It will be admitted.

7                        (Government Exhibit No. 31

8                         received into evidence.)

9    BY MS. WILLIS:

10   Q.   Dr. Schaening, can a provider use J7326 if they are not

11   using Gel-One?

12   A.   They -- that code could be used also for SYNVISC.  That

13   is another brand name that's -- basically.  But they should be

14   specific to SYNVISC Gel-One, and that was added later in the

15   descriptors.  But that particular code should be used for the

16   brand names that the descriptor of the year you're billing is

17   identifying.  In this year they were -- it was specific for

18   Gel-One.

19   Q.   Is there another code, J7321, that would refer to other

20   types of injections?

21   A.   Yes.  That would be hyaluronan acid derivative, brand

22   name Supartz.

23   Q.   Okay.  Supartz?

24   A.   Yes.

25   Q.   Now, regardless of the medication, is J7326 limited to a

1    particular part of the body?

2    A.   These hyaluronan acid derivatives, all of those items

3    are approved by the FDA as devices to treat the osteoarthritic

4    knee.  So they have approval for being used on the treatment

5    of a knee with osteoarthritis.

6    Q.   So is it fair to say that to use -- for Medicare to

7    reimburse under J7326, the injection would have to be for

8    an osteoarthritic knee?

9    A.   Yes.

10   Q.   Could it be for another part of the body, the shoulder,

11   a leg, a hip?

12   A.   That would be noncovered.

13   Q.   So Medicare would not reimburse for J7326 for any other

14   part of the body than the knee.

15   A.   Correct.

16        MS. WILLIS:  I don't have any further questions at

17   this time.

18        THE COURT:  All right.  We can break now for lunch and

19   start the cross-examination at 1:45.  Mr. Khouri, is that your

20   preference?

21        MR. KHOURI:  That would be fine.

22        THE COURT:  All right.  Let's break now for lunch.

23   Seems like a natural breaking point.  We'll resume with the

24   cross-examination of the doctor at 1:45.

25     Ladies and gentlemen, we're lucky this courthouse can have

1    a cafeteria.  Many courthouses lost their cafeterias, either

2    don't have them or lost them when things shut down because of

3    the pandemic.  The cafeteria is not back up to full service,

4    but it does have limited service, and I think you'll find it

5    quite a pleasant place if you want to go there.  And obviously

6    there are places outside the courthouse.  Enjoy your lunch.

7    I'll see you at 1:45.

8        (Lunch recess taken at 12:48 p.m.)

*   *   *   *   *   *

CERTIFICATE

    I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

## $

**$30,000** [2] - 537:9, 537:12
**$80,000** [1] - 537:13

## '

**'15** [1] - 498:11

## /

**/s** [1] - 550:9

## 0

**0230T** [1] - 543:17

## 1

**1** [8] - 455:11, 511:1, 511:2, 511:15, 511:19, 519:11, 519:12, 531:6
**10** [5] - 461:22, 497:25, 518:17, 519:25, 520:1
**10:03** [1] - 462:2
**10:16** [1] - 471:6
**10:24** [1] - 471:6
**11** [1] - 475:17
**11:39** [1] - 518:19
**11:58** [1] - 518:19
**12** [1] - 520:6
**1250** [1] - 454:21
**1255377180** [1] - 512:17
**128** [1] - 521:4
**12:48** [1] - 549:8
**1326230830** [1] - 518:10
**1400** [1] - 454:14
**15** [2] - 461:22, 515:21
**18** [1] - 506:11
**1862(a)(1** [1] - 522:10
**19-0255** [1] - 454:4
**19-255** [1] - 456:3
**1965** [1] - 507:23
**1:00** [1] - 505:8
**1:45** [3] - 548:19, 548:24, 549:7

## 2

**2** [3] - 518:8, 531:7, 531:8

**20** [1] - 505:11
**20001** [1] - 454:25
**20005** [1] - 454:14
**20036** [1] - 454:22
**2012** [1] - 510:14
**2014** [1] - 498:11
**2015** [3] - 524:4, 525:13, 538:11
**2016** [2] - 525:16, 525:23
**2017** [2] - 463:8, 464:1
**2018** [2] - 524:4, 525:13
**202** [3] - 454:15, 454:22, 454:25
**2022** [1] - 454:6
**215** [1] - 454:17
**2222** [1] - 454:17
**25** [1] - 513:4
**25B** [3] - 468:17, 469:3, 471:22
**26** [6] - 515:20, 523:21, 523:23, 524:7, 525:3, 525:10
**26-29** [2] - 455:13, 525:6
**27** [3] - 513:5, 523:21, 525:22
**28** [3] - 515:20, 523:22, 527:16
**29** [4] - 523:22, 523:23, 524:7, 525:3
**2A** [6] - 455:12, 516:8, 516:13, 516:16, 516:20, 517:3
**2B** [7] - 455:12, 517:18, 518:1, 518:5, 518:8, 518:25, 520:18

## 3

**3** [4] - 454:9, 512:13, 514:1, 514:2
**30** [2] - 537:22, 537:23
**31** [4] - 455:15, 546:19, 547:3, 547:7
**32** [1] - 497:24
**32A** [7] - 455:14, 538:3, 538:4, 538:8, 538:21, 539:1, 543:8
**33** [11] - 455:13, 525:24, 526:11, 526:22, 528:21, 528:23, 529:2, 529:7, 529:10, 529:16, 540:7
**333** [1] - 454:24
**336-2433** [1] - 454:18

**34** [8] - 455:14, 526:5, 526:11, 533:9, 533:10, 533:14, 533:17, 533:20
**35** [1] - 526:11
**353-0822** [1] - 454:15
**354-3186** [1] - 454:25
**36** [3] - 525:24, 526:12, 541:8

## 4

**4** [6] - 468:18, 514:14, 514:23, 518:16, 530:23, 540:8
**4,500** [1] - 537:9
**462** [1] - 455:3
**4704-A** [1] - 454:24
**471** [1] - 455:4
**492** [1] - 455:4
**496** [2] - 455:5, 455:6
**4A** [1] - 515:2

## 5

**5** [5] - 512:13, 520:16, 520:18, 530:23, 531:6
**500** [2] - 455:6, 477:23
**504** [1] - 455:7
**505** [1] - 455:8
**511** [1] - 455:11
**516** [1] - 455:12
**518** [1] - 455:12
**525** [1] - 455:13
**529** [1] - 455:13
**533** [1] - 455:14
**539** [1] - 455:14
**547** [1] - 455:15
**59** [5] - 545:25, 546:1, 546:2, 546:11, 546:12

## 6

**6** [4] - 469:3, 469:4, 469:5, 516:9
**62** [1] - 498:4
**64** [1] - 538:6
**64366** [1] - 532:25
**644** [1] - 537:24
**64479** [3] - 538:13, 539:4, 539:6
**64483** [10] - 537:19, 539:17, 539:18, 539:21, 541:1, 541:6, 542:1, 543:3, 543:9, 543:10

**646** [2] - 495:6, 495:15
**64633** [14] - 523:19, 523:24, 525:18, 526:20, 526:24, 531:10, 532:3, 532:24, 534:10, 536:17, 541:1, 541:8, 544:23, 544:25
**64634** [3] - 525:22, 526:19, 526:24
**64635** [3] - 463:12, 527:17, 528:9
**64636** [11] - 463:12, 523:19, 523:24, 528:8, 531:11, 532:3, 534:10, 536:17, 541:1, 544:23, 544:25
**64999** [3] - 545:3, 545:9, 545:11
**65** [3] - 498:4, 507:24, 509:15

## 7

**7** [2] - 471:22, 519:16
**70** [1] - 537:13
**700** [1] - 454:21
**79** [1] - 539:10

## 8

**8** [4] - 454:6, 515:12, 515:13, 517:2
**8/14/2012** [1] - 515:25
**80** [1] - 539:11
**83** [2] - 538:18, 539:12
**855** [1] - 511:10, 512:15, 512:25, 515:20
**855l** [1] - 511:6
**855s** [1] - 511:7
**861-0870** [1] - 454:22

## 9

**90** [1] - 478:8
**92612** [1] - 454:18
**949** [1] - 454:18
**9:30** [1] - 462:7
**9:51** [1] - 454:6

## A

**a.m** [5] - 454:6, 462:2, 471:6, 518:19

**a.m.** [1] - 518:19
**abide** [1] - 514:25
**ability** [1] - 532:21
**able** [9] - 458:9, 458:18, 462:13, 494:7, 534:7, 534:17, 540:14, 541:1, 545:21
**above-entitled** [1] - 550:5
**absolutely** [2] - 490:16, 490:21
**accompany** [1] - 486:13
**account** [1] - 517:7
**accurate** [11] - 476:2, 476:5, 476:10, 479:5, 483:1, 492:17, 492:21, 517:22, 519:17, 519:24, 521:8
**acid** [3] - 546:22, 547:21, 548:2
**acknowledge** [2] - 513:22, 520:7
**acting** [1] - 481:20
**action** [1] - 456:3
**actual** [1] - 501:8
**add** [5] - 495:16, 526:6, 526:19, 528:8, 537:14
**add-on** [3] - 526:6, 526:19, 528:8
**added** [1] - 547:14
**addition** [1] - 486:21
**additional** [6] - 521:23, 526:6, 526:8, 526:21, 526:22, 539:11
**additionally** [1] - 458:5
**adhere** [1] - 513:21
**adjacent** [1] - 540:2
**adjustment** [1] - 523:3
**administer** [2] - 468:12, 506:4
**administrates** [1] - 510:11
**administration** [1] - 507:14
**administrative** [6] - 466:15, 506:3, 506:6, 507:19, 510:7, 514:11
**admissible** [2] - 465:24, 466:1
**admission** [2] - 466:21, 529:4
**admit** [8] - 511:15, 516:16, 518:1,

524:7, 529:2,
533:14, 538:21,
547:3
**admitted** [14] - 468:18,
469:4, 469:5,
511:18, 516:19,
518:4, 524:12,
524:21, 525:4,
525:5, 529:7,
533:16, 538:24,
547:6
**admitting** [1] - 465:21
**advance** [1] - 520:24
**Advantage** [1] -
508:11
**advice** [1] - 493:23
**advised** [1] - 476:13
**afternoon** [1] - 459:8
**afterwards** [1] -
501:25
**agent** [5] - 525:19,
526:3, 538:16,
539:25, 540:23
**agents** [3] - 519:15,
532:13, 536:11
**agree** [7] - 458:6,
458:24, 511:11,
513:2, 513:20,
514:25, 519:5
**agreed** [1] - 488:10
**agreeing** [2] - 511:13,
519:23
**agreement** [2] -
519:22, 520:12
**agrees** [1] - 519:12
**ahead** [2] - 514:19,
518:22
**Alice** [1] - 466:23
**aligned** [1] - 463:19
**ALLENE** [3] - 455:6,
496:19, 497:11
**Allene** [2] - 496:18,
497:11
**alleviate** [3] - 541:12,
541:17, 541:19
**alleviates** [2] - 540:24,
541:21
**allow** [12] - 458:20,
458:21, 461:1,
461:15, 479:17,
489:24, 495:13,
495:14, 495:25,
514:21, 516:5,
534:10
**allowed** [2] - 461:14,
491:8
**allows** [4] - 516:24,
528:14, 528:19,
530:11
**alteration** [1] - 514:9

**altogether** [1] - 546:16
**ambulatory** [1] - 508:8
**AMERICA** [1] - 454:3
**America** [1] - 456:3
**American** [1] - 544:10
**amount** [4] - 485:20,
523:7, 536:23,
536:24
**anatomical** [7] -
526:2, 526:9,
526:17, 536:1,
536:13, 536:15,
539:14
**anesthetic** [5] -
538:16, 539:24,
540:23, 541:17,
542:24
**anesthetics** [1] -
540:6
**angle** [1] - 535:15
**answer** [8] - 467:11,
476:16, 476:21,
477:10, 478:1,
487:14, 499:21,
503:3
**answered** [1] - 492:18
**answering** [1] -
468:23
**answers** [3] - 474:3,
477:7, 491:24
**anti** [1] - 542:10
**anti-kickback** [1] -
515:8
**apart** [1] - 465:2
**APC** [1] - 454:16
**apologize** [1] - 462:12
**apologizing** [1] -
462:4
**appear** [2] - 460:19,
538:8
**APPEARANCES** [1] -
454:11
**applicable** [3] - 515:9,
520:14, 539:8
**application** [12] -
511:3, 511:4, 512:3,
512:4, 513:4,
513:14, 513:15,
514:5, 514:7,
514:10, 515:2,
515:22
**apply** [2] - 515:1,
546:5
**appointment** [1] -
499:3
**appreciate** [2] - 478:2,
496:11
**appropriate** [2] -
474:8, 477:3
**approval** [1] - 548:4

**approved** [1] - 548:3
**area** [12] - 457:19,
501:16, 529:25,
530:2, 530:17,
530:23, 531:11,
536:10, 536:15,
540:22, 545:19
**areas** [2] - 507:18,
507:20
**arguing** [1] - 466:8
**arm** [5] - 498:17,
535:2, 535:9,
535:10, 535:14
**arrangement** [1] -
533:7
**arrived** [1] - 499:4
**arthritis** [1] - 499:8
**articular** [12] - 527:3,
528:16, 529:21,
529:23, 529:24,
530:16, 530:18,
530:23, 531:17,
546:22
**articulation** [10] -
527:5, 527:6,
528:13, 528:17,
528:19, 530:1,
530:13, 530:20,
530:25, 531:18
**aspect** [3] - 540:4,
540:14, 542:10
**asserted** [2] - 464:14,
465:19
**assigned** [3] - 512:5,
520:2, 523:1
**assistance** [1] -
459:20
**associated** [9] -
510:15, 511:23,
512:15, 512:20,
518:11, 520:20,
523:24, 532:2,
546:24
**Associates** [2] -
518:11, 518:14
**assume** [3] - 456:12,
502:21, 524:22
**assuming** [2] -
473:21, 481:8
**assurance** [1] - 520:4
**attached** [1] - 501:13
**attempt** [2] - 479:4,
479:11
**attestation** [3] -
511:12, 520:17,
546:7
**audit** [16] - 463:9,
463:11, 463:14,
463:15, 463:23,
463:25, 464:6,

464:10, 465:2,
465:20, 465:22,
466:4, 466:9,
466:13, 466:19,
466:24
**auditors** [1] - 466:12
**authority** [1] - 513:15
**authorization** [1] -
517:13
**available** [5] - 515:3,
522:2, 524:2,
524:13, 524:24
**Avenue** [4] - 454:14,
454:21, 454:24
**average** [1] - 537:15
**aware** [1] - 466:9
**awareness** [1] -
465:20

## B

**baby** [1] - 487:3
**background** [1] -
506:17
**backwards** [1] -
458:12
**bank** [1] - 517:7
**barely** [1] - 472:24
**based** [6] - 458:1,
465:12, 487:13,
522:23, 523:9, 537:2
**basis** [1] - 481:7
**beat** [1] - 468:19
**became** [3] - 506:23,
506:24, 507:2
**beck** [1] - 518:18
**BEFORE** [1] - 454:10
**behalf** [1] - 513:15
**behind** [2] - 478:24,
539:9
**beings** [1] - 528:20
**belief** [9] - 458:13,
459:21, 459:24,
487:14, 490:11,
490:19, 491:2,
491:3, 491:4
**bell** [1] - 494:18
**below** [5] - 503:1,
503:8, 503:10,
503:11, 535:4
**bench** [5] - 467:8,
489:19, 491:22,
496:2, 525:2
**Bench** [5] - 464:21,
488:20, 490:15,
495:12, 524:9
**bend** [2] - 528:14,
528:20
**bending** [1] - 530:12

