```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA


   UNITED STATES OF AMERICA,       .
                                   .
             Plaintiff,            .  CR No. 19-0255 (TSC)
                                   .
        v.                         .
                                   .  Washington, D.C.
   FREDERICK GOODING,              .  Friday, September 9, 2022
                                   .  9:19 a.m.
             Defendant.            .
   . . . . . . . . . . . . . . . . .  Morning Session
```

```
                            DAY 4
                  TRANSCRIPT OF JURY TRIAL
            BEFORE THE HONORABLE TANYA S. CHUTKAN
                 UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

```
For the Government:          JILLIAN D. WILLIS, ESQ.
                             JIL SIMON, ESQ.
                             U.S. Department of Justice
                             1400 New York Avenue NW
                             Washington, DC 20005
                             (202) 353-0822


For Defendant:               MICHAEL J. KHOURI, ESQ.
                             Khouri Law Firm, APC
                             2222 Martin
                             Suite 215
                             Irvine, CA 92612
                             (949) 336-2433


                             FREDERICK D. COOKE, JR., ESQ.
                             Rubin, Winston, Diercks,
                             Harris & Cooke, LLP
                             1250 Connecticut Avenue NW
                             Suite 700
                             Washington, DC 20036
                             (202) 861-0870


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```

C O N T E N T S

TESTIMONY

ALICE MIERZWA:        Cross-Examination........................675
                      Redirect Examination.....................687

KAREN MACKEY:         Direct Examination.......................691
                      Cross-Examination........................696
                      Redirect Examination.....................707

GREGORY BROWNE:       Direct Examination.......................708
                      Cross-Examination........................716

YVONNE ANDERSON:      Direct Examination.......................723
                      Cross-Examination........................727
                      Redirect Examination.....................729

JUDITH MASON:         Direct Examination.......................730
                      Cross-Examination........................742

STEPHEN QUINDOZA:     Direct Examination.......................746

*   *   *

EXHIBITS RECEIVED

Government Exhibit No. 35 ................................715
Government Exhibit No. 7 .................................751
Government Exhibit No. 23 ................................752

*   *   *

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have criminal action 19-255, United States of America versus Frederick Gooding, and all counsel are present.

THE COURT:  All right.  Good morning.  At the end of the day yesterday, government counsel raised the issue that they believed that the door had been opened for admission of evidence having to do with Dr. Gooding's prior disciplinary actions from the Medical Board of Licensure and Discipline of the state of Delaware and the Board of Medicine for the District of Columbia.

Defendant had sought to exclude this information and the government sought to permit it.  According to the indictment, on or about December 2, 2010, Dr. Gooding was sanctioned by the Delaware board for performing cervical block injections without the use of fluoroscopic guidance.  The Delaware board, among other sanctions, suspended Dr. Gooding's license for six months and placed his medical license on a period of probation for approximately two years.  The board also prohibited Dr. Gooding from performing cervical and paracervical injections.

The D.C. medical board reinstated Dr. Gooding's medical license on or about July 13, 2012, with certain restrictions based on the findings of the Delaware medical board.

On or about February 6, 2014, the D.C. medical board

1    terminated its restrictions on Dr. Gooding's medical license.

2       Now, at the pretrial conference I held these motions in

3    abeyance, and I told you that I would not let the information

4    come into evidence unless Dr. Gooding opened the door by

5    disputing a contested element of knowledge, such as his

6    knowledge of what fluoroscopic imaging was, or the requirements

7    for using that imaging in certain procedures or by arguing

8    that he was mistaken.

9       As I said, if the defense were to do that, then the

10    evidence would come in as relevant to intent.  I also warned

11    defense counsel that they could also open the door through

12    questioning of witnesses during the government's case-in-

13    chief, and that if the defense counsel did so, I would permit

14    the government to admit that evidence.

15       And I believe the door has been opened in the government's

16    case-in-chief through questioning of the government witnesses.

17       In its questioning of Dr. Schaening-Perez, Mr. Khouri

18    probed extensively into the requirements for using fluoroscopy

19    imaging during certain injection procedures and whether

20    ultrasound was a permissible substitute for fluoroscopy.

21       For instance, Mr. Khouri had a line of questioning to

22    elicit that if there was any indication that he was not

23    permitted to use ultrasound or that fluoroscopy was truly

24    necessary, then a medical board would have taken action,

25    and that -- and I quote, "Medicare leaves that decision of

1     what a physician is going to do in the best interest of the

2     patient and how the physician wants to practice up to the

3     state, various state medical boards."  And that's at page

4     581 of the transcript.

5         The clear implication being that this is -- well, the

6     inference that the jury could draw was that this was a mere

7     administrative matter, not a matter of what is appropriate.

8     And I'm not talking about competent patient care; I'm talking

9     about the fact that the standards that -- Medicare requires

10    this imaging done as part of these kinds of injections.  And

11    the questioning was basically, you know, whether this is

12    appropriate is a question for the D.C. medical board.

13        And I think having raised that inference, the government

14    is entitled to put on evidence to rebut that inference, which

15    is that not only is that not -- not only is use of fluoroscopy

16    or CT technology with those kinds of injections required by

17    Medicare, but Dr. Gooding knows that that kind of imaging is

18    required for these injections because his license was

19    suspended and restrictions were placed on his license for

20    doing just this.  And so he was well aware that the

21    requirement was that he use fluoroscopic or other imaging

22    technology during these injections.

23        I mean, I don't know what the government intends to elicit,

24    but the fact is that in fact he agreed to stop doing these

25    cervical and paracervical injections for a period of time

1    after those sanctions.

2        Mr. Khouri yesterday then pressed Dr. Schaening-Perez

3    to acknowledge that the provisions of the insurance policy

4    pertaining to CPT code 64633, in quotes, "do not prohibit

5    ultrasound," and that the word "required" does not appear

6    in Government's Exhibits 26, 27, 28, and 29.  And that's

7    in the transcript at page 583 to 84.

8        Mr. Khouri then asked Dr. Schaening-Perez whether he

9    agreed that the long description and consumer description

10   were different, and whether that could create confusion

11   for anyone looking at the document, including a physician.

12   The implication being that ultrasound meets the consumer

13   description because it is a form of imaging guidance.

14   And that's at page 587 of the transcript.

15       Mr. Khouri also asked Dr. Schaening and Ms. Wright whether

16   mistakes can be made in billing even if someone is acting in

17   good faith, though the government objected to most of those

18   questions and I sustained the objections.

19       So it's clear to me that defense counsel disputes

20   Dr. Gooding's knowledge of whether fluoroscopic imaging was

21   required for certain injections, and that had ultrasound not

22   been permitted, a medical board would have taken action, and

23   that's the inference that's been raised, and so I am going

24   to allow the government to introduce that evidence.

25       Now, Mr. Khouri and the government mentioned at the end

1    of the day yesterday whether there could be some kind of a

2    stipulation.  Have the parties discussed that, Mr. Khouri?

3        MR. KHOURI:  Not yet, but I imagine that we will,

4    which raises my point.  I actually in all candor agree with

5    the Court.  I asked those questions for a specific purpose,

6    knowing and intentionally, to develop a defense -- actually,

7    multiple defenses -- to be utilized in closing argument.

8        So I think that -- what I'm concerned about is that what's

9    prejudicial -- overly prejudicial in the medical board order

10   needs to be redacted out, and I'm also concerned that we

11   accurately describe the administrative action to the jury.

12       No. 1.  It had nothing to do with Medicare.

13       No. 2.  It was limited to cervical injections.

14       And No. 3.  It is -- the Washington medical board did

15   nothing to Dr. Gooding's license except suspend it based

16   upon comity, reinstate it, and once it was reinstated he

17   had absolutely no restrictions on his license.

18       Delaware, yes.  Washington, D.C., no.  The other exception

19   was for a period of time since Dr. Gooding moved here to the

20   District, he transferred his probation here so that he didn't

21   have to keep running up to Delaware to comply with the terms

22   and conditions of the Delaware probation.

23       So I think it's very important to describe to the jury that

24   this is discipline imposed by the Delaware medical board, not

25   the Washington medical board.  That's one of the reasons he

1    moved his practice --

2              THE COURT:  Mr. Khouri, you're preaching to the choir.

3    I agree with you, I think we have to be very careful with this

4    evidence.  And that's one of the questions I was going to have

5    for the government:  How do you propose to admit this?

6              MR. KHOURI:  And before I --

7              MS. SIMON:  Your Honor, may I speak from here?

8              THE COURT:  I'm going to get to you.  Okay, Mr. Khouri.

9    And if you want a limiting instruction and you want to propose

10   a limiting instruction, I'll consider one.

11             MR. KHOURI:  Sure.  If you don't open the door, because

12   I know what the Court was thinking, then you lose a great

13   amount of defenses.

14             THE COURT:  Double-edged sword.  I hear you.

15             MR. KHOURI:  All right, Your Honor.  Thank you.

16             THE COURT:  Thank you.

17      Yes, Ms. Simon.

18             MS. SIMON:  Thank you, Your Honor.  So we certainly

19   agree that it's important to make sure that this evidence is

20   treated carefully.  The government has not sought and is not

21   seeking to get in the fact that the medical board complaint

22   stemmed from a patient death.

23             THE COURT:  No.  No, no, no.  You can't go there.

24             MS. SIMON:  We would, however, seek to admit the fact

25   that the board sanctioned the defendant.  We think the best

1    evidence for doing this is the board order itself in redacted

2    form.

3            THE COURT:  I haven't seen it.  All I have are the

4    parties' pleadings.  So what I'm going to ask you all to do

5    is at some time, I don't know if now or at the close of

6    Ms. Mierzwa's testimony, if you could or one of you could

7    start working on a proposed -- or show Mr. Khouri the proposed

8    redacted version.  I don't know if you have.

9            MS. SIMON:  We do have it, Your Honor.

10           THE COURT:  Okay.  I'm going to leave this to you all.

11   I'll step in if I have to.  If you want to talk about a

12   stipulation.  I'd like a proposed limiting instruction.  I may

13   make changes to it.  And if you all can agree on one, so much

14   the better.  But if not, that's going to give me some work to

15   do and I want to start having that -- do you want to have any

16   limiting instruction given when the evidence comes in or at

17   the close of the case, Mr. Khouri?

18           MR. KHOURI:  It depends on what the Court's going to

19   give.  I'll propose one that I would like the Court to give

20   at the time the evidence comes in.

21           THE COURT:  Okay.  Well, let Ms. Simon know about it

22   first.  Ms. Simon.

23           MS. WILLIS:  I believe we have a limiting instruction,

24   Your Honor.

25           MS. SIMON:  We're not trying to double-team.

1    Apologies.

2            MS. WILLIS:  I will just note that -- and we can talk

3    to defense about this, but in the government's proposed jury

4    instructions, in the top of Counts 1 through 11, contemplating

5    that this evidence might come in, the government does have

6    language in there that says you've heard evidence related to

7    events that took place starting in 2008.  The evidence of

8    events occurring before January 2015 was admitted for its

9    possible relevance to motive, opportunity, and it goes to

10   that.  However, to find him guilty of healthcare fraud you

11   must unanimously find that he -- I'm paraphrasing -- engaged

12   in affirmative healthcare fraud against Medicare on the dates

13   listed after January 2015.

14       I don't know if the Court wants to put more of a limiting

15   instruction in there, but that was an attempt for the

16   government --

17           THE COURT:  Okay.  I don't have it here with me.

18   I'll look at it.  Mr. Khouri, I need you to let me know if

19   you think that limiting instruction is okay or whether you

20   have any proposed changes.

21           MR. KHOURI:  I'll have to take a look at it.

22           THE COURT:  Okay.  If you could do that.

23           MR. KHOURI:  Did you need a copy of the Delaware order,

24   Your Honor?  Or did I mishear you?

25           THE COURT:  I haven't seen it.  So if you can show me a

1    copy of the redacted -- whatever it is you plan to admit or

2    seek to admit.

3         MR. KHOURI:  Okay.  This is the unredacted.

4         THE COURT:  Okay.  I want to see the version the jury's

5    going to get.

6         MS. SIMON:  Would you like to see our proposed

7    redaction, Your Honor, or after we speak with defense counsel?

8         THE COURT:  Why don't you show Mr. Khouri first.

9    We don't need to do any of this to get through Ms. Mierzwa's

10   testimony.  And then how many witnesses -- are you planning on

11   eliciting this through a witness?

12        MS. SIMON:  One moment, Your Honor.

13        MS. WILLIS:  Your Honor, the Delaware documents are --

14   we have a 902(11) certification.  Because the testimony would

15   be so limited, we would just want to put in the order with the

16   self-authenticating 902(11) cert and not say really anything

17   else about it.

18        THE COURT:  Okay.  Mr. Khouri, do you have any

19   objection -- I'm not talking about the substance of the

20   evidence -- to the method of admission?

21        MR. KHOURI:  Yes.

22        THE COURT:  I thought you might.

23        MR. KHOURI:  Number one, I think the evidence should

24   be admitted by stipulation that the government and the defense

25   work on and it's just read into evidence.  I don't think that

1     the order should be redacted because it leaves the jury to

2     think, well, what's in the redaction, and it raises an

3     implication that it's redacted because there's something bad

4     they don't want them to see.  So we can get the same

5     information to the jury by way of a simple stipulation.

6          THE COURT:  Well, I need to see the order, and I'll

7     consider that.  But I want both.  I want a proposed

8     stipulation -- well, it doesn't need to be proposed if you all

9     stipulate.  I'd like to have a joint stipulation saying the

10    defense and the government -- y'all can do this however you

11    want.  I think it would be fairer to have a joint stipulation

12    saying you agree that this happened.

13       But my inclination is also to admit the redacted order.

14    And I already have an instruction on redactions and I can give

15    it again, that they're not to speculate, there's information

16    in there that's not relevant and leave it at that.  But I do

17    think the government's entitled to have the actual order

18    admitted.

19       But see what stipulation you can come up with.  Maybe it

20    will satisfy the government.  To the extent you can work this

21    out amongst yourselves, that would be my preference.  But

22    otherwise I can tell you that I'm inclined to let the order

23    in with -- a redacted order with an appropriate limiting

24    instruction and with a stipulation if you can come up with

25    one.

1          So there's a lot of room for you to get -- you know, to

2     sanitize this and to pull the sting, because obviously --

3          MR. KHOURI:  I would suggest that counsel and I meet

4     over the lunch hour in the cafeteria.  Cafeterias usually work

5     magic.  I've learned that over the years.

6          MS. WILLIS:  The jury is there.

7          THE COURT:  Oh, the jury is there?  Maybe you can find

8     a breakout room or far away table.

9        By the way, I meant to tell you all that there is an online

10    ordering function for the cafeteria that's very handy if

11    you're in trial.  You can order online and then just pick it

12    up and not have to stand in line and mingle with everybody.

13       But you all work it out wherever you want to work it out.

14    Yes.

15         MS. SIMON:  Your Honor, just to clarify, we are seeking

16    to bring this in during our case-in-chief, and I know yesterday

17    there was some discussion about whether it would be --

18         THE COURT:  Yeah, I'm going to allow you to bring it in

19    in your case-in-chief.

20         MS. SIMON:  Thank you, Your Honor.

21         THE COURT:  Now, how many more witnesses do you have

22    after Ms. Mierzwa?

23         MS. SIMON:  Five witnesses, Your Honor.

24         THE COURT:  All right.  You gave me -- yesterday the

25    government -- I was given a case that I was told was from the

1    government with regard to impeachment on a collateral matter.

2    I read it.  I am familiar with that subject matter.  I don't

3    know what it's for or why you're teeing this up but I looked

4    at the case.

5        MS. SIMON:  Thank you, Your Honor.  Apologies.  I know

6    that it was also a long case.  The government believes defense

7    counsel may seek to cross one of today's witnesses, one of the

8    patient witnesses on prior drug abuse and mental health

9    issues.  So -- this belief is based in part on defense

10   counsel's questioning of this witness during her deposition.

11      It's the government's position that this witness's prior

12   drug use and mental health challenges are not relevant to this

13   case, and we're raising it in the hopes of sparing her any

14   embarrassment that's unnecessary.

15       THE COURT:  All right.  Well, a witness who takes the

16   stand puts their credibility at issue, and a witness who takes

17   the stand may be impeached with prior convictions.  I assume

18   that's not what we're talking about.

19       MS. SIMON:  That is not what we're talking about.

20       THE COURT:  Now, drug use and mental health issues, I

21   can imagine if there's an issue with regard to the witness's

22   competency to recall what the witness said that they're

23   recalling, that might be an issue.  In other words, if this is

24   somebody who has delusions or hallucinations or has a history

25   of fabrication, or who was under the influence of drugs at the

1   time the witness says they made these observations, I could

2   see where it could be relevant.

3        Mr. Khouri?

4        But otherwise -- and I'll finish my thought.  But otherwise

5   it doesn't come in simply to show that they're a bad person,

6   unless it bears on their credibility in some way, you know,

7   prior fraud, prior acts of dishonesty.

8        MR. KHOURI:  I understand.  So what I have is

9   Exhibit I, which was included in our exhibits when I write to

10  court, and it's a medical report from the VA that describes a

11  couple things.

12       THE COURT:  Hold on, Mr. Khouri.  Let me just get to

13  it.  As it happens, that exhibit is empty.  I don't have it.

14       THE DEPUTY CLERK:  It might be on the side.

15       MR. KHOURI:  In one of the sleeves.

16       THE DEPUTY CLERK:  Behind that list I put one.

17       THE COURT:  Progress notes?

18       MR. KHOURI:  Yes, Your Honor.

19       THE COURT:  Okay.

20       MR. KHOURI:  So if you look about a third of the way --

21  not even a third, about 20 percent down it says problem list,

22  and it says that this witness has Bipolar II Disorder and

23  chronic cocaine dependence.

24       THE COURT:  Yes.

25       MR. KHOURI:  Now, when I took -- well, when I

1    participated in the deposition of this witness, she denied

2    ever receiving any shots that were billed for by Dr. Gooding.

3    She also denied any cocaine or any opioid dependence, which is

4    also listed, opioid-type dependence, a little bit farther

5    down.  She even denied having a couple MRIs that apparently

6    the government isn't challenging me being able to impeach her

7    if she testifies similarly.

8         She spoke to an FBI agent just a few days ago and denied

9    having these MRIs.

10              THE COURT:  Sounds like you've got plenty to work with.

11              MR. KHOURI:  So I do.  And I think it's reasonable to

12   suggest that one of the reasons she can't recall is that she's

13   bipolar and she's habitually addicted to cocaine.

14              THE COURT:  All right.  Well, obviously you're allowed

15   to cross-examine her on her denial of the MRIs.  But as to her

16   bipolar condition, I don't think -- I'm not going to allow you

17   to cross-examine her on that.

18        First of all, you haven't -- I mean, she's bipolar.  She

19   hasn't denied being bipolar, but how would her being bipolar

20   affect her ability to recall?  People are bipolar and function

21   very well.  It's a mental health condition that many people

22   live with and function productively with, and it's not -- you

23   know, it's personal to her, and unless you can show me some

24   nexus between her ability to recall here or what was going

25   on, then I'm not going to allow you to cross-examine on her

1   bipolar condition.

2       As to the drug -- her denial of the cocaine use, again,

3   that's something that people would deny.  It doesn't go to

4   her honesty or her integrity; it goes to her unwillingness

5   to admit that she was using cocaine, and/or opioids, which

6   I also see indicated on there.

7       And unless there's a connection that she was using drugs

8   at the time she denied it in the deposition or under the

9   influence of drugs here today, I'm not sure how it comes in.

10      But you have plenty to cross-examine her with regard to

11  her denial of receiving the MRI because it goes straight, as

12  far as I can see, to her credibility on the issue of whether

13  she got the injection or not.

14          MR. KHOURI:  All right, Your Honor.  Thank you.

15          MS. SIMON:  Your Honor, I'm sorry.  I just want to

16  make sure, in the interest of full candor to the Court, I

17  have this patient's deposition transcript.

18      When Mr. Khouri was questioning her, he did say, "Question:

19  Do you deny that you ever have had bipolar disease?"  And the

20  witness's answer was "Yes."  So she did deny that.  It's our

21  position this is a collateral matter that is not relevant to

22  the charges at hand, and she shouldn't be impeached on this

23  answer.

24          THE COURT:  Yeah, I don't think that would have been

25  appropriate on direct examination or cross-examination.  So

1    I think it is a collateral issue.  As I said, if the witness

2    -- if there's an assertion or a proffer that the witness was

3    under the influence of drugs today or under the influence of

4    drugs at the time of the deposition, then yes, Mr. Khouri

5    could cross-examine her on her drug use.  But I think the fact

6    that she's already made a denial about having an MRI procedure

7    for which there's impeaching evidence will be sufficient.

8              MS. SIMON:  Thank you, Your Honor.

9              THE COURT:  Again, I don't know.  Maybe the witness

10   will say something that opens the door to that line of

11   cross-examination, and I know if the witness does, Mr. Khouri

12   will be asking me to revisit my ruling.  So we'll see.  But at

13   this point that's where I am on that.

14       All right.  Can we bring in the jury?

15             MS. SIMON:  The government has nothing further.

16             THE DEPUTY CLERK:  Your Honor, the jury panel.

17       (Jury in at 9:48 a.m.)

18             THE COURT:  Good morning.  Lovely day, and it is

19   Friday.  And we are moving along very well in our trial.

20   So thank you all for being here and being on time.  Sorry we're

21   running a little late.  But I assure you it's because we are

22   trying to streamline the presentation of evidence in this case.

23       So I believe we were about to start the cross-examination of

24   Ms. Mierzwa, who can come forward.

25

1    ALICE MIERZWA, WITNESS FOR THE GOVERNMENT, PREVIOUSLY SWORN

2                           CROSS-EXAMINATION

3    BY MR. KHOURI:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   My name is Mike Khouri, and I'm one of Dr. Gooding's

7    lawyers.  And it's a pleasure to meet you.

8    A.   Likewise.

9    Q.   You work for a private company that has a contract with

10   the Medicare administration.  Is that true?

11   A.   Yes.

12   Q.   And that private contractor employs hundreds of employees

13   to help the government manage and deliver the Medicare health

14   benefit program.  Correct?

15   A.   Yes.

16   Q.   And part of the function of your company to assist the

17   government in managing the Medicare program is to perform the

18   type of audit that you performed with respect to Dr. Gooding.

19   Correct?

20   A.   Yes.

21   Q.   And part of the objectives in doing so is to identify

22   what Medicare now perceives as an overpayment so that you

23   can recoup money for the government.  True?

24   A.   Yes.

25   Q.   By the way, do you also deal with claims that were

1    originally rejected by Medicare?

2    A.    No.

3    Q.    Were any of the claims that you looked at in this case

4    rejected by Medicare?

5    A.    You mean initially?

6    Q.    Yes.

7    A.    No.

8    Q.    Afterwards were they rejected?

9    A.    Yes.

10   Q.    It's true that Medicare does not pay all claims.  Right?

11   A.    Yes.

12   Q.    Okay.  Now, you identified Dr. Gooding for an audit based

13   upon a review of data.  Correct?

14   A.    Yes.

15   Q.    And the terminology y'all use to identify someone to be

16   audited is that person's an outlier.  Right?

17   A.    Yes.

18   Q.    When you identified or looked at that data, did you

19   personally prepare that data?

20   A.    No.

21   Q.    The data was prepared -- was it prepared by another

22   department in your same company or another company?

23   A.    Same -- a different department in my company.

24   Q.    Are you aware of any guidelines that the company follows

25   in order to determine what statistics are important?

1   A.   I don't have that information personally.

2   Q.   You don't know.

3   A.   No.

4   Q.   Okay.  You've never received any training or a handbook

5   that sets forth these guidelines?

6   A.   There are guidelines, yes.

7   Q.   And are these guidelines that you've personally looked

8   at?

9   A.   No.

10   Q.   So when you looked at the data, I imagine that you

11   interpreted it or identified Dr. Gooding as a candidate for

12   an audit because of the frequency of his billing.

13   A.   I personally did not identify Dr. Gooding.

14   Q.   Somebody else did.

15   A.   Yes.

16   Q.   But I imagine you have general knowledge of why people

17   are identified for an audit.  Right?

18   A.   Yes.

19   Q.   Do you know whether anybody determined how many patients

20   that Dr. Gooding sees are Medicare patients?

21   A.   I don't know.

22   Q.   Does it make common sense to you that if a person has

23   a very high percentage of patients covered by Medicare, that

24   percentage-wise their Medicare billings will be higher than

25   people who do not?

1    A.   They're compared to their peers.

2    Q.   Right.  Compared to their peers.  So let's talk about the

3    definition of peers.  Is the comparison to the peers, are the

4    peers composed of physicians that have a very high percentage

5    of Medicare patients like Dr. Gooding, virtually all of them?

6          MS. SIMON:  Objection, Your Honor.

7          MR. KHOURI:  I can rephrase.

8          THE COURT:  I'll sustain the objection.  Ask you to

9    rephrase, Mr. Khouri.

10   BY MR. KHOURI:

11   Q.   Do you know if the comparison to the peers are peers that

12   have almost all Medicare patients?

13   A.   No.

14   Q.   Now, you know that this audit concerned a doctor that

15   conducted -- had a pain management practice.  Right?

16   A.   Yes.

17   Q.   And you probably know -- tell me if you don't -- that

18   pain can be treated different ways.  For instance, an

19   injection is one.  Right?

20   A.   Yes.

21   Q.   And another way to treat pain is through opioids.

22   Correct?

23   A.   Yes.

24   Q.   And another one is surgery.  Right?

25   A.   Yes.

1    Q.   Okay.  Now, are you familiar with that pain management

2    physicians can be from different specialties like physiatry,

3    anesthesiology, physiatry, surgery, and so on?

4    A.   Yes.

5    Q.   You know, you're pretty familiar with how different areas

6    of medicine work.

7            MS. SIMON:  Objection, Your Honor.  Beyond the scope.

8            MR. KHOURI:  It was a bad question.

9            THE COURT:  Okay.  Try again.

10   BY MR. KHOURI:

11   Q.   So, do you know if the peers that Dr. Gooding was

12   compared to were only physiatrists.?

13   A.   I personally do not know.

14   Q.   Do you know if the peers Dr. Gooding was compared to

15   included physicians that didn't do injections but prescribed

16   opiates?

17   A.   I don't know.

18   Q.   And do you know if the peers that Dr. Gooding was

19   compared to included physicians that didn't do injections,

20   didn't prescribe opiates, but did surgery?  Right?

21   A.   I don't know.

22   Q.   Does it make sense to you that when you're dealing with

23   patients in their 80s, that getting them addicted to opiates

24   is probably a bad thing?

25           MS. SIMON:  Objection, Your Honor.

1          MR. KHOURI:  I'll rephrase.

2          THE COURT:  Yes.  I don't think getting addicted to

3     opioids is ever a good thing.

4     BY MR. KHOURI:

5     Q.   Does it make sense to you as a healthcare auditor that

6     there are other alternatives -- that there are alternatives to

7     treating pain other than prescribing opiates because of the

8     possibility of addiction?

9          MS. SIMON:  Same objection, Your Honor.

10         THE COURT:  I'll allow it, but Mr. Khouri, you're

11    straying far from the scope.

12         MR. KHOURI:  Okay.

13    BY MR. KHOURI:

14    Q.   Does that make sense to you?

15    A.   Yes.

16    Q.   So there's also -- have you ever heard of anything called

17    radiofrequency ablation?

18    A.   Yes.

19    Q.   And that's a way of killing nerves with radio waves

20    that's performed by interventional radiologists, correct?

21         MS. SIMON:  Objection, Your Honor.

22         THE COURT:  Sustained.  Mr. Khouri, you're --

23    BY MR. KHOURI:

24    Q.   What do you know about radio --

25         THE COURT:  Wait.  Wait.  That line of questioning

 1    is beyond the scope of the direct examination.

 2             MR. KHOURI:  All right.

 3    BY MR. KHOURI:

 4    Q.    Okay.  So let's move on.  So you identified Dr. Gooding

 5    for an audit, and one of the areas that you found to be

 6    lacking in Dr. Gooding's billing was what you termed a lack

 7    of medical necessity.  Right?

 8    A.    Yes.

 9    Q.    Now, I'm going to -- I'm thinking that you made the

10    determination of medical necessity based on the documentation.

11    Correct?

12    A.    Yes.

13    Q.    And that was a documentation from one visit to another.

14    Right?

15    A.    That was the documentation submitted.

16    Q.    Submitted for the dates that you were auditing?

17    A.    Submitted by the provider.

18    Q.    I understand that, ma'am.  But submitted by the provider

19    for the dates of billings that you were auditing.

20    A.    I reviewed the dates that were under medical review.

21    Not all the medical records were for that particular one

22    date of service.

