UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,       .
                                .
          Plaintiff,            .   CR No. 19-0255 (TSC)
                                .
     v.                         .
                                .
                                .   Washington, D.C.
FREDERICK GOODING,              .   Monday, September 12, 2022
                                .   9:30 a.m.
          Defendant.            .
. . . . . . . . . . . . . . . ..    Morning Session


DAY 5
TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE TANYA S. CHUTKAN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Government:          JILLIAN D. WILLIS, ESQ.
                             JIL SIMON, ESQ.
                             U.S. Department of Justice
                             1400 New York Avenue NW
                             Washington, DC 20005
                             (202) 353-0822

For Defendant:               MICHAEL J. KHOURI, ESQ.
                             Khouri Law Firm, APC
                             2222 Martin
                             Suite 215
                             Irvine, CA 92612
                             (949) 336-2433

                             FREDERICK D. COOKE, JR., ESQ.
                             Rubin, Winston, Diercks,
                             Harris & Cooke, LLP
                             1250 Connecticut Avenue NW
                             Suite 700
                             Washington, DC 20036
                             (202) 861-0870

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186

C O N T E N T S

DEFENSE OPENING STATEMENT ................................. 896

*   *   *

TESTIMONY

FREDERICK GOODING:   Direct Examination......................902
                     Cross-Examination.......................959
                     Redirect Examination...................980

*   *   *

1             P R O C E E D I N G S

2          THE COURT:  Good morning.  Mr. Bradley informs me

3     that one of the jurors who was seated outside this morning, I

4     saw him, said he was having some coughing.  No other symptoms.

5     He took a test this morning and is negative -- took two tests

6     this morning and it's negative.  So I said it's my inclination

7     to just make sure he keeps his mask on, and if he starts

8     feeling any symptoms at all to let us know and we'll do

9     something, but just keep his mask on.

10         We have not had a situation arise with a juror getting

11     COVID or anybody -- you know, so I hope that does not happen.

12     But I just wanted to let you all know that.

13              THE DEPUTY CLERK:  Your Honor?

14              THE COURT:  Oh, the case.  Sorry.

15              THE DEPUTY CLERK:  No, no.  Your Honor, we have

16     criminal action 19-255, United States of America versus

17     Frederick Gooding, and all counsel are present.

18              THE COURT:  All right.  Thank you.

19         Before the jury comes in, on Friday defendant moved for

20     judgment of acquittal pursuant to rule of criminal procedure

21     29 on all counts for all reasons.  Defense counsel advanced

22     specific arguments on seven of the 11 counts in the

23     indictment.

24         First Mr. Khouri argued that the evidence is insufficient

25     to sustain a conviction on Count 7 of the indictment as to

1    patient Y.A. because she couldn't remember what type of

2    injection she received or when she received it.

3        Second, Mr. Khouri argued that the evidence as to Counts 10

4    and 11 pertaining to patient S.B. was insufficient to sustain

5    a conviction because the testimony came from S.B.'s former

6    girlfriend and did not, in Mr. Khouri's eyes, rule out the

7    possibility that S.B. received injections in his spine.

8        Third, Mr. Khouri challenged Counts 5 and 6 in the

9    indictment which pertained to patient A.M., arguing that A.M.

10   did not provide any testimony that would prove the falsity of

11   those claims.

12       Fourth, Mr. Khouri argued that the evidence is insufficient

13   as to Counts 1 and 2 of the indictment pertaining to patient

14   K.M.  He contends that K.M. was a completely unreliable

15   witness and so her testimony that she did not receive an

16   injection in her spine must not be credited.

17       In ruling on a motion for judgment of acquittal the Court

18   must consider the evidence in the light most favorable to the

19   government and determine whether so read it is sufficient to

20   permit a rational trier of fact to find all of the essential

21   elements of the crime beyond a reasonable doubt.  And I'm

22   quoting from -- well, for example, but I'm quoting from *United*

23   *States v. Kayode*, 254 F.3d 204 at 212 to 213.

24       The Court must accord the government the benefit of all

25   legitimate inferences and deny the motion if any rational

trier of fact could have found the essential elements of the

crime beyond a reasonable doubt.  *United States v. Arrington*,

309 F.3d 40 at 48.

Put another way, I may grant a motion for judgment of

acquittal only when a reasonable juror must necessarily have

had a reasonable doubt as to the defendant's guilt.  And

that's from *United States v. Weisz*, 718 F.2d at 437.

Applying the standard and viewing the evidence in the light

most favorable to the government, I find that a reasonable

jury could find each of the elements of each count in the

indictment beyond a reasonable doubt, and so I will deny the

defendant's motion.

As an initial matter, the government has provided evidence,

specifically claims data introduced through Stephen Quindoza,

from which a reasonable juror could find that defendant

submitted or caused to be submitted each of the claims at

issue in the indictment to the Medicare health benefit

program.

The government has also offered evidence from which a

reasonable jury could find that Medicare requires that

fluoroscopy or CT imaging must be used at the time of the

injection in order to be reimbursed for claims for codes

64635, 64636, and 64483.

Moreover, through the testimony of Maya Parrott and

Erica Wright, the government provided evidence from which

1    a reasonable jury could find that the defendant did not have a
2    fluoroscopy machine during the relevant time in the indictment
3    and has provided testimony from former patients that he did
4    not use a fluoroscopy guidance imaging at the time of the
5    relevant procedures.
6        The government also provided testimony from Alice Mierzwa
7    that had Medicare known the defendant was not using
8    fluoroscopy guidance imaging when administering the services
9    listed in the indictment, it would not have paid those claims.
10       And the government also provided evidence relating to
11   Dr. Gooding's knowledge and willful execution of a scheme with
12   the intend to defraud Medicare.
13       Specifically, it provided evidence of prior disciplinary
14   action taken against Dr. Gooding in 2010 regarding the
15   necessity of using fluoroscopy while performing certain
16   injections; it provided testimony from Maya Parrott that
17   she spoke with Dr. Gooding about the Medicare requirements
18   for codes 64635 and 64636, and the requirement of using
19   fluoroscopy, and that Dr. Gooding stated he has the newest
20   interventional way of doing it with ultrasound.  And I'm
21   actually quoting from the transcript here.
22       Government provided testimony from Erica Wright that
23   Dr. Gooding personally filled out charge sheets and selected
24   which billing codes to use.  And testimony from Alice Mierzwa
25   about a letter that Medicare wrote to defendant, to

1    Dr. Gooding in 2017, after Medicare conducted a review of some

2    of Dr. Gooding's claims, including claims for fluoroscopy or

3    CT guided spinal injections.

4        In the letter, which is Exhibit 5, Medicare set out the

5    requirements for this type of spinal injection to be billed,

6    and it states that CT or fluoroscopy guidance was required.

7    From this evidence, a reasonable jury could find all the

8    essential elements of Counts 1, 2, 4 to 6 and 8 to 11 beyond

9    a reasonable doubt.

10       As to Count 3, the government introduced evidence that the

11   defendant billed Medicare in relation to an intra-articular

12   injection for patient G.B. in November of 2016 using a

13   modifying code, indicating that the injection was to G.B.'s

14   knee.  However, G.B. testified that he did not receive any

15   knee injections after his knee was replaced in 2013.

16       So, combined with the other evidence already summarized,

17   a reasonable jury could find defendant guilty on this count.

18       And finally, regarding Count 7, the government introduced

19   evidence that defendant submitted a Medicare claim for an

20   intra-articular injection to patient Y.A.'s knee on June 14,

21   2017.  Patient Y.A. testified that she was a patient of

22   Dr. Gooding's for 15 or more years and that during that time

23   she received injections in both her lower back and her left

24   knee.

25       She testified that she received approximately two

1    injections, and those injections happened in the same year.

2    Regarding the timing of those injections, Y.A.'s testimony

3    varied.  In response to one question, she testified that she

4    received those injections in the last two or three years of

5    her time as Dr. Gooding's patient; and in response to another

6    question, she testified that she received the knee injection

7    maybe a year before she stopped seeing him.

8         On redirect she testified that she stopped seeing

9    Dr. Gooding in August, "probably two or three years when

10   I last saw him."  Defense counsel is correct that Y.A.'s

11   testimony is not entirely consistent or forthcoming.

12        But viewing Y.A.'s testimony, combined with claims data

13   for Y.A., in the light most favorable to the government, a

14   reasonable jury could find that Y.A. did not receive a knee

15   injection on June 14, 2017, as was billed.

16        Accordingly, defendant's Rule 29 motion for judgment of

17   acquittal is denied.

18        I sent counsel my final version of the -- my version of the

19   final jury instructions last night.  I don't know if you've

20   had a chance to look at them, and if you have any objections,

21   Ms. Willis and Ms. Simon?

22            MS. WILLIS:  The government doesn't have any

23   objections, but we do have a few points that we think would

24   merit discussion.  For example -- do you want me to go through

25   all the points or --

1          THE COURT:  Is the jury ready?

2          THE DEPUTY CLERK:  They're all here, yes.

3          THE COURT:  Why don't we do that at the break or --

4    yeah, at our next break.  Are they just -- are they major or

5    minor, and have you told defense counsel?

6          MS. WILLIS:  We have not discussed them with defense

7    counsel.  Two of them are pretty minor, just about verifying

8    that it was one witness versus multiple witnesses for a

9    certain few objections.

10      And then regarding the limiting instruction regarding why

11   the 404(b) would come in, we do list a number of different

12   reasons, and we would be willing to strike some of those

13   reasons to make it more streamlined for the jury to know that

14   that 404(b) evidence wasn't introduced, for example, for

15   identification.  I think right now the jury instruction says

16   something to the effect of --

17         THE COURT:  Yes.  That would be good if we could

18   streamline it.  What I'm going to ask you to do is confer

19   with the defense and see what they disagree -- you know, what

20   they object to and what they don't, and that way I don't have

21   to do that inquiry when we discuss it.

22      As to the verdict form, I think we discussed this earlier.

23   I held some issues in abeyance including regarding the billing

24   code, I think, and I have not seen or been provided any

25   authority for the defense position that the billing code

1   should be so included.  So I'm going to go with the verdict

2   form that the government proposed without any modification

3   unless somebody can point to some authority for that

4   modification.

5        But we'll discuss this again.  I'm going to have Mr. Khouri

6   do his opening and put on the case, and then we can maybe let

7   the jury have a long lunch while we have a final charging

8   conference and then go into closing argument and instructions.

9   It would be nice if we could get that done today.  And

10  depending on how the juror feels, we may have to revisit

11  that issue, but let's hope for the best.

12       All right.  I don't have any matters today, either at

13  lunchtime or this afternoon.  So we can go the full day.

14       (Jury in at 9:44 a.m.)

15       THE COURT:  Good morning, members of the jury.  I hope

16  you had a good and restful and relaxing weekend.  We just had

17  to deal with some legal matters, and now we are ready to

18  hear -- the government has rested its evidence, rested its

19  case and closed its presentation of evidence, and now we'll

20  hear from Mr. Khouri.  You'll see we have a few changes to our

21  courtroom this morning so I think you'll be able to hear him

22  better.

23       Mr. Khouri, you may proceed.

24       MR. KHOURI:  Good morning.  As the judge said, I hope

25  y'all had a wonderful weekend, and thank you for all showing

1    up on this Monday.

2                    DEFENSE OPENING STATEMENT

3              MR. KHOURI:  This is a very special time of the trial

4    for myself, and for Dr. Gooding as well, because it's the

5    first opportunity that I have to speak to you directly and

6    have sort of a conversation about the case.  And far beyond

7    me to tell you what you should do.  I'm here to advocate for

8    Dr. Gooding, to make suggestions, and ask you to look at the

9    evidence in a slow, deliberate, mindful way, because if you

10   do that, I believe you'll vote not guilty.

11       And I always say to juries when I first meet them

12   face-to-face that it's a great gift from God to be a lawyer.

13   To be able to stand up in front of you and be an advocate

14   for Dr. Gooding is like nothing else you'll ever experience.

15       Now, before I begin to talk about the facts of the case,

16   let's remind ourselves what Dr. Gooding is charged with and

17   what he's not charged with.

18       He is not charged with malpractice.  He's not charged

19   with incorrect billing.  He's charged with something called

20   healthcare fraud.  And healthcare fraud -- and the judge will

21   instruct you on all this at the end of the trial, so if

22   there's anything that's different from what I say and what

23   the judge says, what the judge says goes.

24       But I'm thinking that the instruction you're going to get

25   is something like healthcare fraud involves a material --

1   that's No. 1 -- misrepresentation, No. 2; and the third

2   element is with the intent to defraud -- think steal.

3   To take money from somebody or something, like the United

4   States government, with the intent to steal, knowing that

5   you're not entitled to it.

6       And you're going to also receive an instruction that says

7   that good faith is a complete defense to this case.  And it's,

8   of course, up to the government to prove that beyond a

9   reasonable doubt, that intent to steal.

10      So let's start out by talking about Dr. Gooding.  Dr. Gooding

11  is an accomplished physician.  He went to college at Princeton,

12  he went to medical school here in the District of Columbia at

13  Howard University.  After graduating from Howard, he went to

14  California, where I'm from.

15          THE COURT:  Mr. Khouri, just one moment.  Could you

16  pick up the phone, please?

17      (Bench conference.)

18          THE COURT:  Mr. Khouri, I hate to interrupt your

19  opening statement, but none of this is -- are you putting

20  this on as evidence in this case?  Is this what the evidence

21  is going to show?

22          MR. KHOURI:  Uh-huh.  It's going to be through him.

23          THE COURT:  Oh, okay.  All right.  Thank you.

24          MR. KHOURI:  Thank you, Your Honor.

25      (End of bench conference.)

1          THE COURT:  Thank you.  Sorry for the interruption.

2          MR. KHOURI:  And a good point has been raised.  A lot

3     of the evidence that I'm going to be relying on when I come

4     back to talk to you in final argument has already been put

5     into evidence through cross-examination.  And this opening

6     statement is limited to what I'm going to show on behalf of

7     Dr. Gooding in my case, and that's because you're going to

8     hear from the most important witness -- or I'm sorry -- the

9     most important person in the courtroom, who is Dr. Gooding.

10         So he went out to California, and he did a residency in

11    physiatry at the University of California Los Angeles.  So

12    he did a residency at UCLA, and he learned about how to be a

13    physiatrist at a time when ultrasound and fluoroscopy really

14    weren't in use.

15         After his residency, he came back east and began to

16    practice.  And between 2012 and 2015, during his practice,

17    he did the injections, and he did the injections without

18    fluoroscopy but with ultrasound.  He billed Medicare, and

19    there was absolutely no problem.

20         And the reason there wasn't any problem is because

21    between 2012 and 2015, the codes were different.  There was

22    a code for an injection, and there was a code for imaging,

23    either fluoroscopy or ultrasound.  So he was able to bill

24    for the injection, and he was able to bill for the imaging

25    without a problem.

1    In 2015, the code changed to the code that you've heard
2    about in this trial, where fluoroscopy and the injection were
3    bundled together.  You've heard about this 2017 letter that
4    he received from the Medicare carrier, and you'll hear about
5    it through Dr. Gooding, and Dr. Gooding will tell you that he
6    read that letter, he understood that letter, and he rejected
7    it.

8    And the reason he rejected that instruction from the
9    Medicare carrier is because, in his opinion, ultrasound was
10   a much better technique than fluoroscopy.  And the reason why
11   ultrasound was a much better technique is because fluoroscopy
12   exposed his patients to radiation that vastly increased the
13   chances that his patients would get cancer.

14   His patient population is a population of individuals
15   that were in chronic pain, that needed recurrent treatment.
16   Fluoroscopy would be exposure to recurrent radiation.  And
17   he did always what he believed to be in the best interest of
18   his patients.

19   So, what is he supposed to do?  The government takes the
20   position that you should put your patients in a situation to
21   choose between being in pain or getting exposed to radiation
22   where you could get cancer, and the chances of getting cancer
23   are vastly increased.  So Dr. Gooding and Erica Wright got
24   together and they decided to try to find a way to bill
25   Medicare appropriately while still using ultrasound and still

1     being paid for the services they provided.

2      So what did they do?  They talked to other doctors.

3     They talked to billers.  Dr. Gooding went to some conferences.

4     Dr. Gooding read through the CPT code.  And remember, he's doing

5     all this when he's running a business and he's seeing patients.

6      So what they decided to do -- and you've heard some of this

7     already -- is they decided to bill the bundled code, which

8     bundles together the injection and the fluoroscopy, and bill

9     an ultrasound code.

10     Dr. Gooding believed that by billing the ultrasound code

11     as well, he was telling Medicare that he was doing ultrasound.

12     And that makes perfect sense because, as you've already heard,

13     it would be foolish for Medicare to think that he was doing

14     fluoroscopy and ultrasound at the same time.

15     You're going to hear evidence that Dr. Gooding and Erica

16     Wright worked together in good faith to achieve this result.

17     And that's exactly what they did.  They believed that they

18     were telling Medicare they were doing ultrasound and you pay

19     us what you want to pay us.

20     Dr. Gooding, it's important to note, and he'll testify to

21     this, that the only reason they knew he was doing ultrasound

22     in the first place is because when he was audited back in '15,

23     '16, '17, he told Medicare that he was doing ultrasound.

24     That's how they found out.  That's how they came to the

25     reimbursement order, and that's what resulted in that 2017

1    letter.

2        You're going to hear evidence through Dr. Gooding that he

3    performed all the services that he billed for.  I'll talk about

4    all the counts in final argument, but there are a few counts

5    that I'd like to talk about right now that Dr. Gooding will talk

6    about, and that is in particular Counts 3 and 7.  And Counts 3

7    and 7 require you, and all of us in this courtroom, to learn

8    about and distinguish between a diagnosis code and a procedure

9    code.

10       In 3 and 7, Dr. Gooding performed an injection in the hip.

11   But for some reason Medicare paid thinking that the injection

12   was in the knee.  The actual procedure code -- remember, the

13   one that tells Medicare what was done to the patient? -- simply

14   talks about an injection of something called Gel-One.

15       It doesn't say into the knee or into the hip.  The diagnosis

16   code on the bill is the code that tells Medicare what was wrong

17   with the patient, and apparently the diagnosis code mentioned

18   the knee.  That's why the government thinks there was an

19   injection in the knee, because the diagnosis code said knee

20   pain.

21       But as Dr. Gooding will testify, and as I think Dr. Perez

22   also testified, Medicare pays based upon the procedure code,

23   not the diagnosis code.  So any misrepresentation was not what

24   we lawyers call material.  And that'll be in the jury

25   instructions.

1       So I think what you will find is that Dr. Gooding always

2   acted in good faith.  Dr. Gooding never made a misrepresentation,

3   because he disclosed that he was using ultrasound in his bills,

4   and no one would think that a physician was using ultrasound and

5   fluoroscopy at the same time.  And you'll find that if there was

6   a mistake, it was a mistake, and that what was said on the bill

7   was not material.

8       So, when this is all done, I'll be back to discuss the

9   evidence in its entirety and ask that you return a verdict of

10  not guilty.  Thank you.

11          THE COURT:  Thank you, Mr. Khouri.  You may call your

12  first witness.

13          MR. KHOURI:  Dr. Frederick Gooding.

14      FREDERICK GOODING, WITNESS FOR THE DEFENSE, SWORN

15                   DIRECT EXAMINATION

16  BY MR. KHOURI:

17  Q.   Good morning.

18  A.   Good morning, sir.

19  Q.   What do you do for a living, Dr. Gooding?

20  A.   I am a physician that specializes in physiatry and

21  subspecialize in chronic pain management.

22  Q.   Could you tell the jury where you went to college and

23  medical school and where you did your residency?

24  A.   Yes.  I went to Princeton University and went to medical

25  school at Howard University College of Medicine.  I did my

1    training at UCLA, Wadsworth VA, in physiatry, otherwise known

2    as physical medicine and rehabilitation.

3    Q.   How long did you -- did it take for you to complete your

4    residency?

5    A.   It's a three-year program.

6    Q.   After your residency, did you become board certified?

7    A.   Yes, sir.

8    Q.   In what areas did you become board certified?

9    A.   Board certified in physiatry and subsequently certified

10   in pain management.

11   Q.   So am I correct in understanding that you are double

12   board certified?

13   A.   That's correct.

14   Q.   After you got out of your residency did you practice for

15   a while in California?

16   A.   I did.

17   Q.   And where did you practice?

18   A.   I practiced in the Los Angeles area generally speaking,

19   West Los Angeles, Inglewood, et cetera.

20   Q.   Were you on staff at any hospitals?

21   A.   Yes.  Several hospitals.

22   Q.   What hospitals were that?

23   A.   Brotman Memorial, Centinela Hospital, Los Angeles Doctors

24   Hospital.  There are a couple others that have come and gone

25   in terms of administration and the title of the hospital, but

1    I was on staff at about five hospitals.

2    Q.   Before you got on the staff at a hospital, did you have

3    to be vetted at all by the hospital?

4    A.   Yeah.  They take you through a rigorous qualifying

5    program to become a staff member.

6    Q.   When you -- how long did you stay in California before

7    coming back home?

8    A.   I was in California approximately 12 years.

9    Q.   And what did you do during those 12 years?

10   A.   Well, initially I worked at a clinic called Watts Health

11   Foundation, and I was the director of physical medicine at

12   that center.  And then I opened my private practice while

13   acting as director of physical medicine at Los Angeles Doctors

14   Hospital.  I was a consultant at all the hospitals I was on

15   staff at, which was approximately five, maybe even six.

16   Q.   When you were in residency, did you learn how to perform

17   injections in certain parts of the spine?

18   A.   Yes, I did.

19   Q.   And in certain parts -- and in the hip area?

20   A.   Yes.

21   Q.   Shoulder?

22   A.   Yes.

23   Q.   Okay.  And what were the purpose of those injections?

24   A.   Well, to decrease inflammation, to reduce pain, to

25   restore range of motion and mobility for patients.  The upshot

1    of physical medicine and rehabilitation is to restore

2    function.  So everything that we do is oriented toward getting

3    people to be able to be independent in activities of daily

4    living, mobility, and other specific functions that are

5    pertinent to their everyday life.

6    Q.    Now, how did they teach you to do those injections?

7    And what I'm getting at is did you use imaging, or did you

8    do them without imaging?

9    A.    Well, I started my residency when pain management was

10   just coming into vogue as a specialty.  So we were trained

11   in anatomical landmarks so that you could identify surface

12   anatomy, palpate for anatomy that's below the surface, to

13   direct where you were going to do your injection.

14        In addition to surface anatomy, once you inject the

15   needle, there's something called loss of resistance.  The

16   needle is almost like an extension of my hand.  I can tell

17   which tissue I'm in depending on how much resistance it gives

18   me.  A tendon gives me more resistance than a muscle, and a

19   bone gives me more resistance than either of those.  So you

20   can sort of tell where you are.  It's an extension of my

21   fingertip.

22   Q.    And was that the way it was throughout your three-year

23   residency?

24   A.    Yes.  As you alluded to, this was prior to any imaging

25   being available.  So we were taught how to do these using,

1    again, surface anatomy and that's -- all of the procedures,

2    some people call them blind because there was no imaging

3    involved at that time.

4    Q.    Is that the way it was for the next 12 years when you

5    practiced in California?

6    A.    Correct.

7    Q.    So how many patients did you inject without any imaging

8    over that period of time?

9    A.    I don't know an exact number, but since I left my

10   residency I've been a very busy doctor, and probably

11   thousands.

12   Q.    Were you licensed in California to practice medicine?

13   A.    Correct.

14   Q.    So you come back here to come home, and where'd you

15   start practicing?

16   A.    Washington, D.C.

17   Q.    And what kind of practice did you have?

18   A.    Well, my practice evolved from general physiatry,

19   which is treating problems that affect the nerves, the muscles

20   and the joints, and then it evolved into sports medicine.

21   And most of the sports medicine cases involved pain.

22         So word got around town that I was a pain doctor, and

23   I was getting referrals.  My practice is primarily referral

24   from other physicians, and they would refer cases that had

25   severe pain.

1          So we moved from general physiatry where you're dealing

2      with strokes and all kinds of neurologic issues, head trauma,

3      et cetera.  I used to do a lot of inpatient, seeing patients

4      in the hospital, but that evolved into, again, sports medicine

5      and then into pain management.

6      Q.   So when you came back to the East Coast, what year was

7      that, about?

8      A.   Approximately 1990.

9      Q.   And did you ever open up a practice in Delaware?

10     A.   I opened up a practice in Delaware subsequent to my

11     practice in Washington.  I don't know the exact year, but yes.

12     I had practices in both states.

13     Q.   What year was that?

14     A.   I'm trying to recall.  Probably somewhere in the

15     neighborhood of 1995 or 1996.  I'm not exactly sure.

16     Q.   Okay.  We're going to circle back to that, but I want

17     to fast-forward you to 2012.  All right?

18     A.   Okay.

19     Q.   At that time were you licensed here in Washington, D.C.?

20     A.   Yes.

21     Q.   And did you have the same practice here in Washington,

22     D.C.?

23     A.   Yes.

24     Q.   Was your license in Washington, D.C., unrestricted?

25     A.   Yes.

1    Q.   Free and clear?

2    A.   Yes.

3    Q.   Was there a time when you started to consider performing

4    injections with imaging?

5    A.   Yes.

6    Q.   And when was that?

7    A.   2010 was when I started to research ways to visualize

8    the tissue as opposed to just feeling it with the pressure

9    of the needle and the surface anatomy.

10   Q.   Why did you do that?  Why did you start looking into

11   that?

12   A.   Well, because clearly -- we were talking about cervical

13   and thoracic and lumbar.  Cervical is in the neck area.  I do

14   all kinds of injections, by the way.  We inject muscles and

15   tendons and bursa and joints and trigger points, not to get

16   too technical.

17       But specifically for spine injections where, you know,

18   you're very close to the spinal cord, the nerves are coming

19   out from the spinal cord.  In the neck area, it's a little

20   more congested.  Things are a little tighter.  It's a smaller

21   area.

22       So it's easier to have untoward effects or things you

23   don't want to happen, because the medication will sometimes

24   drift into areas you don't want it to drift into.  So it was

25   important to be able to localize where you were injecting the

1    medicine, particularly in the cervical area.  So visualization

2    became necessary.  Mandatory.

3    Q.   All right.  Before we go any further, the cervical spine

4    is approximately where?

5    A.   It's in the neck area.  It's right here.  C1 through C7,

6    right here in your neck, that's cervical.

7    Q.   And your thoracic spine is where?

8    A.   That's upper back.

9    Q.   And the lumbar spine and sacral region is where?

10   A.   Lower back.

11   Q.   You're familiar with the indictment in this case?

12   A.   Yes, sir.

13   Q.   The injections you gave the patients named in the

14   indictment, are any of them cervical injections?

15   A.   No, sir.

16   Q.   They're all lumbar and hip injections.  Is that true?

17   A.   I believe they're all lumbar and lower extremity, hip,

18   knee.  Yes, sir.

19   Q.   All right.  Let's go back to 2010.  Now, this -- and

20   when I say "this" I mean this case isn't your first battle

21   with the authorities over imaging.  Right?

22   A.   Yes.

23   Q.   Okay.  And around 2010 did the Delaware medical board

24   tell you to use imaging for -- I'm sorry -- for cervical

25   injections?

```
 1    A.   Yes.

 2    Q.   Just for injections in the neck.  Right?

 3    A.   Yes.

 4    Q.   And did the Delaware medical board tell you that

 5    the imaging they wanted you to use was fluoroscopy?

 6    A.   Yes.

 7    Q.   Okay.

 8    A.   Fluoroscopy or CT.

 9    Q.   And did your license in Delaware go on probation?

10    A.   Yes.

11    Q.   With certain terms and conditions?

12    A.   Yes.

13    Q.   And did you fulfill those terms and conditions?

14    A.   Yes.

15    Q.   And was your license in Delaware restored?

16    A.   Yes.

17    Q.   When?

18    A.   2012 -- 2012, yes.

19    Q.   Without any conditions.  Correct?

20    A.   Well, actually, it was 2014 because there was a period

21    of time we had to do some remedial things.  And as of 2014 it

22    became unrestricted.

23    Q.   When it was restored, were there any conditions?

24    A.   No, sir.

25    Q.   Okay.  And as a matter of, I'm going to say reciprocity,
```

1    did Washington do anything to your license?

2    A.   No.  They just followed through with what Delaware

3    recommended, and once those stipulations were satisfied,

4    it satisfied both Delaware and Washington.

5    Q.   So in 2014, was your license in Washington free and

6    clear and unrestricted?

7    A.   Yes, sir.

8    Q.   And even in 2012 here in Washington, were you allowed

9    to perform spinal injections in any area without imaging?