**beneficiaries** [5] -
508:13, 508:16,
509:3, 509:24,
522:18
**beneficiary** [8] -
509:13, 509:14,
509:15, 509:18,
509:21, 510:4,
510:9, 521:15
**benefit** [1] - 509:16
**benefits** [6] - 481:13,
487:20, 487:22,
507:23, 508:15,
508:19
**best** [1] - 535:15
**better** [5] - 467:16,
471:19, 491:20,
494:7, 531:13
**between** [12] - 456:11,
458:3, 459:2,
525:13, 526:1,
526:13, 527:3,
528:14, 530:10,
540:2, 540:12, 541:6
**beyond** [3] - 484:3,
488:9, 488:24
**bias** [7] - 456:14,
457:19, 488:22,
489:10, 490:18,
491:7, 491:10
**big** [5] - 533:6, 533:7,
533:8, 533:25,
534:2, 534:3
**bigger** [2] - 534:3,
534:4
**bill** [17] - 470:11,
474:9, 475:24,
476:4, 482:21,
484:25, 485:3,
485:17, 488:6,
495:6, 495:16,
496:6, 509:1,
509:22, 510:2,
510:5, 545:6
**billed** [9] - 470:8,
470:10, 485:20,
493:24, 494:3,
520:5, 546:6, 546:10
**biller** [3] - 474:24,
475:10, 476:24
**billing** [18] - 469:23,
470:4, 470:6,
474:19, 475:1,
475:5, 475:8,
475:11, 475:13,
475:17, 475:23,
477:19, 484:22,
484:24, 514:12,
526:20, 545:3,
547:16

**bills** [7] - 474:22, 475:20, 476:1, 476:2, 477:3, 486:22, 496:5
**birth** [1] - 485:8
**bit** [11] - 506:17, 508:22, 522:3, 522:12, 527:10, 528:12, 529:17, 530:5, 541:8, 543:19, 546:15
**blade** [4] - 502:16, 502:18, 503:1, 503:11
**blame** [2] - 462:9
**blocking** [2] - 541:23, 542:2
**blown** [1] - 534:19
**Blue** [6] - 478:17, 478:18, 498:2
**board** [1] - 506:20
**body** [8] - 499:12, 499:16, 504:18, 542:14, 544:17, 548:1, 548:10, 548:14
**book** [8] - 538:9, 538:10, 538:11, 538:12, 543:21, 544:7, 545:14, 545:18
**Botox** [1] - 468:10
**bottom** [6] - 481:14, 512:14, 520:17, 543:11
**Bradley** [1] - 467:10
**branch** [2] - 531:21, 532:6
**brand** [4] - 547:1, 547:13, 547:16, 547:21
**break** [7] - 461:20, 461:24, 466:8, 505:8, 505:10, 548:18, 548:22
**breakfast** [1] - 462:13
**breaking** [1] - 548:23
**briefly** [2] - 492:10, 504:13
**bringing** [1] - 466:23, 467:4
**BRYAN** [2] - 454:23, 550:3
**Bryan** [2] - 550:9, 550:9
**building** [1] - 534:9
**bundled** [3] - 496:5, 546:10, 546:13
**burned** [1] - 532:12
**business** [4] - 479:10,

479:19, 479:20, 510:12
**BY** [52] - 462:20, 464:4, 464:18, 467:9, 468:16, 469:9, 471:10, 472:1, 473:1, 473:23, 476:23, 477:14, 479:18, 480:6, 481:10, 482:6, 483:24, 484:7, 484:13, 488:12, 489:20, 490:2, 490:10, 492:1, 492:12, 496:4, 496:21, 497:8, 497:20, 500:2, 500:14, 502:14, 503:7, 503:17, 503:24, 504:16, 505:18, 511:21, 515:18, 516:22, 517:5, 518:7, 518:23, 522:19, 525:8, 529:12, 532:10, 533:19, 535:17, 538:2, 539:3, 547:9

## C

**CA** [1] - 454:18
**cafeteria** [2] - 549:1, 549:3
**cafeterias** [1] - 549:1
**calculation** [1] - 522:23
**candor** [1] - 459:25
**captured** [2] - 535:3, 535:11
**cards** [1] - 461:17
**care** [4] - 483:25, 498:14, 501:1, 542:6
**carefully** [1] - 513:19
**carpal** [1] - 499:7
**carrier** [1] - 506:25
**carries** [1] - 540:18
**case** [4] - 462:11, 486:11, 489:21, 491:18
**Category** [2] - 543:21, 543:22
**caught** [1] - 495:1
**causes** [1] - 520:10
**Center** [2] - 473:16, 506:15
**Centers** [1] - 522:8
**centers** [1] - 508:9
**certain** [11] - 481:11,

485:3, 508:13, 511:13, 513:17, 523:16, 532:24, 542:18, 542:24, 546:5
**certainly** [2] - 488:21, 524:16
**CERTIFICATE** [1] - 550:2
**certification** [7] - 475:9, 511:10, 513:6, 513:17, 513:20, 514:2, 514:3
**certifications** [2] - 513:1, 513:25
**certified** [2] - 475:10, 506:20
**certify** [1] - 550:3
**cervical** [6] - 525:21, 527:7, 527:9, 527:11, 527:24, 539:10
**chain** [1] - 458:2
**change** [3] - 525:12, 525:24, 526:14
**changed** [1] - 510:23
**changes** [11] - 510:18, 510:19, 511:7, 516:3, 526:1, 526:5, 539:9, 539:12, 539:14, 539:19
**charge** [6] - 463:17, 476:6, 492:23, 493:4, 493:8, 493:9
**charges** [3] - 463:24, 490:7, 490:20
**charts** [4] - 463:16, 463:21, 463:22, 495:17
**chat** [3] - 459:4, 460:23, 460:24
**check** [2] - 499:25, 517:6
**checking** [1] - 499:24
**chemical** [1] - 532:13
**chemicals** [2] - 541:23, 541:24
**chief** [1] - 506:23
**choice** [2] - 490:5, 494:3
**choosing** [1] - 526:12
**CHUTKAN** [1] - 454:10
**circle** [3] - 488:13, 529:14, 531:18
**circled** [2] - 532:7, 532:8
**circling** [1] - 487:25
**circuited** [1] - 460:15
**civil** [2] - 514:10,

514:13
**claim** [21] - 469:23, 476:9, 476:11, 476:24, 480:21, 481:16, 487:19, 487:22, 492:16, 492:20, 510:7, 515:5, 515:15, 520:9, 520:12, 520:23, 520:24, 521:10, 521:18, 545:21
**claims** [33] - 463:9, 475:9, 476:6, 479:5, 479:11, 480:14, 480:15, 480:19, 481:3, 481:12, 481:21, 492:23, 506:4, 506:5, 507:15, 509:9, 509:11, 510:11, 515:16, 517:14, 517:16, 519:14, 519:17, 519:20, 519:21, 519:23, 520:7, 520:8, 521:3, 521:4, 521:5, 521:6, 521:7
**clarity** [1] - 461:8
**clean** [2] - 501:25, 502:1
**clear** [7] - 458:1, 458:3, 460:22, 470:7, 500:3, 524:11, 544:14
**clearer** [1] - 460:19
**clearly** [1] - 536:14
**CLERK** [1] - 456:2
**client** [1] - 458:13
**clinical** [1] - 466:24
**clinics** [1] - 506:21
**close** [2] - 505:8, 505:9
**closer** [1] - 472:24
**CMS** [9] - 472:5, 473:14, 473:16, 474:11, 478:25, 519:14, 520:2, 522:1
**CMS-855I** [1] - 511:4
**CMS-assigned** [1] - 520:2
**Coast** [1] - 507:5
**code** [77] - 468:8, 469:15, 469:21, 477:11, 482:2, 482:8, 482:21, 482:23, 483:6, 483:10, 485:20, 485:24, 485:25, 486:2, 486:11,

486:12, 486:13, 486:16, 486:21, 486:22, 486:24, 487:3, 487:4, 487:5, 487:7, 487:9, 487:10, 487:25, 488:1, 493:15, 494:3, 494:7, 496:6, 521:13, 521:18, 521:20, 523:8, 523:19, 525:17, 526:2, 526:6, 526:7, 526:19, 526:23, 528:8, 537:19, 537:20, 537:21, 538:5, 538:6, 538:12, 539:19, 541:6, 543:9, 543:11, 543:17, 543:19, 544:4, 544:9, 544:14, 544:15, 545:3, 545:4, 545:14, 545:15, 546:10, 546:16, 546:21, 547:12, 547:15, 547:19
**coder** [1] - 475:10
**codes** [90] - 463:11, 467:25, 468:4, 468:22, 469:17, 470:8, 474:4, 474:8, 477:16, 477:21, 478:14, 479:2, 481:25, 482:1, 482:7, 482:10, 482:12, 482:16, 482:17, 482:24, 482:25, 483:2, 483:3, 484:15, 484:16, 484:19, 485:16, 486:9, 486:10, 487:7, 493:5, 493:12, 493:13, 493:19, 493:22, 493:24, 494:5, 494:6, 494:11, 495:6, 495:15, 521:14, 521:18, 521:20, 521:24, 523:17, 523:24, 524:2, 524:24, 525:12, 525:24, 526:1, 526:4, 526:8, 526:11, 526:15, 527:13, 532:24, 532:25, 533:1, 534:10, 537:16, 537:18, 538:12, 539:8, 540:25,

541:7, 543:20,
543:21, 543:22,
544:3, 544:22,
544:23, 544:25,
545:1, 545:5, 545:7,
545:12, 545:13,
545:16, 545:17,
545:23, 546:4, 546:5
**coding** [4] - 475:11,
522:1, 522:2, 543:15
**collections** [1] - 480:8
**COLUMBIA** [1] - 454:1
**Columbia** [4] - 472:12,
472:17, 473:9,
473:12
**column** [1] - 468:22
**comfortable** [2] -
497:1, 497:7
**coming** [5] - 461:21,
505:25, 522:12,
530:19, 531:20
**comma** [2] - 538:18,
539:10
**commercial** [1] -
478:24
**common** [2] - 488:6,
541:10
**communicating** [1] -
466:9
**communication** [1] -
514:8
**companies** [3] -
478:15, 478:20,
478:25
**company** [2] - 478:16,
485:21
**compare** [1] - 533:24
**complete** [2] - 467:4,
519:17, 519:24
**completely** [1] -
490:25
**completeness** [1] -
458:17
**compliance** [2] -
515:9, 534:8
**complying** [1] - 515:6
**computer** [3] - 475:21,
485:17, 501:10
**computers** [1] -
487:15
**concentrated** [1] -
469:16
**concerned** [1] -
456:24
**concerns** [1] - 457:20
**concluded** [2] - 466:4,
466:13
**condition** [1] - 486:17
**conditioned** [1] -
515:5

**conditions** [2] -
511:13, 515:9
**conducted** [2] - 464:1,
466:24
**conference** [10] -
464:21, 467:8,
488:20, 489:19,
490:15, 491:22,
495:12, 496:2,
524:9, 525:2
**conferring** [1] - 538:1
**confident** [1] - 544:13
**confirm** [1] - 493:4
**confirming** [1] -
542:21
**confronted** [1] -
460:25
**confusing** [1] - 482:9
**confusion** [1] - 484:15
**Congress** [1] - 497:25
**conjoins** [1] - 529:23
**Connecticut** [1] -
454:21
**connection** [1] -
518:13
**consider** [1] - 460:10
**consideration** [1] -
523:13
**considered** [10] -
522:17, 534:15,
536:17, 536:20,
542:5, 543:3, 543:5,
543:22, 544:4, 544:6
**constitutes** [2] -
520:3, 520:4
**Constitution** [1] -
454:24
**consultation** [1] -
494:2
**consulted** [1] - 494:1
**Cont'............** [1] -
455:3
**contacted** [1] - 473:15
**contain** [1] - 511:10
**contained** [2] - 514:7,
514:8
**containing** [1] -
512:25
**contains** [1] - 513:17
**context** [10] - 457:25,
458:19, 458:21,
458:22, 459:17,
460:12, 460:22,
461:5, 461:13,
466:20
**continue** [1] - 462:13
**CONTINUED** [1] -
462:19
**continuous** [1] -
513:18

**contract** [1] - 506:14
**contracted** [1] -
508:12
**contracting** [1] -
508:16
**contractor** [24] -
466:14, 505:25,
506:3, 506:6, 506:9,
506:10, 506:12,
506:13, 507:2,
507:4, 507:5, 507:6,
507:12, 507:16,
507:19, 508:12,
510:8, 510:10,
510:11, 515:4,
519:14, 521:3,
522:15, 545:19
**contractors** [3] -
508:15, 521:25,
522:9
**contrast** [2] - 542:20,
542:21
**conversation** [1] -
495:6
**conversion** [1] - 523:6
**convey** [1] - 472:16
**conviction** [1] -
520:13
**COOKE** [1] - 454:19
**Cooke** [2] - 454:20,
456:5
**copy** [2] - 456:10,
538:9
**cord** [3] - 540:17,
540:19
**Correct** [3] - 475:22,
479:15, 494:14
**correct** [69] - 457:11,
465:15, 469:18,
469:19, 470:12,
473:18, 474:9,
474:10, 474:23,
475:3, 477:2, 477:5,
477:7, 477:8, 479:2,
479:3, 479:6,
479:12, 479:14,
479:22, 480:15,
481:1, 482:14,
484:19, 484:23,
485:1, 485:2, 485:6,
485:9, 485:10,
485:13, 485:14,
485:15, 485:19,
485:23, 486:12,
486:20, 487:1,
487:2, 487:5,
487:24, 488:2,
488:3, 490:4,
492:18, 493:3,
493:11, 494:22,

494:23, 495:5,
501:8, 506:8,
509:19, 509:20,
510:2, 510:25,
512:18, 516:12,
521:17, 526:16,
526:19, 528:4,
528:7, 528:10,
535:21, 536:15,
541:24, 548:15,
550:4
**correctional** [1] -
506:21
**Correctional** [1] -
506:24
**correctly** [2] - 477:11,
484:22
**cost** [4] - 509:4, 523:5,
523:10, 523:14
**costs** [1] - 537:4
**counsel** [4] - 456:8,
465:21, 488:15,
492:15
**count** [2] - 500:20,
504:2
**country** [2] - 509:6,
509:8
**couple** [6] - 457:2,
459:12, 470:18,
500:21, 500:22,
503:6
**course** [2] - 481:22,
510:12
**court** [4] - 460:4,
490:3, 490:5, 522:12
**Court** [8] - 454:23,
457:5, 458:15,
458:24, 460:1,
514:21, 524:11,
550:3
**COURT** [128] - 454:1,
456:8, 456:17,
457:1, 457:9,
457:13, 457:16,
458:6, 458:16,
458:25, 459:3,
459:21, 460:3,
460:15, 460:17,
460:24, 461:10,
461:19, 461:23,
462:3, 462:17,
464:3, 464:13,
464:24, 465:4,
465:7, 465:10,
465:17, 465:23,
466:6, 466:18,
467:1, 467:7, 468:8,
468:13, 469:4,
469:6, 470:17,
470:22, 471:1,