23    Q.    Okay.  So if you -- did you look at the entire patient's

24    chart and make a determination of medical necessity based upon

25    whether the patient was experiencing pain and the pain got

1    better?

2    A.   I looked at the entire medical records submitted.

3    Q.   So my question is, did you take into consideration that

4    the patient started treating with Dr. Gooding and had pain

5    and then got better?  Did you take that into consideration?

6    A.   I evaluated the medical record to see whether the

7    requirements of the codes billed were met.

8         MR. KHOURI:  I'm going to ask the Court permission

9    to reask this question.

10        THE COURT:  Well, your question assumes facts not in

11   evidence.  I'm looking at your question now.  Your question

12   was:  "So my question is did you take into consideration that

13   the patient started treating with Dr. Gooding and had pain and

14   then got better."

15        MR. KHOURI:  Okay.

16   BY MR. KHOURI:

17   Q.   Did you look at the medical records and ask yourself

18   the question, did the patient start with pain and got better?

19   A.   I evaluated the medical record to see whether the

20   requirements of the CPT codes were met.

21   Q.   Okay.  Let me try it this way.  Did you contact the

22   patients and ask them that question:  Did you start out with

23   pain and did you get better?

24   A.   No.

25   Q.   Did you contact any of the patients and ask them that

1     question --

2     A.    No.

3     Q.    -- did you start out with pain and get better.  No.

4     Okay.  Is that your answer, no?

5     A.    That's correct.

6     Q.    Okay.  And doesn't it make sense to you that the best

7     test of medical necessity is whether a patient was sick and

8     then got better?

9     A.    That's one aspect of medical necessity or --

10    Q.    But it's not the aspect that you're asked to look at.

11    You're asked to look at the codes and check the documentation.

12    Right?

13    A.    Looking to see whether the requirements for the code are

14    met.

15    Q.    Right.  Based upon the documentation.

16    A.    Yes.

17    Q.    Okay.  And the requirements of the code, you relied upon

18    the CPT book, I presume?

19    A.    Yes.

20    Q.    And when you read the code about these injections, you

21    relied upon an area in the CPT description in parentheses

22    that says "fluoroscopy or CT."  Right?

23    A.    Yes.

24    Q.    Was there anything in the code that prohibited using

25    ultrasound as opposed to fluoroscopy or CT?

1    A.   No.

2         MR. KHOURI:  Could I have one moment, please?

3         THE COURT:  Yes.

4         MR. KHOURI:  Could I ask the government to pull up

5    Exhibit 26?

6       (Exhibit published.)

7         MR. KHOURI:  Your Honor, may I speak to Mr. Bradley?

8       (Off-the-record discussion.)

9         MR. KHOURI:  I think we have it solved.

10   BY MR. KHOURI:

11   Q.   Do you have a copy on your screen?

12   A.   No.

13        THE DEPUTY CLERK:  If you put it on the ELMO, everybody

14   can see it.

15        THE COURT:  Well, let's not give up the ghost on the

16   exhibit yet, because we're going to need that today working.

17   Mine's flickering.

18        MR. KHOURI:  Could I approach the witness, Your Honor,

19   with this exhibit?

20        THE COURT:  Yes.

21   BY MR. KHOURI:

22   Q.   So I'm going to place in front of you what's been marked

23   as Government's Exhibit 26, and it's been admitted in evidence

24   and I'm going to put it in front of you.

25        Have you ever seen that document before?

1    A.    It looks to be a page from the CPT book.

2    Q.    And do you see the two descriptions of the code at the

3    top, one says long description, I think?  I'm just going from

4    memory.  And the other one goes consumer friendly description?

5    A.    Yes.

6    Q.    And could you read to yourself the consumer friendly

7    description?

8    A.    Out loud or to myself?

9    Q.    Just read it to yourself and then I have a couple

10   questions.

11         (Witness complies.)

12         Now, that description allows for the billing of that

13   code, just according to the description, with imaging

14   guidance.  Correct?

15   A.    Yes.

16   Q.    Now, that looks like a page out of the CPT code, and

17   the CPT code is a code book.  I'm revealing my age.  Do you

18   remember telephone books?

19   A.    Yes.

20   Q.    Yeah.  Big thick books, about, I don't know, five inches

21   big.  And the CPT book is kind of like a telephone book, but

22   it contains all the codes.  Right?

23   A.    Yes.

24   Q.    And in that book there are hundreds if not thousands of

25   codes.  Right?

1    A.   Yes.

2    Q.   It ranges from anesthesiology services to podiatry

3    services and everything in between.  Right?

4    A.   Yes.

5    Q.   So it's a book that's used by, partially by physicians,

6    to determine how to best bill their services.  Right?

7    A.   I don't work for a physician.

8    Q.   Okay.

9    A.   I can't answer that.

10    Q.   All right.  You don't know.  It's used by medical billers

11    and coders.  Right?

12    A.   Yes.

13    Q.   And it's used by the medical billers and coders that work

14    for physicians.  Right?

15    A.   Yes.

16    Q.   Who are working on behalf of physicians to determine how

17    best to bill their services.  Correct?

18    A.   Yes.

19         MR. KHOURI:  Thank you very much.  I have nothing

20    further, Your Honor.  Can I approach the witness and retrieve

21    the exhibit?

22         THE COURT:  Yes.

23         MS. SIMON:  Redirect, Your Honor?

24         THE COURT:  Yes, Ms. Simon.

25

1                    REDIRECT EXAMINATION

2     BY MS. SIMON:

3     Q.    Hello again, Ms. Mierzwa.

4     A.    Hello.

5     Q.    Just a few questions.  Mr. Khouri asked you a moment

6     ago about determining outlier biller status and selecting

7     Dr. Gooding for the claims review.  That wasn't your job.

8     A.    That's correct.

9     Q.    Correct?

10    A.    No, it was not.

11    Q.    You didn't identify Dr. Gooding for that claims review.

12    A.    No.

13    Q.    And when you were a claims review nurse, did you identify

14    any of the providers that you reviewed in the clinical review?

15    A.    No.

16    Q.    When you were conducting the clinical reviews, was it

17    part of your job to call patients whose files you were

18    reviewing from the providers?

19    A.    No.

20    Q.    Did you ever call a patient?

21    A.    No.

22    Q.    Was that something that Novitas had as one of the steps

23    that you should or could take as part of a clinical review?

24    A.    No.

25    Q.    When you performed the clinical review of Dr. Gooding's

1    claims in 2017, you looked at the actual claims that

2    Dr. Gooding had billed to Medicare?

3    A.   Yes.

4    Q.   And the documentation that he provided to Medicare for

5    this claims review.

6    A.   Yes.

7    Q.   And in looking at all of that, all of the claims were

8    denied.

9    A.   Yes.

10   Q.   I believe that you said something a moment ago that the

11   code that you were looking at, Exhibit 26, doesn't prohibit

12   ultrasound.  Is that right?

13   A.   I'd like to clarify, the Exhibit 26 did not include one

14   of the codes that I reviewed.

15            MR. KHOURI:  Objection.

16            THE COURT:  Overruled.

17            MS. SIMON:  Your Honor, for clarity, I'll just bring

18   up Exhibit 26.

19            THE COURT:  Yes.  I think that makes sense.

20            MS. SIMON:  And could we just highlight from the year

21   2017?  I think we all agree that's what we're talking about

22   with this witness.  Thank you so much, Ms. Slater.

23   BY MS. SIMON:

24   Q.   So, Ms. Mierzwa, this is the exhibit I was just referring

25   to.  And I believe the answer that you provided to Mr. Khouri

MIERZWA - REDIRECT

1    was that there's nothing in this code that prohibits

2    ultrasound.  Is that correct?

3    A.   Yes.

4    Q.   But you said a moment ago that you wanted to clarify

5    something?  Is that clarified now that you have looked at

6    this exhibit?

7    A.   This is for code 64633.  I did not review that code

8    during the medical review.

9    Q.   Thank you, Ms. Mierzwa.

10        Exhibit 28, please.

11        So, are we now looking at CPT code 64635?

12        This is for the year 2017 that we've highlighted.

13   Could you please look at this language and let us know if

14   your answer is the same, that there's nothing in this code,

15   64635, that prohibits ultrasound?

16   A.   It does not prohibit.

17   Q.   Is there anything in the code that allows ultrasound?

18   A.   No.

19   Q.   Does this code in general require imaging guidance?

20   A.   Yes.

21   Q.   And is the imaging guidance required during the

22   injection?

23   A.   Yes.

24        MS. SIMON:  Court's indulgence.

25

1    BY MS. SIMON:

2    Q.   And just one other question, Ms. Mierzwa.  You also spoke

3    with --

4             MR. KHOURI:  May I pose an objection?

5         (Bench conference.)

6             MR. COOKE:  I know your rule about double-teaming,

7    but Mr. Khouri was talking to the client when the question

8    was asked and he may not have heard it.

9             THE COURT:  That's okay.

10            MR. COOKE:  Counsel for the government asked the

11   witness if there was anything in the CPT codes that allowed

12   ultrasound, and the answer was no.  That's just not true.

13            THE COURT:  The question -- I'm looking at it right

14   here.  It says, "is there anything in the code."  She's

15   referring to 64635, anything in "the code," not in the whole

16   CPT.

17            MR. COOKE:  Okay.  All right.

18        (End of bench conference.)

19            THE COURT:  Objection's overruled.

20   BY MS. SIMON:

21   Q.   Ms. Mierzwa, when you were answering Mr. Khouri's

22   questions about medical necessity, were you talking about

23   medical necessity from the perspective of Medicare to pay

24   claims?

25   A.   Yes.

```
 1              MS. SIMON:  Nothing further.  Thank you.
 2              THE COURT:  Thank you, Ms. Mierzwa.  You're free to
 3     leave.
 4              THE WITNESS:  Thank you.
 5          (Witness steps down.)
 6              THE COURT:  Next witness.
 7              MS. SIMON:  The government calls Karen Mackey.
 8          KAREN MACKEY, WITNESS FOR THE GOVERNMENT, SWORN
 9                         DIRECT EXAMINATION
10     BY MS. SIMON:
11     Q.   Good morning, Ms. Mackey.
12     A.   Good morning.
13     Q.   Can you see me all right?
14     A.   Yes.
15     Q.   Great.  Can you please say and spell your name?
16     A.   Karen Mackey.  K-A-R-E-N, M-A-C-K-E-Y.
17     Q.   And, Ms. Mackey, where do you live?
18     A.   I live in Washington, D.C., in Northeast.
19     Q.   How long have you lived in D.C.?
20     A.   All my life.
21     Q.   And are you currently working?  Are you retired?
22     A.   I'm retired.
23     Q.   What did you do before you were retired?
24     A.   Before I retired I worked as a program analyst at the
25     VA medical center, and I also was in the United States Army
```

1    for over 15 years.

2    Q.   Do you have health insurance?

3    A.   Yes.

4    Q.   And what health insurance do you have?

5    A.   Currently I'm using Medicare, and there's a portion

6    of Medicaid that I have that the city provides.

7    Q.   And how long -- when did you start having Medicare,

8    if you remember?

9    A.   I started receiving Medicare in 2009.

10   Q.   Do you know Dr. Frederick Gooding?

11   A.   Yes.

12   Q.   How do you know him?

13   A.   I know him from a referral from a friend, a doctor,

14   Peter Greene referred him to me, and he was working at

15   Providence Hospital.  I had knee problems and he was suggested

16   as an interim or something else to go instead of using --

17   having knee replacement surgery.

18   Q.   So you went to see Dr. Gooding for your knee problem.

19   A.   Yes.

20   Q.   Do you remember approximately when you started to see

21   Dr. Gooding for your knee problem?

22   A.   My recollection is either very late 2015 or the beginning

23   of January of 2016.

24   Q.   And what type of treatment, if any, did Dr. Gooding do

25   for your knee?

1    A.   One of the treatments I remember, I believe was

2    aspiration.  He removed some fluid from my knee, and

3    I received cortisone shots.

4    Q.   Did you remember in 2016 getting an MRI of your knee?

5    A.   No.

6    Q.   Did Dr. Gooding treat you for anything other than your

7    knee?

8    A.   No.

9    Q.   And what knee was that?

10   A.   Left.

11   Q.   Did he treat you for pain in your lower back?

12   A.   No.

13   Q.   Did you have pain in your lower back when you were seeing

14   Dr. Gooding?

15   A.   No.

16   Q.   Other than the knee injection, I think you said cortisone

17   shot and aspiration of your knee, did Dr. Gooding give you

18   injections anywhere else on your body?

19   A.   No.

20   Q.   Did there come a time that you stopped going to

21   Dr. Gooding for treatment?

22   A.   Yes.

23   Q.   When was that?

24   A.   It was probably -- I think it was in late 2016.  This is

25   a while ago.  I'm estimating.

1    Q.   Was there something -- was there something that happened

2    in late 2016 that made it so that you -- sorry, Your Honor.

3    I'm going to strike that question.

4         Do you remember why you stopped going to Dr. Gooding?

5    A.   Yes.  I started receiving -- well, always you receive

6    these summaries in the mail from Medicare.  It's not a bill,

7    but it's a summary of services that you receive from any

8    doctors that you've seen under your Medicare health insurance.

9    And I received -- and I look at mine, and I received a summary

10   that was very odd.

11        It was about some treatment that I received at

12   Dr. Gooding's office, and one day stood out in particular

13   of some treatment that I knew I hadn't received, and it was

14   pretty blatant.  So I called Medicare, who suggested that I go

15   into the doctor's office that I visited and inquire about it.

16   Q.   And just so we're clear, you said you saw procedures --

17   or items on this statement that were procedures that you knew

18   that hadn't been done.

19   A.   Exactly.

20   Q.   Okay.  What were those procedures?

21   A.   One of them -- I'm not sure what the technical term is,

22   but one of them seemed like something like, it had to do with

23   my spine.

24   Q.   Why did that stand out for you?

25   A.   It stands out because that's a very specific type of

1    procedure in my opinion.  And I hadn't had any type of

2    procedure that had to do with anyone going into my back or

3    into my spine area, either to the top or the bottom of my

4    back.

5            MS. SIMON:  Nothing further, Your Honor.

6        Thank you, Ms. Mackey.

7            THE COURT:  Cross-examination.  Mr. Khouri?

8          (Bench conference.)

9            THE COURT:  Yes, Mr. Khouri.

10           MR. KHOURI:  So Exhibit I, on the first page, the

11    first item under the --

12           THE COURT:  Hold on.  Let me grab it.  Hold on.

13       Yes.

14           MR. KHOURI:  The first item says backache.

15           THE COURT:  All right.

16           MR. KHOURI:  And if I go on -- first item says

17    backache.

18           THE COURT:  You can cross on that.

19           MR. KHOURI:  Okay.  Thank you.

20           THE COURT:  You can cross on the fact that she

21    said backache and she said she didn't have any back pain.

22    You still can't go into the drug use or the bipolar.

23           MR. KHOURI:  Of course.

24           THE COURT:  Okay.

25           MR. KHOURI:  Okay, thanks.

1              CROSS-EXAMINATION

2    BY MR. KHOURI:

3    Q.   Good morning.

4    A.   Good morning.

5    Q.   I don't know if you recognize me.  I'm Mike Khouri.

6    I'm one of Dr. Gooding's lawyers.  It's a pleasure to meet you.

7       Now, you treated with Dr. Gooding between 2015 and the end

8    of 2016.  Correct?

9    A.   Yes.

10   Q.   And you were referred to Dr. Gooding by a physician.  True?

11   A.   Yes.

12   Q.   And the physician that referred you to Dr. Gooding was --

13   did I hear correctly was a friend of yours?

14   A.   Yes.

15   Q.   And do you remember or do you know what kind of physician

16   he was?  Or she?

17   A.   The referring physician?

18   Q.   Yes.

19   A.   Dermatologist.

20   Q.   Had you treated with this physician for a long time?

21   A.   The physician that referred me to Dr. Gooding was a

22   friend that happened to be a physician.

23   Q.   Okay.  And you trusted your friend to refer you to

24   someone that your friend believed was a good doctor and could

25   help you.  Right?

1    A.    Yes.

2    Q.    With respect to the treatments that were rendered to your

3    knee, those consisted, according to your recollection, of

4    aspiration of fluid from the knee?

5    A.    Yes.

6    Q.    And is it your recollection that Dr. Gooding never gave

7    you an injection in your back?

8    A.    Correct.

9    Q.    And this was about -- your treatment was about six or

10   seven years ago?

11   A.    That would be correct.

12   Q.    Roughly?

13   A.    Yeah.

14   Q.    Now, do you remember having an MRI on your knee during

15   the treatment period with Dr. Gooding?

16   A.    No, I do not.

17   Q.    Or at any time?

18   A.    No.

19   Q.    Do you remember having an MRI on your back at any time?

20   A.    No.

21   Q.    Or during the treatment time?

22   A.    No.

23   Q.    Do you remember speaking to an FBI agent on or about

24   September 2 and telling the FBI agent that you never had an

25   MRI?

1    A.   I don't remember.

2    Q.   Okay.  Do you remember telling the FBI agent on September

3    2 that you knew you never had an MRI because you wouldn't get

4    into one of those cases?

5    A.   Not exactly.  I would have remembered the casing.  So

6    that's why I did not remember having an MRI.  I've had an MRI

7    before, so I would have remembered had I had one.

8    Q.   So you did tell that to the FBI on September 2?

9    A.   No.  You're asking me if I remember telling the FBI agent

10   that.  I'm telling you I do not remember that conversation.

11   Q.   Would it refresh your recollection if I showed you a copy

12   of the agent's report?

13   A.   That's your choice, sir.

14   Q.   I'm sorry?  Is that yes?

15   A.   Sure.

16        MR. KHOURI:  May I approach, Your Honor?

17        THE COURT:  Yes.

18     (Witness reviewing document.)

19   BY MR. KHOURI:

20   Q.   Now, I placed before you what appears to be a copy --

21        THE COURT:  Mr. Khouri, just ask the witness to look

22   at the document and read it to herself.

23        MR. KHOURI:  I'm just about to, Your Honor.

24   BY MR. KHOURI:

25   Q.   And did you read that document?  Don't read it aloud.

1    Just read it.

2         (Witness reviewing document.)

3         Tell me when you're done and then I have a few questions.

4    A.   Okay.

5    Q.   Having read that document, does it refresh your

6    recollection of what you told the FBI on September 2?

7    A.   Yes.

8    Q.   I don't want you to just read what's on the document.

9    I want to know does it refresh your recollection.  Do you

10   remember?

11   A.   No.  I can't obviously say that I absolutely remember

12   that day.  But it states the exact same thing that I just said

13   to you, that I didn't remember having the MRI.

14   Q.   Do you remember being interviewed by the FBI on September

15   2?

16   A.   I do, on a few occasions I certainly do remember.  But

17   the exact dates, no.

18   Q.   But you don't remember what you told the agent.

19   A.   No.  Not specifically, I don't.

20        MR. KHOURI:  May I retrieve the document?

21        THE COURT:  Yes.

22   BY MR. KHOURI:

23   Q.   Now, do you know a hospital in Washington, D.C., called

24   Providence Hospital?

25   A.   Yes.

1    Q.   And do you recall receiving an MRI of your lumbar spine,

2    mid-back, in January of 2016?

3    A.   No, I don't.

4    Q.   Would it refresh your recollection if I showed you --

5    well, before I do that, your name is Karen Mackey,

6    M-A-C-K-E-Y?

7    A.   Yes.

8    Q.   And Karen is common spelling K-A-R-E-N?

9    A.   Correct.

10    Q.   Your date of birth is &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;?

11    A.   Yes.

12         THE COURT:  Mr. Khouri, we don't usually put that sort

13    of information in a public transcript.  I'm going to ask that

14    that information be sealed.

15         MR. KHOURI:  All right.

16    BY MR. KHOURI:

17    Q.   Do you know of any other Karen Mackey?

18    A.   No.

19    Q.   Would it refresh your recollection if I showed you a

20    copy of your MRI report of the spine ordered by Dr. Gooding?

21    A.   No.

22    Q.   It wouldn't?  Okay.

23         MR. KHOURI:  Your Honor, this document has already

24    been admitted into evidence.  Can I put it up on the ELMO?

25         THE COURT:  Has it been admitted?  Yes, you may.

 1                MR. KHOURI:   Thank you.

 2      BY MR. KHOURI:

 3      Q.   Now, is it your testimony --

 4                THE COURT:   What's the exhibit number?   I'm sorry.

 5      The exhibit number?

 6                MR. KHOURI:   I would have to look.   It's 11.   Okay.

 7      Exhibit 11.

 8                THE COURT:   Thank you.   Just for my records.

 9      BY MR. KHOURI:

10      Q.   Now, is it your testimony that you did not at the time

11      have any pain in your back?

12      A.   Say that again, please?

13      Q.   At the time that you treated with Dr. Gooding, around

14      that time, did you have any pain in your back?

15      A.   Not that I remember.

16      Q.   Okay.   Did you have any problems with bulging discs?

17      A.   No.

18      Q.   Okay.   So I'm going to show you --

19                THE COURT:   We don't have 11 up, by the way.   It's not

20      up yet.

21      BY MR. KHOURI:

22      Q.   Okay.   So I'm going to show you page 1 of the MRI report.

23                THE COURT:   Is that Exhibit 11?

24                MR. KHOURI:   It is.

25                THE COURT:   Okay.

1    BY MR. KHOURI:

2    Q.   So just to reiterate, was Providence Hospital located in

3    Washington, D.C., at the time you treated with Dr. Gooding?

4    A.   Yes.

5    Q.   And was Providence Hospital near where you resided?

6    A.   Somewhat.  Sure.

7    Q.   So it would be one that you would seek medical care at

8    if it was recommended to you?

9    A.   Yes.

10   Q.   And the patient name that I'm pointing to, that's your

11   name?

12   A.   Yes.

13   Q.   And that's your date of birth.

14   A.   Yes.

15   Q.   And you see that the procedure is an MRI of the lumbar

16   spine without contrast on January 25, 2016?  You were treating

17   with Dr. Gooding at that time, right?

18   A.   Correct.

19   Q.   And the exam is an MRI of the lumbar spine.  And let me

20   show you page 2, which has the findings.  One finding is a

21   broad-based disc bulge.  Another finding -- a third finding

22   that are the same but at different levels of your lumbar

23   spine, and that you have multilevel degenerate disc disease.

24        Do you remember now obtaining this MRI?

25   A.   No, I don't.

1    Q.   Okay.  Can you think of any reason why Providence

2    Hospital would put your name and date of birth on an MRI

3    report other than you having received the MRI?

4    A.   Certainly can't.

5    Q.   Okay.  Now, is it your testimony that you never received

6    an MRI of the knee?

7    A.   That's correct.

8         MR. KHOURI:  So again, Your Honor, if I could put

9    another part of Exhibit 11 on the ELMO?

10         THE COURT:  Yes.

11    BY MR. KHOURI:

12    Q.   Again, Providence Hospital.  There's only one Providence

13    Hospital, correct, in Washington, D.C.?

14    A.   That I know of, yeah.

15    Q.   Name, date of birth, those are yours.  Correct?

16    A.   Correct.

17    Q.   January 25, 2016.  And you were treating with Dr. Gooding

18    at the time.

19    A.   Yes.

20    Q.   And I will put up page 2, where the doctor's findings

21    are made.  Is it still your testimony that you cannot remember

22    having an MRI of the knee at Providence Hospital?

23    A.   That's correct.

24    Q.   I don't mean to pry, but can you think of any reason why

25    you can't remember?

1      A.   No.

2      Q.   Okay.  Now, is it your testimony that you never had any

3      back pain at the time you treated with Dr. Gooding?

4      A.   That's correct.

5      Q.   Okay.  Were you ever a patient at that time at the VA

6      hospital here in Washington?

7      A.   A patient at that time?

8      Q.   Yeah.

9      A.   No.

10     Q.   How about in December of 2016?

11     A.   No.

12     Q.   Okay.  Is your middle initial E?

13     A.   Correct.

14     Q.   And at that time you lived on 2nd Street Northwest?

15     A.   Yes.

16     Q.   In an apartment.

17     A.   Correct.

18     Q.   Okay.  Now, can you think of any reason why the Veterans

19     Administration would have a medical record indicating that in

20     December of 2016 you had a backache?

21     A.   No.  I would not know that.

22     Q.   Okay.  If I showed you the document, might it change your

23     testimony?

24     A.   I doubt it.

25     Q.   Okay.  Can you remember whether you had a backache at

1    that time?

2    A.   No.  I don't remember being treated for a backache at

3    that time, and I don't remember having backache at that time.

4    You said it's December of 2016?

5    Q.   Yes, ma'am.

6    A.   Yeah, I don't recall.

7    Q.   Okay.  Well, would it refresh your recollection,

8    possibly, if I showed you a medical record from the VA at

9    that time?

10   A.   No.  I doubt if it would.

11   Q.   Okay.  Okay.  Now, is it your testimony that you did

12   not treat at the VA in December of 2016?

13   A.   I have ongoing treatment at the VA medical center, but

14   I wasn't being treated there at that time.

15   Q.   And when you were treating at the VA medical center,

16   you would have been treating at the one here in Washington.

17   Correct?

18   A.   Mm-hm.  Yes.

19   Q.   Okay.

20        MR. KHOURI:  Your Honor, the document I'm referring

21   to has been marked as Defense Exhibit I for identification

22   purposes only.

23        THE COURT:  Yes.

24        MR. KHOURI:  And I'm done questioning the witness,

25   but could we have a conference on the phone?

1           THE COURT:  Yes.

2       (Bench conference.)

3           THE COURT:  Yes, Mr. Khouri.

4           MR. KHOURI:  So I'd like to move this document into

5       evidence.  I don't think there's any problem with it coming

6       in because I believe there's been a waiver of foundational and

7       authenticity objections.  It's one of the ones received from

8       the subpoena.  But the document has references to the cocaine

9       and opiate abuse, so it will have to be redacted.

10          THE COURT:  Ms. Willis or Ms. Simon?

11          MS. WILLIS:  Yes, Your Honor.  We're fine with

12      redacting that information and we don't have any objection to

13      the admissibility of this document.

14          THE COURT:  All right.

15          MR. KHOURI:  Then I'll just submit it sometime later.

16          THE COURT:  Yes.

17          MR. KHOURI:  Okay.  Thank you.

18      (End of bench conference.)

19          THE COURT:  Are you finished with your

20      cross-examination, Mr. Khouri?

21          MR. KHOURI:  Yes, Your Honor.

22          THE COURT:  Ms. Simon.  Redirect?

23          MS. SIMON:  Thank you, Your Honor.

24

25

REDIRECT EXAMINATION

1

BY MS. SIMON:

2

Q.   Hello again, Ms. Mackey.

3

I'm going to ask Ms. Slater to please bring up on the

4

screen the MRI reports that you were just looking at a moment

5

ago with Mr. Khouri.

6

Ms. Slater, can we please start with Government's Exhibit

7

11, I believe it's page 52.

8

Ms. Mackey, do you see at the top on the right side where

9

it says DOS and then the date?

10

A.   I'm sorry.  Where it says what?

11

Q.   DOS and then a colon and a date?

12

A.   Yes.

13

Q.   What is that date?

14

A.   It says 01/25/16.

15

Q.   And Ms. Slater, could you please take that down and put

16

up page 54 of the same exhibit.

17

Ms. Mackey, do you see at the top right of this MRI

18

report from the MRI of the knee what date is listed?

19

A.   It says the same date, January 25, 2016.

20

Q.   And you don't remember receiving an MRI of your back

21

or knee at that time?

22

A.   No, I don't.

23

Q.   Mr. Khouri asked you on cross-examination about treatment

24

that you were receiving at Providence Hospital.  Do you know

25

1   everything that a doctor has ever written about you in your

2   medical files?

3   A.   No.

4   Q.   Have you looked at all your medical files and know what's

5   in there?

6   A.   No, I don't.

7   Q.   Okay.  Thank you, Ms. Mackey.

8        MS. SIMON:  Nothing further, Your Honor.

9        THE COURT:  All right.  You're excused.  Thank you,

10  Ms. Mackey.

11     (Witness steps down.)

12        THE COURT:  Next witness?  I have a -- ladies and

13  gentlemen of the jury, I have a 12:30 hearing.  So I'm

14  going -- my plan is to let you go to lunch at 12:25.  And so

15  we may -- we'll probably take our midmorning break -- we'll

16  see how long this direct examination takes -- I'm thinking

17  around eleven o'clock, if that works for you.  Okay.  Thank

18  you, Ms. Willis.