10   A.   Yes.

11   Q.   So in '10 you started to look into imaging.  Correct?

12   A.   Yes.

13   Q.   And did you research both fluoroscopy and ultrasound?

14   A.   I did.

15   Q.   And how did you research them?

16   A.   Well, with fluoroscopy I got together with an

17   anesthesiologist who had the fluoroscopy machine, and I sort

18   of mentored under him for several weeks so that I could learn

19   the technique, et cetera.

20   Q.   And how did you research ultrasound?

21   A.   Ultrasound, I attended any number of meetings that

22   applied to the specialty, pain management.  There are a couple

23   of societies that cater to pain practitioners.  One is for

24   doctors that do interventions -- there's a certain segment of

25   physicians that do interventions and there's a segment that

1    don't.  So the societies that dealt with interventions would

2    have instructions and special workshops at these national

3    meetings where you could learn about ultrasound visualization.

4    It was the emerging technology that was more or less all the

5    rave.  You could not get room in some of these seminars, these

6    hands-on workshops as they call them, because this was another

7    way to visualize and guide you doing these types of

8    injections.

9        I failed to mention the literature.  We did extensive

10   literature search too regarding ultrasound versus fluoroscopy

11   et cetera.  Yes.

12   Q.   How many hours did you spend, just your best estimate,

13   on researching articles, talking to other practitioners, going

14   to seminars?

15   A.   Well, I made it a habit of trying to stay current.

16   They require you to do continuous medical education to renew

17   your license anyway.  But, in addition to that, because pain

18   management is a relatively new specialty -- it just started

19   in 1978, which was when I was in training.  It's been a rapidly

20   evolving field.  So lots more discoveries, lots more techniques

21   and technologies that came into bear with respect to how we

22   manage pain.

23      So we had to stay current, and so I did.  I can't give you

24   the number of hours.  But I love medicine and I love medical

25   science.  So that's what I do in my spare time.  I read all of

1    the time, and I'm researching, and especially because of

2    the directive given by Delaware, I really poured my attention

3    into specifically these visualization techniques.

4    Q.   And what technique did you decide upon using in your

5    practice?

6    A.   Right.  I decided that ultrasound was most appropriate

7    for my practice and my patient population because it allows

8    me to see all those tissues, the other tissues -- see, I don't

9    only do spinal injections.  We do injections of joints and

10   connective tissue as we call it, which are the tendons and

11   the ligaments and all those things.

12        So ultrasound allows you to see those fairly clearly.

13   You can even see nerves when they're fairly close to the

14   surface.  Fluoroscopy is an x-ray.  It allows you to see

15   bones, pretty much.  So the ultrasound was more appropriate

16   for my practice because I could visualize all of the tissues

17   that I have to treat.

18   Q.   Was there anything about fluoroscopy that you thought

19   would not be good for your patients?

20   A.   Well, when they do fluoroscopic guidance, they usually

21   inject the dye, and that's invasive.  You can have allergies

22   to the dyes, et cetera.  And of course, there's the radiation

23   factor.  Now, a lot of pain doctors will do injections for

24   your pain, but I'm a chronic pain management doctor.  And

25   there's a distinction because, as you heard from some of my

patients that came in, I've had patients with me for 15, 20, 25 years.

So we have to manage -- see, I'm trying to maintain function and also alleviate pain.  So the single objective is not to alleviate pain but to overall keep people functional. So we manage these people almost like a primary care doctor.

I have to look at what other medications they're taking and make sure that they don't interact with the kinds of medications we're using, and I have to interact with other doctors, their internists, their orthopedists, their rheumatologists.

A lot of other specialists, orthopedists and the like, would refer these patients to me.  So I have to be on top of everything because I'm managing the patient for a longer period of time; it's not just one and done in terms of trying to get rid of your pain.  It's following through, because most of these conditions are incurable.

There's no cure for degenerative joint disease, degenerative disc disease.  This is wear and tear.  So you try to preserve as much of the tissue and try to slow down the deterioration or the degeneration as much as possible.  That's long-term management and that's in contradistinction to other doctors who do acute management for pain.

Q.   Is there anything about the radiation that concerns you? Radiation from fluoroscopy?

1    A.   Yes.   Absolutely.   And especially for senior patients.

2    My practice was predominantly Medicare, which are disabled

3    and elderly patients, and there is a risk of -- a greater

4    risk in elderly parents of developing cancer if you have

5    multiple exposures to radiation.

6         These patients have already had plenty of x-rays

7    throughout their lives for one thing or another, they've got

8    bad joints, they've got bad backs, they've had plenty of

9    x-rays.   So, for me to intervene to try to help them with

10   their pain and their function and to expose them to repeated

11   radiation was not a good way to manage people long-term.

12   Q.   And what can happen from the exposure to radiation for

13   these types of patients?

14   A.   Cancer.   You have an increased risk of developing cancer.

15   In fact, radiologists have an increased risk of developing

16   cancer.   You can have on the lead jacket, et cetera, but

17   there's still an increased risk, and certainly for the

18   patients who don't have a lead jacket on.

19   Q.   Is there anything about your patient population that

20   would make this increased risk of cancer even greater?

21   A.   Well, yes.   Again, most practices have an even mix

22   of private patients versus Medicare, an even mix of acute

23   pain patients versus chronic pain.   Most doctors don't handle

24   chronic pain.   There's a subspecialized group such as myself

25   that deal with the chronic pain, and radiation is obviously a

1    risk factor when you're dealing with long-term management.

2        So I didn't think it was a good fit for my patient

3    population.  My patient population was predominantly Medicare.

4    Only 14 percent of the practices in the United States have

5    predominantly Medicare and don't have that even mix that I

6    was mentioning to you before.

7        Besides that, I developed this reputation of being the

8    last stop before surgery.  So a lot of patients came to me,

9    had already had surgery recommended, but they didn't want to

10   have surgery.  So we were trying to mitigate that and prolong

11   that or avoid that.  So we had a skewed population.  Our

12   practice was different from most practices in terms of the

13   patient demographic.

14   Q.   Did your patients have at this time -- what's a

15   comorbidity?

16   A.   Comorbidity is other things that -- other illnesses or

17   other problems that you have.  So a lot of my patients had

18   heart problems, kidney problems, liver problems.  They're on

19   multiple medications.  A lot of them came to me on heavy

20   opioids, being managed by other physicians.  And so these are

21   elderly people, and their bodies start to break down and they

22   had a lot of problems.

23   Q.   And did that make the risk of cancer go up, or down, or...

24   A.   With radiation exposure, certainly.  Yes.

25   Q.   It makes it go up?

917

1    A.    Yes.

2    Q.    Is that one of the reasons why you decided on ultrasound?

3    A.    Yes, sir.

4    Q.    Any other reasons?

5    A.    Yes.  There are many reasons, and one is that it's more

6    efficient and it was -- most of the literature and national

7    meetings and people who are known to be the authorities in

8    the field, the top researchers in the field, have published

9    articles, scholarly articles in scholarly journals that

10   indicate that ultrasound is an alternative to fluoroscopy or

11   CT, and even a preferable or better alternative for certain

12   patient populations.

13   Q.    Before we move on, can you give us kind of a description

14   of what the ultrasound machine does and how you apply it to a

15   patient?

16   A.    Yes.  They're sound waves.  And so it's a machine that

17   has a transducer.  You place it on the skin and it emits these

18   sound waves through the tissues, and what bounces back depends

19   on the density of the tissue, so you're able to develop a

20   picture, just like with prenatal care, you're able to develop

21   a -- and the machines have developed, again like the

22   specialty, such that the pictures are much clearer now and

23   you can really distinguish things quite well.

24   Q.    Turning your attention back to 2012, did you begin --

25   did you purchase an ultrasound machine?

```
 1        A.    I did.

 2        Q.    Did you begin to perform these injections with ultrasound

 3        imaging guidance?

 4        A.    Yes, I did.

 5        Q.    Did some of the injections require you to keep the

 6        ultrasound machine on so you could watch the needle go to

 7        a certain point as opposed to taking a picture and then

 8        doing it from memory?

 9        A.    Yes.

10        Q.    Which of those -- what injections are those?

11        A.    Those are primarily the spinal injections.  For the joint

12        injections and for some of the muscle injections, you don't

13        necessarily have to localize the needle.  As I was mentioning

14        to you, with the cervical region you want to be a little more

15        precise because the nerves are fairly close together, and this

16        is a visualization technique that allows you to see where the

17        needle tip is.

18              So you place the transducer on, and so it's real-time.

19        You're actually seeing where the needle is in the tissue.

20        You can identify the needle too.

21        Q.    And are those injections where you did that real-time

22        ultrasound, I'm going to call it --

23        A.    Yes.

24        Q.    -- the facet injections in the lower back area?

25        A.    Yes.  Those are the spinal injections.  That's the
```

1    category where you would want to use it in real time in

2    terms of visualizing the needle.

3    Q.   So those would be the facet injections in the lumbar

4    spine?

5    A.   Correct.

6            THE COURT:  Mr. Khouri, I'm going to ask you not to

7    lead the witness.

8            MR. KHOURI:  All right, Your Honor.

9    BY MR. KHOURI:

10   Q.   And are you familiar with what's in the indictment

11   in this case?

12   A.   Yes, I am.

13   Q.   What type of -- did you use ultrasound with all of

14   the facet injections?

15   A.   Yes, sir.

16   Q.   And can you describe whether -- how you used it?

17   Do you understand the question?

18   A.   I'm not sure.

19   Q.   Okay.  Neither am I.

20           Did you use -- which method did you use, the picture

21   or the real-time?

22   A.   I actually did both.  For every patient that came to my

23   office, even though I may have set up a series of -- a lot of

24   these procedures require a series.  So you do one injection

25   one week and then two weeks later you do a second and then two

1    weeks later you do a third.  And the theory is you're

2    decreasing inflammation.  Inflammation is really the king

3    of pain and that's what causes the breakdown of joints,

4    et cetera, et cetera.  So you're sequentially reducing that

5    inflammation so that you can eliminate the pain and the loss

6    of mobility and all those other bad things that come with it.

7    Q.   My question was, when you did a facet injection to the

8    patients in the indictment, did you use real-time ultrasound?

9    A.   I did.

10   Q.   Now, so we're back in 2012 again, and you're in your

11   practice.  Were you billing Medicare?

12   A.   Yes.

13   Q.   Can you describe how you billed Medicare for the

14   injections and ultrasound?

15   A.   Well, you would bill for the procedure, and you would

16   bill for the visualization technique.  Those were two separate

17   codes that we used in 2012.

18   Q.   Was one code for the injection?

19   A.   Correct.

20   Q.   And was the other code for the ultrasound?

21   A.   Yes.

22   Q.   And was there a specific code for the ultrasound?

23   A.   Yes.

24   Q.   Any problems?

25   A.   Not that I know of.

1    Q.   Were you getting paid by Medicare?

2    A.   Well, that's always a dance, but for the most part

3    I think they were being acknowledged, yes.

4    Q.   Was there anything -- at that time was there anything

5    bundled with the injection code, or was it a standalone?

6    A.   Yeah, it was a standalone.

7    Q.   Was there anything bundled with the ultrasound code,

8    or was it a standalone?

9    A.   Standalone.

10   Q.   Now, at some point in time, did you receive notice of

11   an audit?

12   A.   Right.  It was called a chart review.  They requested

13   the records on specific dates of 30 patients.

14   Q.   Is that the audit that the witness for the government

15   from the contractor testified to earlier in the trial?

16   A.   Yes.

17   Q.   Okay.  Now, did you learn anything about the codes at

18   that time?

19   A.   Yeah.  I learned that they had been bundled in 2015.

20   That's when the change occurred, and that's when everything

21   became a little more complicated.

22   Q.   I'm going to stop you right there.

23   A.   Yes.

24   Q.   When you say they were bundled in 2015, are you referring

25   to the injection code or the ultrasound code?

1    A.    The injection code was bundled with fluoroscopy and CT.

2    Q.    And was there a separate code that you were aware of for

3    ultrasound?

4    A.    There was still codes for ultrasound, yes.

5    Q.    Did you go through the audit?

6    A.    Yes.

7    Q.    Did you ultimately receive any notification of the

8    result?

9    A.    Yes.

10   Q.    And how were you notified?

11   A.    They sent a letter.

12   Q.    Did you read the letter?

13   A.    I did.

14   Q.    Did you understand the letter?

15   A.    Yes, sir.

16   Q.    And what did you understand the letter to say?

17   A.    It was reinforcement of if I used that particular code,

18   it would have to be with fluoroscopy and CT.  But, of course,

19   we were using ultrasound and we were trying to get clarity

20   on how we would proceed with billing Medicare properly using

21   ultrasound.

22   Q.    Did you agree with what was in the letter?

23   A.    No, because I wasn't using fluoro and CT.  I was using

24   ultrasound.  And we were trying to get at the proper way of

25   billing for that.

1   Q.   We'll get there.  Did you go out and buy a fluoroscopy

2   machine?

3   A.   No, I didn't.  The hospital had one.

4   Q.   Why didn't you buy a fluoroscopy machine and put that

5   machine in use?

6   A.   It was not a good fit for my patient population.  Again,

7   we're dealing with chronic pain patients, elderly patients,

8   and there's an increase risk to them.

9   Q.   So what did you do?

10   A.   So we tried to figure out how to satisfy Medicare.

11   We wanted to bill them properly for what we did, and we

12   always disclosed that we used ultrasound.  We never tried to

13   misrepresent that we were using fluoroscopy and CT.  So we

14   were trying to find the correct pathway for what we thought

15   was a good treatment modality for my patient population.

16   Q.   And this is around 2015?

17   A.   Correct.

18   Q.   And you got the letter in 2017.  Correct?

19   A.   Yes.

20   Q.   Did you start trying to figure out how to bill properly

21   using ultrasound in 2017?

22   A.   Yes, sir.

23   Q.   Who did you work with in this quest?

24   A.   Well, as my office manager mentioned, we did consult --

25   Q.   Who are you referring to?

1    A.    Erica Wright.

2    Q.    Okay.  Go ahead.

3    A.    So we said, okay, how do we get this done?  So she did

4    some research, I did some research, and we came up with what

5    we thought would pass muster for Medicare in terms of what we

6    were doing.

7    Q.    What did you do to come to the conclusion that you

8    ultimately came to?

9    A.    Well, we made a number of changes.  We stopped using the

10   bundled code and we started using other codes that the CPT

11   code book suggested that we use.  One was an unspecified code.

12   So if you -- it says if you didn't use fluoro or CT, then use

13   this code.  And that was the unspecified code.  We used that

14   code.  We tried that code, I should say.  And it also says

15   in the book, if you didn't use fluoro or CT and you used

16   ultrasound, to use this code.  And those codes were called

17   T codes, and we tried those.

18   Q.    Did they work?

19   A.    Neither the T codes or the unspecified codes worked,

20   and that was recommended in the CPT code book.

21   Q.    So we're going to get back to that, but what did you

22   and Erica do to try to get to the right code?  Did you talk

23   to people?  Did --

24   A.    Yes.

25   Q.    What did you do?

1   A.   Okay.  So, in addition to looking at the CPT code book

2   and combing through it and trying to figure out what Medicare

3   wanted us to do with using ultrasound visualization, we tried

4   those things, they didn't work.  We also spoke with other

5   billing experts.  I went to a number of seminars that dealt

6   with pain management codes specifically so that we could

7   get -- hopefully get more insight as to how to properly bill

8   those.

9        Many of the coding experts that we consulted with had

10  differing opinions about how to do it.  So I don't think

11  there was any consensus on how to make it clear to Medicare

12  what we were doing and how to get reimbursed for what we were

13  doing.

14  Q.   And did you believe that Erica was honestly assisting

15  you in good faith to find the answer?

16  A.   Absolutely.

17  Q.   And were you doing the same thing?

18  A.   Yes, sir.

19  Q.   So, again I'll ask you to recall the counts in the

20  indictment.  How did you start billing for ultrasound with

21  respect -- after the 2017 letter and into the time of the

22  indictment?

23  A.   Well, we would bill -- I told you we went through trying

24  the T codes and the unspecified codes, et cetera, and then we

25  came upon -- I'm not sure if it was Erica or myself -- I think

1    it was Erica.  I wasn't as intimately involved in the billing

2    as in retrospect perhaps I should have been.

3        But Erica I think came up with finding the 59 -- there's

4    a modifier and it's called 59, that unbundles the code for

5    doing the procedure.  It more or less lets Medicare know that

6    we're not using CT and fluoroscopy, but instead we're using

7    ultrasound.  And that 59 specifically says, okay, he's not

8    using -- he's unbundling it.  So you're taking those pieces

9    that were put together apart so that Medicare would recognize

10   that there's something different going on here.

11   Q.   Before you started using the 59 modifier, did you bill

12   the bundled code along with ultrasound?

13   A.   Yes.

14   Q.   Okay.

15   A.   Yes, I did.

16   Q.   So as a physiatrist, do you think it makes sense to do

17   fluoroscopy and ultrasound at the same time?

18   A.   No.  It would be redundant.

19   Q.   When you billed that way, and referring to billing the

20   bundled injection and fluoroscopy code, and an ultrasound

21   code, what were you trying to communicate to Medicare?

22   A.   I was always trying to alert Medicare to the fact that I

23   was an ultrasound guy.  So there was never any representation

24   that we were trying to do fluoro or CT.  We felt that would

25   stimulate -- in fact, we tried to reach out to Medicare to get

1    further clarity on how to bill it properly.  But we thought

2    that would at least stimulate to the claims examiners

3    questions about how to properly allow for the procedure we

4    were doing using ultrasound guidance.

5    Q.   Sometime after that, did you -- did Erica tell you about

6    the 59 modifier?

7    A.   Yes.

8    Q.   And did you start using the 59 modifier?

9    A.   We did.

10   Q.   So just to kind of recap the way the bill would look is

11   the bundled injection fluoroscopy code plus ultrasound, and

12   then later on the bundled injection fluoroscopy code plus

13   ultrasound plus the modifier.

14   A.   Yes.

15   Q.   Did you want to get paid?

16   A.   Yes.

17   Q.   By Medicare?

18   A.   Yes.

19   Q.   Did you ever intend to deceive anybody?

20   A.   No, sir.

21   Q.   How did the auditors find out that you were using

22   ultrasound and not fluoroscopy?

23   A.   We told them.  I mean, when they requested our notes,

24   it's everywhere in our procedure reports and in our chart

25   slips that ultrasound was the way that we were guiding the

1    spinal injections.

2    Q.   Let me change gears here for a little bit, and I want to

3    ask you about how you do the injections.  How do you position

4    the patient?

5    A.   We're talking about spinal injections?

6    Q.   I'm sorry.  Spinal injections.

7    A.   Well, you can do it -- for classic spinal injections I

8    have the patient lying on their side, and we perform the

9    injection with my assistant usually on the other side of the

10   table.  A lot of these patients have needle phobias, I have

11   one myself, so we would anesthetize the patient in the area

12   we're going to treat to mitigate any injection soreness and

13   decrease their fear of the needle and that sort of thing.

14   Q.   Okay.  Hold on, Doctor.  When you say lying on their

15   side, the patient is facing away from you.  Right?

16   A.   The patient is facing away from me.  Their back is

17   towards me.

18   Q.   Now, before you put the needle in, do you apply anything

19   to the patient?

20   A.   Yes.  So as I was -- I think I got lost in my thought

21   from your previous question, and that is I do diagnostic

22   ultrasound so that every time a patient comes in to see me,

23   I reevaluate them, even if they have a series of injections.

24   You don't just come in and get an injection.  You have to be

25   reevaluated.  So I have to examine them.  And then I actually

1    use the ultrasound -- you can use the ultrasound to find out

2    where the inflammation is.  It lights up, so you can see

3    exactly where you need to target.

4         So that's the first thing that I did.  And then once we

5    find out where the targets are, what's still hot, what's still

6    lighting up on the screen, then we actually use the ultrasound

7    to guide us.  We have these special needles, we can see the

8    needle a little better, to guide us into the areas of

9    inflammation.

10   Q.   Before you put the needle in, do you put anything on the

11   skin?

12   A.   Yeah.  We use topical anesthesia.  It's something called

13   ethyl chloride.  And -- yeah.

14   Q.   Okay.  Topical anesthesia.  Do you use any other type of

15   anesthetic as you're injecting the patient as the needle goes

16   inside?

17   A.   Yes.  Lidocaine is another anesthetic.  It's a

18   short-acting anesthetic that we use while we're actually

19   inserting the needle.

20   Q.   Does that come out of the same needle as the medicine

21   comes out of?

22   A.   Yes.

23   Q.   So how do patients react when the needle goes in with

24   the anesthetic?

25   A.   Well, most of them could barely feel it if they felt it

1    at all.  That was the idea, to not add pain but to do these

2    injections pretty much pain-free.

3    Q.   How do the people that don't feel it at all react?

4    A.   I'm sorry?

5    Q.   Do some people just not know they're getting an

6    injection?

7    A.   There are many occasions when we say, okay, we're all

8    done.  And they say whoa, I didn't know.  So, yes, I think

9    that the anesthesia was adequate enough for people not to

10   always feel what was going on, and they didn't necessarily

11   know that we were finished.

12   Q.   So let's go back to the staff that you had at the time

13   of the indictment.  You had Erica Wright.

14   A.   Yes.

15   Q.   And what was her responsibility?

16   A.   She was the office manager.  So she handled general --

17   all the administrative responsibilities of the office,

18   including the billing.

19   Q.   And who else was there at the office?

20   A.   We had a medical assistant, Kenrick Cooper, and we had

21   a receptionist, Lena Thompson.  Well, she wasn't there the

22   entire time, but the last person that was there was Lena

23   Thompson.

24   Q.   What about a woman named Maya?

25   A.   Maya started with me in 2012 and left in 2016.  So right

1    after we moved into the new office, Maya was there, but she

2    was in the -- mainly doing administrative and front -- we call

3    it -- so we call front office the administrative side of the

4    practice, back office is the clinical side of the practice.

5    That's where I'm doing my exams and my procedures et cetera.

6    So front office is where Maya was primarily.

7    Q.   Was she ever in the room when you performed injections?

8    A.   Yes.  On occasion.  Everybody in the office is trained to

9    be cross-trained so that if somebody's absent, somebody else

10   can fill in.  So there were occasions when she was in the exam

11   room.

12   Q.   How would the gel get on the ultrasound machine before

13   you apply it to the patient?  Who put it on?

14   A.   I applied the gel.  I applied the gel.

15   Q.   And who cleans it up afterward?

16   A.   Mainly the medical assistant, but I would -- I mean, it

17   was a very busy practice, and we have more than one exam room.

18   So while they're preparing another patient, sometimes they

19   wouldn't be available and I'd just go ahead and take care of

20   all of that myself.

21   Q.   By the way, what's gel -- is it Gel-One or One-Gel?

22   A.   Yes.

23   Q.   What's it called?  What's the exact --

24   A.   Gel-One is not the ultrasound gel.  That's a --

25   Q.   I get it.  What is Gel-One?

A.   Gel-One is a -- it's called hyaluronan.  You've probably
heard of it because they're using it in all sorts of places
now for your skin fillers, et cetera.  But it is a component
of your joints.  Hyaluronan is a part of what we call synovial
fluid that's in your joints.  And we add this synthetic
hyaluronan to degenerating joints to lubricate them.  And
a lot of our patients had bone on bone, and they were
recommended to go to surgery, and this lubricates it in a way
that they can still tolerate weight bearing on those joints.

Q.   Were there different types of gels that you used for
arthritic joints in the office?

A.   Well, the hyaluronan became very popular when it was
introduced.  It was effective.  So many companies started
developing their own hyaluronan preparations.  So there were
approximately 17 different preparations of this gel.  Gel-One
was just one of them.  There were 16 others that you could
choose from.

Q.   How many others -- well, did you have others besides
Gel-One in your --

A.   Yes, I did.

Q.   To use for the same purpose?

A.   Yes.

Q.   What were those brand names?

A.   Supartz, Euflexxa, OrthoVisc, Synvisc.  I went through
many of them.  The drug reps would come around and they'd want

1    you to use their product.  So we tried them, but we preferred

2    Gel-One because we didn't have to do as many injections.  A

3    lot of them required that the patient come in once a week for

4    five weeks, you have to give them an injection.  That was too

5    much for some of my elderly patients, so we landed on Gel-One.

6    That was my go-to because the patients didn't have to come in

7    as frequently and made it a lot more user friendly and

8    convenient for the patients.

9    Q.   Did you have enough of these gels, whatever brand, to do

10   all your injections?

11   A.   Sure.

12   Q.   And we heard about a drug salesman who said Gel-One was

13   one syringe to a patient?

14   A.   Right.

15   Q.   Did you give less than that?

16   A.   Depending on the patient and the presentation, sometimes

17   my best clinical judgment, depending on how much congestion

18   was in the joint, et cetera, we didn't always use a full

19   syringe of it, no.

20   Q.   Why not?

21   A.   Because, again, it depended on how congested the joint

22   was and how severe the presentation was.

23   Q.   Did you have an impression that the drug salesman had

24   another motive --

25            THE COURT:  Mr. Khouri, please don't lead the witness.

1          MR. KHOURI:  All right, Your Honor.  Thank you.

2     BY MR. KHOURI:

3     Q.   Did you have any impression --

4          THE COURT:  Please go to the phone.

5          (Bench conference.)

6          THE COURT:  Ms. Willis, if you have an objection, you

7     need to stand up and make the objection.  I don't know what

8     halfway coming out of your seat means.

9          Second of all, if the government has decided not to make

10    a single objection during this presentation, that's on them.

11    But I've not said anything during a lot of what is leading,

12    but I'm not going to have Mr. Khouri testifying, which is why

13    I just cautioned him.

14         Yes, Ms. Willis.

15         MS. WILLIS:  Our only objection is that that calls

16    for speculation as to what the sales reps were thinking.

17         THE COURT:  It's objectionable on a number of fronts,

18    but so is a lot of other testimony that you haven't objected

19    to.  So I'll sustain the objection.

20         (End of bench conference.)

21         THE COURT:  Objection sustained.

22    BY MR. KHOURI:

23    Q.   Let's talk about some of the counts in the indictment,

24    briefly.  Now, do you remember patient K.M.?

25    A.   Yes.

1    Q.   Can you remember the exact days that she treated just

2    off the top of your head?

3    A.   No, sir.  I'd have to refer to my chart.

4    Q.   Would it refresh your recollection to refer to your

5    chart?

6    A.   I'm sure it would, yeah.

7    Q.   And I'm interested in the dates of service of March 31,

8    2016, and October 13, 2016.

9        If it's all right with the Court, could you refresh your

10   recollection from -- or attempt to refresh your recollection

11   from your patient chart?  And then I'll have some questions to

12   ask you after you read it.

13            THE COURT:  Do you have it, Mr. Khouri?

14            MR. KHOURI:  I think he has it, Your Honor.

15            THE WITNESS:  It's in my briefcase.  Yes.  I can do

16   that.

17            MR. KHOURI:  May I retrieve it?

18            THE COURT:  Yes.

19        (Counsel retrieves document, tenders to the witness.)

20            THE COURT:  All right.  We need to take a short break.

21   So, ladies and gentlemen, let's come back at five after 11:00.

22   Thank you.  All right.  Let's make it 10 after 11:00.  My

23   court reporter has been going since before you all came in.

24   So he needs a break.  Thank you.

25        (Jury out at 10:59 a.m.)

1          THE COURT:  All right.  Mr. Gooding, you're still

2     on the stand so I'm going to ask you not to talk about the

3     subject matter of your testimony, even with your lawyers,

4     while you're a witness on the stand.

5          THE WITNESS:  All right.

6          THE COURT:  Thank you all.  See you at 10 after 11:00.

7      (Recess from 10:59 a.m. to 11:15 a.m.)

8          THE COURT:  All right.  Mr. Khouri, you may continue.

9     Dr. Gooding, you may retake the stand.

10     (Witness resumes the stand.)

11   BY MR. KHOURI:

12   Q.   All right.  I think, Doctor, I was asking you about

13   March 31, 2016, October 13, 2016, for Karen Mackey.  Would

14   it refresh your recollection if you looked at your chart?

15   A.   Yes, sir.

16        MR. KHOURI:  May I approach, Your Honor?

17        THE COURT:  Yes.

18   BY MR. KHOURI:

19   Q.   So, look at those two dates, and don't say anything.

20   Just look at those two dates.

21        THE COURT:  Can you direct him to what portion of

22   the document, page, what part of the document?

23        MR. KHOURI:  I don't know what page, but the date

24   of service would be March 31, 2016, and October 13, 2016.