471:3, 471:7,
471:24, 472:23,
473:21, 476:16,
476:21, 477:12,
479:17, 479:23,
480:3, 481:6, 481:8,
482:5, 483:20,
483:22, 484:3,
484:5, 484:11,
488:10, 488:17,
488:21, 489:3,
489:9, 489:18,
489:24, 490:8,
490:14, 490:16,
490:23, 491:3,
491:12, 491:16,
491:23, 492:8,
495:13, 495:18,
495:21, 495:25,
496:10, 496:14,
496:17, 497:4,
497:18, 499:21,
500:11, 502:10,
503:3, 503:12,
503:22, 504:12,
504:14, 504:20,
504:25, 505:4,
505:7, 505:15,
511:16, 511:18,
514:15, 514:19,
514:22, 516:17,
516:19, 518:2,
518:4, 518:17,
518:20, 522:11,
524:8, 524:10,
524:15, 524:22,
524:25, 525:5,
529:1, 529:4, 529:7,
532:9, 533:16,
535:5, 537:25,
538:22, 538:24,
547:4, 547:6,
548:18, 548:22
**Court's** [1] - 537:24
**court's** [3] - 470:13,
495:9, 500:9
**courthouse** [2] -
548:25, 549:6
**Courthouse** [1] -
454:24
**courthouses** [1] -
549:1
**cover** [2] - 521:21,
545:10
**coverage** [6] - 494:15,
507:16, 522:5,
522:7, 522:8, 522:15
**covered** [3] - 509:18,
522:16, 540:19
**CPT** [13] - 521:14,

521:17, 521:24,
523:17, 525:17,
534:10, 537:16,
537:18, 538:10,
543:21, 544:7,
545:6, 545:14
**CR** [1] - 454:4
**create** [7] - 527:5,
528:17, 530:1,
530:20, 535:12,
536:9, 540:12
**credenza** [1] - 463:19
**credit** [1] - 461:17
**criminal** [2] - 456:2,
514:10
**CROSS** [2] - 471:9,
500:13
**Cross** [5] - 455:4,
455:6, 478:17,
478:18, 498:2
**cross** [13] - 456:13,
457:18, 461:25,
470:18, 471:7,
488:21, 492:15,
495:19, 495:22,
500:11, 524:17,
548:19, 548:24
**CROSS-
EXAMINATION** [2] -
471:9, 500:13
**cross-examination**
[10] - 456:13, 457:18,
461:25, 471:7,
495:19, 495:22,
500:11, 524:17,
548:19, 548:24
**Cross-Examination..
.................** [2] -
455:4, 455:6
**cross-examine** [1] -
488:21
**CRR** [1] - 454:23
**CT** [13] - 525:21,
527:22, 533:2,
533:25, 534:2,
534:5, 534:11,
534:13, 537:17,
538:17, 541:10,
542:6, 544:12
**cuff** [1] - 499:24
**cure** [1] - 539:25
**current** [1] - 538:10
**cushion** [1] - 530:11
**cushioning** [1] -
528:18
**cut** [1] - 458:2

# D

**D.C** [5] - 454:5,
497:13, 497:16,
506:7, 507:11
**damages** [1] - 514:13
**data** [3] - 517:13,
517:15, 519:1
**date** [6] - 457:6,
463:17, 473:10,
485:8, 485:19,
485:22
**dated** [1] - 515:24
**dating** [1] - 457:9
**DAY** [1] - 454:9
**DC** [3] - 454:14,
454:22, 454:25
**DCMS** [1] - 472:11
**deal** [2] - 462:10,
526:20
**dealing** [2] - 456:9,
546:12
**decide** [2] - 508:13,
522:20
**decision** [3] - 465:13,
478:24, 494:5
**decisions** [1] - 470:7
**decrease** [1] - 541:16
**deemed** [1] - 544:10
**deep** [1] - 503:4
**defeat** [2] - 490:7,
490:20
**Defendant** [2] - 454:7,
454:16
**defendant** [4] - 465:8,
465:9, 465:16,
494:24
**defendant's** [2] -
464:22, 465:4
**defense** [3] - 459:22,
460:8, 492:15
**define** [1] - 522:16
**definitely** [1] - 473:15
**degeneration** [1] -
532:25
**delay** [1] - 462:4
**delegated** [1] - 513:16
**deliberate** [3] - 514:6,
514:9, 515:16
**demonstrate** [1] -
537:23
**demonstrative** [4] -
529:3, 529:5, 529:8,
535:18
**denial** [1] - 514:12
**denials** [1] - 469:15
**denied** [5] - 469:18,
469:23, 476:11,
476:12, 513:22

**deny** [2] - 546:5, 546:8
**Department** [2] -
454:13, 466:16
**depended** [2] - 483:6,
483:10
**depict** [1] - 537:23
**DEPUTY** [1] - 456:2
**derivative** [2] -
546:22, 547:21
**derivatives** [1] - 548:2
**describe** [9] - 499:3,
521:11, 521:18,
521:21, 528:5,
528:12, 534:20,
539:22, 540:16
**described** [4] - 523:9,
530:22, 539:5,
545:14
**describes** [1] - 546:21
**describing** [2] -
529:18, 539:6
**description** [4] -
525:17, 526:13,
539:7, 539:8
**descriptions** [5] -
523:24, 524:1,
525:12, 537:24,
538:4
**descriptor** [9] -
525:18, 525:23,
526:2, 526:9,
527:19, 538:11,
538:13, 539:13,
547:16
**descriptors** [2] -
526:18, 547:15
**designated** [1] -
519:14
**desk** [1] - 472:22
**destroy** [5] - 532:3,
532:11, 532:13,
532:16, 536:10
**destroyed** [2] -
532:13, 532:17
**destroying** [4] -
531:25, 541:11,
541:19, 541:22
**destroys** [1] - 541:20
**Destruction** [1] -
525:19
**destruction** [11] -
526:3, 527:20,
527:21, 531:23,
532:12, 532:20,
536:8, 541:7, 545:4,
545:6
**destructions** [1] -
536:7
**detail** [1] - 536:4
**determination** [6] -

465:24, 466:15,
522:7, 522:8,
522:15, 544:8
**determinations** [3] -
494:16, 507:17,
522:5
**determine** [7] - 473:8,
477:16, 477:21,
478:14, 481:11,
481:15, 487:16
**detriment** [1] - 483:17
**develop** [1] - 545:20
**device** [1] - 501:13
**devices** [1] - 548:3
**diagnoses** [1] - 487:6
**diagnosing** [1] -
486:18
**diagnosis** [13] -
476:12, 486:22,
486:24, 487:4,
487:10, 487:25,
493:12, 493:15,
493:19, 493:22,
494:6, 521:14,
521:15
**Diercks** [1] - 454:20
**difference** [2] - 541:6,
541:11
**differences** [1] -
526:15
**different** [14] - 457:23,
468:11, 475:11,
482:25, 503:20,
503:25, 508:3,
523:5, 526:10,
526:13, 530:5,
545:2, 546:15
**diminish** [1] - 541:13
**DIRECT** [3] - 462:19,
496:20, 505:17
**direct** [7] - 461:24,
472:4, 488:24,
492:25, 494:20,
502:4, 524:18
**Direct** [3] - 455:3,
455:6, 455:8
**direction** [2] - 504:5,
507:20
**directions** [3] - 476:8,
503:25, 507:18
**director** [11] - 505:25,
506:9, 506:10,
506:12, 506:23,
506:25, 507:2,
507:4, 507:5,
507:12, 507:16
**disabilities** [1] -
507:24
**disability** [1] - 509:16
**disc** [3] - 528:14,

530:8, 530:10
**discs** [1] - 528:19
**disease** [2] - 506:21,
507:25
**disregard** [2] - 491:23,
515:17
**distinct** [1] - 526:17
**DISTRICT** [3] - 454:1,
454:1, 454:10
**District** [4] - 472:12,
472:17, 473:9,
473:11
**Doctor** [1] - 518:20
**doctor** [19] - 476:11,
485:25, 486:16,
493:1, 494:5,
498:10, 506:19,
509:22, 509:23,
510:1, 510:5, 510:6,
511:11, 514:15,
514:16, 548:24
**doctors** [3] - 510:17,
510:22, 511:12
**document** [1] - 517:9
**documentation** [1] -
494:4
**documents** [3] -
463:20, 510:12,
510:14
**done** [8] - 462:7,
470:2, 485:18,
489:2, 493:1, 505:9,
533:1, 545:8
**door** [2] - 471:4,
489:11
**dorsal** [2] - 527:6,
531:20
**double** [1] - 465:12
**doubt** [1] - 460:4
**down** [11] - 469:25,
486:7, 487:9, 493:6,
496:16, 503:11,
505:6, 520:22,
522:11, 527:13,
549:2
**downcoded** [1] -
482:2
**Dr** [101] - 456:12,
457:7, 457:21,
458:4, 458:11,
458:12, 459:2,
459:5, 459:8,
459:13, 461:11,
463:2, 463:9,
463:19, 463:21,
464:8, 464:10,
467:2, 467:17,
469:12, 469:20,
470:11, 471:15,
472:9, 472:16,

473:5, 473:8, 474:4,
474:9, 474:14,
474:16, 474:19,
475:1, 475:14,
475:16, 477:4,
477:11, 477:17,
480:7, 480:17,
480:25, 481:11,
481:15, 481:18,
481:23, 482:20,
482:23, 483:11,
483:14, 483:25,
484:8, 485:12,
487:8, 488:14,
488:22, 488:23,
490:7, 490:12,
491:7, 491:11,
492:2, 493:5,
493:23, 494:13,
494:20, 498:6,
498:10, 498:12,
498:18, 498:25,
499:4, 499:16,
500:17, 500:19,
500:25, 501:3,
501:7, 501:23,
502:4, 504:1,
505:14, 505:24,
510:15, 511:2,
511:22, 512:14,
513:12, 514:2,
516:10, 518:24,
520:23, 524:13,
525:12, 529:13,
533:21, 537:23,
538:3, 540:9,
546:20, 547:10
**dura** [1] - 540:20
**during** [5] - 474:21,
524:4, 524:24,
534:24, 544:19
**duties** [1] - 507:13
**dye** [1] - 536:3

## E

**E&M** [1] - 487:7
**easier** [1] - 497:4
**echo** [1] - 537:9
**EDI** [7] - 517:10,
517:12, 517:20,
517:21, 517:22,
518:13, 519:4
**edits** [1] - 546:5
**education** [3] - 475:8,
506:17, 521:25
**effect** [1] - 466:17
**effective** [5] - 536:17,
536:20, 543:1,
543:3, 543:25

**effectively** [1] - 534:17
**effort** [2] - 474:3,
484:16
**efforts** [3] - 477:6,
484:18, 484:21
**eight** [2] - 475:15
**either** [2] - 512:20,
549:1
**elaborate** [1] - 476:3
**elderly** [1] - 507:24
**electronic** [9] -
475:25, 487:16,
516:10, 516:23,
517:13, 517:15,
517:16, 518:25,
520:4
**electronically** [2] -
485:1, 516:25
**element** [1] - 523:1
**elicit** [4] - 490:21,
491:8, 524:17,
524:18
**elicited** [1] - 490:18
**eliciting** [3] - 466:19,
491:6, 491:12
**eligible** [1] - 498:4
**email** [6] - 456:10,
456:11, 457:8,
457:14, 467:23,
489:1
**emailed** [1] - 457:10
**emerging** [1] - 543:23
**emit** [1] - 534:7
**employees** [1] -
519:15
**end** [4] - 507:25,
523:6, 537:10,
537:13
**End** [5] - 467:8,
489:19, 491:22,
496:2, 525:2
**end-stage** [1] - 507:25
**ended** [1] - 475:16
**enjoy** [1] - 549:6
**enlarge** [9] - 513:9,
513:24, 514:1,
514:14, 515:12,
515:21, 519:11,
519:16, 519:25
**enrolled** [3] - 509:23,
509:25, 510:17
**enrolling** [2] - 511:5,
516:3
**enrollment** [14] -
510:11, 510:14,
510:21, 510:22,
511:3, 512:3, 512:4,
513:5, 513:18,
516:1, 517:21,
517:23, 519:1, 519:4

**enter** [3] - 540:3,
540:4, 540:13
**entering** [1] - 540:10
**entire** [2] - 459:6,
459:11
**entities** [2] - 475:24,
477:15
**entitled** [4] - 459:9,
459:10, 459:23,
550:5
**entry** [1] - 513:22
**epidural** [11] - 538:15,
538:17, 539:24,
540:5, 540:15,
540:16, 540:21,
542:18, 542:20,
542:22
**equate** [1] - 523:4
**equation** [2] - 522:23,
523:1
**equipment** [1] - 537:3
**ERICA** [2] - 455:3,
462:18
**Erica** [1] - 462:16
**Erika** [1] - 459:2
**ESQ** [4] - 454:12,
454:13, 454:16,
454:19
**ESRD** [1] - 509:15
**essentially** [1] - 528:5
**estimate** [3] - 477:20,
502:25, 503:5
**evaluated** [1] - 487:15
**evaluating** [1] -
486:17
**evaluation** [2] -
486:13, 486:15
**evidence** [13] -
456:14, 468:18,
473:22, 481:8,
491:15, 511:20,
516:21, 518:6,
525:7, 529:11,
533:18, 539:2, 547:8
**exact** [1] - 473:10
**exactly** [3] - 487:13,
489:9, 491:12
**exam** [2] - 470:1,
501:6
**EXAMINATION** [8] -
462:19, 471:9,
492:11, 496:3,
496:20, 500:13,
504:15, 505:17
**examination** [11] -
456:13, 457:18,
461:25, 471:7,
488:24, 495:19,
495:22, 500:11,
524:17, 548:19,

548:24
**Examination** [1] -
455:3
**Examination............**
**...** [2] - 455:4, 455:7
**Examination............**
**....** [1] - 455:5
**Examination............**
**......** [2] - 455:6, 455:8
**Examination............**
**.......** [2] - 455:4, 455:6
**examine** [1] - 488:21
**examined** [2] -
488:21, 501:7
**example** [7] - 457:20,
469:20, 516:13,
517:20, 526:5,
533:21, 542:17
**examples** [1] - 484:8
**exception** [1] - 465:11
**exceptions** [1] -
465:25
**exchange** [5] -
456:11, 458:9,
461:12, 484:1
**excuse** [3] - 470:19,
489:5, 544:24
**executive** [1] - 507:5
**Exhibit** [48] - 455:11,
455:12, 455:12,
455:13, 455:13,
455:14, 455:14,
455:15, 468:17,
469:3, 471:22,
511:1, 511:2,
511:15, 511:19,
516:7, 516:16,
516:20, 517:3,
517:18, 518:1,
518:5, 518:8,
518:25, 525:6,
525:10, 525:22,
527:16, 528:21,
528:23, 529:7,
529:10, 529:16,
533:9, 533:10,
533:14, 533:17,
533:20, 537:22,
537:23, 538:3,
538:21, 539:1,
540:7, 543:8,
546:19, 547:3, 547:7
**exhibit** [18] - 466:22,
472:2, 472:5,
472:15, 472:21,
473:2, 473:6,
473:11, 512:13,
513:5, 515:20,
517:4, 520:16,
531:7, 535:19,