19        MS. WILLIS:  The government calls Gregory Browne.

20     GREGORY BROWNE, WITNESS FOR THE GOVERNMENT, SWORN

21                    DIRECT EXAMINATION

22  BY MS. WILLIS:

23  Q.   Good morning, Mr. Browne.

24  A.   Good morning.

25  Q.   Can you say and spell your name for the record, please?

1    A.   Gregory Browne.  Spell my last name or whole name?

2    Q.   I think both.

3    A.   G-R-E-G-O-R-Y.  Last name B-R-O-W-N-E.

4    Q.   Thank you, Mr. Browne.  Mr. Browne, where are you joining

5    us from today?  Where do you live, without --

6    A.   Largo, Maryland.

7    Q.   Is that in the D.C. area?

8    A.   Yes, it is.

9    Q.   How long have you lived in the D.C. area?

10   A.   I was born and raised in D.C., and I moved to Prince

11   George's County about 35 years ago.

12   Q.   Okay.  Now, Mr. Browne, what do you do for a living?

13   A.   Now I'm retired -- semiretired.  I work for my nephew

14   who owns a pharmacy.  So I'm a security personnel there.

15   Q.   Okay.  You mentioned that you're semiretired.

16   A.   Yes.

17   Q.   What kind of health insurance do you have?

18   A.   Now, just changed to UnitedHealthcare, but I had

19   Medicare, and then I have a supplement.  But now I have an

20   Advantage plan with UnitedHealthcare.

21   Q.   Were you covered by Medicare in 2016?

22   A.   Yes, I was.

23   Q.   And at some point were you a patient of Dr. Frederick

24   Gooding?

25   A.   Yes, I was.

1    Q.   And is it fair to say you liked Dr. Gooding?

2    A.   Loved Dr. Gooding.

3    Q.   How long did you go to Dr. Gooding?

4    A.   If I can recollect, I think I started going to

5    Dr. Gooding in two thousand, maybe '11 or '12.

6    Q.   And why did you first start going to Dr. Gooding?

7    A.   For two reasons.  One, I was having problems in my

8    left knee and I was having a lot of back problems, and I was

9    suggested to him by my primary physician, who was Dr. Nelson.

10   Q.   And do you know if Dr. Nelson knew Dr. Gooding?

11   Were they friends or anything?

12   A.   I think they were.  Or at least professionally knew

13   each other.

14   Q.   Okay.  So you mentioned knee problems, back problems.

15   A.   Yes.  And later on finger.

16   Q.   And then finger problems.

17   A.   Yes, ma'am.

18   Q.   We're going to talk about those problems one at a time.

19   We're going to start at the knees, okay?

20   A.   Okay.

21   Q.   Did Dr. Gooding help you with your knee pain?

22   A.   Yes.

23   Q.   And what kind of treatments did you get for your knees?

24   A.   I got injections in my knee.  Then I had a knee band,

25   brace, to put on to wear.  And all of this was prior to

1    having -- I actually ended up having surgery.

2    Q.   Okay.  You mentioned you had surgery.  At some point,

3    did you get a knee replacement?

4    A.   Yes, ma'am, I did.

5    Q.   When was that?

6    A.   October 29, 2013.

7    Q.   Okay.  The date must have been memorable.

8    A.   Yeah.

9    Q.   And after you had that knee replacement, did you get any

10   more injections in your knees?

11   A.   No.  Not after my knee replacement.

12   Q.   So in November of 2016, were you still getting injections

13   in your knees?

14   A.   2016?  No.  I don't remember, or I don't recollect

15   having.  But after the knee surgery, I was like a new person,

16   so.

17   Q.   Okay.  Is it fair to say that, you know, you could do

18   things like dance and you were fine after your -- by November

19   of 2016?

20   A.   Yes, I could.

21   Q.   Now let's talk about your -- I think you said back?

22   A.   Back.  Yes, ma'am.

23   Q.   Tell me about the treatments for your back.

24   A.   Starting in the very first beginning was -- I don't

25   really know the proper medical term for it, but like electro

1    stimulation, okay?  And as time went on, my back just

2    progressively gotten bad, and actually Dr. Gooding was the one

3    that had me have MRIs to find out really what was wrong with

4    my back.  And I found out that it was -- I hope I'm

5    pronouncing it correctly -- degenerative disc lumbar 4.

6    Q.   Okay.  And did you get shots in your spine for your back?

7    A.   Yes, I did.

8    Q.   And at the same time that -- well, I'll ask you, are you

9    familiar with what a sonogram is?

10   A.   Yes.

11   Q.   And when you would get back injections, was a sonogram

12   used?

13   A.   Yes.

14   Q.   Was it used at the same time you were getting the back

15   injection?

16   A.   I remember a few times it was.

17   Q.   Now, when I say at the same time, was the sonogram used

18   at the same time the needle was in your back?

19   A.   I don't remember.  I think it was maybe prior to just

20   doing my back.  But I don't really remember if it was done

21   at the same time.  Besides, my back was turned away from him.

22   So I couldn't see what was on my back.

23   Q.   Okay.  So is it your testimony that you couldn't tell

24   if a sonogram was used at the same time you were getting the

25   shot?

1   A.   Yes.  Because prior to everything I got some kind of

2   freeze to freeze the area.  So if there was a -- if I'm not

3   wrong, a sonogram touches your skin.  So if my back is -- if

4   it's numbed, I couldn't tell if a sonogram was on it or not.

5   I didn't even feel the needles going in because he always

6   sprayed my back first.

7   Q.   Okay.  Mr. Browne, do you recall giving a deposition

8   on December 1, 2020?

9   A.   Yes.

10         MS. WILLIS:  May I have the Court's indulgence?

11         THE COURT:  Yes.

12         MS. WILLIS:  Apologies.  I left my papers behind me.

13      Your Honor, may I approach the witness?

14         THE COURT:  Yes.

15         MS. WILLIS:  And I'm looking at page 19, line 13.

16   BY MS. WILLIS:

17   Q.   Mr. Browne, were you under oath when you were giving

18   a deposition?

19   A.   The very first time?  I think so, because it was

20   videotaped in an office.  And I think I was under oath.

21   Q.   Okay.  So you were telling the truth in the deposition.

22   A.   Yes, I was.

23   Q.   Okay.

24   A.   To my recollection, yes.

25   Q.   Okay.  I'm going to pass this -- can I pass this around

 1    the glass?

 2            THE COURT:  Yes.

 3        (Witness reviewing document.)

 4    BY MS. WILLIS:

 5    Q.   And at that deposition you were asked:  "Do you ever

 6    recall -- or actually, let me ask it a different way.  Was

 7    a sonogram used" --

 8            THE COURT:  Ms. Willis, if you could say "question" to

 9    preface the question and "answer" to preface the answer.  Just

10    so it's clear for the record.

11    BY MS. WILLIS:

12    Q.   Okay.  Page 19 of the transcript of Gregory Browne,

13    December 1, 2020, line 9.

14        "Question:  Do you ever recall -- or actually, let me ask

15    it in a different way.  Was a sonogram used at the same time

16    you were getting the shot?

17        "Answer:  No.  Not that -- no.  I always got a sonogram

18    and then I got, would get a shot, but not -- not at the same

19    time, no."

20        Line 17.  "Question:  So he was never using the sonogram

21    while he had the needle inside you?

22        "Answer:  No.  No, sir."

23        Did I read that correctly, Mr. Browne?

24    A.   You read what's on this paper.

25    Q.   Okay.  So I did read what --

```
 1    A.    Yes.

 2    Q.    I'll take it back.

 3    A.    Mm-hm.

 4          THE COURT:  Did you mark that portion as an exhibit?

 5          MS. WILLIS:  We will mark page 19, lines 9 through 19.

 6    And that will be Exhibit No. 35.

 7          THE COURT:  All right.  Are you moving for admission?

 8          MS. WILLIS:  Yes.  We would move to admit that portion

 9    into evidence.

10          THE COURT:  Mr. Khouri?

11          MR. KHOURI:  No objection.

12          THE COURT:  It will be admitted.

13                              (Government Exhibit No. 35

14                                received into evidence.)

15    BY MS. WILLIS:

16    Q.    Now, Mr. Browne, you also mentioned that you had -- I

17    think you said hand pain.

18    A.    Yes.

19    Q.    And did you get any shots in your hands?

20    A.    Yes, I did.

21    Q.    Okay.  Thank you very much.  I don't have any other

22    questions.

23    A.    Yes, ma'am.

24          THE COURT:  Mr. Khouri?

25
```

```
 1                          CROSS-EXAMINATION

 2    BY MR. KHOURI:

 3    Q.   Good morning, Mr. Browne.

 4    A.   Good morning.

 5    Q.   I don't know if you remember me.

 6    A.   I do.

 7    Q.   Thank you.  It's nice to see you again.

 8         So you were referred to Dr. Gooding by your primary

 9    care physician?

10    A.   Yes.

11    Q.   I imagine you had treated with that physician for some

12    time before that referral?

13    A.   Yes.

14    Q.   You trusted that physician to give you --

15    A.   Absolutely.

16    Q.   -- right?

17              THE COURT:  Mr. Browne, you're going to have to wait

18    for him to finish the question before you answer.  Otherwise

19    it's difficult for the court reporter.

20              THE WITNESS:  I'm sorry, Your Honor.

21              THE COURT:  That's all right.

22    BY MR. KHOURI:

23    Q.   Let me ask it again.  You trusted that physician to give

24    it to you straight.  Right?

25    A.   Yes.
```

```
 1      Q.   And you had trust in that physician.  Right?

 2      A.   Yes.

 3      Q.   Okay.  So you went to see Dr. Gooding, and you had a good

 4      experience with Dr. Gooding.  Right?

 5      A.   Yes.

 6      Q.   You always were able to communicate your problems,

 7      physical problems, to him.  Right?

 8      A.   Yes.

 9      Q.   Which included back pain and knee pain?

10      A.   Yes.

11      Q.   And when you say "back pain," would that include the

12      hip as well?

13      A.   Yes.  It was back pain, lower back pain, and in my

14      hip and down my legs.

15      Q.   Was the hip pain, if you know, referred by the problems

16      in your knee or was the hip pain --

17      A.   No.

18      Q.   -- something on its own?

19      A.   No.  The hip pain, all of it was associated with the

20      back pain.

21      Q.   Okay.  Did you get the impression that Dr. Gooding

22      listened to you, to your problems?

23      A.   I'm sorry.  I didn't hear you.

24      Q.   Did you get the impression that Dr. Gooding listened

25      carefully to the physical problems that you had?
```

1    A.   Oh.  Yes, sir, he did.

2    Q.   Did you talk to Dr. Gooding about those problems that

3    you had?

4    A.   In depth.

5    Q.   And his treatment recommendations?

6    A.   Yes.

7    Q.   Did you talk about other things, like normal chitchat

8    type things?

9    A.   Yes.  Just in general, you know, about -- he knew my

10   family.  So sometimes we would talk about family.

11   Q.   And you treated with Dr. Gooding over how many years?

12   A.    I'm going to say approximately six?  You know, four to

13   six years.  I know I started -- this is where I get a little

14   shaky -- two thousand either '10 or '11, up until 2017.  I

15   think that's when his office was closed and we got a notice

16   that his office was closing.

17   Q.   So how many times did you see Dr. Gooding in a typical

18   year?  Was it once a month, once a quarter?

19   A.   It varied.  It depend on what was -- how I was doing.

20   If I could say normally, I could see Dr. Gooding twice a month,

21   sometimes three times a month depending on what I was being

22   treated for.

23   Q.   So did you feel like you got to know him pretty well?

24   A.   Yes.

25   Q.   Did you formulate an opinion in your mind as to whether

1        Dr. Gooding was an honest person?

2                THE COURT:  Sustained.

3                MS. WILLIS:  Objection.

4                THE COURT:  Mr. Khouri, sustained.

5                MR. KHOURI:  On what grounds, Your Honor?  I'm sorry.

6           (Bench conference.)

7                THE COURT:  First of all, it's beyond the scope; and

8       second of all, it's trying to elicit improper character

9       evidence.  It's totally improper and I'm going to strike the

10      question.

11               MR. KHOURI:  Okay.  I disagree, and if I can be heard.

12               THE COURT:  Sure.

13               MR. KHOURI:  Number one, I don't think it's beyond the

14      scope, because otherwise I'd have to subpoena him and call him

15      as a character witness.

16               THE COURT:  First of all, your client hasn't taken the

17      stand and put his credibility at issue.  I realize he's being

18      charged with fraud, but it is beyond the scope, and his

19      opinion as to whether Dr. Gooding is an honest person is

20      not -- was not the subject of the direct testimony.  You want

21      to put him on as a character witness, you can put him on as a

22      character witness in your case.

23               MR. KHOURI:  Okay.  I'll move on.

24               THE COURT:  Yes.

25          (End of bench conference.)

```
1              THE COURT:  The objection is sustained.  And the jury

2    will disregard the question and the answer.

3    BY MR. KHOURI:

4    Q.   Okay.  So do you remember going to see Dr. Gooding in

5    November 2016 after your knee was replaced?

6    A.   Yes.  Because the knee was replaced in two thousand --

7    yeah, '13.  So yeah.

8    Q.   Can you remember whether you received on or around that

9    time an injection in your hip?

10   A.   In 2016?

11   Q.   Yes.

12   A.   Yes.

13   Q.   Did you also receive injections in your lower back during

14   that time?

15   A.   Yes.

16   Q.   And then I have some questions to ask you about the

17   ultrasound.

18   A.   Okay.

19   Q.   When you went into the office, did Dr. Gooding have a

20   machine that had a wand --

21   A.   Yes.

22   Q.   -- type instrument?  And there would be some type of

23   gel at the end of the wand?

24   A.   Yes.

25   Q.   And he would apply the wand to the area that was about
```

1    to be injected.  Correct?

2    A.   Exactly.

3    Q.   And then he would be looking at the image that was on

4    the screen.  Right?

5    A.   Exactly.  Yes.

6    Q.   And when the needle went into you, could you feel the

7    needle being -- the direction of the needle being changed?

8    A.   It -- I remember -- when you say direction change, I

9    remember it being like it was put in a different place in my

10   back without pain, like it started here and it may have gone

11   below that and then on the other side of that.

12        THE COURT:  Let the record reflect the witness is

13   indicating his lower back, starting with the right side and

14   moving across his back to the left side.

15   BY MR. KHOURI:

16   Q.   And when it was being changed on the one side, was there

17   a second breaking of the skin, or could you sense whether the

18   needle was taken all the way out or redirected once inside?

19   A.   I'm trying to remember.  I think it was like it would

20   come out, actually taken out of the back and put back in.

21   But because the area was numb, I couldn't tell you how many

22   times.  But I know it was moved.

23   Q.   Right.  It was moved from one side to the other.

24   A.   Yes, sir.

25   Q.   Okay.  But other than that, if the needle was being

```
 1       redirected on the same side --
 2       A.   Oh, I wouldn't know.
 3       Q.   You wouldn't know.  Okay.
 4            MR. KHOURI:  All right.  Thank you very much, sir.
 5       Thank you, Your Honor.
 6            THE COURT:  Thank you, Mr. Khouri.
 7       Redirect?
 8            MS. WILLIS:  No redirect, Your Honor.
 9            THE COURT:  All right.  I'm going to release the jury
10       for a break.  Come back at 11:15, please.  10 minutes, 11
11       minutes.
12            (Jury out at 11:05 a.m.)
13            (Witness steps down.)
14            THE COURT:  All right.  We have a break till 11:15.
15            (Recess from 11:05 a.m. to 11:26 a.m.)
16            THE COURT:  All right.  Next witness?
17            MS. SIMON:  Thank you, Your Honor.
18            THE COURT:  And ladies and gentlemen, I know I said we
19       could go to five o'clock today, but I have to see the chief
20       judge, which I believe is at 4:30.  So that's when I have to
21       go.  I'll know for sure, but I think you can expect to be done
22       at 4:30 today.
23            MS. SIMON:  The government calls Yvonne Anderson.
24
25
```

1          YVONNE ANDERSON, WITNESS FOR THE GOVERNMENT, SWORN

2                          DIRECT EXAMINATION

3     BY MS. SIMON:

4     Q.   Good morning, Ms. Anderson.

5     A.   Good morning.

6     Q.   Can you see me all right?

7     A.   Yes.

8     Q.   Okay.  Ms. Anderson, can you please state and spell

9     your name?

10    A.   Yvonne Y-V-O-N-N-E, Anderson, A-N-D-E-R-S-O-N.

11    Q.   And Ms. Anderson, would you be comfortable taking your

12    mask off, or would you prefer to leave it on?  It's up to you.

13    A.   It's okay.  I can take it off.

14    Q.   Okay.  Thank you.  Ms. Anderson, where do you live?

15    A.   Right now in Brandywine, Maryland.

16    Q.   How long have you lived in the D.C. area?

17    A.   Just a few weeks.

18    Q.   In Brandywine, Maryland?

19    A.   Yes.

20    Q.   Where did you live before that?

21    A.   Largo.

22    Q.   How long have you lived in the D.C. area?

23    A.   Fifty years.

24    Q.   And Ms. Anderson, are you retired, are you working?

25    A.   Retired.

```
 1    Q.   What did you do before you retired?

 2    A.   Several.  Hotels.  Like the last job I had was at the

 3    Senate.  I retired from the Senate.

 4    Q.   And what did you do at the Senate?

 5    A.   Custodian.

 6    Q.   Do you have medical insurance, Ms. Anderson?

 7    A.   Yes, I do.

 8    Q.   What do you have?

 9    A.   Blue Cross and Medicare.

10    Q.   And do you remember when you got Medicare?

11    A.   No.

12    Q.   Okay.

13    A.   It's been a long time.

14    Q.   Okay.

15    A.   When I was 64, 65 when I started getting Medicare.

16    Q.   Okay.  Ms. Anderson, do you know Dr. Frederick Gooding?

17    A.   Yes.

18    Q.   How do you know him?

19    A.   He was my pain management specialist.

20    Q.   Okay.  And you said pain management specialist.

21    Why did you start going to Dr. Gooding?

22    A.   Well, I had an on-the-job injury, and I was referred

23    to him by my primary doctor.

24    Q.   And about how long did you see Dr. Gooding?  How long

25    did he treat you?
```

1    A.    Fifteen years or more.  Fifteen years for sure.

2    Q.    You liked Dr. Gooding?

3    A.    Yes.

4    Q.    Generally, what were the problems that you had?  You said

5    on-the-job injury.  What injury did you have?

6    A.    A back injury.  A piece of metal partition -- I bent over

7    and a piece of metal partition fell across my back.

8    Q.    Did Dr. Gooding give you injections?

9    A.    Yes, he did.

10   Q.    And where on your body did you get those injections?

11   A.    In my lower back.

12   Q.    Did Dr. Gooding ever give you injections in your knee?

13   A.    Yes, he did.

14   Q.    And which knee was that?

15   A.    The left.

16   Q.    Now, you said you went to Dr. Gooding for 15 or more

17   years.  Do you remember when, during that time, Dr. Gooding

18   gave you knee injections?

19   A.    It was -- by the years that I saw him, probably the last

20   maybe two or three years.  Because he didn't always give me

21   the injections in my knee.

22   Q.    Approximately how many times did he give you a knee

23   injection?

24   A.    Two times I know for sure.  It may have been more, but

25   I don't really remember.  But I know two times for sure.

1    Q.   Okay.  And that was in the left knee?

2    A.   Yes.

3    Q.   Okay.  Now, the two times that you remember, were they --

4    did you get those within the same year?

5    A.   Same year?  Yes.

6    Q.   And you said that they were toward the -- is it fair to

7    say that you said that was toward the end of when Dr. Gooding

8    was treating you?

9    A.   Yes.

10            MS. SIMON:  Court's indulgence.

11            THE COURT:  Yes.

12        (Government conferring.)

13    BY MS. SIMON:

14    Q.   So when you say toward the end of when Dr. Gooding was

15    treating you, was that right before you stopped seeing him,

16    the year before you stopped seeing him?  Something else?

17    A.   Maybe a year before I stopped seeing him.

18    Q.   And both injections were within the same year, you said.

19    A.   Yes.

20    Q.   Ms. Anderson, in addition to the injections that you

21    talked about in your back for the injury and the couple of

22    knee injections that we just talked about, did Dr. Gooding

23    prescribe you any medicine?

24    A.   Yes.

25    Q.   What kind of medicine?

1    A.   Oxycodone.

2    Q.   Okay.

3         MS. SIMON:  No further questions, Your Honor.

4         THE COURT:  All right.  Thank you.

5       Cross-examination.

6                       CROSS-EXAMINATION

7    BY MR. KHOURI:

8    Q.   Good morning.

9    A.   Good morning.

10   Q.   Can you hear me?

11   A.   Yes.

12   Q.   Oh, good.  Okay.  I'm Mike Khouri.  I'm --

13   A.   Okay.  I can hear you barely.  Can you speak a little

14   bit louder?

15   Q.   Sure.  I'm Mike Khouri, and I'm one of Dr. Gooding's

16   lawyers.  And it's a pleasure to meet you, ma'am.

17        Can you remember whether you treated with Dr. Gooding

18   back in June of 2017?

19   A.   2017?

20   Q.   Yes.  Can't remember?

21   A.   No.  It depends on what you want to know about 2017.

22   Q.   Well, in June of 2017, do you remember whether you had

23   an appointment with Dr. Gooding?

24   A.   No.

25   Q.   Okay.  But you do know that Dr. Gooding gave you

1   injections in your knee, right?

2   A.   In my what?

3   Q.   In your knee?

4   A.   Uh-huh.  I don't know what year it was.

5   Q.   Sure.  And he gave you injections in your lower back?

6   A.   Yes.

7   Q.   And in your hip.  Right?

8   A.   Just my lower back.

9   Q.   Just your lower back?

10  A.   Yeah.

11  Q.   Lower back below the waist, or above the waist?

12  Can you remember?

13  A.   In my lower back right above the hip.

14  Q.   Right above the hip.  Okay.  So some people may call

15  that the lower back and some people may call that the upper

16  hip.  It's basically the same area you're talking about?

17  A.   It was in my lower back.  I don't know if you want to

18  call it the hip or the back or what, but it was in my lower

19  back.

20  Q.   All right.  Around the waistline?

21  A.   Lower.

22  Q.   Lower.  Okay.  Got it.

23       So you were referred to Dr. Gooding by whom?

24  A.   Dr. Filetti, my primary doctor at the time.

25  Q.   And you trusted Dr. Filetti to give it to you straight

```
 1    about going to a doctor that could help you?
 2    A.   Repeat?
 3    Q.   You trusted Dr. Filetti to give you a good recommendation
 4    for a pain management specialist.  Right?
 5    A.   Yes.
 6    Q.   And did Dr. Gooding help you?
 7    A.   Yes.  But as the time went on, the pain got worse.
 8    Q.   Uh-huh.  Okay.
 9    A.   He did what he could.
10    Q.   Sure.  All right.  Thank you very much.
11         MR. KHOURI:  Thank you, Your Honor.
12         THE COURT:  Thank you, Mr. Khouri.  Any redirect?
13         MS. SIMON:  Very briefly, Your Honor.
14         THE COURT:  All right.
15                       REDIRECT EXAMINATION
16    BY MS. SIMON:
17    Q.   Ms. Anderson, when did you stop seeing Dr. Gooding?
18    A.   I'm not sure.  I know it was in August, probably three
19    years ago.  Two or three years when I last saw him.
20    Q.   Do you remember why you stopped seeing him?
21    A.   I was told that he had retired.
22         MS. SIMON:  Okay.  Thank you, Ms. Anderson.
23       Nothing further.
24         THE COURT:  All right.  You're excused.  Thank you
25    very much.
```

```
 1          (Witness steps down.)

 2              MS. SIMON:  Your Honor, the government would call

 3      Judith Mason to the stand.

 4              THE COURT:  All right.

 5          JUDITH MASON, WITNESS FOR THE GOVERNMENT, SWORN

 6                      DIRECT EXAMINATION

 7      BY MS. SIMON:

 8      Q.   Good morning, Ms. Mason.

 9      A.   Good morning.

10      Q.   Can you see me okay?

11      A.   Yes.

12      Q.   And you can hear me?

13      A.   Yes.

14      Q.   Okay, great.  Ms. Mason, did you want to take your mask

15      off or did you want to leave it on?

16      A.   I'd like to take it off if you don't mind.

17              THE COURT:  That's fine.

18      BY MS. SIMON:

19      Q.   Thanks so much.

20          Ms. Mason, could you please say and spell your name?

21      A.   Judith Mason, J-U-D-I-T-H, M-A-S-O-N.

22      Q.   And Ms. Mason, where do you live?

23      A.   Now I live in Fairfax.

24      Q.   Where did you live before that?

25      A.   In Washington, D.C.
```

1    Q.   How long have you lived in D.C.?

2    A.   Well, 20 years plus.  I was born in D.C., moved away

3    and went back.

4    Q.   Do you know an individual with the last name Burch,

5    initials S.B.?

6    A.   Yes.

7    Q.   We're going to show -- Ms. Slater, if you could please

8    pull up Exhibit 16.

9         MS. SIMON:  Your Honor, this is in evidence.  The

10   patient that we will be asking Ms. Mason about is deceased.

11        THE COURT:  All right.

12        MS. SIMON:  We want to preserve some privacy but

13   identify the individual we're talking about.

14        THE COURT:  That's fine.

15        MS. SIMON:  Thank you, Your Honor.

16     Ms. Slater, can we please pull up page 2 of Exhibit 16?

17   BY MS. SIMON:

18   Q.   Ms. Mason, do you see this document on your screen?

19   A.   Yes.

20   Q.   And, Ms. Mason, do you see under patient information a

21   name of an individual, initials S.B., last name Burch?

22   A.   Yes.

23   Q.   Is that the individual that you just identified as

24   knowing?

25   A.   Yes.

```
1    Q.   Do you also see your name on this document?

2    A.   Yes.

3    Q.   Okay.  Thank you.

4         Thank you, Ms. Slater.

5         So, how did you know the individual with the initials

6    S.B.?

7    A.   We were high school sweethearts, and then we went our

8    separate ways after high school, and got back together.  His

9    wife had passed away and I was divorced, and my brother-in-law

10   saw him downtown and told him I was back in town, and we

11   called each other or emailed and then got back together and

12   lived together.

13   Q.   And how long were y'all together in a relationship?

14   A.   About 21 years.

15   Q.   Did you get married?

16   A.   No.

17   Q.   But for 21 years you were in a relationship with S.B.?

18   A.   Yes.

19   Q.   And you said you lived together?

20   A.   Yes.

21   Q.   How long did you live with S.B.?

22   A.   About -- well, we'd lived in Virginia -- about 20 years.

23   Around that.

24   Q.   And so living together, did you see S.B. a lot?

25   A.   Yes.
```

1    Q.   Were you both retired during any of that time?

2    A.   Well, we were both working during that time, and he

3    started his own company.  And then I retired, and he didn't

4    retire.  He still had his little company.

5    Q.   Is it fair to say that you spent a lot of time together

6    during those years?

7    A.   Yes.

8    Q.   And were you -- you were able to observe his physical

9    conditions.

10   A.   Yes.

11   Q.   Were you aware of any of his medical conditions?

12   A.   Yes.

13   Q.   Did you ever take him to any doctor's appointments?

14   A.   Yes.

15   Q.   Ms. Mason, do you know Dr. Gooding?

16   A.   Only that he was one of Swift's doctors, and he took me

17   to meet him one time at his appointment.

18   Q.   Okay.  Just to be clear, S.B. took you to an appointment?

19   A.   Yes.

20   Q.   And at that appointment you met Dr. Gooding?

21   A.   Yes.

22   Q.   Okay.  At that appointment, did you go into the exam room

23   with S.B.?

24   A.   I did at first, and then I sat outside.

25   Q.   Okay.  What, if anything, happened while you were in the

1    exam room?

2    A.    Nothing, really.

3    Q.    Okay.  So were you in a relationship with S.B. during the

4    entire time that S.B. was being treated by Dr. Gooding?

5    A.    Yes.

6    Q.    Do you know why S.B. was being treated by Dr. Gooding?

7           MR. KHOURI:  Objection.  Calls for hearsay.

8           THE COURT:  Pick up the phone.

9        (Bench conference.)

10          THE COURT:  I don't think it's hearsay if she was at

11    the doctor with him or observed -- she's laid the foundation

12    that she observed him physically.  So I don't think it calls

13    for hearsay.  If you want to lead a little bit, I'll let you

14    lead so we don't elicit hearsay.

15          MS. SIMON:  Thank you, Your Honor.

16          MR. KHOURI:  Your Honor, if I may, the only way she can

17    testify to that question is what Burch said to her.  That's

18    the only way she could know his condition.

19          THE COURT:  But that doesn't mean it's all hearsay.

20    For example, statements made for the purpose of medical

21    diagnosis, if she heard him telling the doctor things, that

22    wouldn't be hearsay.  If he's telling her he's in pain or of

23    his physical condition.  It's not being offered for the truth

24    of the matter asserted, it's not hearsay.  There are a number

25    of statements he could have made.  And she's already said she

1    went with him to the doctor.