25     (Witness reviewing document.)

```
 1                 THE WITNESS:  Okay.
 2       BY MR. KHOURI:
 3       Q.   You can close the chart up now.
 4            Is your recollection refreshed?
 5       A.   Yes.
 6       Q.   What did you -- how did you treat Ms. Mackey on those
 7       two dates?  I'm sorry.  Patient K.M. on those two dates.
 8       A.   It was a knee problem.  How did I treat them?  If I may
 9       refer again?  Yeah.  I performed an injection for the knee.
10       Q.   And how long had she been your patient?
11       A.   I don't recall offhand.  Let's see --
12                 THE COURT:  Well, no.  If you don't recall, then you
13       have to --
14       BY MR. KHOURI:
15       Q.   I'm talking about overall.  How long had she been your
16       patient.  Do you recall?
17       A.   Not exactly.
18       Q.   Would it refresh your recollection to look at your chart?
19       A.   Yes.
20       Q.   Okay.  Go ahead.
21            (Witness reviewing document.)
22       A.   November 2015.
23       Q.   Go ahead and close up the chart.
24       A.   Okay.
25       Q.   So she was your patient from November 2015 for how long?
```

1    A.   I think until 2016.

2    Q.   All right.

3         MR. KHOURI:  Your Honor, may I have a moment, please?

4         THE COURT:  Yes.

5         MR. KHOURI:  Thank you.

6    BY MR. KHOURI:

7    Q.   So do you remember patient Swift Burch?

8    A.   I do vaguely.

9    Q.   Would it refresh your recollection to look at your chart?

10   A.   Yes.

11        MR. KHOURI:  Your Honor, may I approach?

12        THE COURT:  Yes.

13      (Witness reviewing document.)

14   BY MR. KHOURI:

15   Q.   And I'm interested in the dates of February 24, 2016,

16   and July 13, 2016.

17   A.   Okay.

18   Q.   And how did you treat Mr. Burch on those occasions?

19   A.   I provided an injection in his left knee.

20   Q.   Okay.  All right.  Did you inject Ms. Mackey in her back

21   on those dates that I mentioned?

22   A.   May I...

23        THE COURT:  Are you saying you don't remember?

24        THE WITNESS:  I don't.

25

1      BY MR. KHOURI:

2      Q.   Would it refresh your recollection to look at the chart?

3      A.   Yes.

4      Q.   So I'm talking about March 31, 2016, and 10/13/2016.

5           (Witness reviewing document.)

6      A.   Yes.

7      Q.   What kind of service did you provide on those dates?

8      A.   I provided pain management by way of an intra-articular

9      injection to the knee as well as a block of the nerves that

10     supplied the knee.

11     Q.   And where's that nerve?

12     A.   It's L3 and L4.

13     Q.   And what's L3 and L4?

14     A.   Those are spinal nerves that come out of the lower spine,

15     and they actually supply the knee.

16     Q.   So let's talk about patient K.M.  What areas of the body

17     did you inject?

18     A.   I don't recall.  I believe it was left knee.  It was the

19     knee, I think.

20     Q.   And was there another portion of the body that you injected?

21     You just said --

22     A.   May I refresh?

23     Q.   Sure.

24     A.   Okay.

25     Q.   March 31, 2016, October 13, 2016.

1          (Witness reviewing document.)

2     A.   It was left knee, and again, we injected the nerves that

3     supply the knee.

4     Q.   Which are where?

5     A.   In the lower back.

6     Q.   Okay.  And was that a spinal injection?

7     A.   Yes.

8     Q.   Did you use ultrasound?

9     A.   Yes.

10    Q.   Did you -- with respect to the spinal injection, was

11    it real-time ultrasound or just once at the beginning?

12    A.   Real-time ultrasound.

13    Q.   Now, when you inject a patient, do you inject just

14    one area?

15    A.   It depends on where the inflammation is, where the

16    pain sites are.

17    Q.   Can you inject more than one area with one jab?

18         MS. WILLIS:  Objection, Your Honor.

19         THE COURT:  Sustained.  Leading.

20    BY MR. KHOURI:

21    Q.   Under what circumstances would you inject more than

22    one area?

23    A.   If I have identified areas of inflammation in multiple

24    places.

25    Q.   Do you take the needle all the way out and put it back

1    in again?

2              MS. WILLIS:  Objection, Your Honor.

3              THE COURT:  Leading.  Sustained.

4    BY MR. KHOURI:

5    Q.   How do you inject more than one area?

6    A.   Well, depending on what we're doing, if there are pain

7    generators that are close to each other, a lot of times these

8    structures are only a few centimeters away, you can -- there's

9    a technique called -- the location of the needle goes in so

10   that you can move it to the different sites without pulling

11   it completely out and re-sticking the patient.  You can pull

12   it back to the subcutaneous tissue, redirect the needle, and

13   inject the other sites where there's inflammation in close

14   proximity.

15   Q.   When you use that redirection technique, how many

16   injections would you bill for?

17   A.   It depends on how many sites were injected.  Generally

18   speaking, when I use the redirection technique in the spinal

19   area, it was two or three.  But, again, it depends on the

20   patient and where the inflammation was identified.

21   Q.   And why did you bill for two or three injections when

22   you only stuck the patient once?

23   A.   Because an injection means that you're delivering

24   medicine by way of a syringe and a needle to a tissue.

25   There's no requirement that you pull the needle completely

1    out; and in fact, it's recommended, that with this technique

2    that you are saving the patient from obviously the pain of

3    multiple injections.  You're decreasing the risk of infection.

4    You're increasing the patient's compliance because they're not

5    as fearful of having all of these sticks, as it were.  So it's

6    a more user-friendly, patient-friendly technique.

7    Q.   All right.  Now let's go to patient Swift Burch.

8    Do you remember anything generally about your treatment

9    of that patient?

10   A.   Yes.  Generally.

11   Q.   What do you remember?

12   A.   I believe I treated his knee.  A similar situation that

13   we were discussing previously.

14   Q.   And did you treat the nerves that supplied the knee?

15   A.   Right.  So I don't automatically do that with every

16   patient.  It just depends on whether or not they also have

17   degenerative disc disease, meaning that they've got -- or

18   degenerative joint disease in the lower spine.

19        So the nerves come out of a little hole, the foramen,

20   and if there's inflammation around the joint or if there's

21   degeneration creating inflammation around the joint, it can

22   irritate that nerve.  That nerve supplies the knee.  You don't

23   have to feel back pain to feel the pain that's being generated

24   by the nerve if the nerve is being irritated.

25        So whenever I would do the nerve block for the knee as

1    well as the injection in the knee itself, it was to address

2    both of those things that were causing the pain.

3    Q.   What's referred pain?

4    A.   Referred pain is -- again, the nerves are very

5    complicated, and you can have pain in a hip joint and it can

6    refer down to the knee.  You can have pain in the back and it

7    can refer to anywhere in the leg.  Sometimes you're going to

8    have pain in the foot and you have a pinched nerve in your

9    back.

10        So you don't always have to have both.  It depends on the

11   level of irritation of the nerve or damage of the nerve.

12   Q.   Could pain in your knee be caused by something going on

13   in your back?

14   A.   Yes.

15   Q.   Okay.  So, for the Court's reference, these are Counts 10

16   and 11.

17        Do you remember what you did with Mr. Burch on February

18   24 and July 13 of 2016?

19   A.   If those are the dates in question that I just reviewed,

20   I did an injection in the knee, and I also injected the nerves

21   that supply the knee because of the conditions I just

22   described.

23   Q.   And where were those nerves that supplied the knee?

24   A.   They're in the lower back.

25   Q.   Did you use real-time ultrasound on those lower back

1     injections?

2     A.   Yes, sir.

3     Q.   Do you remember patient Gregory Browne?

4     A.   Yes.

5     Q.   And these are Counts 3 and 4.  Do you remember anything

6     about Mr. Browne?

7     A.   I do.

8     Q.   By the way, I just want to circle back to Ms. Mackey.

9     Do you remember if she had any back problems -- well, let me

10    start over again.  Do you remember you referring her out for

11    an MRI?

12         MS. WILLIS:  Objection, Your Honor.

13         THE COURT:  You're leading, Mr. Khouri.

14    BY MR. KHOURI:

15    Q.   Do you remember referring her out for any imaging?

16         THE COURT:  Sustained.

17         MS. WILLIS:  Objection.

18    BY MR. KHOURI:

19    Q.   Did you ask her to receive any other treatment?

20    A.   Well, I did request that she have some diagnostic test

21    performed on her lower back.

22    Q.   Do you recall what the results of those diagnostic tests

23    were?

24    A.   Yes.  She had an MRI, which revealed that she had

25    degeneration in the lower spine, and that's the disc as

1    well as the joints.

2    Q.   So Gregory Browne, do you remember anything about

3    Mr. Browne?

4    A.   Yes.

5    Q.   What do you remember?

6    A.   He's a fine patient.  I really enjoyed him.

7         And he had back problems and joint problems.  The knees,

8    the hips, his fingers.

9    Q.   Can you recall what service you performed on November 10,

10   2016?

11             THE COURT:  For?  For Mr. Browne?

12             MR. KHOURI:  For Mr. Browne, yes.

13             THE WITNESS:  I can't recall off the top, no.

14   BY MR. KHOURI:

15   Q.   How about -- would it refresh your recollection if you

16   looked at the chart?

17   A.   I believe so, yes.

18   Q.   Okay.

19             MR. KHOURI:  May I approach, Your Honor?

20             THE COURT:  Yes.

21             THE WITNESS:  Thank you.

22        (Witness reviewing document.)

23             THE WITNESS:  What were the dates, sir?

24             MR. KHOURI:  Two types of services both on November 10,

25   2016.

```
1              THE WITNESS:  2016.
2         (Witness reviewing document.)
3              THE WITNESS:  October 19, 2016?
4              MR. KHOURI:  I'm sorry.  October 10, 2016.
5              THE COURT:  I thought you said November 10.
6              MR. KHOURI:  I'm sorry.  November 10, 2016.
7              THE WITNESS:  There we go.  I have it.  Yes.
8         (Witness reviewing document.)
9              THE WITNESS:  Yes.
10    BY MR. KHOURI:
11    Q.   What did you do on that day?
12    A.   I performed an injection into his hip.
13    Q.   What did you inject into the hip?
14    A.   I injected a combination of medications.  It's a
15    cocktail.  One is for inflammation, one is for anesthesia,
16    one is short-term, one is long-term.  And hyaluronan.
17    Q.   Is that -- what's the brand name for that drug?
18    A.   Gel-One.
19    Q.   And did you perform any other injections on that date,
20    on Mr. Browne?
21    A.   Yes.  I injected the nerves that supply the hip area.
22    Q.   Where are the nerves that supply the hip area?
23    A.   The lower, lumbar spine.
24    Q.   What's the common name for the lumbar spine?
25    A.   Lower back.
```

947

1    Q.   Now, the bill -- do you know anything about the bill

2    that would go out for that injection into the hip to Medicare?

3    A.   I don't offhand, no.

4    Q.   Are you familiar with diagnosis codes and the procedure

5    codes?

6    A.   Yes.

7    Q.   So when your office billed the services rendered to

8    Mr. Browne, what would the procedure code be?

9    A.   For intra-articular injection and for nerve block.

10   Q.   What about -- which one's the Gel-One?

11   A.   Oh, the Gel-One is another code for the medication.

12   Q.   How would the bill reflect what the patient's problem

13   was?

14   A.   I have progress notes, and on the charge slip for that

15   day I list out the diagnoses that were appropriate that we

16   were treating.

17   Q.   And what diagnoses did you list out on the chart?

18   A.   Osteoarthritis of the hip.

19   Q.   So let's go to Allene McDuffie, which are Counts 5 and 6.

20   Do you remember anything about Ms. McDuffie?

21   A.   I do, generally speaking, yes.

22   Q.   And what do you remember about her generally speaking?

23   A.   Another lovely patient, and I primarily treated her

24   shoulder.  She had rotator cuff issues and shoulder arthritis

25   issues.

1    Q.    Do you remember anything about the dates of service on

2    November 11 and October 11, 2016?

3    A.    Vaguely I do, yes.

4    Q.    What do you remember?

5    A.    Well, it was a different chief complaint on that date

6    of service.  Normally I was treating her shoulder, but she

7    said she was in a car, I believe, and reached -- I'll have to

8    refresh the exact history, but she had an incident where she

9    strained her lower back, essentially, and I evaluated her on

10   that date of service for the lower back strain.

11   Q.    Do you remember what kind of procedures you performed

12   on those dates?

13   A.    I do not.

14   Q.    Okay.  Now, keeping in mind that the dates in the

15   indictment might be approximate, would it refresh your

16   recollection if you looked at her chart?

17   A.    Yes.

18           MR. KHOURI:  May I approach, Your Honor?

19           THE COURT:  Yes.

20           THE WITNESS:  Thank you.

21      (Witness reviewing document.)

22           THE WITNESS:  Okay.

23   BY MR. KHOURI:

24   Q.    So what procedure did you perform on Ms. McDuffie on

25   October 11, 2016?

1    A.   I performed a sacroiliac block.

2    Q.   And what about on November 11, 2016?  I'm sorry.

3    A.   October?

4         MS. WILLIS:  Objection.

5         THE COURT:  If you're refreshing recollection,

6    you can't have the witness reading from the record.

7         MR. KHOURI:  Okay.  I see that.

8      Could you close that up, Doctor?

9         THE WITNESS:  Sure.

10        MR. KHOURI:  Thank you.

11   BY MR. KHOURI:

12   Q.   After looking at your chart, is your recollection

13   refreshed?

14   A.   Yes.

15   Q.   Okay.  And on October 11, 2016, what procedures did

16   you perform?

17   A.   I performed a sacroiliac block as well as the spinal

18   nerves that supplied that area.

19   Q.   And where are the spinal nerves that supply that area?

20   A.   Lower back.

21   Q.   When you say sacral iliac -- is that how you pronounce

22   that?  Where's that?

23   A.   That's the lower back as well.  It's the joint that

24   connects your spine to your pelvis.  It's the joint right down

25   here.

1          THE COURT:  Let the record reflect the witness is --
2     can you point again, Doctor?
3          THE WITNESS:  Sure.
4          THE COURT:  He's taking his right hand and pointing
5     to the top -- the right lower back area.
6          THE WITNESS:  Yeah.
7          THE COURT:  Is it posterior hip section?  Am I right
8     there?
9          THE WITNESS:  Posterior, yes.
10    BY MR. KHOURI:
11    Q.   Were you pointing below your belt, like where your back
12    pocket is or above the belt?
13    A.   Yes.  Below my belt.
14    Q.   About midway down the back pocket of your suit?
15    A.   Yes.
16    Q.   Okay.  So let's go to patient Yvonne Anderson.
17         Do you remember anything about Yvonne Anderson?
18    A.   I do.
19    Q.   And what do you remember about Ms. Anderson?
20    A.   Ms. Anderson treated with me for a very long time.
21    She primarily had problems in her lower back, but it's not
22    uncommon for some of these patients to have -- if you have
23    degeneration in your spine, particularly the lower back because
24    that is one of your main shock absorbers, and then the other
25    major joints in your lower extremity, your hip and your knee

```
1    are the other two major shock absorbers.

2      So Ms. Anderson had some severe problems in her lower back.

3    She treated with me for a long time, and we kept her on her

4    feet.  So we mainly treated her lower back, but we would treat

5    the joints in the lower extremity from time to time as well.

6    Q.   Do you recall what procedure you performed on Yvonne

7    Anderson on June 14, 2017?

8    A.   I do not recall.

9    Q.   Would it refresh your recollection if you looked at her

10   chart?

11   A.   Yes.

12            MR. KHOURI:  May I approach, Your Honor?

13            THE COURT:  Yes.

14            THE WITNESS:  Thank you.

15        (Witness reviewing document.)

16            THE WITNESS:  Okay.

17   BY MR. KHOURI:

18   Q.   You can close it up now.

19   A.   I want to make sure I have the right date.

20   Q.   Okay.

21        (Witness reviewing document.)

22   A.   Was it 6/14?

23   Q.   June 14, '17.

24   A.   Correct.  Okay.

25   Q.   Is your recollection refreshed?
```

952

1    A.    Yes.

2    Q.    And what happened on June 14, '17?

3    A.    I treated her left hip as well as her spinal nerves

4    bilaterally.

5    Q.    The spinal nerves that supply the hip?

6    A.    No.  The spine -- well, yes.  They do supply the hip,

7    but I treated some other nerves that were primary loci or

8    sites of inflammation.

9    Q.    How did you treat the hip?

10   A.    With an injection of the anti-inflammatory and the

11   hyaluronan, I believe.

12   Q.    What was the brand name of that drug?

13   A.    I didn't notice, but might have been Gel-One.

14   Q.    Okay.  And do you recall what your diagnosis was that

15   you put in your chart?

16   A.    May I refresh?

17   Q.    If the Court says it's okay.  Would it refresh your

18   recollection to look in your chart?

19   A.    Yes.

20   Q.    And what was the diagnosis code that you used for that

21   procedure?

22         (Witness reviewing document.)

23   A.    Her diagnoses were subchondral cyst, osteoarthritis,

24   spondylosis and radiculopathy.

25   Q.    Do you have any idea what actually went out on the bill

1    that was electronically submitted to Medicare as a diagnosis

2    code?

3    A.    I do not.

4    Q.    Okay.  And finally, do you remember a patient named

5    James Gilchrist?

6    A.    Yes.

7    Q.    What do you remember about Mr. Gilchrist?

8    A.    Mr. Gilchrist had multiple problems, lower back and knee

9    primarily.  I'm sorry.  James Gilchrist was primarily knee.

10   Yes.

11   Q.    Would it refresh your recollection if you looked at his

12   chart?

13   A.    Yes.

14   Q.    And I'm specifically asking you about dates of service

15   on February 16, 2016, and February 27, 2018.

16              MR. KHOURI:  May I approach, Your Honor?

17              THE COURT:  Yes.

18        (Witness reviewing document.)

19              THE WITNESS:  Okay.

20   BY MR. KHOURI:

21   Q.    What happened on February 16, 2016?

22   A.    I examined the patient and determined that he had

23   inflammatory osteoarthritis of the knees and provided an

24   intra-articular injection there using Synvisc-One.

25   Q.    Did you inject the nerve supplying the knee at that time?

1    A.   I believe so, yes.

2    Q.   Could you look and check and make sure?

3    A.   Absolutely. (Witness reviewing document.)

4         Yes.

5    Q.   And what about on February 27, 2018?

6    A.   Okay.  (Witness reviewing document.)

7         Yes.

8    Q.   What happened on that day?

9    A.   That day I injected both of his knees bilateral

10   and the nerves that supplied them, in the lower back.

11   Q.   Now, I've just got some final questions to ask you.

12   Are all these charts that you are using to refresh your

13   recollection, are they your office charts that you kept

14   on every patient?

15   A.   Yes, sir.

16   Q.   And did you make notes in the charts around the time

17   that you treated the patient?

18   A.   Yes.

19   Q.   Okay.  Now, are you familiar with the different types

20   of medical specialties that practice pain management?

21   A.   Yes.

22   Q.   What types of medical specialties practice pain

23   management?

24   A.   You name it.  There are very many.  Internists,

25   neurologists, interventional radiologists, anesthesiologists,

1    psychiatrists, orthopedists and rheumatologists.

2    Q.   Are you familiar with how the different specialties treat

3    pain?  And I'm referring specifically to spinal injections.

4    A.   Yes.

5    Q.   How do the different specialties differ from physiatry?

6    A.   90 percent of the spinal injections are performed by

7    anesthesiologists or interventional radiologists.

8    Physiatrists are -- the physiatrists don't always do spinal

9    injections.  There's a certain subsegment of physiatrists that

10   do what we call interventional pain management.  So we do the

11   spinal injections as well.

12       And the approaches are quite different.  Physiatry's

13   orientation with our training is again a comprehensive

14   approach to the -- treating the nerves, the muscles and the

15   joints, and our objective is to restore function, to keep

16   people going for long period -- keep them going for as long

17   as we possibly can.

18   Q.   In terms of the frequency of the injections, is there a

19   difference --

20              THE COURT:  Do you have an objection?

21              MS. WILLIS:  Objection.

22              THE COURT:  To the -- pick up the phone, please.

23              MR. KHOURI:  I'll rephrase.

24          (Bench conference.)

25              THE COURT:  Yes, Ms. Willis.

956

1          MS. WILLIS:  I think getting into these questions about

2     people in different fields, how often they do things, is a bit

3     speculative.  He hasn't laid the foundation that this witness,

4     who doesn't practice in those fields, would actually know.

5          THE COURT:  That's correct.  Objection sustained to

6     that line of questioning, Mr. Khouri.  Unless you have a

7     proffer?

8          MR. KHOURI:  I can ask him about whether he's gone to

9     conferences with these different doctors and whether he's

10    studied about the frequency of injections by these different

11    doctors.

12         THE COURT:  Well, as you emphasized previously,

13    he's not being charged with malpractice or even incompetence.

14    He's being charged with Medicare fraud.  And I know certainly

15    there's an issue of intent.  He's testified extensively about

16    his intent and the reasons he did the billing.  But I think

17    this line of questioning as to what other specialists do and

18    how they manage pain, and whether physiatrists are -- I just

19    don't see how that goes to any of the elements.

20         MR. KHOURI:  It goes to the summary charts.  The

21    summary charts that say he billed this particular code more

22    than anybody else.

23         THE COURT:  Then I think your questions need to be a

24    little more directed to that issue.

25         MR. KHOURI:  All right.

1          THE COURT:  Thank you.

2      (End of bench conference.)

3          THE COURT:  Objection sustained.

4   BY MR. KHOURI:

5   Q.   Over the years, have you learned the different techniques

6   by the different medical specialties in pain management?

7   A.   I didn't get the question.

8   Q.   Have you learned the different techniques used by

9   different medical specialties with respect to pain management

10  over the years?

11  A.   Yes.

12  Q.   Okay.  Have you read about it in medical journals?

13  A.   Yes.

14  Q.   And have these medical journals been specific to the

15  different specialties that you mentioned previously?

16  A.   Yes.

17  Q.   Have you gone to conferences where these other --

18          THE COURT:  I think the question, Mr. Khouri, in a

19  non-leading way would be how has he learned?

20          MR. KHOURI:  I'm sorry?

21          THE COURT:  The non-leading question would be how

22  has he learned this, without leading him.

23          MR. KHOURI:  Okay.

24  BY MR. KHOURI:

25  Q.   And how have you learned that?

A.   Through reading and attending conferences and talking
to colleagues.

Q.   All right.  Have you learned whether there's a difference
in the frequency of injections used by --

A.   Yes, by nature of the specialty, there's a difference,
yes.

Q.   Does having a chronic pain management practice affect
the frequency of injections?

A.   I'm not quite sure how to answer that.  I think chronic
pain management is a different animal than acute pain
management.

Q.   And how is it different?

A.   Well, with acute pain management you're generally giving
episodic care, meaning you're just trying to alleviate the
pain acutely, right then and there, and usually your pain is
supposed to go away after a certain amount of time.

Chronic pain is a different animal because the nervous
system turns into something else when the pain doesn't go away
when it's supposed to.  So pain is a protective mechanism.
It's a warning sign.  When that warning sign stays on for too
long, the nervous system says okay, we've got a problem here
so we've got to increase our sensitivity to protect the
person.

So with chronic pain you often get -- it's a fancy term,
but the nerves start communicating with each other and they

1    start saying, okay, listen, we've got a problem over here or

2    over here, so we're going to be extra vigilant to make sure

3    this person doesn't hurt themselves anymore.  And so with

4    chronic pain management we have to monitor and intervene on

5    a regular basis.

6    Q.   Is that different, the regular basis different than

7    someone who has an acute pain practice?

8    A.   Yes.  Many of the acute pain practices will provide

9    opioids or they will provide anti-inflammatory medication, or

10   they will do -- a lot of your interventional radiologists that

11   I mentioned before and your anesthesiologists, orthopedists or

12   rheumatologists or internists will write a prescription and

13   say look, would you kindly give this patient a nerve block in

14   the lower back area because we've discovered a problem.

15       So just like they do x-rays upon request, they will do

16   these nerve blocks upon request.  So it's a little more

17   episodic.  They don't follow people over a long period of

18   time.

19   Q.   All right, Doctor, thank you.

20       MR. KHOURI:  Thank you, Your Honor.  No further questions.

21       THE COURT:  Thank you, Mr. Khouri.

22     Cross-examination, Ms. Willis?

23       MS. WILLIS:  Thank you, Your Honor.

24

25

1                           CROSS-EXAMINATION

2       BY MS. WILLIS:

3       Q.    Good morning, Dr. Gooding.

4       A.    Good morning.

5       Q.    Now, I'm just going to go over a few things that you

6       discussed on your direct examination.   Okay?

7       A.    Okay.

8       Q.    You knew based on your testimony that Medicare required

9       CT or fluoroscopy for spinal injections after 2015.   Correct?

10      A.    Yes.

11      Q.    Okay.   To get paid.   Correct?

12      A.    For that particular code.   But there are also provisions

13      for --

14      Q.    And I'm going to stop you.   I'm sorry.

15      A.    Okay.

16      Q.    I'm going to ask you to just limit your answers to the

17      questions that I ask you.

18      A.    Yes, ma'am.

19      Q.    Now, you got the letter from Medicare in April of 2017.

20      Correct?

21      A.    I did.

22      Q.    So you received that.

23      A.    Yes.

24      Q.    And you knew their reasoning for telling you that they

25      couldn't pay the claims that they looked at.   Correct?

1    A.   Yes.

2    Q.   And you just didn't agree.  Is that correct?  You didn't

3    agree with their decision.

4    A.   I didn't think that was appropriate for my patient

5    population.

6    Q.   Okay.  Now, you were talking about what was appropriate

7    for your patient population with these fluoroscopy and CT

8    codes.  Now, if you were using 64633 through 64636, those,

9    if used properly, could only be billed twice a year.  Is that

10   correct?

11   A.   I didn't know that.  I didn't know that there was any

12   limit on that.

13   Q.   Did you hear the testimony -- are you -- you're familiar

14   with the testimony of Dr. Schaening while you were sitting

15   here.  Correct?

16   A.   Yes.

17   Q.   And did you hear him say that nerve destruction should

18   last at least six months?

19   A.   Well, that's incorrect.

20   Q.   Okay.  So it is your testimony that if the nerve is

21   actually destroyed, that it can regenerate in less than six

22   months.

23   A.   The nerve isn't totally destroyed using chemicals.

24   See, there's different ways to do neurolysis or destruction

25   of the nerve.  It's not total destruction.  It's partial

1   destruction.  It's like getting a haircut and your hair

2   regrowing after a certain period of time, versus radiofrequency

3   ablation, which does more of a total destruction, and that

4   does last for six to 12 months.

5   Q.   Okay.  So let's go back to some of the background of

6   your practice.  You owned and operated your practice here

7   in D.C. between 2015 and 2018.  Is that correct?

8   A.   Yes.

9   Q.   And you already told us you practiced in pain management

10  and physiatry.  Is that correct?

11  A.   Yes.

12  Q.   And you were the only doctor there.

13  A.   Yes.

14  Q.   And you were commuting to D.C. during that time period.

15  Is that correct?

16  A.   Yes.

17  Q.   As the owner and CEO of that practice, you were in charge

18  of paying the bills?

19  A.   Yes.

20  Q.   You were in charge of hiring employees.

21  A.   Yes.

22  Q.   It's fair to say that you were not just a doctor but a

23  businessman.

24  A.   You can try to give me that title, but I'm a doctor.

25  Q.   Okay.  So you were -- but you were I guess charged with

1    running the business.

2    A.   Yes.

3    Q.   And part of your business was giving spinal injections.

4    A.   Yes.

5    Q.   And these spinal injections, based on your -- well, did

6    these spinal injections involve destroying the facet joint

7    nerves?

8    A.   Yes.

9    Q.   We're going to go through this a little bit more.

10        Ms. Slater, could you pull up Exhibit 24, page 26?  And

11   Ms. Slater, can you rotate it?  And we don't have to show this

12   particular one to the jury.  It's enough for the witness to

13   look at Exhibit 24, page 26.  We're just laying a foundation.

14        And do you see on the bottom of that photo there's a

15   poster of a spine?  Do you see that?

16   A.   Yes.

17   Q.   Ms. Slater, can you show the witness Exhibit 36, or

18   what's been marked for identification as Exhibit 36?

19        Is this essentially the same poster, just blown up?

20   A.   Yes.

21            THE COURT:  Okay.  That's a new one?

22            MS. WILLIS:  That's a new one.

23            THE COURT:  So it hasn't been admitted.  Are you

24   moving to --

25            MS. WILLIS:  We're moving to admit it just for

1       demonstrative purposes.  We just want to publish it.

2               THE COURT:  You want to publish it?

3               MS. WILLIS:  Yes.

4               THE COURT:  Do you want it admitted into the record,

5       or are you just using it as a guide here?

6               MS. WILLIS:  Yes, Your Honor.

7               THE COURT:  Any objection, Mr. Khouri?

8               MR. KHOURI:  No, Your Honor.

9               THE COURT:  All right.  The jury can see Exhibit 36

10      as a demonstrative.

11              MS. WILLIS:  And if we could publish that for the jury.

12      Thank you.

13      BY MS. WILLIS:

14      Q.   Okay.  Dr. Gooding, so looking at the middle of that,

15      is that the spine?