540:8, 545:22
**Exhibits** [4] - 523:21,
523:23, 524:7, 525:3
**exhibits** [3] - 470:19,
470:23, 535:6
**EXHIBITS** [1] - 455:10
**exist** [1] - 497:18
**exit** [1] - 545:22
**expect** [1] - 532:16
**expense** [3] - 522:24,
523:15, 537:2
**experienced** [3] -
457:1, 474:24,
476:24
**experimental** [1] -
544:1
**explain** [6] - 458:22,
461:14, 528:23,
530:4, 531:14, 536:4
**explanation** [5] -
476:17, 481:13,
487:20, 487:21,
540:9

## F

**fabricate** [1] - 493:20
**facet** [16] - 525:20,
525:21, 526:21,
527:1, 527:5,
527:12, 527:20,
527:23, 528:11,
528:13, 529:17,
531:22, 532:1,
536:7, 536:9
**facets** [1] - 536:13
**facilities** [2] - 508:7,
508:9
**facility** [1] - 508:8
**fact** [1] - 481:25
**factor** [1] - 523:6
**factors** [1] - 523:3
**facts** [2] - 473:21,
481:8
**fair** [6] - 460:11,
517:22, 523:9,
527:24, 548:6
**faith** [2] - 481:2,
481:20
**false** [1] - 515:14
**falsification** [1] -
514:7
**falsified** [1] - 520:11
**falsifies** [1] - 520:10
**falsifying** [1] - 514:4
**falsity** [1] - 515:17
**familiar** [6] - 523:16,
533:3, 534:23,
537:19, 537:21,

546:16
**family** [1] - 539:9
**fancy** [1] - 537:6
**far** [5] - 470:23,
502:18, 502:20,
503:11, 540:25
**fashion** [1] - 525:25
**fastest** [1] - 532:19
**fault** [1] - 462:9
**FBI** [1] - 489:21
**FDA** [1] - 548:3
**features** [2] - 528:24,
537:14
**federal** [4] - 507:22,
515:8, 520:8, 520:14
**fee** [6] - 463:17, 506:5,
508:25, 509:1,
515:4, 522:22
**fee-for-service** [2] -
506:5, 515:4
**few** [3] - 468:9, 470:3,
514:1
**figure** [4] - 479:1,
480:22, 481:3,
484:22
**finally** [1] - 520:6
**financial** [1] - 483:17
**fine** [5] - 471:3, 474:7,
480:3, 520:13,
548:21
**fines** [1] - 514:13
**finished** [1] - 461:24
**firm** [1] - 497:25
**Firm** [1] - 454:16
**first** [11] - 459:7,
459:10, 461:21,
467:24, 470:4,
499:6, 513:9,
525:11, 526:21,
531:15, 539:5
**First** [1] - 507:5
**five** [5] - 470:21,
470:22, 506:11,
531:5
**flat** [1] - 530:17
**flexibility** [1] - 528:18
**Florida** [3] - 507:3,
507:7, 507:10
**fluor** [1] - 537:11
**fluoroscopic** [8] -
533:11, 534:13,
535:22, 536:14,
536:24, 537:17,
542:1, 544:11
**fluoroscopy** [19] -
494:22, 496:5,
525:20, 527:22,
533:2, 533:3, 533:4,
533:6, 533:12,
533:22, 533:24,

534:5, 534:11,
534:23, 537:5,
537:12, 538:17,
541:10, 542:6
**fluoroscopy-guided**
[1] - 541:10
**focusing** [1] - 508:21
**follow** [1] - 529:8
**following** [2] - 476:8,
526:8
**follows** [4] - 478:24,
513:13, 514:3,
514:24
**font** [1] - 538:14
**FOR** [4] - 454:1,
462:18, 496:19,
505:16
**foramen** [7] - 540:1,
540:5, 540:11,
542:8, 542:9, 542:10
**foregoing** [1] - 550:4
**forgot** [1] - 495:21
**form** [11] - 475:23,
512:13, 513:5,
514:10, 516:13,
517:20, 517:21,
517:23, 518:13,
519:4, 530:24
**formed** [1] - 540:1
**forms** [10] - 510:19,
510:21, 510:22,
510:23, 511:6,
511:10, 512:25,
516:1, 516:5, 516:10
**forth** [2] - 466:15,
478:19
**foundation** [3] -
489:10, 489:15,
489:25
**four** [2] - 462:15,
519:10
**frankly** [2] - 456:16,
490:23
**fraudulent** [1] -
515:15
**Frederick** [8] - 456:3,
456:5, 498:6,
510:15, 515:24,
518:11, 518:14,
520:21
**FREDERICK** [2] -
454:6, 454:19
**free** [3] - 496:11,
505:4, 524:17
**front** [4] - 475:20,
490:24, 529:14,
529:16
**full** [2] - 538:11, 549:3
**functioning** [1] -
532:15

**funded** [1] - 508:1
**funds** [3] - 516:10,
516:23, 520:8
**future** [2] - 456:23,
543:24

## G

**gather** [1] - 543:23
**gauge** [1] - 461:13
**gel** [2] - 501:21,
501:23
**Gel** [6] - 468:11,
469:15, 547:1,
547:11, 547:14,
547:18
**Gel-One** [6] - 468:11,
469:15, 547:1,
547:11, 547:14,
547:18
**generally** [2] - 507:21,
524:16
**generosity** [2] -
483:15, 484:9
**generous** [2] - 483:11,
489:12
**gentlemen** [3] - 462:3,
470:17, 548:25
**geo** [1] - 523:6
**geographic** [1] - 523:3
**geographically** [1] -
507:9
**given** [2] - 492:18,
492:22
**goals** [1] - 479:13
**gold** [2] - 542:7,
544:10
**Gooding** [71] - 456:4,
456:6, 456:12,
457:21, 458:4,
459:2, 459:5, 459:8,
459:13, 463:2,
463:21, 464:8,
464:10, 467:2,
469:20, 470:11,
472:9, 472:16,
473:5, 473:8,
474:14, 474:16,
475:1, 475:14,
475:16, 477:4,
480:7, 481:11,
481:15, 481:18,
481:23, 482:20,
482:23, 483:11,
483:14, 483:25,
485:12, 487:8,
488:14, 488:22,
488:23, 490:7,
490:12, 491:7,

491:11, 492:2,
493:5, 493:23,
494:13, 494:20,
498:6, 498:10,
498:12, 498:18,
498:25, 499:4,
499:16, 500:19,
500:25, 501:3,
501:7, 501:23,
502:4, 504:1,
510:15, 515:24,
518:11, 518:14,
520:21, 524:13
**GOODING** [1] - 454:6
**Gooding's** [18] -
457:7, 458:11,
458:12, 461:11,
463:9, 463:19,
467:17, 469:12,
471:15, 474:4,
474:9, 474:19,
477:11, 477:17,
480:17, 480:25,
484:8, 500:17
**government** [29] -
456:5, 456:23,
457:3, 457:4,
457:11, 458:20,
459:17, 460:7,
460:8, 460:12,
461:18, 462:16,
466:7, 470:15,
471:22, 471:23,
490:4, 496:17,
496:18, 505:13,
508:1, 511:14,
516:15, 517:25,
524:6, 533:3,
538:1, 538:20, 547:2
**Government** [20] -
454:12, 455:11,
455:12, 455:12,
455:13, 455:13,
455:14, 455:14,
455:15, 511:19,
516:20, 518:5,
518:25, 524:7,
525:6, 529:10,
533:14, 533:17,
539:1, 547:7
**GOVERNMENT** [3] -
462:18, 496:19,
505:16
**Government's** [3] -
516:7, 520:18,
527:16
**government's** [1] -
459:23
**government-funded**
[1] - 508:1

**gracious** [1] - 471:23
**great** [2] - 471:20,
489:13
**group** [3] - 459:4,
460:23, 479:8
**guidance** [30] -
478:21, 494:22,
507:17, 507:20,
521:23, 522:1,
525:20, 527:21,
533:2, 534:13,
536:18, 536:21,
536:24, 537:17,
538:17, 542:1,
543:2, 543:6,
543:15, 543:16,
544:12, 544:13,
544:15, 544:18,
545:1, 545:2, 545:5
**guided** [4] - 534:16,
541:10, 542:6,
543:18
**guidelines** [1] - 494:5
**guilt** [1] - 491:9
**guilty** [1] - 491:5
**guy** [1] - 489:13

## H

**half** [1] - 459:5
**hand** [5] - 461:18,
504:22, 505:1,
505:12, 527:9
**handing** [1] - 461:4
**handle** [1] - 534:8
**handwriting** [4] -
467:17, 467:20,
467:22, 469:12
**hard** [2] - 471:17,
504:4
**Harris** [1] - 454:20
**HCPCS** [1] - 546:21
**head** [4] - 474:19,
475:1, 477:19,
503:13
**health** [3] - 498:1,
507:22, 507:23
**Health** [2] - 466:16,
506:24
**hear** [3] - 472:24,
497:5
**heard** [1] - 467:2
**hearing** [2] - 471:18,
489:16
**hearsay** [9] - 464:2,
464:12, 464:20,
464:23, 465:3,
465:10, 465:12,
465:13, 465:25

**help** [4] - 504:18, 528:23, 540:9, 542:11
**helped** [1] - 483:25
**helping** [1] - 501:4
**hepatitis** [1] - 506:22
**herself** [1] - 512:8
**hi** [2] - 459:8, 496:23
**hide** [1] - 460:1
**high** [1] - 537:10
**higher** [1] - 537:14
**himself** [1] - 512:8
**hip** [1] - 548:11
**hire** [1] - 479:13
**hit** [6] - 534:17, 534:21, 536:2, 542:8, 542:9, 542:11
**hits** [1] - 530:1
**hitting** [1] - 536:9
**HIV** [1] - 506:22
**hold** [3] - 461:4, 489:5, 529:1
**hole** [4] - 540:1, 540:4, 540:13, 540:14
**home** [1] - 463:21
**honesty** [1] - 460:1
**Honor** [40] - 456:2, 456:16, 459:25, 461:7, 462:1, 466:22, 467:6, 468:15, 468:19, 470:21, 471:22, 473:20, 476:14, 481:5, 481:7, 481:9, 482:3, 483:19, 484:10, 488:9, 488:16, 489:5, 489:23, 490:13, 491:21, 492:7, 492:10, 495:11, 496:9, 496:15, 500:12, 503:2, 503:21, 504:13, 505:2, 514:17, 518:3, 525:3, 538:23, 547:5
**HONORABLE** [1] - 454:10
**hope** [3] - 459:12, 462:12, 491:17
**hospitals** [1] - 508:8
**house** [1] - 534:6
**human** [1] - 528:20
**Human** [1] - 466:16
**hundred** [1] - 477:25
**hyaluronan** [3] - 546:22, 547:21, 548:2
**hypothetical** [1] - 487:9

**I**

**ID** [2] - 485:7, 485:8
**idea** [2] - 532:13, 539:25
**identifiable** [2] - 546:3, 546:7
**identifier** [3] - 512:1, 520:2, 520:3
**identifies** [1] - 545:15
**identify** [4] - 521:13, 521:14, 531:1, 531:5
**identifying** [2] - 485:5, 547:17
**ignorance** [1] - 515:16
**Ill** [2] - 543:21, 543:22
**ill** [1] - 491:7
**image** [6] - 533:2, 534:16, 535:12, 535:16, 542:6, 545:1
**imagine** [1] - 479:24
**imaging** [10] - 525:20, 527:21, 534:11, 536:18, 537:16, 538:17, 542:11, 542:13, 543:2, 543:5
**immediately** [1] - 461:13
**impeach** [4] - 457:18, 458:17, 459:16, 490:18
**impeaching** [1] - 489:14
**impeachment** [1] - 456:13
**important** [1] - 521:17
**imposition** [1] - 514:13
**impressed** [1] - 483:11
**imprisonment** [2] - 514:13, 520:13
**improper** [4] - 490:16, 490:21, 490:25, 491:18
**inaccurate** [1] - 477:1
**inches** [4] - 502:20, 502:25, 503:6
**inclined** [2] - 460:10, 460:11
**include** [3] - 463:11, 519:4, 523:13
**includes** [1] - 506:7
**including** [4] - 477:16, 506:17, 514:11, 515:7
**increase** [2] - 482:21, 482:24
**independently** [2] -

465:15, 466:4
**indicated** [2] - 479:7, 502:4
**individual** [4] - 512:23, 512:24, 513:10, 513:13
**indulgence** [4] - 470:13, 495:9, 500:9, 537:24
**infectious** [1] - 506:20
**inferior** [8] - 527:4, 528:16, 529:21, 529:23, 530:13, 530:18, 530:21, 540:2
**inflamed** [1] - 541:16
**inflammation** [2] - 541:14, 541:16
**information** [15] - 485:3, 485:5, 493:21, 494:8, 494:9, 494:21, 494:25, 514:5, 514:7, 514:8, 516:24, 520:11, 522:2, 524:23, 543:24
**ingrown** [1] - 487:10
**initial** [3] - 460:21, 469:23, 513:18
**inject** [4] - 540:5, 540:14, 540:23, 542:22
**injected** [1] - 502:4
**injection** [17] - 486:12, 496:6, 499:19, 500:1, 500:4, 500:6, 501:7, 501:8, 523:16, 534:21, 535:24, 538:16, 539:24, 541:2, 541:22, 546:22, 548:7
**injections** [13] - 468:11, 474:5, 474:9, 477:11, 477:17, 494:21, 495:3, 498:25, 499:9, 499:11, 541:4, 543:2, 547:20
**innocence** [1] - 491:9
**innocent** [2] - 490:21, 491:4
**innovative** [1] - 544:2
**inquiring** [1] - 480:10
**inserting** [4] - 535:25, 536:3, 541:23, 544:19
**inside** [1] - 503:19
**instance** [1] - 482:20

**instructions** [3] - 515:1, 515:3, 515:7
**insurance** [11] - 474:22, 476:5, 478:15, 478:16, 478:20, 478:24, 478:25, 485:21, 488:7, 498:1, 507:23
**intending** [1] - 457:17
**interchange** [1] - 519:1
**internal** [1] - 506:20
**interpretation** [1] - 541:9
**interventional** [1] - 495:2
**intervertebral** [1] - 528:19
**interviewed** [1] - 489:21
**intra** [1] - 546:22
**intra-articular** [1] - 546:22
**invading** [1] - 491:19
**involve** [1] - 541:1
**involved** [3] - 475:4, 475:13, 475:17
**irradiates** [1] - 535:10
**irrelevant** [1] - 466:5
**Irvine** [1] - 454:18
**Islands** [3] - 507:1, 507:3, 507:7
**isolate** [1] - 458:20
**issue** [2] - 456:10, 500:24
**issues** [1] - 468:4
**it'll** [2] - 460:18, 497:15
**items** [1] - 548:2
**itself** [3] - 484:25, 519:15, 542:9

**J**

**J3726** [2] - 546:17, 546:20
**J7321** [1] - 547:19
**J7326** [5] - 546:24, 547:10, 547:25, 548:7, 548:13
**Jacksonville** [1] - 507:10
**JIL** [1] - 454:13
**Jil** [1] - 456:4
**Jill** [1] - 546:21
**Jillian** [1] - 456:4
**JILLIAN** [1] - 454:12
**job** [6] - 480:21, 480:23, 480:24,