2              MR. KHOURI:  Right.  And she said that nothing happened

3    while they were in the exam room.  So I don't think she can

4    testify to anything.

5              THE COURT:  Well, I think that establishes that she

6    knew he had medical issues.  For example, she could testify

7    that she saw him limping or she heard him complaining in pain.

8    I don't know what the answer is going to be, but I'll ask

9    Ms. Simon to lead so she doesn't elicit hearsay.

10             MR. KHOURI:  Okay.  Thank you.

11         (End of bench conference.)

12             THE COURT:  Objection is overruled.

13   BY MS. SIMON:

14   Q.   Ms. Mason, you observed S.B. in physical pain.

15   Is that correct?

16   A.   Yes.

17   Q.   And what part of his body caused him pain?

18   A.   His knee.

19   Q.   How do you know that?

20   A.   Because he complained about it.

21             MR. KHOURI:  Objection.  Calls for hearsay.

22             THE COURT:  Not being offered for the truth of the

23   matter asserted.  Well, actually, it's a hearsay exception.

24   We can put it on the record if you want to pick up the phone.

25         (Bench conference.)

1          THE COURT:  All right.  It would come in as a

2     present-sense impression or it would come in under 803(3) as a

3     then-existing mental, emotional or physical condition.  Okay?

4          MR. KHOURI:  Well, I don't think she should be allowed

5     to testify to the medical condition of an individual because

6     that individual told her.  It can't be for -- it cannot be for

7     the truth of the matter asserted.

8          THE COURT:  Why isn't it 803(3)?

9          THE WITNESS:  Because we're not talking about a

10    specific medical condition limited in time.  We're talking

11    about what Mr. Burch complained of over a period of time.

12         THE COURT:  Okay.  803(3) states:  "A statement of

13    the declarant's then-existing state of mind (such as motive,

14    intent, or plan) or emotional, sensory, or physical condition

15    (such as mental feeling, pain, or bodily health), but not

16    including a statement of memory or belief to prove the fact

17    remembered or believed unless it relates to the validity or

18    terms of the declarant's will."

19      So the statement of Mr. Burch regarding his physical

20    condition, including pain, would be admissible under 803(3).

21         MR. KHOURI:  Well, if the question was limited to a

22    certain point in time, I think the Court has a point.  But

23    I recall the question being what did he complain about,

24    basically.

25         THE COURT:  The question is:  "What part caused him

1    pain?  Answer:  His knee.  Question:  How do you know that?

2    Answer:  Because he complained about it."

3        Are you going beyond that, Ms. Simon?

4            MR. KHOURI:  Well, that's the problem, because she

5    asked her what part was hurting him, and then she asked her

6    why.  And this witness has now testified almost as a doctor,

7    saying that Mr. Burch has knee pain.

8            THE COURT:  That's not as a doctor.  That's -- any

9    layperson can say, my husband, my companion, my boyfriend

10   complained of knee plan.  She's not diagnosing him.  It's a

11   very general question and it fits within the definition of

12   rule 803(3).  So I'm going to allow it.  In fact, she's

13   answered it.  Thank you.

14       (End of bench conference.)

15           THE COURT:  The objection is overruled.  I believe

16   the witness answered the question.

17       (Testimony read back by the court.)

18       Ms. Simon.

19           MS. SIMON:  Thank you, Your Honor.

20   BY MS. SIMON:

21   Q.   And were the knee problems what S.B. went to Dr. Gooding

22   for treatment for?

23   A.   Yes.

24   Q.   Did S.B. have any other physical conditions -- physical

25   problems when he was being treated by Dr. Gooding?

1          MR. KHOURI:  Lack of foundation.  Calls for hearsay.

2          THE COURT:  Overruled.  You can rephrase the question

3     if you wish.

4     BY MS. SIMON:

5     Q.   Did you observe any other physical problems or issues

6     that S.B. had during the time that he was seeing Dr. Gooding

7     other than his knees?

8     A.   No.

9          MS. SIMON:  Court's indulgence.

10        (Government conferring.)

11    BY MS. SIMON:

12    Q.   Ms. Mason, did S.B. ever bring home anything from

13    Dr. Gooding's office about the treatment that he had received?

14    A.   He brought home a pamphlet about a shot in his knee that

15    he was to get, and that whatever it was was going to

16    regenerate the knee.

17    Q.   Did he ever bring home anything about a back injection

18    from Dr. Gooding's office?

19    A.   No.

20    Q.   To your knowledge, did S.B. ever receive a back injection

21    from Dr. Gooding?

22        MR. KHOURI:  Lack of foundation.

23        THE COURT:  Sustained.

24    BY MS. SIMON:

25    Q.   Did S.B. like to get injections?

```
 1      A.   No.

 2             MR. KHOURI:  Objection.  Relevance.

 3             THE COURT:  Overruled.

 4             THE WITNESS:  No.

 5      BY MS. SIMON:

 6      Q.   How do you know that?

 7             MR. KHOURI:  I'm sorry, Your Honor --

 8             THE COURT:  Overruled.

 9             THE WITNESS:  He was like a child when it came

10      to needles.  So he would let you know he didn't want any.

11      He would embarrass me sometimes.

12      BY MS. SIMON:

13      Q.   So do you believe that you would know if S.B. received

14      injections in a body part that wasn't his knee?

15      A.   Oh, yes.

16      Q.   Is there a time that S.B. stopped going to Dr. Gooding

17      for treatment?

18      A.   Yes.

19      Q.   And why was that?

20             MR. KHOURI:  Objection.  Hearsay.

21             THE WITNESS:  Nothing was working.

22             MR. KHOURI:  Move to strike.

23          (Bench conference.)

24             THE COURT:  I don't believe it's being offered for

25      the truth of the matter asserted.  She asked if she knew why
```

he stopped.  And the answer was nothing was working, that's

why he stopped.  But it's being offered to show why the person

stopped going, not that the treatment actually stopped

working.  So it's not being offered for the truth of the

matter asserted.

MR. KHOURI:  Well, I don't think that's the way the

jury's going to look at it.  Essentially, she's a replacement

witness for someone who's deceased.

THE COURT:  That's not the point.  The point of the

matter is that if it's -- it is hearsay, but it's not being

offered for the truth of the matter asserted.  There have been

other witnesses who said, you know, it helped for a while, it

stopped, it didn't help, I had surgery.  You've talked a lot

about how -- elicited testimony a lot about how Dr. Gooding

helped people, and so has the government.

So I don't think your concern about whether they're going

to think he's a bad doctor or something, first of all, that's

not what he's being charged with, but it's not being offered

for the truth.  She said do you know why he stopped going, and

the witness is going to say because it stopped working.

MR. KHOURI:  Isn't that why she's asking the question?

To prove that he stopped going because it stopped working?

Isn't that the truth of the matter?

THE COURT:  It's being offered to prove that that's

why he -- he's saying that's why he stopped, but not that the

1    treatment stopped working, because she hasn't asked her, did

2    he continue to be in pain.

3        So -- and there may be times when statements that are not

4    being offered for the truth could be misinterpreted, but she's

5    not asking that this statement -- she's asking this statement

6    be admitted to show why he stopped.  It would be why did you

7    bring your car to a stop?  Because there was a stop sign.

8        MR. KHOURI:  Your Honor, she's testifying that he

9    stopped going because it didn't work, and that's for the truth

10   of the matter.  That's the only reason they would ask the

11   question, is to show why he stopped going.  I don't think we

12   can parse it out like that.

13       THE COURT:  Ms. Simon?

14       MS. SIMON:  Your Honor, we laid a solid foundation

15   that this witness lived with S.B., the patient of Dr. Gooding,

16   for years.  She observed him.  She went with him to some of

17   the appointments.  She was familiar with his medical conditions.

18   As Your Honor said, we're not offering it for the truth of

19   whether Dr. Gooding actually was successful or helped this

20   patient or not.

21       THE COURT:  Why don't you ask it a different way.

22   You can ask if he continued to have pain after he stopped

23   going to see Dr. Gooding.

24       MR. KHOURI:  I would object as irrelevant.

25       THE COURT:  Well, otherwise -- the testimony has been

1      that S.B. went to Dr. Gooding for years and then stopped

2      going.  What's the purpose of the question, Ms. Simon?

3              MS. SIMON:  Your Honor, it was -- I mean, frankly, just

4      to sort of put an end to the fact that he went for a certain

5      period of time and she was aware of that period of time.

6              THE COURT:  Why don't you just ask if she remembers

7      when he stopped going.  It doesn't seem particularly necessary

8      to your case.

9              MS. SIMON:  Thank you, Your Honor.

10         (End of bench conference.)

11             THE COURT:  Objection sustained.

12     BY MS. SIMON:

13     Q.   Ms. Mason, do you remember when S.B. stopped going to

14     Dr. Gooding?

15     A.   No.  I don't remember when.

16             MS. SIMON:  Thank you.  No further questions.

17             THE COURT:  All right.  Thank you.  Cross-examination?

18                       CROSS-EXAMINATION

19     BY MR. KHOURI:

20     Q.   Good afternoon now.

21     A.   Good afternoon.

22     Q.   It's a pleasure to meet you.  My name is Mike Khouri.

23     I'm one of Dr. Gooding's lawyers.

24          So you lived with Mr. Burch for some time?

25     A.   Yes.

1    Q.   I can't remember.  Did you say 20 years?

2    A.   Yes.

3    Q.   Okay.  And sometime during that time he developed pain

4    that you believe was coming from the knee.  Correct?

5    A.   Yes.

6    Q.   And did you see him hobble around or have a problem

7    standing, going upstairs or anything like that?

8    A.   Yes.

9    Q.   How about when he bent over?

10   A.   From his waist or from his knees?

11   Q.   Both.  How about when he bent over from his waist?

12   A.   From his waist he didn't complain.

13   Q.   Okay.  From his knees he complained.

14   A.   Yes.

15   Q.   And you're not a doctor or don't have any medical

16   background or anything like that?

17   A.   No.

18   Q.   So you don't have any idea whether the knee pain was

19   being caused by degeneration of his lower back?

20   A.   No.

21   Q.   Okay.  Do you, just from common sense, do you recognize

22   that that's a possibility?

23   A.   Excuse me?

24   Q.   Just as a matter of common sense, because I know you're

25   not a doctor, is it possible in your mind that his knee pain

1    was being caused by narrowing of the disc spaces --

2              MS. SIMON:  Objection.

3              THE COURT:  Sustained.  You just said the witness

4    doesn't have any medical experience or training.

5              MR. KHOURI:  Okay.

6    BY MR. KHOURI:

7    Q.   And then when you went with Mr. Burch to Dr. Gooding's

8    office, was it only one occasion?

9    A.   As far as I remember, yes.

10   Q.   And then he took you back to meet Dr. Gooding?

11   A.   Yes.

12   Q.   Did you get the impression that he liked Dr. Gooding?

13   A.   He was fine with him, yes.  He wanted me to know -- he

14   wanted Dr. Gooding to know that I was Dr. Marshall's cousin.

15   And Dr. Marshall was somebody known in the Providence Hospital

16   area.  So Swift always liked to connect people.

17   Q.   And how did Mr. Burch get referred to Dr. Gooding?

18   A.   I think it was another doctor he was seeing.

19   Q.   Okay.  And how long were you in that room with

20   Dr. Gooding?

21   A.   Not very long.

22   Q.   And then you went out --

23   A.   Right outside the room and sat in a chair in the hall.

24   Q.   So you have no personal knowledge of what happened inside

25   the treatment room in any of Mr. Burch's visits.

1    A.   No.

2    Q.  Well, let me ask that differently.  Do you have any

3    personal knowledge of what happened in the exam room during

4    any of Mr. Burch's visits?

5    A.   No.

6    Q.  Okay.  Thank you.  Nothing further.

7           THE COURT:  Thank you.  Any redirect?

8           MS. SIMON:  No redirect.

9           THE COURT:  Thank you.

10      Thank you, Ms. Mason.  You may step down.

11          THE WITNESS:  Thank you.

12    (Witness steps down.)

13    (Bench conference.)

14        MS. WILLIS:  -- going to be the witness with whom we

15    are offering the summary exhibits.  I know that the Court was

16    going to maybe give an instruction before that witness started

17    talking about the summary exhibits.  I have provided to

18    defense counsel and through Mr. Bradley to the Court just the

19    jury instruction that we're asking about the --

20         THE COURT:  I saw it.  It's fine.

21         MS. WILLIS:  Okay.

22         THE COURT:  Do you want me to give that instruction

23    before the witness starts testifying?

24         MS. WILLIS:  That was not our request.  I just wanted

25    to say that the defense had requested that before, and so I

1    just wanted to make sure that we were clear that that's what

2    we're about to do.

3            THE COURT:  Well, are you going to have some preamble

4    in direct before you start introducing the summaries?

5            MS. WILLIS:  Yes.

6            THE COURT:  Why don't you say at what point that the

7    instruction will be appropriate.  Mr. Khouri, is that what you

8    want?

9            MR. KHOURI:  Yes.

10           THE COURT:  Okay.  And I'll read it.  But -- oh,

11   I have it.  All right.

12        (End of bench conference.)

13           MS. WILLIS:  At this time the government calls

14   Stephen Quindoza.

15       STEPHEN QUINDOZA, WITNESS FOR THE GOVERNMENT, SWORN

16                       DIRECT EXAMINATION

17   BY MS. WILLIS:

18   Q.   Can you say and spell your name for the record?

19   A.   Stephen Quindoza.  S-T-E-P-H-E-N, Q-U-I-N-D-O-Z-A.

20   Q.   And what is it that you do for a living?

21   A.   I work for a company called SafeGuard Services.

22   Q.   What is SafeGuard Services?

23   A.   SafeGuard Services is a private company that engages

24   with two contracts with the federal government to identify

25   and investigate allegations of healthcare fraud in both the

 1    Medicare and Medicaid programs.

 2    Q.   Why does a company like SafeGuard Services exist versus

 3    a MAC like Novitas?

 4    A.   I guess I'll need to explain it this way.  The type

 5    of company that I work for is typically called a program

 6    integrity contractor or a unified program integrity

 7    contractor.  They haven't always existed since the Medicare

 8    program started.  There was legislation in the mid-'90s that

 9    specified that there should be separate contracts specifically

10    to address healthcare fraud in the Medicare and Medicaid

11    programs, hence that's when companies like the one I work

12    for were created, or at least the contracts were created.

13    Q.   Is SafeGuard Services otherwise referred to as a UPIC?

14    A.   Yes, ma'am.

15    Q.   Does a UPIC look at claims on the front end or the back

16    end?

17    A.   Back end.

18    Q.   How long have you worked with the Medicare program as a

19    contractor?

20    A.   Yesterday made 41 years.

21    Q.   In your role as an employee with SafeGuard Services,

22    do you have access to claims data?

23    A.   Yes, ma'am.

24    Q.   What is claims data?

25    A.   Claims data is a compilation of claims that are submitted

1    to and processed by the Medicare program by healthcare

2    providers like a doctor, a hospital, a laboratory, a medical

3    equipment supplier.

4    Q.   And does SafeGuard Services as a Medicare UPIC have

5    access to claims data for practitioners across the country

6    in its regular course of business?

7    A.   Yes, ma'am.

8    Q.   Now, Ms. Slater, can you show the witness what has been

9    marked for identification as Government's Exhibit 7.

10    Mr. Quindoza, do you recognize Government's Exhibit 7?

11    A.   Yes, ma'am.

12    Q.   And is this claims data related to a particular provider?

13    A.   Yes, ma'am.

14    Q.   Is that provider Frederick Gooding?

15    A.   Yes, ma'am.

16    Q.   And are there more than one NPI numbers reflected in the

17    claims data in terms of -- related to rendering provider or

18    billing provider?

19    A.   Yes, ma'am.  There are two.

20    Q.   And do you know what two those are?

21    A.   I don't have them memorized.  I just know there is one

22    for the doctor and one for his practice.

23    Q.   Okay.  Have you confirmed that the data in Exhibit 7 is

24    a true and correct copy of claims data for Frederick Gooding

25    and Gooding & Associates for the period of January 15 until

1    May -- January of 2015 until May 2018?

2              MR. KHOURI:  Lack of foundation.

3              THE COURT:  Lay the foundation, Ms. Willis.

4    BY MS. WILLIS:

5    Q.   You mentioned that in your role -- well, that SafeGuard

6    Services has regular access and uses in the regular course

7    of business claims data for providers enrolled in Medicare

8    throughout the country.  Correct?

9    A.   Yes, ma'am.

10   Q.   In your role, do you have access to that claims data that

11   you use in the regular course of business?

12   A.   Yes, ma'am.

13   Q.   Did you look at that claims data and compare it to

14   Exhibit 7 to confirm that this is a true and correct copy of

15   the SafeGuard Services claims data?

16   A.   Yes, ma'am.

17             MS. WILLIS:  The government would move to admit

18   Government's Exhibit 7.

19        (Bench conference.)

20             THE COURT:  -- where he got it from?  The data.

21             MS. WILLIS:  The data is in the SafeGuard Services

22   system.  This is just a copy of it.

23             THE COURT:  Where does that data come from that's in

24   the SafeGuard system?

25             MR. KHOURI:  Your Honor, could I voir dire the witness?

1           THE COURT:  About a business record?

2           MR. KHOURI:  Well, I think I know where it comes from.

3   And I don't think he has any knowledge whatsoever as to the

4   reliability of the data.

5           THE COURT:  Why are -- why didn't you bring this up

6   before?  There's a way to do things.  And the way to do things

7   would have been to either file a motion in limine or a motion

8   to voir dire or bring it up this morning or at any point, but

9   not in the middle of the witness's direct.  You're certainly

10  entitled to cross-examine the witness as to the accuracy or

11  veracity of it, but you just made a foundation objection.

12          MR. KHOURI:  Okay.  Thank you.

13       (End of bench conference.)

14  BY MS. WILLIS:

15  Q.   Mr. Quindoza, where does Medicare claims data come from?

16  A.   It comes from the healthcare providers who submit them

17  to the Medicare program.

18  Q.   And then how does SafeGuard Services get the Medicare

19  claims data?

20  A.   Okay.  There are 12 separate and distinct Medicare

21  contractors who process claims nationwide.  Once those claims

22  are processed, they're all housed in a national repository

23  known as the national claims history, which is all healthcare

24  providers for all states nationwide.  That is the access that

25  SafeGuard Services has.

1    Q.   So when you were looking at this claims data, did you

2    confirm that this is a copy of the data for Frederick Gooding

3    for the time period housed in that repository that you have

4    access to?

5    A.   Yes, ma'am.

6         THE COURT:  Any objection based on that?

7         MR. KHOURI:  Same objection, Your Honor.

8         THE COURT:  Of foundation?

9         MR. KHOURI:  Yes.

10        THE COURT:  Objection's overruled.  It will be

11   admitted.

12                        (Government Exhibit No. 7

13                        received into evidence.)

14   BY MS. WILLIS:

15   Q.   Mr. Quindoza, will you also take a look at, just for you,

16   Exhibit 23.

17   A.   Yes, ma'am.

18   Q.   Did you also confirm that the claims data in Exhibit 23

19   includes claims submitted for services for a beneficiary with

20   the initials Y.A. between May 2018 and August 2019?

21   A.   Yes, ma'am.

22   Q.   And did you confirm that Exhibit 23 is a fair and

23   accurate -- true and accurate copy of that claims data that

24   was in the repository that you could access?

25   A.   Yes, ma'am.

1          MS. WILLIS:  The government would move to admit 23.

2          THE COURT:  Same objection, Mr. Khouri?

3          MR. KHOURI:  Yes, Your Honor.  Same objection.

4          THE COURT:  It will be admitted over objection.

5                            (Government Exhibit No. 23

6                             received into evidence.)

7          MS. WILLIS:  Let's go back to Exhibit 7, Ms. Slater.

8    And permission to publish Exhibit 7 for the jury?

9          THE COURT:  Yes, you may.

10   BY MS. WILLIS:

11   Q.   Now, taking a look at the claims data, let's talk a

12   little bit more about what's included in this data set.

13   Does the claims data show the beneficiary with whom it is

14   associated?

15   A.   Yes, ma'am.

16   Q.   And what rows are those, or columns?

17   A.   Columns.  Essentially columns A through I, which is their

18   name, their date of birth, their gender, ID numbers, their

19   Medicare ID number specifically, and their Social Security

20   number.

21   Q.   And does the claims data reflect the date of service?

22   A.   Yes, ma'am.

23   Q.   And how is that service reflected, the type of service?

24   A.   I'm sorry?  Say that again?

25   Q.   Well, I'll back up.  What column is the date of service

1      in?

2      A.    J and K.

3      Q.    And is the service itself reflected in the claims data?

4      A.    Yes, ma'am.

5             THE COURT:  I'm sorry.  Let me interrupt you one minute

6      for two things.  Ladies and gentlemen, you're hearing medical

7      evidence and seeing information about medical testimony.  I

8      know I don't have to tell you that this is confidential

9      information, and obviously you can consider it in your

10     verdict, but this is not information that should be copied

11     or shared outside of this courtroom because it is medical

12     information.  And I know I don't have to tell you, but I will

13     just tell you in an abundance of caution.  Also, can you pick

14     up your phone.

15            (Bench conference.)

16            THE COURT:  Mr. Khouri, you did not object to this

17     exhibit pretrial.  So your objection during the middle of the

18     witness's testimony is really unfair to the government because

19     you had an opportunity to object to this for some time before

20     this trial started.  All right.  Thank you.

21            MS. WILLIS:  Your Honor?

22            THE COURT:  Yes.

23            MS. WILLIS:  Can we make another note for the record?

24            THE COURT:  Yes.

25            MS. WILLIS:  About the admissibility?

1          THE COURT:  Yes.

2          MS. WILLIS:  This data in this particular exhibit was

3     listed as coming in through this witness in the government's

4     pretrial briefing about the summary exhibits as being

5     admissible, and I believe that the defense indicated they were

6     not taking an issue with that.

7          THE COURT:  That's correct.  Thank you.

8        (End of bench conference.)

9     BY MS. WILLIS:

10    Q.   I think we left off on date of service.  Is that correct?

11    A.   Yes, ma'am.

12    Q.   For the record, what columns are those?

13    A.   J and K.

14    Q.   What about the type of service?  Is that reflected in

15    claims data?

16    A.   Yes, ma'am.

17    Q.   What columns are those?

18    A.   It starts on column Q and R.

19    Q.   And is Q the actual code and R the description?

20    A.   Yes, ma'am.

21    Q.   Does the data include the diagnosis code that the

22    provider submitted?

23    A.   Yes, ma'am.

24    Q.   And what column is that?

25    A.   I don't recall, but if you can scroll it until I can see

1    it.  Keep scrolling please, keep going.  Starting on column

2    AD, and it's several columns, at least eight or nine.  Okay.

3    AD through AP.

4    Q.   And are there modifier codes also reflected in the claims

5    data?

6    A.   Yes, ma'am.

7    Q.   And are these the codes that providers submit?

8    A.   Yes, ma'am.

9    Q.   Is the name of the rendering provider, is that

10    information in the claims data?

11    A.   Yes, ma'am.

12    Q.   And is that column BD?

13        Ms. Slater, can you scroll over?

14        It's not.  Do you know what column the --

15    A.   I don't have it memorized.  Or there it is.

16    No, that's billing.  Rendering is BP and BQ.

17    Q.   What about the amount billed for a claim or service?

18    A.   That's also contained in this data.

19    Q.   And can you kind of direct us to what -- there's a lot

20    of columns.  Can you direct us to --

21    A.   You can scroll to the left, it is right after the columns

22    for the modifier codes.  There, starting on column AT, or just

23    AT, I'm sorry.

24    Q.   And what about the amount paid?

25    A.   That's column AW.

1    Q.   Now, Mr. Quindoza -- Ms. Slater, could you kind of scroll

2    like all the way down this spreadsheet?

3       Does this claims data include more than 20,000 claim

4    details?

5    A.   Yes, ma'am.

6    Q.   And does it also include over, I don't know how many,

7    thousands and thousands of services billed?

8    A.   Yes.  Over 29,000 services billed.

9    Q.   So based -- we're going to talk a little bit about

10    particular parts of the data, but I think the Court may want

11    to give an instruction.

12       THE COURT:  Yes.  Ladies and gentlemen, you'll hear

13    this instruction again at the end, but because this witness

14    is testifying as to some particular data, I want to just give

15    you some instruction as to how to assess the testimony and the

16    evidence.

17    The government is presenting testimony from an individual

18    regarding exhibits in the form of charts, or is going to

19    present testimony from an individual regarding exhibits in

20    the form of charts and summaries.  Those charts and summaries

21    will be admitted -- well, they will ask for admission of those

22    charts and summaries into evidence, for clarity and

23    convenience, and you should treat the charts and summaries

24    as you treat any other evidence admitted during this trial.

25       On the other hand, the testimony regarding summary exhibits

1    is to be used only as a matter of convenience as an aid to

2    evaluating the evidence.  All right.

3    BY MS. WILLIS:

4    Q.   Now, let's talk about some individual claim detail lines.

5    Based on your review of this -- have you reviewed the claims

6    data?

7    A.   Yes, ma'am.

8    Q.   Okay.  And based on your review of the claims data, was

9    there a claim submitted for a beneficiary with the initials

10   K.M. for CPT code 64636, or destruction of lower or sacral

11   spinal facet joint nerves with imaging guidance on March 31,

12   2016?

13   A.   Yes, ma'am.

14   Q.   And, Ms. Slater, could you highlight row 19,268.

15        19,268.  Okay.  So talking about the claim detail line

16   19,268.  Is this claim for -- this claim detail line indicate

17   that a claim was submitted for K.M.?

18   A.   Yes, ma'am.

19   Q.   For the date of service March 31, 2016?

20   A.   Yes.

21   Q.   Ms. Slater, can you scroll over a little bit more?  Stop.

22        Does row Q tell us -- or column Q, I apologize -- the CPT

23   code?

24   A.   Yes, ma'am.

25   Q.   And then does row R tell us the description?

1    A.   Yes.

2    Q.   Thank you.  I'm going to -- was there a claim detail or

3    claim submitted for a beneficiary with the same initials, same

4    beneficiary, for CPT code 64636 on October 13, 2016?

5    A.   Yes.  I believe so.

6    Q.   And if you could get there, Ms. Slater, could you go to

7    row 19,300.

8         And just to confirm, from columns D and E, this is the

9    same patient, same name, and the date of service is

10   10/13/2016.  Is that correct?

11   A.   Yes, ma'am.

12        MS. WILLIS:  Your Honor, I don't know if this would be

13   a good place to stop.

14        THE COURT:  Yes.  I have a 12:30 matter.  I think this

15   witness is going to be on the stand a while.  So it's probably

16   a good time to stop, and I have to get my next matter cued up.

17   It's a Zoom hearing, so it takes a few minutes to get

18   everything done.

19      Mr. Quindoza, we are going to have to stop now, and I'm

20   going to ask that during -- you're still under oath.  You're

21   still in your testimony -- that you not discuss the subject

22   matter of your testimony with anyone.  Have a good lunch.

23        THE WITNESS:  Yes, Your Honor.

24        THE COURT:  Thank you.  Ladies and gentlemen, it's a

25   lovely day.  It's clam chowder day if you like that kind of

1        thing.   Enjoy your lunch.   I'll see you back here at 1:30.

2        Thank you.

3             (Jury out at 12:24 p.m.)

4             (Lunch recess taken at 12:24 p.m.)