16      A.   Yes, it is.

17      Q.   And the spine is made up of -- and tell me if I

18      mispronounce it.  Vertebrae?

19      A.   Yes.

20      Q.   And so when we're talking about the cervical spine,

21      thoracic spine and lumbar spine, we can see in this poster

22      the top is the cervical spine.  Is that correct?

23      A.   Yes.

24      Q.   And the middle is the thoracic spine.  Is that correct?

25      A.   Correct.

1    Q.   And the bottom is the lumbar spine.

2    A.   Yes.

3    Q.   And each of these vertebrae have, for lack of a better

4    way to say it, a name, like L4, L5.

5    A.   Right.

6    Q.   And so when we're talking about facet joint injections,

7    we're talking about injecting chemicals or medicine into --

8    in between these vertebrae.  Correct?

9    A.   It's around the joint.

10   Q.   Around the joint.  So the joint between each of these

11   vertebrae.  Is that correct?

12   A.   Yes.

13   Q.   And the facet joints between the vertebrae allow for

14   movement.  Is that correct?

15   A.   Correct.

16   Q.   So when we're talking about a superior, I guess, facet

17   joint, we're talking about the one on top of the vertebrae?

18   Is that correct?

19   A.   Well, here's the joint.  This is the superior portion

20   and that's what's moving.

21        THE COURT:  Can you come up closer to the microphone --

22        THE WITNESS:  Oh, I'm sorry.  Yes.  There are two

23   components of the joint.  In the lumbar area it's in this

24   orientation.  It's more of a vertical orientation.

25        MS. WILLIS:  Okay.

1    BY MS. WILLIS:

2    Q.   Just so we're on the same page, there are two sets

3    of facet joints for each vertebrae, one -- the anterior

4    and the superior.  One on each side.  Is that fair to say?

5    A.   No.  It's one joint, and it has two components.

6    Q.   Two components of one joint for each vertebrae.

7    A.   Yeah.

8    Q.   And each of these facet joints has small nerves.

9    A.   Yes.

10   Q.   And Ms. Slater, can you publish Government's Exhibit 33

11   that has already been admitted for use as a demonstrative.

12        So when we're talking about the nerves we're talking

13   about these medial branch nerves.  Correct?  Those are the

14   ones that are associated with the facet joint?

15   A.   Yes.

16   Q.   And so when you're destroying the nerves associated with

17   the facet joint, we're talking about these medial branch

18   nerves.  Correct?

19   A.   Yes.

20   Q.   That are in the spine.

21   A.   Yes.

22   Q.   Thank you.  You can take that down, Ms. Slater.

23        Just wanted to make sure we were playing from the same

24   sheet of music.

25        Now, when we're talking about these knee injections,

1    these Gel-One injections, Gel-One is a type of -- can you

2    tell us what Gel-One is?

3    A.   It is a viscal -- well, it's a substance that naturally

4    occurs in the knee or in any major joint, and it is

5    responsible for lubricating the knee and reducing friction.

6    It's also a component of the body's regenerative process to

7    keep the joint healthy.

8    Q.   And Gel-One specifically is a name brand.  Is that right?

9    A.   That is correct.

10   Q.   It was advertised or created by Zimmer?

11   A.   I believe so, yes.

12   Q.   And it was approved by the FDA for a particular purpose.

13   Is that correct?

14   A.   I think so, yes.

15   Q.   And it was FDA approved just for the knee, for an

16   osteoarthritic knee.  Is that correct?

17   A.   I don't know.

18   Q.   You ordered Gel-One.  Correct?

19   A.   Yes, I did.

20   Q.   And with all drugs there's a package insert.

21   Is that correct?

22   A.   Yes.

23   Q.   So the package insert tells things like what the drug

24   is for.  Is that correct?

25   A.   Yes.

1    Q.   So if the package insert says that it is indicated for

2    use of the knee in patients who have failed to respond

3    adequately to nonpharmacologic therapy, and that is the

4    indication for the treatment, indicated for the treatment

5    of pain in osteoarthritis of the knee, that would be its

6    indication for use.  Correct?

7    A.   Yes.

8    Q.   Thank you.  Now, if there were no other indication,

9    any other use would be experimental.

10   A.   Well, when medications come out --

11   Q.   And it's either a yes or no, or you don't know is fine.

12   A.   No.  Not experimental.

13   Q.   Just off label.

14   A.   Correct.

15   Q.   Now, we know that you saw a number of people in the

16   office, in your office, that were covered by Medicare.

17   A.   Yes.

18   Q.   And you're enrolled as a provider?

19   A.   Correct.

20   Q.   And you made certifications as part of your enrollment?

21   A.   Yes.

22   Q.   And you had to update those every time you moved offices

23   or made a change.  Is that correct?

24   A.   I think so.

25   Q.   And you went to conferences about Medicare, or where

 1    Medicare was discussed.

 2    A.    Where the -- yeah.  There were portions of the

 3    conferences that would discuss billing.  It wasn't necessarily

 4    Medicare but just billing in general.

 5    Q.    Okay.  So you had some -- you've researched billing, you

 6    went to conferences regarding billing.  Is that fair to say?

 7    A.    Yes.

 8    Q.    And you were in charge in the office of what codes were

 9    used ultimately.

10    A.    Yes.

11    Q.    You understood that there were certain codes for spinal

12    injections?

13    A.    Yes.

14    Q.    And you knew that there was some amount of danger

15    involved in spinal injections.

16    A.    Yeah.  There's a risk in everything we do in medicine.

17    Q.    And you have to be careful when you're doing spinal

18    injections because of that area of the body.  Correct?

19    A.    Yes.

20    Q.    And you know what a diagnosis code is.  Correct?

21    A.    I do.

22    Q.    And you know that it's important that when you're billing

23    procedure codes and diagnosis codes that you're accurate for

24    Medicare.  Correct?

25    A.    Yes.

```
1     Q.   Because you promised to -- you promised Medicare
2     that you would submit accurate claims.  Is that correct?
3     A.   Yes.
4     Q.   Now, you agree with me that an ultrasound machine is not
5     a fluoroscopy machine.
6     A.   Right.
7     Q.   And you agree it's not a CT machine.
8     A.   Right.
9     Q.   And you agree that you didn't have either one of those
10    at your practice.
11    A.   Correct.
12    Q.   You did have an ultrasound machine.  Is that correct?
13    A.   Yes.
14    Q.   If you had a fluoroscopy machine or a CT machine, it
15    would have increased the operating cost at your practice.
16    Yes?
17    A.   Yeah, I think so.
18    Q.   You would have had to have a whole other room for it.
19    Correct?
20    A.   Well, I would have had a larger office if I chose to
21    go that way.
22    Q.   Okay.  So would you have had to pay more rent?
23    A.   Would have been a larger office.
24    Q.   And you would have had to pay for more training on how
25    to use a fluoroscopy machine?
```

1    A.   Well, yes and no, because I do have colleagues that are

2    anesthesiologists.   I mentioned earlier that I was being

3    mentored by one of those.

4    Q.   Okay.  So you mentioned earlier that you had done a few

5    weeks of training with an anesthesiologist on fluoroscopy.

6    Is that correct?

7    A.   Yes.

8    Q.   Had you yourself ever done a fluoroscopy-guided

9    injection?

10   A.   I did one with the anesthesiologist, yes.

11   Q.   So one time?

12   A.   Yes.

13   Q.   What about a CT-guided injection?  Have you ever done

14   that?

15   A.   No.

16   Q.   And what about an ultrasound-guided injection?  Have you

17   done that?

18   A.   Yes.

19   Q.   So you've used the ultrasound at the same time that the

20   needle was in the body.

21   A.   Yes.

22   Q.   And you would agree that, you know, any imaging guidance

23   is important for these spinal injections.

24   A.   Yes.

25   Q.   So if you didn't use ultrasound guidance with these

1   spinal injections when the needle was in the body, that

2   wouldn't be safe.

3   A.   Well, it would be less accurate.  I think there are still

4   doctors that use the original technique, which is anatomical,

5   surface anatomy.  So there are many doctors who were trained

6   early on like me -- I'm a dinosaur I guess now.

7   Q.   And I'm just going to stop you.  I hate to interrupt you.

8   Just you personally, your techniques, you would agree that for

9   you, if the ultrasound wasn't in use at the same time that the

10  needle was in the body, that would not be as safe for spinal

11  injections.

12  A.   Yes.  Generally speaking I think that's accurate.

13  Q.   And without imaging guidance you couldn't really tell

14  exactly where the needle is in the body, can you?  You can't

15  see through the skin.

16  A.   But you can feel.

17  Q.   You can feel it, but can you see it?

18  A.   You can't see it, no.

19  Q.   And is it your testimony that the ultrasound machine

20  shows us where those nerves are in the spine and the facet

21  joint?

22  A.   It shows you -- yes.

23  Q.   Okay.  So it doesn't just show you the tissue; it shows

24  you the actual nerves that you are injecting?

25  A.   Not always.  So if you can locate the facet joint, you

1    know where the nerve is relative to that.  Sometimes you --

2    depending on the habitus of the patient, sometimes you can see

3    it.  Probably most of the time you cannot.

4    Q.   Now, you talked about looking for different codes.

5    You never found a code that described spinal injections --

6    spinal nerve destruction injections or nerve blocks without

7    imaging guidance, did you, that was paid?

8    A.   There's a code that's called "unspecified" that permits

9    the doctor to use other techniques.

10   Q.   And did you submit that code?

11   A.   I did.

12   Q.   And did it get paid?

13   A.   I don't believe so.

14   Q.   Now, you also said that you submitted some T codes.

15   Is that correct?

16   A.   Correct.

17   Q.   And did those get paid?

18   A.   I don't believe so.

19   Q.   Ms. Slater, can you pull up Exhibit 32E.

20       Now, are you familiar with local coverage determinations?

21   A.   Yes.

22   Q.   Okay.  So a local coverage determination it's fair to say

23   is Medicare --

24       THE COURT:  I'm sorry.  32E, you said?  Yes, that has

25   been admitted.

1          MS. WILLIS:  That has been admitted.

2     BY MS. WILLIS:

3     Q.   Now, local coverage determinations contain guidance

4     from Medicare.  Is that fair to say?

5     A.   Yes.

6     Q.   And the name of the local coverage determination that

7     we're looking at right now is called Services That Are Not

8     Reasonable and Necessary.  Is that correct?

9     A.   Yes.

10    Q.   Ms. Slater, could you page through a few pages?

11         And stop.  Can you go back one page?

12         You would note that there's a number of T codes listed

13    in this LCD about services that are not considered reasonable

14    and necessary.  Correct?

15    A.   Yes.

16    Q.   And you see, for example, T code 216T.  Correct?

17    A.   Yes.

18    Q.   And does that appear to be an injection?

19    A.   Yes.

20    Q.   Paravert with US?

21    A.   Yes.

22    Q.   And could the US be ultrasound?

23    A.   Yes.

24    Q.   Ms. Slater, could you go to the next page?

25         Do you see T code 230T?  There's a number of them.

1    228 to 232 -- well, 231.  Do these appear to be codes

2    for other injections that involve ultrasound?

3    A.   Yes.

4    Q.   Thank you, Ms. Slater.  You can take that down.

5         Now, you yourself, we discussed earlier, went to some

6    trainings and things, but your staff, you never sent like

7    Erica Wright to a conference.  Is that correct?

8    A.   No.

9    Q.   No -- I'm sorry.  So the record is clear, no, that's

10   not correct, or no, you never sent her to a conference?

11   A.   I never sent her to a conference.

12   Q.   Okay.  Thank you.

13        Now, we talked a little bit about the Delaware board.  Do

14   you remember that line of questioning on direct examination?

15   A.   Yes.

16   Q.   And -- Ms. Slater, could you publish Exhibit 10C, which

17   has been admitted.

18        You were the subject of this board proceeding that's

19   reflected in Exhibit 10C.  Is that correct?

20   A.   Yes.

21   Q.   And you went to the hearings?

22   A.   Yes.

23   Q.   And you received this particular order.  Is that correct?

24   A.   Yes.

25             THE COURT:  And you will have this exhibit to take back

1    with you when you begin your deliberation.

2    BY MS. WILLIS:

3    Q.   And Ms. Slater, could you go to page 6 of this exhibit.

4         And you would agree that paragraph 22 indicates that the

5    standard of care per this Delaware board order requires the

6    use of fluoroscopic guidance when performing cervical nerve

7    blocks.  Is that correct?

8    A.   Yes.

9    Q.   And there's some reference to the International Spine

10   Intervention Society.  Is that correct?

11   A.   Yes.

12   Q.   And you mentioned on direct that you consulted or

13   looked at research for some of these societies like that

14   one.  Is that correct?

15   A.   Correct.

16   Q.   Ms. Slater, could you go to page 8, please.

17        And it's correct that page 8, you know, discusses some

18   additional findings about the applicable standard of care

19   requiring fluoroscopic guidance when performing cervical

20   injections.  Is that correct?

21   A.   Yes.

22   Q.   And is it fair to say that in the middle of the page

23   in this order it indicates that you failed to embrace the

24   technology available to you and required by that standard

25   of care?

1    A.   It does say that.

2    Q.   Thank you.  You can take that down, Ms. Slater.

3         Now, 64633 through 64636, you're familiar with those

4    codes we've been talking about.  Correct?

5    A.   Yes.

6    Q.   Is it fair to say that that procedure is virtually

7    the same procedure just in different parts of the spine,

8    the cervical spine, the thoracic spine, the lumbar spine?

9    You agree with that?

10   A.   Yes.

11        MS. WILLIS:  May I have the Court's indulgence?

12        THE COURT:  Yes.

13      (Government conferring.)

14        MS. WILLIS:  I appreciate your time, Dr. Gooding.

15   Thank you.  Oh, I'm sorry.  I do have a couple more questions.

16   I apologize.  A few more minutes of your time.

17   BY MS. WILLIS:

18   Q.   Now, on direct you talked about a number of things that

19   happened with the patients that are named in the indictment.

20   Is that correct?

21   A.   Yes.

22   Q.   And I guess we saw from your testimony, you don't really

23   have an independent memory of those dates that are in the

24   indictment.  Is that fair to say?

25   A.   No.  I see so many patients I'd have to refer to my

1    charts, yeah.

2    Q.   Okay.  So, when we're talking about these patients,

3    we're really looking at what you have in your charts.

4    Is that fair to say?

5    A.   Sure.

6    Q.   Ms. Slater, can you pull up Government's Exhibit 11,

7    page 30.

8          THE COURT:  It's in evidence.

9    BY MS. WILLIS:

10   Q.   And it's fair to say that this is a chart for K.M. -- or

11   procedural note for K.M. on March 31, 2016.  Is that correct?

12   A.   Correct.

13   Q.   And is this the type of document that's in your chart

14   that you were refreshing your recollection on?

15   A.   One of them, yes.

16   Q.   Okay.  Now, on this procedural report, it indicates that

17   you gave K.M. a nerve block.  Is that correct?

18   A.   Correct.

19   Q.   And a nerve block is, you know -- correct me if I'm

20   wrong -- you were putting medicine in the small nerves in

21   the spine.  Is that correct?

22   A.   Yes.

23   Q.   And were you destroying the nerves or blocking, or do

24   you know?

25   A.   I'm blocking the nerves.  Now, I know that the

1    terminology says destroy, but the analogy that I made

2    about the haircut is that when you use chemical neurolysis,

3    it's not complete destruction.  I have elderly patients that

4    if you completely destroy the nerve, you could compromise

5    their motor function as well.  So we weren't trying to do

6    something as heavy as radiofrequency ablation which is the

7    new toy that most doctors are going to.

8    Q.   Okay.  So I'm just going to stop you.  So a nerve

9    block is not the same thing as destroying the entire nerve.

10    Is that correct to say?

11    A.   The conventional nerve blocks are very temporary.

12    Q.   Okay.  So that would be like putting medicine in there

13    to numb the nerve.  Is that fair to say?

14    A.   Right.

15    Q.   Now, where on this procedural report does it say that

16    you used ultrasound?

17    A.   Yeah, it doesn't on this particular report.

18    Q.   Okay.  Thank you.

19    Ms. Slater, could you pull up Government's Exhibit 19A,

20    please.

21    THE COURT:  It's in evidence.

22    BY MS. WILLIS:

23    Q.   And could you scroll a couple of pages.

24    I'm going to stop you.  Go one back.

25    Now, do you see this charge sheet for patient A.M. for

1       10/11/2016?

2       A.   Yes, I do.

3       Q.   Now, can you confirm this is your handwriting on this

4       chart sheet.  Right?

5       A.   Yes, it is.

6       Q.   You marked the X's?

7       A.   Yes.

8       Q.   And with ultrasound, it says "limited extremity."

9       Is that correct?

10      A.   Yes.

11           MS. WILLIS:  May I have the Court's indulgence?

12         (Government conferring.)

13           MS. WILLIS:  I'm done now.  Thank you for your time.

14           THE COURT:  Thank you, Ms. Willis.

15      Mr. Khouri, any redirect?

16           MR. KHOURI:  Yes, Your Honor.

17                      REDIRECT EXAMINATION

18      BY MR. KHOURI:

19      Q.   Dr. Gooding, what is the off label use of medications?

20      A.   It's -- once clinicians discover it can be useful in

21      other areas other than the labeling that she was mentioning

22      with the package of the medication, it's common use for

23      physicians to use the medications for things that they've

24      found it to be effective for.

25      Q.   And is that done by the community of pain management

1    specialists in the country?

2    A.   Yes.

3    Q.   Okay.  Where was your office located between 2015 and

4    2018?

5    A.   In the DePaul Medical Building of Providence Hospital

6    campus.

7    Q.   How close was that building to the hospital?

8            MS. WILLIS:  Objection, Your Honor.

9            THE COURT:  Beyond the scope.

10           MR. KHOURI:  May I get on the phone, please?

11           THE COURT:  Yes.

12       (Bench conference.)

13           MR. KHOURI:  It's not, because if he wanted to use

14   a fluoroscope, he wouldn't have had to get a new office; he

15   would have just had to walk the patients to the hospital.

16           THE COURT:  All right.  Your point is regarding the

17   questioning about whether he would have needed a bigger

18   office?

19           MR. KHOURI:  Right.

20           THE COURT:  Okay.

21           MR. KHOURI:  Thank you.

22       (End of bench conference.)

23           THE COURT:  Objection overruled.

24   BY MR. KHOURI:

25   Q.   I think the question was how close was that building

1    to the hospital?

2    A.   It was a part of it.

3    Q.   Did the hospital have a fluoroscopy machine?

4    A.   Yes.

5    Q.   Did you have privileges to use it if you wanted to with

6    patients?

7    A.   Well, yes.  I could send patients there if I wanted to.

8    Q.   Now, counsel --

9         THE COURT:  Well, the question was did you have

10   privileges to use it.  In other words, could you use it?

11   Your answer was you could send patients there.

12        THE WITNESS:  Right.  Because I didn't have competency

13   in it, I would not use it.

14        THE COURT:  Okay.

15   BY MR. KHOURI:

16   Q.   But if you gained competency in it, you could use it.

17   A.   Yes.

18   Q.   Okay.  Now, counsel showed you a document from

19   Ms. Mackey's chart.  Remember that document?

20   A.   Yes.

21   Q.   And you were asked about where it was shown that you

22   used ultrasound?

23   A.   Right.

24   Q.   Would that be in another part of the chart that you

25   used ultrasound?

1    A.   The procedure report?

2    Q.   Yes.

3    A.   Yeah.  So whenever the main target was a major joint like

4    a knee or a hip, and I also treated the nerve that supplied

5    that area, I have two different forms.  One is for joints,

6    major joints, and another's for lumbar or nerves.  So I didn't

7    use the long form as well as the major; it sort of conflates

8    both of them into the one report.

9    Q.   Where would you note that in the chart, that ultrasound

10   was used?

11   A.   Well, when I did the major joint reports, I may not have

12   noted that.

13   Q.   All right.  Was it your practice to note it?

14   A.   For spinal injections, yes.  For the major joint

15   injections, I would use it primarily for diagnostic purposes

16   as opposed to guidance.  So it wasn't included on the report

17   per se.

18   Q.   Okay.  Would it refresh your recollection if you looked

19   at the May 31 handwritten notes --

20        THE COURT:  There has not been a statement of failure

21   to recall.

22   BY MR. KHOURI:

23   Q.   Do you remember if you wrote down that you used

24   ultrasound in Ms. Mackey's chart for the 3/31/2016 visit?

25   A.   I don't recall if I wrote it down, but I always did use

1    ultrasound for every patient, every visit.

2    Q.   Okay.

3    A.   Diagnostically and therapeutically.

4    Q.   And this is for an injection to the back.

5    A.   Yes.

6         MR. KHOURI:  All right.  Thank you.  Nothing further.

7         THE COURT:  Thank you.

8      Dr. Gooding, you may step down.

9      (Witness steps down.)

10      Do you have another witness, Mr. Khouri?

11         MR. KHOURI:  No, Your Honor.  We rest.

12         THE COURT:  All right.  The defense rests.  Does the

13    government intend to call any rebuttal witnesses or put on any

14    rebuttal testimony?

15         MS. WILLIS:  No, Your Honor.

16         THE COURT:  All right.  Then the evidence is complete,

17    ladies and gentlemen, and what I'm going to do is, the lawyers

18    and I have to have a discussion about the final jury

19    instructions, the verdict form, all the things you need to

20    begin your deliberations.

21      So I'm going to give you an extra long lunch today, since

22    we are well ahead of schedule.  I'm going to ask that you

23    come back -- it's almost 12:30.  I'm going to ask that you

24    come back at two o'clock, which will give us a chance to have

25    a discussion, and also have a chance to have lunch.

1          I'll see you at two o'clock for closing arguments and

2     final instructions.  After that the case will go to you for

3     deliberations.  Thank you very much for all your time and

4     attention.

5          (Jury out at 12:29 p.m.)

6          THE COURT:  All right.  I changed the proposed

7     final jury instructions.  I originally had an instruction

8     on the defendant not testifying.  And now I have one for the

9     defendant testifying.  It's the standard instruction.  Just

10    give me a minute, please.

11         Okay.  Ms. Willis and Ms. Simon, did you have a chance to

12    discuss with the defense your proposed changes to the final

13    instructions?

14         MS. WILLIS:  I apologize, Your Honor.  We have not

15    asked the defense that question.

16         THE COURT:  You've been busy.

17         So, well, I think it makes sense then for us to come back

18    early from lunch so it will give you a chance at lunch to go

19    over these things.  So I would propose to break for lunch now,

20    come back here at 1:30 or 1:15, giving you 45 minutes for

21    lunch and discussions, whatever you want.  And then we have --

22    I don't think we have a lot to go over in that area.

23         So why don't we come back at 1:30.  That way you'll have

24    all had a chance to discuss your proposed edits to the jury

25    instructions, and then you're going to have to let -- then

986

1        you're going to have to -- my law clerk is going to have to

2        incorporate whatever instructions I agree to.  So that'll

3        take a few minutes, but we can get that done.

4            So let's break now and come back at 1:30 promptly.

5            All right.

6            (Lunch recess taken at 12:32 p.m.)

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.


/s/ Bryan A. Wayne
Bryan A. Wayne

**'**

**'10** [1] - 911:11
**'15** [1] - 900:22
**'16** [1] - 900:23
**'17** [3] - 900:23, 951:23, 952:2

**/**

**/s** [1] - 987:9

**1**

**1** [3] - 889:13, 892:8, 897:1
**10** [9] - 889:3, 935:22, 936:6, 943:15, 945:9, 945:24, 946:4, 946:5, 946:6
**10/11/2016** [1] - 980:1
**10/13/2016** [1] - 939:4
**10:59** [2] - 935:25, 936:7
**10C** [2] - 975:16, 975:19
**11** [10] - 888:22, 889:4, 892:8, 943:16, 948:2, 948:25, 949:2, 949:15, 978:6
**11:00** [3] - 935:21, 935:22, 936:6
**11:15** [1] - 936:7
**12** [5] - 886:6, 904:8, 904:9, 906:4, 962:4
**1250** [1] - 886:21
**12:29** [1] - 985:5
**12:30** [1] - 984:23
**12:32** [1] - 986:6
**13** [6] - 935:8, 936:13, 936:24, 938:16, 939:25, 943:18
**14** [6] - 892:20, 893:15, 916:4, 951:7, 951:23, 952:2
**1400** [1] - 886:14
**15** [2] - 892:22, 914:1
**16** [3] - 932:16, 953:15, 953:21
**17** [1] - 932:15
**19** [1] - 946:3
**19-0255** [1] - 886:4
**19-255** [1] - 888:16
**1978** [1] - 912:19
**1990** [1] - 907:8
**1995** [1] - 907:15
**1996** [1] - 907:15
**19A** [1] - 979:19

**1:15** [1] - 985:20
**1:30** [3] - 985:20, 985:23, 986:4

**2**

**2** [3] - 889:13, 892:8, 897:1
**20** [1] - 914:1
**20001** [1] - 886:25
**20005** [1] - 886:14
**20036** [1] - 886:22
**2010** [4] - 891:14, 908:7, 909:19, 909:23
**2012** [10] - 898:16, 898:21, 907:17, 910:18, 911:8, 917:24, 920:10, 920:17, 930:25
**2013** [1] - 892:15
**2014** [3] - 910:20, 910:21, 911:5
**2015** [11] - 898:16, 898:21, 899:1, 921:19, 921:24, 923:16, 937:22, 937:25, 960:9, 962:7, 981:3
**2016** [28] - 892:12, 930:25, 935:8, 936:13, 936:24, 938:1, 938:15, 938:16, 939:4, 939:25, 943:18, 945:10, 945:25, 946:1, 946:3, 946:4, 946:6, 948:2, 948:25, 949:2, 949:15, 953:15, 953:21, 978:11
**2017** [10] - 892:1, 892:21, 893:15, 899:3, 900:25, 923:18, 923:21, 925:21, 951:7, 960:19
**2018** [4] - 953:15, 954:5, 962:7, 981:4
**202** [3] - 886:15, 886:22, 886:25
**2022** [1] - 886:6
**204** [1] - 889:23
**212** [1] - 889:23
**213** [1] - 889:23
**215** [1] - 886:17
**216T** [1] - 974:16
**22** [1] - 976:4
**2222** [1] - 886:17

**228** [1] - 975:1
**230T** [1] - 974:25
**231** [1] - 975:1
**232** [1] - 975:1
**24** [4] - 938:15, 943:18, 963:10, 963:13
**25** [1] - 914:2
**254** [1] - 889:23
**26** [2] - 963:10, 963:13
**27** [2] - 953:15, 954:5
**29** [2] - 888:21, 893:16

**3**

**3** [5] - 892:10, 901:6, 901:10, 944:5
**3/31/2016** [1] - 983:24
**30** [2] - 921:13, 978:7
**309** [1] - 890:3
**31** [7] - 935:7, 936:13, 936:24, 939:4, 939:25, 978:11, 983:19
**32E** [2] - 973:19, 973:24
**33** [1] - 966:10
**333** [1] - 886:24
**336-2433** [1] - 886:18
**353-0822** [1] - 886:15
**354-3186** [1] - 886:25
**36** [3] - 963:17, 963:18, 964:9

**4**

**4** [2] - 892:8, 944:5
**40** [1] - 890:3
**404(b** [2] - 894:11, 894:14
**437** [1] - 890:7
**45** [1] - 985:20
**4704-A** [1] - 886:24
**48** [1] - 890:3

**5**

**5** [4] - 886:9, 889:8, 892:4, 947:19
**59** [6] - 926:3, 926:4, 926:7, 926:11, 927:6, 927:8

**6**

**6** [4] - 889:8, 892:8, 947:19, 976:3

**6/14** [1] - 951:22
**64483** [1] - 890:23
**64633** [2] - 961:8, 977:3
**64635** [2] - 890:23, 891:18
**64636** [2] - 890:23, 891:18, 961:8, 977:3

**7**

**7** [5] - 888:25, 892:18, 901:6, 901:7, 901:10
**700** [1] - 886:21
**718** [1] - 890:7

**8**

**8** [3] - 892:8, 976:16, 976:17
**861-0870** [1] - 886:22
**896** [1] - 887:3

**9**

**90** [1] - 955:6
**902** [1] - 887:6
**92612** [1] - 886:18
**949** [1] - 886:18
**959** [1] - 887:6
**980** [1] - 887:7
**9:30** [1] - 886:6
**9:44** [1] - 895:14

**A**

**a.m** [5] - 886:6, 895:14, 935:25, 936:7
**A.M** [3] - 889:9, 979:25
**abeyance** [1] - 894:23
**ablation** [2] - 962:3, 979:6
**able** [8] - 895:21, 896:13, 898:23, 898:24, 905:3, 908:25, 917:19, 917:20
**above-entitled** [1] - 987:5
**absent** [1] - 931:9
**absolutely** [4] - 898:19, 915:1, 925:16, 954:3
**absorbers** [2] - 950:24, 951:1
**accomplished** [1] -