480:25, 492:3, 541:18
**joining** [3] - 505:24, 507:8, 507:9
**joint** [13] - 525:20, 525:21, 526:21, 527:1, 527:6, 527:20, 527:23, 528:11, 528:13, 532:1, 536:7, 536:9
**joints** [4] - 527:12, 529:17, 530:11, 531:22
**Jr** [1] - 456:6
**JR** [1] - 454:19
**Juan** [2] - 505:14, 505:22
**JUAN** [2] - 455:8, 505:16
**JUDGE** [1] - 454:10
**judge's** [1] - 468:23
**jurisdiction** [3] - 506:8, 507:6, 522:16
**jurisdictions** [1] - 506:4
**jurors** [1] - 479:25
**JURY** [1] - 454:9
**jury** [15] - 461:23, 462:2, 467:2, 467:11, 472:25, 486:15, 490:24, 491:19, 491:23, 497:5, 507:21, 517:3, 524:12, 529:8, 539:7
**Justice** [1] - 454:13

**K**

**keep** [3] - 479:23, 501:3, 510:19
**KHOURI** [90] - 454:16, 456:15, 456:20, 457:4, 457:10, 457:15, 458:10, 458:24, 459:1, 459:19, 459:25, 460:13, 461:16, 464:2, 464:12, 464:20, 465:12, 465:21, 466:2, 466:12, 471:8, 471:10, 471:25, 472:1, 473:1, 473:23, 476:14, 476:23, 477:13, 477:14, 479:18, 480:6, 481:7, 481:9, 481:10, 482:4,

482:6, 483:19,
483:21, 483:23,
483:24, 484:4,
484:6, 484:7,
484:12, 484:13,
488:11, 488:12,
488:15, 489:1,
489:4, 489:17,
489:20, 490:2,
490:10, 490:22,
491:1, 491:10,
491:14, 491:21,
492:1, 492:6,
495:11, 495:15,
495:20, 495:24,
496:1, 496:4, 496:9,
499:20, 500:12,
500:14, 502:11,
502:13, 502:14,
503:7, 503:17,
503:24, 504:10,
511:17, 516:18,
518:3, 524:11,
524:20, 525:1,
529:6, 533:15,
538:23, 547:5,
548:21
**Khouri** [27] - 454:16,
456:6, 456:12,
457:9, 458:7, 461:3,
461:10, 465:10,
466:18, 470:17,
471:7, 471:14,
472:23, 476:22,
477:12, 484:3,
488:17, 489:6,
490:8, 490:14,
492:8, 500:17,
503:12, 524:8,
524:10, 524:25,
548:19
**Khouri's** [1] - 476:17
**kickback** [1] - 515:8
**kind** [6] - 489:10,
498:22, 501:13,
530:15, 536:3, 536:4
**knee** [5] - 546:23,
548:4, 548:5, 548:8,
548:14
**knowing** [2] - 459:17,
475:9
**knowingly** [3] - 466:7,
466:8, 515:14

# L

**L4-L5** [1] - 530:22
**lack** [1] - 461:8
**ladies** [3] - 462:3,
470:17, 548:25

**landmarks** [1] - 536:1
**large** [1] - 534:19
**last** [5] - 457:4,
491:23, 505:22,
517:3, 532:21
**late** [3] - 456:9, 462:7,
462:10
**Law** [1] - 454:16
**law** [6] - 466:8,
466:15, 497:25,
507:23, 515:8,
520:14
**laws** [3] - 514:25,
515:2, 515:6
**lawyer** [4] - 457:1,
458:12, 459:22,
460:8
**lawyers** [3] - 462:8,
471:15, 500:18
**lay** [3] - 489:9, 489:15,
489:24
**LCDs** [2] - 494:15,
522:4
**least** [1] - 532:19
**leave** [4] - 470:25,
478:10, 480:8, 505:4
**leaving** [1] - 497:1
**lectern** [1] - 456:22
**left** [7] - 467:15, 499:5,
499:13, 502:8,
504:22, 505:1,
518:24
**leg** [1] - 548:11
**legal** [2] - 462:11,
520:4
**legitimate** [2] -
458:10, 481:4
**less** [5] - 469:16,
482:16, 483:2,
483:5, 483:8
**letter** [12] - 464:5,
464:8, 464:25,
465:2, 465:13,
466:19, 466:25,
467:3, 467:4, 492:2,
531:3
**letters** [3] - 486:3,
486:6, 486:24
**level** [5] - 465:13,
538:7, 539:11,
539:12, 539:20
**library** [1] - 497:24
**Library** [1] - 497:24
**likewise** [1] - 496:15
**limited** [6] - 508:18,
514:11, 515:7,
524:12, 547:25,
549:4
**line** [1] - 519:1
**lines** [2] - 509:9,

509:11
**list** [4] - 466:22, 487:6,
494:6, 513:1
**listed** [5] - 463:16,
513:21, 515:2,
544:8, 544:9
**live** [4] - 478:7,
497:12, 497:16,
507:10
**lived** [1] - 497:14
**living** [1] - 523:5
**LLP** [1] - 454:20
**local** [4] - 494:15,
522:5, 522:7, 522:14
**locally** [1] - 522:16
**located** [1] - 527:6
**location** [2] - 510:18,
526:2
**locations** [2] - 510:24,
511:7
**look** [18] - 457:21,
458:12, 458:18,
460:13, 460:16,
460:19, 460:24,
461:1, 461:3,
461:11, 461:24,
468:21, 470:19,
470:23, 472:15,
507:16, 535:25,
544:20
**looked** [2] - 468:19,
534:18
**looking** [10] - 472:15,
511:2, 530:6,
533:21, 535:4,
535:14, 535:15,
535:23, 539:15
**looks** [6] - 460:21,
472:5, 501:13,
533:11, 535:2, 535:9
**lost** [2] - 549:1, 549:2
**loved** [1] - 498:19
**low** [1] - 537:13
**lower** [8] - 482:7,
498:20, 498:22,
498:25, 528:3,
528:6, 528:8, 529:24
**lucky** [1] - 548:25
**lumbar** [11] - 527:11,
527:22, 528:2,
530:23, 531:4,
531:5, 538:6,
538:19, 539:12,
539:18
**lumbosacral** [1] -
527:7
**Lunch** [1] - 549:8
**lunch** [5] - 505:7,
505:8, 548:18,
548:22, 549:6

# M

**M-C-D-U-F-F-I-E** [1] -
497:11
**M480** [1] - 493:16
**ma'am** [7] - 471:5,
476:20, 489:21,
497:2, 497:14,
499:22, 504:3
**machine** [23] - 500:5,
501:10, 501:13,
533:4, 533:6, 533:8,
533:12, 533:22,
533:24, 533:25,
534:2, 534:23,
535:21, 535:22,
536:14, 536:21,
537:4, 537:5, 537:6,
537:7, 537:9,
544:21, 545:8
**machines** [4] - 534:5,
534:6, 537:13
**mail** [1] - 463:15
**maintain** [1] - 510:11
**majority** [1] - 478:8
**malpractice** [1] -
522:24
**management** [2] -
486:13, 486:15
**manager** [1] - 479:8
**maneuver** [2] -
501:16, 501:19
**manner** [1] - 543:1
**margins** [1] - 536:13
**mark** [1] - 535:6
**marked** [3] - 493:5,
493:9, 535:8
**Martin** [1] - 454:17
**mask** [1] - 497:1
**match** [2] - 487:4,
493:13
**matched** [1] - 493:5
**material** [3] - 525:13,
525:25, 526:1
**matter** [9] - 462:6,
462:10, 462:11,
464:14, 465:19,
465:22, 481:25,
505:7, 550:5
**McDuffie** [9] - 496:16,
496:22, 497:9,
497:11, 497:12,
500:10, 504:17,
505:3, 505:4
**MCDUFFIE** [2] -
455:6, 496:19
**MD** [1] - 520:21
**mean** [16] - 457:17,
459:22, 468:2,

486:3, 488:5,
495:23, 502:20,
503:10, 503:11,
504:18, 517:16,
532:11, 543:20,
544:16, 545:9
**meaningless** [1] -
465:16
**means** [1] - 545:10
**medial** [3] - 531:16,
531:21, 532:6
**medic** [1] - 508:11
**Medicaid** [3] - 473:17,
506:15, 522:9
**Medical** [4] - 472:12,
472:17, 473:9,
473:12
**medical** [23] - 473:19,
473:24, 474:2,
475:4, 475:8,
475:10, 475:13,
475:17, 478:15,
479:8, 505:25,
506:10, 506:12,
506:23, 506:25,
507:2, 507:4, 507:5,
507:12, 507:16,
507:18, 507:19,
509:4
**medically** [2] - 520:24,
543:5
**Medicare** [121] - 463:9,
463:22, 463:25,
464:5, 465:14,
466:14, 466:24,
473:15, 473:16,
474:6, 474:22,
476:4, 476:9, 477:7,
477:10, 477:16,
477:20, 478:18,
478:22, 478:23,
478:24, 480:15,
480:18, 481:3,
484:25, 485:7,
485:8, 485:11,
485:14, 485:17,
485:25, 486:7,
486:25, 487:4,
487:14, 487:20,
487:21, 488:1,
488:4, 488:6, 494:3,
494:4, 494:9,
494:11, 495:1,
495:7, 498:2, 498:3,
506:4, 506:5, 506:6,
506:9, 506:15,
506:16, 506:25,
507:14, 507:21,
507:22, 508:1,
508:3, 508:11,

508:14, 508:18, 508:20, 508:23, 508:24, 509:2, 509:4, 509:6, 509:9, 509:11, 509:17, 509:18, 509:19, 509:21, 509:23, 509:25, 510:1, 510:4, 510:7, 510:10, 510:17, 510:20, 510:23, 511:3, 511:13, 511:23, 512:2, 512:3, 512:4, 512:6, 513:19, 513:23, 514:9, 514:12, 514:25, 515:2, 515:5, 515:10, 515:15, 516:2, 517:9, 519:13, 520:9, 520:24, 521:7, 521:11, 521:23, 522:9, 522:20, 523:10, 524:16, 536:16, 543:3, 544:3, 545:10, 546:11, 548:6, 548:13
**Medicare's** [1] - 493:21
**medicate** [1] - 542:25
**medication** [4] - 468:21, 508:19, 540:15, 547:25
**medications** [1] - 508:18
**medicine** [6] - 479:10, 506:19, 506:20, 534:15, 534:16, 546:25
**medicines** [1] - 508:19
**medium** [2] - 542:20, 542:21
**meet** [3] - 465:10, 471:15, 471:16
**membrane** [2] - 540:19, 540:20
**mention** [1] - 472:18
**mentioned** [7] - 472:19, 485:24, 495:15, 508:17, 509:13, 539:13, 542:5
**message** [15] - 456:25, 457:15, 457:25, 458:3, 458:4, 458:5, 458:14, 459:12, 460:12, 460:20,

460:23, 489:7, 491:1, 491:14
**messages** [4] - 459:2, 459:20, 478:10, 480:7
**met** [2] - 513:18, 513:23
**MICHAEL** [1] - 454:16
**Michael** [1] - 456:6
**microphone** [1] - 472:24
**middle** [1] - 472:4
**midmorning** [1] - 505:10
**Mierzwa** [1] - 466:23
**might** [2] - 499:23, 511:6
**Mike** [2] - 471:14, 500:17
**millions** [2] - 521:3, 521:4
**mind** [8] - 457:23, 465:17, 465:19, 466:1, 466:2, 466:5, 466:6, 466:11
**minimum** [1] - 459:11
**minute** [1] - 466:18
**minutes** [7] - 461:22, 470:19, 470:21, 470:22, 505:11, 518:17
**misrepresentation** [1] - 514:6
**misrepresented** [1] - 520:10
**misrepresents** [1] - 520:10
**miss** [2] - 459:13, 542:19
**missing** [1] - 529:21
**modifier** [5] - 545:25, 546:1, 546:2, 546:6, 546:11
**modifiers** [1] - 546:4
**moment** [1] - 483:19
**money** [5] - 482:16, 482:17, 509:24, 517:6, 523:8
**month** [2] - 497:15, 500:23
**months** [3] - 532:20, 532:21, 532:23
**Morning** [1] - 454:7
**morning** [16] - 456:8, 457:7, 457:12, 458:1, 458:11, 462:3, 462:17, 462:21, 462:22, 471:11, 471:12, 496:22, 500:15,

500:16, 505:19, 505:20
**most** [1] - 478:24
**mostly** [1] - 526:20
**movable** [1] - 535:14
**move** [13] - 476:14, 484:12, 488:11, 495:20, 511:14, 516:15, 517:25, 524:6, 529:2, 533:13, 535:15, 538:20, 547:3
**moved** [1] - 503:20
**movement** [1] - 530:12
**moving** [2] - 495:22, 504:1
**MR** [89] - 456:15, 456:20, 457:4, 457:10, 457:15, 458:10, 458:24, 459:1, 459:19, 459:25, 460:13, 461:16, 464:2, 464:12, 464:20, 465:12, 465:21, 466:2, 466:12, 471:8, 471:10, 471:25, 472:1, 473:1, 473:23, 476:14, 476:23, 477:13, 477:14, 479:18, 480:6, 481:7, 481:9, 481:10, 482:4, 482:6, 483:19, 483:21, 483:23, 483:24, 484:4, 484:6, 484:7, 484:12, 484:13, 488:11, 488:12, 488:15, 489:1, 489:4, 489:17, 489:20, 490:2, 490:10, 490:22, 491:1, 491:10, 491:14, 491:21, 492:1, 492:6, 495:11, 495:15, 495:20, 495:24, 496:1, 496:4, 496:9, 499:20, 500:12, 500:14, 502:11, 502:13, 502:14, 503:7, 503:17, 503:24, 504:10, 511:17, 516:18, 518:3, 524:11, 524:20, 525:1, 529:6, 533:15,

538:23, 547:5, 548:21
**MS** [81] - 457:25, 460:16, 460:18, 461:7, 461:21, 462:1, 462:16, 462:20, 464:4, 464:18, 464:22, 465:1, 465:6, 465:9, 466:22, 467:6, 467:9, 468:7, 468:15, 468:16, 469:2, 469:5, 469:7, 469:9, 470:13, 470:21, 473:20, 479:16, 481:5, 482:3, 484:2, 484:10, 488:9, 489:5, 489:23, 490:13, 492:10, 492:12, 496:18, 496:21, 497:8, 497:19, 497:20, 500:2, 500:9, 503:2, 503:21, 504:13, 504:16, 505:2, 505:13, 505:18, 511:14, 511:21, 514:17, 514:21, 515:11, 515:18, 516:15, 516:22, 517:5, 517:25, 518:7, 518:23, 522:19, 524:6, 524:23, 525:8, 529:2, 529:12, 532:10, 533:13, 533:19, 535:7, 535:17, 538:2, 538:20, 539:3, 547:2, 547:9, 548:16
**multiple** [8] - 477:9, 477:15, 507:18, 508:5, 510:22, 510:23, 511:7, 537:18
**multiplied** [1] - 523:3
**multiply** [2] - 523:6, 523:7
**muscle** [1] - 502:21
**must** [12] - 474:21, 477:9, 509:23, 509:25, 512:2, 513:2, 513:18, 519:5, 531:24, 534:7, 542:8, 545:6