* * * * * *

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne

**'**

**'10** [1] - 718:14
**'11** [2] - 710:5, 718:14
**'12** [1] - 710:5
**'13** [1] - 720:7

**/**

**/s** [1] - 760:9

**0**

**01/25/16** [1] - 707:15

**1**

**1** [5] - 663:12, 666:4, 701:22, 713:8, 714:13
**10** [1] - 722:10
**10/13/2016** [1] - 758:10
**11** [8] - 666:4, 701:6, 701:7, 701:19, 701:23, 703:9, 707:8, 722:10
**11:05** [2] - 722:12, 722:15
**11:15** [2] - 722:10, 722:14
**11:26** [1] - 722:15
**12** [1] - 750:20
**1250** [1] - 657:21
**12:24** [2] - 759:3, 759:4
**12:25** [1] - 708:14
**12:30** [2] - 708:13, 758:14
**13** [3] - 659:23, 713:15, 758:4
**1400** [1] - 657:14
**15** [3] - 692:1, 725:16, 748:25
**16** [2] - 731:8, 731:16
**17** [1] - 714:20
**19** [4] - 713:15, 714:12, 715:5
**19,268** [3] - 757:14, 757:15, 757:16
**19,300** [1] - 758:7
**19-0255** [1] - 657:4
**19-255** [1] - 659:3
**1:30** [1] - 759:1

**2**

**2** [10] - 659:14, 663:13, 697:24, 698:3, 698:8, 699:6, 699:15, 702:20, 703:20, 731:16
**20** [4] - 671:21, 731:2, 732:22, 743:1
**20,000** [1] - 756:3
**20001** [1] - 657:25
**20005** [1] - 657:14
**20036** [1] - 657:22
**2008** [1] - 666:7
**2009** [1] - 692:9
**2010** [1] - 659:14
**2012** [1] - 659:23
**2013** [1] - 711:6
**2014** [1] - 659:25
**2015** [5] - 666:8, 666:13, 692:22, 696:7, 749:1
**2016** [22] - 692:23, 693:4, 693:24, 694:2, 696:8, 700:2, 702:16, 703:17, 704:10, 704:20, 705:4, 705:12, 707:20, 709:21, 711:12, 711:14, 711:19, 720:5, 720:10, 757:12, 757:19, 758:4
**2017** [8] - 688:1, 688:21, 689:12, 718:14, 727:18, 727:19, 727:21, 727:22
**2018** [2] - 749:1, 751:20
**2019** [1] - 751:20
**202** [3] - 657:15, 657:22, 657:25
**2020** [2] - 713:8, 714:13
**2022** [1] - 657:6
**21** [2] - 732:14, 732:17
**215** [1] - 657:17
**2222** [1] - 657:17
**23** [6] - 658:16, 751:16, 751:18, 751:22, 752:1, 752:5
**25** [3] - 702:16, 703:17, 707:20
**26** [6] - 662:6, 684:5, 684:23, 688:11, 688:13, 688:18
**27** [1] - 662:6
**28** [2] - 662:6, 689:10

**29** [2] - 662:6, 711:6
**29,000** [1] - 756:8
**2nd** [1] - 704:14

**3**

**3** [1] - 663:14
**31** [2] - 757:11, 757:19
**333** [1] - 657:24
**336-2433** [1] - 657:18
**35** [4] - 658:15, 709:11, 715:6, 715:13
**353-0822** [1] - 657:15
**354-3186** [1] - 657:25

**4**

**4** [2] - 657:9, 712:5
**41** [1] - 747:20
**4704-A** [1] - 657:24
**4:30** [2] - 722:20, 722:22

**5**

**52** [1] - 707:8
**54** [1] - 707:17
**581** [1] - 661:4
**583** [1] - 662:7
**587** [1] - 662:14

**6**

**6** [1] - 659:25
**64** [1] - 724:15
**64633** [2] - 662:4, 689:7
**64635** [3] - 689:11, 689:15, 690:15
**64636** [2] - 757:10, 758:4
**65** [1] - 724:15
**675** [1] - 658:3
**687** [1] - 658:4
**691** [1] - 658:5
**696** [1] - 658:5

**7**

**7** [9] - 658:16, 748:9, 748:10, 748:23, 749:14, 749:18, 751:12, 752:7, 752:8
**700** [1] - 657:21
**707** [1] - 658:6

**708** [1] - 658:7
**715** [1] - 658:15
**716** [1] - 658:7
**723** [1] - 658:8
**727** [1] - 658:9
**729** [1] - 658:9
**730** [1] - 658:10
**742** [1] - 658:11
**746** [1] - 658:12
**751** [1] - 658:16
**752** [1] - 658:16

**8**

**803(3** [3] - 736:2, 736:8, 736:12
**803(3)** [2] - 736:20, 737:12
**80s** [1] - 679:23
**84** [1] - 662:7
**861-0870** [1] - 657:22

**9**

**9** [3] - 657:6, 714:13, 715:5
**902(11** [2] - 667:14, 667:16
**92612** [1] - 657:18
**949** [1] - 657:18
**9:19** [1] - 657:6
**9:48** [1] - 674:17

**A**

**A-N-D-E-R-S-O-N** [1] - 723:10
**a.m** [2] - 657:6, 674:17, 722:12, 722:15
**abeyance** [1] - 660:3
**ability** [2] - 672:20, 672:24
**ablation** [1] - 680:17
**able** [3] - 672:6, 717:6, 733:8
**above-entitled** [1] - 760:5
**absolutely** [3] - 663:17, 699:11, 716:15
**abundance** [1] - 753:13
**abuse** [2] - 670:8, 706:9
**access** [7] - 747:22, 748:5, 749:6, 749:10, 750:24,

**751:4**, 751:24
**according** [3] - 659:13, 685:13, 697:3
**accuracy** [1] - 750:10
**accurate** [2] - 751:23
**accurately** [1] - 663:11
**acknowledge** [1] - 662:3
**acting** [1] - 662:16
**action** [4] - 659:3, 660:24, 662:22, 663:11
**actions** [1] - 659:9
**acts** [1] - 671:7
**actual** [3] - 668:17, 688:1, 754:19
**AD** [2] - 755:2, 755:3
**addicted** [3] - 672:13, 679:23, 680:2
**addiction** [1] - 680:8
**addition** [1] - 726:20
**address** [1] - 747:10
**Administration** [1] - 704:19
**administration** [1] - 675:10
**administrative** [2] - 661:7, 663:11
**admissibility** [2] - 706:13, 753:25
**admissible** [2] - 736:20, 754:5
**admission** [4] - 659:7, 667:20, 715:7, 756:21
**admit** [10] - 660:14, 664:5, 664:24, 667:1, 667:2, 668:13, 673:5, 715:8, 749:17, 752:1
**admitted** [12] - 666:8, 667:24, 668:18, 684:23, 700:24, 700:25, 715:12, 741:6, 751:11, 752:4, 756:21, 756:24
**Advantage** [1] - 709:20
**affect** [1] - 672:20
**afternoon** [2] - 742:20, 742:21
**afterwards** [1] - 676:8
**age** [1] - 685:17
**agent** [6] - 672:8, 697:23, 697:24, 698:2, 698:9, 699:18
**agent's** [1] - 698:12

**ago** [9] - 672:8, 687:6, 688:10, 689:4, 693:25, 697:10, 707:6, 709:11, 729:19
**agree** [6] - 663:4, 664:3, 664:19, 665:13, 668:12, 688:21
**agreed** [2] - 661:24, 662:9
**aid** [1] - 757:1
**ALICE** [2] - 658:3, 675:1
**allegations** [1] - 746:25
**allow** [6] - 662:24, 669:18, 672:16, 672:25, 680:10, 737:12
**allowed** [3] - 672:14, 690:11, 736:4
**allows** [2] - 685:12, 689:17
**almost** [2] - 678:12, 737:6
**aloud** [1] - 698:25
**alternatives** [2] - 680:6
**America** [1] - 659:3
**AMERICA** [1] - 657:3
**amount** [3] - 664:13, 755:17, 755:24
**analyst** [1] - 691:24
**ANDERSON** [2] - 658:8, 723:1
**Anderson** [12] - 722:23, 723:4, 723:8, 723:10, 723:11, 723:14, 723:24, 724:6, 724:16, 726:20, 729:17, 729:22
**anesthesiology** [2] - 679:3, 686:2
**answer** [16] - 673:20, 673:23, 683:4, 686:9, 688:25, 689:14, 690:12, 714:9, 714:17, 714:22, 716:18, 720:2, 735:8, 737:2, 740:1
**Answer** [1] - 737:1
**answered** [2] - 737:13, 737:16
**answering** [1] - 690:21
**AP** [1] - 755:3
**apartment** [1] - 704:16

**APC** [1] - 657:16
**apologies** [3] - 666:1, 670:5, 713:12
**apologize** [1] - 757:22
**appear** [1] - 662:5
**APPEARANCES** [1] - 657:11
**apply** [1] - 720:25
**appointment** [5] - 727:23, 733:17, 733:18, 733:20, 733:22
**appointments** [2] - 733:13, 741:17
**approach** [4] - 684:18, 686:20, 698:16, 713:13
**appropriate** [5] - 661:7, 661:12, 668:23, 673:25, 746:7
**area** [11] - 683:21, 695:3, 709:7, 709:9, 713:2, 720:25, 721:21, 723:16, 723:22, 728:16, 744:16
**areas** [2] - 679:5, 681:5
**arguing** [1] - 660:7
**argument** [1] - 663:7
**Army** [1] - 691:25
**aspect** [2] - 683:9, 683:10
**aspiration** [3] - 693:2, 693:17, 697:4
**asserted** [6] - 734:24, 735:23, 736:7, 739:25, 740:5, 740:11
**assertion** [1] - 674:2
**assess** [1] - 756:15
**assist** [1] - 675:16
**associated** [2] - 717:19, 752:14
**Associates** [1] - 748:25
**assume** [1] - 670:17
**assumes** [1] - 682:10
**assure** [1] - 674:21
**AT** [2] - 755:22, 755:23
**attempt** [1] - 666:15
**audit** [6] - 675:18, 676:12, 677:12, 677:17, 678:14, 681:5
**audited** [1] - 676:16
**auditing** [2] - 681:16, 681:19

**auditor** [1] - 680:5
**August** [2] - 729:18, 751:20
**authenticating** [1] - 667:16
**authenticity** [1] - 706:7
**Avenue** [3] - 657:14, 657:21, 657:24
**AW** [1] - 755:25
**aware** [4] - 661:20, 676:24, 733:11, 742:5

## B

**B-R-O-W-N-E** [1] - 709:3
**backache** [7] - 695:14, 695:17, 695:21, 704:20, 704:25, 705:2, 705:3
**background** [1] - 743:16
**bad** [6] - 668:3, 671:5, 679:8, 679:24, 712:2, 740:17
**band** [1] - 710:24
**barely** [1] - 727:13
**based** [12] - 659:24, 663:15, 670:9, 676:12, 681:10, 681:24, 683:15, 702:21, 751:6, 756:9, 757:5, 757:8
**BD** [1] - 755:12
**bears** [1] - 671:6
**BEFORE** [1] - 657:10
**beginning** [2] - 692:22, 711:24
**behalf** [1] - 686:16
**behind** [2] - 671:16, 713:12
**belief** [2] - 670:9, 736:16
**believes** [1] - 670:6
**below** [2] - 721:11, 728:11
**bench** [9] - 690:18, 706:18, 719:25, 735:11, 737:14, 742:10, 746:12, 750:13, 754:8
**Bench** [10] - 690:5, 695:8, 706:2, 719:6, 734:9, 735:25, 739:23, 745:13, 749:19, 753:15
**beneficiary** [5] -

751:19, 752:13, 757:9, 758:3, 758:4
**benefit** [1] - 675:14
**bent** [3] - 725:6, 743:9, 743:11
**best** [5] - 661:1, 664:25, 683:6, 686:6, 686:17
**better** [8] - 665:14, 682:1, 682:5, 682:14, 682:18, 682:23, 683:3, 683:8
**between** [4] - 672:24, 686:3, 696:7, 751:20
**beyond** [6] - 679:7, 681:1, 719:7, 719:13, 719:18, 737:3
**Big** [1] - 685:20
**big** [1] - 685:21
**bill** [3] - 686:6, 686:17, 694:6
**billed** [6] - 672:2, 682:7, 688:2, 755:17, 756:7, 756:8
**biller** [1] - 687:6
**billers** [2] - 686:10, 686:13
**billing** [6] - 662:16, 677:12, 681:6, 685:12, 748:18, 755:16
**billings** [2] - 677:24, 681:19
**Bipolar** [1] - 671:22
**bipolar** [9] - 672:13, 672:16, 672:18, 672:19, 672:20, 673:1, 673:19, 695:22
**birth** [5] - 700:10, 702:13, 703:2, 703:15, 752:18
**bit** [6] - 672:4, 727:14, 734:13, 752:12, 756:9, 757:21
**blatant** [1] - 694:14
**block** [1] - 659:15
**Blue** [1] - 724:9
**Board** [2] - 659:9, 659:10
**board** [16] - 659:15, 659:16, 659:19, 659:22, 659:24, 659:25, 660:24, 661:12, 662:22, 663:9, 663:14, 663:24, 663:25, 664:21, 664:25, 665:1

**boards** [1] - 661:3
**bodily** [1] - 736:15
**body** [4] - 693:18, 725:10, 735:17, 739:14
**book** [7] - 683:18, 685:1, 685:17, 685:21, 685:24, 686:5
**books** [2] - 685:18, 685:20
**born** [2] - 709:10, 731:2
**bottom** [1] - 695:3
**boyfriend** [1] - 737:9
**BP** [1] - 755:16
**BQ** [1] - 755:16
**brace** [1] - 710:25
**Bradley** [2] - 684:7, 745:18
**Brandywine** [2] - 723:15, 723:18
**break** [3] - 708:15, 722:10, 722:14
**breaking** [1] - 721:17
**breakout** [1] - 669:8
**briefing** [1] - 754:4
**briefly** [1] - 729:13
**bring** [10] - 669:16, 669:18, 674:14, 688:17, 707:4, 738:12, 738:17, 741:7, 750:5, 750:8
**broad** [1] - 702:21
**broad-based** [1] - 702:21
**brother** [1] - 732:9
**brother-in-law** [1] - 732:9
**brought** [1] - 738:14
**BROWNE** [2] - 658:7, 708:20
**Browne** [13] - 708:19, 708:23, 709:1, 709:4, 709:12, 713:7, 713:17, 714:12, 714:23, 715:16, 716:3, 716:17
**Bryan** [2] - 760:9, 760:9
**BRYAN** [2] - 657:23, 760:3
**bulge** [1] - 702:21
**bulging** [1] - 701:16
**Burch** [9] - 731:4, 731:21, 734:17, 736:11, 736:19, 737:7, 742:24, 744:7, 744:17

**Burch's** [2] - 744:25, 745:4
**business** [4] - 748:6, 749:7, 749:11, 750:1
**BY** [59] - 675:3, 678:10, 679:10, 680:4, 680:13, 680:23, 681:3, 682:16, 684:10, 684:21, 687:2, 688:23, 690:1, 690:20, 691:10, 696:2, 698:19, 698:24, 699:22, 700:16, 701:2, 701:9, 701:21, 702:1, 703:11, 707:2, 708:22, 713:16, 714:4, 714:11, 715:15, 716:2, 716:22, 720:3, 721:15, 723:3, 726:13, 727:7, 729:16, 730:7, 730:18, 731:17, 735:13, 737:20, 738:4, 738:11, 738:24, 739:5, 739:12, 742:12, 742:19, 744:6, 746:17, 749:4, 750:14, 751:14, 752:10, 754:9, 757:3

---

**C**

---

**CA** [1] - 657:18
**cafeteria** [2] - 669:4, 669:10
**cafeterias** [1] - 669:4
**candidate** [1] - 677:11
**candor** [2] - 663:4, 673:16
**cannot** [2] - 703:21, 736:6
**car** [1] - 741:7
**care** [3] - 661:8, 702:7, 716:9
**careful** [1] - 664:3
**carefully** [2] - 664:20, 717:25
**case** [13] - 660:12, 660:16, 665:17, 669:16, 669:19, 669:25, 670:4, 670:6, 670:13, 674:22, 676:3, 719:22, 742:8
**case-in** [1] - 660:12

**case-in-chief** [3] - 660:16, 669:16, 669:19
**cases** [1] - 698:4
**casing** [1] - 698:5
**caused** [4] - 735:17, 736:25, 743:19, 744:1
**caution** [1] - 753:13
**center** [3] - 691:25, 705:13, 705:15
**cert** [1] - 667:16
**certain** [6] - 659:23, 660:7, 660:19, 662:21, 736:22, 742:4
**certainly** [4] - 664:18, 699:16, 703:4, 750:9
**CERTIFICATE** [1] - 760:2
**certification** [1] - 667:14
**certify** [1] - 760:3
**cervical** [4] - 659:15, 659:20, 661:25, 663:13
**chair** [1] - 744:23
**challenges** [1] - 670:12
**challenging** [1] - 672:6
**change** [2] - 704:22, 721:8
**changed** [3] - 709:18, 721:7, 721:16
**changes** [2] - 665:13, 666:20
**character** [4] - 719:8, 719:15, 719:21, 719:22
**charged** [2] - 719:18, 740:18
**charges** [1] - 673:22
**chart** [1] - 681:24
**charts** [5] - 756:18, 756:20, 756:22, 756:23
**check** [1] - 683:11
**chief** [5] - 660:13, 660:16, 669:16, 669:19, 722:19
**child** [1] - 739:9
**chitchat** [1] - 718:7
**choice** [1] - 698:13
**choir** [1] - 664:2
**chowder** [1] - 758:25
**chronic** [1] - 671:23
**CHUTKAN** [1] - 657:10
**city** [1] - 692:6

**claim** [10] - 755:17, 756:3, 757:4, 757:9, 757:15, 757:16, 757:17, 758:2, 758:3
**claims** [43] - 675:25, 676:3, 676:10, 687:7, 687:11, 687:13, 688:1, 688:5, 688:7, 690:24, 747:15, 747:22, 747:24, 747:25, 748:5, 748:12, 748:17, 748:24, 749:7, 749:10, 749:13, 749:15, 750:15, 750:19, 750:21, 750:23, 751:1, 751:18, 751:19, 751:23, 752:11, 752:13, 752:21, 753:3, 754:15, 755:4, 755:10, 756:3, 757:5, 757:8
**clam** [1] - 758:25
**clarified** [1] - 689:5
**clarify** [3] - 669:15, 688:13, 689:4
**clarity** [2] - 688:17, 756:22
**clear** [6] - 661:5, 662:19, 694:16, 714:10, 733:18, 746:1
**CLERK** [5] - 659:2, 671:14, 671:16, 674:16, 684:13
**client** [2] - 690:7, 719:16
**clinical** [4] - 687:14, 687:16, 687:23, 687:25
**close** [2] - 665:5, 665:17
**closed** [1] - 718:15
**closing** [2] - 663:7, 718:16
**cocaine** [6] - 671:23, 672:3, 672:13, 673:2, 673:5, 706:8
**code** [25] - 662:4, 683:13, 683:17, 683:20, 683:24, 685:2, 685:13, 685:16, 685:17, 688:11, 689:1, 689:7, 689:11, 689:14, 689:17, 689:19, 690:14, 690:15, 754:19,

754:21, 757:10, 757:23, 758:4
**coders** [2] - 686:11, 686:13
**codes** [10] - 682:7, 682:20, 683:11, 685:22, 685:25, 688:14, 690:11, 755:4, 755:7, 755:22
**collateral** [3] - 670:1, 673:21, 674:1
**colon** [1] - 707:12
**Columbia** [1] - 659:11
**COLUMBIA** [1] - 657:1
**column** [9] - 752:25, 754:18, 754:24, 755:1, 755:12, 755:14, 755:22, 755:25, 757:22
**columns** [9] - 752:16, 752:17, 754:12, 754:17, 755:2, 755:20, 755:21, 758:8
**comfortable** [1] - 723:11
**coming** [3] - 706:5, 743:4, 754:3
**comity** [1] - 663:16
**common** [4] - 677:22, 700:8, 743:21, 743:24
**communicate** [1] - 717:6
**companies** [1] - 747:11
**companion** [1] - 737:9
**company** [12] - 675:9, 675:16, 676:22, 676:23, 676:24, 733:3, 733:4, 746:21, 746:23, 747:2, 747:5
**compare** [1] - 749:13
**compared** [5] - 678:1, 678:2, 679:12, 679:14, 679:19
**comparison** [2] - 678:3, 678:11
**competency** [1] - 670:22
**competent** [1] - 661:8
**compilation** [1] - 747:25
**complain** [2] - 736:23, 743:12
**complained** [5] - 735:20, 736:11, 737:2, 737:10, 743:13

**complaining** [1] - 735:7
**complaint** [1] - 664:21
**complies** [1] - 685:11
**comply** [1] - 663:21
**composed** [1] - 678:4
**concern** [1] - 740:16
**concerned** [3] - 663:8, 663:10, 678:14
**condition** [10] - 672:16, 672:21, 673:1, 734:18, 734:23, 736:3, 736:5, 736:10, 736:14, 736:20
**conditions** [5] - 663:22, 733:9, 733:11, 737:24, 741:17
**conducted** [1] - 678:15
**conducting** [1] - 687:16
**conference** [21] - 660:2, 690:5, 690:18, 695:8, 705:25, 706:2, 706:18, 719:6, 719:25, 734:9, 735:11, 735:25, 737:14, 739:23, 742:10, 745:13, 746:12, 749:19, 750:13, 753:15, 754:8
**conferring** [2] - 726:12, 738:10
**confidential** [1] - 753:8
**confirm** [5] - 749:14, 751:2, 751:18, 751:22, 758:8
**confirmed** [1] - 748:23
**confusion** [1] - 662:10
**connect** [1] - 744:16
**Connecticut** [1] - 657:21
**connection** [1] - 673:7
**consider** [3] - 664:10, 668:7, 753:9
**consideration** [3] - 682:3, 682:5, 682:12
**consisted** [1] - 697:3
**Constitution** [1] - 657:24
**consumer** [4] - 662:9, 662:12, 685:4, 685:6
**contact** [2] - 682:21, 682:25
**contained** [1] - 755:18

**contains** [1] - 685:22
**contemplating** [1] - 666:4
**contested** [1] - 660:5
**continue** [1] - 741:2
**continued** [1] - 741:22
**contract** [1] - 675:9
**contractor** [4] - 675:12, 747:6, 747:7, 747:19
**contractors** [1] - 750:21
**contracts** [3] - 746:24, 747:9, 747:12
**contrast** [1] - 702:16
**convenience** [2] - 756:23, 757:1
**conversation** [1] - 698:10
**convictions** [1] - 670:17
**COOKE** [4] - 657:19, 690:6, 690:10, 690:17
**Cooke** [1] - 657:20
**copied** [1] - 753:10
**copy** [11] - 666:23, 667:1, 684:11, 698:11, 698:20, 700:20, 748:24, 749:14, 749:22, 751:2, 751:23
**correct** [36] - 675:14, 675:19, 676:13, 678:22, 680:20, 681:11, 683:5, 685:14, 686:17, 687:8, 687:9, 689:2, 696:8, 697:8, 697:11, 700:9, 702:18, 703:7, 703:13, 703:15, 703:16, 703:23, 704:4, 704:13, 704:17, 705:17, 721:1, 735:15, 743:4, 748:24, 749:8, 749:14, 754:7, 754:10, 758:10, 760:4
**correctly** [3] - 696:13, 712:5, 714:23
**cortisone** [2] - 693:3, 693:16
**counsel** [10] - 659:4, 659:6, 660:11, 660:13, 662:19, 667:7, 669:3, 670:7, 690:10, 745:18
**counsel's** [1] - 670:10

**country** [2] - 748:5, 749:8
**Counts** [1] - 666:4
**County** [1] - 709:11
**couple** [4] - 671:11, 672:5, 685:9, 726:21
**course** [4] - 695:23, 748:6, 749:6, 749:11
**Court** [12] - 657:23, 663:5, 664:12, 665:19, 666:14, 673:16, 682:8, 736:22, 745:15, 745:18, 756:10, 760:3
**COURT** [166] - 657:1, 659:5, 664:2, 664:8, 664:14, 664:16, 664:23, 665:3, 665:10, 665:21, 666:17, 666:22, 666:25, 667:4, 667:8, 667:18, 667:22, 668:6, 669:7, 669:18, 669:21, 669:24, 670:15, 670:20, 671:12, 671:17, 671:19, 671:24, 672:10, 672:14, 673:24, 674:9, 674:18, 678:8, 679:9, 680:2, 680:10, 680:22, 680:25, 682:10, 684:3, 684:15, 684:20, 686:22, 686:24, 688:16, 688:19, 690:9, 690:13, 690:19, 691:2, 691:6, 695:7, 695:9, 695:12, 695:15, 695:18, 695:20, 695:24, 698:17, 698:21, 699:21, 700:12, 700:25, 701:4, 701:8, 701:19, 701:23, 701:25, 703:10, 705:23, 706:1, 706:3, 706:10, 706:14, 706:16, 706:19, 706:22, 708:9, 708:12, 713:11, 713:14, 714:2, 714:8, 715:4, 715:7, 715:10, 715:12, 715:24, 716:17, 716:21, 719:2,

719:4, 719:7, 719:12, 719:16, 719:24, 720:1, 721:12, 722:6, 722:9, 722:14, 722:16, 722:18, 726:11, 727:4, 729:12, 729:14, 729:24, 730:4, 730:17, 731:11, 731:14, 734:8, 734:10, 734:19, 735:5, 735:12, 735:22, 736:1, 736:8, 736:12, 736:25, 737:8, 737:15, 738:2, 738:23, 739:3, 739:8, 739:24, 740:9, 740:24, 741:13, 741:21, 741:25, 742:6, 742:11, 742:17, 744:3, 745:7, 745:9, 745:20, 745:22, 746:3, 746:6, 746:10, 749:3, 749:20, 749:23, 750:1, 750:5, 751:6, 751:8, 751:10, 752:2, 752:4, 752:9, 753:5, 753:16, 753:22, 753:24, 754:1, 754:7, 756:12, 758:14, 758:24
**court** [3] - 671:10, 716:19, 737:17
**court's** [3] - 689:24, 726:10, 738:9
**Court's** [2] - 665:18, 713:10
**Courthouse** [1] - 657:24
**courtroom** [1] - 753:11
**cousin** [1] - 744:14
**covered** [2] - 677:23, 709:21
**CPT** [14] - 662:4, 682:20, 683:18, 683:21, 685:1, 685:16, 685:17, 685:21, 689:11, 690:11, 690:16, 757:10, 757:22, 758:4
**CR** [1] - 657:4
**create** [1] - 662:10
**created** [2] - 747:12

**credibility** [4] - 670:16, 671:6, 673:12, 719:17
**criminal** [1] - 659:2
**Cross** [6] - 658:3, 658:5, 658:7, 658:9, 658:11, 724:9
**cross** [17] - 670:7, 672:15, 672:17, 672:25, 673:10, 673:25, 674:5, 674:11, 674:23, 695:7, 695:18, 695:20, 706:20, 707:24, 727:5, 742:17, 750:10
**CROSS** [5] - 675:2, 696:1, 716:1, 727:6, 742:18
**cross-examination** [8] - 673:25, 674:11, 674:23, 695:7, 706:20, 707:24, 727:5, 742:17
**CROSS-EXAMINATION** [5] - 675:2, 696:1, 716:1, 727:6, 742:18
**Cross-Examination....................** [5] - 658:3, 658:5, 658:7, 658:9, 658:11
**cross-examine** [6] - 672:15, 672:17, 672:25, 673:10, 674:5, 750:10
**CRR** [1] - 657:23
**CT** [3] - 661:16, 683:22, 683:25
**cued** [1] - 758:16
**custodian** [1] - 724:5

## D

**D.C** [18] - 657:5, 659:22, 659:25, 661:12, 663:18, 691:18, 691:19, 699:23, 702:3, 703:13, 709:7, 709:9, 709:10, 723:16, 723:22, 730:25, 731:1, 731:2
**dance** [1] - 711:18
**data** [43] - 676:13, 676:18, 676:19, 676:21, 677:10, 747:22, 747:24, 747:25, 748:5,

748:12, 748:17, 748:23, 748:24, 749:7, 749:10, 749:13, 749:15, 749:20, 749:21, 749:23, 750:4, 750:15, 750:19, 751:1, 751:2, 751:18, 751:23, 752:11, 752:12, 752:13, 752:21, 753:3, 754:2, 754:15, 754:21, 755:5, 755:10, 755:18, 756:3, 756:10, 756:14, 757:6, 757:8
**date** [17] - 681:22, 700:10, 702:13, 703:2, 703:15, 707:10, 707:12, 707:14, 707:19, 707:20, 711:7, 752:18, 752:21, 752:25, 754:10, 757:19, 758:9
**dates** [5] - 666:12, 681:16, 681:19, 681:20, 699:17
**DAY** [1] - 657:9
**days** [1] - 672:8
**DC** [3] - 657:14, 657:22, 657:25
**deal** [1] - 675:25
**dealing** [1] - 679:22
**death** [1] - 664:22
**deceased** [2] - 731:10, 740:8
**December** [7] - 659:14, 704:10, 704:20, 705:4, 705:12, 713:8, 714:13
**decision** [1] - 660:25
**declarant's** [2] - 736:13, 736:18
**Defendant** [2] - 657:7, 657:16
**defendant** [2] - 659:12, 664:25
**Defense** [1] - 705:21
**defense** [14] - 660:9, 660:11, 660:13, 662:19, 663:6, 666:3, 667:7, 667:24, 668:10, 670:6, 670:9, 745:18, 745:25, 754:5
**defenses** [2] - 663:7,