897:11
**accord** [1] - 889:24
**accordingly** [1] - 893:16
**accurate** [4] - 969:23, 970:2, 972:3, 972:12
**achieve** [1] - 900:16
**acknowledged** [1] - 921:3
**acquittal** [4] - 888:20, 889:17, 890:5, 893:17
**acted** [1] - 902:2
**acting** [2] - 904:13, 929:18
**action** [2] - 888:16, 891:14
**activities** [1] - 905:3
**actual** [2] - 901:12, 972:24
**acute** [6] - 914:23, 915:22, 958:10, 958:13, 959:7, 959:8
**acutely** [1] - 958:15
**add** [2] - 930:1, 932:5
**addition** [3] - 905:14, 912:17, 925:1
**additional** [1] - 976:18
**address** [1] - 943:1
**adequate** [1] - 930:9
**adequately** [1] - 968:3
**administering** [1] - 891:8
**administration** [1] - 903:25
**administrative** [3] - 930:17, 931:2, 931:3
**admit** [1] - 963:25
**admitted** [6] - 963:23, 964:4, 966:11, 973:25, 974:1, 975:17
**advanced** [1] - 888:21
**advertised** [1] - 967:10
**advocate** [2] - 896:7, 896:13
**affect** [2] - 906:19, 958:7
**afternoon** [1] - 895:13
**agree** [11] - 922:22, 961:2, 961:3, 970:4, 970:7, 970:9, 971:22, 972:8, 976:4, 977:9, 986:2
**ahead** [5] - 924:2, 931:19, 937:20, 937:23, 984:22
**alert** [1] - 926:22
**Alice** [2] - 891:6,

891:24
**Allene** [1] - 947:19
**allergies** [1] - 913:21
**alleviate** [3] - 914:4, 914:5, 958:14
**allow** [2] - 927:3, 965:13
**allowed** [1] - 911:8
**allows** [4] - 913:7, 913:12, 913:14, 918:16
**alluded** [1] - 905:24
**almost** [3] - 905:16, 914:6, 984:23
**alternative** [2] - 917:10, 917:11
**America** [1] - 888:16
**AMERICA** [1] - 886:3
**amount** [2] - 958:16, 969:14
**analogy** [1] - 979:1
**anatomical** [2] - 905:11, 972:4
**anatomy** [6] - 905:12, 905:14, 906:1, 908:9, 972:5
**Anderson** [6] - 950:16, 950:17, 950:19, 950:20, 951:2, 951:7
**anesthesia** [4] - 929:12, 929:14, 930:9, 946:15
**anesthesiologist** [3] - 911:17, 971:5, 971:10
**anesthesiologists** [4] - 954:25, 955:7, 959:11, 971:2
**anesthetic** [4] - 929:15, 929:17, 929:18, 929:24
**anesthetize** [1] - 928:11
**Angeles** [5] - 898:11, 903:18, 903:19, 903:23, 904:13
**animal** [2] - 958:10, 958:17
**another's** [1] - 983:6
**answer** [3] - 925:15, 958:9, 982:11
**answers** [1] - 960:16
**anterior** [1] - 966:3
**anti** [2] - 952:10, 959:9
**anti-inflammatory** [2] - 952:10, 959:9
**anyway** [1] - 912:17
**apart** [1] - 926:9
**APC** [1] - 886:16

**apologize** [2] - 977:16, 985:14
**appear** [2] - 974:18, 975:1
**APPEARANCES** [1] - 886:11
**applicable** [1] - 976:18
**applied** [3] - 911:22, 931:14
**apply** [3] - 917:14, 928:18, 931:13
**applying** [1] - 890:8
**appreciate** [1] - 977:14
**approach** [7] - 936:16, 938:11, 945:19, 948:18, 951:12, 953:16, 955:14
**approaches** [1] - 955:12
**appropriate** [5] - 913:6, 913:15, 947:15, 961:4, 961:6
**appropriately** [1] - 899:25
**approved** [2] - 967:12, 967:15
**approximate** [1] - 948:15
**April** [1] - 960:19
**area** [25] - 903:18, 904:19, 908:13, 908:19, 908:21, 909:1, 909:5, 911:9, 918:24, 928:11, 940:14, 940:17, 940:22, 941:5, 941:19, 946:21, 946:22, 949:18, 949:19, 950:5, 959:14, 965:23, 969:18, 983:5, 985:22
**areas** [6] - 903:8, 908:24, 929:8, 939:16, 940:23, 980:21
**argued** [3] - 888:24, 889:3, 889:12
**arguing** [1] - 889:9
**argument** [3] - 895:8, 898:4, 901:4
**arguments** [2] - 888:22, 985:1
**arise** [1] - 888:10
**Arrington** [1] - 890:2
**arthritic** [1] - 932:11
**arthritis** [1] - 947:24
**articles** [3] - 912:13,

917:9
**articular** [5] - 892:11, 892:20, 939:8, 947:9, 953:24
**assistant** [3] - 928:9, 930:20, 931:16
**assisting** [1] - 925:14
**associated** [2] - 966:14, 966:16
**attempt** [1] - 935:10
**attended** [1] - 911:21
**attending** [1] - 958:1
**attention** [3] - 913:2, 917:24, 985:4
**audit** [3] - 921:11, 921:14, 922:5
**audited** [1] - 900:22
**auditors** [1] - 927:21
**August** [1] - 893:9
**authorities** [2] - 909:21, 917:7
**authority** [2] - 894:25, 895:3
**automatically** [1] - 942:15
**available** [3] - 905:25, 931:19, 976:24
**Avenue** [3] - 886:14, 886:21, 886:24
**avoid** [1] - 916:11
**aware** [1] - 922:2

## B

**background** [1] - 962:5
**backs** [1] - 915:8
**bad** [3] - 915:8, 920:6
**barely** [1] - 929:25
**based** [3] - 901:22, 960:8, 963:5
**basis** [2] - 959:5, 959:6
**battle** [1] - 909:20
**bear** [1] - 912:21
**bearing** [1] - 932:9
**became** [4] - 909:2, 910:22, 921:21, 932:12
**become** [3] - 903:6, 903:8, 904:5
**BEFORE** [1] - 886:10
**began** [1] - 898:15
**begin** [5] - 896:15, 917:24, 918:2, 976:1, 984:20
**beginning** [1] - 940:11
**behalf** [1] - 898:6
**below** [3] - 905:12,

950:11, 950:13
**belt** [3] - 950:11, 950:12, 950:13
**Bench** [4] - 897:17, 934:5, 955:24, 981:12
**bench** [4] - 897:25, 934:20, 957:2, 981:22
**benefit** [2] - 889:24, 890:17
**best** [4] - 895:11, 899:17, 912:12, 933:17
**better** [6] - 895:22, 899:10, 899:11, 917:11, 929:8, 965:3
**between** [9] - 898:16, 898:21, 899:21, 901:8, 962:7, 965:8, 965:10, 965:13, 981:3
**beyond** [7] - 889:21, 890:2, 890:11, 892:8, 896:6, 897:8, 981:9
**bigger** [1] - 981:17
**bilateral** [1] - 954:9
**bilaterally** [1] - 952:4
**bill** [22] - 898:23, 898:24, 899:24, 900:7, 900:8, 901:16, 902:6, 920:15, 920:16, 923:11, 923:20, 925:7, 925:23, 926:11, 927:1, 927:10, 941:16, 941:21, 947:1, 947:12, 952:25
**billed** [10] - 892:5, 892:11, 893:15, 898:18, 901:3, 920:13, 926:19, 947:7, 956:21, 961:9
**billers** [1] - 900:3
**billing** [19] - 891:24, 894:23, 894:25, 896:19, 900:10, 920:11, 922:20, 922:25, 925:5, 925:20, 926:1, 926:19, 930:18, 956:16, 969:3, 969:4, 969:5, 969:6, 969:22
**bills** [2] - 902:3, 962:18
**bit** [4] - 928:2, 956:2, 963:9, 975:13

**blind** [1] - 906:2
**block** [9] - 939:9, 942:25, 947:9, 949:1, 949:17, 959:13, 978:17, 978:19, 979:9
**blocking** [2] - 978:23, 978:25
**blocks** [4] - 959:16, 973:6, 976:7, 979:11
**blown** [1] - 963:19
**board** [9] - 903:6, 903:8, 903:9, 903:12, 909:23, 910:4, 975:13, 975:18, 976:5
**bodies** [1] - 916:21
**body** [7] - 939:16, 939:20, 969:18, 971:20, 972:1, 972:10, 972:14
**body's** [1] - 967:6
**bone** [3] - 905:19, 932:7
**bones** [1] - 913:15
**book** [4] - 924:11, 924:15, 924:20, 925:1
**bottom** [2] - 963:14, 965:1
**bounces** [1] - 917:18
**Bradley** [1] - 888:2
**branch** [2] - 966:13, 966:17
**brand** [5] - 932:23, 933:9, 946:17, 952:12, 967:8
**break** [7] - 894:3, 894:4, 916:21, 935:20, 935:24, 985:19, 986:4
**breakdown** [1] - 920:3
**briefcase** [1] - 935:15
**briefly** [1] - 934:24
**brotman** [1] - 903:23
**Browne** [8] - 944:3, 944:6, 945:2, 945:3, 945:11, 945:12, 946:20, 947:8
**Bryan** [2] - 987:9, 987:9
**BRYAN** [2] - 886:23, 987:3
**Building** [1] - 981:5
**building** [2] - 981:7, 981:25
**bundled** [12] - 899:3, 900:7, 921:5, 921:7, 921:19, 921:24, 922:1, 924:10,

926:12, 926:20, 927:11, 927:12
**bundles** [1] - 900:8
**Burch** [4] - 938:7, 938:18, 942:7, 943:17
**bursa** - 908:15
**business** [3] - 900:5, 963:1, 963:3
**businessman** [1] - 962:23
**busy** [3] - 906:10, 931:17, 985:16
**buy** [2] - 923:1, 923:4
**BY** [36] - 902:16, 919:9, 934:2, 934:22, 936:11, 936:18, 937:2, 937:14, 938:6, 938:14, 939:1, 940:20, 941:4, 944:14, 944:18, 945:14, 946:10, 948:23, 949:11, 950:10, 951:17, 953:20, 957:4, 957:24, 960:2, 964:13, 966:1, 974:2, 976:2, 977:17, 978:9, 979:22, 980:18, 981:24, 982:15, 983:22

**C**

**C1** [1] - 909:5
**C7** [1] - 909:5
**CA** [1] - 886:18
**California** [8] - 897:14, 898:10, 898:11, 903:15, 904:6, 904:8, 906:5, 906:12
**campus** [1] - 981:6
**cancer** [9] - 899:13, 899:22, 915:4, 915:14, 915:16, 915:20, 916:23
**cannot** [1] - 973:3
**car** [1] - 948:7
**care** [7] - 914:6, 917:20, 931:19, 958:14, 976:5, 976:18, 976:25
**careful** [1] - 969:17
**carrier** [2] - 899:4, 899:9
**case** [12] - 888:14,

895:6, 895:19, 896:6, 896:15, 897:7, 897:20, 898:7, 909:11, 909:20, 919:11, 985:2
**cases** [2] - 906:21, 906:24
**category** [1] - 919:1
**cater** [1] - 911:23
**caused** [2] - 890:16, 943:12
**causes** [1] - 920:3
**causing** [1] - 943:2
**cautioned** [1] - 934:13
**center** [1] - 904:12
**centimeters** [1] - 941:8
**Centinela** [1] - 903:23
**CEO** [1] - 962:17
**certain** [12] - 891:15, 894:9, 904:17, 904:19, 910:11, 911:24, 917:11, 918:7, 955:9, 958:16, 962:2, 969:11
**certainly** [3] - 915:17, 916:24, 956:14
**CERTIFICATE** [1] - 987:2
**certifications** [1] - 968:20
**certified** [5] - 903:6, 903:8, 903:9, 903:12
**certify** [1] - 987:3
**cervical** [13] - 908:12, 908:13, 909:1, 909:3, 909:6, 909:14, 909:24, 918:14, 964:20, 964:22, 976:6, 976:19, 977:8
**cetera** [12] - 903:19, 907:3, 911:19, 912:11, 913:22, 915:16, 920:4, 925:24, 931:5, 932:3, 933:18
**challenged** [1] - 889:8
**chance** [6] - 893:20, 984:24, 984:25, 985:11, 985:18, 985:24
**chances** [2] - 899:13, 899:22
**change** [3] - 921:20, 928:2, 968:23
**changed** [2] - 899:1, 985:6

**changes** [3] - 895:20, 924:9, 985:12
**charge** [6] - 891:23, 947:14, 962:17, 962:20, 969:8, 979:25
**charged** [8] - 896:16, 896:17, 896:18, 896:19, 956:13, 956:14, 962:25
**charging** [1] - 895:7
**chart** [26] - 921:12, 927:24, 935:3, 935:5, 935:11, 936:14, 937:3, 937:18, 937:23, 938:9, 939:2, 945:16, 947:17, 948:16, 949:12, 951:10, 952:15, 952:18, 953:12, 978:10, 978:13, 980:4, 982:19, 982:24, 983:9, 983:24
**charts** [7] - 954:12, 954:13, 954:16, 956:20, 956:21, 978:1, 978:3
**check** [1] - 954:2
**chemical** [1] - 979:2
**chemicals** [2] - 961:23, 965:7
**chief** [1] - 948:5
**chloride** [1] - 929:13
**choose** [2] - 899:21, 932:17
**chose** [1] - 970:20
**chronic** [12] - 899:15, 902:21, 913:24, 915:23, 915:24, 915:25, 923:7, 958:7, 958:9, 958:17, 958:24, 959:4
**CHUTKAN** [1] - 886:10
**circle** [2] - 907:16, 944:8
**circumstances** [1] - 940:21
**claim** [1] - 892:19
**claims** [11] - 889:11, 890:14, 890:16, 890:22, 891:9, 892:2, 893:12, 927:2, 960:25, 970:2
**clarity** [1] - 922:19, 927:1
**classic** [1] - 928:7

**cleans** [1] - 931:15
**clear** [4] - 908:1, 911:6, 925:11, 975:9
**clearer** [1] - 917:22
**clearly** [2] - 908:12, 913:12
**CLERK** [3] - 888:13, 888:15, 894:2
**clerk** [1] - 986:1
**clinic** [1] - 904:10
**clinical** [2] - 931:4, 933:17
**clinicians** [1] - 980:20
**close** [11] - 908:18, 913:13, 918:15, 937:3, 937:23, 941:7, 941:13, 949:8, 951:18, 981:7, 981:25
**closed** [1] - 895:19
**closer** [1] - 965:21
**closing** [2] - 895:8, 985:1
**Coast** [1] - 907:6
**cocktail** [1] - 946:15
**code** [59] - 892:13, 894:24, 894:25, 898:22, 899:1, 900:4, 900:7, 900:9, 900:10, 901:8, 901:9, 901:12, 901:16, 901:17, 901:19, 901:22, 901:23, 920:18, 920:20, 920:22, 921:5, 921:7, 921:25, 922:1, 922:2, 922:17, 924:10, 924:11, 924:13, 924:14, 924:16, 924:20, 924:22, 925:1, 926:4, 926:12, 926:20, 926:21, 927:11, 927:12, 947:8, 947:11, 952:20, 953:2, 956:21, 960:12, 969:20, 973:5, 973:8, 973:10, 974:16, 974:25
**codes** [27] - 890:22, 891:18, 891:24, 898:21, 920:17, 921:17, 922:4, 924:10, 924:16, 924:17, 924:19, 925:6, 925:24, 947:4, 947:5, 961:8, 969:8, 969:11,

969:23, 973:4, 973:14, 974:12, 975:1, 977:4
**coding** [1] - 925:9
**colleagues** [2] - 958:2, 971:1
**College** [1] - 902:25
**college** [2] - 897:11, 902:22
**COLUMBIA** [1] - 886:1
**Columbia** [1] - 897:12
**combination** [1] - 946:14
**combined** [2] - 892:16, 893:12
**combing** [1] - 925:2
**coming** [4] - 904:7, 905:10, 908:18, 934:8
**common** [2] - 946:24, 980:22
**communicate** [1] - 926:21
**communicating** [1] - 958:25
**community** [1] - 980:25
**commuting** [1] - 962:14
**comorbidity** [2] - 916:15, 916:16
**companies** [1] - 932:13
**competency** [2] - 982:12, 982:16
**complaint** [1] - 948:5
**complete** [4] - 897:7, 903:3, 979:3, 984:16
**completely** [4] - 889:14, 941:11, 941:25, 979:4
**compliance** [1] - 942:4
**complicated** [2] - 921:21, 943:5
**component** [2] - 932:3, 967:6
**components** [3] - 965:23, 966:5, 966:6
**comprehensive** [1] - 955:13
**compromise** [1] - 979:4
**concerns** [1] - 914:24
**conclusion** [1] - 924:7
**conditions** [6] - 910:11, 910:13, 910:19, 910:23, 914:17, 943:21
**conducted** [1] - 892:1

**confer** [1] - 894:18
**conference** [12] - 895:8, 897:17, 897:25, 934:5, 934:20, 955:24, 957:2, 975:7, 975:10, 975:11, 981:12, 981:22
**conferences** [7] - 900:3, 956:9, 957:17, 958:1, 968:25, 969:3, 969:6
**conferring** [2] - 977:13, 980:12
**confirm** [1] - 980:3
**conflates** [1] - 983:7
**congested** [2] - 908:20, 933:21
**congestion** [1] - 933:17
**Connecticut** [1] - 886:21
**connective** [1] - 913:10
**connects** [1] - 949:24
**consensus** [1] - 925:11
**consider** [2] - 889:18, 908:3
**considered** [1] - 974:13
**consistent** [1] - 893:11
**Constitution** [1] - 886:24
**consult** [1] - 923:24
**consultant** [1] - 904:14
**consulted** [2] - 925:9, 976:12
**contain** [1] - 974:3
**contends** [1] - 889:14
**continue** [1] - 936:8
**continuous** [1] - 912:16
**contractor** [1] - 921:15
**contradistinction** [1] - 914:22
**convenient** [1] - 933:8
**conventional** [1] - 979:11
**conversation** [1] - 896:6
**conviction** [2] - 888:25, 889:5
**COOKE** [1] - 886:19
**Cooke** [1] - 886:20
**Cooper** [1] - 930:20
**cord** [2] - 908:18,

908:19
**correct** [76] - 893:10, 903:11, 903:13, 906:6, 906:13, 910:19, 911:11, 919:5, 920:19, 923:14, 923:18, 951:24, 956:5, 960:9, 960:11, 960:20, 960:25, 961:2, 961:10, 961:15, 962:7, 962:10, 962:15, 964:22, 964:24, 964:25, 965:8, 965:11, 965:14, 965:15, 965:18, 966:13, 966:18, 967:9, 967:13, 967:16, 967:18, 967:21, 967:24, 968:6, 968:14, 968:23, 969:18, 969:20, 969:24, 970:2, 970:11, 970:12, 970:19, 971:6, 973:15, 973:16, 974:8, 974:14, 974:16, 975:7, 975:10, 975:19, 975:23, 976:7, 976:10, 976:14, 976:15, 976:17, 976:20, 977:4, 977:20, 978:11, 978:12, 978:17, 978:18, 978:19, 978:21, 979:10, 980:9, 987:4
**Correct** [2] - 923:17, 968:19
**cost** [1] - 970:15
**coughing** [1] - 888:4
**counsel** [9] - 888:17, 888:21, 893:10, 893:18, 894:5, 894:7, 935:19, 982:8, 982:18
**count** [2] - 890:10, 892:17
**Count** [3] - 888:25, 892:10, 892:18
**country** [1] - 981:1
**counts** [6] - 888:21, 888:22, 901:4, 925:19, 934:23
**Counts** [5] - 889:3, 889:8, 889:13, 892:8, 901:6, 943:15, 944:5,

947:19
**couple** [4] - 903:24, 911:22, 977:15, 979:23
**course** [3] - 897:8, 913:22, 922:18
**COURT** [82] - 886:1, 888:2, 888:14, 888:18, 894:1, 894:3, 894:17, 895:15, 897:15, 897:18, 897:23, 898:1, 902:11, 919:6, 933:25, 934:4, 934:6, 934:17, 934:21, 935:13, 935:18, 935:20, 936:1, 936:6, 936:8, 936:17, 936:21, 937:12, 938:4, 938:12, 938:23, 940:19, 941:3, 944:13, 944:16, 945:11, 945:20, 946:5, 948:19, 949:5, 950:1, 950:4, 950:7, 951:13, 953:17, 955:20, 955:22, 955:25, 956:5, 956:12, 956:23, 957:1, 957:3, 957:18, 957:21, 959:21, 963:21, 963:23, 964:2, 964:4, 964:7, 964:9, 965:21, 973:24, 975:25, 977:12, 978:8, 979:21, 980:14, 981:9, 981:11, 981:16, 981:20, 981:23, 982:9, 982:14, 983:20, 984:7, 984:12, 984:16, 985:6, 985:16
**court** [1] - 935:23
**Court** [6] - 886:23, 888:17, 889:24, 935:9, 952:17, 987:3
**Court's** [3] - 943:15, 977:11, 980:11
**Courthouse** [1] - 886:24
**courtroom** [3] - 895:21, 898:9, 901:7
**coverage** [4] - 973:20, 973:22, 974:3, 974:6
**covered** [1] - 968:16

**COVID** [1] - 888:11
**CPT** [4] - 900:4, 924:10, 924:20, 925:1
**CR** [1] - 886:4
**created** [1] - 967:10
**creating** [1] - 942:21
**credited** [1] - 889:16
**crime** [2] - 889:21, 890:2
**criminal** [2] - 888:16, 888:20
**CROSS** [1] - 960:1
**cross** [3] - 898:5, 931:9, 959:22
**Cross** [1] - 887:6
**CROSS-EXAMINATION** [1] - 960:1
**cross-examination** [2] - 898:5, 959:22
**Cross-Examination.................** [1] - 887:6
**cross-trained** [1] - 931:9
**CRR** [1] - 886:23
**CT** [18] - 890:21, 892:3, 892:6, 910:8, 917:11, 922:1, 922:18, 922:23, 923:13, 924:12, 924:15, 926:6, 926:24, 960:9, 961:7, 970:7, 970:14, 971:13
**CT-guided** [1] - 971:13
**cuff** [1] - 947:24
**cure** [1] - 914:18
**current** [2] - 912:15, 912:23
**cyst** [1] - 952:23

# D

**D.C** [7] - 886:5, 906:16, 907:19, 907:22, 907:24, 962:7, 962:14
**daily** [1] - 905:3
**damage** [1] - 943:11
**dance** [1] - 921:2
**danger** [1] - 969:14
**data** [2] - 890:14, 893:12
**date** [5] - 936:23, 946:19, 948:5, 948:10, 951:19

**dates** [16] - 921:13, 935:7, 936:19, 936:20, 937:7, 938:15, 938:21, 939:7, 943:19, 945:23, 948:1, 948:12, 948:14, 953:14, 977:23
**DAY** [1] - 886:9
**days** [1] - 935:1
**DC** [3] - 886:14, 886:22, 886:25
**deal** [2] - 895:17, 915:25
**dealing** [3] - 907:1, 916:1, 923:7
**dealt** [2] - 912:1, 925:5
**deceive** [1] - 927:19
**decide** [1] - 913:4
**decided** [6] - 899:24, 900:6, 900:7, 913:6, 917:2, 934:9
**decision** [1] - 961:3
**decrease** [2] - 904:24, 928:13
**decreasing** [2] - 920:2, 942:3
**Defendant** [2] - 886:7, 886:16
**defendant** [10] - 888:19, 890:15, 891:1, 891:7, 891:25, 892:11, 892:17, 892:19, 985:8, 985:9
**defendant's** [3] - 890:6, 890:12, 893:16
**DEFENSE** [3] - 887:3, 896:2, 902:14
**defense** [10] - 888:21, 893:10, 894:5, 894:6, 894:19, 894:25, 897:7, 984:12, 985:12, 985:15
**defraud** [2] - 891:12, 897:2
**degenerating** [1] - 932:6
**degeneration** [4] - 914:21, 942:21, 944:25, 950:23
**degenerative** [4] - 914:18, 942:17, 942:18
**Delaware** [11] - 907:9, 907:10, 909:23, 910:4, 910:9, 910:15, 911:2,

911:4, 913:2,
975:13, 976:5
**deliberate** [1] - 896:9
**deliberation** [1] -
976:1
**deliberations** [2] -
984:20, 985:3
**delivering** [1] - 941:23
**demographic** [1] -
916:13
**demonstrative** [3] -
964:1, 964:10,
966:11
**denied** [1] - 893:17
**density** [1] - 917:19
**deny** [2] - 889:25,
890:11
**Department** [1] -
886:13
**DePaul** [1] - 981:5
**depended** [1] - 933:21
**DEPUTY** [3] - 888:13,
888:15, 894:2
**describe** [2] - 919:16,
920:13
**described** [2] -
943:22, 973:5
**description** [1] -
917:13
**destroy** [2] - 979:1,
979:4
**destroyed** [2] -
961:21, 961:23
**destroying** [4] - 963:6,
966:16, 978:23,
979:9
**destruction** [7] -
961:17, 961:24,
961:25, 962:1,
962:3, 973:6, 979:3
**deterioration** [1] -
914:20
**determination** [2] -
973:22, 974:6
**determinations** [2] -
973:20, 974:3
**determine** [1] - 889:19
**determined** [1] -
953:22
**develop** [2] - 917:19,
917:20
**developed** [2] - 916:7,
917:21
**developing** [4] -
915:4, 915:14,
915:15, 932:14
**diagnoses** [3] -
947:15, 947:17,
952:23
**diagnosis** [11] - 901:8,

901:15, 901:17,
901:19, 901:23,
947:4, 952:14,
952:20, 953:1,
969:20, 969:23
**diagnostic** [4] -
928:21, 944:20,
944:22, 983:15
**diagnostically** [1] -
984:3
**Diercks** [1] - 886:20
**differ** [1] - 955:5
**difference** [3] -
955:19, 958:3, 958:5
**different** [30] - 894:11,
896:22, 898:21,
916:12, 926:10,
932:10, 932:15,
941:10, 948:5,
954:19, 955:2,
955:5, 955:12,
956:2, 956:9,
956:10, 957:5,
957:6, 957:8, 957:9,
957:15, 958:10,
958:12, 958:17,
959:6, 961:24,
973:4, 977:7, 983:5
**differing** [1] - 925:10
**dinosaur** [1] - 972:6
**direct** [6] - 905:13,
936:21, 960:6,
975:14, 976:12,
977:18
**DIRECT** [1] - 902:15
**Direct** [1] - 887:6
**directed** [1] - 956:24
**directive** [1] - 913:2
**directly** [1] - 896:5
**director** [2] - 904:11,
904:13
**disabled** [1] - 915:2
**disagree** [1] - 894:19
**disc** [3] - 914:19,
942:17, 944:25
**disciplinary** [1] -
891:13
**disclosed** [2] - 902:3,
923:12
**discover** [1] - 980:20
**discovered** [1] -
959:14
**discoveries** [1] -
912:20
**discuss** [6] - 894:21,
895:5, 902:8, 969:3,
985:12, 985:24
**discussed** [5] - 894:6,
894:22, 960:6,
969:1, 975:5

**discusses** [1] - 976:17
**discussing** [1] -
942:13
**discussion** [3] -
893:24, 984:18,
984:25
**discussions** [1] -
985:21
**disease** [4] - 914:18,
914:19, 942:17,
942:18
**distinction** [1] -
913:25
**distinguish** [2] -
901:8, 917:23
**DISTRICT** [3] - 886:1,
886:1, 886:10
**District** [1] - 897:12
**Doctor** [5] - 928:14,
936:12, 949:8,
950:2, 959:19
**doctor** [8] - 906:10,
906:22, 913:24,
914:6, 962:12,
962:22, 962:24,
973:9
**Doctors** [2] - 903:23,
904:13
**doctors** [11] - 900:2,
911:24, 913:23,
914:10, 914:22,
915:23, 956:9,
956:11, 972:4,
972:5, 979:7
**document** [21] -
935:19, 936:22,
936:25, 937:21,
938:13, 939:5,
940:1, 945:22,
946:2, 946:8,
948:21, 951:15,
951:21, 952:22,
953:18, 954:3,
954:6, 978:13,
982:18, 982:19
**done** [13] - 895:9,
901:13, 902:8,
914:15, 924:3,
930:8, 971:4, 971:8,
971:13, 971:17,
980:13, 980:25,
986:3
**double** [1] - 903:11
**doubt** [6] - 889:21,
890:2, 890:6,
890:11, 892:9, 897:9
**down** [13] - 914:20,
916:21, 916:23,
943:6, 949:24,
950:14, 966:22,