## N

**name** [14] - 471:14,

485:8, 485:11, 497:10, 505:21, 505:22, 515:22, 515:23, 520:20, 547:1, 547:13, 547:22
**name's** [1] - 500:17
**names** [1] - 547:16
**nation** [1] - 512:11
**national** [2] - 512:1, 522:8
**native** [1] - 497:17
**natural** [1] - 548:23
**necessary** [5] - 458:22, 520:25, 522:10, 522:17, 543:5
**neck** [3] - 498:15, 498:16, 499:8
**need** [13] - 456:17, 470:18, 470:20, 470:23, 505:11, 508:19, 514:15, 522:9, 530:20, 530:24, 542:17, 543:23
**needle** [15] - 502:15, 502:22, 503:4, 503:19, 504:1, 504:5, 535:25, 536:8, 536:14, 540:10, 540:22, 542:14, 544:16, 544:19, 544:21
**needs** [3] - 461:23, 479:23, 533:8
**nerve** [27] - 531:16, 531:20, 531:21, 531:22, 531:24, 532:4, 532:5, 532:6, 532:8, 532:14, 532:15, 532:16, 532:17, 532:18, 532:25, 540:3, 540:13, 540:24, 541:7, 541:12, 541:13, 541:14, 541:15, 541:19, 541:20, 542:2
**nerve(s** [1] - 525:20
**nerves** [4] - 540:18, 540:19, 540:21, 541:22
**neural** [5] - 540:1, 540:5, 540:11, 542:8
**neurological** [1] - 545:19
**neurolytic** [4] - 525:19, 526:3, 536:11, 545:4

**New** [1] - 454:14
**new** [2] - 495:1, 543:22
**next** [4] - 480:13, 497:15, 515:19, 520:15
**nice** [1] - 471:16
**night** [1] - 457:4
**nine** [3] - 462:5, 462:6, 475:17
**non** [1] - 511:5
**non-physician** [1] - 511:5
**noncovered** [4] - 544:5, 544:6, 544:8, 548:12
**none** [5] - 511:17, 518:3, 529:6, 538:23, 547:5
**nonreimbursable** [1] - 544:15
**nonresponsive** [1] - 476:15
**nonspecified** [1] - 545:12
**normal** [2] - 480:3, 480:11
**North** [1] - 544:9
**Nos** [2] - 455:13, 525:6
**note** [11] - 462:14, 467:15, 467:18, 467:20, 467:24, 469:8, 469:10, 472:8, 474:1, 493:7, 529:13
**notes** [1] - 493:6
**nothing** [3] - 460:1, 495:10, 496:9
**notice** [3] - 463:16, 467:25, 472:13
**Novitas** [11] - 506:1, 506:2, 506:3, 506:6, 506:10, 506:11, 506:13, 507:4, 507:12, 507:14, 510:10
**NPI** [12] - 511:25, 512:8, 512:9, 512:10, 512:11, 512:15, 512:20, 512:22, 518:9, 518:10, 520:3
**NPIs** [1] - 512:7
**number** [16] - 477:22, 477:24, 479:4, 479:5, 485:7, 485:8, 485:14, 493:19, 511:23, 512:1, 512:5, 518:9,

518:10, 520:2
**numbers** [4] - 486:3, 486:25, 530:22, 531:3
**numbing** [1] - 541:12
**numbs** [1] - 540:24
**numerical** [4] - 485:24, 486:1, 486:2, 486:5
**nurse** [1] - 466:24
**NW** [3] - 454:14, 454:21, 454:24

## O

**o'clock** [3] - 462:6, 462:15, 518:18
**objection** [28] - 457:17, 461:6, 461:7, 464:12, 464:20, 473:20, 479:16, 481:5, 482:3, 484:2, 484:5, 484:10, 488:9, 489:23, 490:13, 499:20, 503:2, 503:4, 503:21, 511:16, 516:17, 516:18, 518:2, 524:8, 529:4, 533:15, 538:22, 547:4
**observe** [1] - 503:15
**observed** [1] - 503:13
**obtain** [1] - 509:16
**obviously** [5] - 461:12, 461:14, 502:23, 542:11, 549:5
**occur** [1] - 542:13
**occurring** [1] - 528:24
**OF** [3] - 454:1, 454:3, 454:9
**offered** [2] - 461:10, 464:13
**offering** [4] - 461:3, 465:5, 465:6, 465:7
**office** [6] - 463:19, 470:5, 474:19, 480:17, 493:7, 534:6
**officer** [1] - 460:4
**offices** [1] - 480:18
**Official** [1] - 550:3
**often** [1] - 462:5
**old** [1] - 509:15
**omission** [1] - 514:6
**omitted** [1] - 486:6
**once** [7] - 460:19, 460:24, 478:23,

487:19, 487:20, 500:23, 503:19
**One** [7] - 468:10, 468:11, 469:15, 547:1, 547:11, 547:14, 547:18
**one** [43] - 459:5, 459:7, 460:21, 468:9, 468:10, 471:14, 479:4, 479:13, 480:16, 495:23, 495:24, 500:17, 502:7, 504:8, 505:11, 509:2, 509:7, 513:25, 514:17, 515:11, 516:5, 516:10, 518:18, 522:18, 523:4, 526:7, 526:22, 528:6, 530:1, 531:3, 531:13, 532:16, 535:6, 541:11, 541:20, 541:22, 541:23, 545:25
**onerous** [1] - 521:4
**ones** [5] - 466:14, 483:7, 483:8, 519:7, 530:11
**open** [1] - 541:9
**opened** [1] - 489:11
**operate** [2] - 509:6, 509:7
**opinion** [3] - 459:22, 491:17, 493:25
**opponent** [2] - 465:11, 466:11
**opportunity** [2] - 461:11, 476:18
**Options** [1] - 507:6
**oral** [1] - 508:19
**order** [1] - 466:17
**ordered** [1] - 457:5
**organization** [1] - 515:1
**organizations** [3] - 477:10, 478:13, 479:1
**original** [4] - 465:13, 482:8, 482:17, 483:8
**originator** [1] - 531:25
**osteoarthritic** [2] - 548:3, 548:8
**osteoarthritis** [1] - 548:5
**outside** [1] - 549:6
**overrule** [1] - 503:3
**overruled** [4] - 464:14, 479:17, 499:21, 503:22

**own** [1] - 483:17

## P

**P-E-R-E-Z** [1] - 505:23
**p.m** [1] - 549:8
**page** [33] - 467:15, 468:18, 469:3, 469:4, 469:5, 469:8, 471:22, 512:12, 512:13, 512:14, 513:4, 513:5, 515:19, 515:20, 516:8, 516:9, 517:2, 517:3, 517:19, 518:8, 518:16, 520:15, 520:16, 520:18, 522:1, 528:22, 531:7, 531:8, 531:15, 532:8, 540:8
**pages** [2] - 521:25, 550:4
**paid** [14] - 479:5, 479:11, 479:19, 481:16, 482:7, 482:15, 483:3, 488:8, 493:15, 508:24, 510:6, 516:5, 516:25, 520:7
**pain** [18] - 463:6, 498:15, 498:20, 499:10, 501:17, 531:23, 531:25, 532:14, 532:15, 539:25, 540:24, 541:12, 541:15, 541:17, 541:20, 541:21, 541:24
**painful** [1] - 504:2
**pandemic** [1] - 549:3
**paper** [1] - 475:23
**paragraph** [4] - 514:16, 515:12, 515:13
**paragraphs** [1] - 513:10
**paravertebral** [9] - 525:19, 526:3, 527:1, 527:5, 527:12, 530:23, 531:18, 531:22, 536:9
**parenthetical** [3] - 543:10, 543:13, 543:15
**Part** [22] - 506:5, 508:4, 508:6, 508:7, 508:10, 508:14, 508:15, 508:17,

508:18, 508:20, 508:21, 508:22, 508:24, 518:9
**part** [18] - 463:22, 467:22, 480:21, 484:1, 508:11, 523:2, 523:15, 526:25, 530:7, 535:3, 535:10, 535:12, 539:15, 539:19, 548:1, 548:10, 548:14
**part-time** [1] - 484:1
**participate** [1] - 509:16
**participation** [1] - 515:10
**particular** [7] - 511:22, 512:15, 522:21, 536:12, 546:24, 547:15, 548:1
**parties** [2] - 456:7, 470:18
**parts** [2] - 508:3, 508:5
**party** [2] - 465:11, 466:11
**past** [1] - 458:13
**patience** [1] - 462:12
**patient** [16] - 483:25, 485:6, 485:25, 486:14, 486:17, 486:18, 486:25, 493:6, 493:24, 498:9, 509:21, 510:4, 535:11, 540:24, 543:1, 543:25
**patient's** [1] - 486:17
**patients** [7] - 463:16, 470:1, 470:3, 483:14, 506:22
**pay** [11] - 475:24, 482:7, 487:4, 487:16, 487:17, 508:8, 509:11, 521:3, 523:10, 545:21, 546:8
**payable** [2] - 487:7, 493:22
**payer** [3] - 476:10, 492:16, 492:21
**payment** [10] - 482:21, 482:24, 510:8, 512:6, 515:4, 515:15, 517:16, 520:9, 523:4, 546:4
**payments** [1] - 480:10
**payor** [2] - 476:25, 544:1

**pays** [4] - 486:16, 488:1, 488:4, 521:4
**pedicles** [1] - 531:2
**penalties** [2] - 514:4, 514:11
**people** [9] - 458:3, 459:4, 460:23, 479:13, 487:15, 507:24, 507:25, 535:19
**per** [1] - 494:4
**perceive** [1] - 532:15
**percent** [1] - 478:8
**PEREZ** [2] - 455:8, 505:16
**Perez** [4] - 505:14, 505:22, 505:23, 505:24
**perform** [5] - 509:1, 509:2, 543:16, 544:13, 545:16
**performed** [6] - 466:13, 520:5, 521:15, 522:18, 536:17, 541:10
**performing** [1] - 544:11
**performs** [1] - 507:19
**perhaps** [2] - 467:14, 489:7
**period** [5] - 484:14, 500:21, 500:22, 524:4, 524:24
**person** [5] - 478:7, 483:12, 509:15, 513:14, 513:16
**personal** [3] - 485:5, 491:8, 512:10
**pertinent** [1] - 531:1
**phone** [14] - 457:6, 458:12, 460:13, 461:1, 461:2, 461:11, 461:17, 477:9, 477:15, 478:4, 478:5, 488:18, 488:19, 490:14
**phones** [1] - 461:4
**physician** [11] - 501:1, 508:25, 511:5, 511:7, 512:20, 516:23, 516:24, 522:22, 535:4, 535:13, 535:23
**physicians** [4] - 509:25, 511:5, 511:22, 523:10
**pick** [2] - 488:18
**picture** [1] - 534:18
**place** [3] - 536:14,

542:25, 549:5
**placed** [2] - 504:22, 505:1
**places** [2] - 503:20, 549:6
**Plaintiff** [1] - 454:4
**plan** [1] - 505:8
**planning** [1] - 466:19
**pleasant** [1] - 549:5
**pleasure** [1] - 471:15
**Plexiglas** [1] - 472:25
**plus** [1] - 521:15
**point** [12] - 456:20, 458:6, 458:7, 458:10, 480:13, 480:24, 489:14, 499:9, 504:18, 538:18, 539:9, 548:23
**pointed** [1] - 504:5
**population** [1] - 506:21
**possibility** [2] - 472:18, 478:12
**possible** [4] - 467:11, 471:4, 471:14, 535:15
**possibly** [1] - 491:13
**Post** [5] - 467:15, 467:17, 467:20, 469:7, 469:10
**Post-it** [5] - 467:15, 467:17, 467:20, 469:7, 469:10
**potentially** [2] - 510:22, 519:19
**practice** [8] - 479:7, 510:18, 512:9, 512:21, 512:22, 522:24, 523:15, 537:2
**practices** [2] - 510:24, 511:8
**practitioner** [3] - 513:11, 513:13, 516:2
**practitioners** [1] - 511:5
**preceded** [1] - 459:11
**preceding** [1] - 458:18
**precise** [1] - 542:10
**predicting** [1] - 456:23
**preference** [1] - 548:20
**prep** [1] - 470:3
**present** [2] - 456:7, 515:14
**presented** [1] - 515:14
**pretty** [2] - 474:24, 533:5

**prevail** [2] - 459:14, 490:12
**prevails** [1] - 491:18
**previous** [3] - 526:7, 531:13
**PREVIOUSLY** [1] - 462:18
**previously** [3] - 486:9, 539:13, 542:5
**prices** [1] - 482:25
**prick** [1] - 502:15
**primarily** [1] - 470:4
**primary** [2] - 498:14, 501:1
**print** [2] - 494:11, 494:15
**printed** [1] - 514:5
**private** [8] - 474:22, 476:4, 476:10, 478:20, 478:25, 488:7, 508:12, 508:15
**privileges** [1] - 514:12
**probe** [1] - 544:20
**problem** [2] - 487:11, 498:22
**procedural** [1] - 538:10
**procedure** [40] - 463:18, 485:20, 485:24, 486:10, 486:11, 486:21, 487:4, 487:9, 488:1, 493:5, 493:13, 494:3, 521:13, 521:14, 522:17, 522:25, 526:3, 528:5, 532:20, 533:5, 534:24, 535:14, 536:6, 536:12, 536:25, 537:8, 539:22, 539:23, 542:2, 542:11, 542:17, 542:19, 543:16, 543:18, 544:13, 545:4, 545:7, 545:13, 546:3
**procedures** [13] - 470:2, 493:1, 524:16, 531:10, 531:12, 532:2, 534:16, 535:19, 536:16, 536:23, 541:20, 544:2, 544:8
**proceed** [1] - 483:21
**proceedings** [1] - 550:5
**process** [13] - 475:9, 484:25, 509:9,

527:4, 528:16, 529:21, 529:23, 529:24, 530:16, 530:17, 530:18, 531:17
**processed** [1] - 487:20
**processing** [1] - 485:21
**produced** [1] - 457:24
**product** [1] - 479:20
**professional** [2] - 478:13, 479:1
**proffer** [2] - 460:5, 460:8
**Program** [1] - 506:24
**program** [14] - 507:22, 508:1, 509:2, 509:17, 509:24, 509:25, 511:13, 513:19, 513:23, 515:1, 515:3, 515:7, 520:9
**promises** [1] - 511:11
**prompted** [1] - 459:9
**proper** [4] - 477:16, 477:21, 478:14, 479:2
**proven** [3] - 465:14, 466:5
**provide** [9] - 507:17, 507:20, 508:12, 516:24, 517:6, 517:9, 521:23, 523:11, 530:11
**provided** [9] - 456:10, 457:3, 458:1, 460:20, 494:4, 494:8, 510:9, 521:12, 524:14
**provider** [23] - 485:11, 485:14, 512:1, 512:5, 512:7, 512:8, 513:2, 516:2, 516:5, 516:24, 517:6, 517:9, 519:5, 519:12, 519:22, 519:23, 520:5, 521:10, 522:24, 522:25, 534:20, 545:21, 547:10
**provider's** [1] - 520:3
**provider-specific** [1] - 512:5
**providers** [4] - 488:6, 521:17
**provides** [1] - 507:23
**providing** [1] - 495:2
**province** [1] - 491:19
**provisions** [2] - 519:5,

519:7
**PTAN** [1] - 512:4
**publicly** [3] - 524:1, 524:13, 524:23
**publish** [6] - 467:11, 517:2, 518:8, 525:9, 533:20, 545:7
**published** [1] - 517:4
**Puerto** [5] - 506:21, 506:23, 506:25, 507:3, 507:7
**pull** [5] - 460:14, 467:10, 468:17, 469:2, 471:22
**pulled** [3] - 463:15, 463:17, 463:18
**punch** [1] - 468:20
**punished** [1] - 514:10
**pure** [1] - 487:9
**purports** [1] - 456:11
**purpose** [1] - 524:20
**purposes** [6] - 486:11, 512:6, 524:12, 529:3, 529:5, 529:8
**pursuant** [1] - 520:12
**put** [6] - 463:18, 472:21, 501:23, 527:9, 542:20, 542:23
**puts** [1] - 487:9