664:13
**definition** [2] - 678:3, 737:11
**degenerate** [1] - 702:23
**degeneration** [1] - 743:19
**degenerative** [1] - 712:5
**Delaware** [10] - 659:10, 659:15, 659:16, 659:24, 663:18, 663:21, 663:22, 663:24, 666:23, 667:13
**deliver** [1] - 675:13
**delusions** [1] - 670:24
**denial** [4] - 672:15, 673:2, 673:11, 674:6
**denied** [7] - 672:1, 672:3, 672:5, 672:8, 672:19, 673:8, 688:8
**deny** [3] - 673:3, 673:19, 673:20
**Department** [1] - 657:13
**department** [2] - 676:22, 676:23
**dependence** [3] - 671:23, 672:3, 672:4
**deposition** [9] - 670:10, 672:1, 673:8, 673:17, 674:4, 713:7, 713:18, 713:21, 714:5
**depth** [1] - 718:4
**DEPUTY** [5] - 659:2, 671:14, 671:16, 674:16, 684:13
**dermatologist** [1] - 696:19
**describe** [2] - 663:11, 663:23
**describes** [1] - 671:10
**description** [11] - 662:9, 662:13, 683:21, 685:3, 685:4, 685:7, 685:12, 685:13, 754:19, 757:25
**descriptions** [1] - 685:2
**destruction** [1] - 757:10
**detail** [4] - 757:4, 757:15, 757:16, 758:2
**details** [1] - 756:4
**determination** [2] -

681:10, 681:24
**determine** [3] - 676:25, 686:6, 686:16
**determined** [1] - 677:19
**determining** [1] - 687:6
**develop** [1] - 663:6
**developed** [1] - 743:3
**diagnosing** [1] - 737:10
**diagnosis** [2] - 734:21, 754:21
**Diercks** [1] - 657:20
**different** [10] - 662:10, 676:23, 678:18, 679:2, 679:5, 702:22, 714:6, 714:15, 721:9, 741:21
**differently** [1] - 745:2
**difficult** [1] - 716:19
**dire** [2] - 749:25, 750:8
**Direct** [5] - 658:5, 658:7, 658:8, 658:10, 658:12
**direct** [8] - 673:25, 681:1, 708:16, 719:20, 746:4, 750:9, 755:19, 755:20
**DIRECT** [5] - 691:9, 708:21, 723:2, 730:6, 746:16
**direction** [2] - 721:7, 721:8
**disagree** [1] - 719:11
**disc** [4] - 702:21, 702:23, 712:5, 744:1
**disciplinary** [1] - 659:8
**discipline** [1] - 663:24
**Discipline** [1] - 659:9
**discs** [1] - 701:16
**discuss** [1] - 758:21
**discussed** [1] - 663:2
**discussion** [2] - 669:17, 684:8
**disease** [2] - 673:19, 702:23
**dishonesty** [1] - 671:7
**Disorder** [1] - 671:22
**disputes** [1] - 662:19
**disputing** [1] - 660:5
**disregard** [1] - 720:2
**distinct** [1] - 750:20
**District** [2] - 659:11, 663:20

**DISTRICT** [3] - 657:1, 657:1, 657:10
**divorced** [1] - 732:9
**doctor** [18] - 678:14, 692:13, 696:24, 708:1, 724:23, 728:24, 729:1, 734:11, 734:21, 735:1, 737:6, 737:8, 740:17, 743:15, 743:25, 744:18, 748:2, 748:22
**doctor's** [3] - 694:15, 703:20, 733:13
**doctors** [2] - 694:8, 733:16
**document** [18] - 662:11, 684:25, 698:18, 698:22, 698:25, 699:2, 699:5, 699:8, 699:20, 700:23, 704:22, 705:20, 706:4, 706:8, 706:13, 714:3, 731:18, 732:1
**documentation** [6] - 681:10, 681:13, 681:15, 683:11, 683:15, 688:4
**documents** [1] - 667:13
**done** [7] - 661:10, 694:18, 699:3, 705:24, 712:20, 722:21, 758:18
**door** [6] - 659:7, 660:4, 660:11, 660:15, 664:11, 674:10
**DOS** [2] - 707:10, 707:12
**double** [3] - 664:14, 665:25, 690:6
**double-edged** [1] - 664:14
**double-team** [1] - 665:25
**double-teaming** [1] - 690:6
**doubt** [2] - 704:24, 705:10
**down** [11] - 671:21, 672:5, 691:5, 707:16, 708:11, 717:14, 722:13, 730:1, 745:10, 745:12, 756:2
**downtown** [1] - 732:10

**Dr** [128] - 659:8, 659:14, 659:17, 659:20, 659:22, 660:1, 660:4, 660:17, 661:17, 662:2, 662:8, 662:15, 662:20, 663:15, 663:19, 672:2, 675:6, 675:18, 676:12, 677:11, 677:13, 677:20, 678:5, 679:11, 679:14, 679:18, 681:4, 681:6, 682:4, 682:13, 687:7, 687:11, 687:25, 688:2, 692:10, 692:18, 692:21, 692:24, 693:6, 693:14, 693:17, 693:21, 694:4, 694:12, 696:6, 696:7, 696:10, 696:12, 696:21, 697:6, 697:15, 700:20, 701:13, 702:3, 702:17, 703:17, 704:3, 709:23, 710:1, 710:2, 710:3, 710:5, 710:6, 710:9, 710:10, 710:21, 712:2, 716:8, 717:3, 717:4, 717:21, 717:24, 718:2, 718:11, 718:17, 718:20, 719:1, 719:19, 720:4, 720:19, 724:16, 724:21, 724:24, 725:2, 725:8, 725:12, 725:16, 725:17, 726:7, 726:14, 726:22, 727:15, 727:17, 727:23, 727:25, 728:23, 728:24, 728:25, 729:3, 729:6, 729:17, 733:15, 733:20, 734:4, 734:6, 737:21, 737:25, 738:6, 738:13, 738:18, 738:21, 739:16, 740:14, 741:15, 741:19, 741:23, 742:1, 742:14, 742:23, 744:7, 744:10, 744:12, 744:14,

744:15, 744:17, 744:20
**draw** [1] - 661:6
**drug** [6] - 670:8, 670:12, 670:20, 673:2, 674:5, 695:22
**drugs** [5] - 670:25, 673:7, 673:9, 674:3, 674:4
**during** [21] - 660:12, 660:19, 661:22, 669:16, 670:10, 689:8, 689:21, 697:14, 697:21, 720:13, 725:17, 733:1, 733:2, 733:6, 734:3, 738:6, 743:3, 745:3, 753:17, 756:24, 758:20

## E

**edged** [1] - 664:14
**eight** [1] - 755:2
**either** [4] - 692:22, 695:3, 718:14, 750:7
**electro** [1] - 711:25
**element** [1] - 660:5
**eleven** [1] - 708:17
**elicit** [5] - 660:22, 661:23, 719:8, 734:14, 735:9
**elicited** [1] - 740:14
**eliciting** [1] - 667:11
**ELMO** [3] - 684:13, 700:24, 703:9
**emailed** [1] - 732:11
**embarrass** [1] - 739:11
**embarrassment** [1] - 670:14
**emotional** [2] - 736:3, 736:14
**employee** [1] - 747:21
**employees** [1] - 675:12
**employs** [1] - 675:12
**empty** [1] - 671:13
**End** [9] - 690:18, 706:18, 719:25, 735:11, 737:14, 742:10, 746:12, 750:13, 754:8
**end** [11] - 659:5, 662:25, 696:7, 720:23, 726:7, 726:14, 742:4, 747:15, 747:16, 747:17, 756:13

ended [1] - 711:1
engaged [1] - 666:11
engages [1] - 746:23
enjoy [1] - 759:1
enrolled [1] - 749:7
entire [3] - 681:23,
682:2, 734:4
entitled [4] - 661:14,
668:17, 750:10,
760:5
equipment [1] - 748:3
ESQ [4] - 657:12,
657:13, 657:16,
657:19
essentially [2] - 740:7,
752:17
establishes [1] -
735:5
estimating [1] -
693:25
evaluated [2] - 682:6,
682:19
evaluating [1] - 757:2
events [2] - 666:7,
666:8
evidence [34] - 659:8,
660:4, 660:10,
660:14, 661:14,
662:24, 664:4,
664:19, 665:1,
665:16, 665:20,
666:5, 666:6, 666:7,
667:20, 667:23,
667:25, 674:7,
674:22, 682:11,
684:23, 700:24,
706:5, 715:9,
715:14, 719:9,
731:9, 751:13,
752:6, 753:7,
756:16, 756:22,
756:24, 757:2
exact [2] - 699:12,
699:17
exactly [4] - 694:19,
698:5, 721:2, 721:5
exam [5] - 702:19,
733:22, 734:1,
735:3, 745:3
examination [11] -
673:25, 674:11,
674:23, 681:1,
695:7, 706:20,
707:24, 708:16,
727:5, 742:17
EXAMINATION [13] -
675:2, 687:1, 691:9,
696:1, 707:1,
708:21, 716:1,
723:2, 727:6,

729:15, 730:6,
742:18, 746:16
Examination.............
....... [3] - 658:4,
658:6, 658:9
Examination.............
......... [5] - 658:5,
658:7, 658:8,
658:10, 658:12
Examination.............
............ [5] - 658:3,
658:5, 658:7, 658:9,
658:11
examine [6] - 672:15,
672:17, 672:25,
673:10, 674:5,
750:10
example [2] - 734:20,
735:6
except [1] - 663:15
exception [2] -
663:18, 735:23
exclude [1] - 659:12
excuse [1] - 743:23
excused [2] - 708:9,
729:24
Exhibit [32] - 658:15,
658:16, 658:16,
671:9, 684:5,
684:23, 688:11,
688:13, 688:18,
689:10, 695:10,
701:7, 701:23,
703:9, 705:21,
707:7, 715:6,
715:13, 731:8,
731:16, 748:9,
748:10, 748:23,
749:14, 749:18,
751:12, 751:16,
751:18, 751:22,
752:5, 752:7, 752:8
exhibit [13] - 671:13,
684:6, 684:16,
684:19, 686:21,
688:24, 689:6,
701:4, 701:5,
707:17, 715:4,
753:17, 754:2
Exhibits [1] - 662:6
EXHIBITS [1] - 658:14
exhibits [7] - 671:9,
745:15, 745:17,
754:4, 756:18,
756:19, 756:25
exist [1] - 747:2
existed [1] - 747:7
existing [2] - 736:3,
736:13
expect [1] - 722:21

experience [2] -
717:4, 744:4
experiencing [1] -
681:25
explain [1] - 747:4
extensively [1] -
660:18
extent [1] - 668:20

F

fabrication [1] -
670:25
facet [1] - 757:11
fact [10] - 661:9,
661:24, 664:21,
664:24, 674:5,
695:20, 736:16,
737:12, 742:4
facts [1] - 682:10
fair [5] - 710:1,
711:17, 726:6,
733:5, 751:22
fairer [1] - 668:11
Fairfax [1] - 730:23
faith [1] - 662:17
familiar [5] - 670:2,
679:1, 679:5, 712:9,
741:17
family [2] - 718:10
far [4] - 669:8, 673:12,
680:11, 744:9
FBI [9] - 672:8,
697:23, 697:24,
698:2, 698:8, 698:9,
699:6, 699:14
February [1] - 659:25
federal [1] - 746:24
fell [1] - 725:7
few [7] - 672:8, 687:5,
699:3, 699:16,
712:16, 723:17,
758:17
fifteen [2] - 725:1
fifty [1] - 723:23
file [1] - 750:7
files [3] - 687:17,
708:2, 708:4
Filetti [3] - 728:24,
728:25, 729:3
findings [3] - 659:24,
702:20, 703:20
fine [6] - 706:11,
711:18, 730:17,
731:14, 744:13,
745:20
finger [2] - 710:15,
710:16
finish [2] - 671:4,

716:18
finished [1] - 706:19
Firm [1] - 657:16
first [15] - 665:22,
667:8, 672:18,
695:10, 695:11,
695:14, 695:16,
710:6, 711:24,
713:6, 713:19,
719:7, 719:16,
733:24, 740:17
fits [2] - 737:11
five [2] - 669:23,
685:20, 722:19
flickering [1] - 684:17
fluid [2] - 693:2, 697:4
fluoroscopic [4] -
659:16, 660:6,
661:21, 662:20
fluoroscopy [6] -
660:18, 660:20,
660:23, 661:15,
683:22, 683:25
follows [1] - 676:24
FOR [7] - 657:1,
675:1, 691:8,
708:20, 723:1,
730:5, 746:15
foregoing [1] - 760:4
form [4] - 662:13,
665:2, 756:18,
756:20
formulate [1] - 718:25
forth [1] - 677:5
forward [1] - 674:24
foundation [8] -
734:11, 738:1,
738:22, 741:14,
749:2, 749:3,
750:11, 751:8
foundational [1] -
706:6
four [1] - 718:12
frankly [1] - 742:3
fraud [6] - 666:10,
666:12, 671:7,
719:18, 746:25,
747:10
FREDERICK [2] -
657:6, 657:19
Frederick [7] - 659:3,
692:10, 709:23,
724:16, 748:14,
748:24, 751:2
free [1] - 691:2
freeze [2] - 713:2
frequency [1] - 677:12
Friday [2] - 657:6,
674:19
friend [5] - 692:13,

696:13, 696:22,
696:23, 696:24
friendly [2] - 685:4,
685:6
friends [1] - 710:11
front [3] - 684:22,
684:24, 747:15
full [1] - 673:16
function [4] - 669:10,
672:20, 672:22,
675:16

G

G-R-E-G-O-R-Y [1] -
709:3
gel [1] - 720:23
gender [1] - 752:18
general [4] - 677:16,
689:19, 718:9,
737:11
generally [1] - 725:4
gentlemen [5] -
708:13, 722:18,
753:6, 756:12,
758:24
George's [1] - 709:11
ghost [1] - 684:15
given [2] - 665:16,
669:25
glass [1] - 714:1
Gooding [106] - 659:4,
659:14, 659:20,
660:4, 661:17,
663:19, 672:2,
675:18, 676:12,
677:11, 677:13,
677:20, 678:5,
679:11, 679:14,
679:18, 681:4,
682:4, 682:13,
687:7, 687:11,
688:2, 692:10,
692:18, 692:21,
692:24, 693:6,
693:14, 693:17,
693:21, 694:4,
696:7, 696:10,
696:12, 696:21,
697:6, 697:15,
700:20, 701:13,
702:3, 702:17,
703:17, 704:3,
709:24, 710:1,
710:2, 710:3, 710:5,
710:6, 710:10,
710:21, 712:2,
716:8, 717:3, 717:4,
717:21, 717:24,
718:2, 718:11,

718:17, 718:20,
719:1, 719:19,
720:4, 720:19,
724:16, 724:21,
724:24, 725:2,
725:8, 725:12,
725:16, 725:17,
726:7, 726:14,
726:22, 727:17,
727:23, 727:25,
728:23, 729:6,
729:17, 733:15,
733:20, 734:4,
734:6, 737:21,
737:25, 738:6,
738:21, 739:16,
740:14, 741:15,
741:19, 741:23,
742:1, 742:14,
744:10, 744:12,
744:14, 744:17,
744:20, 748:14,
748:24, 748:25,
751:2
**GOODING** [1] - 657:6
**Gooding's** [16] -
659:8, 659:17,
659:22, 660:1,
662:20, 663:15,
675:6, 681:6,
687:25, 694:12,
696:6, 727:15,
738:13, 738:18,
742:23, 744:7
**GOVERNMENT** [6] -
675:1, 691:8,
708:20, 723:1,
730:5, 746:15
**government** [39] -
659:6, 659:13,
660:14, 660:16,
661:13, 661:23,
662:17, 662:24,
662:25, 664:5,
664:20, 666:5,
666:16, 667:24,
668:10, 668:20,
669:25, 670:1,
670:6, 672:6,
674:15, 675:13,
675:17, 675:23,
684:4, 690:10,
691:7, 708:19,
722:23, 726:12,
730:2, 738:10,
740:15, 746:13,
746:24, 749:17,
752:1, 753:18,
756:17
**Government** [7] -

657:12, 658:15,
658:16, 658:16,
715:13, 751:12,
752:5
**government's** [6] -
660:12, 660:15,
666:3, 668:17,
670:11, 754:3
**Government's** [6] -
662:6, 684:23,
707:7, 748:9,
748:10, 749:18
**grab** [1] - 695:12
**great** [3] - 664:12,
691:15, 730:14
**Greene** [1] - 692:14
**Gregory** [3] - 708:19,
709:1, 714:12
**GREGORY** [2] - 658:7,
708:20
**grounds** [1] - 719:5
**guess** [1] - 747:4
**guidance** [6] - 659:16,
662:13, 685:14,
689:19, 689:21,
757:11
**guidelines** [4] -
676:24, 677:5,
677:6, 677:7
**guilty** [1] - 666:10


## H


**habitually** [1] - 672:13
**hall** [1] - 744:23
**hallucinations** [1] -
670:24
**hand** [3] - 673:22,
715:17, 756:25
**handbook** [1] - 677:4
**hands** [1] - 715:19
**handy** [1] - 669:10
**Harris** [1] - 657:20
**health** [10] - 670:8,
670:12, 670:20,
672:21, 675:13,
692:2, 692:4, 694:8,
709:17, 736:15
**healthcare** [8] -
666:10, 666:12,
680:5, 746:25,
747:10, 748:1,
750:16, 750:23
**hear** [7] - 664:14,
696:13, 717:23,
727:10, 727:13,
730:12, 756:12
**heard** [6] - 666:12,
680:16, 690:8,

719:11, 734:21,
735:7
**hearing** [2] - 708:13,
753:6, 758:17
**hearsay** [13] - 734:7,
734:10, 734:13,
734:14, 734:19,
734:22, 734:24,
735:9, 735:21,
735:23, 738:1,
739:20, 740:10
**held** [1] - 660:2
**hello** [3] - 687:3,
687:4, 707:3
**help** [6] - 675:13,
696:25, 710:21,
729:1, 729:6, 740:13
**helped** [3] - 740:12,
740:15, 741:19
**hence** [1] - 747:11
**herself** [1] - 698:22
**high** [4] - 677:23,
678:4, 732:7, 732:8
**higher** [1] - 677:24
**highlight** [2] - 688:20,
757:14
**highlighted** [1] -
689:12
**hip** [11] - 717:12,
717:14, 717:15,
717:16, 717:19,
720:9, 728:7,
728:13, 728:14,
728:16, 728:18
**history** [2] - 670:24,
750:23
**hm** [2] - 705:18, 715:3
**hobble** [1] - 743:6
**hold** [3] - 671:12,
695:12
**home** [3] - 738:12,
738:14, 738:17
**honest** [2] - 719:1,
719:19
**honesty** [1] - 673:4
**Honor** [67] - 659:2,
664:7, 664:15,
664:18, 665:9,
665:24, 666:24,
667:7, 667:12,
667:13, 669:15,
669:20, 669:23,
670:5, 671:18,
673:14, 673:15,
674:8, 674:16,
678:6, 679:7,
679:25, 680:9,
680:21, 684:7,
684:18, 686:20,
686:23, 688:17,

694:2, 695:5,
698:16, 698:23,
700:23, 703:8,
705:20, 706:11,
706:21, 706:23,
708:8, 713:13,
716:20, 719:5,
722:5, 722:8,
722:17, 727:3,
729:11, 729:13,
730:2, 731:9,
731:15, 734:15,
734:16, 737:19,
739:7, 741:8,
741:14, 741:18,
742:3, 742:9,
749:25, 751:7,
752:3, 753:21,
758:12, 758:23
**HONORABLE** [1] -
657:10
**hope** [1] - 712:4
**hopes** [1] - 670:13
**Hospital** [10] - 692:15,
699:24, 702:2,
702:5, 703:2,
703:12, 703:13,
703:22, 707:25,
744:15
**hospital** [3] - 699:23,
704:6, 748:2
**hotels** [1] - 724:2
**hour** [1] - 669:4
**housed** [2] - 750:22,
751:3
**hundreds** [2] - 675:12,
685:24
**hurting** [1] - 737:5
**husband** [1] - 737:9


## I


**ID** [2] - 752:18, 752:19
**idea** [1] - 743:18
**identification** [2] -
705:21, 748:9
**identified** [6] - 676:12,
676:18, 677:11,
677:17, 681:4,
731:23
**identify** [7] - 675:21,
676:15, 677:13,
687:11, 687:13,
731:13, 746:24
**II** [1] - 671:22
**image** [1] - 721:3
**imagine** [5] - 663:3,
670:21, 677:10,
677:16, 716:11

**imaging** [12] - 660:6,
660:7, 660:19,
661:10, 661:17,
661:21, 662:13,
662:20, 685:13,
689:19, 689:21,
757:11
**impeach** [1] - 672:6
**impeached** [2] -
670:17, 673:22
**impeaching** [1] -
674:7
**impeachment** [1] -
670:1
**implication** [3] -
661:5, 662:12, 668:3
**important** [3] -
663:23, 664:19,
676:25
**imposed** [1] - 663:24
**impression** [4] -
717:21, 717:24,
736:2, 744:12
**improper** [2] - 719:8,
719:9
**inches** [1] - 685:20
**inclination** [1] -
668:13
**inclined** [1] - 668:22
**include** [5] - 688:13,
717:11, 754:21,
756:3, 756:6
**included** [5] - 671:9,
679:15, 679:19,
717:9, 752:12
**includes** [1] - 751:19
**including** [3] - 662:11,
736:16, 736:20
**indicate** [1] - 757:16
**indicated** [2] - 673:6,
754:5
**indicating** [2] -
704:19, 721:13
**indication** [1] - 660:22
**indictment** [1] -
659:13
**individual** [10] - 731:4,
731:13, 731:21,
731:23, 732:5,
736:5, 736:6,
756:17, 756:19,
757:4
**indulgence** [4] -
689:24, 713:10,
726:10, 738:9
**inference** [4] - 661:6,
661:13, 661:14,
662:23
**influence** [4] - 670:25,
673:9, 674:3

**information** [14] - 659:12, 660:3, 668:5, 668:15, 677:1, 700:13, 700:14, 706:12, 731:20, 753:7, 753:9, 753:10, 753:12, 755:10
**initial** [1] - 704:12
**initials** [6] - 731:5, 731:21, 732:5, 751:20, 757:9, 758:3
**injected** [1] - 721:1
**injection** [11] - 660:19, 673:13, 678:19, 689:22, 693:16, 697:7, 712:15, 720:9, 725:23, 738:17, 738:20
**injections** [30] - 659:15, 659:21, 661:10, 661:16, 661:18, 661:22, 661:25, 662:21, 663:13, 679:15, 679:19, 683:20, 693:18, 710:24, 711:10, 711:12, 712:11, 720:13, 725:8, 725:10, 725:12, 725:18, 725:21, 726:18, 726:20, 726:22, 728:1, 728:5, 738:25, 739:14
**injury** [5] - 724:22, 725:5, 725:6, 726:21
**inquire** [1] - 694:15
**inside** [3] - 714:21, 721:18, 744:24
**instance** [2] - 660:21, 678:18
**instead** [1] - 692:16
**instruction** [16] - 664:9, 664:10, 665:12, 665:16, 665:23, 666:15, 666:19, 668:14, 668:24, 745:16, 745:19, 745:22, 746:7, 756:11, 756:13, 756:15
**instructions** [1] - 666:4
**instrument** [1] - 720:22
**insurance** [6] - 662:3, 692:2, 692:4, 694:8, 709:17, 724:6
**integrity** [3] - 673:4,

747:6
**intends** [1] - 661:23
**intent** [2] - 660:10, 736:14
**intentionally** [1] - 663:6
**interest** [2] - 661:1, 673:16
**interim** [1] - 692:16
**interpreted** [1] - 677:11
**interrupt** [1] - 753:5
**interventional** [1] - 680:20
**interviewed** [1] - 699:14
**introduce** [1] - 662:24
**introducing** [1] - 746:4
**investigate** [1] - 746:25
**irrelevant** [1] - 741:24
**Irvine** [1] - 657:18
**issue** [8] - 659:6, 670:16, 670:21, 670:23, 673:12, 674:1, 719:17, 754:6
**issues** [4] - 670:9, 670:20, 735:6, 738:5
**item** [3] - 695:11, 695:14, 695:16
**items** [1] - 694:17
**itself** [2] - 665:1, 753:3

## J

**January** [9] - 666:8, 666:13, 692:23, 700:2, 702:16, 703:17, 707:20, 748:25, 749:1
**JIL** [1] - 657:13
**JILLIAN** [1] - 657:12
**job** [5] - 687:7, 687:17, 724:2, 724:22, 725:5
**joining** [1] - 709:4
**joint** [3] - 668:9, 668:11, 757:11
**JR** [1] - 657:19
**judge** [1] - 722:20
**JUDGE** [1] - 657:10
**JUDITH** [3] - 658:10, 730:5, 730:21
**Judith** [2] - 730:3, 730:21
**July** [1] - 659:23
**June** [2] - 727:18, 727:22
**JURY** [1] - 657:9

**jury** [18] - 661:6, 663:11, 663:23, 666:3, 668:1, 668:5, 669:6, 669:7, 674:14, 674:16, 674:17, 708:13, 720:1, 722:9, 722:12, 745:19, 752:8, 759:3
**jury's** [2] - 667:4, 740:7
**Justice** [1] - 657:13

## K

**K.M** [2] - 757:10, 757:17
**Karen** [5] - 691:7, 691:16, 700:5, 700:8, 700:17
**KAREN** [4] - 658:5, 691:8, 691:16, 700:8
**keep** [3] - 663:21, 755:1
**KHOURI** [116] - 657:16, 663:3, 664:6, 664:11, 664:15, 665:18, 666:21, 666:23, 667:3, 667:21, 667:23, 669:3, 671:8, 671:15, 671:18, 671:20, 671:25, 672:11, 673:14, 675:3, 678:7, 678:10, 679:8, 679:10, 680:1, 680:4, 680:12, 680:13, 680:23, 681:2, 681:3, 682:8, 682:15, 682:16, 684:2, 684:4, 684:7, 684:9, 684:10, 684:18, 684:21, 686:19, 688:15, 690:4, 695:10, 695:14, 695:16, 695:19, 695:23, 695:25, 696:2, 698:16, 698:19, 698:23, 698:24, 699:20, 699:22, 700:15, 700:16, 700:23, 701:1, 701:2, 701:6, 701:9, 701:21, 701:24, 702:1, 703:8, 703:11, 705:20, 705:24, 706:4,

706:15, 706:17, 706:21, 715:11, 716:2, 716:22, 719:5, 719:11, 719:13, 719:23, 720:3, 721:15, 722:4, 727:7, 729:11, 734:7, 734:16, 735:2, 735:10, 735:21, 736:4, 736:21, 737:4, 738:1, 738:22, 739:2, 739:7, 739:20, 739:22, 740:6, 740:21, 741:8, 741:24, 742:19, 744:5, 744:6, 746:9, 749:2, 749:25, 750:2, 750:12, 751:7, 751:9, 752:3
**Khouri** [47] - 657:16, 660:17, 660:21, 662:2, 662:8, 662:15, 662:25, 663:2, 664:2, 664:8, 665:7, 665:17, 666:18, 667:8, 667:18, 671:3, 671:12, 673:18, 674:4, 674:11, 675:6, 678:9, 680:10, 680:22, 687:5, 688:25, 690:7, 695:7, 695:9, 696:5, 698:21, 700:12, 706:3, 706:20, 707:6, 707:24, 715:10, 715:24, 719:4, 722:6, 727:12, 727:15, 729:12, 742:22, 746:7, 752:2, 753:16
**Khouri's** [1] - 690:21
**killing** [1] - 680:19
**kind** [11] - 661:17, 663:1, 685:21, 696:15, 709:17, 710:23, 713:1, 726:25, 755:19, 756:1, 758:25
**kinds** [2] - 661:10, 661:16
**knee** [51] - 692:15, 692:17, 692:18, 692:21, 692:25, 693:2, 693:4, 693:7, 693:9, 693:16, 693:17, 697:3,

697:4, 697:14, 703:6, 703:22, 707:19, 707:22, 710:8, 710:14, 710:21, 710:24, 711:3, 711:9, 711:11, 711:15, 717:9, 717:16, 720:5, 720:6, 725:12, 725:14, 725:18, 725:21, 725:22, 726:1, 726:22, 728:1, 728:3, 735:18, 737:1, 737:7, 737:10, 737:21, 738:14, 738:16, 739:14, 743:4, 743:18, 743:25
**knees** [7] - 710:19, 710:23, 711:10, 711:13, 738:7, 743:10, 743:13
**knowing** [2] - 663:6, 731:24
**knowledge** [8] - 660:5, 660:6, 662:20, 677:16, 738:20, 744:24, 745:3, 750:3
**known** [2] - 744:15, 750:23
**knows** [1] - 661:17