975:4, 977:2,
983:23, 983:25,
984:8, 984:9
**Dr** [42] - 891:11,
891:14, 891:17,
891:19, 891:23,
892:1, 892:2,
892:22, 893:5,
893:9, 896:4, 896:8,
896:14, 896:16,
897:10, 898:7,
898:9, 899:5,
899:23, 900:3,
900:4, 900:10,
900:15, 900:20,
901:2, 901:5,
901:10, 901:21,
902:1, 902:2,
902:13, 902:19,
936:9, 960:3,
961:14, 964:14,
977:14, 980:19,
984:8
**drift** [2] - 908:24
**drug** [6] - 932:25,
933:12, 933:23,
946:17, 952:12,
967:23
**drugs** [1] - 967:20
**during** [7] - 891:2,
892:22, 898:16,
904:9, 934:10,
934:11, 962:14
**dye** [1] - 913:21
**dyes** [1] - 913:22

# E

**early** [2] - 972:6,
985:18
**easier** [1] - 908:22
**east** [1] - 898:15
**East** [1] - 907:6
**edits** [1] - 985:24
**education** [1] - 912:16
**effect** [1] - 894:16
**effective** [2] - 932:13,
980:24
**effects** [1] - 908:22
**efficient** [1] - 917:6
**either** [5] - 895:12,
898:23, 905:19,
968:11, 970:9
**elderly** [6] - 915:3,
915:4, 916:21,
923:7, 933:5, 979:3
**electronically** [1] -
953:1
**element** [1] - 897:2

**elements** [5] - 889:21,
890:1, 890:10,
892:8, 956:19
**eliminate** [1] - 920:5
**embrace** [1] - 976:23
**emerging** [1] - 912:4
**emits** [1] - 917:17
**emphasized** [1] -
956:12
**employees** [1] -
962:20
**end** [1] - 896:21
**End** [4] - 897:25,
934:20, 957:2,
981:22
**enjoyed** [1] - 945:6
**enrolled** [1] - 968:18
**enrollment** [1] -
968:20
**entire** [2] - 930:22,
979:9
**entirely** [1] - 893:11
**entirety** [1] - 902:9
**entitled** [2] - 897:5,
987:5
**episodic** [2] - 958:14,
959:17
**Erica** [13] - 890:25,
891:22, 899:23,
900:15, 924:1,
924:22, 925:14,
925:25, 926:1,
926:3, 927:5,
930:13, 975:7
**especially** [2] - 913:1,
915:1
**ESQ** [4] - 886:12,
886:13, 886:16,
886:19
**essential** [3] - 889:20,
890:1, 892:8
**essentially** [2] - 948:9,
963:19
**estimate** [1] - 912:12
**et** [12] - 903:19, 907:3,
911:19, 912:11,
913:22, 915:16,
920:4, 925:24,
931:5, 932:3, 933:18
**ethyl** [1] - 929:13
**Euflexxa** [1] - 932:24
**evaluated** [1] - 948:9
**everyday** [1] - 905:5
**everywhere** [1] -
927:24
**evidence** [28] -
888:24, 889:3,
889:12, 889:18,
890:8, 890:13,
890:19, 890:25,

891:10, 891:13,
892:7, 892:10,
892:16, 892:19,
894:14, 895:18,
895:19, 896:9,
897:20, 898:3,
898:5, 900:15,
901:2, 902:9, 978:8,
979:21, 984:16
**evolved** [3] - 906:18,
906:20, 907:4
**evolving** [1] - 912:20
**exact** [5] - 906:9,
907:11, 931:23,
935:1, 948:8
**exactly** [5] - 900:17,
907:15, 929:3,
937:17, 972:14
**exam** [2] - 931:10,
931:17
**EXAMINATION** [3] -
902:15, 960:1,
980:17
**examination** [4] -
898:5, 959:22,
960:6, 975:14
**Examination.............**
**.....** [1] - 887:7
**Examination.............**
**.......** [1] - 887:6
**Examination.............**
**........** [1] - 887:6
**examine** [1] - 928:25
**examined** [1] - 953:22
**examiners** [1] - 927:2
**example** [4] - 889:22,
893:24, 894:14,
974:16
**exams** [1] - 931:5
**execution** [1] - 891:11
**exhibit** [2] - 975:25,
976:3
**Exhibit** [12] - 892:4,
963:10, 963:13,
963:17, 963:18,
964:9, 966:10,
973:19, 975:16,
975:19, 978:6,
979:19
**experience** [1] -
896:14
**experimental** [2] -
968:9, 968:12
**experts** [2] - 925:5,
925:9
**expose** [1] - 915:10
**exposed** [2] - 899:12,
899:21
**exposure** [3] - 899:16,
915:12, 916:24

**exposures** [1] - 915:5
**extension** [2] -
905:16, 905:20
**extensive** [1] - 912:9
**extensively** [1] -
956:15
**extra** [2] - 959:2,
984:21
**extremity** [4] - 909:17,
950:25, 951:5, 980:8
**eyes** [1] - 889:6

## F

**F.2d** [1] - 890:7
**F.3d** [2] - 889:23,
890:3
**face** [2] - 896:12
**face-to-face** [1] -
896:12
**facet** [14] - 918:24,
919:3, 919:14,
920:7, 963:6, 965:6,
965:13, 965:16,
966:3, 966:8,
966:14, 966:17,
972:20, 972:25
**facing** [2] - 928:15,
928:16
**fact** [6] - 889:20,
890:1, 915:15,
926:22, 926:25,
942:1
**factor** [2] - 913:23,
916:1
**facts** [1] - 896:15
**failed** [3] - 912:9,
968:2, 976:23
**failure** [1] - 983:20
**fair** [11] - 962:22,
966:4, 969:6,
973:22, 974:4,
976:22, 977:6,
977:24, 978:4,
978:10, 979:13
**fairly** [3] - 913:12,
913:13, 918:15
**faith** [4] - 897:7,
900:16, 902:2,
925:15
**falsity** [1] - 889:10
**familiar** [8] - 909:11,
919:10, 947:4,
954:19, 955:2,
961:13, 973:20,
977:3
**fancy** [1] - 958:24
**far** [1] - 896:6
**fast** [1] - 907:17

**fast-forward** [1] -
907:17
**favorable** [3] - 889:18,
890:9, 893:13
**FDA** [2] - 967:12,
967:15
**fear** [1] - 928:13
**fearful** [1] - 942:5
**February** [6] - 938:15,
943:17, 953:15,
953:21, 954:5
**feet** [1] - 951:4
**felt** [2] - 926:24,
929:25
**few** [10] - 893:23,
894:9, 895:20,
901:4, 941:8, 960:5,
971:4, 974:10,
977:16, 986:3
**field** [3] - 912:20,
917:8
**fields** [2] - 956:2,
956:4
**figure** [3] - 923:10,
923:20, 925:2
**fill** [1] - 931:10
**filled** [1] - 891:23
**fillers** [1] - 932:3
**final** [10] - 893:18,
893:19, 895:7,
898:4, 901:4,
954:11, 984:18,
985:2, 985:7, 985:12
**finally** [2] - 892:18,
953:4
**findings** [1] - 976:18
**fine** [2] - 945:6, 968:11
**fingers** [1] - 945:8
**fingertip** [1] - 905:21
**finished** [1] - 930:11
**Firm** [1] - 886:16
**first** [7] - 888:24,
896:5, 896:11,
900:22, 902:12,
909:20, 929:4
**fit** [2] - 916:2, 923:6
**five** [4] - 904:1,
904:15, 933:4,
935:21
**fluid** [1] - 932:5
**fluoro** [4] - 922:23,
924:12, 924:15,
926:24
**fluoroscope** [1] -
981:14
**fluoroscopic** [3] -
913:20, 976:6,
976:19
**fluoroscopy** [47] -
890:21, 891:2,

891:4, 891:8,
891:15, 891:19,
892:2, 892:6,
898:13, 898:18,
898:23, 899:2,
899:10, 899:11,
899:16, 900:8,
900:14, 902:5,
910:5, 910:8,
911:13, 911:16,
911:17, 912:10,
913:14, 913:18,
914:25, 917:10,
922:1, 922:18,
923:1, 923:4,
923:13, 926:6,
926:17, 926:20,
927:11, 927:12,
927:22, 960:9,
961:7, 970:5,
970:14, 970:25,
971:5, 971:8, 982:3
**fluoroscopy-guided**
[1] - 971:8
**follow** [1] - 959:17
**followed** [1] - 911:2
**following** [1] - 914:16
**foolish** [1] - 900:13
**foot** [1] - 943:8
**FOR** [2] - 886:1,
902:14
**foramen** [1] - 942:19
**foregoing** [1] - 987:4
**form** [4] - 894:22,
895:2, 983:7, 984:19
**former** [2] - 889:5,
891:3
**forms** [1] - 983:5
**forthcoming** [1] -
893:11
**forward** [1] - 907:17
**foundation** [2] -
956:3, 963:13
**Foundation** [1] -
904:11
**fourth** [1] - 889:12
**fraud** [4] - 896:20,
896:25, 956:14
**Frederick** [2] - 888:17,
902:13
**FREDERICK** [4] -
886:6, 886:19,
887:6, 902:14
**free** [3] - 908:1, 911:5,
930:2
**frequency** [4] -
955:18, 956:10,
958:4, 958:8
**frequently** [1] - 933:7
**friction** [1] - 967:5

**Friday** [1] - 888:19
**friendly** [3] - 933:7,
942:6
**front** [4] - 896:13,
931:2, 931:3, 931:6
**fronts** [1] - 934:17
**fulfill** [1] - 910:13
**full** [2] - 895:13,
933:18
**function** [5] - 905:2,
914:4, 915:10,
955:15, 979:5
**functional** [1] - 914:5
**functions** [1] - 905:4

## G

**G.B** [2] - 892:12,
892:14
**G.B.'s** [1] - 892:13
**gained** [1] - 982:16
**gears** [1] - 928:2
**Gel** [20] - 901:14,
931:21, 931:24,
931:25, 932:1,
932:15, 932:19,
933:2, 933:5,
933:12, 946:18,
947:10, 947:11,
952:13, 967:1,
967:2, 967:8, 967:18
**gel** [6] - 931:12,
931:14, 931:21,
931:24, 932:15
**Gel-One** [19] - 901:14,
931:21, 931:24,
931:25, 932:1,
932:15, 932:19,
933:2, 933:5,
933:12, 946:18,
947:10, 947:11,
952:13, 967:1,
967:2, 967:8, 967:18
**gels** [2] - 932:10,
933:9
**general** [4] - 906:18,
907:1, 930:16, 969:4
**generally** [8] - 903:18,
941:17, 942:8,
942:10, 947:21,
947:22, 958:13,
972:12
**generated** [1] - 942:23
**generators** [1] - 941:7
**gentlemen** [2] -
935:21, 984:17
**gift** [1] - 896:12
**Gilchrist** [4] - 953:5,
953:7, 953:8, 953:9

**girlfriend** [1] - 889:6
**given** [1] - 913:2
**go-to** [1] - 933:6
**God** [1] - 896:12
**GOODING** [3] - 886:6,
887:6, 902:14
**Gooding** [38] - 888:17,
891:14, 891:17,
891:19, 891:23,
892:1, 893:9, 896:4,
896:8, 896:14,
896:16, 897:10,
898:7, 898:9, 899:5,
899:23, 900:3,
900:4, 900:10,
900:15, 900:20,
901:2, 901:5,
901:10, 901:21,
902:1, 902:2,
902:13, 902:19,
936:1, 936:9, 960:3,
964:14, 977:14,
980:19, 984:8
**Gooding's** [4] -
891:11, 892:2,
892:22, 893:5
**government** [24] -
889:19, 889:24,
890:9, 890:13,
890:19, 890:25,
891:6, 891:10,
891:22, 892:10,
892:18, 893:13,
893:22, 895:2,
895:18, 897:4,
897:8, 899:19,
901:18, 921:14,
934:9, 977:13,
980:12, 984:13
**Government** [1] -
886:12
**Government's** [3] -
966:10, 978:6,
979:19
**graduating** [1] -
897:13
**grant** [1] - 890:4
**great** [1] - 896:12
**greater** [2] - 915:3,
915:20
**Gregory** [2] - 944:3,
945:2
**group** [1] - 915:24
**guess** [4] - 962:25,
965:16, 972:6,
977:22
**guidance** [14] - 891:4,
891:8, 892:6,
913:20, 918:3,
927:4, 971:22,

971:25, 972:13,
973:7, 974:3, 976:6,
976:19, 983:16
**guide** [4] - 912:7,
929:7, 929:8, 964:5
**guided** [4] - 892:3,
971:8, 971:13,
971:16
**guiding** [1] - 927:25
**guilt** [1] - 890:6
**guilty** [3] - 892:17,
896:10, 902:10
**guy** [1] - 926:23

## H

**habit** [1] - 912:15
**habitus** [1] - 973:2
**hair** [1] - 962:1
**haircut** [2] - 962:1,
979:2
**halfway** [1] - 934:8
**hand** [2] - 905:16,
950:4
**handle** [1] - 915:23
**handled** [1] - 930:16
**hands** [1] - 912:6
**hands-on** [1] - 912:6
**handwriting** [1] -
980:3
**handwritten** [1] -
983:19
**Harris** [1] - 886:20
**hate** [2] - 897:18,
972:7
**head** [2] - 907:2, 935:2
**health** [1] - 890:17
**Health** [1] - 904:10
**healthcare** [3] -
896:20, 896:25
**healthy** [1] - 967:7
**hear** [4] - 895:18,
895:20, 895:21,
898:8, 899:4,
900:15, 901:2,
961:13, 961:17
**heard** [7] - 899:1,
899:3, 900:6,
900:12, 913:25,
932:2, 933:12
**hearings** [1] - 975:21
**heart** [1] - 916:18
**heavy** [2] - 916:19,
979:6
**held** [1] - 894:23
**help** [1] - 915:9
**hip** [19] - 901:10,
901:15, 904:19,
909:16, 909:17,

943:5, 946:12,
946:13, 946:21,
946:22, 947:2,
947:18, 950:7,
950:25, 952:3,
952:5, 952:6, 952:9,
983:4
**hips** [1] - 945:8
**hiring** [1] - 962:20
**history** [1] - 948:8
**hold** [1] - 928:14
**hole** [1] - 942:19
**home** [2] - 904:7,
906:14
**honestly** [1] - 925:14
**Honor** [25] - 888:13,
888:15, 897:24,
919:8, 934:1,
935:14, 936:16,
938:3, 938:11,
940:18, 941:2,
944:12, 945:19,
948:18, 951:12,
953:16, 959:20,
959:23, 964:6,
964:8, 980:16,
981:8, 984:11,
984:15, 985:14
**HONORABLE** [1] -
886:10
**hope** [4] - 888:11,
895:11, 895:15,
895:24
**hopefully** [1] - 925:7
**Hospital** [4] - 903:23,
903:24, 904:14,
981:5
**hospital** [9] - 903:25,
904:2, 904:3, 907:4,
923:3, 981:7,
981:15, 982:1, 982:3
**hospitals** [5] - 903:20,
903:21, 903:22,
904:1, 904:14
**hot** [1] - 929:5
**hours** [2] - 912:12,
912:24
**Howard** [2] - 897:13,
902:25
**hurt** [1] - 959:3
**hyaluronan** [7] -
932:1, 932:4, 932:6,
932:12, 932:14,
946:16, 952:11

## I

**I..** [1] - 938:22
**idea** [2] - 930:1,

952:25
**identification** [2] -
894:15, 963:18
**identified** [2] - 940:23,
941:20
**identify** [2] - 905:11,
918:20
**iliac** [1] - 949:21
**illnesses** [1] - 916:16
**imaging** [21] - 890:21,
891:4, 891:8,
898:22, 898:24,
905:7, 905:8,
905:24, 906:2,
906:7, 908:4,
909:21, 909:24,
910:5, 911:9,
911:11, 918:3,
944:15, 971:22,
972:13, 973:7
**important** [6] - 898:8,
898:9, 900:20,
908:25, 969:22,
971:23
**impression** [2] -
933:23, 934:3
**incident** [1] - 948:8
**inclination** [1] - 888:6
**included** [2] - 895:1,
983:16
**including** [3] - 892:2,
894:23, 930:18
**incompetence** [1] -
956:13
**incorporate** [1] -
986:2
**incorrect** [2] - 896:19,
961:19
**increase** [2] - 923:8,
958:22
**increased** [7] -
899:12, 899:23,
915:14, 915:15,
915:17, 915:20,
970:15
**increasing** [1] - 942:4
**incurable** [1] - 914:17
**independent** [2] -
905:3, 977:23
**indicate** [1] - 917:10
**indicated** [2] - 968:1,
968:4
**indicates** [3] - 976:4,
976:23, 978:16
**indicating** [1] - 892:13
**indication** [2] - 968:4,
968:6, 968:8
**indictment** [19] -
888:23, 888:25,
889:9, 889:13,

890:11, 890:17,
891:2, 891:9,
909:11, 909:14,
919:10, 920:8,
925:20, 925:22,
930:13, 934:23,
948:15, 977:19,
977:24
**individuals** [1] -
899:14
**indulgence** [2] -
977:11, 980:11
**infection** [1] - 942:3
**inferences** [1] -
889:25
**inflammation** [14] -
904:24, 920:2,
920:5, 929:2, 929:9,
940:15, 940:23,
941:13, 941:20,
942:20, 942:21,
946:15, 952:8
**inflammatory** [3] -
952:10, 953:23,
959:9
**informs** [1] - 888:2
**Inglewood** [1] -
903:19
**initial** [1] - 890:13
**inject** [14] - 905:14,
906:7, 908:14,
913:21, 938:20,
939:17, 940:13,
940:17, 940:21,
941:5, 941:13,
946:13, 953:25
**injected** [7] - 939:20,
940:2, 941:17,
943:20, 946:14,
946:21, 954:9
**injecting** [4] - 908:25,
929:15, 965:7,
972:24
**injection** [50] - 889:2,
889:16, 890:22,
892:5, 892:12,
892:13, 892:20,
893:6, 893:15,
898:22, 898:24,
899:2, 900:8,
901:10, 901:11,
901:14, 901:19,
905:13, 919:24,
920:7, 920:18,
921:5, 921:25,
922:1, 926:20,
927:11, 927:12,
928:9, 928:12,
928:24, 930:6,
933:4, 937:9,

938:19, 939:9, 940:6, 940:10, 941:23, 943:1, 943:20, 946:12, 947:2, 947:9, 952:10, 953:24, 971:9, 971:13, 971:16, 974:18, 984:4
**injections** [81] - 889:7, 891:16, 892:3, 892:15, 892:23, 893:1, 893:2, 893:4, 898:17, 904:17, 904:23, 905:6, 908:4, 908:14, 908:17, 909:13, 909:14, 909:16, 909:25, 910:2, 911:9, 912:8, 913:9, 913:23, 918:2, 918:5, 918:10, 918:11, 918:12, 918:21, 918:24, 918:25, 919:3, 919:14, 920:14, 928:1, 928:3, 928:5, 928:6, 928:7, 928:23, 930:2, 931:7, 933:2, 933:10, 941:16, 941:21, 942:3, 944:1, 946:19, 955:3, 955:6, 955:9, 955:11, 955:18, 956:10, 958:4, 958:8, 960:9, 963:3, 963:5, 963:6, 965:6, 966:25, 967:1, 969:12, 969:15, 969:18, 971:23, 972:1, 972:11, 973:5, 973:6, 975:2, 976:20, 983:14, 983:15
**inpatient** [1] - 907:3
**inquiry** [1] - 894:21
**insert** [3] - 967:20, 967:23, 968:1
**inserting** [1] - 929:19
**inside** [1] - 929:16
**insight** [1] - 925:7
**instead** [1] - 926:6
**instruct** [1] - 896:21
**instruction** [7] - 894:10, 894:15, 896:24, 897:6, 899:8, 985:7, 985:9
**instructions** [10] - 893:19, 895:8,

901:25, 912:2, 984:19, 985:2, 985:7, 985:13, 985:25, 986:2
**insufficient** [3] - 888:24, 889:4, 889:12
**intend** [3] - 891:12, 927:19, 984:13
**intent** [5] - 897:2, 897:4, 897:9, 956:15, 956:16
**interact** [2] - 914:8, 914:9
**interest** [1] - 899:17
**interested** [2] - 935:7, 938:15
**International** [1] - 976:9
**internists** [3] - 914:10, 954:24, 959:12
**interrupt** [2] - 897:18, 972:7
**interruption** [1] - 898:1
**intervene** [2] - 915:9, 959:4
**Intervention** [1] - 976:10
**interventional** [5] - 891:20, 954:25, 955:7, 955:10, 959:10
**interventions** [3] - 911:24, 911:25, 912:1
**intimately** [1] - 926:1
**intra** [5] - 892:11, 892:20, 939:8, 947:9, 953:24
**intra-articular** [5] - 892:11, 892:20, 939:8, 947:9, 953:24
**introduced** [5] - 890:14, 892:10, 892:18, 894:14, 932:13
**invasive** [1] - 913:21
**involve** [2] - 963:6, 975:2
**involved** [4] - 906:3, 906:21, 926:1, 969:15
**involves** [1] - 896:25
**irritate** [1] - 942:22
**irritated** [1] - 942:24
**irritation** [1] - 943:11
**Irvine** [1] - 886:18
**issue** [4] - 890:17, 895:11, 956:15,

956:24
**issues** [4] - 894:23, 907:2, 947:24, 947:25
**itself** [1] - 943:1

---
**J**
---

**jab** [1] - 940:17
**jacket** [2] - 915:16, 915:18
**James** [2] - 953:5, 953:9
**JIL** [1] - 886:13
**JILLIAN** [1] - 886:12
**joint** [30] - 914:18, 918:11, 933:18, 933:21, 942:18, 942:20, 942:21, 943:5, 945:7, 949:23, 949:24, 963:6, 965:6, 965:9, 965:10, 965:17, 965:19, 965:23, 966:5, 966:6, 966:14, 966:17, 967:4, 967:7, 972:21, 972:25, 983:3, 983:11, 983:14
**joints** [19] - 906:20, 908:15, 913:9, 915:8, 920:3, 932:4, 932:5, 932:6, 932:9, 932:11, 945:1, 950:25, 951:5, 955:15, 965:13, 966:3, 966:8, 983:5, 983:6
**journals** [3] - 917:9, 957:12, 957:14
**JR** [1] - 886:19
**JUDGE** [1] - 886:10
**judge** [4] - 895:24, 896:20, 896:23
**judgment** [5] - 888:20, 889:17, 890:4, 893:16, 933:17
**July** [2] - 938:16, 943:18
**June** [5] - 892:20, 893:15, 951:7, 951:23, 952:2
**juries** [1] - 896:11
**juror** [4] - 888:10, 890:5, 890:15, 895:10
**jurors** [1] - 888:3
**JURY** [1] - 886:9

**jury** [24] - 888:19, 890:10, 890:20, 891:1, 892:7, 892:17, 893:14, 893:19, 894:1, 894:13, 894:15, 895:7, 895:14, 895:15, 901:24, 902:22, 935:25, 963:12, 964:9, 964:11, 984:18, 985:5, 985:7, 985:24
**Justice** [1] - 886:13

---
**K**
---

**K.M** [8] - 889:14, 934:24, 937:7, 939:16, 978:10, 978:11, 978:17
**Karen** [1] - 936:13
**Kayode** [1] - 889:23
**keep** [6] - 888:9, 914:5, 918:5, 955:15, 955:16, 967:7
**keeping** [1] - 948:14
**keeps** [1] - 888:7
**Kenrick** [1] - 930:20
**kept** [2] - 951:3, 954:13
**KHOURI** [69] - 886:16, 895:24, 896:3, 897:22, 897:24, 898:2, 902:13, 902:16, 919:8, 919:9, 934:1, 934:2, 934:22, 935:14, 935:17, 936:11, 936:16, 936:18, 936:23, 937:2, 937:14, 938:3, 938:5, 938:6, 938:11, 938:14, 939:1, 940:20, 941:4, 944:14, 944:18, 945:12, 945:14, 945:19, 945:24, 946:4, 946:6, 946:10, 948:18, 948:23, 949:7, 949:10, 949:11, 950:10, 951:12, 951:17, 953:16, 953:20, 955:23, 956:8, 956:20, 956:25, 957:4, 957:20, 957:23, 957:24, 959:20, 964:8,

980:16, 980:18, 981:10, 981:13, 981:19, 981:21, 981:24, 982:15, 983:22, 984:6, 984:11
**Khouri** [23] - 886:16, 888:24, 889:3, 889:8, 889:12, 895:5, 895:20, 895:23, 897:15, 897:18, 902:11, 919:6, 933:25, 934:12, 935:13, 936:8, 944:13, 956:6, 957:18, 959:21, 964:7, 980:15, 984:10
**Khouri's** [1] - 889:6
**kidney** [1] - 916:18
**kind** [6] - 906:17, 917:13, 927:10, 939:7, 948:11
**kindly** [1] - 959:13
**kinds** [3] - 907:2, 908:14, 914:8
**king** [1] - 920:2
**knee** [45] - 892:14, 892:15, 892:20, 892:24, 893:6, 893:14, 901:12, 901:15, 901:18, 901:19, 909:18, 937:8, 937:9, 938:19, 939:9, 939:10, 939:15, 939:18, 939:19, 940:2, 940:3, 942:12, 942:14, 942:22, 942:25, 943:1, 943:6, 943:12, 943:20, 943:21, 943:23, 950:25, 953:8, 953:9, 953:25, 966:25, 967:4, 967:5, 967:15, 967:16, 968:2, 968:5, 983:4
**knees** [3] - 945:7, 953:23, 954:9
**knowing** [1] - 897:4
**knowledge** [1] - 891:11
**known** [3] - 891:7, 903:1, 917:7

---
**L**
---

**L3** [2] - 939:12, 939:13

**L4** [3] - 939:12, 939:13, 965:4
**L5** [1] - 965:4
**label** [2] - 968:13, 980:19
**labeling** [1] - 980:21
**lack** [1] - 965:3
**ladies** [2] - 935:21, 984:17
**laid** [1] - 956:3
**landed** [1] - 933:5
**landmarks** [1] - 905:11
**larger** [2] - 970:20, 970:23
**last** [7] - 893:4, 893:10, 893:19, 916:8, 930:22, 961:18, 962:4
**Law** [1] - 886:16
**law** [1] - 986:1
**lawyer** [1] - 896:12
**lawyers** [3] - 901:24, 936:3, 984:17
**laying** [1] - 963:13
**LCD** [1] - 974:13
**lead** [4] - 915:16, 915:18, 919:7, 933:25
**leading** [7] - 934:11, 940:19, 941:3, 944:13, 957:19, 957:21, 957:22
**learn** [5] - 901:7, 904:16, 911:18, 912:3, 921:17
**learned** [8] - 898:12, 921:19, 957:5, 957:8, 957:19, 957:22, 957:25, 958:3
**least** [2] - 927:2, 961:18
**left** [7] - 892:23, 906:9, 930:25, 938:19, 939:18, 940:2, 952:3
**leg** [1] - 943:7
**legal** [1] - 895:17
**legitimate** [1] - 889:25
**Lena** [2] - 930:21, 930:22
**less** [5] - 912:4, 926:5, 933:15, 961:21, 972:3
**letter** [14] - 891:25, 892:4, 899:3, 899:6, 901:1, 922:11, 922:12, 922:14, 922:16, 922:22, 923:18, 925:21,

960:19
**level** [1] - 943:11
**license** [6] - 907:24, 910:9, 910:15, 911:1, 911:5, 912:17
**licensed** [2] - 906:12, 907:19
**lidocaine** [1] - 929:17
**life** [1] - 905:5
**ligaments** [1] - 913:11
**light** [3] - 889:18, 890:8, 893:13
**lighting** [1] - 929:6
**lights** [1] - 929:2
**limit** [2] - 960:16, 961:12
**limited** [2] - 898:6, 980:8
**limiting** [1] - 894:10
**line** [3] - 956:6, 956:17, 975:14
**list** [3] - 894:11, 947:15, 947:17
**listed** [2] - 891:9, 974:12
**listen** [1] - 959:1
**literature** [3] - 912:9, 912:10, 917:6
**liver** [1] - 916:18
**lives** [1] - 915:7
**living** [2] - 902:19, 905:4
**LLP** [1] - 886:20
**local** [4] - 973:20, 973:22, 974:3, 974:6
**localize** [2] - 908:25, 918:13
**locate** [1] - 972:25
**located** [1] - 981:3
**location** [1] - 941:9
**loci** [1] - 952:7
**long-term** [4] - 914:21, 915:11, 916:1, 946:16
**look** [14] - 893:20, 896:8, 911:11, 914:7, 927:10, 936:19, 936:20, 937:18, 938:9, 939:2, 952:18, 954:2, 959:13, 963:13
**looked** [8] - 936:14, 945:16, 948:16, 951:9, 953:11, 960:25, 976:13, 983:18
**looking** [7] - 908:10, 925:1, 949:12, 964:14, 973:4,