---

### Q

**qualified** [1] - 545:18
**questioning** [1] - 519:2
**questions** [11] - 456:22, 457:2, 468:23, 470:14, 474:3, 484:24, 491:24, 499:9, 504:4, 524:16, 548:16
**quick** [2] - 462:10, 471:14
**quickly** [1] - 471:4
**quite** [4] - 456:16, 533:7, 533:8, 549:5

---

### R

**radiation** [2] - 534:7, 534:8
**radiofrequency** [1] - 536:11
**raise** [1] - 505:11
**ramus** [1] - 531:20
**ran** [1] - 462:10
**range** [3] - 505:10,

537:7, 537:8
**rate** [2] - 482:8, 483:8
**rather** [1] - 467:5
**ray** [1] - 533:4
**rays** [2] - 535:3,
535:11
**reach** [1] - 536:10
**read** [13] - 467:24,
469:14, 513:12,
514:4, 514:15,
514:16, 519:12,
520:1, 520:20,
524:14, 525:17,
526:11, 538:12
**readily** [1] - 522:2
**reading** [2] - 472:8,
539:7
**ready** [1] - 456:21
**real** [3] - 470:22,
533:5, 544:19
**really** [3] - 529:20,
530:20, 546:13
**reason** [6] - 460:3,
474:7, 474:11,
481:13, 487:23,
544:9
**reasonable** [2] -
522:10, 522:17
**reasons** [1] - 460:22
**recalled** [1] - 500:5
**receive** [5] - 464:8,
482:19, 509:24,
510:8, 512:4
**RECEIVED** [1] -
455:10
**received** [12] - 463:15,
467:2, 482:16,
482:17, 511:20,
516:21, 518:6,
525:7, 529:11,
533:18, 539:2, 547:8
**receptionist** [1] -
497:25
**Recess** [2] - 471:6,
518:19
**recess** [1] - 549:8
**reckless** [1] - 515:16
**recode** [2] - 476:12,
481:16
**recoded** [1] - 481:21
**recognize** [2] -
523:23, 533:10
**recollection** [5] -
456:16, 456:18,
490:17, 499:23,
501:9
**recommendation** [2] -
492:3, 498:14
**record** [10] - 460:18,
461:16, 504:20,

505:21, 520:11,
532:7, 532:9,
535:18, 543:14,
550:5
**recovering** [1] - 468:1
**recross** [2] - 495:13,
495:14
**Recross** [1] - 455:5
**RECROSS** [1] - 496:3
**RECROSS-
EXAMINATION** [1] -
496:3
**Recross-
Examination...........
......** [1] - 455:5
**REDIRECT** [2] -
492:11, 504:15
**redirect** [5] - 458:22,
461:15, 476:19,
492:9, 504:12
**Redirect** [2] - 455:4,
455:7
**reduction** [1] - 482:19
**refer** [3] - 482:1,
546:20, 547:19
**referred** [2] - 474:6,
500:25
**referring** [7] - 459:15,
461:9, 478:16,
489:6, 513:6, 526:24
**reflect** [3] - 461:16,
532:7, 532:9
**refresh** [3] - 456:15,
456:17, 490:17
**refreshing** [1] - 489:8
**regard** [1] - 456:10
**regarding** [5] - 461:8,
493:12, 521:24,
522:1, 522:2
**regardless** [1] -
547:25
**regenerate** [3] -
532:18, 532:22
**region** [1] - 506:7
**regions** [3] - 507:17,
526:9, 526:17
**regular** [1] - 510:12
**regulations** [4] -
514:25, 515:3,
515:6, 536:16
**reimburse** [6] - 483:7,
509:4, 522:20,
544:3, 548:7, 548:13
**reimbursement** [7] -
482:7, 482:15,
483:2, 483:5,
536:23, 536:25
**reject** [3] - 480:15,
487:12, 487:13
**rejected** [6] - 467:25,

468:5, 480:21,
481:12, 482:13,
482:18
**rejecting** [2] - 481:3,
487:22
**rejections** [1] - 480:12
**rejects** [1] - 480:19
**relate** [2] - 507:13,
507:14
**related** [2] - 508:7,
546:13
**relating** [1] - 520:11
**relationship** [1] -
488:23
**relative** [2] - 522:23,
523:1
**relevance** [1] - 466:12
**relevant** [6] - 489:11,
491:2, 491:4,
491:13, 491:17,
491:18
**relieve** [2] - 531:23,
531:25
**remember** [10] -
456:19, 463:8,
463:14, 482:8,
482:10, 489:22,
498:5, 498:12,
502:2, 540:11
**removing** [1] - 487:9
**renal** [1] - 507:25
**rendered** [1] - 477:1
**reopen** [2] - 495:20,
495:23
**repeat** [5] - 473:4,
480:16, 482:9,
482:22, 484:17
**repeating** [1] - 466:3
**rephrase** [4] - 480:14,
482:4, 512:19
**report** [2] - 463:18,
526:23
**reported** [1] - 526:22
**Reporter** [2] - 454:23,
550:3
**reporter's** [1] - 522:13
**reporting** [1] - 545:7
**reports** [1] - 486:18
**representation** [1] -
517:22
**representing** [2] -
456:5, 456:6
**request** [1] - 512:2
**require** [3] - 534:5,
537:16, 537:18
**required** [6] - 490:19,
494:21, 520:12,
533:1, 534:14, 542:1
**requirements** [4] -
513:19, 513:21,

513:23, 532:24
**requires** [1] - 458:18
**requiring** [1] - 536:24
**response** [1] - 494:24
**responsible** [1] -
519:13
**resub** [1] - 469:15
**resubmission** [1] -
468:3
**resubmit** [3] - 463:24,
469:21, 476:13
**resubmitting** [1] -
469:17
**resubs** [2] - 468:1,
468:2
**result** [1] - 465:1
**results** [8] - 463:25,
464:5, 464:10,
464:16, 464:19,
465:20, 466:9, 467:3
**resume** [1] - 548:23
**resumes** [1] - 518:21
**retired** [3] - 497:21,
497:22, 497:23
**retrieve** [1] - 488:15
**review** [4] - 463:21,
507:20, 513:19,
521:5
**reviewed** [1] - 510:14
**revocation** [1] -
514:12
**revoked** [1] - 513:22
**Rico** [5] - 506:22,
506:23, 506:25,
507:3, 507:7
**rings** [1] - 494:18
**ripe** [1] - 489:7
**room** [5] - 470:1,
493:1, 501:6,
501:10, 533:12
**Room** [1] - 454:24
**rotator** [1] - 499:24
**RPR** [1] - 454:23
**Rubin** [1] - 454:20
**rule** [1] - 458:17
**rules** [2] - 522:22,
536:16

---

# S

**s"** [1] - 502:12
**sacral** [5] - 527:22,
538:7, 538:19,
539:12, 539:18
**sacroiliac** [1] - 527:8
**safe** [6] - 536:17,
536:20, 542:22,
543:1, 543:3, 543:25
**safely** [2] - 534:8,

534:17
**saw** [4] - 456:8,
473:11, 480:7,
542:25
**scale** [1] - 508:25
**scan** [2] - 533:2,
534:11
**SCHAENING** [3] -
455:8, 505:16,
505:23
**Schaening** [18] -
505:14, 505:22,
511:2, 511:22,
512:14, 513:12,
514:2, 516:10,
518:24, 520:23,
525:12, 529:13,
533:21, 537:23,
538:3, 540:9,
546:20, 547:10
**SCHAENING-PEREZ**
[2] - 455:8, 505:16
**Schaening-Perez** [2] -
505:14, 505:22
**schedule** [3] - 488:4,
488:5, 522:22
**scheduled** [1] - 462:6
**schooling** [2] - 475:7,
506:18
**scope** [3] - 484:3,
488:9, 488:24
**screen** [7] - 472:2,
501:10, 529:14,
535:13, 535:14,
535:24, 544:20
**screenshot** [1] - 457:8
**second** [1] - 461:19
**Section** [1] - 515:21
**section** [3] - 468:21,
514:23, 515:2
**see** [54] - 458:9,
458:19, 458:21,
458:25, 459:9,
459:10, 459:12,
459:15, 459:23,
460:12, 461:2,
467:12, 467:17,
467:20, 469:10,
472:2, 472:6,
479:24, 496:24,
497:5, 499:4,
500:19, 500:22,
501:3, 502:22,
503:12, 512:14,
529:19, 529:20,
530:8, 530:10,
530:17, 531:16,
531:17, 531:19,
531:24, 532:20,
533:5, 533:12,

535:2, 535:9, 535:12, 535:15, 536:13, 538:4, 538:13, 538:18, 542:21, 543:10, 543:24, 544:21, 545:20, 549:7
**seeing** [2] - 498:10, 498:12
**seek** [3] - 456:13, 466:20, 489:15
**seeking** [4] - 489:14, 489:24, 490:17
**seem** [1] - 458:1
**sell** [1] - 479:20
**send** [2] - 464:5, 487:21
**sensation** [1] - 532:14
**sensed** [1] - 503:18
**sent** [5] - 457:5, 457:7, 458:4, 467:23, 496:5
**sentences** [1] - 467:24
**separate** [4] - 465:2, 512:9, 545:23, 546:2, 546:3
**separately** [1] - 546:7
**September** [1] - 454:6
**series** [2] - 485:16, 486:24
**service** [22] - 463:17, 476:25, 485:19, 485:22, 487:7, 492:17, 492:21, 506:5, 509:1, 509:2, 515:4, 521:16, 522:21, 545:16, 546:7, 546:8, 546:10, 546:12, 546:13, 549:3, 549:4
**Service** [2] - 506:24, 507:5
**Services** [4] - 466:16, 473:17, 506:15, 522:9
**services** [19] - 507:19, 508:8, 508:13, 508:24, 508:25, 509:4, 509:22, 510:2, 510:5, 510:8, 520:5, 521:11, 521:12, 521:13, 521:21, 522:22, 523:10, 523:14, 544:11
**Session** [1] - 454:7
**set** [2] - 466:14, 493:19
**sets** [1] - 478:23
**sheet** [5] - 463:17, 476:7, 492:24,

493:8, 493:10
**sheets** [1] - 493:4
**shenanigans** [2] - 459:14, 461:9
**Shield** [3] - 478:17, 478:18, 498:2
**short** [1] - 460:15
**short-circuited** [1] - 460:15
**shorter** [2] - 515:11, 519:7
**shoulder** [14] - 498:15, 498:16, 502:5, 502:7, 502:9, 502:16, 502:18, 502:22, 503:1, 503:8, 503:11, 504:23, 505:1, 548:10
**shoulders** [7] - 499:8, 499:13, 502:6, 502:10, 502:11, 502:15, 504:17
**show** [15] - 458:8, 466:1, 511:1, 516:7, 517:18, 523:21, 524:22, 524:23, 525:9, 527:16, 528:21, 533:9, 536:4, 537:22, 546:19
**showed** [3] - 459:4, 472:13, 483:15
**showing** [3] - 524:13, 538:3, 538:8
**shows** [2] - 457:22, 466:2
**shut** [1] - 549:2
**sign** [4] - 511:7, 511:12, 513:14, 513:15
**signature** [6] - 515:22, 515:23, 515:24, 520:4, 520:17, 520:20
**signed** [1] - 507:22
**signing** [1] - 513:20
**Simon** [10] - 456:4, 457:17, 458:18, 459:8, 459:15, 466:20, 470:20, 476:18, 488:18, 492:9
**SIMON** [51] - 454:13, 457:25, 460:16, 460:18, 461:7, 461:21, 462:1, 462:16, 462:20, 464:4, 464:18, 464:22, 465:1,

465:6, 465:9, 466:22, 467:6, 467:9, 468:7, 468:15, 468:16, 469:2, 469:5, 469:7, 469:9, 470:13, 470:21, 473:20, 479:16, 481:5, 482:3, 484:2, 484:10, 488:9, 489:5, 489:23, 490:13, 492:10, 492:12, 496:18, 496:21, 497:8, 497:19, 497:20, 500:2, 500:9, 503:2, 503:21, 504:13, 504:16, 505:2
**Simon's** [1] - 495:14
**simplify** [1] - 487:8
**single** [8] - 458:20, 513:25, 525:21, 526:7, 527:23, 538:7, 539:11, 539:20
**sitting** [1] - 475:20
**situation** [2] - 480:1, 486:2
**six** [4] - 475:15, 532:20, 532:21, 532:22
**size** [1] - 534:4
**skin** [2] - 503:10, 503:19
**Slater** [40] - 468:7, 468:17, 469:2, 469:7, 469:25, 471:24, 511:1, 512:12, 513:4, 513:9, 513:24, 514:14, 515:12, 515:19, 516:7, 516:9, 517:18, 518:8, 518:16, 519:11, 519:16, 519:25, 520:15, 520:22, 523:21, 525:9, 525:15, 527:16, 528:21, 531:7, 531:15, 533:9, 533:20, 537:22, 539:4, 539:17, 540:7, 543:8, 545:22, 546:19
**slight** [1] - 526:15
**slightly** [1] - 526:10
**slow** [1] - 522:11
**small** [6] - 467:13, 467:14, 534:19,

534:22, 538:14, 542:7
**snippet** [1] - 458:8
**Society** [5] - 472:12, 472:17, 473:9, 473:12, 544:10
**society** [5] - 472:18, 473:19, 473:24, 474:2, 478:15
**solicit** [1] - 493:23
**solution** [1] - 540:6
**Solutions** [5] - 506:1, 506:2, 506:3, 507:4, 507:13
**someone** [2] - 460:21, 509:18
**sometimes** [4] - 478:10, 478:11, 480:18, 532:22
**somewhere** [1] - 505:9
**son** [2] - 457:7, 458:11
**sorry** [12] - 456:9, 460:1, 462:4, 473:4, 480:2, 489:5, 489:6, 493:17, 493:18, 504:3, 530:3, 535:5
**sort** [4] - 461:8, 533:7, 537:15, 545:2
**sounds** [2] - 475:19, 484:14
**space** [14] - 473:3, 473:6, 534:6, 534:7, 540:5, 540:15, 540:16, 540:20, 540:21, 542:8, 542:18, 542:19, 542:20, 542:22
**specialty** [1] - 506:19
**specific** [3] - 512:5, 547:14, 547:17
**specifically** [2] - 494:21, 533:2
**specified** [1] - 545:17
**speculation** [1] - 479:16
**spell** [2] - 497:10, 505:21
**spelled** [1] - 505:23
**spends** [1] - 486:16
**spinal** [10] - 494:21, 523:16, 531:11, 531:20, 540:3, 540:17, 540:19, 541:1, 541:4, 541:22
**Spinal** [1] - 544:10
**spine** [18] - 501:19, 504:5, 526:25, 527:6, 527:9, 527:11, 527:13,