## L

**laboratory** [1] - 748:2
**lack** [4] - 681:6, 738:1, 738:22, 749:2
**lacking** [1] - 681:6
**ladies** [5] - 708:12, 722:18, 753:6, 756:12, 758:24
**laid** [2] - 734:11, 741:14
**language** [2] - 666:6, 689:13
**largo** [1] - 709:6
**Largo** [1] - 723:21
**last** [7] - 709:1, 709:3, 724:2, 725:19, 729:19, 731:4, 731:21
**late** [4] - 674:21, 692:22, 693:24, 694:2
**law** [1] - 732:9
**Law** [1] - 657:16
**lawyers** [4] - 675:7,

696:6, 727:16, 742:23

**lay** [1] - 749:3
**layperson** [1] - 737:9
**lead** [3] - 734:13, 734:14, 735:9
**learned** [1] - 669:5
**least** [3] - 710:12, 747:12, 755:2
**leave** [5] - 665:10, 668:16, 691:3, 723:12, 730:15
**leaves** [2] - 660:25, 668:1
**left** [8] - 693:10, 710:8, 713:12, 721:14, 725:15, 726:1, 754:10, 755:21
**legislation** [1] - 747:8
**legs** [1] - 717:14
**levels** [1] - 702:22
**license** [8] - 659:17, 659:18, 659:23, 660:1, 661:18, 661:19, 663:15, 663:17
**Licensure** [1] - 659:9
**life** [1] - 691:20
**likewise** [1] - 675:8
**limine** [1] - 750:7
**limited** [4] - 663:13, 667:15, 736:10, 736:21
**limiting** [8] - 664:9, 664:10, 665:12, 665:16, 665:23, 666:14, 666:19, 668:23
**limping** [1] - 735:7
**line** [9] - 660:21, 669:12, 674:10, 680:25, 713:15, 714:13, 714:20, 757:15, 757:16
**lines** [2] - 715:5, 757:4
**list** [2] - 671:16, 671:21
**listed** [4] - 666:13, 672:4, 707:19, 754:3
**listened** [2] - 717:22, 717:24
**live** [10] - 672:22, 691:17, 691:18, 709:5, 723:14, 723:20, 730:22, 730:23, 730:24, 732:21
**lived** [11] - 691:19, 704:14, 709:9, 723:16, 723:22,

731:1, 732:12, 732:19, 732:22, 741:15, 742:24
**living** [3] - 709:12, 732:24, 746:20
**LLP** [1] - 657:20
**located** [1] - 702:2
**look** [16] - 666:18, 666:21, 671:20, 681:23, 682:17, 683:10, 683:11, 689:13, 694:9, 698:21, 701:6, 740:7, 747:15, 749:13, 751:15, 752:11
**looked** [9] - 670:3, 676:3, 676:18, 677:7, 677:10, 682:2, 688:1, 689:5, 708:4
**looking** [11] - 662:11, 682:11, 683:13, 688:7, 688:11, 689:11, 690:13, 707:5, 713:15, 721:3, 751:1
**looks** [2] - 685:1, 685:16
**lose** [1] - 664:12
**loud** [1] - 685:8
**louder** [1] - 727:14
**loved** [1] - 710:2
**lovely** [2] - 674:18, 758:25
**lower** [18] - 693:11, 693:13, 717:13, 720:13, 721:13, 725:11, 728:5, 728:8, 728:9, 728:11, 728:13, 728:15, 728:17, 728:18, 728:21, 728:22, 743:19, 747:10
**lumbar** [5] - 700:1, 702:15, 702:19, 702:22, 712:5
**Lunch** [1] - 759:4
**lunch** [4] - 669:4, 708:14, 758:22, 759:1

# M

**M-A-C-K-E-Y** [1] - 691:16
**M-A-S-O-N** [1] - 730:21

**ma'am** [37] - 681:18, 705:5, 710:17, 711:4, 711:22, 715:23, 727:16, 747:14, 747:23, 748:7, 748:11, 748:13, 748:15, 748:19, 749:9, 749:12, 749:16, 751:5, 751:17, 751:21, 751:25, 752:15, 752:22, 753:4, 754:11, 754:16, 754:20, 754:23, 755:6, 755:11, 756:5, 757:7, 757:13, 757:18, 757:24, 758:11
**MAC** [1] - 747:3
**machine** [1] - 720:20
**MACKEY** [3] - 658:5, 691:8, 700:6
**Mackey** [12] - 691:7, 691:11, 691:16, 691:17, 695:6, 700:5, 700:17, 707:3, 707:9, 707:18, 708:7, 708:10
**magic** [1] - 669:5
**mail** [1] - 694:6
**manage** [1] - 675:13
**management** [5] - 678:15, 679:1, 724:19, 724:20, 729:4
**managing** [1] - 675:17
**March** [2] - 757:11, 757:19
**mark** [2] - 715:4, 715:5
**marked** [3] - 684:22, 705:21, 748:9
**married** [1] - 732:15
**Marshall** [1] - 744:15
**Marshall's** [1] - 744:14
**Martin** [1] - 657:17
**Maryland** [2] - 709:6, 723:15, 723:18
**mask** [2] - 723:12, 730:14
**MASON** [2] - 658:10, 730:5
**Mason** [14] - 730:3, 730:8, 730:14, 730:20, 730:21, 730:22, 731:10, 731:18, 731:20, 733:15, 735:14, 738:12, 742:13,

745:10
**matter** [20] - 661:7, 670:1, 670:2, 673:21, 734:24, 735:23, 736:7, 739:25, 740:5, 740:10, 740:11, 740:23, 741:10, 743:24, 757:1, 758:14, 758:16, 758:22, 760:5
**mean** [6] - 661:23, 672:18, 676:5, 703:24, 734:19, 742:3
**meant** [1] - 669:9
**Medicaid** [3] - 692:6, 747:1, 747:10
**medical** [54] - 659:18, 659:22, 659:24, 659:25, 660:1, 660:24, 661:3, 661:12, 662:22, 663:9, 663:14, 663:24, 663:25, 664:21, 671:10, 681:7, 681:10, 681:20, 681:21, 681:24, 682:2, 682:6, 682:17, 682:19, 683:7, 683:9, 686:10, 686:13, 689:8, 690:22, 690:23, 691:25, 702:7, 704:19, 705:8, 705:13, 705:15, 708:2, 708:4, 711:25, 724:6, 733:11, 734:20, 735:6, 736:5, 736:10, 741:17, 743:15, 744:4, 748:2, 753:6, 753:7, 753:11
**Medical** [1] - 659:9
**Medicare** [43] - 660:25, 661:9, 661:17, 663:12, 666:12, 675:10, 675:13, 675:17, 675:22, 676:1, 676:4, 676:10, 677:20, 677:23, 677:24, 678:5, 678:12, 688:2, 688:4, 690:23, 692:5, 692:7, 692:9, 694:6, 694:8, 694:14, 709:19,

709:21, 724:9, 724:10, 724:15, 747:1, 747:7, 747:10, 747:18, 748:1, 748:4, 749:7, 750:15, 750:17, 750:18, 750:20, 752:19
**Medicine** [1] - 659:10
**medicine** [3] - 679:6, 726:23, 726:25
**meet** [7] - 669:3, 675:7, 696:6, 727:16, 733:17, 742:22, 744:10
**meets** [1] - 662:12
**memorable** [1] - 711:7
**memorized** [2] - 748:21, 755:15
**memory** [2] - 685:4, 736:16
**mental** [6] - 670:8, 670:12, 670:20, 672:21, 736:3, 736:15
**mentioned** [6] - 662:25, 709:15, 710:14, 711:2, 715:16, 749:5
**mere** [1] - 661:6
**met** [4] - 682:7, 682:20, 683:14, 733:20
**metal** [2] - 725:6, 725:7
**method** [1] - 667:20
**MICHAEL** [1] - 657:16
**mid** [1] - 700:2
**mid-'90s** [1] - 747:8
**mid-back** [1] - 700:2
**middle** [3] - 704:12, 750:9, 753:17
**midmorning** [1] - 708:15
**Mierzwa** [8] - 669:22, 674:24, 687:3, 688:24, 689:9, 690:2, 690:21, 691:2
**MIERZWA** [2] - 658:3, 675:1
**Mierzwa's** [2] - 665:6, 667:9
**might** [5] - 666:5, 667:22, 670:23, 671:14, 704:22
**Mike** [5] - 675:6, 696:5, 727:12, 727:15, 742:22
**mind** [4] - 718:25, 730:16, 736:13,

743:25
**mine** [1] - 694:9
**mine's** [1] - 684:17
**mingle** [1] - 669:12
**minute** [1] - 753:5
**minutes** [3] - 722:10, 722:11, 758:17
**mishear** [1] - 666:24
**misinterpreted** [1] - 741:4
**mistaken** [1] - 660:8
**mistakes** [1] - 662:16
**mm-hm** [2] - 705:18, 715:3
**modifier** [2] - 755:4, 755:22
**moment** [6] - 667:12, 684:2, 687:5, 688:10, 689:4, 707:5
**money** [1] - 675:23
**month** [3] - 718:18, 718:20, 718:21
**months** [1] - 659:18
**Morning** [1] - 657:7
**morning** [19] - 659:5, 674:18, 675:4, 675:5, 691:11, 691:12, 696:3, 696:4, 708:23, 708:24, 716:3, 716:4, 723:4, 723:5, 727:8, 727:9, 730:8, 730:9, 750:8
**most** [1] - 662:17
**motion** [1] - 750:7
**motions** [1] - 660:2
**motive** [2] - 666:9, 736:13
**move** [7] - 681:4, 706:4, 715:8, 719:23, 739:22, 749:17, 752:1
**moved** [6] - 663:19, 664:1, 709:10, 721:22, 721:23, 731:2
**moving** [3] - 674:19, 715:7, 721:14
**MR** [118] - 663:3, 664:6, 664:11, 664:15, 665:18, 666:21, 666:23, 667:3, 667:21, 667:23, 669:3, 671:8, 671:15, 671:18, 671:20, 671:25, 672:11, 673:14, 675:3, 678:7, 678:10, 679:8, 679:10,

680:1, 680:4, 680:12, 680:13, 680:23, 681:2, 681:3, 682:8, 682:15, 682:16, 684:2, 684:4, 684:7, 684:9, 684:10, 684:18, 684:21, 686:19, 688:15, 690:4, 690:6, 690:10, 690:17, 695:10, 695:14, 695:16, 695:19, 695:23, 695:25, 696:2, 698:16, 698:19, 698:23, 698:24, 699:20, 699:22, 700:15, 700:16, 700:23, 701:1, 701:2, 701:6, 701:9, 701:21, 701:24, 702:1, 703:8, 703:11, 705:20, 705:24, 706:4, 706:15, 706:17, 706:21, 715:11, 716:2, 716:22, 719:5, 719:11, 719:13, 719:23, 720:3, 721:15, 722:4, 727:7, 729:11, 734:7, 734:16, 735:2, 735:10, 735:21, 736:4, 736:21, 737:4, 738:1, 738:22, 739:2, 739:7, 739:20, 739:22, 740:6, 740:21, 741:8, 741:24, 742:19, 744:5, 744:6, 746:9, 749:2, 749:25, 750:2, 750:12, 751:7, 751:9, 752:3
**MRI** [24] - 673:11, 674:6, 693:4, 697:14, 697:19, 697:25, 698:3, 698:6, 699:13, 700:1, 700:20, 701:22, 702:15, 702:19, 702:24, 703:2, 703:3, 703:6, 703:22, 707:5, 707:18, 707:19, 707:21
**MRIs** [4] - 672:5, 672:9, 672:15, 712:3
**MS** [107] - 664:7,

664:18, 664:24, 665:9, 665:23, 665:25, 666:2, 667:6, 667:12, 667:13, 669:6, 669:15, 669:20, 669:23, 670:5, 670:19, 673:15, 674:8, 674:15, 678:6, 679:7, 679:25, 680:9, 680:21, 686:23, 687:2, 688:17, 688:20, 688:23, 689:24, 690:1, 690:20, 691:1, 691:7, 691:10, 695:5, 706:11, 706:23, 707:2, 708:8, 708:19, 708:22, 713:10, 713:12, 713:15, 713:16, 714:4, 714:11, 715:5, 715:8, 715:15, 719:3, 722:8, 722:17, 722:23, 723:3, 726:10, 726:13, 727:3, 729:13, 729:16, 729:22, 730:2, 730:7, 730:18, 731:9, 731:12, 731:15, 731:17, 734:15, 735:13, 737:19, 737:20, 738:4, 738:9, 738:11, 738:24, 739:5, 739:12, 741:14, 742:3, 742:9, 742:12, 742:16, 744:2, 745:8, 745:14, 745:21, 745:24, 746:5, 746:13, 746:17, 749:4, 749:17, 749:21, 750:14, 751:14, 752:1, 752:7, 752:10, 753:21, 753:23, 753:25, 754:2, 754:9, 757:3, 758:12
**multilevel** [1] - 702:23
**multiple** [1] - 663:7
**must** [2] - 666:11, 711:7

**N**

**name** [22] - 675:6, 691:15, 700:5, 702:10, 702:11, 703:2, 703:15, 708:25, 709:1, 709:3, 723:9, 730:20, 731:4, 731:21, 732:1, 742:22, 746:18, 752:18, 755:9, 758:9
**narrowing** [1] - 744:1
**national** [2] - 750:22, 750:23
**nationwide** [2] - 750:21, 750:24
**near** [1] - 702:5
**necessary** [2] - 660:24, 742:7
**necessity** [7] - 681:7, 681:10, 681:24, 683:7, 683:9, 690:22, 690:23
**need** [7] - 666:18, 666:23, 667:9, 668:6, 668:8, 684:16, 747:4
**needle** [7] - 712:18, 714:21, 721:6, 721:7, 721:18, 721:25
**needles** [2] - 713:5, 739:10
**needs** [1] - 663:10
**Nelson** [2] - 710:9, 710:10
**nephew** [1] - 709:13
**nerves** [2] - 680:19, 757:11
**never** [7] - 677:4, 697:6, 697:24, 698:3, 703:5, 704:2, 714:20
**new** [1] - 711:15
**New** [1] - 657:14
**next** [4] - 691:6, 708:12, 722:16, 758:16
**nexus** [1] - 672:24
**nice** [1] - 716:7
**nine** [1] - 755:2
**normal** [1] - 718:7
**normally** [1] - 718:20
**Northeast** [1] - 691:18
**Northwest** [1] - 704:14
**note** [2] - 666:2, 753:23

**notes** [1] - 671:17
**nothing** [15] - 663:12, 663:15, 674:15, 686:19, 689:1, 689:14, 691:1, 695:5, 708:8, 729:23, 734:2, 735:2, 739:21, 740:1, 745:6
**notice** [1] - 718:15
**November** [3] - 711:12, 711:18, 720:5
**Novitas** [2] - 687:22, 747:3
**NPI** [1] - 748:16
**numb** [1] - 721:21
**numbed** [1] - 713:4
**number** [7] - 667:23, 701:4, 701:5, 719:13, 734:24, 752:19, 752:20
**numbers** [2] - 748:16, 752:18
**nurse** [1] - 687:13
**NW** [3] - 657:14, 657:21, 657:24

**O**

**o'clock** [2] - 708:17, 722:19
**oath** [3] - 713:17, 713:20, 758:20
**object** [3] - 741:24, 753:16, 753:19
**objected** [1] - 662:17
**objection** [28] - 667:19, 678:6, 678:8, 679:7, 679:25, 680:9, 680:21, 688:15, 690:4, 706:12, 715:11, 719:3, 720:1, 734:7, 735:12, 735:21, 737:15, 739:2, 739:20, 742:11, 744:2, 750:11, 751:6, 751:7, 752:2, 752:3, 752:4, 753:17
**objection's** [2] - 690:19, 751:10
**objections** [2] - 662:18, 706:7
**objectives** [1] - 675:21
**observations** [1] - 671:1
**observe** [2] - 733:8,

738:5
**observed** [4] - 734:11, 734:12, 735:14, 741:16
**obtaining** [1] - 702:24
**obviously** [4] - 669:2, 672:14, 699:11, 753:9
**occasion** [1] - 744:8
**occasions** [1] - 699:16
**occurring** [1] - 666:8
**October** [2] - 711:6, 758:4
**odd** [1] - 694:10
**OF** [3] - 657:1, 657:3, 657:9
**Off-the-record** [1] - 684:8
**offered** [9] - 734:23, 735:22, 739:24, 740:2, 740:4, 740:11, 740:18, 740:24, 741:4
**offering** [2] - 741:18, 745:15
**office** [9] - 694:12, 694:15, 713:20, 718:15, 718:16, 720:19, 738:13, 738:18, 744:8
**Official** [1] - 760:3
**on-the-job** [2] - 724:22, 725:5
**once** [5] - 663:16, 718:18, 721:18, 750:21
**one** [55] - 663:25, 664:4, 664:10, 665:6, 665:13, 665:19, 667:12, 667:23, 668:25, 670:7, 671:15, 671:16, 672:12, 675:6, 678:19, 678:24, 681:5, 681:13, 681:21, 683:9, 684:2, 685:3, 685:4, 687:22, 688:13, 690:2, 693:1, 694:12, 694:21, 694:22, 696:6, 698:4, 698:7, 702:7, 702:20, 703:12, 705:16, 706:7, 710:7, 710:18, 712:2, 719:13, 721:16, 721:23, 727:15, 733:16, 733:17,

742:23, 744:8, 747:11, 748:16, 748:21, 748:22, 753:5
**ones** [1] - 706:7
**ongoing** [1] - 705:13
**online** [2] - 669:9, 669:11
**open** [2] - 660:11, 664:11
**opened** [3] - 659:7, 660:4, 660:15
**opens** [1] - 674:10
**opiate** [1] - 706:9
**opiates** [4] - 679:16, 679:20, 679:23, 680:7
**opinion** [3] - 695:1, 718:25, 719:19
**opioid** [2] - 672:3, 672:4
**opioid-type** [1] - 672:4
**opioids** [3] - 673:5, 678:21, 680:3
**opportunity** [2] - 666:9, 753:19
**opposed** [1] - 683:25
**order** [12] - 663:9, 665:1, 666:23, 667:15, 668:1, 668:6, 668:13, 668:17, 668:22, 668:23, 669:11, 676:25
**ordered** [1] - 700:20
**ordering** [1] - 669:10
**originally** [1] - 676:1
**otherwise** [7] - 668:22, 671:4, 716:18, 719:14, 741:25, 747:13
**outlier** [2] - 676:16, 687:6
**outside** [3] - 733:24, 744:23, 753:11
**overly** [1] - 663:9
**overpayment** [1] - 675:22
**overruled** [8] - 688:16, 690:19, 735:12, 737:15, 738:2, 739:3, 739:8, 751:10
**own** [2] - 717:18, 733:3
**owns** [1] - 709:14
**oxycodone** [1] - 727:1

## P

**p.m** [2] - 759:3, 759:4
**page** [15] - 661:3, 662:7, 662:14, 685:1, 685:16, 695:10, 701:22, 702:20, 703:20, 707:8, 707:17, 713:15, 714:12, 715:5, 731:16
**pages** [1] - 760:4
**paid** [1] - 755:24
**pain** [47] - 678:15, 678:18, 678:21, 679:1, 680:7, 681:25, 682:4, 682:13, 682:18, 682:23, 683:3, 693:11, 693:13, 695:21, 701:11, 701:14, 704:3, 710:21, 715:17, 717:9, 717:11, 717:13, 717:15, 717:16, 717:19, 717:20, 721:10, 724:19, 724:20, 729:4, 729:7, 734:22, 735:7, 735:14, 735:17, 736:15, 736:20, 737:1, 737:7, 741:2, 741:22, 743:3, 743:18, 743:25
**pamphlet** [1] - 738:14
**panel** [1] - 674:16
**paper** [1] - 714:24
**papers** [1] - 713:12
**paracervical** [2] - 659:20, 661:25
**paraphrasing** [1] - 666:11
**parentheses** [1] - 683:21
**parse** [1] - 741:12
**part** [11] - 661:10, 670:9, 675:16, 675:21, 687:17, 687:23, 703:9, 735:17, 736:25, 737:5, 739:14
**partially** [1] - 686:5
**participated** [1] - 672:1
**particular** [6] - 681:21, 694:12, 748:12, 754:2, 756:10, 756:14

**particularly** [1] - 742:7
**parties** [1] - 663:2
**parties'** [1] - 665:4
**partition** [2] - 725:6, 725:7
**parts** [1] - 756:10
**pass** [2] - 713:25
**passed** [1] - 732:9
**patient** [19] - 661:2, 661:8, 664:22, 670:8, 681:25, 682:4, 682:13, 682:18, 683:7, 687:20, 702:10, 704:5, 704:7, 709:23, 731:10, 731:20, 741:15, 741:20, 758:9
**patient's** [2] - 673:17, 681:23
**patients** [9] - 677:19, 677:20, 677:23, 678:5, 678:12, 679:23, 682:22, 682:25, 687:17
**pay** [2] - 676:10, 690:23
**peers** [10] - 678:1, 678:2, 678:3, 678:4, 678:11, 679:11, 679:14, 679:18
**people** [9] - 672:20, 672:21, 673:3, 677:16, 677:25, 728:14, 728:15, 740:15, 744:16
**perceives** [1] - 675:22
**percent** [1] - 671:21
**percentage** [3] - 677:23, 677:24, 678:4
**percentage-wise** [1] - 677:24
**perform** [1] - 675:17
**performed** [3] - 675:18, 680:20, 687:25
**performing** [2] - 659:15, 659:20
**period** [9] - 659:18, 661:25, 663:19, 697:15, 736:11, 742:5, 748:25, 751:3
**permissible** [1] - 660:20
**permission** [2] - 682:8, 752:8
**permit** [2] - 659:13,

660:13
**permitted** [2] - 660:23, 662:22
**person** [6] - 671:5, 677:22, 711:15, 719:1, 719:19, 740:2
**person's** [1] - 676:16
**personal** [3] - 672:23, 744:24, 745:3
**personally** [5] - 676:19, 677:1, 677:7, 677:13, 679:13
**personnel** [1] - 709:14
**perspective** [1] - 690:23
**pertaining** [1] - 662:4
**Peter** [1] - 692:14
**pharmacy** [1] - 709:14
**phone** [4] - 705:25, 734:8, 735:24, 753:14
**physiatrists** [1] - 679:12
**physiatry** [2] - 679:2, 679:3
**physical** [11] - 717:7, 717:25, 733:8, 734:23, 735:14, 736:3, 736:14, 736:19, 737:24, 738:5
**physically** [1] - 734:12
**physician** [17] - 661:1, 661:2, 662:11, 686:7, 696:10, 696:12, 696:15, 696:17, 696:20, 696:21, 696:22, 710:9, 716:9, 716:11, 716:14, 716:23, 717:1
**physicians** [7] - 678:4, 679:2, 679:15, 679:19, 686:5, 686:14, 686:16
**pick** [4] - 669:11, 734:8, 735:24, 753:13
**piece** [2] - 725:6, 725:7
**place** [4] - 666:7, 684:22, 721:9, 758:13
**placed** [3] - 659:18, 661:19, 698:20
**Plaintiff** [1] - 657:4
**plan** [5] - 667:1, 708:14, 709:20, 736:14, 737:10

**planning** [1] - 667:10
**pleadings** [1] - 665:4
**pleasure** [4] - 675:7, 696:6, 727:16, 742:22
**plenty** [2] - 672:10, 673:10
**plus** [1] - 731:2
**podiatry** [1] - 686:2
**point** [10] - 663:4, 674:13, 709:23, 711:2, 736:22, 740:9, 746:6, 750:8
**pointing** [1] - 702:10
**policy** [1] - 662:3
**portion** [3] - 692:5, 715:4, 715:8
**pose** [1] - 690:4
**position** [2] - 670:11, 673:21
**possibility** [2] - 680:8, 743:22
**possible** [2] - 666:9, 743:25
**possibly** [1] - 705:8
**practice** [4] - 661:2, 664:1, 678:15, 748:22
**practitioners** [1] - 748:5
**preaching** [1] - 664:2
**preamble** [1] - 746:3
**preface** [1] - 714:9
**prefer** [1] - 723:12
**preference** [1] - 668:21
**prejudicial** [1] - 663:9
**prepare** [1] - 676:19
**prepared** [2] - 676:21
**prescribe** [2] - 679:20, 726:23
**prescribed** [1] - 679:15
**prescribing** [1] - 680:7
**present** [3] - 659:4, 736:2, 756:19
**present-sense** [1] - 736:2
**presentation** [1] - 674:22
**presenting** [1] - 756:17
**preserve** [1] - 731:12
**pressed** [1] - 662:2
**presume** [1] - 683:18
**pretrial** [3] - 660:2, 753:17, 754:4
**pretty** [3] - 679:5, 694:14, 718:23

**PREVIOUSLY** [1] - 675:1
**primary** [4] - 710:9, 716:8, 724:23, 728:24
**Prince** [1] - 709:10
**privacy** [1] - 731:12
**private** [3] - 675:9, 675:12, 746:23
**probation** [3] - 659:18, 663:20, 663:22
**probed** [1] - 660:18
**problem** [6] - 671:21, 692:18, 692:21, 706:5, 737:4, 743:6
**problems** [18] - 692:15, 701:16, 710:7, 710:8, 710:14, 710:16, 710:18, 717:6, 717:7, 717:15, 717:22, 717:25, 718:2, 725:4, 737:21, 737:25, 738:5
**procedure** [4] - 674:6, 695:1, 695:2, 702:15
**procedures** [5] - 660:7, 660:19, 694:16, 694:17, 694:20
**proceedings** [1] - 760:5
**process** [1] - 750:21
**processed** [2] - 748:1, 750:22
**productively** [1] - 672:22
**professionally** [1] - 710:12
**proffer** [1] - 674:2
**program** [9] - 675:14, 675:17, 691:24, 747:5, 747:6, 747:8, 747:18, 748:1, 750:17
**programs** [2] - 747:1, 747:11
**progress** [1] - 671:17
**progressively** [1] - 712:2
**prohibit** [3] - 662:4, 688:11, 689:16
**prohibited** [2] - 659:19, 683:24
**prohibits** [2] - 689:1, 689:15
**pronouncing** [1] - 712:5

**proper** [1] - 711:25
**propose** [3] - 664:5, 664:9, 665:19
**proposed** [8] - 665:7, 665:12, 666:3, 666:20, 667:6, 668:7, 668:8
**prove** [3] - 736:16, 740:22, 740:24
**provided** [3] - 688:4, 688:25, 745:17
**Providence** [10] - 692:15, 699:24, 702:2, 702:5, 703:1, 703:12, 703:22, 707:25, 744:15
**provider** [8] - 681:17, 681:18, 748:12, 748:14, 748:17, 748:18, 754:22, 755:9
**providers** [7] - 687:14, 687:18, 748:2, 749:7, 750:16, 750:24, 755:7
**provides** [1] - 692:6
**provisions** [1] - 662:3
**pry** [1] - 703:24
**public** [1] - 700:13
**publish** [1] - 752:8
**published** [1] - 684:6
**pull** [4] - 669:2, 684:4, 731:8, 731:16
**purpose** [3] - 663:5, 734:20, 742:2
**purposes** [1] - 705:22
**put** [20] - 661:14, 666:14, 667:15, 671:16, 684:13, 684:24, 700:12, 700:24, 703:2, 703:8, 703:20, 707:16, 710:25, 719:17, 719:21, 721:9, 721:20, 735:24, 742:4
**puts** [1] - 670:16

### Q

**Q-U-I-N-D-O-Z-A** [1] - 746:19
**quarter** [1] - 718:18
**questioning** [9] - 660:12, 660:16, 660:17, 660:21, 661:11, 670:10, 673:18, 680:25, 705:24

**questions** [11] - 662:18, 663:5, 664:4, 685:10, 687:5, 690:22, 699:3, 715:22, 720:16, 727:3, 742:16
**Quindoza** [7] - 746:14, 746:19, 748:10, 750:15, 751:15, 756:1, 758:19
**QUINDOZA** [2] - 658:12, 746:15
**quote** [1] - 660:25
**quotes** [1] - 662:4

### R

**radio** [2] - 680:19, 680:24
**radiofrequency** [1] - 680:17
**radiologists** [1] - 680:20
**raised** [4] - 659:6, 661:13, 662:23, 709:10
**raises** [2] - 663:4, 668:2
**raising** [1] - 670:13
**ranges** [1] - 686:2
**read** [16] - 667:25, 670:2, 683:20, 685:6, 685:9, 698:22, 698:25, 699:1, 699:5, 699:8, 714:23, 714:24, 714:25, 737:17, 746:10
**realize** [1] - 719:17
**really** [7] - 667:16, 711:25, 712:3, 712:20, 725:25, 734:2, 753:18
**reask** [1] - 682:9
**reason** [4] - 703:1, 703:24, 704:18, 741:10
**reasonable** [1] - 672:11
**reasons** [3] - 663:25, 672:12, 710:7
**rebut** [1] - 661:14
**recalling** [1] - 670:23
**receive** [4] - 694:5, 694:7, 720:13, 738:20
**RECEIVED** [1] - 658:14