974:7, 978:3
**Los** [5] - 898:11, 903:18, 903:19, 903:23, 904:13
**loss** [2] - 905:15, 920:5
**lost** [1] - 928:20
**love** [1] - 912:24
**lovely** [1] - 947:23
**lower** [27] - 892:23, 909:10, 909:17, 918:24, 939:14, 940:5, 942:18, 943:24, 943:25, 944:21, 944:25, 946:23, 946:25, 948:9, 948:10, 949:20, 949:23, 950:5, 950:21, 950:23, 950:25, 951:2, 951:4, 951:5, 953:8, 954:10, 959:14
**lubricate** [1] - 932:6
**lubricates** [1] - 932:8
**lubricating** [1] - 967:5
**lumbar** [12] - 908:13, 909:9, 909:16, 909:17, 919:3, 946:23, 946:24, 964:21, 965:1, 965:23, 977:8, 983:6
**lunch** [7] - 895:7, 984:21, 984:25, 985:18, 985:19, 985:21
**Lunch** [1] - 986:6
**lunchtime** [1] - 895:13
**lying** [2] - 928:8, 928:14

**M**

**ma'am** [1] - 960:18
**machine** [19] - 891:2, 911:17, 917:14, 917:16, 917:25, 918:6, 923:2, 923:4, 923:5, 931:12, 970:4, 970:5, 970:7, 970:12, 970:14, 970:25, 972:19, 982:3
**machines** [1] - 917:21
**Mackey** [4] - 936:13, 937:6, 938:20, 944:8
**Mackey's** [2] - 982:19, 983:24
**main** [2] - 950:24,

983:3
**maintain** [1] - 914:3
**major** [9] - 894:4, 950:25, 951:1, 967:4, 983:3, 983:6, 983:7, 983:11, 983:14
**malpractice** [2] - 896:18, 956:13
**manage** [5] - 912:22, 914:3, 914:6, 915:11, 956:18
**managed** [1] - 916:20
**management** [24] - 902:21, 903:10, 905:9, 907:5, 911:22, 912:18, 913:24, 914:22, 914:23, 916:1, 925:6, 939:8, 954:20, 954:23, 955:10, 957:6, 957:9, 958:7, 958:10, 958:11, 958:13, 959:4, 962:9, 980:25
**manager** [2] - 923:24, 930:16
**managing** [1] - 914:14
**mandatory** [1] - 909:2
**March** [6] - 935:7, 936:13, 936:24, 939:4, 939:25, 978:11
**marked** [2] - 963:18, 980:6
**Martin** [1] - 886:17
**mask** [2] - 888:7, 888:9
**material** [3] - 896:25, 901:24, 902:7
**matter** [4] - 890:13, 910:25, 936:3, 987:5
**matters** [2] - 895:12, 895:17
**Maya** [6] - 890:24, 891:16, 930:24, 930:25, 931:1, 931:6
**McDuffie** [3] - 947:19, 947:20, 948:24
**mean** [3] - 909:20, 927:23, 931:16
**meaning** [2] - 942:17, 958:14
**means** [2] - 934:8, 941:23
**mechanism** [1] - 958:19
**medial** [2] - 966:13, 966:17

**medical** [15] - 897:12, 902:23, 902:24, 909:23, 910:4, 912:16, 912:24, 930:20, 931:16, 954:20, 954:22, 957:6, 957:9, 957:12, 957:14
**Medical** [1] - 981:5
**Medicare** [53] - 890:17, 890:20, 891:7, 891:12, 891:17, 891:25, 892:1, 892:4, 892:11, 892:19, 898:18, 899:4, 899:9, 899:25, 900:11, 900:13, 900:18, 900:23, 901:11, 901:13, 901:16, 901:22, 915:2, 915:22, 916:3, 916:5, 920:11, 920:13, 921:1, 922:20, 923:10, 924:5, 925:2, 925:11, 926:5, 926:9, 926:21, 926:22, 926:25, 927:17, 947:2, 953:1, 956:14, 960:8, 960:19, 968:16, 968:25, 969:1, 969:4, 969:24, 970:1, 973:23, 974:4
**medication** [4] - 908:23, 947:11, 959:9, 980:22
**medications** [7] - 914:7, 914:9, 916:19, 946:14, 968:10, 980:19, 980:23
**Medicine** [1] - 902:25
**medicine** [16] - 903:2, 904:11, 904:13, 905:1, 906:12, 906:20, 906:21, 907:4, 909:1, 912:24, 929:20, 941:24, 965:7, 969:16, 978:20, 979:12
**meet** [1] - 896:11
**meetings** [3] - 911:21, 912:3, 917:7
**member** [1] - 904:5
**members** [1] - 895:15
**Memorial** [1] - 903:23

memory [2] - 918:8, 977:23
mention [1] - 912:9
mentioned [8] - 901:17, 923:24, 938:21, 957:15, 959:11, 971:2, 971:4, 976:12
mentioning [3] - 916:6, 918:13, 980:21
mentored [2] - 911:18, 971:3
merit [1] - 893:24
method [1] - 919:20
MICHAEL [1] - 886:16
microphone [1] - 965:21
middle [3] - 964:14, 964:24, 976:22
midway [1] - 950:14
Mierzwa [2] - 891:6, 891:24
might [2] - 948:15, 952:13
mind [1] - 948:14
mindful [1] - 896:9
minor [2] - 894:5, 894:7
minute [1] - 985:10
minutes [3] - 977:16, 985:20, 986:3
mispronounce [1] - 964:18
misrepresent [1] - 923:13
misrepresentation [3] - 897:1, 901:23, 902:2
mistake [2] - 902:6
mitigate [2] - 916:10, 928:12
mix [3] - 915:21, 915:22, 916:5
mobility [3] - 904:25, 905:4, 920:6
modality [1] - 923:15
modification [2] - 895:2, 895:4
modifier [5] - 926:4, 926:11, 927:6, 927:8, 927:13
modifying [1] - 892:13
moment [2] - 897:15, 938:3
Monday [2] - 886:6, 896:1
money [1] - 897:3
monitor [1] - 959:4
months [1] - 961:18,

961:22, 962:4
moreover [1] - 890:24
Morning [1] - 886:7
morning [11] - 888:2, 888:3, 888:5, 888:6, 895:15, 895:21, 895:24, 902:17, 902:18, 960:3, 960:4
most [16] - 889:18, 890:9, 893:13, 898:8, 898:9, 906:21, 913:6, 914:17, 915:21, 915:23, 916:12, 917:6, 921:2, 929:25, 973:3, 979:7
motion [6] - 889:17, 889:25, 890:4, 890:12, 893:16, 904:25
motive [1] - 933:24
motor [1] - 979:5
move [2] - 917:13, 941:10
moved [4] - 888:19, 907:1, 931:1, 968:22
movement [1] - 965:14
moving [3] - 963:24, 963:25, 965:20
MR [68] - 895:24, 896:3, 897:22, 897:24, 898:2, 902:13, 902:16, 919:8, 919:9, 934:1, 934:2, 934:22, 935:14, 935:17, 936:11, 936:16, 936:18, 936:23, 937:2, 937:14, 938:3, 938:5, 938:6, 938:11, 938:14, 939:1, 940:20, 941:4, 944:14, 944:18, 945:12, 945:14, 945:19, 945:24, 946:4, 946:6, 946:10, 948:18, 948:23, 949:7, 949:10, 949:11, 950:10, 951:12, 951:17, 953:16, 953:20, 955:23, 956:8, 956:20, 956:25, 957:4, 957:20, 957:23, 957:24, 959:20, 964:8, 980:16, 980:18, 981:10, 981:13,

981:19, 981:21, 981:24, 982:15, 983:22, 984:6, 984:11
MRI [2] - 944:11, 944:24
MS [33] - 893:22, 894:6, 934:15, 940:18, 941:2, 944:12, 944:17, 949:4, 955:21, 956:1, 959:23, 960:2, 963:22, 963:25, 964:3, 964:6, 964:11, 964:13, 965:25, 966:1, 974:1, 974:2, 976:2, 977:11, 977:14, 977:17, 978:9, 979:22, 980:11, 980:13, 981:8, 984:15, 985:14
multiple [6] - 894:8, 915:5, 916:19, 940:23, 942:3, 953:8
muscle [2] - 905:18, 918:12
muscles [3] - 906:19, 908:14, 955:14
music [1] - 966:24
must [5] - 889:16, 889:18, 889:24, 890:5, 890:21
muster [1] - 924:5

## N

name [7] - 946:17, 946:24, 952:12, 954:24, 965:4, 967:8, 974:6
named [4] - 909:13, 930:24, 953:4, 977:19
names [1] - 932:23
national [2] - 912:2, 917:6
naturally [1] - 967:3
nature [1] - 958:5
necessarily [4] - 890:5, 918:13, 930:10, 969:3
Necessary [1] - 974:8
necessary [2] - 909:2, 974:14
necessity [1] - 891:15
neck [5] - 908:13, 908:19, 909:5,

909:6, 910:2
need [5] - 929:3, 934:7, 935:20, 956:23, 984:19
needed [2] - 899:15, 981:17
needle [27] - 905:15, 905:16, 908:9, 918:6, 918:13, 918:17, 918:19, 918:20, 919:2, 928:10, 928:13, 928:18, 929:8, 929:10, 929:15, 929:19, 929:20, 929:23, 940:25, 941:9, 941:12, 941:24, 941:25, 971:20, 972:1, 972:10, 972:14
needles [1] - 929:7
needs [1] - 935:24
negative [2] - 888:5, 888:6
neighborhood [1] - 907:15
nerve [29] - 939:11, 942:22, 942:24, 942:25, 943:8, 943:11, 947:9, 953:25, 959:13, 959:16, 961:17, 961:20, 961:23, 961:25, 973:1, 973:6, 976:6, 978:17, 978:19, 979:4, 979:8, 979:9, 979:11, 979:13, 983:4
nerves [34] - 906:19, 908:18, 913:13, 918:15, 939:9, 939:14, 940:2, 942:14, 942:19, 943:4, 943:20, 943:23, 946:21, 946:22, 949:18, 949:19, 952:3, 952:5, 952:7, 954:10, 955:14, 958:25, 963:7, 966:8, 966:12, 966:13, 966:16, 966:18, 972:20, 972:24, 978:20, 978:23, 978:25, 983:6
nervous [2] - 958:17, 958:21
neurologic [1] - 907:2

neurologists [1] - 954:25
neurolysis [2] - 961:24, 979:2
never [7] - 902:2, 923:12, 926:23, 973:5, 975:6, 975:10, 975:11
new [6] - 912:18, 931:1, 963:21, 963:22, 979:7, 981:14
New [1] - 886:14
newest [1] - 891:19
next [3] - 894:4, 906:4, 974:24
nice [1] - 895:9
night [1] - 893:19
non [2] - 957:19, 957:21
non-leading [2] - 957:19, 957:21
none [2] - 897:19
nonpharmacologic [1] - 968:3
normally [1] - 948:6
note [5] - 900:20, 974:12, 978:11, 983:9, 983:13
noted [1] - 983:12
notes [4] - 927:23, 947:14, 954:16, 983:19
nothing [2] - 896:14, 984:6
notice [2] - 921:10, 952:13
notification [1] - 922:7
notified [1] - 922:10
November [9] - 892:12, 937:22, 937:25, 945:9, 945:24, 946:5, 946:6, 948:2, 949:2
numb [1] - 979:13
number [11] - 894:11, 906:9, 911:21, 912:24, 924:9, 925:5, 934:17, 968:15, 974:12, 974:25, 977:18
NW [3] - 886:14, 886:21, 886:24

## O

o'clock [2] - 984:24, 985:1
object [1] - 894:20

**objected** [1] - 934:18
**objection** [18] - 934:6,
934:7, 934:10,
934:15, 934:19,
934:21, 940:18,
941:2, 944:12,
944:17, 949:4,
955:20, 955:21,
956:5, 957:3, 964:7,
981:8, 981:23
**objectionable** [1] -
934:17
**objections** [3] -
893:20, 893:23,
894:9
**objective** [2] - 914:4,
955:15
**obviously** [2] -
915:25, 942:2
**occasion** [1] - 931:8
**occasions** [3] - 930:7,
931:10, 938:18
**occurred** [1] - 921:20
**occurs** [1] - 967:4
**October** [10] - 935:8,
936:13, 936:24,
939:25, 946:3,
946:4, 948:2,
948:25, 949:3,
949:15
**OF** [3] - 886:1, 886:3,
886:9
**offered** [1] - 890:19
**offhand** [2] - 937:11,
947:3
**office** [21] - 919:23,
923:24, 930:16,
930:17, 930:19,
931:1, 931:3, 931:4,
931:6, 931:8,
932:11, 947:7,
954:13, 968:16,
969:8, 970:20,
970:23, 981:3,
981:14, 981:18
**offices** [1] - 968:22
**Official** [1] - 987:3
**often** [2] - 956:2,
958:24
**once** [7] - 905:14,
911:3, 929:4, 933:3,
940:11, 941:22,
980:20
**One** [21] - 901:14,
931:21, 931:24,
931:25, 932:1,
932:15, 932:19,
933:2, 933:5,
933:12, 946:18,
947:10, 947:11,

952:13, 953:24,
967:1, 967:2, 967:8,
967:18
**one** [49] - 888:3,
893:3, 894:8,
897:15, 901:13,
902:4, 911:23,
914:15, 915:7,
917:2, 917:5,
919:24, 919:25,
920:18, 923:3,
924:11, 928:11,
931:17, 932:16,
933:13, 940:14,
940:17, 940:22,
941:5, 946:15,
946:16, 950:24,
963:12, 963:21,
963:22, 965:17,
966:3, 966:4, 966:5,
966:6, 970:9, 971:3,
971:10, 971:11,
974:11, 976:14,
978:15, 979:24,
983:5, 983:8, 985:8
**one's** [1] - 947:10
**One-Gel** [1] - 931:21
**ones** [1] - 966:14
**open** [1] - 907:9
**opened** [2] - 904:12,
907:10
**opening** [3] - 895:6,
897:19, 898:5
**OPENING** [2] - 887:3,
896:2
**operated** [1] - 962:6
**operating** [1] - 970:15
**opinion** [1] - 899:9
**opinions** [1] - 925:10
**opioids** [2] - 916:20,
959:9
**opportunity** [1] -
896:5
**opposed** [3] - 908:8,
918:7, 983:16
**or..** [1] - 916:23
**order** [5] - 890:22,
900:25, 975:23,
976:5, 976:23
**ordered** [1] - 967:18
**orientation** [3] -
955:13, 965:24
**oriented** [1] - 905:2
**original** [1] - 972:4
**originally** [1] - 985:7
**orthopedists** [4] -
914:10, 914:12,
955:1, 959:11
**OrthoVisc** [1] - 932:24
**osteoarthritic** [1] -

967:16
**osteoarthritis** [4] -
947:18, 952:23,
953:23, 968:5
**otherwise** [1] - 903:1
**ourselves** [1] - 896:16
**outside** [1] - 888:3
**overall** [2] - 914:5,
937:15
**overruled** [1] - 981:23
**own** [1] - 932:14
**owned** [1] - 962:6
**owner** [1] - 962:17

## P

**p.m** [2] - 985:5, 986:6
**package** [4] - 967:20,
967:23, 968:1,
980:22
**page** [13] - 936:22,
936:23, 963:10,
963:13, 966:2,
974:10, 974:11,
974:24, 976:3,
976:16, 976:17,
976:22, 978:7
**pages** [3] - 974:10,
979:23, 987:4
**paid** [9] - 891:9, 900:1,
901:11, 921:1,
927:15, 960:11,
973:7, 973:12,
973:17
**pain** [69] - 899:15,
899:21, 901:20,
902:21, 903:10,
904:24, 905:9,
906:21, 906:22,
906:25, 907:5,
911:22, 911:23,
912:17, 912:22,
913:23, 913:24,
914:4, 914:5,
914:16, 914:23,
915:10, 915:23,
915:24, 915:25,
920:3, 920:5, 923:7,
925:6, 930:1, 930:2,
939:8, 940:16,
941:6, 942:2,
942:23, 943:2,
943:3, 943:4, 943:5,
943:6, 943:8,
943:12, 954:20,
954:22, 955:3,
955:10, 956:18,
957:6, 957:9, 958:7,
958:10, 958:13,
958:15, 958:17,

958:18, 958:19,
958:24, 959:4,
959:7, 959:8, 962:9,
968:5, 980:25
**pain-free** [1] - 930:2
**palpate** [1] - 905:12
**paragraph** [1] - 976:4
**paravert** [1] - 974:20
**parents** [1] - 915:4
**Parrott** [2] - 890:24,
891:16
**part** [7] - 921:2, 932:4,
936:22, 963:3,
968:20, 982:2,
982:24
**partial** [1] - 961:25
**particular** [8] - 901:6,
922:17, 956:21,
960:12, 963:12,
967:12, 975:23,
979:17
**particularly** [2] -
909:1, 950:23
**parts** [3] - 904:17,
904:19, 977:7
**pass** [1] - 924:5
**pathway** [1] - 923:14
**patient** [67] - 889:1,
889:4, 889:9,
889:13, 892:12,
892:20, 892:21,
893:5, 899:14,
901:13, 901:17,
913:7, 914:14,
915:19, 916:2,
916:3, 916:13,
917:12, 917:15,
919:22, 923:6,
923:15, 928:4,
928:8, 928:11,
928:15, 928:16,
928:19, 928:22,
929:15, 931:13,
931:18, 933:3,
933:13, 933:16,
934:24, 935:11,
937:7, 937:10,
937:16, 937:25,
938:7, 939:16,
940:13, 941:11,
941:20, 941:22,
942:2, 942:6, 942:7,
942:9, 942:16,
944:3, 945:6,
947:23, 950:16,
953:4, 953:22,
954:14, 954:17,
959:13, 961:4,
961:7, 973:2,
979:25, 984:1

**patient's** [2] - 942:4,
947:12
**patient-friendly** [1] -
942:6
**patients** [44] - 891:3,
899:12, 899:13,
899:18, 899:20,
900:5, 904:25,
906:7, 907:3,
909:13, 913:19,
914:1, 914:13,
915:1, 915:3, 915:6,
915:13, 915:18,
915:22, 915:23,
916:8, 916:14,
916:17, 920:8,
921:13, 923:7,
928:10, 929:23,
932:7, 933:5, 933:6,
933:8, 950:22,
968:2, 977:19,
977:25, 978:2,
979:3, 981:15,
982:6, 982:7, 982:11
**pay** [5] - 900:18,
900:19, 960:25,
970:22, 970:24
**paying** [1] - 962:18
**pays** [1] - 901:22
**pelvis** [1] - 949:24
**people** [15] - 905:3,
906:2, 914:5, 914:6,
915:11, 916:21,
917:7, 924:23,
930:3, 930:5, 930:9,
955:16, 956:2,
959:17, 968:15
**per** [2] - 976:5, 983:17
**percent** [1] - 916:4,
955:6
**Perez** [1] - 901:21
**perfect** [1] - 900:12
**perform** [7] - 904:16,
911:9, 918:2, 928:8,
946:19, 948:24,
949:16
**performed** [12] -
901:3, 901:10,
931:7, 937:9,
944:21, 945:9,
946:12, 948:11,
949:1, 949:17,
951:6, 955:6
**performing** [4] -
891:15, 908:3,
976:6, 976:19
**perhaps** [1] - 926:2
**period** [7] - 906:8,
910:20, 914:15,
955:16, 959:17,

962:2, 962:14
**permit** [1] - 889:20
**permits** [1] - 973:8
**person** [4] - 898:9, 930:22, 958:23, 959:3
**personally** [2] - 891:23, 972:8
**pertained** [1] - 889:9
**pertaining** [2] - 889:4, 889:13
**pertinent** [1] - 905:5
**phobias** [1] - 928:10
**phone** [3] - 897:16, 934:4, 955:22, 981:10
**photo** [1] - 963:14
**physiatrist** [2] - 898:13, 926:16
**physiatrists** [4] - 955:8, 955:9, 956:18
**physiatry** [8] - 898:11, 902:20, 903:1, 903:9, 906:18, 907:1, 955:5, 962:10
**physiatry's** [1] - 955:12
**physical** [4] - 903:2, 904:11, 904:13, 905:1
**physician** [3] - 897:11, 902:4, 902:20
**physicians** [4] - 906:24, 911:25, 916:20, 980:23
**pick** [2] - 897:16, 955:22
**picture** [3] - 917:20, 918:7, 919:20
**pictures** [1] - 917:22
**pieces** [1] - 926:8
**pinched** [1] - 943:8
**place** [3] - 900:22, 917:17, 918:18
**places** [2] - 932:2, 940:24
**Plaintiff** [1] - 886:4
**playing** [1] - 966:23
**plenty** [2] - 915:6, 915:8
**plus** [3] - 927:11, 927:12, 927:13
**pocket** [2] - 950:12, 950:14
**point** [6] - 895:3, 898:2, 918:7, 921:10, 950:2, 981:16
**pointing** [2] - 950:4, 950:11

points [3] - 893:23, 893:25, 908:15
**popular** [1] - 932:12
**population** [11] - 899:14, 913:7, 915:19, 916:3, 916:11, 923:6, 923:15, 961:5, 961:7
**populations** [1] - 917:12
**portion** [3] - 936:21, 939:20, 965:19
**portions** [1] - 969:2
**position** [3] - 894:25, 899:20, 928:3
**possibility** [1] - 889:7
**possible** [1] - 914:21
**possibly** [1] - 955:17
**poster** [3] - 963:15, 963:19, 964:21
**posterior** [2] - 950:7, 950:9
**poured** [1] - 913:2
**practice** [33] - 898:16, 903:14, 903:17, 904:12, 906:12, 906:17, 906:18, 906:23, 907:9, 907:10, 907:11, 907:21, 913:5, 913:7, 913:16, 915:2, 916:12, 920:11, 931:4, 931:17, 954:20, 954:22, 956:4, 958:7, 959:7, 962:6, 962:17, 970:10, 970:15, 983:13
**practiced** [3] - 903:18, 906:5, 962:9
**practices** [5] - 907:12, 915:21, 916:4, 916:12, 959:8
**practicing** [1] - 906:15
**practitioners** [2] - 911:23, 912:13
**precise** [1] - 918:15
**predominantly** [3] - 915:2, 916:3, 916:5
**preferable** [1] - 917:11
**preferred** [1] - 933:1
**prenatal** [1] - 917:20
**preparations** [2] - 932:14, 932:15
**preparing** [1] - 931:18
**prescription** [1] - 959:12
**present** [1] - 888:17
**presentation** [4] - 895:19, 933:16,

933:22, 934:10
**preserve** [1] - 914:19
**pressure** [1] - 908:8
**pretty** [3] - 894:7, 913:15, 930:2
**previous** [1] - 928:21
**previously** [3] - 942:13, 956:12, 957:15
**primarily** [8] - 906:23, 918:11, 931:6, 947:23, 950:21, 953:9, 983:15
**primary** [2] - 914:6, 952:7
**Princeton** [2] - 897:11, 902:24
**private** [2] - 904:12, 915:22
**privileges** [2] - 982:5, 982:10
**probation** [1] - 910:9
**problem** [8] - 898:19, 898:20, 898:25, 937:8, 947:12, 958:21, 959:1, 959:14
**problems** [13] - 906:19, 916:17, 916:18, 916:22, 920:24, 944:9, 945:7, 950:21, 951:2, 953:8
**procedural** [3] - 978:11, 978:16, 979:15
**procedure** [17] - 888:20, 901:8, 901:12, 901:22, 920:15, 926:5, 927:3, 927:24, 947:4, 947:8, 948:24, 951:6, 952:21, 969:23, 977:6, 977:7, 983:1
**procedures** [6] - 891:5, 906:1, 919:24, 931:5, 948:11, 949:15
**proceed** [2] - 895:23, 922:20
**proceeding** [1] - 975:18
**proceedings** [1] - 987:5
**process** [1] - 967:6
**product** [1] - 933:1
**proffer** [1] - 956:7
**program** [3] - 890:18, 903:5, 904:5

**progress** [1] - 947:14
**prolong** [1] - 916:10
**promised** [2] - 970:1
**promptly** [1] - 986:4
**pronounce** [1] - 949:21
**proper** [1] - 922:24
**properly** [7] - 922:20, 923:11, 923:20, 925:7, 927:1, 927:3, 961:9
**propose** [1] - 985:19
**proposed** [4] - 895:2, 985:6, 985:12, 985:24
**protect** [1] - 958:22
**protective** [1] - 958:19
**prove** [2] - 889:10, 897:8
**provide** [4] - 889:10, 939:7, 959:8, 959:9
**provided** [13] - 890:13, 890:25, 891:3, 891:6, 891:10, 891:13, 891:16, 891:22, 894:24, 900:1, 938:19, 939:8, 953:23
**Providence** [1] - 981:5
**provider** [1] - 968:18
**provisions** [1] - 960:12
**proximity** [1] - 941:14
**psychiatrists** [1] - 955:1
**publish** [5] - 964:1, 964:2, 964:11, 966:10, 975:16
**published** [1] - 917:8
**pull** [6] - 941:11, 941:25, 963:10, 973:19, 978:6, 979:19
**pulling** [1] - 941:10
**purchase** [1] - 917:25
**purpose** [3] - 904:23, 932:21, 967:12
**purposes** [2] - 964:1, 983:15
**pursuant** [1] - 888:20
**put** [13] - 890:4, 895:6, 898:4, 899:20, 923:4, 926:9, 928:18, 929:10, 931:13, 940:25, 952:15, 984:13
**putting** [3] - 897:19, 978:20, 979:12

## Q

**qualifying** [1] - 904:4
**quest** [1] - 923:23
**questioning** [4] - 956:6, 956:17, 975:14, 981:17
**questions** [8] - 927:3, 935:11, 954:11, 956:1, 956:23, 959:20, 960:17, 977:15
**Quindoza** [1] - 890:14
**quite** [3] - 917:23, 955:12, 958:9
**quoting** [3] - 889:22, 891:21

## R

**radiation** [11] - 899:12, 899:16, 899:21, 913:22, 914:24, 914:25, 915:5, 915:11, 915:12, 915:25, 916:24
**radiculopathy** [1] - 952:24
**radiofrequency** [2] - 962:2, 979:6
**radiologists** [4] - 915:15, 954:25, 955:7, 959:10
**raised** [1] - 898:2
**range** [1] - 904:25
**rapidly** [1] - 912:19
**rational** [2] - 889:20, 889:25
**rave** [1] - 912:5
**ray** [1] - 913:14
**rays** [3] - 915:6, 915:9, 959:15
**re** [1] - 941:11
**re-sticking** [1] - 941:11
**reach** [1] - 926:25
**reached** [1] - 948:7
**react** [2] - 929:23, 930:3
**read** [7] - 889:19, 899:6, 900:4, 912:25, 922:12, 935:12, 957:12
**reading** [2] - 949:6, 958:1
**ready** [2] - 894:1, 895:17

**real** [8] - 918:18, 918:21, 919:1, 919:21, 920:8, 940:11, 940:12, 943:25
**real-time** [7] - 918:18, 918:21, 919:21, 920:8, 940:11, 940:12, 943:25
**really** [8] - 898:13, 913:2, 917:23, 920:2, 945:6, 972:13, 977:22, 978:3
**reason** [5] - 898:20, 899:8, 899:10, 900:21, 901:11
**Reasonable** [1] - 974:8
**reasonable** [15] - 889:21, 890:2, 890:5, 890:6, 890:9, 890:11, 890:15, 890:20, 891:1, 892:7, 892:9, 892:17, 893:14, 897:9, 974:13
**reasoning** [1] - 960:24
**reasons** [7] - 888:21, 894:12, 894:13, 917:2, 917:4, 917:5, 956:16
**rebuttal** [2] - 984:13, 984:14
**recap** [1] - 927:10
**receive** [7] - 889:15, 892:14, 893:14, 897:6, 921:10, 922:7, 944:19
**received** [10] - 889:2, 889:7, 892:23, 892:25, 893:4, 893:6, 899:4, 960:22, 975:23
**receptionist** [1] - 930:21
**Recess** [1] - 936:7
**recess** [1] - 986:6
**reciprocity** [1] - 910:25
**recognize** [1] - 926:9
**recollection** [19] - 935:4, 935:10, 936:14, 937:4, 937:18, 938:9, 939:2, 945:15, 948:16, 949:5, 949:12, 951:9, 951:25, 952:18, 953:11, 954:13,