527:25, 528:3, 528:6, 528:8, 528:13, 528:18, 530:7, 531:8, 539:15, 540:18
**spurred** [1] - 459:9
**staff** [1] - 483:14
**stage** [1] - 507:25
**stand** [2] - 472:11, 518:21
**standard** [6] - 478:23, 534:15, 534:16, 542:5, 542:7, 544:10
**standards** [2] - 513:17, 534:9
**standing** [1] - 456:22
**stands** [1] - 473:16
**stark** [1] - 515:8
**start** [5] - 461:4, 461:25, 471:21, 498:10, 548:19
**started** [7] - 462:7, 470:4, 475:14, 498:12, 499:6, 528:11
**starting** [1] - 513:10
**starts** [1] - 470:18
**state** [13] - 457:23, 465:17, 465:19, 466:1, 466:2, 466:5, 466:6, 466:11, 497:9, 509:7, 509:9, 509:11, 523:4
**statement** [19] - 458:19, 458:20, 458:21, 459:18, 464:24, 465:1, 465:4, 465:7, 465:11, 465:15, 466:3, 466:10, 483:1, 513:6, 513:17, 513:20, 522:15, 538:19, 539:9
**statements** [1] - 464:22
**States** [1] - 456:3
**states** [4] - 513:13, 514:3, 514:24, 515:13
**STATES** [3] - 454:1, 454:3, 454:10
**statute** [1] - 515:8
**stay** [2] - 471:1, 532:17
**steam** [1] - 522:12
**steps** [2] - 496:16, 505:6
**steroid** [7] - 538:16, 539:24, 540:23,

541:13, 541:17, 541:18, 542:24
**steroids** [1] - 540:6
**still** [2] - 461:1, 478:1
**stop** [2] - 458:6, 466:18
**stopping** [1] - 462:15
**straight** [1] - 518:18
**strain** [1] - 479:24
**streamline** [1] - 471:25
**strep** [1] - 487:10
**strike** [6] - 476:14, 476:21, 490:8, 490:23, 531:2, 533:24
**stuff** [2] - 485:8, 530:4
**subject** [1] - 520:13
**submission** [2] - 517:16, 520:8
**submit** [19] - 475:23, 476:4, 476:6, 476:9, 476:24, 482:23, 482:24, 486:7, 487:18, 492:16, 492:20, 512:2, 512:3, 515:16, 517:14, 519:17, 519:19, 519:21, 519:23
**submits** [1] - 510:7
**submitted** [13] - 463:22, 474:21, 481:20, 482:1, 482:8, 484:25, 485:21, 492:23, 510:23, 518:13, 519:14, 520:23, 521:7
**submitter** [1] - 520:3
**submitting** [3] - 510:19, 511:11, 521:10
**succeeded** [1] - 491:6
**sufficient** [2] - 460:6, 537:8
**Suite** [2] - 454:17, 454:21
**suite** [1] - 533:11
**Supartz** [3] - 469:15, 547:22, 547:23
**superior** [12] - 527:4, 528:15, 529:19, 529:22, 529:23, 530:16, 530:21, 540:2, 540:4, 540:12, 540:14, 542:10
**supplier's** [1] - 515:9
**supplying** [1] - 514:8

**supposed** [1] - 540:4
**surface** [2] - 529:25, 530:18
**surfaces** [1] - 531:2
**surgical** [1] - 508:9
**sustained** [6] - 464:3, 473:21, 481:6, 484:5, 484:11, 488:10
**switched** [3] - 482:12, 483:7, 483:10
**switching** [1] - 483:6
**swivel** [1] - 503:13
**SWORN** [3] - 462:18, 496:19, 505:16
**SYNVISC** [2] - 547:12, 547:14
**Synvisc** [1] - 468:10
**Synvisc-One** [1] - 468:10
**syringe** [2] - 542:23
**system** [3] - 511:23, 546:4, 546:5

---

## T

**table** [1] - 488:15
**TANYA** [1] - 454:10
**target** [13] - 530:24, 531:22, 534:17, 534:18, 534:19, 534:20, 534:22, 536:2, 539:14, 542:7, 542:12
**targeting** [1] - 531:24
**team** [1] - 459:8
**technician** [1] - 497:24
**technology** [5] - 523:13, 537:1, 543:23, 543:24
**terminology** [2] - 475:12, 538:10
**terms** [1] - 511:6
**testified** [4] - 489:12, 492:25, 493:12, 494:20
**testify** [1] - 490:11
**testifying** [2] - 480:3, 497:6
**TESTIMONY** [1] - 455:2
**testimony** [3] - 457:19, 462:14, 529:9
**text** [28] - 456:24, 457:13, 457:15, 457:22, 458:2, 458:3, 458:8, 458:9,

458:14, 458:18, 459:1, 459:5, 459:6, 459:9, 459:11, 459:17, 459:20, 460:6, 461:2, 461:12, 489:6, 489:13, 491:1, 491:14, 514:9
**texts** [2] - 459:5, 460:5
**THE** [158] - 454:1, 454:10, 456:2, 456:8, 456:17, 457:1, 457:9, 457:13, 457:16, 458:6, 458:16, 458:25, 459:3, 459:21, 460:3, 460:15, 460:17, 460:24, 461:10, 461:19, 461:23, 462:3, 462:17, 462:18, 464:3, 464:13, 464:17, 464:24, 465:4, 465:7, 465:10, 465:17, 465:23, 466:6, 466:18, 467:1, 467:7, 468:8, 468:9, 468:13, 468:14, 469:4, 469:6, 470:16, 470:17, 470:22, 470:25, 471:1, 471:2, 471:3, 471:5, 471:7, 471:24, 472:23, 473:21, 476:16, 476:20, 476:21, 477:12, 479:17, 479:23, 480:2, 480:3, 480:5, 481:6, 481:8, 482:5, 483:20, 483:22, 484:3, 484:5, 484:11, 488:10, 488:17, 488:21, 489:3, 489:9, 489:18, 489:24, 490:1, 490:8, 490:14, 490:16, 490:23, 491:3, 491:12, 491:16, 491:23, 492:8, 495:13, 495:18, 495:21, 495:25, 496:10, 496:13, 496:14, 496:15, 496:17, 496:19, 497:4, 497:18, 499:21, 499:23, 500:11, 502:10, 502:12, 503:3,

503:5, 503:12, 503:16, 503:22, 503:23, 504:11, 504:12, 504:14, 504:20, 504:24, 504:25, 505:4, 505:7, 505:15, 505:16, 511:16, 511:18, 514:15, 514:19, 514:20, 514:22, 514:23, 515:13, 516:17, 516:19, 518:2, 518:4, 518:17, 518:20, 522:11, 522:14, 524:8, 524:10, 524:15, 524:22, 524:25, 525:5, 529:1, 529:4, 529:7, 532:9, 533:16, 535:5, 535:8, 537:25, 538:22, 538:24, 547:4, 547:6, 548:18, 548:22
**themselves** [2] - 521:20, 526:16
**theory** [1] - 541:15
**therapeutic** [1] - 542:23
**therefore** [2] - 491:7, 546:8
**therein** [1] - 513:21
**they've** [1] - 510:23
**thinking** [1] - 462:6
**third** [2] - 468:22, 532:8
**thoracic** [4] - 525:21, 526:5, 527:11, 539:11
**thousands** [1] - 474:22
**three** [8] - 458:3, 459:4, 460:23, 474:20, 474:21, 475:2, 477:19, 513:9
**throat** [1] - 487:10
**throughout** [2] - 509:6, 509:8
**throws** [1] - 535:3
**Thursday** [1] - 454:6
**ticket** [1] - 463:17
**today** [8] - 462:15, 462:23, 462:25, 505:7, 505:24, 507:9, 508:21
**toenail** [1] - 487:10
**together** [2] - 481:2, 546:6
**took** [1] - 463:21

**top** [6] - 467:15, 469:8, 504:23, 505:1, 513:10, 515:21
**topic** [1] - 459:7
**torn** [1] - 499:24
**touch** [1] - 528:17
**toward** [1] - 491:7
**towards** [1] - 491:11
**track** [1] - 544:1
**tracking** [2] - 543:22, 545:7
**training** [1] - 475:7
**transaction** [1] - 515:6
**TRANSCRIPT** [1] - 454:9
**transcript** [1] - 550:4
**transfer** [4] - 516:11, 516:23, 517:13, 517:15
**transforaminal** [4] - 538:15, 538:16, 539:24, 542:8
**transmission** [1] - 487:16
**transmitted** [1] - 475:20
**treat** [1] - 548:3
**treating** [2] - 498:13, 506:22
**treatment** [1] - 548:4
**trial** [1] - 457:1
**TRIAL** [1] - 454:9
**true** [12] - 470:10, 475:2, 475:18, 475:21, 480:20, 483:3, 483:17, 484:16, 484:22, 485:18, 485:22, 492:22
**trust** [3] - 488:13, 488:23, 521:7
**trusted** [4] - 474:16, 477:4, 481:18, 489:12
**truth** [6] - 464:13, 465:5, 465:6, 465:18, 465:22, 515:17
**truthful** [2] - 519:18, 519:24
**try** [13] - 462:5, 469:15, 471:13, 474:8, 477:6, 477:16, 477:21, 478:13, 478:14, 479:1, 480:22, 481:2, 541:16
**trying** [8] - 471:3, 472:16, 473:8,

477:10, 532:3, 534:21, 541:12, 541:19
**TSC** [1] - 454:4
**tunnel** [1] - 499:7
**turn** [2] - 512:12, 513:4
**turning** [1] - 461:17
**turns** [1] - 499:7
**two** [9] - 459:5, 467:24, 479:5, 491:23, 503:6, 530:20, 530:22, 540:2, 540:12
**type** [10] - 475:7, 486:14, 498:1, 508:9, 531:3, 537:8, 542:2, 544:11, 546:15, 546:24
**types** [4] - 468:11, 474:4, 510:19, 547:20
**typical** [1] - 499:3

## U

**U.S** [2] - 454:13, 454:24
**ultrasound** [30] - 495:3, 495:4, 495:16, 496:6, 499:14, 499:16, 499:18, 499:25, 500:5, 501:8, 536:21, 537:1, 537:4, 537:11, 537:12, 543:16, 543:18, 544:12, 544:13, 544:15, 544:16, 544:18, 544:20, 544:21, 545:2, 545:5, 545:8, 545:23, 545:25, 546:14
**unclear** [1] - 493:17
**uncommon** [2] - 480:14, 480:17
**under** [16] - 465:24, 503:10, 520:9, 520:13, 522:10, 522:16, 522:22, 527:19, 527:21, 536:16, 543:2, 543:10, 543:16, 544:11, 544:15, 548:7
**undercut** [1] - 489:10
**underlying** [1] - 515:6
**undermine** [1] -

457:19
**underneath** [2] - 502:16, 502:18
**understood** [1] - 467:6
**unique** [1] - 520:2
**UNITED** [3] - 454:1, 454:3, 454:10
**United** [1] - 456:3
**UnitedHealthcare** [1] - 478:18
**units** [2] - 522:23, 523:2
**unless** [1] - 503:12
**unlisted** [4] - 545:3, 545:4, 545:6, 545:16
**unsolicited** [2] - 458:14, 458:16
**unusual** [2] - 479:10, 480:9
**up** [28] - 460:14, 461:21, 465:14, 466:5, 467:10, 468:17, 469:2, 471:17, 471:22, 475:16, 479:23, 488:18, 492:13, 493:15, 495:1, 497:4, 501:25, 502:1, 516:8, 518:20, 527:10, 532:8, 532:21, 534:19, 539:21, 549:3
**update** [1] - 510:21
**updated** [1] - 511:6
**upper** [2] - 527:25, 528:6
**usable** [1] - 457:23

## V

**vague** [1] - 499:20
**validity** [1] - 521:5
**value** [2] - 522:23, 523:2
**varies** [1] - 532:19
**various** [1] - 477:15
**verify** [3] - 520:24, 521:5, 536:1
**versus** [2] - 456:3, 537:4
**vertebra** [19] - 527:3, 527:4, 527:7, 528:15, 529:19, 529:21, 529:22, 529:24, 530:10, 530:19, 531:4, 531:5, 540:2, 540:12

**vertebras** [5] - 530:8, 530:21, 530:24, 531:1
**videotape** [1] - 504:21
**view** [1] - 531:8
**Virgin** [3] - 507:1, 507:3, 507:7
**visit** [4] - 486:14, 486:17, 493:6, 508:14
**visiting** [1] - 507:11
**voice** [1] - 479:23

## W

**wait** [2] - 456:17, 461:19
**wand** [4] - 501:14, 501:16, 501:19, 501:21
**Washington** [8] - 454:5, 454:14, 454:22, 454:25, 497:13, 497:16, 506:7, 507:11
**Washingtonian** [1] - 497:17
**Wayne** [2] - 550:9, 550:9
**WAYNE** [2] - 454:23, 550:3
**web** [1] - 522:1
**website** [1] - 493:21
**weight** [1] - 523:2
**welcome** [6] - 468:14, 469:1, 470:16, 478:3, 496:14, 504:11
**white** [1] - 530:9
**whole** [4] - 458:9, 514:15, 530:6, 530:7
**WILLIS** [33] - 454:12, 505:13, 505:18, 511:14, 511:21, 514:17, 514:21, 515:11, 515:18, 516:15, 516:22, 517:5, 517:25, 518:7, 518:23, 522:19, 524:6, 524:23, 525:3, 525:8, 529:2, 529:12, 532:10, 533:13, 533:19, 535:7, 535:17, 538:2, 538:20, 539:3, 547:2, 547:9, 548:16
**Willis** [5] - 456:4,

457:16, 518:22, 524:18, 524:22
**Winston** [1] - 454:20
**WITNESS** [28] - 462:18, 464:17, 468:9, 468:14, 470:16, 470:25, 471:2, 471:5, 476:20, 480:2, 480:5, 490:1, 496:13, 496:15, 496:19, 499:23, 502:12, 503:5, 503:16, 503:23, 504:11, 504:24, 505:16, 514:20, 514:23, 515:13, 522:14, 535:8
**Witness** [3] - 496:16, 505:6, 518:21
**witness** [33] - 457:18, 458:17, 458:22, 460:25, 461:1, 461:14, 461:21, 465:9, 466:10, 467:5, 470:24, 489:8, 490:3, 502:10, 503:13, 504:21, 504:22, 504:25, 505:9, 511:1, 516:7, 517:18, 517:19, 523:21, 524:15, 525:9, 528:21, 532:8, 533:9, 535:5, 537:22, 546:19
**witness's** [3] - 456:16, 461:2, 529:9
**wondering** [1] - 502:25
**word** [4] - 460:4, 495:2, 509:13, 530:15
**words** [4] - 459:3, 459:12, 465:18, 521:20
**worth** [2] - 461:22, 523:8
**Wright** [20] - 456:11, 456:12, 459:2, 459:6, 459:7, 462:14, 462:16, 462:17, 462:21, 462:23, 467:12, 468:22, 469:10, 470:1, 470:14, 472:2, 492:2, 492:13, 495:10, 496:10
**WRIGHT** [2] - 455:3,

462:18
**Wright's** [1] - 460:6
**write** [2] - 486:6, 486:8
**writing** [1] - 486:18
**written** [2] - 472:8, 493:6
**wrote** [1] - 466:24

## X

**X's** [1] - 493:9
**x-ray** [1] - 533:4
**x-rays** [2] - 535:3, 535:11

## Y

**y'all** [2] - 482:12, 484:21
**year** [8] - 497:15, 521:4, 526:12, 526:13, 532:21, 538:11, 547:16, 547:17
**years** [14] - 474:20, 474:21, 475:2, 475:13, 475:17, 477:19, 497:24, 497:25, 500:21, 500:23, 506:11, 509:15, 525:25
**yesterday** [4] - 463:12, 468:19, 469:17, 470:6
**York** [1] - 454:14
**yourself** [1] - 457:9

## Z

**zoom** [9] - 467:14, 469:7, 518:9, 525:11, 525:15, 527:19, 539:4, 539:17, 543:9