**received** [15] - 677:4, 693:3, 694:9, 694:11, 694:13, 703:3, 703:5, 706:7, 715:14, 720:8, 738:13, 739:13, 751:13, 752:6
**receiving** [2] - 672:2, 673:11, 692:9, 694:5, 700:1, 707:21, 707:25
**Recess** [1] - 722:15
**recess** [1] - 759:4
**recognize** [3] - 696:5, 743:21, 748:10
**recollect** [2] - 710:4, 711:14
**recollection** [10] - 692:22, 697:3, 697:6, 698:11, 699:6, 699:9, 700:4, 700:19, 705:7, 713:24
**recommendation** [1] - 729:3
**recommendations** [1] - 718:5
**recommended** [1] - 702:8
**record** [14] - 682:6, 682:19, 684:8, 704:19, 705:8, 708:25, 714:10, 721:12, 735:24, 746:18, 750:1, 753:23, 754:12, 760:5
**records** [4] - 681:21, 682:2, 682:17, 701:8
**recoup** [1] - 675:23
**redacted** [9] - 663:10, 665:1, 665:8, 667:1, 668:1, 668:3, 668:13, 668:23, 706:9
**redacting** [1] - 706:12
**redaction** [2] - 667:7, 668:2
**redactions** [1] - 668:14
**redirect** [7] - 686:23, 706:22, 722:7, 722:8, 729:12, 745:7, 745:8
**Redirect** [3] - 658:4, 658:6, 658:9
**REDIRECT** [3] - 687:1, 707:1, 729:15
**redirected** [2] - 721:18, 722:1

**refer** [1] - 696:23
**references** [1] - 706:8
**referral** [2] - 692:13, 716:12
**referred** [10] - 692:14, 696:10, 696:12, 696:21, 716:8, 717:15, 724:22, 728:23, 744:17, 747:13
**referring** [4] - 688:24, 690:15, 696:17, 705:20
**reflect** [2] - 721:12, 752:21
**reflected** [5] - 748:16, 752:23, 753:3, 754:14, 755:4
**refresh** [6] - 698:11, 699:5, 699:9, 700:4, 700:19, 705:7
**regard** [3] - 670:1, 670:21, 673:10
**regarding** [4] - 736:19, 756:18, 756:19, 756:25
**regenerate** [1] - 738:16
**regular** [4] - 748:6, 749:6, 749:11
**reinstate** [1] - 663:16
**reinstated** [2] - 659:22, 663:16
**reiterate** [1] - 702:2
**rejected** [3] - 676:1, 676:4, 676:8
**related** [3] - 666:6, 748:12, 748:17
**relates** [1] - 736:17
**relationship** [3] - 732:13, 732:17, 734:3
**release** [1] - 722:9
**relevance** [2] - 666:9, 739:2
**relevant** [5] - 660:10, 668:16, 670:12, 671:2, 673:21
**reliability** [1] - 750:4
**relied** [2] - 683:17, 683:21
**remember** [52] - 685:18, 692:8, 692:20, 693:1, 693:4, 694:4, 696:15, 697:14, 697:19, 697:23, 698:1, 698:2, 698:6, 698:9, 698:10, 699:10, 699:11,

699:13, 699:14, 699:16, 699:18, 701:15, 702:24, 703:21, 703:25, 704:25, 705:2, 705:3, 707:21, 711:14, 712:16, 712:19, 712:20, 716:5, 720:4, 720:8, 721:8, 721:9, 721:19, 724:10, 725:17, 725:25, 726:3, 727:17, 727:20, 727:22, 728:12, 729:20, 742:13, 742:15, 743:1, 744:9
**remembered** [3] - 698:5, 698:7, 736:17
**remembers** [1] - 742:6
**removed** [1] - 693:2
**rendered** [1] - 697:2
**rendering** [3] - 748:17, 755:9, 755:16
**repeat** [1] - 729:2
**rephrase** [4] - 678:7, 678:9, 680:1, 738:2
**replaced** [2] - 720:5, 720:6
**replacement** [5] - 692:17, 711:3, 711:9, 711:11, 740:7
**report** [4] - 671:10, 698:12, 700:20, 701:22, 703:3, 707:19
**reporter** [1] - 716:19
**Reporter** [2] - 657:23, 760:3
**reports** [1] - 707:5
**repository** [3] - 750:22, 751:3, 751:24
**request** [1] - 745:24
**requested** [1] - 745:25
**require** [1] - 689:19
**required** [5] - 661:16, 661:18, 662:5, 662:21, 689:21
**requirement** [1] - 661:21
**requirements** [6] - 660:6, 660:18, 682:7, 682:20, 683:13, 683:17
**requires** [1] - 661:9
**resided** [1] - 702:5
**respect** [2] - 675:18, 697:2

**restrictions** [4] - 659:23, 660:1, 661:19, 663:17
**retire** [1] - 733:4
**retired** [12] - 691:21, 691:22, 691:23, 691:24, 709:13, 723:24, 723:25, 724:1, 724:3, 729:21, 733:1, 733:3
**retrieve** [2] - 686:20, 699:20
**revealing** [1] - 685:17
**review** [13] - 676:13, 681:20, 687:7, 687:11, 687:13, 687:14, 687:23, 687:25, 688:5, 689:7, 689:8, 757:5, 757:8
**reviewed** [4] - 681:20, 687:14, 688:14, 757:5
**reviewing** [4] - 687:18, 698:18, 699:2, 714:3
**reviews** [1] - 687:16
**revisit** [1] - 674:12
**role** [3] - 747:21, 749:5, 749:10
**room** [9] - 669:1, 669:8, 733:22, 734:1, 735:3, 744:19, 744:23, 744:25, 745:3
**Room** [1] - 657:24
**roughly** [1] - 697:12
**row** [4] - 757:14, 757:22, 757:25, 758:7
**rows** [1] - 752:16
**RPR** [1] - 657:24
**Rubin** [1] - 657:20
**rule** [2] - 690:6, 737:12
**ruling** [1] - 674:12
**running** [2] - 663:21, 674:21

---

**S**

**S.B** [23] - 731:5, 731:21, 732:6, 732:17, 732:21, 732:24, 733:18, 733:23, 734:3, 734:4, 734:6, 735:14, 737:21, 737:24, 738:6,

738:12, 738:20, 738:25, 739:13, 739:16, 741:15, 742:1, 742:13
**sacral** [1] - 757:10
**SafeGuard** [13] - 746:21, 746:22, 746:23, 747:2, 747:13, 747:21, 748:4, 749:5, 749:15, 749:21, 749:24, 750:18, 750:25
**sanctioned** [2] - 659:14, 664:25
**sanctions** [2] - 659:17, 662:1
**sanitize** [1] - 669:2
**sat** [2] - 733:24, 744:23
**satisfy** [1] - 668:20
**saw** [6] - 694:16, 725:19, 729:19, 732:10, 735:7, 745:20
**Schaening** [4] - 660:17, 662:2, 662:8, 662:15
**Schaening-Perez** [3] - 660:17, 662:2, 662:8
**school** [2] - 732:7, 732:8
**scope** [5] - 679:7, 680:11, 681:1, 719:7, 719:14, 719:18
**screen** [4] - 684:11, 707:5, 721:4, 731:18
**scroll** [5] - 754:25, 755:13, 755:21, 756:1, 757:21
**scrolling** [1] - 755:1
**sealed** [1] - 700:14
**second** [2] - 719:8, 721:17
**security** [1] - 709:14
**Security** [1] - 752:19
**see** [9] - 667:4, 667:6, 668:4, 668:6, 668:19, 671:2, 673:6, 673:12, 674:12, 682:6, 682:19, 683:13, 684:14, 685:2, 691:13, 692:18, 692:20, 702:15, 707:9, 707:18, 708:16, 712:22, 716:7, 717:3, 718:17, 718:20,

720:4, 722:19, 723:6, 724:24, 730:10, 731:18, 731:20, 732:1, 732:24, 741:23, 743:6, 754:25, 759:1
**seeing** [9] - 693:13, 726:15, 726:16, 726:17, 729:17, 729:20, 738:6, 744:18, 753:7
**seek** [4] - 664:24, 667:2, 670:7, 702:7
**seeking** [2] - 664:21, 669:15
**seem** [1] - 742:7
**sees** [1] - 677:20
**selecting** [1] - 687:6
**self** [1] - 667:16
**self-authenticating** [1] - 667:16
**semiretired** [2] - 709:13, 709:15
**Senate** [3] - 724:3, 724:4
**sense** [10] - 677:22, 679:22, 680:5, 680:14, 683:6, 688:19, 721:17, 736:2, 743:21, 743:24
**sensory** [1] - 736:14
**separate** [3] - 732:8, 747:9, 750:20
**September** [6] - 657:6, 697:24, 698:2, 698:8, 699:6, 699:14
**service** [11] - 681:22, 752:21, 752:23, 752:25, 753:3, 754:10, 754:14, 755:17, 757:19, 758:9
**Services** [12] - 746:21, 746:22, 746:23, 747:2, 747:13, 747:21, 748:4, 749:6, 749:15, 749:21, 750:18, 750:25
**services** [8] - 686:2, 686:3, 686:6, 686:17, 694:7, 751:19, 756:7, 756:8
**Session** [1] - 657:7
**set** [1] - 752:12
**sets** [1] - 677:5
**seven** [1] - 697:10
**several** [2] - 724:2, 755:2

**shaky** [1] - 718:14
**shared** [1] - 753:11
**shot** [5] - 693:17,
712:25, 714:16,
714:18, 738:14
**shots** [4] - 672:2,
693:3, 712:6, 715:19
**show** [14] - 665:7,
666:25, 667:8,
671:5, 672:23,
701:18, 701:22,
702:20, 731:7,
740:2, 741:6,
741:11, 748:8,
752:13
**showed** [5] - 698:11,
700:4, 700:19,
704:22, 705:8
**sick** [1] - 683:7
**side** [8] - 671:14,
707:9, 721:11,
721:13, 721:14,
721:16, 721:23,
722:1
**sign** [1] - 741:7
**similarly** [1] - 672:7
**SIMON** [69] - 657:13,
664:7, 664:18,
664:24, 665:9,
665:25, 667:6,
667:12, 669:15,
669:20, 669:23,
670:5, 670:19,
673:15, 674:8,
674:15, 678:6,
679:7, 679:25,
680:9, 680:21,
686:23, 687:2,
688:17, 688:20,
688:23, 689:24,
690:1, 690:20,
691:1, 691:7,
691:10, 695:5,
706:23, 707:2,
708:8, 722:17,
722:23, 723:3,
726:10, 726:13,
727:3, 729:13,
729:16, 729:22,
730:2, 730:7,
730:18, 731:9,
731:12, 731:15,
731:17, 734:15,
735:13, 737:19,
737:20, 738:4,
738:9, 738:11,
738:24, 739:5,
739:12, 741:14,
742:3, 742:9,
742:12, 742:16,

744:2, 745:8
**Simon** [11] - 664:17,
665:21, 665:22,
686:24, 706:10,
706:22, 735:9,
737:3, 737:18,
741:13, 742:2
**simple** [1] - 668:5
**simply** [1] - 671:5
**six** [4] - 659:17, 697:9,
718:12, 718:13
**skin** [2] - 713:3,
721:17
**Slater** [14] - 688:22,
707:4, 707:7,
707:16, 731:7,
731:16, 732:4,
748:8, 752:7,
755:13, 756:1,
757:14, 757:21,
758:6
**sleeves** [1] - 671:15
**Social** [1] - 752:19
**solid** [1] - 741:14
**solved** [1] - 684:9
**someone** [4] - 662:16,
676:15, 696:24,
740:8
**sometime** [2] -
706:15, 743:3
**sometimes** [3] -
718:10, 718:21,
739:11
**somewhat** [1] - 702:6
**sonogram** [10] -
712:9, 712:11,
712:17, 712:24,
713:3, 713:4, 714:7,
714:15, 714:17,
714:20
**sorry** [13] - 673:15,
674:20, 694:2,
698:14, 701:4,
707:11, 716:20,
717:23, 719:5,
739:7, 752:24,
753:5, 755:23
**sort** [2] - 700:12,
742:4
**sought** [3] - 659:12,
659:13, 664:20
**sounds** [1] - 672:10
**spaces** [1] - 744:1
**sparing** [1] - 670:13
**speaking** [1] - 697:23
**specialist** [3] - 724:19,
724:20, 729:4
**specialties** [1] - 679:2
**specific** [3] - 663:5,
694:25, 736:10

**specifically** [3] -
699:19, 747:9,
752:19
**specified** [1] - 747:9
**speculate** [1] - 668:15
**spell** [6] - 691:15,
708:25, 709:1,
723:8, 730:20,
746:18
**spelling** [1] - 700:8
**spent** [1] - 733:5
**spinal** [1] - 757:11
**spine** [8] - 694:23,
695:3, 700:1,
700:20, 702:16,
702:19, 702:23,
712:6
**sprayed** [1] - 713:6
**spreadsheet** [1] -
756:2
**stand** [7] - 669:12,
670:16, 670:17,
694:24, 719:17,
730:3, 758:15
**standards** [1] - 661:9
**standing** [1] - 743:7
**stands** [1] - 694:25
**start** [12] - 665:7,
665:15, 674:23,
682:18, 682:22,
683:3, 692:7, 707:7,
710:6, 710:19,
724:21, 746:4
**started** [13] - 682:4,
682:13, 692:9,
692:20, 694:5,
710:4, 718:13,
721:10, 724:15,
733:3, 745:16,
747:8, 753:20
**starting** [5] - 666:7,
711:24, 721:13,
755:1, 755:22
**starts** [2] - 745:23,
754:18
**state** [5] - 659:10,
661:3, 723:8, 736:13
**statement** [6] -
694:17, 736:12,
736:16, 736:19,
741:5
**statements** [3] -
734:20, 734:25,
741:3
**States** [2] - 659:3,
691:25
**states** [3] - 699:12,
736:12, 750:24
**STATES** [3] - 657:1,
657:3, 657:10

**statistics** [1] - 676:25
**status** [1] - 687:6
**stemmed** [1] - 664:22
**step** [2] - 665:11,
745:10
**Stephen** [2] - 746:14,
746:19
**STEPHEN** [3] -
658:12, 746:15,
746:19
**steps** [5] - 687:22,
691:5, 708:11,
722:13, 730:1,
745:12
**still** [6] - 695:22,
703:21, 711:12,
733:4, 758:20,
758:21
**stimulation** [1] - 712:1
**sting** [1] - 669:2
**stipulate** [1] - 668:9
**stipulation** [9] - 663:2,
665:12, 667:24,
668:5, 668:8, 668:9,
668:11, 668:19,
668:24
**stood** [1] - 694:12
**stop** [8] - 661:24,
729:17, 741:7,
757:21, 758:13,
758:16, 758:19
**stopped** [25] - 693:20,
694:4, 726:15,
726:16, 726:17,
729:20, 739:16,
740:1, 740:2, 740:3,
740:13, 740:19,
740:20, 740:22,
740:25, 741:1,
741:6, 741:9,
741:11, 741:22,
742:1, 742:7, 742:13
**straight** [3] - 673:11,
716:24, 728:25
**straying** [1] - 680:11
**streamline** [1] -
674:22
**Street** [1] - 704:14
**strike** [3] - 694:3,
719:9, 739:22
**subject** [3] - 670:2,
719:20, 758:21
**submit** [3] - 706:15,
750:16, 755:7
**submitted** [11] -
681:15, 681:16,
681:17, 681:18,
682:2, 747:25,
751:19, 754:22,
757:9, 757:17, 758:3

**subpoena** [2] - 706:8,
719:14
**substance** [1] -
667:19
**substitute** [1] - 660:20
**successful** [1] -
741:19
**sufficient** [1] - 674:7
**suggest** [2] - 669:3,
672:12
**suggested** [3] -
692:15, 694:14,
710:9
**Suite** [2] - 657:17,
657:21
**summaries** [6] -
694:6, 746:4,
756:20, 756:22,
756:23
**summary** [6] - 694:7,
694:9, 745:15,
745:17, 754:4,
756:25
**supplement** [1] -
709:19
**supplier** [1] - 748:3
**surgery** [8] - 678:24,
679:3, 679:20,
692:17, 711:1,
711:2, 711:15,
740:13
**suspend** [1] - 663:15
**suspended** [2] -
659:17, 661:19
**sustain** [1] - 678:8
**sustained** [8] -
662:18, 680:22,
719:2, 719:4, 720:1,
738:23, 742:11,
744:3
**sweethearts** [1] -
732:7
**swift** [1] - 744:16
**swift's** [1] - 733:16
**sword** [1] - 664:14
**SWORN** [6] - 675:1,
691:8, 708:20,
723:1, 730:5, 746:15
**system** [2] - 749:22,
749:24

---

**T**

---

**table** [1] - 669:8
**TANYA** [1] - 657:10
**team** [1] - 665:25
**teaming** [1] - 690:6
**technical** [1] - 694:21
**technology** [2] -

661:16, 661:22
**teeing** [1] - 670:3
**telephone** [2] -
685:18, 685:21
**term** [2] - 694:21,
711:25
**termed** [1] - 681:6
**terminated** [1] - 660:1
**terminology** [1] -
676:15
**terms** [3] - 663:21,
736:18, 748:17
**test** [1] - 683:7
**testified** [1] - 737:6
**testifies** [1] - 672:7
**testify** [4] - 734:17,
735:4, 735:6, 736:5
**testifying** [3] - 741:8,
745:23, 756:14
**TESTIMONY** [1] -
658:2
**testimony** [23] - 665:6,
667:10, 667:14,
701:3, 701:10,
703:5, 703:21,
704:2, 704:23,
705:11, 712:23,
719:20, 737:17,
740:14, 741:25,
753:7, 753:18,
756:15, 756:17,
756:19, 756:25,
758:21, 758:22
**THE** [186] - 657:1,
657:10, 659:2,
659:5, 664:2, 664:8,
664:14, 664:16,
664:23, 665:3,
665:10, 665:21,
666:17, 666:22,
666:25, 667:4,
667:8, 667:18,
667:22, 668:6,
669:7, 669:18,
669:21, 669:24,
670:15, 670:20,
671:12, 671:14,
671:16, 671:17,
671:19, 671:24,
672:10, 672:14,
673:24, 674:9,
674:16, 674:18,
675:1, 678:8, 679:9,
680:2, 680:10,
680:22, 680:25,
682:10, 684:3,
684:13, 684:15,
684:20, 686:22,
686:24, 688:16,
688:19, 690:9,

690:13, 690:19,
691:2, 691:4, 691:6,
691:8, 695:7, 695:9,
695:12, 695:15,
695:18, 695:20,
695:24, 698:17,
698:21, 699:21,
700:12, 700:25,
701:4, 701:8,
701:19, 701:23,
701:25, 703:10,
705:23, 706:1,
706:3, 706:10,
706:14, 706:16,
706:19, 706:22,
708:9, 708:12,
708:20, 713:11,
713:14, 714:2,
714:8, 715:4, 715:7,
715:10, 715:12,
715:24, 716:17,
716:20, 716:21,
719:2, 719:4, 719:7,
719:12, 719:16,
719:24, 720:1,
721:12, 722:6,
722:9, 722:14,
722:16, 722:18,
723:1, 726:11,
727:4, 729:12,
729:14, 729:24,
730:4, 730:5,
730:17, 731:11,
731:14, 734:8,
734:10, 734:19,
735:5, 735:12,
735:22, 736:1,
736:8, 736:9,
736:12, 736:25,
737:8, 737:15,
738:2, 738:23,
739:3, 739:4, 739:8,
739:9, 739:21,
739:24, 740:9,
740:24, 741:13,
741:21, 741:25,
742:6, 742:11,
742:17, 744:3,
745:7, 745:9,
745:11, 745:20,
745:22, 746:3,
746:6, 746:10,
746:15, 749:3,
749:20, 749:23,
750:1, 750:5, 751:6,
751:8, 751:10,
752:2, 752:4, 752:9,
753:5, 753:16,
753:22, 753:24,
754:1, 754:7,
756:12, 758:14,

758:23, 758:24
**then-existing** [2] -
736:3, 736:13
**thick** [1] - 685:20
**thinking** [3] - 664:12,
681:9, 708:16
**third** [3] - 671:20,
671:21, 702:21
**thousand** [3] - 710:5,
718:14, 720:6
**thousands** [3] -
685:24, 756:7
**three** [4] - 718:21,
725:20, 729:18,
729:19
**throughout** [1] - 749:8
**today** [6] - 673:9,
674:3, 684:16,
709:5, 722:19,
722:22
**today's** [1] - 670:7
**together** [7] - 732:8,
732:11, 732:12,
732:13, 732:19,
732:24, 733:5
**took** [5] - 666:7,
671:25, 733:16,
733:18, 744:10
**totally** [1] - 719:9
**touches** [1] - 713:3
**toward** [3] - 726:6,
726:7, 726:14
**town** [1] - 732:10
**training** [2] - 677:4,
744:4
**transcript** [7] - 661:4,
662:7, 662:14,
673:17, 700:13,
714:12, 760:4
**TRANSCRIPT** [1] -
657:9
**transferred** [1] -
663:20
**treat** [7] - 678:21,
693:6, 693:11,
705:12, 724:25,
756:23, 756:24
**treated** [16] - 664:20,
678:18, 696:7,
696:20, 701:13,
702:3, 704:3, 705:2,
705:14, 716:11,
718:11, 718:22,
727:17, 734:4,
734:6, 737:25
**treating** [9] - 680:7,
682:4, 682:13,
702:16, 703:17,

705:15, 705:16,
726:8, 726:15
**treatment** [16] -
692:24, 693:21,
694:11, 694:13,
697:9, 697:15,
697:21, 705:13,
707:24, 718:5,
737:22, 738:13,
739:17, 740:3,
741:1, 744:25
**treatments** [4] - 693:1,
697:2, 710:23,
711:23
**trial** [4] - 669:11,
674:19, 753:20,
756:24
**TRIAL** [1] - 657:9
**true** [8] - 675:10,
675:23, 676:10,
690:12, 696:10,
748:24, 749:14,
752:13
**truly** [1] - 660:23
**trust** [1] - 717:1
**trusted** [5] - 696:23,
716:14, 716:23,
728:25, 729:3
**truth** [12] - 713:21,
734:23, 735:22,
736:7, 739:25,
740:4, 740:11,
740:19, 740:23,
741:4, 741:9, 741:18
**try** [2] - 679:9, 682:21
**trying** [4] - 665:25,
674:22, 719:8,
721:19
**TSC** [1] - 657:4
**turned** [1] - 712:21
**twice** [1] - 718:20
**two** [15] - 659:19,
685:2, 710:5, 710:7,
718:14, 720:6,
725:20, 725:24,
725:25, 726:3,
729:19, 746:24,
748:19, 748:20,
753:6
**type** [11] - 672:4,
675:18, 692:24,
694:25, 695:1,
718:8, 720:22,
747:4, 752:23,
754:14
**typical** [1] - 718:17
**typically** [1] - 747:5

# U

**U.S** [2] - 657:13,
657:24
**ultrasound** [12] -
660:20, 660:23,
662:5, 662:12,
662:21, 683:25,
688:12, 689:2,
689:15, 689:17,
690:12, 720:17
**unanimously** [1] -
666:11
**under** [13] - 670:25,
673:8, 674:3,
681:20, 694:8,
695:11, 713:17,
713:20, 731:20,
736:2, 736:20,
758:20
**unfair** [1] - 753:18
**unified** [1] - 747:6
**United** [2] - 659:3,
691:25
**UNITED** [3] - 657:1,
657:3, 657:10
**UnitedHealthcare** [2]
- 709:18, 709:20
**unless** [5] - 660:4,
671:6, 672:23,
673:7, 736:17
**unnecessary** [1] -
670:14
**unredacted** [1] - 667:3
**unwillingness** [1] -
673:4
**up** [27] - 661:2,
663:21, 668:19,
668:24, 669:12,
670:3, 684:4,
684:15, 688:18,
700:24, 701:19,
701:20, 703:20,
707:4, 707:17,
711:1, 718:14,
723:12, 731:8,
731:16, 734:8,
735:24, 750:5,
750:8, 752:25,
753:14, 758:16
**UPIC** [3] - 747:13,
747:15, 748:4
**upper** [1] - 728:15
**upstairs** [1] - 743:7
**uses** [1] - 749:6
**utilized** [1] - 663:7

## V

**VA** [7] - 671:10, 691:25, 704:5, 705:8, 705:12, 705:13, 705:15
**validity** [1] - 736:17
**varied** [1] - 718:19
**various** [1] - 661:3
**veracity** [1] - 750:11
**verdict** [1] - 753:10
**version** [2] - 665:8, 667:4
**versus** [2] - 659:3, 747:2
**Veterans** [1] - 704:18
**videotaped** [1] - 713:20
**Virginia** [1] - 732:22
**virtually** [1] - 678:5
**visit** [1] - 681:13
**visited** [1] - 694:15
**visits** [2] - 744:25, 745:4
**voir** [2] - 749:25, 750:8

## W

**waist** [5] - 728:11, 743:10, 743:11, 743:12
**waistline** [1] - 728:20
**wait** [3] - 680:25, 716:17
**waiver** [1] - 706:6
**wand** [3] - 720:20, 720:23, 720:25
**wants** [2] - 661:2, 666:14
**warned** [1] - 660:10
**Washington** [14] - 657:5, 657:14, 657:22, 657:25, 663:14, 663:18, 663:25, 691:18, 699:23, 702:3, 703:13, 704:6, 705:16, 730:25
**waves** [1] - 680:19
**Wayne** [2] - 760:9, 760:9
**WAYNE** [2] - 657:23, 760:3
**ways** [2] - 678:18, 732:8
**wear** [1] - 710:25
**weeks** [1] - 723:17
**whatsoever** [1] -

750:3
**whole** [2] - 690:15, 709:1
**wife** [1] - 732:9
**WILLIS** [40] - 657:12, 665:23, 666:2, 667:13, 669:6, 706:11, 708:19, 708:22, 713:10, 713:12, 713:15, 713:16, 714:4, 714:11, 715:5, 715:8, 715:15, 719:3, 722:8, 745:14, 745:21, 745:24, 746:5, 746:13, 746:17, 749:4, 749:17, 749:21, 750:14, 751:14, 752:1, 752:7, 752:10, 753:21, 753:23, 753:25, 754:2, 754:9, 757:3, 758:12
**Willis** [4] - 706:10, 708:18, 714:8, 749:3
**Winston** [1] - 657:20
**wise** [1] - 677:24
**wish** [1] - 738:3
**witness** [41] - 667:11, 670:10, 670:15, 670:16, 670:22, 671:1, 671:22, 672:1, 674:1, 674:2, 674:9, 674:11, 684:18, 686:20, 688:22, 690:11, 691:6, 698:21, 705:24, 708:12, 713:13, 719:15, 719:21, 719:22, 721:12, 722:16, 737:6, 737:16, 740:8, 740:20, 741:15, 744:3, 745:14, 745:16, 745:23, 748:8, 749:25, 750:10, 754:3, 756:13, 758:15
**Witness** [9] - 685:11, 691:5, 698:18, 699:2, 708:11, 714:3, 722:13, 730:1, 745:12
**WITNESS** [14] - 675:1, 691:4, 691:8, 708:20, 716:20, 723:1, 730:5, 736:9, 739:4, 739:9,

739:21, 745:11, 746:15, 758:23
**witness's** [5] - 670:11, 670:21, 673:20, 750:9, 753:18
**witnesses** [8] - 660:12, 660:16, 667:10, 669:21, 669:23, 670:7, 670:8, 740:12
**word** [1] - 662:5
**words** [1] - 670:23
**works** [1] - 708:17
**worse** [1] - 729:7
**Wright** [1] - 662:15
**write** [1] - 671:9
**written** [1] - 708:1

## Y

**y'all** [3] - 668:10, 676:15, 732:13
**Y.A** [1] - 751:20
**year** [9] - 688:20, 689:12, 718:18, 726:4, 726:5, 726:16, 726:17, 726:18, 728:4
**years** [24] - 659:19, 669:5, 692:1, 697:10, 709:11, 718:11, 718:13, 723:23, 725:1, 725:17, 725:19, 725:20, 729:19, 731:2, 732:14, 732:17, 732:22, 733:6, 741:16, 742:1, 743:1, 747:20
**yesterday** [6] - 659:6, 662:2, 663:1, 669:16, 669:24, 747:20
**York** [1] - 657:14
**yourself** [3] - 682:17, 685:6, 685:9
**yourselves** [1] - 668:21
**YVONNE** [3] - 658:8, 723:1, 723:10
**Yvonne** [2] - 722:23, 723:10

## Z

**zoom** [1] - 758:17