978:14, 983:18
**recommended** [5] - 911:3, 916:9, 924:20, 932:8, 942:1
**record** [5] - 949:6, 950:1, 964:4, 975:9, 987:5
**records** [1] - 921:13
**recurrent** [2] - 899:15, 899:16
**Redirect** [1] - 887:7
**REDIRECT** [1] - 980:17
**redirect** [3] - 893:8, 941:12, 980:15
**redirection** [2] - 941:15, 941:18
**reduce** [1] - 904:24
**reducing** [2] - 920:4, 967:5
**redundant** [1] - 926:18
**reevaluate** [1] - 928:23
**reevaluated** [1] - 928:25
**refer** [8] - 906:24, 914:13, 935:3, 935:4, 937:9, 943:6, 943:7, 977:25
**reference** [2] - 943:15, 976:9
**referral** [1] - 906:23
**referrals** [1] - 906:23
**referred** [2] - 943:3, 943:4
**referring** [6] - 921:24, 923:25, 926:19, 944:10, 944:15, 955:3
**reflect** [2] - 947:12, 950:1
**reflected** [1] - 975:19
**refresh** [17] - 935:4, 935:9, 935:10, 936:14, 937:18, 938:9, 939:2, 939:22, 945:15, 948:8, 948:15, 951:9, 952:16, 952:17, 953:11, 954:12, 983:18
**refreshed** [3] - 937:4, 949:13, 951:25
**refreshing** [2] - 949:5, 978:14
**regarding** [9] - 891:14, 892:18, 893:2, 894:10, 894:23, 912:10,

969:6, 981:16
**regenerate** [1] - 961:21
**regenerative** [1] - 967:6
**region** [2] - 909:9, 918:14
**regrowing** [1] - 962:2
**regular** [2] - 959:5, 959:6
**rehabilitation** [2] - 903:2, 905:1
**reimbursed** [2] - 890:22, 925:12
**reimbursement** [1] - 900:25
**reinforcement** [1] - 922:17
**rejected** [2] - 899:6, 899:8
**relating** [1] - 891:10
**relation** [1] - 892:11
**relative** [1] - 973:1
**relatively** [1] - 912:18
**relaxing** [1] - 895:16
**relevant** [2] - 891:2, 891:5
**relying** [1] - 898:3
**remedial** [1] - 910:21
**remember** [29] - 889:1, 900:4, 901:12, 934:24, 935:1, 938:7, 938:23, 942:8, 942:11, 943:17, 944:3, 944:5, 944:9, 944:10, 944:15, 945:2, 945:5, 947:20, 947:22, 948:1, 948:4, 948:11, 950:17, 950:19, 953:4, 953:7, 975:14, 982:19, 983:23
**remind** [1] - 896:16
**rendered** [1] - 947:7
**renew** [1] - 912:16
**rent** [1] - 970:22
**repeated** [1] - 915:10
**rephrase** [1] - 955:23
**replaced** [1] - 892:15
**report** [6] - 978:16, 979:15, 979:17, 983:1, 983:8, 983:16
**Reporter** [2] - 886:23, 987:3
**reporter** [1] - 935:23
**reports** [2] - 927:24, 983:11
**representation** [1] -

926:23
**reps** [2] - 932:25, 934:16
**reputation** [1] - 916:7
**request** [3] - 944:20, 959:15, 959:16
**requested** [2] - 921:12, 927:23
**require** [4] - 901:7, 912:16, 918:5, 919:24
**required** [4] - 892:6, 933:3, 960:8, 976:24
**requirement** [2] - 891:18, 941:25
**requirements** [2] - 891:17, 892:5
**requires** [2] - 890:20, 976:5
**requiring** [1] - 976:19
**research** [7] - 908:7, 911:13, 911:15, 911:20, 924:4, 976:13
**researched** [1] - 969:5
**researchers** [1] - 917:8
**researching** [2] - 912:13, 913:1
**residency** [11] - 898:10, 898:12, 898:15, 902:23, 903:4, 903:6, 903:14, 904:16, 905:9, 905:23, 906:10
**resistance** [4] - 905:15, 905:17, 905:18, 905:19
**respect** [4] - 912:21, 925:21, 940:10, 957:9
**respond** [1] - 968:2
**response** [2] - 893:3, 893:5
**responsibilities** [1] - 930:17
**responsibility** [1] - 930:15
**responsible** [1] - 967:5
**rest** [1] - 984:11
**rested** [2] - 895:18
**restful** [1] - 895:16
**restore** [3] - 904:25, 905:1, 955:15
**restored** [2] - 910:15, 910:23
**rests** [1] - 984:12
**result** [2] - 900:16,

922:8
**resulted** [1] - 900:25
**results** [1] - 944:22
**resumes** [1] - 936:10
**retake** [1] - 936:9
**retrieve** [1] - 935:17
**retrieves** [1] - 935:19
**retrospect** [1] - 926:2
**return** [1] - 902:9
**revealed** [1] - 944:24
**review** [2] - 892:1, 921:12
**reviewed** [1] - 943:19
**reviewing** [15] - 936:25, 937:21, 938:13, 939:5, 940:1, 945:22, 946:2, 946:8, 948:21, 951:15, 951:21, 952:22, 953:18, 954:3, 954:6
**revisit** [1] - 895:10
**rheumatologists** [3] - 914:11, 955:1, 959:12
**rid** [1] - 914:16
**rigorous** [1] - 904:4
**risk** [11] - 915:3, 915:4, 915:14, 915:15, 915:17, 915:20, 916:1, 916:23, 923:8, 942:3, 969:16
**room** [5] - 912:5, 931:7, 931:11, 931:17, 970:18
**Room** [1] - 886:24
**rotate** [1] - 963:11
**rotator** [1] - 947:24
**RPR** [1] - 886:23
**Rubin** [1] - 886:20
**Rule** [2] - 893:16
**rule** [2] - 888:20, 889:6
**ruling** [1] - 889:17
**running** [2] - 900:5, 963:1

## S

**S.B** [2] - 889:4, 889:7
**S.B.'s** [1] - 889:5
**sacral** [2] - 909:9, 949:21
**sacroiliac** [2] - 949:1, 949:17
**safe** [2] - 972:2, 972:10
**sales** [1] - 934:16

salesman [2] - 933:12, 933:23
satisfied [2] - 911:3, 911:4
satisfy [1] - 923:10
saving [1] - 942:2
saw [4] - 888:4, 893:10, 968:15, 977:22
Schaening [1] - 961:14
schedule [1] - 984:22
scheme [1] - 891:11
scholarly [2] - 917:9
school [3] - 897:12, 902:23, 902:25
science [1] - 912:25
scope [1] - 981:9
screen [1] - 929:6
scroll [1] - 979:23
se [1] - 983:17
search [1] - 912:10
seat [1] - 934:8
seated [1] - 888:3
second [3] - 889:3, 919:25, 934:9
section [1] - 950:7
see [30] - 894:19, 895:20, 913:8, 913:12, 913:13, 913:14, 914:3, 918:16, 928:22, 929:2, 929:7, 936:6, 937:11, 949:7, 956:19, 961:24, 963:14, 963:15, 964:9, 964:21, 972:15, 972:17, 972:18, 973:2, 974:16, 974:25, 977:25, 979:25, 985:1
seeing [3] - 893:7, 893:8, 900:5, 907:3, 918:19
segment [2] - 911:24, 911:25
selected [1] - 891:23
seminars [3] - 912:5, 912:14, 925:5
send [2] - 982:7, 982:11
senior [1] - 915:1
sense [3] - 900:12, 926:16, 985:17
sensitivity [1] - 958:22
sent [5] - 893:18, 922:11, 975:6, 975:10, 975:11
separate [2] - 920:16,

922:2
September [1] - 886:6
sequentially [1] - 920:4
series [3] - 919:23, 919:24, 928:23
service [8] - 935:7, 936:24, 939:7, 945:9, 948:1, 948:6, 948:10, 953:14
Services [1] - 947:7
services [6] - 891:8, 900:1, 901:3, 945:24, 947:7, 974:13
Session [1] - 886:7
set [2] - 892:4, 919:23
sets [1] - 966:2
seven [1] - 888:22
several [2] - 903:21, 911:18
severe [3] - 906:25, 933:22, 951:2
sheet [3] - 966:24, 979:25, 980:4
sheets [1] - 891:23
shock [2] - 950:24, 951:1
short [1] - 929:18, 935:20, 946:16
short-acting [1] - 929:18
short-term [1] - 946:16
shoulder [4] - 904:21, 947:24, 948:6
show [5] - 897:21, 898:6, 963:11, 963:17, 972:23
showed [1] - 982:18
showing [1] - 895:25
shown [1] - 982:21
shows [3] - 972:20, 972:22, 972:23
side [6] - 928:8, 928:9, 928:15, 931:3, 931:4, 966:4
sign [2] - 958:20
similar [1] - 942:12
SIMON [1] - 886:13
Simon [2] - 893:21, 985:11
simply [1] - 901:13
single [2] - 914:4, 934:10
sites [5] - 940:16, 941:10, 941:13, 941:17, 952:8
sitting [1] - 961:14
situation [3] - 888:10,

899:20, 942:12
six [4] - 904:15, 961:18, 961:21, 962:4
skewed [1] - 916:11
skin [4] - 917:17, 929:11, 932:3, 972:15
Slater [15] - 963:10, 963:11, 963:17, 966:10, 966:22, 973:19, 974:10, 974:24, 975:4, 975:16, 976:3, 976:16, 977:2, 978:6, 979:19
slip [1] - 947:14
slips [1] - 927:25
slow [2] - 896:9, 914:20
small [2] - 966:8, 978:20
smaller [1] - 908:20
societies [3] - 911:23, 912:1, 976:13
Society [1] - 976:10
someone [1] - 959:7
sometime [1] - 927:5
sometimes [6] - 908:23, 931:18, 933:16, 943:7, 973:1, 973:2
somewhere [1] - 907:14
soreness [1] - 928:12
sorry [17] - 888:14, 898:1, 898:8, 909:24, 928:6, 930:4, 937:7, 946:4, 946:6, 949:2, 953:9, 957:20, 960:14, 965:22, 973:24, 975:9, 977:15
sort [5] - 896:6, 905:20, 911:17, 928:13, 983:7
sorts [1] - 932:2
sound [2] - 917:16, 917:18
spare [1] - 912:25
speaking [5] - 903:18, 941:18, 947:21, 947:22, 972:12
special [3] - 896:3, 912:2, 929:7
specialists [3] - 914:12, 956:17, 981:1
specializes [1] - 902:20

specialties [7] - 954:20, 954:22, 955:2, 955:5, 957:6, 957:9, 957:15
specialty [5] - 905:10, 911:22, 912:18, 917:22, 958:5
specific [5] - 888:22, 905:4, 920:22, 921:13, 957:14
specifically [9] - 890:14, 891:13, 908:17, 913:3, 925:6, 926:7, 953:14, 955:3, 967:8
speculation [1] - 934:16
speculative [1] - 956:3
spend [1] - 912:12
spinal [37] - 892:3, 892:5, 908:18, 908:19, 911:9, 913:9, 918:11, 918:25, 928:1, 928:5, 928:6, 928:7, 939:14, 940:6, 940:10, 941:18, 949:17, 949:19, 952:3, 952:5, 955:3, 955:6, 955:8, 955:11, 960:9, 963:3, 963:5, 963:6, 969:11, 969:15, 969:17, 971:23, 972:1, 972:10, 973:5, 973:6, 983:14
Spine [1] - 976:9
spine [32] - 889:7, 889:16, 904:17, 908:17, 909:3, 909:7, 909:9, 919:4, 939:14, 942:18, 944:25, 946:23, 946:24, 949:24, 950:23, 952:6, 963:15, 964:15, 964:17, 964:20, 964:21, 964:22, 964:24, 965:1, 966:20, 972:20, 977:7, 977:8, 978:21
spondylosis [1] - 952:24
sports [3] - 906:20, 906:21, 907:4
staff [7] - 903:20, 904:1, 904:2, 904:5, 904:15, 930:12, 975:6
stand [6] - 896:13,

934:7, 936:2, 936:4, 936:9, 936:10
standalone [4] - 921:5, 921:6, 921:8, 921:9
standard [5] - 890:8, 976:5, 976:18, 976:24, 985:9
start [10] - 897:10, 906:15, 908:10, 916:21, 923:20, 925:20, 927:8, 944:10, 958:25, 959:1
started [9] - 905:9, 908:3, 908:7, 911:11, 912:18, 924:10, 926:11, 930:25, 932:13
starts [1] - 888:7
statement [3] - 897:19, 898:6, 983:20
STATEMENT [2] - 887:3, 896:2
states [2] - 892:6, 907:12
States [6] - 888:16, 889:23, 890:2, 890:7, 897:4, 916:4
STATES [3] - 886:1, 886:3, 886:10
stay [3] - 904:6, 912:15, 912:23
stays [1] - 958:20
steal [3] - 897:2, 897:4, 897:9
step [1] - 984:8
Stephen [1] - 890:14
steps [1] - 984:9
sticking [1] - 941:11
sticks [1] - 942:5
still [9] - 899:25, 915:17, 922:4, 929:5, 932:9, 936:1, 972:3
stimulate [2] - 926:25, 927:2
stipulations [1] - 911:3
stop [7] - 916:8, 921:22, 960:14, 972:7, 974:11, 979:8, 979:24
stopped [3] - 893:7, 893:8, 924:9
strain [1] - 948:10
strained [1] - 948:9
streamline [1] - 894:18

**streamlined** [1] - 894:13
**strike** [1] - 894:12
**strokes** [1] - 907:2
**structures** [1] - 941:8
**stuck** [1] - 941:22
**studied** [1] - 956:10
**subchondral** [1] - 952:23
**subcutaneous** [1] - 941:12
**subject** [2] - 936:3, 975:18
**submit** [2] - 970:2, 973:10
**submitted** [5] - 890:16, 892:19, 953:1, 973:14
**subsegment** [1] - 955:9
**subsequent** [1] - 907:10
**subsequently** [1] - 903:9
**subspecialize** [1] - 902:21
**subspecialized** [1] - 915:24
**substance** [1] - 967:3
**sufficient** [1] - 889:19
**suggested** [1] - 924:11
**suggestions** [1] - 896:8
**suit** [1] - 950:14
**Suite** [2] - 886:17, 886:21
**summarized** [1] - 892:16
**summary** [2] - 956:20, 956:21
**Supartz** [1] - 932:24
**superior** [3] - 965:16, 965:19, 966:4
**supplied** [6] - 939:10, 942:14, 943:23, 949:18, 954:10, 983:4
**supplies** [1] - 942:22
**supply** [8] - 939:15, 940:3, 943:21, 946:21, 946:22, 949:19, 952:5, 952:6
**supplying** [1] - 953:25
**supposed** [3] - 899:19, 958:16, 958:19
**surface** [7] - 905:11, 905:12, 905:14, 906:1, 908:9,

913:14, 972:5
**surgery** [4] - 916:8, 916:9, 916:10, 932:8
**sustain** [3] - 888:25, 889:4, 934:19
**sustained** [6] - 934:21, 940:19, 941:3, 944:16, 956:5, 957:3
**Swift** [1] - 942:7
**swift** [1] - 938:7
**SWORN** [1] - 902:14
**symptoms** [2] - 888:4, 888:8
**synovial** [1] - 932:4
**synthetic** [1] - 932:5
**Synvisc** [2] - 932:24, 953:24
**Synvisc-One** [1] - 953:24
**syringe** [3] - 933:13, 933:19, 941:24
**system** [2] - 958:18, 958:21

# T

**table** [1] - 928:10
**talks** [1] - 901:14
**TANYA** [1] - 886:10
**target** [2] - 929:3, 983:3
**targets** [1] - 929:5
**taught** [1] - 905:25
**teach** [1] - 905:6
**tear** [1] - 914:19
**technical** [1] - 908:16
**technique** [12] - 899:10, 899:11, 911:19, 913:4, 918:16, 920:16, 941:9, 941:15, 941:18, 942:1, 942:6, 972:4
**techniques** [6] - 912:20, 913:3, 957:5, 957:8, 972:8, 973:9
**technologies** [1] - 912:21
**technology** [2] - 912:4, 976:24
**temporary** [1] - 979:11
**tenders** [1] - 935:19
**tendon** [1] - 905:18
**tendons** [2] - 908:15, 913:10
**term** [6] - 914:21, 915:11, 916:1,

946:16, 958:24
**terminology** [1] - 979:1
**terms** [8] - 903:25, 910:11, 910:13, 914:15, 916:12, 919:2, 924:5, 955:18
**test** [2] - 888:5, 944:20
**testified** [9] - 892:14, 892:21, 892:25, 893:3, 893:6, 893:8, 901:22, 921:15, 956:15
**testify** [2] - 900:20, 901:21
**testifying** [3] - 934:12, 985:8, 985:9
**testimony** [21] - 889:5, 889:10, 889:15, 890:24, 891:3, 891:6, 891:16, 891:22, 891:24, 893:2, 893:11, 893:12, 934:18, 936:3, 960:8, 961:13, 961:14, 961:20, 972:19, 977:22, 984:14
**TESTIMONY** [1] - 887:5
**tests** [2] - 888:5, 944:22
**that'll** [2] - 901:24, 986:2
**THE** [109] - 886:1, 886:10, 888:2, 888:13, 888:14, 888:15, 888:18, 894:1, 894:2, 894:3, 894:17, 895:15, 897:15, 897:18, 897:23, 898:1, 902:11, 902:14, 919:6, 933:25, 934:4, 934:6, 934:17, 934:21, 935:13, 935:15, 935:18, 935:20, 936:1, 936:5, 936:6, 936:8, 936:17, 936:21, 937:1, 937:12, 938:4, 938:12, 938:23, 938:24, 940:19, 941:3, 944:13, 944:16, 945:11, 945:13, 945:20, 945:21, 945:23, 946:1, 946:3, 946:5, 946:7, 946:9,

948:19, 948:20, 948:22, 949:5, 949:9, 950:1, 950:3, 950:4, 950:6, 950:7, 950:9, 951:13, 951:14, 951:16, 953:17, 953:19, 955:20, 955:22, 955:25, 956:5, 956:12, 956:23, 957:1, 957:3, 957:18, 957:21, 959:21, 963:21, 963:23, 964:2, 964:4, 964:7, 964:9, 965:21, 965:22, 973:24, 975:25, 977:12, 978:8, 979:21, 980:14, 981:9, 981:11, 981:16, 981:20, 981:23, 982:9, 982:12, 982:14, 983:20, 984:7, 984:12, 984:16, 985:6, 985:16
**themselves** [1] - 959:3
**theory** [1] - 920:1
**therapeutically** [1] - 984:3
**therapy** [1] - 968:3
**they've** [5] - 915:7, 915:8, 942:17, 980:23
**thinking** [3] - 896:24, 901:11, 934:16
**thinks** [1] - 901:18
**third** [3] - 889:8, 897:1, 920:1
**Thompson** [2] - 930:21, 930:23
**thoracic** [5] - 908:13, 909:7, 964:21, 964:24, 977:8
**thousands** [1] - 906:11
**three** [6] - 893:4, 893:9, 903:5, 905:22, 941:19, 941:21
**three-year** [2] - 903:5, 905:22
**throughout** [2] - 905:22, 915:7
**tighter** [1] - 908:20
**timing** [1] - 893:2
**tip** [1] - 918:17
**tissue** [9] - 905:17, 908:8, 913:10, 914:20, 917:19,

918:19, 941:12, 941:24, 972:23
**tissues** [4] - 913:8, 913:16, 917:18
**title** [2] - 903:25, 962:24
**today** [3] - 895:9, 895:12, 984:21
**together** [7] - 899:3, 899:24, 900:8, 900:16, 911:16, 918:15, 926:9
**tolerate** [1] - 932:9
**took** [2] - 888:5
**top** [7] - 914:13, 917:8, 935:2, 945:13, 950:5, 964:22, 965:17
**topical** [2] - 929:12, 929:14
**total** [2] - 961:25, 962:3
**totally** [1] - 961:23
**toward** [1] - 905:2
**towards** [1] - 928:17
**town** [1] - 906:22
**toy** [1] - 979:7
**trained** [4] - 905:10, 931:8, 931:9, 972:5
**training** [5] - 903:1, 912:19, 955:13, 970:24, 971:5
**trainings** [1] - 975:6
**transcript** [2] - 891:21, 987:4
**TRANSCRIPT** [1] - 886:9
**transducer** [2] - 917:17, 918:18
**trauma** [1] - 907:2
**treat** [9] - 913:17, 928:12, 937:6, 937:8, 938:18, 942:14, 951:4, 952:9, 955:2
**treated** [10] - 935:1, 942:12, 947:23, 950:20, 951:3, 951:4, 952:3, 952:7, 954:17, 983:4
**treating** [4] - 906:19, 947:16, 948:6, 955:14
**treatment** [6] - 899:15, 923:15, 942:8, 944:19, 968:4
**trial** [4] - 896:3, 896:21, 899:2, 921:15
**TRIAL** [1] - 886:9

**tried** [7] - 923:10, 923:12, 924:14, 924:17, 925:3, 926:25, 933:1
**trier** [2] - 889:20, 890:1
**trigger** [1] - 908:15
**true** [1] - 909:16
**try** [6] - 899:24, 914:19, 914:20, 915:9, 924:22, 962:24
**trying** [16] - 907:14, 912:15, 914:3, 914:15, 916:10, 922:19, 922:24, 923:14, 923:20, 925:2, 925:23, 926:21, 926:22, 926:24, 958:14, 979:5
**TSC** [1] - 886:4
**turning** [1] - 917:24
**turns** [1] - 958:18
**twice** [1] - 961:9
**two** [23] - 888:5, 892:25, 893:4, 893:9, 894:7, 919:25, 920:16, 936:19, 936:20, 937:7, 941:19, 941:21, 945:24, 951:1, 965:22, 966:2, 966:5, 966:6, 983:5, 984:24, 985:1
**type** [6] - 889:1, 892:5, 919:13, 929:14, 967:1, 978:13
**types** [6] - 912:7, 915:13, 932:10, 945:24, 954:19, 954:22

**U**

**U.S** [2] - 886:13, 886:24
**UCLA** [2] - 898:12, 903:1
**ultimately** [3] - 922:7, 924:8, 969:9
**ultrasound** [84] - 891:20, 898:13, 898:18, 898:23, 899:9, 899:11, 899:25, 900:9, 900:10, 900:11, 900:14, 900:18, 900:21, 900:23,

902:3, 902:4, 911:13, 911:20, 911:21, 912:3, 912:10, 913:6, 913:12, 913:15, 917:2, 917:10, 917:14, 917:25, 918:2, 918:6, 918:22, 919:13, 920:8, 920:14, 920:20, 920:22, 921:7, 921:25, 922:3, 922:4, 922:19, 922:21, 922:24, 923:12, 923:21, 924:16, 925:3, 925:20, 926:7, 926:12, 926:17, 926:20, 926:23, 927:4, 927:11, 927:13, 927:22, 927:25, 928:22, 929:1, 929:6, 931:12, 931:24, 940:8, 940:11, 940:12, 943:25, 970:4, 970:12, 971:16, 971:19, 971:25, 972:9, 972:19, 974:22, 975:2, 979:16, 980:8, 982:22, 982:25, 983:9, 983:24, 984:1
**ultrasound-guided** [1] - 971:16
**unbundles** [1] - 926:4
**unbundling** [1] - 926:8
**uncommon** [1] - 950:22
**under** [2] - 911:18, 940:21
**understood** [2] - 899:6, 969:11
**United** [6] - 888:16, 889:22, 890:2, 890:7, 897:3, 916:4
**UNITED** [3] - 886:1, 886:3, 886:10
**University** [4] - 897:13, 898:11, 902:24, 902:25
**unless** [2] - 895:3, 956:6
**unreliable** [1] - 889:14
**unrestricted** [3] - 907:24, 910:22, 911:6
**unspecified** [5] -

924:11, 924:13, 924:19, 925:24, 973:8
**untoward** [1] - 908:22
**up** [27] - 896:1, 896:13, 897:8, 897:16, 907:9, 907:10, 916:25, 919:23, 924:4, 926:3, 929:2, 929:6, 931:15, 934:7, 937:3, 937:23, 949:8, 951:18, 955:22, 963:10, 963:19, 964:17, 965:21, 973:19, 978:6, 979:19
**update** [1] - 968:22
**upper** [1] - 909:8
**upshot** [1] - 904:25
**US** [2] - 974:20, 974:22
**useful** [1] - 980:20
**user** [2] - 933:7, 942:6
**user-friendly** [1] - 942:6

**V**

**VA** [1] - 903:1
**vaguely** [2] - 938:8, 948:3
**varied** [1] - 893:3
**vastly** [2] - 899:12, 899:23
**verdict** [4] - 894:22, 895:1, 902:9, 984:19
**verifying** [1] - 894:7
**version** [2] - 893:18
**versus** [6] - 888:16, 894:8, 912:10, 915:22, 915:23, 962:2
**vertebrae** [6] - 964:18, 965:3, 965:8, 965:11, 965:13, 965:17, 966:3, 966:6
**vertical** [1] - 965:24
**vetted** [1] - 904:3
**viewing** [2] - 890:8, 893:12
**vigilant** [1] - 959:2
**virtually** [1] - 977:6
**viscal** [1] - 967:3
**visit** [2] - 983:24, 984:1
**visualization** [6] - 909:1, 912:3, 913:3,

918:16, 920:16, 925:3
**visualize** [3] - 908:7, 912:7, 913:16
**visualizing** [1] - 919:2
**vogue** [1] - 905:10
**vote** [1] - 896:10

**W**

**Wadsworth** [1] - 903:1
**walk** [1] - 981:15
**warning** [2] - 958:20
**Washington** [13] - 886:5, 886:14, 886:22, 886:25, 906:16, 907:11, 907:19, 907:21, 907:24, 911:1, 911:4, 911:5, 911:8
**watch** [1] - 918:6
**Watts** [1] - 904:10
**waves** [2] - 917:16, 917:18
**Wayne** [2] - 987:9, 987:9
**WAYNE** [2] - 886:23, 987:3
**ways** [2] - 908:7, 961:24
**wear** [1] - 914:19
**week** [2] - 919:25, 933:3
**weekend** [2] - 895:16, 895:25
**weeks** [5] - 911:18, 919:25, 920:1, 933:4, 971:5
**weight** [1] - 932:9
**Weisz** [1] - 890:7
**West** [1] - 903:19
**where'd** [1] - 906:14
**whoa** [1] - 930:8
**whole** [1] - 970:18
**willful** [1] - 891:11
**willing** [1] - 894:12
**WILLIS** [34] - 886:12, 893:22, 894:6, 934:15, 940:18, 941:2, 944:12, 944:17, 949:4, 955:21, 956:1, 959:23, 960:2, 963:22, 963:25, 964:3, 964:6, 964:11, 964:13, 965:25, 966:1, 974:1, 974:2, 976:2, 977:11, 977:14,

977:17, 978:9, 979:22, 980:11, 980:13, 981:8, 984:15, 985:14
**Willis** [7] - 893:21, 934:6, 934:14, 955:25, 959:22, 980:14, 985:11
**Winston** [1] - 886:20
**witness** [15] - 889:15, 894:8, 898:8, 902:12, 919:7, 921:14, 933:25, 935:19, 936:4, 949:6, 950:1, 956:3, 963:12, 963:17, 984:10
**WITNESS** [23] - 902:14, 935:15, 936:5, 937:1, 938:24, 945:13, 945:21, 945:23, 946:1, 946:3, 946:7, 946:9, 948:20, 948:22, 949:9, 950:3, 950:6, 950:9, 951:14, 951:16, 953:19, 965:22, 982:12
**Witness** [17] - 936:10, 936:25, 937:21, 938:13, 939:5, 940:1, 945:22, 946:2, 946:8, 948:21, 951:15, 951:21, 952:22, 953:18, 954:3, 954:6, 984:9
**witnesses** [2] - 894:8, 984:13
**woman** [1] - 930:24
**wonderful** [1] - 895:25
**word** [1] - 906:22
**words** [1] - 982:10
**workshops** [2] - 912:2, 912:6
**Wright** [7] - 890:25, 891:22, 899:23, 900:16, 924:1, 930:13, 975:7
**write** [1] - 959:12
**wrote** [3] - 891:25, 983:23, 983:25

**X**

**X's** [1] - 980:6
**x-ray** [1] - 913:14
**x-rays** [3] - 915:6,

915:9, 959:15

## Y

**y'all** [1] - 895:25
**Y.A** [4] - 889:1,
893:21, 893:13,
893:14
**Y.A.'s** [4] - 892:20,
893:2, 893:10,
893:12
**year** [8] - 893:1, 893:7,
903:5, 905:22,
907:6, 907:11,
907:13, 961:9
**years** [9] - 892:22,
893:4, 893:9, 904:8,
904:9, 906:4, 914:2,
957:5, 957:10
**York** [1] - 886:14
**yourself** [2] - 971:8,
975:5
**Yvonne** [3] - 950:16,
950:17, 951:6

## Z

**Zimmer** [1] - 967:10